# Exhibit A: Waukesha County Circuit Court Electronic Record

FILED
11-09-2020
Clerk of Circuit Court
Waukesha County
2020CV001583

**STATE OF WISCONSIN**  **CIRCUIT COURT**  **WAUKESHA**

Erica Brewer et al vs. Town of Eagle et al

**Electronic Filing Notice**

Case No. 2020CV001583
Class Code: Declaratory Judgment

TOWN OF EAGLE
820 E MAIN STREET
EAGLE WI 53119

Case number 2020CV001583 was electronically filed with/converted by the Waukesha County Circuit Court office. The electronic filing system is designed to allow for fast, reliable exchange of documents in court cases.

Parties who register as electronic parties can file, receive and view documents online through the court electronic filing website. A document filed electronically has the same legal effect as a document filed by traditional means. Electronic parties are responsible for serving non-electronic parties by traditional means.

You may also register as an electronic party by following the instructions found at **http://efiling.wicourts.gov/** and may withdraw as an electronic party at any time. There is a $20.00 fee to register as an electronic party.

If you are not represented by an attorney and would like to register an electronic party, you will need to enter the following code on the eFiling website while opting in as an electronic party.

**Pro Se opt-in code: 596b65**

Unless you register as an electronic party, you will be served with traditional paper documents by other parties and by the court. You must file and serve traditional paper documents.

Registration is available to attorneys, self-represented individuals, and filing agents who are authorized under Wis. Stat. 799.06(2). A user must register as an individual, not as a law firm, agency, corporation, or other group. Non-attorney individuals representing the interests of a business, such as garnishees, must file by traditional means or through an attorney or filing agent. More information about who may participate in electronic filing is found on the court website.

If you have questions regarding this notice, please contact the Clerk of Circuit Court at 262-548-7525.

Waukesha County Circuit Court
Date: November 9, 2020

GF-180(CCAP), 06/2017 Electronic Filing Notice §801.18(5)(d), Wisconsin Statutes
This form shall not be modified. It may be supplemented with additional material.
Case 2:20-cv-01820-JPS   Filed 12/09/20   Page 2 of 272   Document 1

**FILED**
**11-09-2020**
**Clerk of Circuit Court**
**Waukesha County**
**2020CV001583**

**STATE OF WISCONSIN**          **CIRCUIT COURT**          **WAUKESHA**

Erica Brewer et al vs. Town of Eagle et al          **Electronic Filing Notice**

Case No. 2020CV001583
Class Code: Declaratory Judgment

TOWN OF EAGLE TOWN BOARD
820 E MAIN STREET
EAGLE WI 53119

Case number 2020CV001583 was electronically filed with/converted by the Waukesha County Circuit Court office. The electronic filing system is designed to allow for fast, reliable exchange of documents in court cases.

Parties who register as electronic parties can file, receive and view documents online through the court electronic filing website. A document filed electronically has the same legal effect as a document filed by traditional means. Electronic parties are responsible for serving non-electronic parties by traditional means.

You may also register as an electronic party by following the instructions found at **http://efiling.wicourts.gov/** and may withdraw as an electronic party at any time. There is a $20.00 fee to register as an electronic party.

If you are not represented by an attorney and would like to register an electronic party, you will need to enter the following code on the eFiling website while opting in as an electronic party.

**Pro Se opt-in code: 596b65**

Unless you register as an electronic party, you will be served with traditional paper documents by other parties and by the court. You must file and serve traditional paper documents.

Registration is available to attorneys, self-represented individuals, and filing agents who are authorized under Wis. Stat. 799.06(2). A user must register as an individual, not as a law firm, agency, corporation, or other group. Non-attorney individuals representing the interests of a business, such as garnishees, must file by traditional means or through an attorney or filing agent. More information about who may participate in electronic filing is found on the court website.

If you have questions regarding this notice, please contact the Clerk of Circuit Court at 262-548-7525.

Waukesha County Circuit Court
Date: November 9, 2020

FILED
11-09-2020
Clerk of Circuit Court
Waukesha County
2020CV001583

**STATE OF WISCONSIN**        **CIRCUIT COURT**        **WAUKESHA**

Erica Brewer et al vs. Town of Eagle et al        **Electronic Filing Notice**

Case No. 2020CV001583
Class Code: Declaratory Judgment

DON MALEK
820 E MAIN STREET
TOWN OF EAGLE CHAIRMAN
EAGLE WI 53119

Case number 2020CV001583 was electronically filed with/converted by the Waukesha County Circuit Court office. The electronic filing system is designed to allow for fast, reliable exchange of documents in court cases.

Parties who register as electronic parties can file, receive and view documents online through the court electronic filing website. A document filed electronically has the same legal effect as a document filed by traditional means. Electronic parties are responsible for serving non-electronic parties by traditional means.

You may also register as an electronic party by following the instructions found at **http://efiling.wicourts.gov/** and may withdraw as an electronic party at any time. There is a $20.00 fee to register as an electronic party.

If you are not represented by an attorney and would like to register an electronic party, you will need to enter the following code on the eFiling website while opting in as an electronic party.

**Pro Se opt-in code: 596b65**

Unless you register as an electronic party, you will be served with traditional paper documents by other parties and by the court. You must file and serve traditional paper documents.

Registration is available to attorneys, self-represented individuals, and filing agents who are authorized under Wis. Stat. 799.06(2). A user must register as an individual, not as a law firm, agency, corporation, or other group. Non-attorney individuals representing the interests of a business, such as garnishees, must file by traditional means or through an attorney or filing agent. More information about who may participate in electronic filing is found on the court website.

If you have questions regarding this notice, please contact the Clerk of Circuit Court at 262-548-7525.

Waukesha County Circuit Court
Date: November 9, 2020

GF-180(CCAP), 06/2017 Electronic Filing Notice §801.18(5)(d), Wisconsin Statutes
This form shall not be modified. It may be supplemented with additional material.
Case 2:20-cv-01820-JPS   Filed 12/09/20   Page 4 of 272   Document 1

**FILED**
**11-09-2020**
**Clerk of Circuit Court**
**Waukesha County**
**2020CV001583**

| | | |
|---|---|---|
| **STATE OF WISCONSIN** | **CIRCUIT COURT** | **WAUKESHA** |

Erica Brewer et al vs. Town of Eagle et al

**Electronic Filing Notice**

Case No. 2020CV001583
Class Code: Declaratory Judgment

CHRIS MOMMAERTS
820 E MAIN STREET
TOWN OF EAGLE SUPERVISOR
EAGLE WI 53119

Case number 2020CV001583 was electronically filed with/converted by the Waukesha County Circuit Court office. The electronic filing system is designed to allow for fast, reliable exchange of documents in court cases.

Parties who register as electronic parties can file, receive and view documents online through the court electronic filing website. A document filed electronically has the same legal effect as a document filed by traditional means. Electronic parties are responsible for serving non-electronic parties by traditional means.

You may also register as an electronic party by following the instructions found at **http://efiling.wicourts.gov/** and may withdraw as an electronic party at any time. There is a $20.00 fee to register as an electronic party.

If you are not represented by an attorney and would like to register an electronic party, you will need to enter the following code on the eFiling website while opting in as an electronic party.

**Pro Se opt-in code: 596b65**

Unless you register as an electronic party, you will be served with traditional paper documents by other parties and by the court. You must file and serve traditional paper documents.

Registration is available to attorneys, self-represented individuals, and filing agents who are authorized under Wis. Stat. 799.06(2). A user must register as an individual, not as a law firm, agency, corporation, or other group. Non-attorney individuals representing the interests of a business, such as garnishees, must file by traditional means or through an attorney or filing agent. More information about who may participate in electronic filing is found on the court website.

If you have questions regarding this notice, please contact the Clerk of Circuit Court at 262-548-7525.

Waukesha County Circuit Court
Date: November 9, 2020

GF-180(CCAP), 06/2017 Electronic Filing Notice §801.18(5)(d), Wisconsin Statutes
This form shall not be modified. It may be supplemented with additional material.
Case 2:20-cv-01820-JPS   Filed 12/09/20   Page 5 of 272   Document 1

**STATE OF WISCONSIN**    **CIRCUIT COURT**    **WAUKESHA**

FILED
11-09-2020
Clerk of Circuit Court
Waukesha County
2020CV001583

Erica Brewer et al vs. Town of Eagle et al

**Electronic Filing Notice**

Case No. 2020CV001583
Class Code: Declaratory Judgment

STEVE MUTH
820 E MAIN STREET
TOWN OF EAGLE SUPERVISOR
EAGLE WI 53119

Case number 2020CV001583 was electronically filed with/converted by the Waukesha County Circuit Court office. The electronic filing system is designed to allow for fast, reliable exchange of documents in court cases.

Parties who register as electronic parties can file, receive and view documents online through the court electronic filing website. A document filed electronically has the same legal effect as a document filed by traditional means. Electronic parties are responsible for serving non-electronic parties by traditional means.

You may also register as an electronic party by following the instructions found at **http://efiling.wicourts.gov/** and may withdraw as an electronic party at any time. There is a $20.00 fee to register as an electronic party.

If you are not represented by an attorney and would like to register an electronic party, you will need to enter the following code on the eFiling website while opting in as an electronic party.

**Pro Se opt-in code: 596b65**

Unless you register as an electronic party, you will be served with traditional paper documents by other parties and by the court. You must file and serve traditional paper documents.

Registration is available to attorneys, self-represented individuals, and filing agents who are authorized under Wis. Stat. 799.06(2). A user must register as an individual, not as a law firm, agency, corporation, or other group. Non-attorney individuals representing the interests of a business, such as garnishees, must file by traditional means or through an attorney or filing agent. More information about who may participate in electronic filing is found on the court website.

If you have questions regarding this notice, please contact the Clerk of Circuit Court at 262-548-7525.

Waukesha County Circuit Court
Date: November 9, 2020

FILED
11-09-2020
Clerk of Circuit Court
Waukesha County
2020CV001583

**STATE OF WISCONSIN**          **CIRCUIT COURT**          **WAUKESHA**

Erica Brewer et al vs. Town of Eagle et al          **Electronic Filing Notice**

Case No. 2020CV001583
Class Code: Declaratory Judgment

JANICE SUHM
820 E MAIN STREET
TOWN OF EAGLE SUPERVISOR
EAGLE WI 53119

Case number 2020CV001583 was electronically filed with/converted by the Waukesha County Circuit Court office. The electronic filing system is designed to allow for fast, reliable exchange of documents in court cases.

Parties who register as electronic parties can file, receive and view documents online through the court electronic filing website. A document filed electronically has the same legal effect as a document filed by traditional means. Electronic parties are responsible for serving non-electronic parties by traditional means.

You may also register as an electronic party by following the instructions found at **http://efiling.wicourts.gov/** and may withdraw as an electronic party at any time. There is a $20.00 fee to register as an electronic party.

If you are not represented by an attorney and would like to register an electronic party, you will need to enter the following code on the eFiling website while opting in as an electronic party.

**Pro Se opt-in code: 596b65**

Unless you register as an electronic party, you will be served with traditional paper documents by other parties and by the court. You must file and serve traditional paper documents.

Registration is available to attorneys, self-represented individuals, and filing agents who are authorized under Wis. Stat. 799.06(2). A user must register as an individual, not as a law firm, agency, corporation, or other group. Non-attorney individuals representing the interests of a business, such as garnishees, must file by traditional means or through an attorney or filing agent. More information about who may participate in electronic filing is found on the court website.

If you have questions regarding this notice, please contact the Clerk of Circuit Court at 262-548-7525.

Waukesha County Circuit Court
Date: November 9, 2020

FILED
11-09-2020
Clerk of Circuit Court
Waukesha County
2020CV001583

**STATE OF WISCONSIN**    **CIRCUIT COURT**    **WAUKESHA**

Erica Brewer et al vs. Town of Eagle et al

**Electronic Filing Notice**

Case No. 2020CV001583
Class Code: Declaratory Judgment

DANIEL WEST
820 E MAIN STREET
TOWN OF EAGLE SUPERVISOR
EAGLE WI 53119

Case number 2020CV001583 was electronically filed with/converted by the Waukesha County Circuit Court office. The electronic filing system is designed to allow for fast, reliable exchange of documents in court cases.

Parties who register as electronic parties can file, receive and view documents online through the court electronic filing website. A document filed electronically has the same legal effect as a document filed by traditional means. Electronic parties are responsible for serving non-electronic parties by traditional means.

You may also register as an electronic party by following the instructions found at **http://efiling.wicourts.gov/** and may withdraw as an electronic party at any time. There is a $20.00 fee to register as an electronic party.

If you are not represented by an attorney and would like to register an electronic party, you will need to enter the following code on the eFiling website while opting in as an electronic party.

**Pro Se opt-in code: 596b65**

Unless you register as an electronic party, you will be served with traditional paper documents by other parties and by the court. You must file and serve traditional paper documents.

Registration is available to attorneys, self-represented individuals, and filing agents who are authorized under Wis. Stat. 799.06(2). A user must register as an individual, not as a law firm, agency, corporation, or other group. Non-attorney individuals representing the interests of a business, such as garnishees, must file by traditional means or through an attorney or filing agent. More information about who may participate in electronic filing is found on the court website.

If you have questions regarding this notice, please contact the Clerk of Circuit Court at 262-548-7525.

Waukesha County Circuit Court
Date: November 9, 2020

GF-180(CCAP), 06/2017 Electronic Filing Notice §801.18(5)(d), Wisconsin Statutes
This form shall not be modified. It may be supplemented with additional material.

Case 2:20-cv-01820-JPS   Filed 12/09/20   Page 8 of 272   Document 1

**FILED**
**11-09-2020**
**Clerk of Circuit Court**
**Waukesha County**
**2020CV001583**

**STATE OF WISCONSIN**          **CIRCUIT COURT**          **WAUKESHA**

Erica Brewer et al vs. Town of Eagle et al                **Electronic Filing Notice**

Case No. 2020CV001583
Class Code: Declaratory Judgment

MUNICIPAL LAW & LITIGATION GROUP, S.C.
730 N GRAND AVENUE
TOWN OF EAGLE ATTORNEY
WAUKESHA WI 53186

Case number 2020CV001583 was electronically filed with/converted by the Waukesha County Circuit Court office. The electronic filing system is designed to allow for fast, reliable exchange of documents in court cases.

Parties who register as electronic parties can file, receive and view documents online through the court electronic filing website. A document filed electronically has the same legal effect as a document filed by traditional means. Electronic parties are responsible for serving non-electronic parties by traditional means.

You may also register as an electronic party by following the instructions found at **http://efiling.wicourts.gov/** and may withdraw as an electronic party at any time. There is a $20.00 fee to register as an electronic party.

If you are not represented by an attorney and would like to register an electronic party, you will need to enter the following code on the eFiling website while opting in as an electronic party.

**Pro Se opt-in code: 596b65**

Unless you register as an electronic party, you will be served with traditional paper documents by other parties and by the court. You must file and serve traditional paper documents.

Registration is available to attorneys, self-represented individuals, and filing agents who are authorized under Wis. Stat. 799.06(2). A user must register as an individual, not as a law firm, agency, corporation, or other group. Non-attorney individuals representing the interests of a business, such as garnishees, must file by traditional means or through an attorney or filing agent. More information about who may participate in electronic filing is found on the court website.

If you have questions regarding this notice, please contact the Clerk of Circuit Court at 262-548-7525.

Waukesha County Circuit Court
Date: November 9, 2020

GF-180(CCAP), 06/2017 Electronic Filing Notice §801.18(5)(d), Wisconsin Statutes
This form shall not be modified. It may be supplemented with additional material.

Case 2:20-cv-01820-JPS   Filed 12/09/20   Page 9 of 272   Document 1

FILED
11-09-2020
Clerk of Circuit Court
Waukesha County
2020CV001583

**STATE OF WISCONSIN**          **CIRCUIT COURT**          **WAUKESHA**

Erica Brewer et al vs. Town of Eagle et al          **Electronic Filing Notice**

Case No. 2020CV001583
Class Code: Declaratory Judgment

---

MARTIN MONTOYA
820 E MAIN STREET
TOWN OF EAGLE BUILDING INSPECTOR
EAGLE WI 53119

Case number 2020CV001583 was electronically filed with/converted by the Waukesha County Circuit Court office. The electronic filing system is designed to allow for fast, reliable exchange of documents in court cases.

Parties who register as electronic parties can file, receive and view documents online through the court electronic filing website. A document filed electronically has the same legal effect as a document filed by traditional means. Electronic parties are responsible for serving non-electronic parties by traditional means.

You may also register as an electronic party by following the instructions found at **http://efiling.wicourts.gov/** and may withdraw as an electronic party at any time. There is a $20.00 fee to register as an electronic party.

If you are not represented by an attorney and would like to register an electronic party, you will need to enter the following code on the eFiling website while opting in as an electronic party.

**Pro Se opt-in code: 596b65**

Unless you register as an electronic party, you will be served with traditional paper documents by other parties and by the court. You must file and serve traditional paper documents.

Registration is available to attorneys, self-represented individuals, and filing agents who are authorized under Wis. Stat. 799.06(2). A user must register as an individual, not as a law firm, agency, corporation, or other group. Non-attorney individuals representing the interests of a business, such as garnishees, must file by traditional means or through an attorney or filing agent. More information about who may participate in electronic filing is found on the court website.

If you have questions regarding this notice, please contact the Clerk of Circuit Court at 262-548-7525.

Waukesha County Circuit Court
Date: November 9, 2020

**FILED**

**11-09-2020**

**Clerk of Circuit Court**

**Waukesha County**

**2020CV001583**

**STATE OF WISCONSIN**        **CIRCUIT COURT**        **WAUKESHA**

Erica Brewer et al vs. Town of Eagle et al                    **Electronic Filing Notice**

Case No. 2020CV001583
Class Code: Declaratory Judgment

TIM SCHWECKE
820 E MAIN STREET
TOWN OF EAGLE PLANNER AND ZONING ADMINISTRATOR
EAGLE WI 53119

Case number 2020CV001583 was electronically filed with/converted by the Waukesha County Circuit Court office. The electronic filing system is designed to allow for fast, reliable exchange of documents in court cases.

Parties who register as electronic parties can file, receive and view documents online through the court electronic filing website. A document filed electronically has the same legal effect as a document filed by traditional means. Electronic parties are responsible for serving non-electronic parties by traditional means.

You may also register as an electronic party by following the instructions found at **http://efiling.wicourts.gov/** and may withdraw as an electronic party at any time. There is a $20.00 fee to register as an electronic party.

If you are not represented by an attorney and would like to register an electronic party, you will need to enter the following code on the eFiling website while opting in as an electronic party.

**Pro Se opt-in code: 596b65**

Unless you register as an electronic party, you will be served with traditional paper documents by other parties and by the court. You must file and serve traditional paper documents.

Registration is available to attorneys, self-represented individuals, and filing agents who are authorized under Wis. Stat. 799.06(2). A user must register as an individual, not as a law firm, agency, corporation, or other group. Non-attorney individuals representing the interests of a business, such as garnishees, must file by traditional means or through an attorney or filing agent. More information about who may participate in electronic filing is found on the court website.

If you have questions regarding this notice, please contact the Clerk of Circuit Court at 262-548-7525.

Waukesha County Circuit Court
Date: November 9, 2020

GF-180(CCAP), 06/2017 Electronic Filing Notice §801.18(5)(d), Wisconsin Statutes
This form shall not be modified. It may be supplemented with additional material.

Case 2:20-cv-01820-JPS   Filed 12/09/20   Page 11 of 272   Document 1-2

FILED
11-09-2020
Clerk of Circuit Court
Waukesha County
2020CV001583

| STATE OF WISCONSIN | CIRCUIT COURT | WAUKESHA COUNTY |
| --- | --- | --- |

PLAINTIFFS

Erica Brewer
W367 S9594 South Road
Eagle, WI 53119-1571

Case No.: _____
Case Codes: <u>30701, 30704, 30301</u>

Zachary Mallory
W367 S9594 South Road
Eagle, WI 53119-1571

Plaintiffs,

v.

DEFENDANTS

Town of Eagle
820 E. Main St.
Eagle, WI 53119

Town of Eagle Town Board
820 E. Main St.
Eagle, WI 53119

Don Malek, in his official capacity as
Chairman of the Town Board
820 E. Main St.
Eagle, WI 53119

FILED
11-09-2020
Clerk of Circuit Court
Waukesha County
2020CV001583

Chris Mommaerts, in her official capacity as
Supervisor on the Town Board
820 E. Main St.
Eagle, WI 53119

Steve Muth, in his official capacity as
Supervisor on the Town Board
820 E. Main St.
Eagle, WI 53119

Janis Suhm, in her official capacity as
Supervisor on the Town Board
820 E. Main St.
Eagle, WI 53119

Daniel West, in his official capacity as
Supervisor on the Town Board
820 E. Main St.
Eagle, WI 53119

Municipal Law & Litigation Group, S.C.
in its official capacity as Town Attorney
730 N. Grand Ave.,
Waukesha WI 53186

Martin Montoya, in his official capacity as
Town Building Inspector
820 E. Main St.
Eagle, WI 53119

Tim Schwecke, in his official capacity as
Town Planner and Zoning Administrator
820 E. Main St.
Eagle, WI 53119

                        Defendants.

2

FILED
11-09-2020
Clerk of Circuit Court
Waukesha County
2020CV001583

## SUMMONS

THE STATE OF WISCONSIN, To each person named above as a Defendant:

You are hereby notified that the Plaintiffs named above have filed a lawsuit against you. The complaint, which is attached, states the nature and basis of the legal action.

Within twenty (20) days of receiving this summons, you must respond with a written answer, as that term is used in chapter 802 of the Wisconsin Statutes, to the complaint. The court may reject or disregard an answer that does not follow the requirements of the statutes. The answer must be sent or delivered to the court, whose address is:

> Clerk of the Circuit Court for Waukesha County
> Waukesha County Courthouse
> 515 W. Moreland Blvd.
> Waueksha, WI 53188

and to Michael Van Kleunen, Plaintiffs' attorney, whose address is:

> Michael Van Kleunen
> CRAMER, MULTHAUF & HAMMES, LLP
> 1601 East Racine Ave., Ste. 200
> Waukesha, WI 53186

Plaintiffs also request that you please send copies of your answer to Plaintiffs' lead counsel—Kirby West, Marie Miller, and Alexa Gervasi—whose pro hac vice applications are currently forthcoming. Their addresses are:

3

Kirby West
Marie Miller
Alexa Gervasi
INSTITUTE FOR JUSTICE
901 N. Glebe Suite, Suite 900
Arlington, VA 22203

You may have an attorney help or represent you.

If you do not provide a proper answer within twenty (20) days, the court may grant judgment against you for the award of money or other legal action requested in the complaint, and you may lose your right to object to anything that is or may be incorrect in the complaint. A judgment may be enforced as provided by law.

Dated this 9th day of November, 2020.

|  | Electronically signed by Michael Van Kleunen |
|---|---|
| Kirby West* (Pa. Bar No. 321371) | Michael Van Kleunen |
| Marie Miller* (Ind. Bar No. 34591-53) | (Wis. Bar No. 1113958) |
| Alexa Gervasi* (D.C. Bar No. 1500433) | CRAMER, MULTHAUF & HAMMES, LLP |
| INSTITUTE FOR JUSTICE | 1601 East Racine Ave., Ste. 200 |
| 901 N. Glebe Suite, Suite 900 | Waukesha, WI 53186 |
| Arlington, VA 22203 | (262) 542-4278 |
|  | mvk@cmhlaw.com |
| *Lead counsel for Plaintiffs; Pro Hac Vice Applications Forthcoming* | *Local Counsel for Plaintiffs* |

4

FILED
11-09-2020
Clerk of Circuit Court
Waukesha County
2020CV001583

| STATE OF WISCONSIN | CIRCUIT COURT | WAUKESHA COUNTY |
| --- | --- | --- |

PLAINTIFFS

Erica Brewer
W367 S9594 South Road
Eagle, WI 53119-1571

Zachary Mallory
W367 S9594 South Road
Eagle, WI 53119-1571

Case No.: _____

Case Codes: <u>30701, 30704, 30301</u>

Plaintiffs,

v.

DEFENDANTS

Town of Eagle
820 E. Main St.
Eagle, WI 53119

Town of Eagle Town Board
820 E. Main St.
Eagle, WI 53119

Don Malek, in his official capacity as
Chairman of the Town Board
820 E. Main St.
Eagle, WI 53119

FILED
11-09-2020
Clerk of Circuit Court
Waukesha County
2020CV001583

Chris Mommaerts, in her official capacity as
Supervisor on the Town Board
820 E. Main St.
Eagle, WI 53119

Steve Muth, in his official capacity as
Supervisor on the Town Board
820 E. Main St.
Eagle, WI 53119

Janis Suhm, in her official capacity as
Supervisor on the Town Board
820 E. Main St.
Eagle, WI 53119

Daniel West, in his official capacity as
Supervisor on the Town Board
820 E. Main St.
Eagle, WI 53119

Municipal Law & Litigation Group, S.C.,
in its official capacity as Town Attorney
730 N. Grand Ave.,
Waukesha WI 53186

Martin Montoya, in his official capacity as
Town Building Inspector
820 E. Main St.
Eagle, WI 53119

Tim Schwecke, in his official capacity as
Town Planner and Zoning Administrator
820 E. Main St.
Eagle, WI 53119

                                        Defendants.

2

FILED
11-09-2020
Clerk of Circuit Court
Waukesha County
2020CV001583

**CIVIL RIGHTS COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

## INTRODUCTION

1.    This is a civil-rights lawsuit to vindicate the constitutional rights of Erica Brewer and Zachary Mallory (the "Mallorys") to speak freely without retribution from their local government and to be protected from a deprivation of their property without due process of law. The Town of Eagle and its Town Board have implemented a policy or custom of retaliating and discriminating against property owners, such as the Mallorys, by selectively enforcing Town ordinances against them—and not other violators of the ordinances—for speaking out against Town officials' exercise of authority. The United States Constitution unequivocally prohibits this selective enforcement. To make matters worse, the Town has deprived the Mallorys of their right to due process by (1) implementing its selective-enforcement practice through individuals who have an improper financial interest in the enforcement proceedings; (2) demanding that the Mallorys either raze certain structures and utility lines on their property or pay punitive permit fees based on the mere fact that the Town cannot locate existing permits in its own records; and (3) imposing fines based on unconfirmed allegations of ordinance violations. The Mallorys are entitled to declaratory and injunctive relief, as well as nominal damages, to redress these constitutional violations and to restore the Mallorys' rights to free speech and enjoyment of their property.

## JURISDICTION AND VENUE

2.    The Mallorys bring this civil-rights lawsuit under the First Amendment to the U.S. Constitution; the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution; the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution; and the Civil Rights Act of 1871, Rev. Stat. § 1979, as amended, 42 U.S.C. § 1983.

3.    The Mallorys seek declaratory and injunctive relief, as well as nominal damages, under Wis. Stat. §§ 806.04 and 813.01 to redress past harms that Defendants have caused and to enjoin future harms that Defendants continue to cause by selectively enforcing Town ordinances based on the Mallorys' protected speech and by depriving the Mallorys of their right to due process of law.

4.    This Court has jurisdiction under Wis. Stat. §§ 753.03 and 801.04.

5.    Venue is proper in this Court pursuant to Wis. Stat. §§ 801.50(2)(a)-(b) and 227.40(1).

## PARTIES

6.    Erica Brewer and Zachary Mallory are a married couple and the owners of the property located at W367 S9594 South Road, Eagle, Wisconsin 53119-1571 (the "Farm"). They have been threatened with fines and fees for alleged violations on that property; those threats are the subject of this lawsuit.

4

7.    Defendant Town of Eagle (the "Town") is a municipality in Waukesha County, Wisconsin. This case concerns unconstitutional ordinance-enforcement policies or customs instituted by the Town and implemented by the Town's officials.

8.    Defendant Town of Eagle Town Board (the "Town Board") was created by the Town in accordance with Wis. Stat. § 60.10 and is authorized to, among other things, determine whether to investigate, pursue, and enforce ordinance violations against residents of the Town, including the Mallorys.

9.    Defendant Don Malek is named in his official capacity as the Chairman of the Town Board. In this role, he is a policymaker for the Town and votes on whether to investigate, pursue, and enforce ordinance violations, including those that are the subject of this lawsuit.

10.    Defendant Chris Mommaerts is named in her official capacity as a Supervisor on the Town Board. In this role, she is a policymaker for the Town and votes on whether to investigate, pursue, and enforce ordinance violations, including those that are the subject of this lawsuit.

11.    Defendant Steve Muth is named in his official capacity as a Supervisor on the Town Board. In this role, he is a policymaker for the Town and votes on whether to investigate, pursue, and enforce ordinance violations, including those that are the subject of this lawsuit.

5

12.     Defendant Janis Suhm is named in her official capacity as a Supervisor on the Town Board. In this role, she is a policymaker for the Town and votes on whether to investigate, pursue, and enforce ordinance violations, including those that are the subject of this lawsuit.

13.     Defendant Daniel West is named in his official capacity as a Supervisor on the Town Board. In this role, he is a policymaker for the Town and votes on whether to investigate, pursue, and enforce ordinance violations, including those that are the subject of this lawsuit.

14.     Defendants Malek, Mommaerts, Muth, Suhm, and West are collectively referred to as the "Board Members."

15.     Defendant Municipal Law & Litigation Group, S.C. ("Municipal Law Group") is a law firm hired by the Town to enforce ordinance violations. Municipal Law Group is named in its official capacity as Town Attorney. This lawsuit concerns the unconstitutionality of Municipal Law Group's financial interest in investigating, pursuing and enforcing or threatening to enforce ordinance violations.

16.     Defendant Martin Montoya is named in his official capacity as the Town Building Inspector. This lawsuit concerns the unconstitutionality of Montoya's financial interest in the Town's inspection, pursuit, and enforcement of ordinance violations.

17.     Defendant Tim Schwecke is named in his official capacity as the Town Planner and Zoning Administrator. This lawsuit concerns the unconstitutionality of

6

Schwecke's financial interest in the Town's investigation, pursuit, and enforcement of ordinance violations.

## STATEMENT OF FACTS

### THE MALLORYS AND THEIR ENJOYMENT OF THE FARM

18.     Plaintiff Erica Brewer is an operating-room nurse specializing in cardiothoracic procedures.

19.     Plaintiff Zachary Mallory is a cyber-security specialist and veteran of the United States Coast Guard.

20.     In 2016, the Mallorys purchased their Farm with intention of creating a stable family business that would generate enough income to provide for the and to enable them to retire early from their outside professions. For the Mallorys, farming is not simply a hobby; it is a business and a way of life.

21.     The Farm is a 3.8-acre property, upon which the Mallorys maintain a house, barn, chicken coop, and sixteen beehives.

22.     The house, barn, and water and electrical lines were built and installed on the Farm at or around the same time in 1997, long before the Mallorys purchased the property.

23.     At the time of purchase, the Mallorys were assured that the house, barn, and original utility lines were properly permitted. They continue to be unaware of any

7

evidence that either the house or the barn were built, or the original utilities were installed, without the required permits.

24.　　When the Mallorys purchased their Farm, it was zoned as "Agricultural 3"; however, the Town unexpectedly rezoned the property to "Rural Residential" in 2017, limiting the Mallorys' ability to engage in agricultural activities under the Town's Zoning Code.

25.　　Despite the rezoning, the Mallorys are allowed to utilize their property for limited agricultural uses. And because of Mr. Mallory's service in the armed forces, their Farm is recognized as a Veteran Farm by the Farmer Veteran Coalition, and the Mallorys are certified members of the Coalition's Homegrown by Heroes program.

26.　　The Mallorys' farming activities provide an important source of income for their family.

27.　　Prior to Defendants' actions at issue in this case, the Farm housed a farm stand, from which the Mallorys sold fresh vegetables, eggs, poultry, and other products to their neighbors, allowing neighbors to leave payment for their purchases on an honor system.

28.　　On information and belief, Board Members and their families regularly purchased products from the Mallorys' farm stand.

29.　　In addition to growing fresh produce, raising laying hens, and preparing organic poultry, the Mallorys conscientiously and humanely extract honey and beeswax

8

from their beehives for jarring and to create hot sauce, lip balm, reusable food wraps, and other products.

30.    The Mallorys, with proper permits and licenses, sell their products at local farmers' markets.

31.    During the COVID-19 pandemic, the Mallorys have exercised all necessary precautions to ensure the safety of themselves and their customers.

32.    Because of the Farm's status as a Veteran Farm and its value to the community, country-music star Brantley Gilbert selected the Mallorys to provide food from their farm during his tour stop in southeastern Wisconsin as part of a Homegrown by Heroes program.

33.    The Mallorys' long-term dream is to offer Mallory Meadows as a haven for veterans to experience nature and engage in therapeutic farming and beekeeping.

34.    Defendants' actions that are the subject of this lawsuit have threatened the Mallorys' long-term plans for their property, including their plans for retirement.

### DEFENDANTS' ORDINANCE INVESTIGATION AND ENFORCEMENT PRACTICES

35.    According to the Town's written policy, the Town may investigate and enforce ordinance violations only in response to written complaints submitted by residents alleging their neighbors are non-compliant with Town ordinances. The terms "ordinance" or "ordinances," as used herein, include the Town of Eagle's Zoning Code,

9

the Town of Eagle's Municipal Code, the Town of Eagle's Building Code, and other civil ordinances enforced through proceedings before the Town Board.

36.     According to the Town's written policy, complainants may submit complaints anonymously after speaking with a Board Member and requesting that the Board Member write and sign the complaint on the complainants' behalf.

37.     According to the Town's written policy, all complaints must be signed by the Town Chairman and forwarded to the Town Clerk before a site inspection may occur.

38.     On information and belief, Defendants do not follow their written policy in all circumstances.

39.     On information and belief, Defendants selectively investigate and enforce violations even if they have not received a neighbor complaint.

40.     On information and belief, Defendants draft and sign certain "anonymous" complaints, though they have not received a complaint from a neighbor of the allegedly non-compliant resident.

41.     On information and belief, Defendants at times direct neighbors of specific residents to lodge complaints, giving the appearance of compliance with the Town's stated enforcement procedures.

42.     According to the Town's written policy, the Town Clerk must forward complaints to the Zoning Administrator and/or Building Inspector who then performs an

10

on-site inspection and notes instances of non-compliance with photographs and references to the violated ordinance.

43.    According to the Town's written policy, if the Zoning Administrator and/or Building Inspector identifies violations, he must give notice of the violations to the non-compliant resident, providing the resident thirty days to come into compliance.

44.    On information and belief, despite this written policy, the Town and Town Board retroactively impose, or threaten to impose, fines for violations even if the resident comes into compliance within the thirty-day compliance period.

45.    Pursuant to the Town's written policy, residents, after making "substantial progress" toward compliance, may appear before the Town Board to request a thirty-day extension.

46.    On information and belief, the Town Board will, in its sole discretion, grant some residents additional extensions.

47.    Pursuant to the Town's written policy, the Zoning Administrator and/or Building Inspector conducts a follow-up inspection after expiration of the time the Town allotted for coming into compliance.

48.    On information and belief, the Zoning Administrator, Building Inspector, and/or Town Attorney at times conduct additional inspections between providing notice of non-compliance and the deadline for compliance, occasionally without either receiving

11

the property owner or occupant's consent for the inspection or obtaining a warrant, though additional inspections are not provided for in the Town's written policy.

49.    On information and belief, the Zoning Administrator, Building Inspector, and/or Town Attorney at times conduct additional inspections after the resident has come into compliance, occasionally without either receiving the property owner or occupant's consent for the inspection or obtaining a warrant, though additional inspections are not provided for in the Town's written policy.

50.    According to the Town's written procedures, if the resident has failed to come into compliance after their time limit has expired, the Zoning Administrator and/or Building Inspector forwards the matter to the Town Attorney for a citation to be issued.

51.    However, based on information and belief, the Town Attorney is often made aware of, and begins communicating with, the non-compliant resident before the time limit for coming into compliance has expired.

52.    According to the Town's written policy, if a resident's property returns to non-compliance within six months of coming into compliance, the Town Attorney might issue a citation or commence a civil action without first providing the resident with notice of the new violation.

53.    Though it is not provided for in the Town's written policy, members of the Town Board generally vote on whether to either pursue fines and fees for violations or to dismiss the allegations and findings of non-compliance.

54.    The Town contracts with Defendant Schwecke, principal of Civi Tek Consulting, LLC, to serve as Zoning Administrator and Town Planner.

55.    Schwecke is paid hourly—$75.00 per hour—for investigating, pursuing, and enforcing violations, including communicating with residents regarding alleged violations and providing instructions for how to come into compliance.

56.    On information and belief, Schwecke receives additional financial compensation for identifying and enforcing violations.

57.    On information and belief, Schwecke advises the Town of additional ordinances that he believes the Town should pass, and he is then compensated for enforcing those ordinances.

58.    On information and belief, Schwecke's fees for investigating, pursuing, and enforcing violations are paid by residents against whom violations are found, either through the fines imposed for the violations or through separate fees.

59.    The Town contracts with Defendant Montoya, a building inspector with SafeBuilt, Inc., to serve as Town Building Inspector.

60.    On information and belief, Montoya is paid on an hourly basis for investigating complaints and enforcing violations, including communicating with residents regarding alleged violations and providing instructions for how to come into compliance.

13

61.　　On information and belief, Montoya receives additional financial compensation for identifying and enforcing violations.

62.　　On information and belief, Montoya's fees for investigating, pursuing, and enforcing violations are paid by residents against whom violations are found, either through fines imposed for the violations or through separate fees.

63.　　The Town contracts with Municipal Law Group to serve as Town Attorney.

64.　　On information and belief, Municipal Law Group is paid on an hourly basis for all work related to enforcing Town ordinances, including conducting inspections, deciding whether to bring enforcement actions, negotiating with residents, attending Town Board meetings related to ordinance violations, and prosecuting violations.

65.　　Though Municipal Law Group does not have the authority to determine whether ordinance violations exist, it will conduct inspections of residents' property without the presence of the Zoning Administrator or Building Inspector.

66.　　Municipal Law Group has no authority under the Town's written policy to conduct an inspection.

67.　　On information and belief, in its bills to the Town and/or the non-compliant resident, Municipal Law Group includes charges for the time spent conducting inspections.

14

68.    On information and belief, Municipal Law Group's fees for investigating, pursuing, and enforcing violations are paid by residents against whom violations are found, either through the fines imposed for the violations or through separate fees.

69.    On information and belief, with Municipal Law Group's advice and counsel, the Town Board has enacted extensive ordinances to facilitate more aggressive enforcement and fine and fee recovery.

70.    On information and belief, many in-town attorneys will not represent residents in enforcement proceedings for fear of retribution, resulting in many residents participating or defending themselves in enforcement proceedings without legal counsel.

71.    On information and belief, Municipal Law Group exercises broad discretion and makes critical decisions, including whether to negotiate out-of-court resolutions, negotiation tactics, and fine and fee amounts.

72.    The Town does not have neutral government attorneys without personal financial incentives to communicate with residents, make settlement decisions, or consider, advise on, or oversee enforcement actions.

73.    Residents are given no opportunity to discuss their violations with neutral government attorneys who do not have a financial stake in the outcome of the enforcement action.

74.    On information and belief, if residents attempt to discuss their violations with Municipal Law Group, Schwecke, or Montoya, these Defendants will either directly

15

bill the resident for the time spent discussing the matter or they will bill the Town, who then passes the bill through to the resident.

75.    On information and belief, Municipal Law Group assists the Town in ensuring that residents—instead of the Town—ultimately pay the bills for Municipal Law Group's, Schwecke's, and Montoya's fees.

76.    On information and belief, Municipal Law Group assisted the Town in creating a cost reimbursement agreement, which the Town—often through Municipal Law Group—demands residents sign before an enforcement action can be resolved.

77.    In meetings and in communications to the Mallorys, Board Members have acknowledged that Municipal Law Group and Schwecke charge "excessive," and occasionally duplicative, fees.

78.    On information and belief, Municipal Law Group, Schwecke, and Montoya may at times exercise ultimate control over enforcement decisions.

### The Mallorys' Speech and the Town's Retaliation

79.    After learning that the Town used its enforcement policy to impede a neighbor's ability to run a small horse-farm business on their property, the Mallorys began speaking up at town meetings and on social media, questioning the propriety of the Town Board's actions.

16

80.    The Mallorys have made open records requests for documents and regularly attempt to communicate with members of the Town Board and the Town Clerk regarding whether the Town Board is following the law and proper procedures.

81.    The Mallorys have been respectful, but persistent, in questioning and calling attention to the Town Board's practices and exercise of authority.

82.    On or about May 15, 2020, Defendant Town Chairman Malek either received or himself created an anonymous complaint alleging that the Mallorys and their Farm were in violation of numerous Town ordinances.

83.    By letter dated May 19, 2020, Schwecke informed the Mallorys that a complaint had been lodged against them for unspecified allegations of ordinance violations.

84.    Schwecke's May 19 letter expressly noted that the Town had "not determined if there [was] merit to the complaint or not."

85.    After requests by the Mallorys, Schwecke provided them with a copy of the anonymous complaint on May 26, eleven days after the complaint was submitted. It alleged that the Mallorys:

a.  Were running a retail business from the Farm and promoting the Farm on social media as a pick-up location for community supported agriculture;

b.  Had excess grazing animals per acre and were announcing, via social media, their intention to sell meat to the public;

17

    c.  Had unconfined poultry and "possible" excess poultry;

    d.  Kept livestock in an accessory building fewer than fifty feet from a lot line;

    e.  Had an excess number of accessory buildings;

    f.  Had constructed or expanded accessory buildings without a permit; and

    g.  Had an outdoor wood burning stove too close to their residence.

86.    On or about June 18, 2020, Schwecke and Montoya conducted an on-site inspection of the Farm pursuant to a special inspection warrant.

87.    By letter dated June 30, 2020, Schwecke and Montoya informed the Mallorys that numerous violations had been identified on their property, including:

    a.  Having too many detached accessory buildings, including a prohibited soft-sided structure;

    b.  Having an unpermitted hot tub;

    c.  Operating a home business without a permit;

    d.  Having too many livestock;

    e.  Housing livestock in a structure within fifty feet of the Mallorys' lot line;

    f.  Failing to properly maintain property by keeping farming equipment and construction materials outside and having tufts of grass or weeds taller than twelve inches;

    g.  Building "something" on their second-floor deck without a permit;

    h.  Having unpermitted water and electrical lines running to their barn; and

18

i.  Failing to complete accessory buildings, evidenced by the sight of plywood on the roof.

88.     On information and belief, none of the cited violations created a health or safety risk for the Mallorys, their neighbors, or the Town.

89.     On information and belief, Defendants do not enforce many of these violations, or similar violations, against similarly situated residents, including the Board Members themselves, who do not speak out against the Town Board.

90.     On information and belief, Defendants do not conduct investigations, even after receiving a written complaint, of Board Members' properties or the properties of Board Members' friends and families.

91.     On information and belief, Defendants conduct less thorough investigations on the properties of similarly situated residents who do not speak out against the Town Board, reducing the chance of identifying the violations alleged in complaints.

92.     Schwecke and Montoya provided the Mallorys with instructions for how to remedy some of the alleged violations and informed the Mallorys that failure to remedy all violations would result in the Town pursuing legal action and the imposition of an undisclosed monetary penalty.

19

93.     Schwecke and Montoya instructed the Mallorys to direct their questions regarding the property maintenance ordinance and building code to Montoya and to direct their questions regarding the zoning code to Schwecke.

94.     In response to these threats of unspecified fines, the Mallorys hired the below-signed attorney, Mr. Van Kleunen, for guidance and took steps to bring the Farm into compliance.

95.     Because in-town attorneys are dissuaded from representing residents, the Mallorys had to seek legal counsel from outside their immediate geographical area. Mr. Van Kleunen is not a resident of the Town of Eagle, and his law firm, Cramer, Multhauf, & Hammes, LLP, is located in Waukesha, Wisconsin, approximately twenty miles from the Town of Eagle.

96.     Between June 30, 2020 and October 5, 2020, the Mallorys—either personally or through their attorney—communicated regularly with Defendants about the Mallorys' efforts to come into compliance, to seek clarification regarding why certain ordinances were being enforced against them, and to accommodate Defendants' requests for follow-up site visits.

97.     During this time, the Mallorys received conflicting information from Schwecke, Montoya, and Municipal Law Group regarding what steps the Mallorys needed to take to come into compliance and which violations would be enforced by the Town, increasing costs and drawing out the enforcement proceedings.

20

98.    On October 2, 2020, after a follow-up site inspection, Montoya informed the Mallorys that they must apply for quadruple-fee permits to bring their barn and water line into compliance with the requirement that such structures and features must be permitted. Montoya insisted on requiring these quadruple-fee permits despite the Mallorys' reliable representations that the barn and water line have been on the property since 1997 and were installed with proper permits.

99.    Despite receiving conflicting advice from Schwecke, Montoya, and Municipal Law Group regarding how to come into compliance, the Mallorys took significant steps to resolve their violations, including closing and tearing down their farm stand, making arrangements to slaughter their excess livestock, razing their greenhouse, removing equipment and building materials from their property, and cutting their grass where necessary.

100.    The Mallorys did not want to take any of these compliance steps.

101.    The Mallorys want their farm stand—which they purchased—on the Farm.

102.    The Mallorys want to be able to sell produce, poultry, eggs, honey, and other products from the Farm—which they are authorized to do by the State of Wisconsin.

103.    The Mallorys want to have the greenhouse—which they purchased—on the Farm.

21

104.    In addition to taking these undesired steps to come into compliance, the Mallorys also filed an open records request for copies of the permits related to their Farm, as the Town is responsible for maintaining records of these permits; however, the Town claimed it did not have any permit records related to the Mallorys' house, barn, or original utility lines.

105.    On October 5, 2020, the Mallorys provided the Town Board with an update on their substantial progress, requested an extension on their deadline to comply, and requested that the Town Board not pursue certain alleged violations due to the Mallorys' belief that they were inapplicable.

106.    The Town Board considered the Mallorys' request in a closed-door session.

107.    By letter dated October 9, 2020 (the "October 9 Letter"), Municipal Law Group, through its representative Paul Alexy, responded to the Mallorys' requests, accusing the Mallorys of an "apparent lack of effort to address the multiple violations" identified by Schwecke and Montoya on June 30, 2020, and further informing the Mallorys, on behalf of the Town Board, that:

> a.  Despite Schwecke's previous instructions, the Mallorys were required to fully remove their entire hot tub, not just the wood-burning heating device, by October 31, 2020;
>
> b.  Despite Schwecke and Montoya's original contention that the Mallorys could keep their tarp shed as long as it was built before March 28, 2017—

22

which it was—the Mallorys were required to remove their tarp shed by October 31, 2020;

c.  The Mallorys remained in violation of property maintenance requirements due to a "vast amount of outside storage" and that the Mallorys were required to come into compliance by October 31, 2020;

d.  The Mallorys were required to either remove the flower shelf from their second-floor balcony or obtain a permit by October 31, 2020;

e.  The Mallorys were required to obtain a permit for the water line to their barn by October 31, 2020;

f.  The Mallorys were required to remove all but two of their beehives by October 31, 2020;

g.  The Mallorys would *only* be granted an extension for slaughtering their excess livestock—to accommodate the butcher's first available appointment—*if* the Mallorys satisfied all other conditions set forth in the letter;

h.  Despite Schwecke's suggestion to the Mallorys otherwise, it is irrelevant that the Town is considering changes to its ordinance to allow structures that house animals within fifty feet of lot lines was irrelevant, and the Mallorys would *only* be excused from razing the housing structure *if* the

23

Mallorys satisfied all other conditions set forth in the letter, applied for a permit for the exception, and paid all permit fees;

i.  The Town would not charge the threatened fees *only if* the Mallorys "sign[ed] a reimbursement agreement with the Town to demonstrate their agreement to reimburse the Town for its costs and expenses in addressing the violations";

j.  If the Mallorys failed to comply with all of the terms set forth in the letter, the Town would pursue fines and fees for each day of each violation, beginning on the date of the anonymous complaint, amounting to undefined "forfeitures in the area of $20,000."

108.    In September of 2020, the Town passed an ordinance limiting properties of less than four acres to two beehives. The Town thereafter added the Mallorys' beehives, which Montoya observed in one of his follow-up inspections, to the list of the Mallorys' violation, as expressed in the October 9 Letter.

109.    After receiving the October 9 Letter, and in response to the threatened fines, the Mallorys additionally removed their tarp shed, which they used to store farming equipment. As with the other changes the Mallorys have been forced to make to their Farm, they did not want remove the tarp shed—which they purchased—and they want to reinstall the structure on the Farm.

24

110.    The Mallorys do not want to remove the hot tub from their property, which, without the heating unit that has been removed, is not in violation of a Town ordinance.

111.    The Mallorys do not want to remove their beehives. The honey and beeswax gathered from the beehives, and the products made from the honey and wax, provide an essential source of income for the Mallorys.

112.    The Mallorys have repeatedly requested that the Town and Town Board inform them of the amount of the costs, or an approximation thereof, that they will be responsible for if they sign the cost reimbursement agreement. To date the Town and Town Board have not provided the Mallorys this information or any documents that would aid the Mallorys in understanding what costs they might face.

113.    The amount of the costs the Mallorys will be responsible for if they sign the reimbursement agreement is a critical consideration in whether they will sign and, therefore, will satisfy the requirements set forth in the October 9 Letter.

114.    Though this cost-liability information is critical to the Mallorys' ability to make an informed decision, the Town and Town Board have not extended the Mallorys' deadline to comply with the October 9 Letter—including the requirement that the Mallorys sign the reimbursement agreement—to account for the Town's failure to provide this information.

115.    Following bouts of rain and snow during the week of the Mallorys' October 31 deadline, the Mallorys requested an additional two weeks, until November 15, 2020,

25

to consider the conditions set forth in the October 9 letter and to take additional steps toward compliance.

116.    Municipal Law Group, through its representative Paul Alexy, initially responded to the request by suggesting that the Town Board *might* consider granting the extension at their next Town meeting (scheduled for November 2, 2020, two days after the October 31 deadline).

117.    Mere hours later, and before receiving a response from the Mallorys, Municipal Law Group, through its representative Paul Alexy, sent a follow-up response (the "October 26 Letter"). The response proclaimed that, even though Alexy did not have discretion to extend or modify the offer set forth in his October 9 letter, his impression "[q]uite frankly . . . is that it is unlikely that [the Mallorys'] request would be granted." Alexy realleged that—despite the Mallorys' destruction of their farming structures, arrangements to slaughter their livestock, movement of their livestock to be at least fifty feet from the lot line, and efforts to remove their outside storage and farming equipment—the Mallorys had not made "a concerted effort to bring the property into compliance."

118.    Alexy closed the October 26 Letter by informing the Mallorys that, though the Town Board had not considered or voted on the Mallorys' request for an extension, the Mallorys should consider the October 31 deadline to remain in effect. He also

informed them, for the first time, that the Town wanted to again reinspect the Mallorys'
property on November 2, 2020.

119.    Though the October 26 Letter noted that the Town sought reinspection on
November 2, 2020, the letter also claimed that the Town Board had to cancel its previously
scheduled November 2 meeting and could not make the time to consider the Mallorys'
request for an extension because of the upcoming election.

120.    Municipal Law Group, through its representative Paul Alexy, ultimately
reinspected the Mallory's Farm on November 6, 2020.

121.    Between June 18 and the filing of this complaint, Schwecke, Montoya,
and/or Municipal Law Group have made five separate visits to the Mallorys' property,
regularly changing their instructions regarding what steps the Mallorys needed to take
to come into compliance.

122.    On information and belief, Schwecke, Montoya, and/or Municipal Law
Group have billed or will bill hourly fees for each visit, with the intention of charging, or
with the understanding that the Town will charge, those fees to the Mallorys.

123.    On the basis of the October 9 Letter, the Mallorys now face the threat of
either (1) agreeing to pay Schwecke, Montoya, and Municipal Law Group an undisclosed
amount for their visits to the Farm, communications with the Mallorys and the Town
Board, meeting attendance, ever-changing compliance guidance, and other fees; or
(2) facing non-itemized, non-specified "forfeitures in the area of $20,000," calculated from

27

the date of the complaint, more than a month before the property was inspected or the Mallorys received notice of the specific violations. Defendants have never provided the Mallorys with an itemized list of the specific violations, the dates on which each specific violation occurred, or the fine that the Town will impose for each violation.

124.    By email dated October 27, 2020, Suhm, a Town Board Supervisor, informed the Mallorys that the Board Members voted against them in deciding to pursue enforcement of the above-enumerated violations because the Mallorys "have literally ticked off all the board members with [their] meeting comments and on [F]acebook." Suhm then warned the Mallorys "that wasn't good because the board members voted with emotion," leaving the Mallorys with no option but to pay for the permits and abide by Municipal Law Group's compliance instructions—which would include agreeing to pay Municipal Law Group's, Montoya's, and Schwecke's fees—"to get this over with."

125.    Defendants have spent six months investigating, pursuing, and enforcing trivial ordinances against the Mallorys, that it does not enforce against similarly situated residents, because the Mallorys spoke out against the Town Board.

126.    The Mallorys want their Farm restored to the way it was before the Town began its enforcement proceedings, and they do not want to tear down their barn, prematurely slaughter their livestock, take down or pay for a permit that is not required by the zoning code for their flower shelf, pay for quadruple-fee permits, remove their bees from the Farm, or pay an undisclosed amount of fees to Municipal Law Group,

28

Montoya, and Schwecke—actions that other members of the Town would not be forced to take. But the Mallorys also cannot afford tens of thousands of dollars in fines. The Town's enforcement proceedings, which were only initiated because the Mallorys exercised their constitutional right to speak freely, have placed the Mallorys in the position of choosing one of these two injurious paths.

127.    Since the Town began its enforcement proceedings against the Mallorys in June of 2020, the Mallorys have not been able to exercise their right to speak about the Town, Town Board, or Town officials without first weighing whether speaking up is worth the risk of likely retribution.

128.    If the Town's retaliatory actions are not enjoined, so that the Mallorys may exercise their right to free speech without constant fear of retribution, they will have no choice but to move away from the Town of Eagle, leaving behind their home, their Farm, and their retirement plans.

## INJURY TO PLAINTIFFS

129.    Because of Defendants' retaliatory and discriminatory threats of fines and fees and unconstitutional enforcement practices, the Mallorys have suffered significant injury, including, but not limited to:

    a.    Being forced to destroy structures on their property that the Town allows similarly situated residents to have and that the Mallorys want to have;

29

b.  Being forced to destroy structures on their property that the Mallorys paid to construct;

c.  Being forced to make changes to their property that the Town does not require of similarly situated residents and that the Mallorys did not want to make;

d.  Being forced to retain an attorney to protect their property rights;

e.  Being forced to destroy their farm stand and cease selling products from the Farm, limiting their earning potential through their farming activities;

f.  Facing the continuing threat that the Town will file suit to enforce an undisclosed fine amount for unspecified violations;

g.  Taking actions that they otherwise would not take based on the Town's threats of litigation to enforce an undisclosed fine amount for unspecified violations;

h.  Facing the continuing threat of Defendants arriving on their property without notice and alleging additional violations;

i.  Living with the fear that they will be subjected to further unconstitutional retaliation and deprivations of property without due process;

j.  Facing threats that they will be compelled to pay an undisclosed amount— but potentially thousands of dollars—to Municipal Law Group, Montoya, and Schwecke for their alleged fees;

30

k.  Taking actions that they otherwise would not take in reliance on the Town's threats that they will charge the Mallorys an undisclosed amount for Municipal Law Group's, Montoya's, and Schwecke's fees;

l.  Being deprived of the opportunity to fully enjoy their property;

m.  Being forced to reconsider their plans for income post-retirement;

n.  Being forced to choose between remaining in the Town of Eagle or exercising their right to free speech;

o.  Worrying that the Town will continue retaliating against them for their past speech; and

p.  Knowing that they will likely face retribution for exercising their right to engage in speech against the Defendants and being forced to weigh whether exercising that right is worth the retaliation and discrimination.

## CONSTITUTIONAL VIOLATIONS

### COUNT I: RETALIATORY ENFORCEMENT
### (Freedom of Speech—U.S. Constitution amend. I)

130.    The Mallorys incorporate Paragraphs 1–129 as if fully set forth herein.

131.    The Mallorys' actions in questioning and challenging the Town Board and holding Board Members accountable to their official duties are safeguarded by the First Amendment to the U.S. Constitution, made applicable to the states through the Fourteenth Amendment.

31

132.    The Town, Town Board, and Board Members are forbidden from enforcing Town ordinances against individuals in retaliation for engaging in free speech.

133.    Yet, the Town and Town Board—acting through the Board Members under color of state law—adopted and enforced a deliberate and pervasive policy or custom to retaliate against residents who speak out against the Town, Town Board, and Town officials.

134.    Motivated to punish the Mallorys for their free speech and to deter them from exercising this right in the future, the Board Members relied on the Town and Town Board's retaliatory policy to repeatedly investigate, pursue, and enforce minor violations that are not enforced against others.

135.    The Board Members' scheme against the Mallorys was part of its deliberate, long-term, and pervasive policy or custom, which the Board Members implemented by:

    a.    Enabling Board Members to anonymously bring complaints against targeted residents or, when necessary, to ask a neighbor of the targeted resident to bring a complaint, initiating enforcement proceedings;

    b.    Designing their system so that they deliberate behind closed doors to decide when and why to proceed in enforcement actions against residents;

    c.    Passing extensive ordinances to create opportunities to find violations; and

    d.    Discouraging local attorneys from representing residents in enforcement proceedings by instilling fear that such attorneys will be treated

32

unfavorably by the Town Board, resulting in residents engaging in the proceedings without legal counsel who might identify the Town Board's abuses.

136.    The Town Board's decision to enforce violations against the Mallorys can easily be separated from the Town Board's interest in protecting the health, safety, or wellbeing of the Town and its residents. Instead of enforcing Town ordinances for the good of the Town, the Board Members—relying on the Town and Town Board's policy or custom of retaliation—"voted with emotion" to pursue enforcement against the Mallorys because they were "ticked off" by the Mallorys' speech.

137.    But for the Mallorys' speech, the Board Members would not have voted to enforce these ordinances.

138.    The Board Members' actions are attributable to the Town and Town Board. The Board Members are the final policymakers of the Town, and in exercising their final authority, they made a deliberate choice to adopt a course of action that retaliated against the Mallorys.

139.    The Board Members also ratified these retaliatory acts by authorizing and directing Schwecke, Montoya, and Municipal Law Group to selectively investigate, pursue, and enforce Town ordinances.

140.    The Board Members are municipal policymakers, and their decision and actions described in this complaint—including their exercise of authority to direct Town

33

staff members such as Schwecke, Montoya, and Municipal Law Group—represent the Town's policy.

141.    The Town's policy or custom of retaliatory enforcement against residents who criticize the Town, Town Board, or its officials has become more persistent and widespread in recent years.

142.    For instance, in the past year, the Town Board has, on multiple occasions, tacked on additional violations after residents complained of or challenged the initial enforcement decisions; and Board Members have expressed open hostility toward residents who stand up for their rights and their property by disparaging them at Town meetings, repeatedly inspecting their property to find violations (regardless of whether a complaint has been lodged), and making open-ended threats of future enforcement actions.

143.    As noted, the reputation of the Town and Town Board's retaliatory policy or custom is so pervasive that in-town attorneys refuse to represent residents in enforcement proceedings for fear of retribution by the Town Board.

144.    As these examples demonstrate, the Town and Town Board's retaliatory policy would chill the speech of any person of ordinary firmness.

145.    Absent the Town and Town Board's policy of retaliating against individuals who criticize those in power, the Mallorys would not have been subjected to the

34

enforcement proceedings, threats of extensive fines and fees, and all of the harms that followed.

146.    If the Town and Town Board's retaliatory policy is not stopped, the Mallorys will be forced to move away from the Town of Eagle so that they can exercise their constitutionally protected rights without retribution.

147.    The Mallorys are entitled to protection from this retaliation and to relief for the harms they have endured as a result of the Town and Town Board's unconstitutional actions.

## COUNT II: DISCRIMINATORY ENFORCEMENT
### (Equal Protection Clause—U.S. Constitution amend. XIV)

148.    The Mallorys incorporate Paragraphs 1–129 as if fully set forth herein.

149.    The Mallorys' right to be treated equally to those similarly situated to them is guaranteed by the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution.

150.    The Town, Town Board, and Board Members are forbidden from enforcing generally *unenforced* Town ordinances against select individuals for their engagement in constitutionally protected activity.

151.    Yet, the Town and Town Board—acting through the Board Members under color of state law—adopted and enforced a deliberate and pervasive policy or custom to discriminate against residents who speak out against the Town, Town Board, and Town officials.

35

152.　　Motivated to punish the Mallorys for exercising their right to engage in protected speech and to deter them from exercising this right in the future, the Board Members relied on the Town and Town Board's discriminatory policy to repeatedly investigate, pursue, and enforce minor violations against the Mallorys that are not enforced against others who are similarly situated.

153.　　The Board Members' scheme against the Mallorys was part of its deliberate, long-term, and pervasive policy or custom, which the Board Members implemented by:

　　a.　Enabling Board Members to anonymously bring complaints against targeted residents or, when necessary, to ask a neighbor of the targeted resident to bring a complaint, initiating enforcement proceedings;

　　b.　Designing their system so that they deliberate behind closed doors to decide when and why to proceed in enforcement actions against residents;

　　c.　Passing extensive ordinances to create opportunities to find violations; and

　　d.　Discouraging local attorneys from representing residents in enforcement proceedings by instilling fear that such attorneys will be treated unfavorably by the Town Board, resulting in residents engaging in the proceedings without legal counsel who might identify the Town Board's abuses.

154.　　The Town Board's decision to enforce violations against the Mallorys can easily be separated from the Town Board's interest in protecting the health, safety, or

36

wellbeing of the Town and its residents. The minor violations claimed against the Mallorys are pervasive, but generally unenforced, throughout the Town, and they have not been enforced against the Mallorys' similarly situated neighbors, or Board Members, who have not spoken out against the Town's leadership.

155.    Instead of enforcing Town ordinances for the good of the Town, the Board Members—relying on the Town and Town Board's policy or custom of discrimination—"voted with emotion" to pursue enforcement against the Mallorys, for violations it does not enforce against others who are similarly situated, because the Board Members were "ticked off" by the Mallorys' speech.

156.    But for the Mallorys' constitutionally protected activity, the Board Members would not have voted to enforce these ordinances.

157.    The Board Members' actions are attributable to the Town and Town Board. The Board Members are the final policymakers of the Town, and in exercising their final authority, they made a deliberate choice to adopt a course of action that caused the Mallorys to be treated differently from similarly situated residents of the Town.

158.    The Board Members also ratified these discriminatory acts by authorizing and directing Schwecke, Montoya, and Municipal Law Group to selectively investigate, pursue, and enforce these violations that are not enforced against similarly situated individuals.

37

159. The Board Members are municipal policymakers, and their decision and actions described in this complaint—including their exercise of authority to direct Town staff members such as Schwecke, Montoya, and Municipal Law Group—represent the Town's policy or custom.

160. The Town's policy or custom of discriminatory enforcement against residents who criticize the Town, Town Board, or its officials has become more persistent and widespread in recent years.

161. For instance, in the past year, the Town Board has, on multiple occasions, tacked on additional violations after residents complained of or challenged the initial enforcement decision. Board Members have also expressed open hostility toward residents who stand up for their rights and their property by disparaging them at Town meetings, repeatedly inspecting their property to find violations (regardless of whether a complaint has been lodged), and making open-ended threats of future enforcement actions. The Town Board does not engage in similar behavior against individuals who do not use their speech to challenge or question the Town Board's authority.

162. As noted, the reputation of the Town and Town Board's discriminatory policy or custom is so pervasive that in-town attorneys refuse to represent residents in enforcement proceedings for fear of retribution by the Town Board.

163. Absent the Town and Town Board's policy of discriminating against individuals who criticize those in power, the Mallorys would not have been subjected to

38

the enforcement proceedings, threats of extensive fines and fees, and all of the harms that followed.

164.    The Mallorys are entitled to protection from this discriminatory enforcement and to relief for the harms they have endured as a result of the Town and Town Board's unconstitutional actions.

### COUNT III: PROCEDURAL DUE PROCESS
### IMPROPER PROFIT MOTIVES
### (Due Process Clause—U.S. Constitution amend. XIV)

165.    The Mallorys incorporate Paragraphs 1–129 as if fully set forth herein.

166.    The Due Process Clause of the Fourteenth Amendment to the U.S. Constitution requires that government deprivations of property occur only through neutral and objective actors.

167.    It is a violation of due process for enforcement processes to be infected with personal interests, financial or otherwise.

168.    Municipal Law Group, Schwecke, and Montoya have significant financial incentives in initiating, pursuing, and drawing out enforcement processes.

169.    These financial interests distort Municipal Law Group's, Schwecke's, and Montoya's decision-making in investigating, identifying, and enforcing ordinance violations.

170.    These financial interests incentivize Municipal Law Group, Schwecke, and Montoya to initiate, pursue, and draw out enforcement actions—and to conduct

39

unnecessary follow-up investigations—unrelated to promoting health and safety, instead of seeking efficient and fair resolution.

171.    These financial interests incentivize Municipal Law Group, Schwecke, and Montoya to initiate, pursue, and draw out enforcement actions—and to conduct unnecessary follow-up investigations—unrelated to promoting health and safety, regardless of equities, justice, or the facts of a given situation.

172.    These financial interests incentivize Municipal Law Group to initiate, pursue, and draw out enforcement actions—and to conduct unnecessary follow-up investigations—unrelated to promoting health and safety, without regard for the stringent ethical responsibilities of attorneys acting in a prosecutorial role.

173.    These financial interests incentivize Municipal Law Group, Montoya, and Schwecke to encourage the Town Board to pass additional ordinances that Municipal Law Group, Montoya, and Schwecke then enforce for financial compensation, further restricting residents' liberty.

174.    When costs—such as hourly fees for the investigation, pursuit, and enforcement of violations—are ultimately passed on to the resident found to be in violation, Municipal Law Group, Schwecke, and Montoya's enforcement model incentivizes the Town to exercise minimal supervision over these agents and to pursue aggressive enforcement strategies without regard for whether there is a reasonable

40

relationship between the cost of the enforcement approach and the severity of the alleged conduct at issue.

175.    The Town could mitigate the risk of improper financial incentives infecting their enforcement processes by, among other solutions, entering into flat-fee contracts—instead of their current hourly fee arrangements—with third-party service providers and providing more oversight of the enforcement process.

176.    Though the Town may technically be responsible for Municipal Law Group's, Schwecke's, and Montoya's fees, the Town has a policy or custom of passing these fees onto residents found in violation of Town ordinances.

177.    The Town has a policy or custom of demanding that residents found in violation of Town ordinances sign a reimbursement agreement promising to pay such fees.

178.    The Town has a policy or custom of conditioning settlements on residents agreeing to pay Municipal Law Group's, Schwecke's, and Montoya's fees, even though the amount of those fees are not disclosed at the time of settlement.

179.    Because of Municipal Law Group's, Schwecke's, and Montoya's personal financial interest in the enforcement proceedings against the Mallorys, the enforcement proceedings, including all notices of violation and threats of fines and fees, are invalid, and any fines or fees that the Town and Town Board attempt to collect would be illegally obtained.

41

180.    The Mallorys are entitled to protection from this profit-driven enforcement and to relief for the harms they have already endured as a result of the profit-incentivized process they have been subjected to until now.

**COUNT IV: PROCEDURAL DUE PROCESS**
**IMPROPER BURDEN OF PROOF FOR PERMITTING**
**(Due Process Clause—U.S. Constitution amend. XIV)**

181.    The Mallorys incorporate Paragraphs 1–129 as if fully set forth herein.

182.    The Due Process Clause of the Fourteenth Amendment to the U.S. Constitution guarantees individuals a meaningful opportunity to be heard before they are deprived of their property.

183.    The Due Process Clause of the Fourteenth Amendment also requires that governments bear the burden of proving violations of municipal ordinances, and it guarantees those accused of wrongdoing a meaningful opportunity to defend themselves.

184.    Individuals are denied a meaningful opportunity to be heard and defend themselves when they are restricted to proving their innocence (that is, that they are in compliance with permit requirements) through only a narrowly described set of documentary evidence—particularly historical records that property owners are unlikely to maintain.

42

185.    However, under the Town's policy or custom, as applied against the Mallorys, proving that structures and utilities are properly permitted can only be accomplished with one document: the permits themselves.

186.    In the Mallorys' case, where the Town—who is responsible for maintaining permit records—cannot locate the permits, the burden of producing this one document (or a copy thereof) is placed on the Mallorys, creating an unconstitutionally stringent standard of proof and denying the Mallorys their rights to be meaningfully heard and to defend themselves and their Farm.

187.    This burden of proof also creates a significant and real danger that the Mallorys will be penalized even if the barn and utilities were properly permitted, but those permits were lost, destroyed, or damaged through no fault of their own.

188.    Due to the unduly high burden of proof the Town has placed on the Mallorys—producing the permits or their copies—which the Mallorys cannot satisfy, the Town and Town Board are now requiring the Mallorys to choose between (1) removing the structure and utilities; or (2) applying for quadruple-fee permits, which the Town Board could ultimately refuse to grant.

189.    The only evidence that the Town has that the Mallorys' barn and utilities are unpermitted is the fact that the Town cannot locate *any* of the permit records for the structures and utility lines that were installed on the Farm long before the Mallorys purchased it.

43

190.    The fact that the Town is unable to locate *any* of the permits for the Farm's structures and utilities that were installed prior to the Mallorys' purchase of the Farm—including their house—evidences the Town's own failure to properly maintain records, not the failure of the previous property owners to properly obtain permits.

191.    The Mallorys have offered the Town and Town Board evidence such as tax records to demonstrate that the barn and utilities are properly permitted. However, the Town and Town Board have refused to even consider or review these documents.

192.    The Mallorys, who were not the owners of the Farm when the house and barn were built or when the original utility lines were installed, reasonably believe these structures and utilities were installed with proper permits. Due process requires that the Mallorys be given a meaningful opportunity to demonstrate the propriety of their structures and utilities through evidence other than the permits, or a narrowly limited set of documents, themselves.

193.    Because the Town did not afford the Mallorys a meaningful opportunity to be heard, and unless and until it does so, it may not require the Mallorys to obtain quadruple-fee permits or to demolish their barn and remove their utility lines. Nor may the Town impose any fines or fees for the Mallorys' failure to obtain quadruple-fee permits.

44

194.    The Mallorys have suffered significant injuries, as outlined in Paragraph 129 above, due to the Town Board's threats of fines, fees, and enforcement actions that are based on this violation of the Mallorys' right to due process.

195.    The Mallorys are entitled to protection from this threatened, unconstitutional deprivation of property and to relief for the harms they have endured as a result of the Town and Town Board's denial of due process to date.

### COUNT V: PROCEDURAL DUE PROCESS
### PRESUMPTION OF WRONGDOING
### (Due Process Clause—U.S. Constitution amend. XIV)

196.    The Mallorys incorporate Paragraphs 1–129 as if fully set forth herein.

197.    The Due Process Clause of the Fourteenth Amendment requires that governments bear the burden of proving municipal-ordinance violations by, at a minimum, a preponderance of the evidence, and it guarantees those accused of wrongdoing a meaningful opportunity to defend themselves.

198.    The Town Board has threatened the Mallorys with daily fines calculated from the day an anonymous complaint was filed against them, more than a month before the Town Board inspected the property to determine whether the allegations were true or informed the Mallorys that they were not in compliance with Town ordinances.

199.    Apart from relying exclusively on the anonymous complaint, the Town Board has no way of knowing whether there actually were violations on the Farm, or

45

what those violations were, between the date the complaint was lodged and the date Montoya and Schwecke inspected the Farm.

200.    Some of the violations asserted in the anonymous complaint were not confirmed by Montoya and Schwecke's inspection, demonstrating the unreliability of the anonymous complaint.

201.    The Town's only basis for imposing violations for the period between the filing of the complaint and the first inspection is its assumption that, because the Mallorys were not in compliance on June 18, they must not have been in compliance on May 15.

202.    However, it is entirely possible that the violations did not occur until after the anonymous complaint was lodged. For instance, the Mallorys have been found to be non-compliant with the Town's property maintenance requirements, including maintaining grass at a height of less than 12". It is reasonably likely that the non-complying patches of grass were not taller than 12" every day between May 15 and June 18, particularly as the anonymous complaint did not accuse the Mallory's of having overgrown grass.

203.    Further, Montoya and Schwecke cited the Mallorys for violations that were not alleged in the anonymous complaint, meaning the Town has no evidence—not even an anonymous complaint—that those violations existed prior to Montoya and Schwecke's inspection. And because these violations were not alleged in the anonymous

46

complaint, the Mallorys had no notice of these potential violations prior to receiving a notice of non-compliance on June 30, 2020.

204.    Because the Mallorys were not informed of the violations on their Farm until June 30, they did not have an opportunity to remedy any violations that may or may not have existed during the time between the lodging of the complaint and the Town's notice of non-compliance. They therefore did not have the opportunity to reduce the amount of the fines that are now threatened against them.

205.    The Town is also, apparently, threatening to enforce daily fines against the Mallorys for each day since the anonymous complaint was submitted through present day, including for violations that were not alleged in the anonymous complaint, if the Mallorys do not comply with every provision of the October 9 letter, even though the Mallorys remedied at least some of their violations weeks and months ago.

206.    To date, the Mallorys have not received an itemized list of the specific fines the Town is threatening to levy against them if they fail to come into full compliance with the terms, including the requirement that the Mallorys sign a reimbursement agreement, of the October 9 Letter.

207.    For the daily fines that the Town has threatened to impose for violations between May 15 and June 18, the Town has presumed, instead of proven, ordinance violations, contrary to due process.

47

208. For the daily fines that the Town has threatened to impose for violations that the Mallorys remedied after the Town's inspection—if the Mallorys fail to comply with every term of the October 9 Letter, including signing a reimbursement agreement—the Town has presumed, instead of proven, these violations, contrary to due process.

209. This lack of confirmation and notice produces an extreme risk that the Mallorys will be deprived of their most fundamental interest—their private land and their savings—through governmental error.

210. This particular risk of erroneous deprivation can be eliminated by instead (1) calculating fines from the date that the Town confirms the existence of the specific violation; and (2) refraining from imposing fines for any violations that have been remedied.

211. Making these changes would place no burden on the Town.

212. The Town has denied the Mallorys their right to due process by threatening them with tens of thousands of dollars of fines for violations that the Town has not proven exist or existed and by threatening fines that (1) include charges for the days upon which the Town had "not determined if there [was] merit to the complaint or not"; (2) include fines for days after violations were remedied; and (3) fail to detail the specific fines that the Mallorys would face for their non-compliance.

213. The Mallorys have acted in reliance on the Town's threats of fines that were necessarily inflated by, among other things, the month-long period before the Town

48

confirmed whether there were any violations on the Mallorys' property at all, and they have suffered significant injuries as a result, as outlined in Paragraph 129 above.

214.    The Town may not enforce fines that it has not proven exist or existed, and the Mallorys are entitled to protection against such enforcement and to relief for the harms they suffered as a result of the Town's threats to enforce violations it has not proven.

## REQUEST FOR RELIEF

215.    The Mallorys respectfully request the following relief:

a.   A declaration that the Town of Eagle and Town Board violated the Mallorys' right to freedom of speech by selectively enforcing Town ordinances against the Mallorys in retaliation for their constitutionally protected speech;

b.   A declaration that the Town of Eagle and Town Board violated the Mallorys' right to equal protection by selectively enforcing town ordinances against the Mallorys for their constitutionally protected speech;

c.   A declaration that Defendants violated the Mallorys' right to due process by enforcing the Town's ordinances through actors with an impermissible financial incentive in the enforcement;

49

d. A declaration that the Town of Eagle and Town Board violated the Mallorys' right to due process by denying them a meaningful opportunity to prove that their barn and utility lines were properly permitting;

e. A declaration that the Town of Eagle and Town Board violated the Mallorys' right to due process by threatening to charge fines for alleged violations without proving the truth of those allegations;

f. A permanent injunction enjoining the Town and Town Board from selectively enforcing ordinances against the Mallorys for exercising their right to engage in protected speech;

g. A permanent injunction enjoining Defendants from enforcing Town ordinances through actors with an impermissible financial incentive in the enforcement;

h. A permanent injunction enjoining Defendants from limiting the Mallorys to a narrow set of documents for proof of compliance with permit requirements;

i. A permanent injunction enjoining the Town and Town Board from charging fines for violations that the Town has not proven;

j. A permanent injunction enjoining the Town of Eagle and Town Board from conditioning resolution of enforcement proceedings on execution of a reimbursement form;

50

k.  A permanent injunction enjoining the Town of Eagle and Town Board from threatening to impose fines without detailing and specifying the exact fines that will be imposed;

l.  An Order directing the Town Board to dismiss all claims of non-compliance raised prior to November 9, 2020;

m.  An Order allowing the Mallorys to restore the structures they have been forced to tear down since June 30, 2020;

n.  An award of $1 in nominal damages for Defendants' violations of the U.S. Constitution and the harms that resulted therefrom;

o.  An award of the Mallorys' costs and expenses for this action, together with reasonable attorneys' fees, pursuant to 42 U.S.C. § 1988; and

p.  Such other and further relief this Court deems just and proper.


Dated this 9th day of November, 2020.


Kirby West* (Pa. Bar No. 321371)           Electronically signed by Michael Van Kleunen
Marie Miller* (Ind. Bar No. 34591-53)      Michael Van Kleunen (Wis. Bar No. 1113958)
Alexa Gervasi* (D.C. Bar No. 1500433)      CRAMER, MULTHAUF & HAMMES, LLP
INSTITUTE FOR JUSTICE                       1601 East Racine Ave., Ste. 200
901 N. Glebe Suite, Suite 900              Waukesha, WI 53186
Arlington, VA 22203                         (262) 542-4278
                                            mvk@cmhlaw.com

* *Lead counsel for Plaintiffs; Pro Hac Vice*
*Applications Forthcoming*                   *Local Counsel for Plaintiffs*


51

FILED
11-24-2020
Clerk of Circuit Court
Waukesha County
2020CV001583

STATE OF WISCONSIN        CIRCUIT COURT        WAUKESHA COUNTY

ERICA BREWER, et al.,

                       Plaintiffs,

      v.

TOWN OF EAGLE, et al.,

                       Defendants.

Case No. 2020CV001583

Case Codes: 30701, 30704, 30301

---

## PLAINTIFFS' NOTICE OF MOTION AND MOTION TO ADMIT
## KIRBY WEST, MARIE MILLER, AND ALEXA GERVASI *PRO HAC VICE*

---

Plaintiffs ERICA BREWER and ZACHARY MALLORY, by and through their attorney MICHAEL VAN KLEUNEN of CRAMER, MULTHAUF & HAMMES, LLP, move the Court for an Order admitting Attorney KIRBY WEST, Attorney MARIE MILLER, and Attorney ALEXA GERVASI to appear before this Court and participate in the above-captioned case, pursuant to Wisconsin Supreme Court Rule 10.03(4).

The Motion shall be heard before the Honorable Ralph M. Ramirez, at the Waukesha County Courthouse, 515 West Moreland Boulevard, Waukesha, Wisconsin, at a date and time as set by the Court, if the Court so requires.

This Motion is based upon the enclosed copies of Applications of KIRBY WEST, MARIE MILLER, and ALEXA GERVASI, and proof of payment of the required fees to the Office of Lawyer Regulation.

Dated: November 23, 2020

Electronically signed by Michael Van Kleunen
Michael Van Kleunen (Wis. Bar No. 1113958)
CRAMER, MULTHAUF & HAMMES, LLP
1601 East Racine Ave., Ste. 200
Waukesha, WI 53186
(262) 542-4278
mvk@cmhlaw.com
*Local Counsel for Plaintiffs*

2

**STATE OF WISCONSIN, CIRCUIT COURT, WAUKESHA**      **COUNTY**

| Case Caption: Erica Brewer et al v. Town of Eagle et al | **Application for Pro Hac Vice Admission** |
|---|---|
| | Case No. 2020CV001583 |

**I DECLARE UNDER PENALTY OF PERJURY:**

1. That I seek to appear pro hac vice in order to represent <u>Plaintiffs</u> in the above-captioned matter;

2. That I am admitted to practice law in the highest court(s) of the state(s) or country(ies) of <u>Pennsylvania</u> ;

3. That there are no disciplinary complaints filed against me for violation of the rules of those courts (if so, please explain): _____;

4. That I am not suspended or disbarred from practice for disciplinary reasons or reason of medical incapacity in any jurisdiction (if yes, please explain): _____;

5. That I am associated with Attorney <u>Michael Van Kleunen</u>, State Bar No. <u>113958</u>, an active member of the State Bar of Wisconsin (name the member of the State Bar of Wisconsin and provide his/her Member Number);

6. That I do not practice or hold out to practice law in the State of Wisconsin;

7. That I acknowledge the jurisdiction of the courts of the State of Wisconsin over my professional conduct, and I agree to abide by the rules of the relevant division of the Circuit Court of the State of Wisconsin, the Wisconsin Court of Appeals, the Wisconsin Supreme Court, and the Rules of Professional Conduct for Attorneys, if I am admitted pro hac vice;

8. That I have complied fully with SCR Rule 10.03 (4);

9. That I am applying for admission pro hac vice for the following reasons: <u>To represent Plaintiffs Erica Brewer and Zachary Mallory in this civil rights action.</u>

I have applied for admission pro hac vice in the courts of the State of Wisconsin <u>0</u> times previously in this calendar year.

I attach hereto evidence of my payment or prior payment of the pro hac vice fee.

| Signature of Attorney _Kirby Thomas West_ | Telephone Number (703) 682-9323 |
|---|---|
| Name Printed Kirby West | Email Address (if any) kwest@ij.org |
| Address of Principal Office Institute for Justice, 901 North Glebe Road, Suite 900, Arlington, VA 22203 | |

CA-180, 08/20 Application for Pro Hac Vice This form meets the requirements of Appendix A to SCR 10.03    SCR 10.03(4)

STATE OF WISCONSIN, CIRCUIT COURT, WAUKESHA                    COUNTY

| | |
|---|---|
| Case Caption:  Erica Brewer et al v. Town of Eagle et al | **Application for Pro Hac Vice Admission** |

Case No. 2020CV001583

### I DECLARE UNDER PENALTY OF PERJURY:

1. That I seek to appear pro hac vice in order to represent <u>Plaintiffs</u> in the above-caption matter;

2. That I am admitted to practice law in the highest court(s) of the state(s) or country(ies) of <u>Indiana</u>;

3. That there are no disciplinary complaints filed against me for violation of the rules of those courts (if so, please explain): _____;

4. That I am not suspended or disbarred from practice for disciplinary reasons or reason of medical incapacity in any jurisdiction (if yes, please explain): _____;

5. That I am associated with Attorney <u>Michael Van Kleunen</u>, State Bar No. <u>113958</u>, an active member of the State Bar of Wisconsin (name the member of the State Bar of Wisconsin and provide his/her Member Number);

6. That I do not practice or hold out to practice law in the State of Wisconsin;

7. That I acknowledge the jurisdiction of the courts of the State of Wisconsin over my professional conduct, and I agree to abide by the rules of the relevant division of the Circuit Court of the State of Wisconsin, the Wisconsin Court of Appeals, the Wisconsin Supreme Court, and the Rules of Professional Conduct for Attorneys, if I am admitted pro hac vice;

8. That I have complied fully with SCR Rule 10.03 (4);

9. That I am applying for admission pro hac vice for the following reasons: <u>To represent Plaintiffs Erica Brewer and Zachary Mallory in this civil rights action.</u>

I have applied for admission pro hac vice in the courts of the State of Wisconsin <u>0</u> times previously in this calendar year.

I attach hereto evidence of my payment or prior payment of the pro hac vice fee.

| Signature of Attorney | Telephone Number |
|---|---|
| *Marie Miller* | (703) 682-9323 |
| Name Printed | Email Address (if any) |
| Marie Miller | mmiller@ij.org |
| Address of Principal Office | |
| Institute for Justice, 901 North Glebe Road, Suite 900, Arlington, VA 22203 | |

CA-180, 08/20  Application for Pro Hac Vice This form meets the requirements of Appendix A to SCR 10.03          SCR 10.03(4)

**Scanned with CamScanner**

**STATE OF WISCONSIN, CIRCUIT COURT, <u>WAUKESHA</u>    COUNTY**

Case Caption:   Erica Brewer et al vs. Town
of Eagle et al

## Application for
## Pro Hac Vice Admission

Case No. <u>2020CV001583</u>

### I DECLARE UNDER PENALTY OF PERJURY:

1. That I seek to appear pro hac vice in order to represent <u>Plaintiffs</u>    in the above-captioned matter;

2. That I am admitted to practice law in the highest court(s) of the state(s) or country(ies) of <u>New York and the District of Columbia</u> ;

3. That there are no disciplinary complaints filed against me for violation of the rules of those courts (if so, please explain):    ;

4. That I am not suspended or disbarred from practice for disciplinary reasons or reason of medical incapacity in any jurisdiction (if yes, please explain):    ;

5. That I am associated with Attorney <u>Michael Van Kleunen</u>, State Bar No. <u>113958</u>, an active member of the State Bar of Wisconsin (name the member of the State Bar of Wisconsin and provide his/her Member Number);

6. That I do not practice or hold out to practice law in the State of Wisconsin;

7. That I acknowledge the jurisdiction of the courts of the State of Wisconsin over my professional conduct, and I agree to abide by the rules of the relevant division of the Circuit Court of the State of Wisconsin, the Wisconsin Court of Appeals, the Wisconsin Supreme Court, and the Rules of Professional Conduct for Attorneys, if I am admitted pro hac vice;

8. That I have complied fully with SCR Rule 10.03 (4);

9. That I am applying for admission pro hac vice for the following reasons: <u>To represent Plaintiffs Erica Brewer and Zachary Mallory in this civil rights action.</u>

I have applied for admission pro hac vice in the courts of the State of Wisconsin <u>0</u> times previously in this calendar year.

I attach hereto evidence of my payment or prior payment of the pro hac vice fee.

| Signature of Attorney | Telephone Number |
|---|---|
|  | (703) 682-9323 |
| Name Printed | Email Address (if any) |
| Alexa Gervasi | agervasi@ij.org |
| Address of Principal Office | |
| Institute for Justice, 901 North Glebe Road, Suite 900, Arlington, VA 22203 | |

CA-180, 08/20   Application for Pro Hac Vice This form meets the requirements of Appendix A to SCR 10.03    SCR 10.03(4)

TO VERIFY AUTHENTICITY, SEE REVERSE SIDE FOR DESCRIPTION OF THE 11 SECURITY FEATURES

**Institute for Justice**
901 N Glebe Rd Ste 900
Arlington, VA 22203

Eagle Bank Operating
7815 Woodmont Ave
Bethesda, MD
20814

001054

Date: 11/06/2020

Eagle Bank

Pay    Seven Hundred Fifty Dollars

$750.00

Pay
to the
Order of    State Bar of Wisconsin
5302 Eastpark Blvd.
Madison, WI 53718

VOID AFTER 90 DAYS

FILED
11-24-2020
Clerk of Circuit Court
Waukesha County
2020CV001583

| STATE OF WISCONSIN | CIRCUIT COURT | WAUKESHA COUNTY |

ERICA BREWER, et al.,

                Plaintiffs,

v.

TOWN OF EAGLE, et al.,

                Defendants.

Case No. 2020CV001583

Case Codes: 30701, 30704, 30301

## ORDER GRANTING MOTION TO APPEAR *PRO HAC VICE*

       The matter before the court, the Motion of Michael Van Kleunen, who is an active member of the State Bar of Wisconsin, to allow Kirby West, Marie Miller, and Alexa Gervasi to appear *pro hac vice* in the above-entitled action in association with Michael Van Kleunen of Cramer, Multhauf & Hammes, LLP, pursuant to Wisconsin Supreme Court Rule 10.03(4).

       NOW THEREFORE, IT IS ORDERED that:

       1.     Pursuant to SCR 10.03(4), Kirby West, Marie Miller, and Alexa Gervasi are granted permission to appear and participate in this court in the above-entitled action in association with Michael Van Kleunen of Cramer, Multhauf & Hammes, LLP; and

2.        Kirby West, Marie Miller, and Alexa Gervasi shall abide by the Rules of Professional Conduct for attorneys and the Rules of Decorum of the court, SCR 62.02. Violation of the provisions will result in revocation of the authorization to appear in this case.

###################################



2

FILED
12-07-2020
Clerk of Circuit Court
Waukesha County
2020CV001583

**STATE OF WISCONSIN        CIRCUIT COURT        WAUKESHA COUNTY**

ERICA BREWER, et al.,

      *Plaintiffs*,

    v.                         Case No. 2020CV001583
                                    Case Codes: 30701, 30704, 30301

TOWN OF EAGLE, et al.,

      *Defendants*.

---

## MEMORANDUM IN SUPPORT OF
## PLAINTIFFS' MOTION FOR A TEMPORARY INJUNCTION

---

### INTRODUCTION

Plaintiffs Erica Brewer and Zachary Mallory (together, "the Mallorys" or "Plaintiffs") seek a temporary injunction to enjoin Defendants from violating their constitutional rights through retaliatory code enforcement actions. A temporary injunction is necessary to protect the Mallorys from imminent and significant harms during the pendency of this lawsuit. With each day that passes without an injunction, Defendants are able to impose additional fines and fees against Plaintiffs, further drawing out their unconstitutional actions and punishing the Mallorys for exercising their right to avail themselves of the court. Additionally, Defendant Town of Eagle Town Board recently voted to bring legal claims against the Mallorys to recover approximately $20,000

in fines and fees, which the Town of Eagle could file any day, placing the Mallorys at immediate risk for further harms in violation of their constitutional rights.

As set out in this memorandum, the Mallorys meet each of the four requirements for the issuance of a temporary injunction. Consequently, this Court should enjoin Defendants from pursuing or taking any enforcement actions against the Mallorys—including inspecting the Mallorys' property, requiring the Mallorys to make any changes to their property, imposing additional fines and fees, or filing enforcement claims—for (1) conditions or alleged violations that existed on their property at the time or before this lawsuit was filed; or (2) violations that may be alleged to occur during the pendency of this lawsuit but that are based on ordinances Defendants cited the Mallorys for violating before this lawsuit was filed.

FACTS

In 2016, the Mallorys purchased a 3.8-acre farm in the Town of Eagle, Wisconsin. *See* Ex. A at ¶ 3 (Brewer Aff.). They hoped to create a family business that would enable them to retire early from their jobs as an operating-room nurse and a cyber-security specialist. *Id.* at ¶¶ 2–4. In addition to their home, the Mallorys maintain a barn, chicken coop, and sixteen beehives on their property. *Id.* at ¶ 5. They also grow vegetables that, until recently, they sold at a farm stand on their property. *Id.* at ¶ 6. Prior to Defendants' actions that are the subject of this lawsuit, the Mallorys also housed a small flock of sheep on their property, which they bred for food for their family. *Id.* at ¶ 26. For the Mallorys,

farming is both a fulfilling way of life and an important source of income for their family. *Id.* at ¶ 7.

The Mallorys became interested in local government several years ago after learning that the Town had used its ordinance enforcement process to undermine a neighbor's efforts to run a small horse-farm business. *Id.* at ¶ 8. After advocating for that neighbor at public town meetings and on social media, the Mallorys began paying more attention to the Town Board and speaking up more regularly at town meetings and on social media when they felt the Board made mistakes. *Id.* at ¶ 9.

On May 19, 2020, Defendant Schwecke, the Town Planner and Zoning Administrator, sent the Mallorys a letter informing them that an anonymous complaint had been lodged against them for unspecified allegations of ordinance violations, noting that the Town had "not determined if there [was] merit to the complaint or not." Ex. B (Letter from T. Schwecke to Mallorys dated May 19, 2020). In response to requests by the Mallorys, Schwecke followed this letter with a copy of the anonymous complaint, which listed six potential ordinance violations. *See* Ex. C (Anonymous complaint dated May 15, 2020). About one month after the initial letter, Defendant Schwecke and Defendant Montoya, the Town Building Inspector, conducted an on-site inspection. *See* Ex. A at ¶ 13. This inspection resulted in the accusation of several new alleged violations, and the Mallorys soon got a letter detailing nine cited violations, including having too many accessory buildings, having two too many livestock, failing to obtain a permit to place a

flower shelf on their balcony, their barn being located within 50 feet of their lot line, and having tufts of grass or weeds taller than twelve inches. *See* Ex. D (Notice of Violation dated June 30, 2020). Not a single one of the alleged violations poses a threat to the health or safety of the Mallorys or the community, *see id.*, and many of the alleged violations are regularly committed by the Mallorys' neighbors without consequence, *see* Ex. A. at ¶ 15.

The Mallorys were provided instructions for how to remedy some of the alleged violations and were informed that failure to remedy all violations would result in legal action and a monetary penalty. Ex. D. The Mallorys hired an attorney and communicated regularly with Defendants about their efforts to come into compliance and to accommodate Defendants' requests for follow-up site visits. *See* Ex. A at ¶¶ 16–17. Over the ensuing months, the Mallorys received conflicting information from various Defendants regarding what they needed to do to comply and which violations would be enforced. *Compare, e.g.*, Ex. E (Letter from T. Schwecke to Mallorys dated September 15, 2020), *with* Ex. F (Letter from P. Alexy to Mallorys dated October 9, 2020).

Despite this confusion, the Mallorys took significant steps to remedy the alleged violations. They closed and tore down their farm stand and greenhouse, they arranged to slaughter excess livestock, and they made sure their grass was cut. *See* Ex. A at ¶ 20. On October 5, 2020, the Mallorys updated the Town Board on their progress and requested an extension on their deadline to comply. *Id.* at ¶ 22. In a letter dated October 9, 2020, Defendant Municipal Law & Litigation Group, through attorney Paul Alexy,

notified the Mallorys that if they failed to comply with all of the onerous compliance demands listed in the letter, including signing a cost agreement promising to pay the town attorney's legal fees, they would be liable for "forfeitures in the area of $20,000." *See* Ex. F at 3.

Between June 18 and the filing of this motion, various Defendants have made five separate visits to the Mallorys' property, regularly changing their instructions regarding what steps the Mallorys needed to take to come into compliance, s*ee* Ex. A at ¶¶ 18–19, and presumptively accumulating charges for each visit—charges that Defendants intend to pass on to the Mallorys.

The Mallorys long suspected that the enforcement actions against them were related to their activism in the Town. *See id.* at ¶ 27. After all, they were being punished severely for trivial offenses that their neighbors appeared to commit regularly without consequence. *See id*. The Mallorys' suspicions were confirmed on October 27, 2020 when Erica received an email from Defendant Janis Suhm, a Town Board Supervisor, who informed Erica that Board Members had voted to pursue enforcement against the Mallorys because the Mallorys "have literally ticked off all the board members with [their] meeting comments and on [F]acebook," causing the Board Members to "vot[e] with emotion." *See* Ex. G (Email from J. Suhm to E. Brewer dated Oct. 27, 2020). On November 9, 2020, after Plaintiffs filed and notified Defendants of the instant action, the Town Board again voted to take further steps against the Mallorys by authorizing the

filing of a lawsuit to enforce fines and fees for the Mallorys' alleged ordinance violations. *See* Ex. A at ¶ 29. They have not yet, however, filed their threatened lawsuit.

The Mallorys want to stay on their farm and pursue their dreams of building it into a successful small business. *Id.* at ¶ 31. But Defendants' retaliatory enforcement actions, as well as the looming threat of future enforcement actions, have led them to consider leaving the Town of Eagle altogether. *Id.* at ¶ 31. A temporary injunction is the only assurance against these continuing deprivations of the Mallorys' constitutional rights. Without a temporary injunction, the Mallorys face serious financial hardship and may be forced to make further permanent, unwanted alterations to their property.

## STANDARD OF REVIEW

The decision to grant a motion for temporary injunction is within "the sound discretion of the trial court." *Pure Milk Prods. Coop. v. Nat'l Farmers Org.*, 90 Wis. 2d 781, 800, 280 N.W.2d 691, 700 (1979). This Court may grant a temporary injunction "[w]hen it appears from a party's pleading that the party is entitled to judgment and any part thereof consists in restraining some act, the commission or continuance of which during the litigation would injure the party . . . ." Wis. Stat. Ann. § 813.02(1)(a). Courts have interpreted this statutory directive to authorize the grant of a temporary injunction where: (1) the movant is likely to suffer irreparable harm if the injunction is not issued; (2) the movant has no other adequate remedy at law; (3) the injunction is necessary to preserve the status quo; and (4) the movant has a reasonable probability of ultimate

success on the merits. *Milwaukee Deputy Sheriffs' Ass'n v. Milwaukee County*, 2016 WI App 56, ¶20, 370 Wis. 2d 644, 883 N.W.2d 154 (2016). The Seventh Circuit, in analogous circumstances, has explained that demonstrating a reasonable likelihood of success on the merits requires a party to merely "show that it has a better than negligible chance of success on the merits of at least one of its claims." *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of U.S. of Am., Inc.*, 549 F.3d 1079, 1096 (7th Cir. 2008) (internal quotation omitted).

ARGUMENT

The Mallorys are entitled to a temporary injunction prohibiting Defendants from further violating their constitutional rights through continued and future pursuit of alleged violations and enforcement actions. Below, Plaintiffs examine each of the four factors of the temporary injunction test, establishing that: (1) they are likely to suffer irreparable harm if the injunction is not issued; (2) they have no other adequate remedy at law; (3) an injunction is necessary to preserve the status quo; and (4) they are likely to prevail on the merits of at least one of their claims.

### I.  Plaintiffs' constitutional injuries constitute irreparable harm.

Wisconsin courts, like other jurisdictions, have recognized that the deprivation of constitutional rights constitutes an irreparable harm. *See, e.g., State v. Behnke*, 155 Wis. 2d 796, 806–07, 456 N.W. 2d 610, 614 (1990) (concluding constitutional violations caused irreparable harm, even though the harms were speculative); *Sentinel-News Co. v. City of*

*Milwaukee*, 212 Wis. 618, 618, 250 N.W. 511, 512 (1933) (explaining that unconstitutional ordinance application and prosecution can result in "great" and "irreparable" injury, warranting injunctive relief); *Ezell v. City of Chicago*, 651 F.3d 684, 699 (7th Cir. 2011) ("When an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary."(quoting 11A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure*, § 2948.1 (2d ed. 1995))). This presumption of irreparable injury is "particularly true in First Amendment claims." *Ezell*, 651 F. 3d a 699; *see also Nat'l People's Action v. Village of Wilmette*, 914 F.2d 1008, 1013 (7th Cir. 1990) ("Even a temporary deprivation of first amendment freedom of expression rights is generally sufficient to prove irreparable harm."). In addition to the violations of the Mallorys' constitutional rights, detailed in full in the Complaint and in part below, the Mallorys have suffered, and will continue to suffer, additional irreparable harm if Defendants are not immediately enjoined from pursuing and enforcing alleged ordinance violations that have no bearing on the health or safety of the Mallorys or their community.

For example, since June, Defendants have shown up on the Mallorys' property on at least five separate occasions to scope out petty violations and retaliate against Plaintiffs for holding the Town Board accountable. If the Court does not enjoin Defendants from pursuing violations during the pendency of this lawsuit, there is nothing to stop Defendants from continuing to invade the Mallorys' property under the pretext of code investigations. Failure to enjoin Defendants from pursuing and enforcing alleged

violations also carries the untenable risk that the Mallorys will be forced to tear down structures on their property, such as their barn, that have been on their land longer than the Mallorys themselves. Having to remove their farm structures, including their barn, would irredeemably deprive the Mallorys of at least part of the relief they have requested in this action. What's more, absent Court intervention, the Town is able to continue calculating daily, rapidly accumulating fines and to use the threat of those fines to force the Mallorys to make irreversible changes to their farm while the Mallorys await adjudication of their claims.

Further, though Defendant Board Members have voted to file suit against the Mallorys, they have not yet done so. If Defendants are able to file claims against the Mallorys to recover the threatened fines and fees while this action is pending, the Mallorys will face the irreparable harm of having to defend against alleged violations that exist only because of Defendants' constitutional violations. Particularly in light of the Plaintiffs' likelihood of success on the merits of their claims, explained further below, it would be inequitable to permit Defendants to force the Mallorys to incur the costs and stress of a lawsuit mired in unconstitutional motives and processes, even if Defendants' claims are ultimately unsuccessful.

These risks are not mere hypotheticals. Because of Defendants' unconstitutional enforcement actions, the Mallorys have already been forced to destroy their farm stand, tear down their canvas shed, slaughter their sheep, and make other undesired changes to

their property, many of which have limited the Mallorys' ability to earn a living from their farming activities. *See* Ex. A at ¶ 25. If the threats of enforcement actions—including for yet uncited violations—continue to loom over the Mallorys, they will face not only the financial injury of fines and fees, but also the irreparable harm of irrational restraints on the free use of their property and the knowledge that they may be continually targeted in retaliation for constitutionally protected activity.

## II. There is no adequate remedy at law for Plaintiffs' constitutional injuries.

The Mallorys' constitutional injuries lack an adequate remedy for at least two reasons. First, constitutional violations, by their very nature, tend to not have adequate remedies at law, and the constitutional violations here are no exception. *See, e.g., Sentinel-News Co.*, 212 Wis. at 618; *Ezell*, 651 F.3d at 699; *GoodCat, LLC v. Cook*, 202 F. Supp. 3d 896, 917–18 (S.D. Ind. 2016) (finding no adequate remedy at law where there was a "reasonable likelihood of a constitutional violation"); *see also, e.g., Elrod v. Burns*, 427 U.S. 347, 373–74 (1976) (holding that where a plaintiff's First Amendment interests are threatened or in fact being impaired, there is no adequate remedy at law and "injunctive relief is clearly appropriate" (internal quotation omitted)). Second, there is no remedy at law that will ensure Defendants will not continue to target the Mallorys, charging them with constantly increasing fines and fees for trivial offenses. Only an injunction can shield the Mallorys from Defendants' ceaseless efforts to pursue and enforce ordinance

violations against them—that bear no relation to needs of health or safety—during the pendency of this lawsuit.

### III. A temporary injunction is necessary to preserve the status quo.

The Wisconsin Supreme Court has highlighted the importance of preserving the status quo between parties by the issuance of a temporary injunction:

> Where the complaint states a cause of action, and the motion papers disclose a reasonable probability of plaintiff's ultimate success, it is well-nigh an imperative duty of the court to preserve the *status quo* by temporary injunction, if its disturbance *pendente lite* will render futile in considerable degree the judgment sought, or cause serious and irreparable injury to one party; especially if injury to the other is slight, or of character easily compensable in money; and that the discretion vested in the court is largely over the question of terms of the restraint and the protection of rights by bonds from one party to the other.

*Shearer v. Congdon*, 25 Wis. 2d 663, 668, 131 N.W.2d 377, 381 (1964) (alterations omitted) (quoting *De Pauw v. Oxley*, 122 Wis. 656, 659, 100 N.W. 1028, 1029 (1904)). Plaintiffs' Complaint states a cause of action, and, as discussed below, Plaintiffs can demonstrate a reasonable probability of success on the merits. Additionally, any injury to Defendants in delayed code enforcement is inconsequential as compared to the irreparable injury to Plaintiffs caused by the violation of their constitutional rights. The lack of potential harm to Defendants is emphasized by the fact that none of the violations alleged against the Mallorys threaten the health or safety of the Mallorys, their neighbors, or the Town. Thus, the principles articulated in *Shearer* and *De Pauw* strongly weigh in favor of preserving

the status quo by enjoining Defendants from pursuing or enforcing these ordinance violations against Plaintiffs while this action is pending.

As of the date of filing this motion, Defendants have not yet filed the threatened enforcement suit to recover fines and fees from the Plaintiffs. Therefore, at present, the Mallorys do not have any judgment against them, nor are they obligated to pay the hefty $20,000 in fines and fees threatened by Defendants. A temporary injunction would ensure the Mallorys do not face that burdensome penalty until this Court has adjudicated their constitutional claims and, in turn, determined whether the threatened fines and fees are themselves constitutional. Importantly, a temporary injunction would also prevent Defendants from adding to the Mallorys' bill by beginning new retaliatory investigations. This factor weighs in favor of granting the requested temporary injunction.

**IV. Plaintiffs are likely to succeed on the merits.**

Crucially, Plaintiffs are likely to succeed on the merits, satisfying the most important prong of the temporary injunction inquiry. Though Plaintiffs need only show a probability of success on one of their claims, the below discussion demonstrates Plaintiffs' likelihood of success on all five counts and the importance of a temporary injunction in this case.

*A. Plaintiffs will likely prevail on Count I: Retaliatory Enforcement.*

Plaintiffs are likely to succeed on Count I of their Complaint, which alleges retaliatory enforcement of town ordinances because the Mallorys exercised their First

Amendment right to speak critically of the government. The Mallorys are civically engaged residents of the Town of Eagle who frequently express their thoughts and concerns about town activities, both at town meetings and on social media. *See* Ex. A. at ¶ 9. When they first learned of the Town's enforcement action against them, the Mallorys suspected it was a result of this active political engagement. *Id.* at ¶ 27. Those suspicions were confirmed in an October 27, 2020 email from Defendant Janis Suhm who clarified that the Town Board had "voted with emotion" to take enforcement actions against the Mallorys because the Mallorys had "literally ticked off all the board members with [their] meeting comments and on [F]acebook." Ex. G. This baldly retaliatory enforcement violates the Mallorys rights under the First Amendment, as incorporated by the Fourteenth Amendment.

Courts examining a First Amendment retaliation claim must engage in a three-step inquiry. First, the court determines whether the plaintiff's speech was constitutionally protected. Second, the court considers whether the defendant's actions were motivated by that constitutionally protected speech. *See Rasche v. Village of Beecher*, 336 F.3d 588, 596–97 (7th Cir. 2003). Third, if the plaintiff successfully shows that constitutionally protected speech was a "substantial or motivating factor" in the defendant's adverse action against him, the defendant has an opportunity to show that it would have taken the same action even if the plaintiff had not engaged in the protected speech. *Id.* If the defendant successfully clears that hurdle, the burden shifts to the

plaintiff to show that the justifications given by the defendant were pretextual and that retaliation was the true motivating factor for the defendant's actions. *Id.*

Application of this test to the facts here is unusually straightforward among First Amendment retaliation claims. There is no doubt that the First Amendment protects the Mallorys' town-meeting and social-media comments challenging the Town Board's actions. *See, e.g., Lozman v. City of Riviera Beach*, 138 S. Ct. 1945, 1954 (2018) (recognizing, in a First Amendment retaliation case brought by an individual who had criticized city government, "the right to petition as one of the most precious of the liberties safeguarded by the Bill of Rights" (internal quotation omitted)); *Surita v. Hyde*, 665 F.3d 860, 870–71 (7th Cir. 2011) (holding that mayor violated a citizen's First Amendment rights when he barred her from voicing criticism of the city at a city council meeting). The Mallorys do not just suspect that they have been targeted because of their speech—they have been directly told as much by one of the Defendants in this case. And this confession is coupled with the non-enforcement of comparable violations against similarly situated residents. As a result, it is clear that any post hoc justification Defendants ultimately provide for the enforcement action is pretextual. The Mallorys are therefore likely to prevail on their First Amendment retaliation claim.

### B. Plaintiffs will likely prevail on Count II: Discriminatory Enforcement.

Plaintiffs are similarly likely to prevail on Count II of their Complaint, which alleges discriminatory enforcement in violation of the Fourteenth Amendment's Equal

Protection Clause. The Equal Protection Clause prohibits government officials from intentionally treating an individual differently from others who are similarly situated without a rational basis for the difference in treatment. *See Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000). Here, the Town has dragged the Mallorys through an expensive, months-long enforcement ordeal based on trivial violations not enforced against other similarly situated residents. As described above, Defendant Janis Suhm has acknowledged that this enforcement action was motivated not by public health or safety concerns, but by specific animus against the Mallorys. *See* Ex. G. A plaintiff can succeed on an equal protection claim where the state action is "motivated solely by a spiteful effort to 'get' him for reasons wholly unrelated to any legitimate state objective." *Village of Willowbrook*, 528 U.S. at 564 (internal quotation marks and citations omitted). The Mallorys can demonstrate Defendants' retaliatory motivation here and are consequently likely to succeed on their Equal Protection claim.

### C.  *Plaintiffs will likely prevail on Count III: Improper Profit Motives.*

Plaintiffs' likelihood of success on *either* Count I *or* Count II is sufficient to satisfy Plaintiffs' duty to demonstrate a probability of success of the merits.  But even if it weren't, Plaintiffs are also likely to succeed on Count III of their Complaint, alleging violation of their right to due process under the Fourteenth Amendment. The Fourteenth Amendment's Due Process Clause "entitles a person to an impartial and disinterested tribunal in both civil and criminal cases." *Marshall v. Jerrico, Inc.*, 446 U.S. 238, 242 (1980).

For this reason, "scheme injecting a personal interest, financial or otherwise, into the enforcement process may . . . in some contexts raise serious constitutional questions." *Id.* at 249–50. Defendants run afoul of this constitutional guarantee by injecting an impermissible financial incentive into the Town's ordinance enforcement scheme. Defendants Municipal Law & Litigation Group, Schwecke, and Montoya each have significant financial interests in enforcement actions. To maximize their profits, these Defendants have an interest in drawing out the enforcement process (for example, by conducting unnecessary follow-up investigations) and in identifying as many violations as possible. The Mallorys were initially targeted by the Town in retaliation for their activism, but once the enforcement process began, they faced a system polluted with profit motives working against their efforts to promptly and reasonably resolve their alleged violations. The Constitution prohibits this unjust profit motive, and the Mallorys are likely to prevail on Count III of their Complaint.

### D. Plaintiffs will likely prevail on Count IV: Improper Burden of Proof for Permitting and on Count V: Presumption of Wrongdoing.

Again, this Court need only find that Plaintiffs have a reasonable probability of success on the merits of *one* of their claims in order to grant a temporary injunction, but Plaintiffs are likely to succeed on all five, including Counts IV and V of their Complaint, which allege improper burdens of proof in the enforcement process. The Due Process Clause of the Fourteenth Amendment requires that governments bear the burden of proving ordinance violations and guarantees those accused of wrongdoing a meaningful

opportunity to defend themselves and be heard before they are deprived of their property. *See, e.g.*, *Goldberg v. Kelly*, 397 U.S. 254, 267–71 (1970) ("Certain principles have remained relatively immutable in our jurisprudence. . . . [T]he evidence used to prove the Government's case must be disclosed to the individual so that he has an opportunity to show that it is untrue." (internal quotation omitted)); *cf., e.g.*, *City of Cudahy v. DeLuca*, 49 Wis. 2d 90, 92–93, 181 N.W.2d 374, 375 (1970) (holding that local governments generally must prove municipal ordinance violations by a preponderance of the evidence). Despite these constitutional guarantees, the Town has threatened the Mallorys with fines dated back to the anonymous complaint, even though the Town did not send an inspector to the Mallorys' property until nearly a month after the complaint was submitted. The Town, therefore, has threatened to impose significant fines and fees, and used these threats to manipulate the Mallorys into making undesired changes to their property, on the mere presumption of violations, instead of rising to its burden of proof.

Relatedly, the Town has deprived the Mallorys of a meaningful opportunity to be heard by denying them the right to demonstrate that their structures were properly permitted through evidence other than the permits themselves. The Town's restriction of admissible evidence to the permit records, which the Town itself is responsible for maintaining, strips the Mallorys of their constitutional right to meaningfully defend their property. *See S. Lyme Prop. Owners Assoc., Inc. v. Town of Old Lyme*, 121 F. Supp. 2d 195,

207 (D. Conn. 2000) ("For owners who have not kept historical records on the use of their property, [limiting admissible evidence to those records] is meaningless.").

The Town has threatened fines and fees without satisfying its burden of proof or providing the Mallorys a meaningful opportunity to be heard. As such, the Mallorys are likely to succeed on the merits of their claims.

## CONCLUSION

If Defendants are not enjoined from pursuing and enforcing ordinance violations against the Mallorys while this suit is pending, the Mallorys will suffer significant and irreparable harms that far outweigh any harm Defendants may suffer in delaying their enforcement proceedings. Therefore, and because the Mallorys are likely to succeed on the merits of at least one of their claims, the Court should grant this motion and enjoin Defendants from pursuing or taking any enforcement actions against the Mallorys— including inspecting the Mallorys' property, requiring the Mallorys to make any changes to their property, imposing additional fines and fees, or filing enforcement claims—for (1) conditions or alleged violations that existed on their property at the time or before this lawsuit was filed; or (2) violations that may be alleged to occur during the pendency of this lawsuit but that are based on ordinances Defendants cited the Mallorys for violating before this lawsuit was filed.

Dated: December 7, 2020

Alexa Gervasi*                              Electronically signed by Michael Van Kleunen
Kirby West*                                 Michael P. Van Kleunen (SBN: 1113958)
Marie Miller*                               CRAMER, MULTHAUF & HAMMES, LLP
INSTITUTE FOR JUSTICE                       1601 East Racine Avenue • Suite 200
901 N. Glebe Rd., Suite 900                 P.O. Box 558
Arlington, VA 22203                         Waukesha, WI 53187
(703) 682-9320                              (262) 542-4278
agervasi@ij.org; kwest@ij.org;             mvk@cmhlaw.com
mmiller@ij.org                             *Local Counsel for Plaintiffs*
*Lead Counsel for Plaintiffs*

*Motion for admission pro hac vice
pending

# Exhibit A

**STATE OF WISCONSIN**     **CIRCUIT COURT**     **WAUKESHA COUNTY**

ERICA BREWER, et al.,

       *Plaintiffs*,

    v.              Case No. 2020CV001583
                        Case Codes: 30701, 30704, 30301

TOWN OF EAGLE, et al.,

       *Defendants*.

---

### AFFIDAVIT OF ERICA F. BREWER

---

Erica F. Brewer, of legal age and being duly sworn, states:

1. I, along with my husband, Zachary Mallory, am a Plaintiff in the above-captioned lawsuit.

2. I am employed as an operating room nurse, and my husband is employed as a cyber-security specialist.

3. My husband and I are the owners of the 3.8-acre property at W367 S9594 South Road, Eagle, WI 53119-1571, which we purchased in 2016.

4. We purchased the property with plans to build a farming business that would enable us to retire early from our current careers to become full-time farmers.

5. On our property, we maintain our home, a barn, a chicken coop, and sixteen beehives.

6. We grow produce on our property, which we previously sold from a farm stand located on our property.

7. For our family, farming is not only a fulfilling way of life, but it also provides an essential source of income.

8. A few years ago, after learning that officials for the Town of Eagle were impeding our neighbors' ability to run a small horse farm on their property, my husband and I began speaking out at public town meetings and on social media.

9. Our advocacy on behalf of our neighbors revealed even more wrongdoings by town officials, so we made an effort to attend as many public town meetings as possible and to speak out at those meetings and on social media in an effort to hold the town officials accountable.

10. Then, in May of 2020, we received a letter from Tim Schwecke, the Town Planner and Zoning Administrator, informing us that a complaint had been submitted alleging ordinance violations on our property.

11. We submitted an open records request to the Town Clerk, Lynn Pepper, asking for a copy of the complaint.

12. Schwecke responded to our request and provided a copy of the anonymous complaint, which alleged numerous violations.

13. On June 18, 2020, Schwecke and the Building Inspector, Martin Montoya, came onto our property for an inspection.

14. In a letter dated June 30, 2020, Schwecke and Montoya alleged that there were nine violations on our property that required remediation.

15. Many of the alleged violations are violations that other residents of the town, including our own neighbors, commit without consequence, even though the town has been made aware of these violations.

16. In response to the notice of violation, we hired an attorney and began taking steps to come into compliance.

17. We regularly communicated with Schwecke, Montoya, the members of the town board, and the town's attorney regarding our compliance efforts.

18. The town has also repeatedly, on at least five separate occasions, sent representatives to our property for re-inspections of our property.

19. During these communications and inspections, we routinely received competing advice on exactly what steps we needed to take to satisfy the town.

20. Between July and October, and in response to the town's allegations of violations, we closed and tore down our farm stand, tore down our greenhouse, removed equipment and building materials from our property, trimmed our grass and weeds, and made arrangements to slaughter our sheep.

21. We would not have taken these steps, which were not in the best interest of our farm, without the town's threats of extreme fines and fees.

22. On October 5, 2020, we provided the town with an update of this progress, and we requested an extension of time for coming into compliance.

23. The town informed us that unless we comply with all of its demands, including signing a cost-reimbursement agreement, the town would fine us around $20,000.

24. Between October and today, we have taken additional steps to come into compliance, including tearing down our canvas shed and slaughtering our sheep.

25. We have suffered financial consequences and our farming efforts have been hindered because of the changes that the town has forced us to make on our property.

26. For instance, because the town will not allow us to temporarily house offspring from our sheep, we have been forced to slaughter the entire flock. It is not financially responsible to maintain sheep through the winter if we are not permitted to breed them in the spring.

27. Because the town was citing us for violations that other residents regularly commit, and because town officials have demonstrated displeasure with our efforts to hold them accountable, we suspected that the town was only acting against us in retaliation for our criticisms.

28. Then, on October 27, 2020, I received an email from one of the board members, Janis Suhm, confirming that the town officials were upset with my husband and me because of our statements at town meetings and on Facebook and were punishing us for those statements by enforcing these alleged violations.

29. During a board meeting on November 9, 2020, the town board voted to file a lawsuit against my husband and me to seek fines and fees for the alleged violations.

30. As of today, the town has not filed any claims against my husband or me.

31. My family wants to stay on our farm and pursue our dreams of building a successful and sustainable farming business, but we will not be able to remain in the Town of Eagle if we are forced to choose between speaking our minds and facing retaliation or staying quiet and letting the town officials act without accountability.

_Erica F. Brewer_

Erica F. Brewer

I, _Leslie Ann Hook_, a Notary Public for the County of _Waukesha_, Wisconsin, do certify that Erica F. Brewer, personally came before me this day and executed the foregoing instrument, and I have seen satisfactory evidence of her identity, by a current state or federal identification with her photograph, in the form of a _driver's license_.

Witness my hand and official stamp or seal, this the _4th_ day of December, 2020.

_Leslie Ann Hook_

Notary Public
Commission expires: _6/17/2024_

LESLIE ANN HOOK
Notary Public
State of Wisconsin

4

# Exhibit B



May 19, 2020

Mailed via regular mail and certified mail (#7017 2620 0000 1405 6810)

Erica and Zachary Mallory
W367S9594 South Road
Eagle, WI 53119-1571

Subject: Site inspection at W367S9594 South Road

Dear Mr. and Mrs. Mallory,

The Town of Eagle has received a complaint alleging that you are violating the Town's zoning regulations.

At this point, we have not determined if there is merit to the complaint or not. Please call me at 920-728-2814 so that we can set up a time for a site inspection. If you get my voicemail, please leave your telephone number and a time you would be available for a return call or the site inspection.

If you prefer, you can send me an email at tim.schwecke@civitekconsulting.com.

Either way, please contact me by May 29, 2020.

Thank you in advance for your cooperation.

Sincerely,

Tim Schwecke, Town Planner
Town of Eagle

cc:     Don Malek, Town Chairman
        Lynn Pepper, Town Clerk

# Exhibit C

May 15, 2020

Chairman Don Malek,
Town of Eagle, WI
Subject: W367S9594 South Rd. Zoning Code Violations

The subject property is zoned Rural Residential and appear to violate numerous
sections of the Town of Eagle Municipal Code:

- Running a retail business with constant traffic and order fulfillment; Social media posts promoting this residential address as a CSA drop site.
- Excess grazing animals per acre; Social media posts announcing an intention to sell meat to the public
- Unconfined poultry, possibly excess poultry
- Livestock kept in an accessory building less than 50 feet from a lot line
- An excess quantity of accessory buildings
- Unpermitted construction/expansion of accessory buildings
- Outdoor wood burning stove too close to residence

I ask that you please investigate these infractions.

Cc: Tim Schwecke

received
5 / 17 / 2020

# Exhibit D



June 30, 2020

Mailed via regular mail and certified mail #7017 2620 0000 1405 6841

Erica Brewer and Zachary Mallory
W367S9594 South Road
Eagle, WI 53119-1571

Subject:   Notice of violations of building code, zoning code, and property maintenance code at W367S9594 South
Road

Dear Ms. Brewer and Mr. Mallory,

Following an on-site inspection conducted on June 24, 2020 pursuant to a special inspection warrant, we have
determined there are various violations on the above-mentioned property relating to the building code, zoning code,
and the town's property maintenance ordinance.

The purpose of this letter is to describe (1) the nature of the violations, (2) how you can remedy the violations, (3) the
penalties for such violations, and (4) how you can obtain the Town Zoning Code.

### 1. Violations

**A. Detached accessory buildings.** There are five detached accessory buildings on the property. There are no Town
records indicating the necessary zoning permits or building permits were obtained when they were first constructed
and/or expanded.

The zoning code does not allow more than two detached accessory buildings. In addition to there being too many
accessory buildings, one of the buildings is soft-sided (i.e., plastic or fabric over a frame). The zoning code, however,
does not allow soft-sided structures (s. 500.854).

If, however, you have evidence that the soft-sided building was installed before March 28, 2017, please advise and
forward any supporting evidence. Likewise, if you believe you have evidence that you have obtained any permits or
approvals for any of the detached buildings, please share that information with us.

**B. Hot tub.** There is an outdoor hot tub on the property that is heated with an integrated wood burner. There are no
Town records indicating you obtained the necessary zoning permits.

In regards to the wood burner, you should be aware that the town adopted an ordinance for regulating outdoor wood
furnaces.

If you believe the hot tub was installed before March 28, 2017, please advise and forward any supporting evidence.
Likewise, if you did obtain any permits or approvals for the hot tub, please share that information with us.

**C. Home business.** You are operating a home business, including the retail sale of farm produce "Malory's Farm
Fresh Stand." This use is classified by the Town's zoning ordinance as an "on-site farm stand," assuming the items
offered for sale are grown on site. Development standards are set forth in s. 500.894 of the Town's zoning code. Such

Page 2

use is only allowed following the issuance of a zoning permit. Again, there are no records of any zoning permit approved by the Town for this use.

If you are selling other items not produced on site, please advise. Again, if you believe you have evidence of having obtained the necessary permits or approvals for the roadside stand, please share them with us.

**D. Livestock**. During the inspection there were approximately 20 geese and 7 sheep observed, three of which appeared to be yearlings. We did not enter any of the buildings, so it is possible there may be more than what was observed at that time. Based on the size of the property (3.8 acres), however, no more than 3 head of livestock (i.e., sheep, goats, horse) are allowed. If there are no more than 30 poultry, those would be in compliance.

**E. Location of building housing livestock**. The Town's Zoning Ordinance requires that a building housing livestock must be at least 50 feet from all lot lines. The building where the sheep were being housed is closer than 50 feet to the side lot line and, therefore, is in violation of the Zoning Ordinance.

**F. General property maintenance**. The Town of Eagle has a Property Maintenance Ordinance (00-07). Section 4A of that ordinance restricts outside storage. We observed unused building materials, unused fencing, and household equipment and other items stored out of doors. Section 4C of that ordinance stipulates that turf grass and/or weeks may not exceed 12 inches tall. In places, we observed grass and weeds in excess of that.

**G. Building permits**. It appears you are currently building something on the second floor deck of the house, perhaps a screened porch. Regardless of what is being constructed, that work has not been permitted.

As previously explained, there are five detached buildings that have not been permitted. In addition, there is a water line to one of the detached buildings, without being permitted. There is electrical power to one or more of the detached buildings, without being permitted. Some of the detached buildings have not been completed (e.g., exposed plywood on roof).

Please understand these are the violations we observed at the time and violations may be revised to account for information you share with us and as we work with you on this matter.

**2. Remedy for the Violation**
To remedy the permit violations described above, you will need to apply for all necessary zoning and building permits, which will be reviewed under the codes in effect at the time of submittal. Any buildings/uses not allowed must be removed. In this regard, do not undertake any work on any of the detached buildings in the hopes of correcting any above-noted deficiencies until such work is done under a zoning permit and building permit. With regard to the property maintenance ordinance, you will need to clean up the yard.

**3. Penalties**
Failure to remedy each of the violations described within this letter will result in for the Town pursuing legal action. Each day of each violation is a separate offense for which a monetary penalty may be imposed. The Town may also seek injunctive relief to compel your compliance.

Section 500.1055 of the zoning code establishes the monetary penalties for zoning violations as follows:

Any person who violates, disobeys, omits, neglects, or refuses to comply with, or who resists the enforcement of, any of the provisions of this chapter, shall be subject to a forfeiture of not less than $10.00 and not to exceed the sum of $2,000.00 for each offense, together with the costs of the action, and in default of the payment thereof, shall be imprisoned in the county jail, for a period of not to exceed 6 months, or until such forfeiture and the subsequent costs have been paid.

Section 6 of the property maintenance ordinance establishes the following penalty:

Page 3

Violators shall pay a forfeiture of a minimum of $100 up to a maximum of $200 plus costs and assessments. Each day that a violation takes place or continues is a separate violation.

Section 1-1-21 of the building code established the following penalty:

Every person, firm, or entity which violates this code shall, upon conviction, forfeit not less than $25.00 nor more than $1,000.00 for each day of non-compliance, together with the costs and assessments imposed by the state an court.

Finally, some of the application fees may be considered after-the-fact, which may have a higher amount.

**4. Town Codes**
You may view the all of the above-reference codes/ordinances at the town hall during normal office hours, depending on staffing. In this regard, you may want to call in advance to ensure the office is open and the materials are readily available. The zoning code is posted online at https://townofeaglewi.us/zoning-code-map/.

Questions relating to the property maintenance ordinance and the building code may be directed to Martin Montoya, Building Inspector, at 262-894-2982 or via email at mmontoya@safebuilt.com. Questions relating to the zoning code should be directed to Tim Schwecke, Zoning Administrator, at 920-728-2814 or via email at tim.schwecke@civitekconsulting.com.

If you do not contact us in the next 30 days, we will recommend that the Town Board pursue court action. In light of the daily fines for each violation, however, it is important that you resolve the violations as soon as possible. Once you believe you are in compliance, you need to contact us.

Thank you in advance for your cooperation.

Sincerely,

Martin Montoya, Town Building Inspector

Tim Schwecke, Town Planner/Zoning Administrator
Town of Eagle

cc:  Don Malek, Town Chairman
     Lynn Pepper, Town Clerk

# Exhibit E



September 15, 2020

Via email to Attorney Van Kleunen at mvk@cmhlaw.com

Erica Brewer and Zachary Mallory
W367S9594 South Road
Eagle, WI 53119-1571

Subject:   Results of on-site inspection on September 14, 2020

Dear Ms. Brewer and Mr. Mallory,

The purpose of this letter is to outline my findings as of this date.

**A. Detached accessory buildings**. As noted in the original complaint letter, five detached accessory buildings were on the property. The building for the roadside stand located in front of the house has been completely removed. You stated that you'll remove the greenhouse located along the north lot line by the end of this week. In the correspondence from your Attorney dated September 15, 2020, he states that the soft-sided structure will be removed by October 31, 2020.

You will need to obtain a zoning permit and building permit for each of the remaining accessory buildings.

**B. Hot tub.** There is an outdoor hot tub on the property that is heated with an integrated wood burner. There are no Town records indicating you obtained the necessary zoning permits.

In the correspondence from your Attorney dated September 15, 2020, he states that the outdoor wood burner will not be used. You should remove the smoke stack which would render the unit inoperable.

If you believe the hot tub was installed before March 28, 2017, please advise and forward any supporting evidence. In this regard, you may submit a signed and dated letter indicating the date you believe it was installed.

**C. Home business**. During our visit you indicated that you are no longer selling anything directly from your property. Signs directly related to your business have been removed along with the roadside stand in the front of your house. As I understand it, you are still growing produce and selling it off-site at farmers markets and other outlets, which is perfectly fine.

**D. Livestock**. During the inspection, there are 5 head of livestock on the property. In the correspondence from your Attorney dated September 15, 2020, he states that the 2 of the livestock will be removed by Thanksgiving Day, 2020.

**E. Location of building housing livestock**. The Town's Zoning Ordinance requires that a building housing livestock must be at least 50 feet from all lot lines. The building where the sheep were being housed is closer than 50 feet to the side lot line and, therefore, is in violation of the Zoning Ordinance.

In this regard, the Town is working on a zoning code amendment, which if adopted as drafted, would remove that 50-foot restriction on buildings housing livestock.

Page 2
_____

With regard to the above, you are asking for additional time as follows:
- Remove greenhouse no later than September 19, 2020
- Remove soft-sided building no later than October 31, 2020
- Remove two of the livestock no later than Thanksgiving Day, 2020 (leaving 3)

I would also suggest these following timelines:
- Remove the smoke stack on the wood burner no later than September 19, 2020
- Apply for all necessary zoning and building permits no later than October 2, 2020

With regard to property maintenance, we will review that progress consistent with the Town Board's direction and can potentially be done at any future inspections.

I will be reviewing my findings with the Town Board at their meeting on September 16, 2020. You should plan on attending the meeting online to answer any questions. Details for joining the meeting will be included on the meeting agenda.

If you should have any questions, you may contact me at 920-728-2814 or via email at tim.schwecke@civitekconsulting.com.

Finally, thank you for your continued cooperation.

Sincerely,


Tim Schwecke, Town Planner/Zoning Administrator


Town of Eagle


cc:  Martin Montoya, Town Building Inspector
     Don Malek, Town Chairman
     Lynn Pepper, Town Clerk

# Exhibit F



DALE W. ARENZ, RETIRED
DONALD S. MOLTER, JR., RETIRED
JOHN P. MACY
H. STANLEY RIFFLE
 COURT COMMISSIONER
ERIC J. LARSON
REMZY D. BITAR

730 N. GRAND AVENUE
WAUKESHA, WISCONSIN 53186
Telephone (262) 548-1340
Direct Line (262) 806-0218
Facsimile (262) 548-9211
Email: palexy@ammr.net

PAUL E. ALEXY
MATTEO REGINATO
LUKE A. MARTELL
SAMANTHA R. SCHMID
STEPHEN J. CENTINARIO, JR.
AMY E, FRY-GALOW
CHRISTOPHER R. SCHULTZ
ANTHONY GARCIA
SADIE ZURFLUH

October 9, 2020

**VIA E-MAIL ONLY**

Atty. Michael P. Van Kleunen
Cramer, Multhauf & Hammes, LLP
1601 East Racine Ave.
Waukesha, WI 53187-0558

RE:      Town of Eagle
         Zach Mallory and Erica Brewer
         Code Violations at W367S9594 South Road

Dear Mr. Van Kleunen:

The Town Board considered the requests made by you on your clients' behalf along with the e-mail correspondence they submitted directly to the Board at its October 5, 2020 meeting.  This letter sets forth the Board's response.

At the outset, the Board is concerned by the apparent lack of effort to address the multiple violations listed in the June 30, 2020 "Notice of violations of building code, zoning code, and property maintenance code at W367S9594 South Road"  Although the greenhouse and the on-site farm stand have been removed, the Building Inspector's report (enclosed) demonstrates that the majority of violations listed in the June 30, Notice still remain.  Moreover, there has been no follow-through on the previous representation to the Board that all permits were going to be immediately applied for.  *Nevertheless*, in a good faith effort to allow your clients one *final* opportunity to resolve their violations without initiation of enforcement proceedings, the Town Board proposes the following resolution.

**Hot Tub**

The Building Inspector's October 2, correspondence states that the heater must be <u>fully</u> removed.  The Board concurs with the Building Inspector and rejects your assertion that simply removing the vent pipe has remedied the violation.  <u>Removal must be accomplished on or before October 31, 2020 to comply with the terms of this offer by the Town.</u>

**Accessory Structures**

Your September 15, letter to the Board stated that "Three of the structures will be removed…".  To date, only two have been removed and the Board rejects your more recent contention that soft-sided structures were not expressly prohibited under the previous zoning ordinance.  No permits were obtained for this structure and its presence on the property violates the permitted number of

October 9, 2020
Page 2 of 3

accessory buildings.  Further, as explained in previous correspondence, uses that are merely "accessory" or "incidental" cannot acquire non-conforming status.

The Board also rejects your contention that the mere *potential* for a *future* ordinance change justifies accessory buildings in excess of what is permitted.  The Town's *current* code consideration process is going on two years and there is no date established when that process will be fully completed.

Therefore, removal of the soft-sided structure must be accomplished on or before October 31, 2020 to comply with this offer by the Town.  In addition, as set forth in the Building Inspector's October 2, report, a zoning permit, building permit, fee payments, and code compliant plans are required and an inspection after the approved plans and permits are issued.

**Property Maintenance**

The Board reviewed the photos submitted by the Building Inspector from his September 30, 2020 inspection with regard to the "vast amount of outside storage." The Board concurred with the Building Inspector that the property violates the Town's Property Maintenance Ordinance.

 Notwithstanding the references to the property being a *farm*, the property is zoned under the Rural *Residential* zoning district.  Moreover, the Board noted that neither the accumulated materials nor the grass and weeds in excess of 12" have any bearing on any *farming* operation(s). Accordingly, the property maintenance violations documented in the Building Inspector's October 2, 2020 letter must be accomplished on or before October 31, 2020 to comply with the terms of this offer by the Town.

**Additional Code Violations**

As set forth in the Building Inspector's October 2, letter:

- The second-floor structure must be removed or, in the alternative, your client must obtain a permit and comply with the Building Code required.
- The exterior water line/hydrant adjacent to the "barn" requires application for a permit, submission of specifications, and payment of the applicable permit fees.
- The property has fifteen (15) beehives in the rear yard. The Town ordinance limits the number of permitted beehives to two (lot size of 3.845 acres) and requires compliance with all Wisconsin state laws relating to beekeeping including Wis. Stat. § 94.76.

These violations must be remedied in accordance with the Building Inspector's October 2, 2002 letter on or before October 31, 2020 to comply with the terms of this offer by the Town.

**Excess Livestock**

Although your clients' have referred to a reduction in the number of livestock due to "two untimely deaths," the long-standing limits on the number of animals remain.  In consideration for compliance with all other aspects of this offer by the Town, however, the Town Board will, on a one-time basis, grant the original request to extend the time for compliance until Thanksgiving Day (November 26, 2020).

**MUNICIPAL LAW & LITIGATION GROUP, S.C.**
**ARENZ, MOLTER, MACY, RIFFLE, LARSON & BITAR**

October 9, 2020
Page 3 of 3

**Barn Setback Violation**

The barn remains in violation of the setback requirements due to its use to house animals. Although a change is currently being considered, an actual change in the ordinance requires a recommendation from the Town's planning commission, a public hearing, approval by the Town Board *and* approval by the Waukesha County Board. No timeframe has been established as to when this process might be concluded. <u>In exchange for compliance with *all* other aspects of this offer, application for a permit, and payment of all applicable permit fees, the Town will forego compliance with the setback requirement.</u>

**Additional Provisions**

In addition to compliance with <u>all</u> of the foregoing requirements within the applicable time limitations, your Clients must sign a reimbursement agreement with the Town to demonstrate their agreement to reimburse the Town for its costs and expenses in addressing the violations. Finally, while as previously noted the Town Board is providing this opportunity to your clients in a good faith effort to allow them to resolve the violations without the need to resort to an enforcement action, in the event of violation of, or rejection of the terms set forth in this letter the Town <u>will</u> pursue its remedies for each day of each violation. Giving consideration to the original complaint having been received in May, 2020, the number of violations, and the minimum per diem penalties under the applicable ordinances, an enforcement action could result in forfeitures in the area of $20,000 in the event of noncompliance.

Finally, this letter is part of compromise negotiations and settlement communications pursuant to Federal Rules of Evidence 408, Wis. Stat. § 904.08 and any other applicable state laws and rules.

Please contact me directly with any questions you may have.

Very truly yours,

MUNICIPAL LAW & LITIGATION GROUP, S.C.

*Paul E. Alexy*

cc:     Don Malek, Town Chair
        Town Board
        Lynn Pepper, Town Clerk

# Exhibit G

 Gmail

**Erica Brewer <erica.f.brewer@gmail.com>**

## Re: TOWN OF EAGLE BOARD OCT 21 MEETING UPDATE

1 message

**Janis Suhm** <janissuhm@gmail.com>                                                    Tue, Oct 27, 2020 at 7:00 PM
To: erica.f.brewer@gmail.com

Let me rephrase that . . . My opinion does matter, but it doesn't change anything as far as votes go. I state facts, suggestions, opinions all the time, but it is always 4 to 1. I need some help next year or things will not change!

As far as your closed session is concerned, Originally I was told I couldn't vote due to our friendship, but I fought to be able to discuss and vote. I argued to voice my opinions. You have literally ticked off all the board members with your meeting comments and on facebook. That wasn't good because the board members voted with emotion. Permits and action by you is needed to be applied for to get this over with.

I am in the process of gathering and typing out information on what I feel are important changes in the land use zoning code ordinances. I will then share this information prior to the November meeting. The residents should know what is going on prior to the public hearing coming up.

I am trying to stay strong, but it is very difficult when I am lumped into "The Board" by residents also. I wish Zoom would end and more people would attend the meetings. I will also be sending an email to Lynn and let her know what happened and to straighten out the town's website. Agendas and meeting minutes also need to be done in a timely manner.

Respectfully,

Janis Suhm

On Tue, Oct 27, 2020 at 9:58 AM <erica.f.brewer@gmail.com> wrote:
  Wow. Thanks for this info.

  Why do you say your opinion doesn't matter?
  Is that why you voted against us in closed session and previous motions?

  I hope you'd value yourself more and who you represent. Yes, in a room of 5 you are one vote, but on the record your one vote stands out and represents many!

  What if the board takes action in the direction of misconduct, and you don't agree but you take the stance your one vote doesn't matter so you say yes and agree.

  Did you know that is a FELONY??? Residents can go after YOU personally!!! Your vote that supposedly doesn't matter, could lump you in to the wrong thing.

  I hope you can come into you're own with this board and not be limited in standing up for what's right. I've always believed in you!

  Erica
  (608) 770-0301

  On Oct 26, 2020, at 9:59 PM, Janis Suhm <janissuhm@gmail.com> wrote:

  We also had a budget workshop meeting and we are short $36,000 after we used the reserve from last year. Mainly due to excessive atty and planner fees. They are cracking down on Schwenke for duplicate charges, charges with Lynn and the same topic with Malek. They blamed it on violations! Not because there are too many ordinances as they make more! I believe a referendum to raise the levy is coming up!? I don't know if that's private or not. I never said anything. I already voiced my opinion on referendum, but doesn't matter!
  Jan

On Mon, Oct 26, 2020 at 9:51 PM Janis Suhm <janissuhm@gmail.com> wrote:
I'm not sure.  I think there is a dollar minimum, then they don't have to have bids.  But Malek didn't even know about the fence cause he asked Lynn what it was for.  He reprimanded her that this was the first he knew about it and he should have known about it.  Who;s running the show?

Jan

On Mon, Oct 26, 2020 at 7:52 PM <erica.f.brewer@gmail.com> wrote:
Thanks for this!!!

That's terrible she didn't listen or consider her error. Even worse: she was happy about it!

So for these costs- fencing, pump, aren't they supposed to ask for bids???

I don't recall those requests...

This Town...

Erica
(608) 770-0301

On Oct 25, 2020, at 10:04 PM, Janis Suhm <janissuhm@gmail.com> wrote:

Of course there were no public comments due to the password mixup.  I suggested Lynn check ID and password on agenda and she stated it was right. She was surprised and happy that their was noone on the zoom meeting tho.
Final Claims:  Several questions from Malek and Suhm as follows. . .
Banyon Data Systems - tax software annual fee $440.00, Bear Graphics - Envelopes for Absentee ballots  $450, BP Business Solutions - Lynn to check out (Fuel for dpw trucks??), Inclusion Solutions - Sanitation wands $998.00 Grant is paying for wands., James Imaging System - $187.34 overage on color copies and ink cartridges, JKS Homes - $2,000 road bonds, Linda Kinjerski - Lynn to check ???, Lemke Fence of Jef $187.32 fixing of fence someone damaged  in park, Lincoln Contractors - $3744.00 Pump rental of Menghe's property, Mukwonago Village - $800.00 Dispatch Annual fee.
10.  Library reported that we are only 17 items lower than Sept. 2019!  Library closed on Nov. 3 due to using library for voters entering lines.
11.  Fire Department:  Consolidated numbers were sent to the committees for review.  Pancake breakfast cancelled.
12.  Operator's License - approved upon clear background check.
13.  Approval of Election Inspectors Roster
14.  Report on Village Board Meeting by me.
15.  Private Roads, town trying to determine how to collect tax for the improvement and maintenance of the private roads (I believe 5 of them.) Roadmasters are to discuss 3 options.  1)  Continue to collect monies for private road on your own accord for maintenance.  2)  Establish a Homeowners Association per Wis Stats. where you can establish your own rules/regulations. or 3) Make an application to the Town of Eagle to take over the road as a town public road, although the Town is not obligated to do so.  Property owners will be billed for services such as tree trimming, snow plowing and road surface repairs through special assessments.

Hope that helps with missing the meeting.

Jan Suhm

FILED
12-07-2020
Clerk of Circuit Court
Waukesha County
2020CV001583

665 F.3d 860
United States Court of Appeals,
Seventh Circuit.

Jose SURITA, Margaret Carrasco and
Chris Blanks, Plaintiffs–Appellees,
v.
Richard HYDE and William
Biang, Defendants–Appellants.

No. 09–1165.
|
Argued Jan. 7, 2011.
|
Decided Dec. 22, 2011.

**Synopsis**
**Background:** Opponents of a city towing ordinance sued the city, its mayor, and its police chief, alleging that defendants violated their rights under the First Amendment and the Equal Protection Clause by denying some of them entry to city council meetings, by taking action against them as retaliation for their protest activities, and by applying a city assembly ordinance against them in an unconstitutional manner. The United States District Court for the Northern District of Illinois, Milton I. Shadur, J., 590 F.Supp.2d 1024, entered summary judgment against defendants on a qualified immunity defense, and they appealed.

**Holdings:** The Court of Appeals, Clevert, District Judge, sitting by designation, held that:

mayor violated an opponent's First Amendment rights when he intentionally barred her from speaking at a city council meeting;

mayor was not entitled to qualified immunity for barring the opponent from speaking;

police chief's involvement in imposing a cash deposit or fee for a protest rally was based on the content of an opponent's speech, in violation of the First Amendment;

triable fact issues existed as to a protestor's First Amendment chilling claim against the chief; and

chief's involvement in the application of an assembly ordinance to an opponent was insufficient to support imposition of § 1983 liability.

Affirmed in part, reversed in part, and remanded.

Manion, Circuit Judge, filed a concurring and dissenting opinion.

**Procedural Posture(s):** On Appeal; Motion for Summary Judgment.

**Attorneys and Law Firms**

**\*865** Robert S. Libman, Jeffrey I. Cummings (argued), Nancy L. Maldonado, Attorneys, Miner, Barnhill & Galland, Chicago, IL, for Plaintiffs–Appellees.

James A. Flesch (argued), Attorney, Glickman, Flesch & Rosenwein, Chicago, IL, for Defendants–Appellants.

Before MANION and WILLIAMS, Circuit Judges, and CLEVERT, District Judge. *

**Opinion**

CLEVERT, District Judge.

A towing ordinance of the City of Waukegan generated several rallies or marches in opposition. While dealing with protestors, City officials barred a citizen from speaking at a city council meeting and imposed outdoor assembly permit and fee requirements. Several individuals then sued the City, its mayor, and its police chief under 42 U.S.C. § 1983, alleging violations of their First Amendment rights of free speech, of assembly, and to petition government for redress of grievances. Mayor Richard Hyde and Police Chief William Biang appeal the district court's denial of qualified immunity as to the First Amendment claims of Jose Surita, Margaret Carrasco, and Chris Blanks.

I

In 2002 the City of Waukegan amended its towing ordinance to allow police to seize and impound vehicles and to impose a $500 fine on persons driving without a valid license or proof of insurance (the "Towing Ordinance"). The Towing Ordinance generated protests that it applied more harshly against minorities.

In early– and mid–2004, Waukegan maintained an outdoor assembly ordinance establishing procedures for the permitting of certain outdoor events (the "Assembly Ordinance"). Written application for a permit had to be made twenty days in advance of the outdoor event, and Waukegan had discretion to require the organizer of the event to pay a cash deposit as a condition of permit issuance. Waukegan's **\*866** police department was responsible for conducting an investigation and making a report and recommendation to the city clerk in connection with events covered by the Assembly Ordinance.

### A. Surita's Claims against Mayor Hyde

During a large rally on January 18, 2004, at Waukegan's Belvidere Mall, Jose Surita criticized Susana Figueroa, the City's community liaison officer. Although details of the encounter are in dispute, the parties agree that Surita told Figueroa "she should do more to help her people." Following the rally, Figueroa reported to Mayor Richard Hyde that Surita had been very angry, "got in her face," and caused her to fear that he would attack her physically.

The Waukegan City Council set aside ten minutes at the end of each of its bimonthly meetings for "audience time." Any member of the public could talk for up to three minutes, on any subject. The mayor was presiding officer and chair of the meetings.

At a meeting on January 20, 2004, Mayor Hyde told Surita, as he stood at the microphone during audience time, that he would not be allowed to speak until he apologized to Figueroa. Hyde chastised Surita for his comments to Figueroa at the Belvidere Mall rally two days earlier:

> All right. Now I want to make one thing clear here because I was going to talk to this gentleman.... The city employees do what they are asked by the city ordinances. We have a Community Liaison Officer. We don't have an Afro American, we have got a Hispanic and she works for the City of Waukegan. Now, Sunday she was severely confronted with language right in her face by a male. And, now,

any man that does that to a woman is lower than a rat. So before I will hear any person of that speaking, you will come to see me after the council meeting and you will go to that lady and you will apologize because you severely hurt her, her personality and her feelings.... And if that person does not apologize to her in person to her face, the next time that happens I will have that person arrested and booked on intimidation. And that is legal. That is very legal. I want to make that known right now because I don't think our employees should have to put up with anything from anybody because they are city employees. They are doing what they are told to do. And this Hispanic lady was confronted with a Hispanic man. And how any man could talk to a woman like that, I don't know. If he was talking to another man like that he'd be decked, right there. So that is all I have to say about that. Okay. No, I am not going to listen to you until you get up and you go to ... Suzanne—I'm talking to you. Until you go to Suzanne Figueroa and you apologize to her. Thank you. Okay, Alderman's time.

Surita wanted to discuss the Towing Ordinance during audience time but did not speak at the city council meeting. Other members of the public addressed the council at the meeting, some discussing the Towing Ordinance.

### B. Carrasco's Claims against Police Chief Biang

Margaret Carrasco opposed the Towing Ordinance and participated in a march on June 28, 2004, to protest it. Waukegan's Chief of Police, William Biang, was informed that Carrasco intended to conduct a rally on July 6, 2004, in conjunction with a city council meeting that night. He was told the upcoming rally would be larger than one at which protesters seemed hostile to police.

WESTLAW    © 2020 Thomson Reuters. No claim to original U.S. Government Works.    2

**\*867** On July 1, 2004, Biang sent an officer to Carrasco's house to ask her to attend a meeting that day to discuss the upcoming rally. Carrasco attended the meeting that afternoon with Biang, three other police officers, and city attorney Gretchen Neddenriep. Exactly what was said at the July 1 meeting is disputed, but the parties agree that Carrasco said she and others would attend the city council meeting on July 6.

At the July 1 meeting, Neddenriep handed Carrasco a copy of the Assembly Ordinance and asked her to comply with it. A follow-up letter from Neddenriep the next day stated that Waukegan would waive the requirement that the application be filed in advance but that Carrasco had to pay a permit fee of $1,500. The fee was based on the number of extra police officers Biang determined were needed for the rally (ten officers at $50 per hour for three hours each). Biang was copied on the letter.

Biang has said that he determined more officers were needed for the rally because it was a protest as opposed to a rally in favor of a City ordinance. Out of 530 events in a five-year period, only two were determined to require payment of a permit fee, and those were protests against the Towing Ordinance. The two events triggering a permit fee were Carrasco's possible event and another planned by Chris Blanks, discussed below.

On July 6, 2004, Carrasco told Biang and Neddenriep that there would be no event that day, pointing out that no deposit was required for overflowing city council meetings. At the July 6 city council meeting Biang reserved eight or ten seats for Carrasco and her group.

### C. Blanks's Claims against Police Chief Biang

Chris Blanks engaged in numerous protest activities against the Towing Ordinance, including attending the Belvidere Mall rally and speaking at city council meetings in July and August 2004. Biang was aware that Blanks was an outspoken critic of the Towing Ordinance.

In August 2004, Blanks advertised a rally against the Towing Ordinance to be held September 4, 2004, in Bedrosian Park, which was owned by the Waukegan Park District. The Park District had its own permit rules, and the Assembly Ordinance did not apply to its property.

After learning of the planned rally, Biang instructed his deputy chief, Artis Yancey, to check whether Blanks had a permit from the Park District and to "handle it." Yancey learned that Blanks had no permit and told Neddenriep.

On September 2, 2004, Neddenriep had a uniformed police officer deliver a letter to Blanks advising him that he was violating the Assembly Ordinance because he had not obtained a permit twenty days in advance. The letter told Blanks that failure to comply with the Assembly Ordinance would result in a violation. However, the letter did not advise Blanks that the Park District, rather than Waukegan, owned Bedrosian Park.

Biang and the city prosecutor were copied on the letter. Blanks was the only person ever advised in writing in advance of an event that he was violating the Assembly Ordinance. Moreover, he and Carrasco were the only persons against whom the Assembly Ordinance was enforced. After receiving the letter Blanks canceled the September 4 rally.

## II

No final judgment was entered by the district court because the case has not concluded. Generally, federal appellate courts possess jurisdiction to hear appeals **\*868** from final decisions only, *see* 🔖 *Viilo v. Eyre,* 547 F.3d 707, 711 (7th Cir.2008), and denials of summary judgment do not qualify as final decisions in most instances, 🔖 *Ortiz v. Jordan,* —— U.S. ——, 131 S.Ct. 884, 891, 178 L.Ed.2d 703 (2011). However, Hyde and Biang appeal the denial of qualified immunity. Assertions of qualified immunity may fall under one of the exceptions to final judgment under the collateral order doctrine. 🔖 *Id.;* 🔖 *Viilo,* 547 F.3d at 711. Some pretrial orders denying qualified immunity are appealable immediately because review after trial would come too late to vindicate the right of public officials not to stand trial. 🔖 *Mitchell v. Forsyth,* 472 U.S. 511, 525–27, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985); 🔖 *Viilo,* 547 F.3d at 711. Accordingly, orders denying summary judgment on the basis of qualified immunity are appealable immediately when the appellate court need not consider the correctness of the plaintiff's version of the facts but need only determine a question of law. 🔖 *Mitchell,* 472 U.S. at 528, 105 S.Ct. 2806; 🔖 *Viilo,* 547 F.3d at 711. If the immunity question cannot

be decided without resolving a disputed question of fact, we lack jurisdiction over the appeal of that question. *Ortiz,* 131 S.Ct. at 891; *Hill v. Coppleson,* 627 F.3d 601, 605 (7th Cir.2010). [1]

 We review de novo the district court's denial of defendants' motions for summary judgment based on qualified immunity. *Hill,* 627 F.3d at 605.

 Qualified immunity protects government officials from liability for civil damages if their actions did not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan,* 555 U.S. 223, 231, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009); *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). It shields an officer from liability if the officer "reasonably believes that his or her conduct complies with the law." *Pearson,* 555 U.S. at 244, 129 S.Ct. 808. Analysis of an assertion of qualified immunity involves two familiar questions: (1) whether a constitutional right was violated using plaintiff's version of the facts, and (2) whether that right was clearly established at the time. *Pearson,* 555 U.S. at 236, 129 S.Ct. 808; *Viilo,* 547 F.3d at 709–10.

 To be clearly established a right must be specific to the relevant factual context of a cited case and not generalized with respect to the amendment that is the basis of the claim. *Viilo,* 547 F.3d at 710. However, a case with similar facts is not necessarily required; the violation may be so obvious in light of law existing at the time that a reasonable person would have known that his or her conduct was unconstitutional. *Brokaw v. Mercer Cnty.,* 235 F.3d 1000, 1023 (7th Cir.2000).

### A. Surita's Claims against Mayor Hyde

The district court characterized Surita's **\*869** First Amendment [2] claim as based on two theories: (1) the audience time portion of the city council meetings was a designated public forum and Mayor Hyde's refusal to allow Surita to speak was a content-based restriction not narrowly tailored to a compelling governmental interest, and (2) Hyde retaliated against Surita for the exercise of his protected speech at the Belvidere Mall by barring him from speaking at the city council meeting. The district court found in Surita's favor on the first theory and did not address the second.

 The First Amendment permits government to regulate use of its property in certain instances depending on the nature of that property. Traditional public forums are places with a long history of being devoted to assembly and debate, such as public streets and parks. Designated public forums are locations or channels of communication that the government opens up for use by the public for expressive activity. Public property not open for public communication by tradition or designation is deemed a nonpublic forum. *Ark. Educ. Television Comm'n v. Forbes,* 523 U.S. 666, 677, 118 S.Ct. 1633, 140 L.Ed.2d 875 (1998); *Cornelius v. NAACP Legal Defense & Educ. Fund, Inc.,* 473 U.S. 788, 800, 802, 105 S.Ct. 3439, 87 L.Ed.2d 567 (1985); *Perry Educ. Ass'n v. Perry Local Educators' Ass'n,* 460 U.S. 37, 45–46, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983); *Christian Legal Soc'y v. Walker,* 453 F.3d 853, 865 (7th Cir.2006).

 A designated public forum is created when the government intentionally makes property or a channel of communication generally open or available to a class of speakers rather permitting only selective access to particular speakers who must obtain permission to use it. *Ark. Educ. Television Comm'n,* 523 U.S. at 678–79, 118 S.Ct. 1633.

There is no doubt that audience time during Waukegan city council meetings constituted a designated public forum. *See, e.g.,* *City of Madison Joint Sch. Dist. No. 8 v. Wis. Emp't Relations Comm'n,* 429 U.S. 167, 176, 97 S.Ct. 421, 50 L.Ed.2d 376 (1976) ("[W]hen the board sits in public meetings to conduct public business and hear the views of citizens, it may not be required to discriminate between speakers on the basis of ... their speech."); *Mesa v. White,* 197 F.3d 1041, 1044 (10th Cir.1999) (noting a lack of dispute regarding whether the public comment period of a county commission meeting was a designated public forum); *White v. City of Norwalk,* 900 F.2d 1421, 1425 (9th Cir.1990) ("City Council meetings like Norwalk's, where the public is afforded the opportunity to address the Council, are the focus of highly important individual and governmental interests.... [S]uch meetings, once opened, have been regarded as public forums, albeit limited ones.");

*Jones v. Heyman,* 888 F.2d 1328, 1331 (11th Cir.1989) ("[T]he city commission designated their meeting a public forum when the commission intentionally opened it to the public and permitted public discourse on agenda items.");

*see* *Collinson v. Gott,* 895 F.2d 994, 1000 (4th Cir.1990) (Phillips, J., concurring) ("Speech at public meetings called by government officials for discussion of matters of public concern is entitled to normal first amendment protections against general restrictions or *ad hoc* parliamentary rulings by presiding officials."); *Musso v. Hourigan,* 836 F.2d 736, 742 (2d Cir.1988) (noting that an open school board meeting is a place where public speech is **\*870** usually allowed); *cf.* *Ark. Educ. Television Comm'n,* 523 U.S. at 680, 118 S.Ct. 1633 (contrasting a nonpublic forum candidate debate with "an open-microphone format"). Hyde concedes that audience time during Waukegan city council meetings was a designated public forum.

Government has only a limited ability to regulate expressive activity in traditional and designated public forums. Any content-based exclusion of speech in such forums is subject to strict scrutiny, meaning that the government must show the exclusion "is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end." *Perry Educ. Ass'n,* 460 U.S. at 45, 103 S.Ct. 948; *accord* *Ark. Educ. Television Comm'n,* 523 U.S. at 677, 118 S.Ct. 1633. Government may enforce reasonable time, place, and manner restrictions provided they are content neutral, they are narrowly tailored to serve a significant government interest, and ample alternative channels of communication exist. *Perry Educ. Ass'n,* 460 U.S. at 45, 103 S.Ct. 948.

Hyde argues his bar on Surita's speech was a permissible time, place or manner restriction because he believed Surita had addressed Figueroa threateningly. However, content neutrality is a basic requirement of a time, place or manner restriction, and the barring of Surita's speech was not content neutral.

Government may not discriminate among speakers. *United States v. Playboy Entm't Grp., Inc.,* 529 U.S. 803, 812, 120 S.Ct. 1878, 146 L.Ed.2d 865 (2000); *City of Madison Joint Sch. Dist. No. 8,* 429 U.S. at 176, 97 S.Ct. 421; *First Nat'l Bank of Bos. v. Bellotti,* 435 U.S. 765, 784–85, 98 S.Ct. 1407, 55 L.Ed.2d 707 (1978) ("In the

realm of protected speech, the legislature is constitutionally disqualified from dictating ... the speakers who may address a public issue."). "Laws designed or intended to suppress or restrict the expression of specific speakers contradict basic First Amendment principles." *Playboy Entm't Grp.,* 529 U.S. at 812, 120 S.Ct. 1878. Just as the government may not favor one speaker over another, *Rosenberger v. Rector & Visitors of Univ. of Va.,* 515 U.S. 819, 828, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995), neither may it disfavor one speaker over another. Although distinctions on the basis of subject matter and identity regarding access to *non*public forums may be inescapable, they are impermissible respecting access to traditional or designated public forums. *See* *Perry Educ. Ass'n,* 460 U.S. at 49, 103 S.Ct. 948. "The government violates the Free Speech Clause of the First Amendment when it excludes a speaker from a speech forum the speaker is entitled to enter." *Christian Legal Soc'y,* 453 F.3d at 865.

Hyde barred anything and everything Surita proposed to say at a public meeting. Because he excluded a speaker within the class to which the designated public forum was available his action is subject to strict scrutiny. *Ark. Educ. Television Comm'n,* 523 U.S. at 677, 118 S.Ct. 1633. Restrictions that favor or disfavor certain speech based on the speaker rather than the content of the message are still content based. *Solantic, LLC v. City of Neptune Beach,* 410 F.3d 1250, 1265 (11th Cir.2005). The content-based nature of Hyde's restriction on Surita is highlighted by Hyde's demand that Surita apologize regarding statements attributed to him by a city employee. Government officials may neither stifle speech because of its message nor require the utterance of a particular message they favor. *See* *Turner Broad. Sys., Inc. v. FCC,* 512 U.S. 622, 641–42, 114 S.Ct. 2445, 129 L.Ed.2d 497 (1994); *Solantic, LLC,* 410 F.3d at 1258.

**\*871** Hyde contends he did not bar Surita from speaking at a city council meeting because of Surita's anticipated objection to Waukegan's Towing Ordinance—indeed, that night other speakers criticized the Towing Ordinance and Figueroa. Instead, Hyde says he barred Surita's speech because of how he believed Surita had confronted Figueroa. Thus, he maintains, the bar was content neutral and permissible.

That others were permitted to speak on the same subject that Surita was expected to address has no bearing on whether the restriction was content based. The Supreme Court

has rejected the argument that a First Amendment violation requires an intention to suppress certain ideas. *See City of Cincinnati v. Discovery Network, Inc.,* 507 U.S. 410, 429, 113 S.Ct. 1505, 123 L.Ed.2d 99 (1993). Actual disagreement with content is not necessary for finding the regulation of speech to be content based. *See id.; Mesa,* 197 F.3d at 1045 n. 4. Therefore, whether Surita wished to speak in protest against the Towing Ordinance, to congratulate the mayor on a job well done, or to contend that Waukegan should collect garbage differently does not alter the analysis. When Hyde intentionally barred Surita from speaking he barred the content of Surita's speech, regardless of whether he agreed or disagreed with the viewpoint Surita was going to expound.

Moreover, even if Hyde's restriction were content neutral, no reasonable jury would find a total bar on Surita's speech to have been a valid time, place, or manner restriction. On January 20, 2004, Surita approached the microphone at the appropriate time, and no cited evidence suggests that he was planning to address the city council in an inappropriate manner. However, Hyde contends that Surita's prior actions at the Belvidere Mall were possibly criminal disorderly conduct; Hyde heard reports that Surita's conduct at the mall rally was threatening in manner or content. Regardless, Surita's possible disorderly conduct two days earlier cannot justify a restriction at the city council meeting. Surita was not barred from speaking at the city council meeting for disorderly conduct or being belligerent. He was not barred from speaking because he had strayed from an announced limited topic, was being repetitive, or had exceeded his three-minute time frame. *See White,* 900 F.2d at 1426 ("A speaker may disrupt a Council meeting by speaking too long, by being unduly repetitious, or by extended discussion of irrelevancies. The meeting is disrupted because the Council is prevented from accomplishing its business in a reasonably efficient manner."). He was barred completely because of something that had occurred two days earlier—not at the city council meeting or even related to it. Hyde's willingness to permit Surita to speak if he apologized first undermines any possible argument that Surita was out-of-line at the city council meeting; if his manner were disruptive, Hyde could have barred his speech completely rather than premise it upon an apology. Hence, the restriction on Surita was not a content-neutral time, place or manner restriction; instead, it was a content-based exclusion that had to be narrowly tailored to effectuate a compelling governmental interest. On that front, Hyde fails to present any compelling interest to justify prohibition of Surita's speech. He argues that his restriction on

Surita's speech was justified as a sanction for conduct toward Figueroa.

Penalties for speech protected under the First Amendment are forbidden. *Fairley v. Andrews,* 578 F.3d 518, 525 (7th Cir.2009). Viewing the facts in Surita's favor, his speech at the Belvidere Mall was **\*872** not threatening. But even if Surita threatened Figueroa at the Belvidere Mall rally as Hyde may have been told, nothing in the record indicates that Surita's proposed speech at the city council meeting would be threatening. Therefore, Hyde used Surita's prior speech to prohibit subsequent protected speech. As the district court pointed out, the absolute prohibition on Surita's speech fails the strict-scrutiny test. Consequently, we conclude that Hyde violated Surita's First Amendment rights.

Next we consider whether as of January 20, 2004, a reasonable person should have known that barring Surita from speaking during city council audience time unless he apologized to Figueroa was a constitutional violation. The answer is "yes." *Playboy Entertainment Group, City of Madison Joint School District No. 8, Perry Education Ass'n, Rosenberger, Mesa,* and *Jones* predated the January 20, 2004, city council meeting. Taken together, these cases clearly established that the city council meeting was a designated public forum, that barring a speaker from any speech in a traditional or designated forum constituted a content-based restriction, and that barring Surita from speaking in that designated public forum because of his alleged actions or words two days earlier was not a valid time, place, or manner restriction and thereby constitutionally impermissible. The Supreme Court cases described above set forth the basics of First Amendment forum analysis and the difference between content-based restrictions (including the suppression of a particular speaker's words) and content-neutral time, place and manner restrictions.

Before 2004 several cases applied those standards to settings of public hearings and meetings of government bodies. For instance, the Second Circuit found that under clearly established law as of September 1983, content-based censorship practiced by a school board official during a public hearing constituted a First Amendment violation. *See Musso,* 836 F.2d at 742–44. One concurring judge in *Collinson* found that by March 1987 an official would have known that he could not constitutionally evict a person from a public meeting if there was no reasonable basis for fearing disruption or if his actual purpose was to prevent expression

of the speaker's viewpoint. 895 F.2d at 1000 (Phillips, J., concurring).

Hyde asserts that many of these cases, dealing with regulation in the form of legislation, cannot have informed him that his ad hoc action at a city council meeting would violate Surita's rights. *See, e.g.,* First Nat'l Bank of Bos., 435 U.S. at 784–85, 98 S.Ct. 1407 (discussing restrictions on acts of the legislature). Yet, in stating that "[i]t is axiomatic that the government may not regulate speech based on its substantive content or the message it conveys," Rosenberger, 515 U.S. at 828, 115 S.Ct. 2510, the Supreme Court did not limit its meaning for the word "regulate" solely to legislation or contrast it against individual acts of municipal officials. In fact, *Rosenberger* involved a University committee's refusal to pay for printing costs of a student publication rather than any form of legislation. Further, the *Musso* and *Jones* courts recognized, in 1988 and 1989 respectively, that First Amendment rights may be violated by ad hoc parliamentary rulings at public meetings or hearings. *See* 836 F.2d at 742–44, 888 F.2d at 1331–34. In 1990, the concurring judge in *Collinson* stated that under the law as of March 1987 speech at public meetings was entitled to normal First Amendment protections against ad hoc rulings by presiding officials. 895 F.2d at 1000. These legal rules and standards **\*873** were acknowledged to be clear more than ten years before Hyde silenced Surita.

Hyde contends that for Surita to avoid his qualified immunity defense Surita had to prove that he intended to suppress speech on the basis of its content. This court discussed in *Hansen v. Bennett* the importance of the intent requirement for a First Amendment claim into the objective qualified immunity standard, finding that the plaintiff must show that a reasonable person in the defendant's position, " 'that is, one acting on [defendant's] information and motivated by [defendant's] purpose,' would have known that ejecting [plaintiff from a public hearing] violated his clearly established rights." 948 F.2d 397, 399 n. 4 (7th Cir.1991). Here, Hyde's purpose in silencing Surita is apparent from his words at the city council meeting: he demanded that Surita apologize to Figueroa before he would be allowed to speak. A reasonable person in January 2004 would have known that silencing Surita for that purpose was constitutionally impermissible. Thus, the denial of qualified immunity on this theory is affirmed.

District Judge Shadur did not address Surita's retaliation theory, nor did he mention the retaliation case of Vukadinovich v. Board of School Trustees of North Newton School Corp., 278 F.3d 693 (7th Cir.2002), in regard to Surita's claim (instead, he did so as to Carrasco's claim). Yet, Hyde contends that the district judge used the standard of *Vukadinovich,* allowing a claim of retaliation for exercise of First Amendment rights to move forward if retaliation was simply one motivating factor of the defendant, rather than the *Fairley* standard requiring that retaliation for exercise of First Amendment rights be the "but-for" cause of the restriction on speech.

In addressing Carrasco's retaliation claim, Judge Shadur used a burden-shifting test from *Vukadinovich:* (1) the speech was constitutionally protected (plaintiff's burden); (2) the defendant's actions were motivated by the plaintiff's protected speech (plaintiff's burden); and (3) the defendant cannot show he would have taken the same action in the absence of the plaintiff's exercise of First Amendment rights (defendant's burden). The judge observed that if Biang met his burden on the third element, the burden shifted back to Carrasco to show that the proffered justifications were pretextual. See Vukadinovich, 278 F.3d at 699. This test required at step (2) only that the constitutionally protected speech was a motivating factor.

Hyde and Biang argue that the motivating-factor portion of the *Vukadinovich* test has been rejected. In Fairley, 578 F.3d at 525, we wrote that after Gross v. FBL Financial Services, Inc., 557 U.S. 167, 129 S.Ct. 2343, 174 L.Ed.2d 119 (2009), but-for causation is part of a plaintiff's burden in all suits under federal law, including First Amendment chilling claims, unless the statute provides otherwise. (The district court decision in the present case predated *Gross* and *Fairley.*) Nevertheless, the *Fairley* court recognized that before trial, if the record contains evidence from which a reasonable jury could find such causation, no more is necessary at that stage, though the instructions at trial must reflect the holding of *Gross.* 578 F.3d at 526.

*Fairley* revived a standard we had used at times. *See* Abrams v. Walker, 307 F.3d 650, 655 (7th Cir.2002) (stating that a plaintiff cannot prevail without establishing that the challenged action would not have occurred "but for" the protected conduct). We disavowed *Abrams*'s

but-for causation in favor of motivating-factor causation in June 2004, *Spiegla v. Hull,* 371 F.3d 928, 941–42 (7th Cir.2004), but returned **\*874** to but-for causation in *Fairley* in 2009. *Vukadinovich,* which predated *Abrams,* had noted the motivating-factor standard, 278 F.3d at 699, and that the plaintiff had to show the challenged action would not have occurred but for constitutionally protected conduct, *id.* at 700. Hyde's barring of Surita's speech occurred after *Vukadinovich* and *Abrams* but before *Spiegla.*

Recently, in *Greene v. Doruff,* 660 F.3d 975 (7th Cir.2011), we addressed the tension in our cases between motivating-factor causation and but-for causation, clarifying that First Amendment cases are governed not by *Gross* but by *Mt. Healthy City School District Board of Education v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977). *Greene,* 660 F.3d at 977. We noted that *Spiegla* and *Fairley* are correct to an extent because the burden of proof relating to causation is divided between the parties in First Amendment cases. *Id.* at 979–80. To meet the prima facie burden regarding causation in a First Amendment case, a plaintiff needs to show only that the defendant's conduct was a motivating factor, i.e., a "sufficient factor," meaning when something present makes something else bound to happen. *Id.* at 978–79. The defendant can then rebut that showing, but only by establishing that his or her conduct was not a but-for or "necessary condition" of the harm, i.e., that the harm would have occurred anyway. *Id.* at 979.

Thus, Judge Shadur was not wrong in referencing a burden-shifting test that included a plaintiff's burden to show a motivating factor. Moreover, at the summary judgment stage the burden-shifting test is used to determine whether a plaintiff makes it to trial. Even as we stated in *Fairley,* if evidence exists upon which a reasonable jury could find but-for causation, no more is necessary to overcome a defendant's summary judgment motion.

Here, viewing the facts in Surita's favor, his speech at the Belvidere Mall was protected. Hyde argues that he was not motivated to suppress Surita's point of view but only the threatening manner in which Surita's view was delivered. However, Hyde's comments during the city council meeting indicate that Surita was silenced to induce him to apologize for the Belvidere Mall speech; by Hyde's own

words, excluding Surita from speaking was a reaction to what Surita said at the Belvidere Mall. Thus, Hyde's comments at the meeting provide evidence that the Belvidere Mall speech was the cause (whether motivating or but-for) that prevented Surita from expressing his views at the city council meeting.

Even before January 2004 an official's act taken in retaliation for the exercise of free speech under the First Amendment was recognized to violate the Constitution. *Vukadinovich* and *Abrams,* decided in 2002, made clear that Hyde could not retaliate against someone for protected First Amendment speech, whether acting pursuant to a but-for motive or a substantially motivating one. Hence, a reasonable official in January 2004 would have known he could not retaliate.

### B. Carrasco's Claims Against Police Chief Biang

Carrasco asserts that Biang (1) violated her First Amendment rights by applying the Assembly Ordinance to her in a discriminatory manner; (2) retaliated against her for exercising First Amendment rights; and (3) attempted to chill her future exercise of First Amendment rights. Carrasco moved for and was granted summary judgment on her as-applied claim. Defendants moved for and were denied **\*875** summary judgment as to all of Carrasco's claims.

Biang contends that he did not participate in any unconstitutional conduct because Neddenriep applied the Assembly Ordinance to Carrasco; he contends he had no personal involvement. To be liable under § 1983, a government official must have caused the deprivation of a constitutional right. He may do so if the deprivation occurs at his direction or with his consent or if he "sets in motion a series of events that [he] knew or reasonably should have known would cause others to deprive plaintiff of constitutional rights." *Brokaw,* 235 F.3d at 1012.

It is undisputed that Biang called a July 1 meeting with Carrasco concerning a scheduled rally protesting Waukegan's Towing Ordinance. He also sent an officer to Carrasco's house to ask her to attend the meeting, where Waukegan's Assembly Ordinance was discussed. Viewing the facts in Carrasco's favor, Biang was directly involved in discussion of the application of the Assembly Ordinance. Further, the amount of the deposit for Carrasco's anticipated July 6 outdoor rally was determined based on Biang's recommendation regarding the number of police officers he would assign to the event.

Therefore, Biang was personally involved in the actual application of the Assembly Ordinance to Carrasco.

An as-applied challenge is one that charges an act is unconstitutional as applied to a plaintiff's specific activities even though it may be capable of valid application to others.

See *Members of City Council v. Taxpayers for Vincent,* 466 U.S. 789, 803 & n. 22, 104 S.Ct. 2118, 80 L.Ed.2d 772 (1984).

Parks and streets are traditional public forums. *Cornelius,* 473 U.S. at 802, 105 S.Ct. 3439; *Perry Educ. Ass'n,* 460 U.S. at 45, 103 S.Ct. 948. An ordinance requiring a permit and fee before speech in a traditional public forum is allowed amounts to a prior restraint on that speech, but the permit and fee may constitutionally be permitted to regulate competing uses of the forum. *Forsyth Cnty. v. Nationalist Movement,* 505 U.S. 123, 130, 112 S.Ct. 2395, 120 L.Ed.2d 101 (1992). Competing rallies at the same time in the same limited space could reduce the forum's availability for free speech or conflict with other uses of that space. *Thomas v. Chi. Park Dist.,* 227 F.3d 921, 924 (7th Cir.2000), *aff'd,* 534 U.S. 316, 122 S.Ct. 775, 151 L.Ed.2d 783 (2002). Again, reasonable time, place, and manner restrictions of speech in traditional public forums are permitted, but they must be content neutral and narrowly tailored to serve a significant government interest, and they must allow ample alternative channels of communication. *Id.; see* *Perry Educ. Ass'n,* 460 U.S. at 45, 103 S.Ct. 948. Restrictions that slip from neutral time, place, and manner concerns into concerns about content are never permitted. *Police Dep't v. Mosley,* 408 U.S. 92, 99, 92 S.Ct. 2286, 33 L.Ed.2d 212 (1972).

*Forsyth County* involved a facial challenge to a county ordinance that permitted an administrator to vary the permit fee for an assembly or parade to reflect estimated administrative expenses and the cost of maintaining public order. 505 U.S. at 127, 112 S.Ct. 2395. The Supreme Court held the ordinance unconstitutional because it lacked any narrow, reasonable, and definite standards to guide the fee determination: "The decision how much to charge for police protection or administrative time—or even whether to charge at all—is left to the whim of the administrator. There are no articulated standards either in the ordinance or in the county's established practice." **\*876** *Id.* at 133, 112 S.Ct. 2395. Further, the ordinance required the fee to be content

based. To calculate the cost of maintaining public order, the administrator had to examine the content of the applicant's speech, forecast the response of others to that content, and gauge the number of police officers needed for the event. *Id.* at 134, 112 S.Ct. 2395.

The Supreme Court ruled that a permitting scheme for parades or open-air assemblies must meet two requirements: (1) the scheme must not assign overly broad discretion to a government official, and (2) as with other time, place, and manner restrictions, the scheme must be content neutral and narrowly tailored to serve a governmental interest, while leaving ample alternatives for communication. *Id.* at 130, 112 S.Ct. 2395. The Court noted that raising revenue to cover police services cannot justify a content-based permit fee, regardless of whether the fee is considered nominal. *Id.* at 135–37, 112 S.Ct. 2395.

Although *Forsyth County* involved a facial challenge to an ordinance, its holding applies here; the problems noted in *Forsyth County* are the same problems Carrasco encountered. The deposit imposed on Carrasco was a function of the number of officers assigned to the event, and Biang admitted that he would have assigned fewer police officers to the July 6, 2004, rally if the event had been organized in support of the Towing Ordinance. Nevertheless, Biang contends his determination was content neutral because his reasoning would apply to any protest, not just a protest against the Towing Ordinance.

*Forsyth County* followed by fifty years the Court's decision in *Cox v. New Hampshire,* 312 U.S. 569, 61 S.Ct. 762, 85 L.Ed. 1049 (1941). At issue in *Cox* was a New Hampshire statute that required an applicant for a parade or open-air meeting license to pay up to $300 per day for use of city property. *Id.* at 571 n. 1, 61 S.Ct. 762. State courts determined that the fee offset expenses for maintaining public order during the event. *Id.* at 577, 61 S.Ct. 762. The Court held the fee constitutional, finding no basis for denying "local governments that flexibility of adjustment of fees which in the light of varying conditions would tend to conserve rather than impair the liberty sought." *Id.* Hence, Biang argues that under *Cox,* Waukegan may impose a fee determined by the anticipated expense of maintaining public safety.

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.    9

After *Forsyth County,* the viability of the fee discussion in *Cox* is limited. *729, Inc. v. Kenton Cnty. Fiscal Court,* 515 F.3d 485, 502 (6th Cir.2008). *Forsyth County* rejected a party's reference to *Cox* because no evidence indicated that the New Hampshire statute granted unbridled discretion to the licensing authority. 505 U.S. at 133 n. 11, 112 S.Ct. 2395. Further, although *Cox* stated that a flexible fee to cover expenses may be permissible, *Forsyth County* makes clear that predicating a flexible fee on content is *not* permissible. *See 729, Inc.,* 515 F.3d at 502–03. Although a government's concern over the burden of open-air assemblies on public resources may be legitimate, a cost-based fee may not rest on content. *Church of Am. Knights of Ku Klux Klan v. City of Gary,* 334 F.3d 676, 682 (7th Cir.2003). The government cannot impose financial burdens on speakers based on the content of their speech. *Rosenberger,* 515 U.S. at 828, 115 S.Ct. 2510.

Biang contends that *Forsyth County* applies only to the "heckler's veto" scenario—when counter-protesters are expected to cause trouble. But his reasoning is too narrow; *Forsyth County* applies to any ordinance that allows determination of an event permit fee grounded on content, even if pegged to anticipated administrative expense or the cost of maintaining public order. Justice Blackmun did not **\*877** limit the scope of the Court's decision to the heckler's veto scenario. Instead, he stated broadly that the Court was addressing whether the right to free speech was violated by an assembly ordinance that allowed a government official power to vary the fee according to the estimated cost of maintaining public order. 505 U.S. at 124, 112 S.Ct. 2395.

Here, the undisputed facts show that Carrasco was asked to pay a deposit calculated on the number of officers Biang thought necessary for the contemplated July 6 rally. Biang testified that he took into account that the event was a protest rally. Had the rally been in support of Waukegan's Towing Ordinance, he would have assigned fewer officers. Thus, Biang's application of the Assembly Ordinance fee to Carrasco was impermissibly content based. Raising revenue to cover police services cannot justify a content-based permit fee.

Biang maintains that he did not consider Carrasco's particular viewpoint. However, because he expected protesters to be angry he concluded that a hostile protest would require more officers. But deciding whether a person is speaking in protest or support of a law always involves consideration of viewpoint, and viewpoint discrimination is "an egregious form of content discrimination," *Rosenberger,* 515 U.S. at 829, 115 S.Ct. 2510.

Biang further contends that a municipality must be allowed to vary the number of officers it assigns to events. But assigning officers was not the constitutional violation. Nothing in the present discussion or caselaw suggests that police are not permitted to staff events according to the circumstances. The problem is in issuing permits and charging fees based on the content of the speech at the events; Biang's violation was his involvement in imposing a cash deposit or fee based on the content of Carrasco's speech.

After *Forsyth County* was decided in 1992, a reasonable official was on notice of the clearly established law regarding impermissible, content-based permitting fees. Further, *Brokaw* summarized in 2000 the law regarding an official's participation in a constitutional violation. Thus, by July 2004, a reasonable official should have known that applying the Assembly Ordinance and charging Carrasco a fee based on her protest viewpoint was constitutionally impermissible.

Carrasco claims that Biang applied the Assembly Ordinance to her in retaliation for her prior protests of the Towing Ordinance and to chill her future speech. Retaliation claims and chilling claims are related in that the Constitution protects citizens from penalties that follow protected speech (retaliation) and threats of penalties for future protected speech (chilling). *Fairley,* 578 F.3d at 525.

For the retaliation claim, the district judge used the burden-shifting test from *Vukadinovich* described above: (1) the speech was constitutionally protected (Carrasco's burden); (2) Biang's actions were motivated by Carrasco's protected speech (Carrasco's burden); and (3) Biang cannot show she would have taken the same action in the absence of Carrasco's exercise of her First Amendment rights (Biang's burden). The judge was mindful that if Biang met his burden on the third element, the burden shifted back to Carrasco to establish that the proffered justifications were pre-textual. This test required at step (2) only that the constitutionally protected speech was a motivating factor. Biang's argument that the *Vukadinovich* test was rejected in *Fairley* was addressed above.

Here, the first element of the retaliation claim is undisputed —Carrasco's June 28 speech was protected. Regarding motivation, **\*878** sufficient evidence establishes an issue of fact, whether under a but-for or motivating-factor causation standard. Biang knew of Carrasco's protected speech at the June 28 march and was told she was planning a larger rally. Just three days after Carrasco's protected speech Biang sent an officer to Carrasco's house and called her in for a meeting at which the Assembly Ordinance was applied. [3] The temporal proximity between the protected speech and application of the Assembly Ordinance suggests (while it may not establish) a retaliatory connection, but there is more. [4] This application of the Assembly Ordinance to Carrasco was, as the district judge put it, "completely out of the ordinary." Prior to July 1, 2004, the Assembly Ordinance had been applied to no one, even though it could have been applied to applicants for 500 earlier events. Yet, after Carrasco exercised her right to free speech on June 28, the Assembly Ordinance was applied to her next planned rally. Biang offers his reactions to other protest activity by Carrasco as evidence that he did not intentionally retaliate against her. For instance, he saved seats for Carrasco and her group at the July 6 city council meeting and at Carrasco's request he appeared at other events. But other conduct that comports with the Constitution does not excuse conduct that violates it.

Whether Biang would have taken the same action absent Carrasco's protest on June 28 is a question of fact. Biang may have had safety concerns about a large rally protesting the Towing Ordinance, but the unprecedented application of the Assembly Ordinance to Carrasco three days after her protected speech cannot be ignored. A reasonable jury could find in Carrasco's favor on this point.

Nevertheless, Biang would enjoy qualified immunity as to this claim if applicable law was not clearly established as of July 1, 2004. However, by then it was clear that Biang could not retaliate against a person for protected First Amendment speech. For these reasons, determination of Biang's qualified immunity defense must await presentation of the facts at trial.

Finally, we turn to Carrasco's chilling claim. The First Amendment prohibits threats of punishment designed to discourage future protected speech. *Fairley,* 578 F.3d at 525. We apply an objective test: whether the alleged conduct by the defendants would likely deter a person of ordinary firmness from continuing to engage in protected activity. *Id.; see Garcia v. City of Trenton,* 348 F.3d 726, 728–29

(8th Cir.2003). Again, Carrasco must show that her potential speech was at least a motivating cause of Biang's threat of punishment. *See Greene,* 660 F.3d at 978–79; *Fairley,* 578 F.3d at 525–26. Would a person of ordinary firmness be deterred from holding a rally if called to a meeting by a uniformed officer and told by the police chief and city attorney that the never-used Assembly Ordinance **\*879** would be enforced, a $1500 permit fee had to be paid, and failure to comply with the Assembly Ordinance would result in a violation of law and denial of future permit applications? Taking the facts in Carrasco's favor, especially in light of the selective nature of the Assembly Ordinance's application, a reasonable jury could answer "yes." Further, a reasonable jury could find that prohibiting Carrasco's speech was the motivating, or even but-for, cause of Biang's threats. At trial, Biang could contend that he was truly concerned about police expense, but the selective nature of the application of the ordinance suggests the contrary.

Biang contends that Carrasco's speech was not actually chilled. Moreover, chilling claims require damages. *Fairley,* 578 F.3d at 526. Here, there appears to be evidence that Carrasco was not planning a rally on July 6, and that she was able to protest the Towing Ordinance in other ways. But whether she was planning a rally on July 6 and chose not to proceed with it due to the threatened permit fee is a question of fact, as is whether she altered her means of protesting after learning that the Assembly Ordinance would apply to her protests. Notably, Neddenriep's letter warned that advance notice would not be waived for future permit applications. Perhaps, as a result, Carrasco foreswore future outdoor assemblies because of the threat. "The effect on freedom of speech may be small, but since there is no justification for harassing people for exercising their constitutional rights it need not be great in order to be actionable." *Bart v. Telford,* 677 F.2d 622, 625 (7th Cir.1982).

Regarding qualified immunity, Biang was on notice before July 2004 that prior restraints on speech are prohibited. While *Fairley,* in 2009, discussed confusion in use of the word "retaliation" to describe penalties for past speech (retaliation) and threats to deter future speech (chilling), prior restraints have been recognized for many years as forbidden and "quintessential first-amendment violation[s]." *See Fairley,* 578 F.3d at 525 (citing Supreme Court cases from 1976, 1975, and 1919).

### C. Blanks's Claims Against Police Chief Biang

Like Carrasco, Blanks raises (1) an as-applied claim regarding use of the Assembly Ordinance; (2) a retaliation claim; and (3) a chilling claim. His assertions stem from his planned September 4, 2004, protest at Bedrosian Park.

In a response similar to that regarding Carrasco's claim, Biang contends that he did not participate in any unconstitutional conduct because Neddenriep applied the Assembly Ordinance to Blanks, not he; according to Biang, he had no personal involvement. On this point, Biang succeeds.

Blanks contends that Biang did not adequately raise qualified immunity and the district court addressed qualified immunity only as to Blanks's retaliation and chilling claims. Qualified immunity pertaining to Blanks's claims first surfaced in Biang's reply brief on summary judgment. Moreover, it was fleeting—just one sentence accusing Blanks of failing to produce evidence of Biang's intent to retaliate or chill speech. However, Biang's failure to discuss qualified immunity respecting Blanks's as-applied claim appears due to Blanks's failure to clarify that he was bringing such a claim. The Third Amended Complaint named only Waukegan and clerk Wayne Motley as defendants for Blanks's as-applied claim. Biang was named only in regard to the retaliation and chilling claims.

**\*880** The district court addressed the qualified immunity issue, though briefly, and did not limit qualified immunity to the retaliation and chilling claims. Instead, Judge Shadur discussed qualified immunity as to Biang's overall liability. Hence, we will not find the qualified immunity issue waived when the district court did not.

Biang's involvement in the application of the Assembly Ordinance to Blanks was insufficient to support § 1983 liability. He may have told Yancey to handle the matter and check with Neddenriep about whether the Assembly Ordinance applied to a rally in Bedrosian Park, but that was not enough to find that Biang participated in applying the Assembly Ordinance to Blanks. Biang did not attend a meeting with Blanks during which application of the Assembly Ordinance to the September 4 event was discussed nor did he participate in determining any permit fee. Neddenriep, not Biang, applied the Assembly Ordinance. Moreover, Biang merely received a copy of the letter Neddenriep sent to Blanks, which no reasonable jury could

conclude is proof of personal involvement. The record includes nothing showing that Biang knew or reasonably should have known that Neddenriep would deprive Blanks of his constitutional rights.

The district judge thought Biang's instruction to Yancey to handle the matter was enough of a causal connection or affirmative link, but we disagree. Thus, summary judgment against Blanks is warranted on the first element of the qualified immunity defense. Further, under the law as of 2004 regarding personal involvement, which required direction or setting an event in motion, *see Brokaw*, 235 F.3d at 1012, a reasonable official in Biang's position would not have known that his direction to Yancey and failure to act upon receipt of Neddenriep's letter would have violated the Constitution.

### III

For the above-discussed reasons, we AFFIRM the denial of qualified immunity regarding the claims of Surita and Carrasco, REVERSE the denial of qualified immunity as to Blanks's claims, and REMAND the case for further proceedings consistent with this opinion.

MANION, Circuit Judge, concurring in part, dissenting in part.

I concur with the court's conclusion that qualified immunity should be denied to Mayor Hyde on plaintiff Surita's claim, and that qualified immunity should be accorded to Police Chief Biang on plaintiff Blanks's claim. But I disagree with the court's conclusion that Biang was "personally involved in the application of the Assembly Ordinance" against plaintiff Carrasco. (Opinion at 23.) The record evidence does not support this conclusion. Because there is no evidence that Biang was personally involved in the violation of Carrasco's constitutional rights, he is entitled to qualified immunity. Therefore, I concur in part and dissent in part.

As the court notes, Carrasco advanced three free-speech claims against Police Chief Biang: (1) that Biang applied the Assembly Ordinance in a discriminatory fashion; (2) that Biang applied the Assembly Ordinance in retaliation against Carrasco; and (3) that Biang applied the Assembly Ordinance to chill Carrasco's future speech. (Opinion at 22–23.) The common thread that runs through these claims is Biang's alleged improper application of the Assembly

Ordinance against Carrasco. If so, it is Biang's application of the Assembly Ordinance that allegedly caused a violation of Carrasco's constitutional rights.

**\*881**  When determining qualified immunity in this instance, we need to examine whether Biang actually caused a violation of Carrasco's constitutional rights. *Pearson v. Callahan,* 555 U.S. 223, 232, 236, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009). As the court correctly states, "[a]n official causes a constitutional violation if he sets in motion a series of events that [he] knew or reasonably should have known would cause others to deprive plaintiff of constitutional rights." *Brokaw v. Mercer Cnty.,* 235 F.3d 1000, 1012 (7th Cir.2000) (citation omitted). The court concludes that Biang caused a violation of Carrasco's constitutional rights by organizing a meeting with city attorney Gretchen Neddenriep, by sending a deputy to Carrasco's house to ask her to attend that meeting, and by calculating the number of officers that would be needed to patrol Carrasco's planned protest. (Opinion at 23.) This limited recitation of the facts leads the court to an erroneous conclusion.

Biang did initiate a meeting with Carrasco after he received word that Carrasco was planning a protest rally outside city hall that would coincide with a city council meeting. And a uniformed police officer did show up at Carrasco's door to invite her to come to the meeting—but only after a call to Carrasco's home had gone unanswered. As for the purpose of the meeting, the record also clearly shows that Biang's aim was "[t]o establish ground rules for where people were going to be [during the protest]." Aware that there were likely "First Amendment issues" surrounding the city's response to Carrasco's protest, Biang also invited Neddenriep so that she could cover any legal issues. Biang averred that, at the time he called for the meeting, he was not aware of any enforcement action that might be taken against Carrasco for not complying with the Assembly Ordinance. At the meeting, it is undisputed that Neddenriep provided Carrasco with a copy of the Assembly Ordinance and went through the permitting and fee requirements. Indeed, Carrasco herself stated that Neddenriep did most of the talking during the meeting and that Biang's comments were limited to logistics

and public safety concerns. This testimony corroborates Biang's contention that it was Neddenriep, not the police department, who decided to apply the Assembly Ordinance.

With this additional factual background, it is apparent that Neddenriep, not Biang, set in motion a series of events that she knew or reasonably should have known would cause others to deprive Carrasco of her constitutional rights. The undisputed evidence demonstrates that Biang called the meeting out of a concern for public safety, and that Biang's estimate of the number of police officers who were needed to patrol the protest was likewise made out of a concern for public safety. [1]  Moreover, Biang summoned Carrasco to the meeting with a uniformed officer only after the police had attempted to contact Carrasco via telephone. Most convincingly, Biang's unopposed testimony shows that he had no idea that Neddenriep would seek to impose the Assembly Ordinance's requirements on Carrasco.

Additionally, the court emphasizes the fact that, before the meeting with Carrasco, the Assembly Ordinance had never **\*882**  been applied despite the fact that more than 500 applications had been filed previously. (Opinion at 30.) But this fact actually cuts in favor of Biang. Indeed, because the city had never applied the Assembly Ordinance, Biang could not have known—nor could he have reasonably foreseen—at the time he called the meeting that Neddenriep would apply the Assembly Ordinance to Carrasco.

That said, for whatever reason, Carrasco did not name Neddenriep as a defendant. The uncontroverted testimony in this case points to Neddenriep as the official responsible for applying the Assembly Ordinance against Carrasco. Because no reasonable fact finder could conclude that Biang did anything that he knew or should have known would result in a violation of Carrasco's constitutional rights, I would reverse the district court and hold that qualified immunity applies to Carrasco's claims against Biang. Accordingly, I dissent.

**All Citations**

665 F.3d 860

**Footnotes**

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

\*     The Honorable Charles N. Clevert, Jr., Chief Judge of the United States Court for the Eastern District of Wisconsin, sitting by designation.

1     In some cases, the district court may conclude that even under the facts presented by the defendant, the defendant's actions violated clearly established law and qualified immunity does not apply. In others, the district court may deny summary judgment because if the facts are found in the plaintiff's favor the defendant is not immune. *Mitchell,* 472 U.S. at 527, 105 S.Ct. 2806. Here, the district judge granted summary judgment for plaintiffs Surita and Carrasco, determining that even under defendants' version of the facts plaintiffs Surita and Carrasco had established that their constitutional rights were violated, thus rejecting those assertions of qualified immunity completely. However, only the denial of qualified immunity under the collateral order rule is appealable; the grant of summary judgment in favor of plaintiffs Surita and Carrasco is not a final appealable order. As to Blanks's claims, the judge denied Biang's motion for summary judgment based on qualified immunity but did not grant summary judgment in Blanks's favor.

2     Although we reference the First Amendment, the protections of that amendment apply to the states through the Fourteenth Amendment. *See Perry Educ. Ass'n v. Perry Local Educators' Ass'n,* 460 U.S. 37, 44, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983).

3     Biang at times argues as if the July 1, 2004, meeting alone was his allegedly unconstitutional conduct. The July 1 meeting was not the problem; the application of the Assembly Ordinance at and after the meeting was.

4     According to Biang, the district court erred in relying on temporal proximity, citing *Sauzek v. Exxon Coal USA, Inc.,* 202 F.3d 913, 918 (7th Cir.2000). Although we have stated several times that suspicious timing alone does not support a reasonable inference of retaliation, the district court was not wrong to consider it in combination with other evidence. *See id.* (noting that "other circumstances must also be present"); *see also Greene,* 660 F.3d at 980 (stating that timing of a conduct report plus the threadbare nature of the report were sufficient to create a triable issue as to whether the report was issued in retaliation).

1     The court acknowledges that varying the number of officers assigned to different events does not violate the Constitution. (Opinion at 28.) The court concludes that Biang's violation was in calculating the permitting fees. But it is undisputed that Neddenriep, not Biang, provided Carrasco with the total fee amount. Therefore, by the court's own reasoning, Biang did not effect a constitutional violation by giving Neddenriep an estimate of the number of police officers needed to patrol the protest.

---

End of Document     © 2020 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW     © 2020 Thomson Reuters. No claim to original U.S. Government Works.     14

**FILED**
**12-07-2020**
**Clerk of Circuit Court**
**Waukesha County**
**2020CV001583**

121 F.Supp.2d 195
United States District Court, D. Connecticut.

SOUTH LYME PROPERTY OWNERS
ASSOCIATION, INC., Charles and
Victoria Parsons and Joan Byer, Plaintiffs,
v.
TOWN OF OLD LYME, Town of Old Lyme
Zoning Commission, Eric Fries, George James,
Jane Marsh, Thomas Risom, Walter Seifert,
Sharon Colvin and Marilyn Ozols, Defendants.

No. 3:00CV97 (EBB).
|
Oct. 10, 2000.

**Synopsis**

Association of property owners and property owners brought state-court action against town, town zoning commission, commission members, and town zoning enforcement officer, seeking to enjoin implementation and enforcement of amended zoning regulations, including systematic designation of properties as "seasonal." After defendants removed action, association and owners moved for preliminary injunction. The District Court, Burns, Senior District Judge, held that: (1) owners and association established irreparable harm required for preliminary injunction; (2) owners had constitutionally protected property interest in maintaining nonconforming, year-round use of their residential property; and (3) owners established likelihood of success on the merits.

Motion granted.

**Procedural Posture(s):** Motion for Preliminary Injunction.

**Attorneys and Law Firms**

**\*197** Kenneth R. Slater, Jr., Eisenberg, Anderson, Michalik & Lynch, New Britain, CT, for Plaintiffs.

Thomas R. Gerarde, David S. Monastersky, Howd & Ludorf, Hartford, CT, Mark K. Branse, Glastonbury, CT, for Defendants.

*Ruling on Plaintiffs' Motion for Preliminary Injunction*

BURNS, Senior District Judge.

Plaintiffs, an association of property owners in Old Lyme, Connecticut and two individually named Old Lyme property owners, seek to enjoin the Town of Old Lyme, the Town of Old Lyme Zoning Commission, its members, and its Zoning Enforcement Officer from implementing certain amendments, adopted in 1995, to the Old Lyme Zoning Regulations [hereinafter "the 1995 Regulations"]. For the reasons set forth below, the Court GRANTS Plaintiffs' motion for preliminary injunction.

## I. BACKGROUND

A. *Procedural History*

Plaintiffs commenced this action in Connecticut Superior Court in the Judicial District of New London, claiming that the adoption and enforcement of the 1995 Regulations regarding seasonal and year-round use of property violate Connecticut General Statutes § 8–2, Article I, §§ 8, 10 and 20 of the Connecticut Constitution, the Fifth and Fourteenth Amendments to the United States Constitution, and 42 U.S.C. § 1983. The action included a request for a preliminary injunction seeking to enjoin the systematic designation of properties as "seasonal" under the 1995 Regulations. [doc. # 5] On January 19, 2000, Defendants removed the action to this Court pursuant to 28 U.S.C. §§ 1441, 1443, and 1446, invoking jurisdiction under 28 U.S.C. §§ 1331 and 1343(3). [doc. # 1].

A three-day hearing on Plaintiffs' motion for preliminary injunction was held on April 12–14, 2000. During that hearing, Plaintiffs limited the scope of their request for a preliminary injunction to their procedural due process claim. Plaintiffs concede for the purposes of this motion only that the 1995 Regulations were validly adopted for a lawful public purpose and are rationally related to public health, safety, and welfare. (Transcript of 4/13/00 at 3–10 [hereinafter "Tr. (4/13)"].) The narrow issue for this motion, therefore, is whether the procedures employed to implement the 1995 Regulations violate the **\*198** fundamental requirements of due process of law. (*Id.* at 5–10.) On this ground alone, Plaintiffs seek temporary relief from the systematic seasonal-use-only determinations currently being made on an alphabetical street-by-street basis.

B. *Statement of Facts*

The Court finds the following facts based on a review of the record at the hearing on plaintiffs' motion for injunctive relief.

The South Lyme Property Owners Association, Inc. [hereinafter "the Association"] is a non-stock corporation located in Old Lyme, Connecticut. (Pls.' Ex. 1.) Its members are comprised of property owners in Old Lyme, and the organization was formed for the purpose of invalidating the 1995 Regulations challenged in this lawsuit. (Pls.' Exs. 2, 3.) Charles and Victoria Parsons are the owners of 11 Brookside Avenue, Old Lyme, Connecticut and are members of the Association. Joan Byer is the owner of 61 Breen Avenue, Old Lyme, Connecticut and is also a member of the Association. (Compl. at ¶¶ 8–9.)

The defendant Town of Old Lyme [hereinafter "the Town"] is a Connecticut municipal corporation. The Defendant Old Lyme Zoning Commission [hereinafter "the Commission"] is the municipal agency designated by the Town to administer the Zoning Regulations of the Town. (Compl. at ¶¶ 2–3.)

The Defendants Eric Fries, George James, Jane Marsh, Thomas Risom, Walter Seifert, and Sharon Colvin, at all times relevant to this action, are or were members of the Commission. Defendant Marilyn Ozols is the Zoning Enforcement Officer (ZEO) of the Town and is empowered to enforce the zoning regulations adopted by the Commission. (Compl. at ¶¶ 4–5.) Each of these defendants is sued in his or her official capacity

The properties at issue in this case are located in the "R–10" zoning district. R–10 stands for a residential classification on a lot of 10,000 square feet. (Transcript of 4/12/00 at 26–27 [hereinafter "Tr. (4/12)"].) Conforming parcels in the R–10 zone have a minimum of 10,000 square feet. Therefore, any lot in the R–10 zone containing less than 10,000 square feet is considered non-conforming. A nonconforming lot, use, or structure is one that is prohibited by a zoning regulation or amendment but which existed lawfully on the date the regulation prohibiting the lot, use, or structure became effective, and, therefore, may lawfully be continued. *See* Tondro, *Connecticut Land Use Regulation* 149–50 (2d Ed.1992); Conn.Gen.Stat. § 8–2(a); (J. Ex. 1, Attach.B, Art. I, § 8.1.1).

Prior to 1992, Article II, § A.1 of the Old Lyme Zoning Regulations [hereinafter "Pre–1992 Regulations"], (J. Ex. 1,

Attach.A), listed the permitted uses for all residential districts, including R–10 zones, and listed single family dwellings as a permitted use. *See* Pre1992 Regulations Art. I, § A.1.1; *see also* (Tr. (4/12) at 27–29). No provision in § A.1 appears to have restricted the use of an R–10 single-family dwelling to a particular time of year or season. The definitions section of the Pre–1992 Regulations defined a "seasonal dwelling" as "a dwelling unit, designed, used or intended to be used for seasonal use," Pre–1992 Regulations Art. I, § C.57, and defined "seasonal use" as "the use of a structure for dwelling purposes between April 1, and November 15, only." *Id.* Art. I, § C.58. Article I, § E.1, regulating non-conforming buildings and uses, prohibited the extension or expansion of any non-conforming use, *see id.* § E.1.3, and prohibited the extension or expansion of any building on a non-conforming lot. *See id.* § E.1.7. Section E, however, did not define "non-conforming uses," nor did it designate seasonal or year-round uses non-conforming in any given zone. [1]

**\*199** In 1992, the Commission passed zoning regulations [hereinafter 1992 Regulations], (J. Ex. 1, Attach.B), amending its non-conformity section under Article I to provide:

8.7 *Nonconformity—Use:* The following provisions and limitations shall apply to a nonconforming use, building or other structure:

8.7.1 *Enlargement:* No nonconforming use of land shall be enlarged, extended and altered, and no building or other structure or part thereof devoted to a nonconforming use shall be enlarged, extended, reconstructed or structurally altered, except where the result of such changes is to reduce or eliminate the nonconformity. This prohibition specifically includes the occupancy of a seasonal use beyond the period of April 1 to November 15 and the winterization, refurbishment or remodeling of a seasonal dwelling to accommodate other than seasonal use.

1992 Regulations Art. I, § 8.7.1. With respect to nonconforming lots, the Commission passed a similar regulation, providing:

8.8 *Nonconformity—Improvements:* The following provisions and limitations shall apply to nonconforming buildings and other structures and site development:

8.8.1 *Enlargement:* ... No building or other structure located on a lot which does not conform to the requirements of these Regulations regarding lot area, shape and frontage,

Case 2:20-cv-01820-JPS　Filed 12/09/20　Page 132 of 272　Document 1-2

**South Lyme Property Owners Ass'n, Inc. v. Town of Old Lyme, 121 F.Supp.2d 195 (2000)**

building bulk and coverage or off-street parking shall be enlarged or extended. These prohibitions specifically include the occupancy of a seasonal use beyond the period of April 1 to November 15 and the winterization, refurbishment or remodeling of a seasonal dwelling to accommodate other than seasonal use.

*Id.* § 8.8.1.[2] The 1992 Regulations continued to define "seasonal dwelling" and "seasonal use" in the definitions section, but again do not cross-reference any particular zones or districts. *See* 1992 Regulations Art. I, § 9.3. Article II, § 21.1, Schedule A–1 listed the permitted uses in residence and rural districts, and continued to include single-family dwellings as a permitted use of property. *See id.* Art. II, § 21.1, A–1. No provision in Schedule A–1 placed any time-of-year or seasonal restriction on the use of property in residential districts.[3]

In 1995, the Commission adopted amendments to the 1992 Regulations [hereinafter the "1995 Regulations"], (J. Ex. 1, Attach C), regarding the permitted use of property in residential districts.[4] **\*200** Most significantly, the Commission amended the schedule of permitted uses in residential zones to provide that year-round use of single-family dwellings is permitted "subject to the additional standards of Par. 21.2." 1995 Regulations Art. II, § 21.1. The relevant provisions under § 21.2 address the conversion of a seasonal use dwelling to a year-round use dwelling, *see id.* § 21.2.5; they do not prohibit all year-round use of property in the R–10 zone, or designate seasonal use as the only permitted use in the R–10 zone.[5] Section 21.2.5 of the 1995 Regulations provides:

21.2.5 *Conversion of Seasonal Use Dwellings to Year-round Use* (June 5, 1995)

a. No dwelling located in the Town of Old Lyme which on the effective date hereof is a seasonal use dwelling shall be converted to a year-round use dwelling unless an application for such conversion has been approved by the Zoning Enforcement Officer ... under the application requirements and standards set forth in subparagraph c. hereof.

b. For the purpose of administration of this section, the Zoning Enforcement Officer ... may designate from time to time those properties on which there has been an affirmative determination that there is located

thereon a seasonal use dwelling.... The absence of such designation shall merely mean no determination has been made by the Zoning Enforcement Officer of the Town of Old Lyme, and shall not be deemed to be evidence that a dwelling is a year-round use dwelling.

Nothing in this Regulation shall be deemed to preclude a landowner from contesting such designation by demonstrating to the Zoning Enforcement Officer that the designated seasonal use dwelling was a lawfully pre-existing non-conforming use, or prior to January 1, 1992 was a lawfully existing single detached dwelling for one family, located on a lot with not more than one such dwelling, and that such dwelling was continuously maintained as a year-round use dwelling thereafter....

Paragraph "C" then describes the standards for converting to year-round use, and, among other things, requires that the lot contain a minimum of 10,000 square feet, that there be no more than one dwelling unit on the lot, and that year-round water supply and on-site septic systems comply with applicable Connecticut Health Department standards. *See* 1995 Regulations Art. II, § 21.2.5(c).

These provisions essentially establish a permit system for conversion from seasonal to year-round use. Any property designated for seasonal use is subject to the permit system for conversion. In order to implement the permit system for conversion, **\*201** however, the Town must first establish which existing properties are seasonal use and which are year-round use. Section 21.2.5(b) enables the ZEO to issue these seasonal determinations. Finally, § 21.2.5(b) enables a property owner to challenge a seasonal use designation by demonstrating year-round use prior to 1992.[6]

Pursuant to this provision, the ZEO implemented a procedure to evaluate the status of existing properties on a systematic street-by-street basis in alphabetical order. The ZEO testified that the purpose of the evaluation is to determine current use of the property, but that related to determining current use is the issue of whether there was a valid non-conforming year-round use of the property existing prior to 1992 that the owner is entitled to maintain. (Tr. (4/13) at 47.) To that end, both the ZEO and Ms. Marsh acknowledged that the determination depended on whether the property was actually used during the winter months prior to 1992. (Tr. (4/12) at 85, 157–58.)

The ZEO begins the systematic process by making a preliminary determination of seasonal versus year-round use based on a review of the property's zoning file

and other available town records. (Tr. ($^4$/12) at 150–54.) These records include assessor's cards, health department determinations, and possibly building permit applications. (*Id.*) The preliminary procedure, however, does not include an interview of the property owner as to whether the property was actually used on a year-round basis prior to 1992. (*Id.* at 152.)

The assessor's records reviewed by the ZEO are "street cards" generated by the Town Assessor, Walter E. Kent. The information collected on the street card is information necessary to evaluate the property for tax purposes. (Pls.' Exs. 7–11.) Typical information includes property location, dimensions, utilities, and improvements. Absent a permit application to improve the property, the property is assessed once every ten years. (Tr. (4/12) at 113–15.) Under Mr. Kent's tenure, property in Old Lyme was evaluated in 1980, in 1990, and is currently undergoing its third re-evaluation.

Assessors employed by Mr. Kent were sent into the field to measure properties and talk to property owners when possible. Some of the cards indicate seasonal use of property in the "notes" section of the card. (Pls.' Exs. 8 & 10.) Mr. Kent testified that the use of the property has no bearing on the value of the property, but is recorded as background information. (Tr. (4/12) at 122.) The seasonal use indication was recorded on the card if the assessor was able to speak to the owner during the inspection; it was not based on inspections performed during winter months to determine whether the property was actually being used off-season. Although efforts were made to access each property for inspection, the assessors were not able to access every property for the 1990 inspection, therefore, some street cards contain information only as recent as 1980. (*Id.* at (115.) Finally, for the latest re-evaluation, Mr. Kent did not require the assessors to inquire about the use of property. (Tr. (4/12) at 124.)

The health department determinations reviewed by the ZEO are "seasonal use only" stamps that were placed on the assessor's street cards in 1988 and 1989 by Marilyn Swaney, the former assistant to Frank Kneen, a former health department employee. (Tr. (4/13) at 130.) According to both Ms. Swaney and Ronald Rose, a health department building inspector, the stamp was marked on those properties that Mr. Kneen believed were unable to support an adequate septic system for year-round use. (Tr. (4/12) at 134–35; Tr. **\*202** (4/13) at 128.) Mr. Kneen performed field inspections and then placed a red "x" on a town map to indicate to Ms. Swaney

which street cards required stamps. The stamp was not affixed based on a determination of actual use of the property, and, in fact, was sometimes affixed despite known actual year-round use. (Tr. (4/13) at 141.)

In addition to the assessor's records and the health department determinations, the ZEO reviews any building permit applications connected to the property that she happens to know about or that appear in her zoning file. (Tr. (4/12) at 153.) One of the sections on the permit forms, under "Existing Status," requires the applicant to check either "seasonal" or "year-round." (Defs.' Exs. E, F, & G.) It is significant to note, however, that seasonal is not defined on the form. Mr. Lawrence Lapila, owner of 20 Swan Avenue Old Lyme, Connecticut, testified that the contractor checked the seasonal space on his application to improve his property. Further, he stated that although he signed the application and saw the checkmark, he did so thinking it meant part-time use and that 20 Swan Avenue was not his primary residence; he did not understand seasonal to mean that he never used the house during the winter months. (Tr. (4/13) at 145–46, 149–50; Pls.' Ex. 14.) Mr. Lapila maintains that he and his family have always made periodic use of their house on weekends during the wintertime.

Based upon the seasonal use indications found on the assessor's cards, the health department stamps, and the building permit applications, the ZEO makes a preliminary determination and sends a notice to the property owner via regular mail. The letter includes the seasonal determination, a list of the records reviewed to make that determination, and a notice to the owner that he or she has sixty days to provide additional information if he or she disagrees with the finding, at which point a final determination will be issued. The notice also informs the owner that this preliminary finding is not a final determination, and, therefore, is not appealable to the Old Lyme Zoning Board of Appeals (ZBA). (Tr. (4/12) at 150–51; Tr. (4/13) at 72–75; Defs.' Ex. L.)

Following the sixty-day period, the ZEO considers any additional information provided to her by the property owner and then issues a final determination to the property owner via certified mail. The final determination letter includes the seasonal designation, lists the items reviewed, and informs the property owner that he or she has thirty days to appeal the decision to the ZBA and that, absent an appeal, the designation will be filed in the Old Lyme Land Records. (Tr. (4/12) at 151; Tr. (4/13) at 75–77; Defs.' Ex. M.)

WESTLAW © 2020 Thomson Reuters. No claim to original U.S. Government Works.

The additional information accepted by the ZEO is generally limited to independent documentation showing year-round use prior to 1992. (Tr. (4/13) at 80–81.) For example, the ZEO has changed preliminary determinations of seasonal use to final determinations of year-round use based on pre–1992 electric bills, oil delivery statements, mail carrier records, rental leases, and school report cards. (Tr. (4/13) at 80–88; Defs.' Exs. O, P, Q, & R.) Testimonial evidence such as statements of property owners regarding their actual use of the property, and corroborating affidavits from neighbors or others who have knowledge of their use, in the absence of documentary evidence, is not considered sufficient evidence by the Zoning Commission to change a preliminary determination of seasonal use and prove year-round use prior to 1992. (Tr. (4/13) at 107–09.)

While it appears that testimonial evidence is not heard or considered by the ZEO, if a property owner appeals to the ZBA, he or she is entitled to testify, call witnesses, and present affidavits or letters from friends and neighbors. (Tr. (4/13) at 170–71.) No seasonal use determinations, however, have been overturned by the ZBA based on this type of additional evidence.

**\*203**　II. LEGAL STANDARDS

A preliminary injunction "is an extraordinary and drastic remedy that should not be granted as a routine matter." *JSG Trading Corp. v. Tray–Wrap, Inc.,* 917 F.2d 75, 80 (2d Cir.1990). Generally, a party seeking to obtain a preliminary injunction must demonstrate (1) a threat of irreparable harm, and (2) either (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make a fair ground for litigation and a balance of hardships tipping in the movant's favor. *See Jolly v. Coughlin,* 76 F.3d 468, 473 (2d Cir.1996); *Polymer Technology Corp. v. Mimran,* 37 F.3d 74, 77–78 (2d Cir.1994). When the preliminary injunction seeks to enjoin "government action taken in the public interest pursuant to a statutory or regulatory scheme" the moving party must satisfy the more rigorous likelihood of success on the merits standard. *See Able v. United States,* 44 F.3d 128, 130 (2d Cir.1995). "This exception reflects the idea that government policies implemented through legislation or regulations developed through presumptively reasoned democratic processes are entitled to a higher degree of deference and should not be enjoined lightly." *Id.* When

governmental action is taken pursuant to specific regulatory authority and public interests lie on both sides, however, the Second Circuit has held that the lower standard of serious-question-on-the-merits may apply. *See Time Warner Cable v. Bloomberg, LP,* 118 F.3d 917, 923–24 (2d Cir.1997). Here, the ZEO is acting pursuant to a regulatory scheme enacted by the Zoning Commission in the interest of public health and safety. [7] The relief Plaintiffs seek, however, would predominantly affect their private property interests in maintaining the nonconforming year-round use of their homes. Therefore, under these circumstances, the Court will apply the more rigorous likelihood of success standard.

Under certain circumstances, an even higher standard may apply. If the injunction sought "will alter, rather than maintain, the status quo," thereby classifying it as a "mandatory" rather than "prohibitory" injunction, the moving party must make a "clear" or "substantial" showing of likelihood of success on the merits. *Tom Doherty Assoc., Inc. v. Saban Entertainment, Inc.,* 60 F.3d 27, 33–34 (2d Cir.1995). While the Court recognizes that the "[t]he distinction between mandatory and prohibitory injunctions is not without ambiguities," the Court will not hold Plaintiffs to a clear or substantial showing. Because the relief sought by Plaintiffs would not require the ZEO to engage in a new course of conduct, but rather would require her to refrain from continuing to implement the systematic street-by-street seasonal use determinations, the Court concludes that the preliminary injunction sought is prohibitory in nature.

### III. DISCUSSION

A. *Irreparable Harm*

An irreparable injury is one that is not remote or speculative but actual and imminent, *see id.* at 37, and "for which a monetary award cannot be adequate compensation." *See Jayaraj v. Scappini,* 66 F.3d 36, 39 (2d Cir.1995) (quoting *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.,* 596 F.2d 70, 72 (2d Cir.1979)).

Plaintiffs argue that irreparable harm should be presumed because the Second Circuit has held that the alleged deprivation of a constitutional right constitutes irreparable harm. Defendants contend that, while there is precedent supporting a finding of irreparable harm when the violation of a substantive right is alleged, due process clause violations,

standing alone, have not been held to constitute irreparable **\*204** harm, and a factual demonstration of irreparable harm is thus required.

In *Mitchell v. Cuomo,* 748 F.2d 804 (2d Cir.1984), the Second Circuit recognized that "[w]hen an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary." *See id.* at 806 (quoting 11 Charles A. Wright & Arthur R. Miller, *Federal Practice & Procedure* § 2948, at 440 (1973)). Subsequently, the Second Circuit expanded on this general proposition, recognizing a "presumption of irreparable injury that flows from a violation of constitutional rights." *Jolly v. Coughlin,* 76 F.3d 468, 482 (2d Cir.1996) (citing *Mitchell,* 748 F.2d at 806); *see also Covino v. Patrissi,* 967 F.2d 73, 77 (2d Cir.1992). The *Jolly* court noted that "it is the alleged violation of a constitutional right that triggers a finding of irreparable harm." *See Jolly,* 76 F.3d at 482; *see also Scelsa v. City Univ. of New York,* 806 F.Supp. 1126, 1135, 1146 (S.D.N.Y.1992) (characterizing an alleged deprivation of constitutional rights as a "per se irreparable harm" while granting a preliminary injunction barring employment discrimination against Italian Americans).

While both *Mitchell* and *Jolly* involve Eighth Amendment claims by prisoners, there is no indication in these holdings that the presumption of irreparable harm is limited to the allegation of substantive constitutional rights to the exclusion of procedural due process claims. At the same time, however, the Second Circuit has also recently held that district courts should consider the nature of the constitutional injury before making a finding of irreparable harm. In *Time Warner Cable,* 118 F.3d at 924, while noting that "the impairment of First Amendment rights can undoubtedly constitute irreparable harm," the Second Circuit instructed lower courts that, "we think it often will be more appropriate to determine irreparable injury by considering what adverse factual consequences the plaintiff apprehends if an injunction is not issued, and then considering whether the infliction of those consequences is likely to violate any of the plaintiff's rights."

Some district courts addressing the nature of an alleged due process claim have declined to find irreparable harm despite the alleged constitutional violation, but those findings have generally hinged on the fact that the movant could

be made whole with money damages. *See, e.g., Air Transport International Ltd. Liab. Co. v. Aerolease Financial Group, Inc.,* 993 F.Supp. 118, 124–25 (D.Conn.1998) (finding that alleged due process violation regarding replevin of an airplane engine readily replaceable by other engines in the marketplace, is not "a systematic or ongoing constitutional violation that could not be remedied with a monetary award"); *Pinckney v. Board of Education,* 920 F.Supp. 393, 400 (E.D.N.Y.1996) (finding that despite constitutional due process claim, "this lawsuit is, at its core, a single plaintiff's claim for money damages"). These cases are consistent with the Second Circuit's insisting that "where monetary damages may provide adequate compensation, a preliminary injunction should not issue." *Jayaraj,* 66 F.3d at 39. They do not, however, demonstrate as a matter of law that alleged due process violations are insufficient grounds for temporary relief.

Applying these standards, the Court finds that Plaintiffs have established irreparable harm because, as discussed below, the plaintiffs have presented sufficient evidence to establish that the continued implementation of the systematic seasonal use determinations subjects them to an unconstitutional procedure, potentially depriving them of vested property rights. Further, because the consequence of an erroneous seasonal use determination resulting from this flawed process would deprive Plaintiffs of total use of their property between November and April of every year, the harm can not be redressed by a monetary award. Defendants' contention, therefore, that Plaintiffs fail to establish irreparable harm because they make no **\*205** claim that a seasonal designation would cause the property to lose value or marketability, is inapposite.

B. *The merits of Plaintiffs' procedural due process claim*

Plaintiffs claim that the implementation of the systematic seasonal use determinations violates their constitutional rights under the Fourteenth Amendment, which provides: "[n]or shall any State deprive any person of life, liberty, or property without due process of law." U.S. Const. amend. XIV, § 1. To support this claim, Plaintiffs must first establish the existence of a constitutionally cognizable property interest.

*See Board of Regents v. Roth,* 408 U.S. 564, 569, 576–77, 92 S.Ct. 2701, 2708–09, 33 L.Ed.2d 548 (1972); *Furlong v. Shalala,* 156 F.3d 384, 393 (2d Cir.1998); *Donato v. Plainview–Old Bethpage Cent. Sch. Dist.,* 96 F.3d 623, 628–

WESTLAW    © 2020 Thomson Reuters. No claim to original U.S. Government Works.    6

29 (2d Cir.1996), *cert. denied,* 519 U.S. 1150, 117 S.Ct. 1083, 137 L.Ed.2d 218 (1997). While the Constitution protects property interests, it does not create them. "Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law." *Furlong,* 156 F.3d at 393 (citing *Board of Regents,* 408 U.S. at 577, 92 S.Ct. 2701).

Plaintiffs assert that the property right at stake in this case is the right to maintain a non-conforming use; a right rooted in Connecticut state law. Connecticut General Statutes § 8–2(a) provides that zoning regulations "shall not prohibit the continuance of any non-conforming use, building or structure existing at the time of the adoption of such regulations." In *Petruzzi v. Zoning Board of Appeals,* 176 Conn. 479, 484, 408 A.2d 243, 246 (1979) (quoting 2 Yokely, *Zoning Law & Practice* § 16–3 at 219), the Connecticut Supreme Court held that "[a] lawfully established nonconforming use is a vested right and is entitled to constitutional protection."

Defendants, however, contend that the property interests Plaintiffs claim are "benefits" rather then vested property rights and, as such, are subject to the "strict entitlement" test for establishing constitutionally protected interests.[8] Defendants characterize Plaintiffs' asserted interests as (1) the enforcement of zoning regulations against other landowners, and (2) the benefit of a "year-round" designation. The Court finds both characterizations inaccurate.

First, Plaintiffs claim a property right in the use of their own land; nowhere do they claim an interest in enforcing zoning regulations as they relate to benefits conferred upon their neighbors. Second, while it is true that establishing the existence of a non-conforming use in this situation results in a year-round designation by the ZEO, the right Plaintiffs assert is the right to maintain the pre-existing lawful use of their property. The ZEO testified that part of making the current seasonal use determinations involves determining who used their property on a year-round basis prior to the 1992 Regulations allegedly making that use non-conforming. Therefore, a year-round designation for those people cannot be characterized as a new benefit.[9] Because the Court finds both characterizations **\*206** inaccurate, Defendants' argument that the strict entitlement test applies is without merit. As discussed above, it is clear under Connecticut law that lawfully established nonconforming uses constitute vested property rights entitled to constitutional protection.

Having satisfied itself that a protected property right is at stake, the Court must now address what process is due. Procedural due process is not a fixed concept, but rather is "flexible and calls for such procedural protections as the particular situation demands." *Morrissey v. Brewer,* 408 U.S. 471, 481, 92 S.Ct. 2593, 2600, 33 L.Ed.2d 484 (1972); *see also J. Andrew Lange, Inc. v. FAA,* 208 F.3d 389, 392 (2d Cir.2000). In evaluating due process claims when the alleged deprivation is by an administrative action, we look to the factors set forth in *Mathews v. Eldridge,* 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976). The factors assess 1) the private interest affected by the challenged action; 2) the risk of erroneous deprivation of that interest through the challenged procedure and the probable value of alternative safeguards, and 3) the government's interest in avoiding the burden that an alternative procedure would entail. *See id.; see also Abdullah v. INS,* 184 F.3d 158, 164 (2d Cir.1999).[10]

Plaintiffs challenge the systematic seasonal use determinations on two grounds. First, they claim that the selection of January 1, 1992 as the date ending the vesting of the right to use residential properties on a year-round basis is improper because the regulations actually prohibiting that use were not enacted until June 5, 1995. Second, Plaintiffs claim that, even if 1992 is the proper vesting date, the procedures utilized by the ZEO to evaluate claims of non-conforming year-round use fail to satisfy minimal requirements of due process.

There is considerable debate in the parties' briefs comparing the 1992 and the 1995 regulations in terms of when and whether year-round use of properties in R–10 zones was prohibited, whether only conversions of property are restricted, and whether seasonal use restrictions apply to nonconforming lots versus nonconforming uses. Because the Court finds the procedure for determining the non-conforming use flawed irrespective of the date, the Court does not reach these issues or the proper vesting date on this motion.

Turning now to the challenged procedure, and applying the *Mathews* factors set out above, the Court finds that Plaintiffs have established a likelihood of success in establishing a violation of their constitutional due process rights. The first factor addresses the private interest at stake. As discussed above, Plaintiffs claim a right to maintain the non-conforming use of their property; a right grounded in Connecticut law. If

deprived of this right, Plaintiffs lose total use of their property for five months of every year. The affected private property interest, therefore, is significant.

Second, the Court must analyze the risk of error. Both parties agree that one of the issues involved in making the systematic seasonal use determinations is deciding whether a property owner has a pre-existing vested right in the non-conforming use of her property on a year-round basis. Further, the parties agree that the factual question underlying this issue is actual use **\*207** of that property during winter months prior to either 1992 or 1995. Plaintiffs claim that the procedure employed by the ZEO fails to properly address that factual question, and the Court agrees.

The ZEO's preliminary determination is based on a review of town records which essentially have nothing to do with an owner's actual use of her property. Furthermore, and quite astonishingly, the ZEO admitted that she did not know the criteria on which those records made seasonal use determinations and was unable to adequately explain how or why their seasonal use indications were relevant to her inquiry of actual use. (Tr. (4/12) at 158–59; Tr. (4/13) at 18–22.) The street cards generated by the assessor's office are not the result of an investigation into actual use of property during winter months. Rather, they include information collected to value the property for tax purposes, attained from a single inspection, made at an unknown time of year, in either 1980 or 1990. At best, this information falls two years shy of the 1992 vesting date and seven years shy of the 1995 date. Further, other information from the street card relied upon by the ZEO, such as type of water supply and type of heating system, reflect the capability of the property to be used on a year-round basis, not whether the property was actually used as such.

Similarly, the "seasonal use only" stamps applied by the health department are out-dated and not the result of an inquiry into actual use of the property. The stamps were affixed in 1988 or 1989 and indicate which properties, in Mr. Kneen's estimation, were unable to support adequate septic systems for year-round use, regardless of actual use.

Finally, the permits occasionally relied upon by the ZEO come closer to addressing the factual question of actual use, but are flawed nonetheless. First, as Mr. Lapila testified, it is the contractor who fills out this portion of the application. Second, the space for indicating seasonal versus year-round use appears without definition. The Court finds credible Mr.

Lapila's explanation that seasonal to him meant part-time; not use limited strictly to April through November.

Taken together, these records do little to address the dispositive question of actual year-round use prior to either 1992 or 1995. Furthermore, the preliminary determination process involves no discussion with the property owner and no discussion with neighbors—two inquiries that would directly address use of the property. The risk of an erroneous preliminary determination by the ZEO, therefore, is glaring.

Although property owners have sixty days to challenge this finding before a final determination is entered, they are only able to do so with documentary evidence such as bills. For owners who have not kept historical records on the use of their property, this opportunity is meaningless. Based on the testimony of Mr. Lapila and upon review of his file, (Pls.' Exs. 14 & 15), it is clear that phone calls, letters, and affidavits attesting to the year-round use of that property receive little, if any, consideration. In the face of eleven letters from contractors, caretakers, neighbors, and family members, the ZEO maintained her preliminary finding of seasonal use, which was based solely on the street cards, the health department stamps, and building permits, all of which, as discussed above, have little relevance to Mr. Lapila's actual use of his property. [11]

Mr. Lapila's experience indicates that the procedure employed by the ZEO fails **\*208** to provide property owners with an adequate opportunity to be heard prior to a final determination on their property. The "fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.' " *Mathews,* 424 U.S. at 333, 96 S.Ct. 893 (quoting *Armstrong v. Manzo,* 380 U.S. 545, 552, 85 S.Ct. 1187, 1191, 14 L.Ed.2d 62 (1965)). This principle is particularly important in light of Conn. Gen.Stat. § 8–2(a) which provides that zoning regulations "shall not provide for the termination of any non-conforming use solely as a result of nonuse ... without regard to the intent of the property owner to maintain that use." [12] This provision indicates that the property owner's intent in determining the existence and continuation of nonconforming uses is significant and must be considered. Therefore, the ZEO's policy against considering letters and sworn affidavits made by the owners and their neighbors is troubling. The failure to consider this relevant information denies owners

a meaningful opportunity to be heard prior to the final determination, and further increases the risk of error.

The final consideration for the Court is the Town's interest. The significant property interest at stake, and the considerable risk of error under the current system must be weighed against the Town's interest in continuing the process in this format. The Defendants, in their brief, list a parade of horribles that might occur if they are temporarily enjoined from continuing with the systematic procedure altogether, but they present no evidence, nor make any argument, regarding the potential burden of alternative procedural measures to ensure that accurate determinations are made.

In sum, while the Court does not dispute the public health and safety interests underlying the 1995 Regulations, the Court finds that the potential burden imposed on the ZEO and the Zoning Commission of alternative procedures, such as interviews or consideration of affidavits and letters, does not outweigh the significance of the property right at stake and the considerable risk of error under the current system. Therefore, the Court finds that Plaintiffs have demonstrated a likelihood of success on the merits on their due process claim.

C. *Entitlement to Preliminary Injunction*
The Second Circuit recently instructed that "[w]henever a request for a preliminary injunction implicates public interests, a court should give some consideration to the balance of such interests in deciding whether a plaintiff's threatened irreparable injury and probability of success on the merits warrants injunctive relief." *Time Warner Cable,* 118 F.3d at 929. Defendants, through the testimony of Mr. Grecci and Mr. Curtis, revealed the potential impact of nitrogen pollution if all seasonal use properties are converted to year-round use properties. As noted above, the Court does not dispute the public health and safety concerns underlying the 1995 Regulations, as their validity is not at issue on this motion. These concerns, however, address the potential conversion of properties from seasonal to year-round use. The process at issue on this motion does not deal with

conversion of property; rather, it determines in the first instance whether the property was actually used on a year-round basis prior to either 1992 or 1995, thereby establishing a vested nonconforming use. The properties at issue are ones that possibly are already used year-round, **\*209** and, therefore, do not present the risk of a dramatic increase in use of property.

Defendants also claim that granting a preliminary injunction will have a devastating effect on the Town because it will allow illegal uses of property to go undetected, and encourage owners to delay permit applications for winterization. As noted below, however, this order does not affect the applications for conversion of property nor does it condone illegal use. These concerns do not outweigh the harm to owners if they are erroneously deprived of total use of their property for five months of every year. The Plaintiffs, therefore, have satisfied the requirements for injunctive relief on their due process claim.

IV. CONCLUSION

In summary, Plaintiffs' Motion for a Preliminary Injunction is GRANTED [doc. # 5]. The ZEO is preliminarily enjoined from proceeding with the enforcement of the systematic street-by-street seasonal determinations until final disposition of the merits of Plaintiffs' complaint. This order, however, does not allow property owners to establish new year-round use, nor does it stop the ZEO from preventing illegal use of property during winter months. Further the order does not preclude the ZEO from continuing to require permit applications for renovations and conversions, nor does it preclude the ZEO from making seasonal determinations upon voluntary request by an owner.

So ordered.

**All Citations**

121 F.Supp.2d 195

---

**Footnotes**

1     Three Connecticut Superior Court cases interpret these Pre–1992 Regulations in zoning enforcement actions brought against property owners to prevent the use of residential dwellings between November 15 and April 1.

In each case, in the context of determining whether the year-round use of a seasonal property constituted an extension or expansion of a pre-existing non-conforming use, the court found that there were no prohibitions in the zoning regulations against the year-round use of seasonal dwellings because although the regulations include definitions of seasonal use, they do so without restricting that use. *See Arcata v. Zoning Board of Appeals,* 1993 WL 394500, at \*6 (Conn.Super.Ct. Sept.21, 1993); *Habicht v. Zoning Board of Appeals,* 1993 WL 284791, at \*7 (Conn.Super.Ct. July 22, 1993); *French v. Zoning Board of Appeals,* 1993 WL 284789, at \*7 (Conn.Super.Ct. July 22, 1993).

2    Jane Marsh, a Commission Member, testified that the adoption of the 1992 Regulations restricted the conversion of seasonal properties to year-round properties on non-conforming lots, and as such, were consistent with Old Lyme's 1990 Town Plan of Development identifying the capacity of on-site sewage systems in the beach area as a critical issue, and recommending a prohibition against the expansion and winterization of seasonal dwellings unless relevant health and building codes are met. (Tr. (4/12) at 90; Defs.' Ex. I at 3–4, 12.) The Connecticut Department of Environmental Protection endorsed this plan with respect to controlling the expansion and winterization of seasonal dwellings in beach areas. (Tr. (4/12) 87–88; Defs.' Ex. H at 3.)

3    Neither Ms. Marsh, nor the ZEO, could identify provisions limiting the permitted use of residential property to certain months of the year. (Tr. (4/12) at 54–55; Tr. 4/13 at 124.)

4    The regulations were adopted in response to the Commission's continued concern for over-use of wells and failing septic systems, (Tr. (4/12) at 57–58, 64, 101–02; Defs. Ex. K at 43), and to the additional concern of ground water pollution and its impact on Long Island Sound. (Tr. (4/12) at 95–99; Defs.' Ex. J.) Dennis Grecci, a supervising engineer with the Connecticut Department of Environmental Protection, and Brian Curtis, an environmental engineer specialist in Connecticut and New York, testified about the risk of nitrogen pollution when houses on lots of 10,000 square feet or less are used year-round. Mr. Grecci testified that the over-use of too many septic tanks located too close together prevents the proper renovation of water. (Transcript of 4/12/00 at 6–8 [hereinafter "Tr. (4/14)].)" When not enough land area exists above a septic system, not enough rainfall is able to reach the groundwater to dilute the nitrates in the septic systems. Mr. Curtis testified that septic systems generally remove 30–40% of nitrogen from the water, but the remainder of the dilution process is dependent upon infiltrating rainfall. (*Id.* at 38.) Non-diluted nitrates cause hypoxia, a condition that starves the water of oxygen. This pollution affects both Long Island Sound and the Town drinking water. High levels of nitrogen pollution in drinking water can cause stress and death among infants. (*Id.* at 39.)

5    Ms. Marsh testified that the Commission at one point had considered making seasonal use the only permitted use in R–10 zones, but decided that such a regulation was too restrictive, and instead should allow for conversion to year-round use if the property could support a proper septic system. (Tr. (4/12) at 78–80.)

6    The Defendants claim that § 8.8.1 of the 1992 Regulations originally prohibited the enlargement or conversion of seasonal properties to year-round properties on non-conforming lots, and, therefore, that 1992 is the relevant benchmark for determining whether a non-conforming year-round use existed and should be grandfathered.

7    As noted at the outset, Plaintiffs concede for the purpose of this motion only that the challenged zoning regulations were enacted for a lawful public purpose and are rationally related to public health, safety, and welfare. (Tr. (4/13) at 3–10.)

8    "This Circuit uses the strict 'entitlement' test to determine whether a party's interest in a land-use regulation is protected under the Fourteenth Amendment. This inquiry stems from the view that a property interest can sometimes exist in what is sought—in addition to what is owned—provided there is a 'legitimate claim of entitlement' to the benefit in question." *Zahra v. Town of Southold,* 48 F.3d 674, 680 (2d Cir.1995) (internal citations omitted).

9    Although courts have characterized permit applications, variance requests, and other necessary approvals as "benefits" subject to the strict entitlement test, *see Crowley v. Courville,* 76 F.3d 47, 52 (2d Cir.1996); *Zahra,* 48 F.3d at 680; *Donegan v. Town of Woodbury,* 863 F.Supp. 63, 64–65 (D.Conn.1994), the plaintiffs

here seek to protect rights that pre-exist the applicable zoning regulations and, therefore, do not classify as benefits.

10    Defendants, citing, among others, 🏷 *Daniels v. Williams,* 474 U.S. 327, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986), and 🏷 *Stemler v. City of Florence,* 126 F.3d 856 (6th Cir.1997), *cert. denied,* 523 U.S. 1118, 118 S.Ct. 1796, 140 L.Ed.2d 936 (1998), argue that the reckless and/or deliberate indifference standard for assessing procedural due process violations applies to this situation. This standard, and the mental state of a governmental official, would only be relevant if Plaintiffs claimed that the ZEO was acting negligently or recklessly in enforcing the systematic procedure set out in § 21.2.5 of the Zoning Regulations. The mental state of the ZEO in making seasonal use determinations was not placed at issue at the hearing. The Plaintiffs here challenge the administrative process itself; therefore, Defendants' argument is without merit.

11    Much is made by Defendants about Mr. Lapila's alleged admissions of seasonal use by the check marks made on the building permits and a letter he wrote to the ZEO on January 11, 1999. (Defs.' Ex. T.) The Court finds Mr. Lapila's explanations credible that the seasonal checks were not signed with the understanding that the property was not used at all during the winter months, and that the only thing Mr. Lapila admitted to in the January 11, 1999 letter was that he did not live in the property full-time during the winter. (Tr. (4/13) at 145–46, 172–73.)

12    This portion of 🏷 § 8–2 was enacted in 1989, superceding the Connecticut Supreme Court's ruling in 🏷 *Essex Leasing, Inc. v. Zoning Board of Appeals,* 206 Conn. 595, 539 A.2d 101 (1988), which had empowered municipalities to terminate nonconforming uses based on nonuse without regard to the owner's intent. The statute is consistent with the Connecticut Supreme Court's prior ruling in 🏷 *Dubitzky v. Liquor Control Commission,* 160 Conn. 120, 125–27, 273 A.2d 876, 879–80 (1970), where it held that manifest intent must be established before a nonconforming use can be deemed terminated.

---

**End of Document**                                   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW    © 2020 Thomson Reuters. No claim to original U.S. Government Works.    11

FILED
12-07-2020
Clerk of Circuit Court
Waukesha County
2020CV001583

336 F.3d 588
United States Court of Appeals,
Seventh Circuit.

Roger RASCHE and Velma
Rasche, Plaintiffs–Appellants,

v.

VILLAGE OF BEECHER, an Illinois
Municipal Corporation and Paul Lohmann,
individually and as Agent for the Village
of Beecher, Defendants–Appellees.

No. 02–3750.
|
Argued May 30, 2003.
|
Decided July 16, 2003.

**Synopsis**

Business owners brought § 1983 action against village and its president, alleging that citations and warnings were issued against them in retaliation for the exercise of their First Amendment rights in speaking out against the village's golf and waterworks bond proposals. The United States District Court for the Northern District of Illinois, Joan Humphrey Lefkow, J., 2002 WL 31118322, granted summary judgment for defendants, and plaintiffs appealed. The Court of Appeals, Ripple, Circuit Judge, held that: (1) village president did not cause or participate in alleged constitutional deprivation, and (2) alleged deprivation was not caused by municipal custom or policy.

Affirmed.

**Procedural Posture(s):** On Appeal; Motion for Summary Judgment.

**Attorneys and Law Firms**

  *590 Charles E. Ruch, Jr. (Argued), Bourbonnais, IL, for Plaintiffs–Appellants.

William W. Kurnik (Argued), Knight, Hoppe, Kurnik & Knight, Des Plaines, IL, for Defendants–Appellees.

Before FLAUM, Chief Judge, EASTERBROOK and RIPPLE, Circuit Judges.

**Opinion**

RIPPLE, Circuit Judge.

Roger and Velma Rasche ("the Rasches") brought this action pursuant to 42 U.S.C. § 1983 against the Village of Beecher and the Village President Paul Lohmann. They alleged that they had been the victims of retaliation because they had exercised their First Amendment rights by opposing Village bond proposals. The district court granted summary judgment for the Village and for Mr. Lohmann. The Rasches appeal. For the reasons set forth in this opinion, we now affirm the judgment of the district court.

*591 I

BACKGROUND

Roger Rasche owns and operates a vehicle towing business out of his home, located on Illinois Route 1 within the Village of Beecher, Illinois. He began his business in 1978 and has maintained a sign on his property since 1978. The business is licensed only in Mr. Rasche's name, but his wife, Velma Rasche, works full time for the business and does not receive a separate salary. Mr. Rasche therefore characterizes the business as a "family business" owned by himself and his wife. R.37, Ex.3 at 12–13. [1]

The Village of Beecher, Illinois, is a municipal corporation with a Board of Trustees. The Village President is Paul Lohmann, an individual defendant in this action. In 1997, the Village Board of Trustees enacted an ordinance authorizing the issuance of $4.5 million in bonds for the purchase of a golf course. Mr. Rasche was a principal organizer of a petition drive to require a referendum concerning the purchase of the course. Mr. Rasche spoke publicly concerning this effort, in addition to co-sponsoring a political advertisement in a newspaper and delivering fliers listing his home number. According to a Village resident, Pat Schroeder, one of the Trustees, Gary LaGesse, in his capacity as the chair of an unrelated association, the Beecher Recreation Association, stated at a meeting of that association in 1997 that he "would get even with anyone opposed to the Golf Course Referendum" and that he "would take out anybody who stood in [the] way of purchasing [the] golf course." R.37, Ex.6 at 10, 40. The voters of the Village of Beecher defeated the purchase of the golf course at an election held on March 17, 1998.

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.     1

In 1999, the Village of Beecher Board enacted an ordinance to issue $907,000 of bonds to pay for improvements to the Village waterworks. Mrs. Rasche was the leader and initiator of the petition drive to obtain a referendum on that proposal. The Rasches circulated the majority of the petitions on the waterworks bonds, and Mrs. Rasche filed the petitions with the Village of Beecher City Clerk. The waterworks bond ordinance was defeated by the Village of Beecher voters in an election held on March 21, 2000.

At least as early as 1997, the Village Board of Trustees was concerned about the appearance of Route 1. In July 1997, the Village Trustees decided to authorize enforcement of the Village's ordinance against temporary or portable signs. On August 11, 1997, at their meeting, the Trustees addressed whether the ordinance prohibited temporary or portable signs. [2] The Board did not take immediate action, but held a public hearing on the temporary or portable sign issue. Affected property owners, including the Rasches, received notification by letter. At the meeting, which Mr. Rasche attended, the signs of the Rasches and seven other businesses were discussed.

At the time it was purchased in 1978, the Rasches' sign was portable. However, Mr. Rasche had rotated the wheels upward, **\*592** had placed the sign on bricks and had affixed it to the ground by a play swing cable. The sign had chicken wire wrapped around it to prevent the letters from blowing off. An extension cord from the Rasche's garage provided power to flashing lights on the sign. Mr. Rasche did not obtain a building permit when he installed the sign in 1978.

The zoning ordinance regarding signs had been enacted in 1974. Under the 1974 code, before a sign could be erected, the owner had to obtain a building permit and approval from the building inspector. Although the code did not prohibit explicitly temporary or portable signs, it impliedly defined a sign as requiring a foundation. A sign is defined as "a name, identification, description, illustration ... *which is affixed* ... upon a structure or land." R.32, Ex.A at 3 (emphasis added). In 1992, the Village amended its zoning ordinance to prohibit "flashing signs," to require that any wiring conform to the electrical code and to require that the sign be able to withstand wind pressure of not less than thirty pounds per square foot. *Id.* The code also stated that prior existing non-conforming signs could be used for any remaining depreciation in value, but not to exceed five years beyond the enactment of the ordinance.

In 1999, the Village appointed its first "Code Enforcement Officer," Julie Riechers. Her duties included identifying any code violations and speaking with the owners about conforming to the requirements. Village Trustee Patrick Lane stated in his deposition that it was his understanding "that with respect to signs and compliance with the sign ordinances of the Village of Beecher that would have been solely Julie's [Riechers'] responsibility as to what were proper signs and what were improper signs." R.37, Ex.10 at 24–25. In the spring of 1999, Village President, Paul Lohmann, and the Village Administrator, [3] Robert Barber, expressed to Riechers their concern about the appearance of Route 1. [4]

**\*593** On July 9, 1999, Riechers visited with seven business owners, including Mr. Rasche, concerning their zoning violations. On July 14 and 15, 1999, Riechers sent letters to building owners who were not available on July 9, explaining that their signs were in violation of the Village Zoning Ordinance, that the sign needed to be removed within 30 days and that the Village might file with the Village Attorney a formal complaint. *See* R.32, Ex.J. Her memorandum to the Trustees, dated July 16, states that some of the property owners had complied with the prior instructions. This memo also notes that on July 9, Riechers spoke with Mr. Rasche, "gave him copies of the Ordinances he was violating and gave him 30 days to remove the sign and clean up the junk. He was also issued a ticket for no village sticker on the RV that he owns and is parked in front of his house." R.32, Ex.M at 1.

On August 9, Riechers visited several property owners, including Mr. Rasche. This time she reported that Mr. Rasche had "clean[ed] up the junk in the driveway. However, the sign was still there and he was issued a ticket for $25.00. He did unplug the extension cord and the sign is not lighted or flashing anymore." R.32, Ex.N at 1. Riechers details in these reports approximately sixty actions she took in connection with code enforcement from June 1999 to May 2000. [5]

**\*594** In July 1999, the Village adopted a local adjudication system to handle ordinance violations. The Rasches received numerous warnings and citations for alleged zoning violations on their property. On August 20, 1999, the Rasches received another ticket (No. 4101) for the sign. On October 1, 1999, the Rasches received a warning about a motor home parked on their property.

On approximately October 21, 1999, Mr. Rasche appeared before the Village adjudication system and ticket No. 4101

was dismissed. [6] On November 23, 1999, the August 9, 1999, ticket for the sign was dismissed in the Illinois state circuit court.

On December 13, 1999, the Rasches received a ticket for having an inoperable vehicle on their property. On December 17, 1999, they received a notice from the Village of Beecher demanding that their sign be removed. On January 5, 2000, the Rasches received seven additional tickets for having inoperable vehicles in their front yard. The inoperable motor vehicle tickets were issued by Tim Mitchell, a Village police officer at the direction of Beecher Chief of Police Mark DiSanto. At the same time, another business, Jody's Transmission Service, also located on Route 1, was issued 29 citations for inoperable vehicles parked in its front yard.

Robert Barber, the Village Administrator, testified that, even though he "believed that under our Village Ordinance we had the authority to enter upon Rasche's property and remove a non-complying sign, [he] felt uncomfortable and recommended to the Trustees, in an Executive Session, that we file a Long Form Complaint in State Court and let the State Court Judge make the determination. The Trustees concurred with my recommendation. At the Executive Session, possible violations were discussed and direction was given to the Village Attorney, Mr. Knuth, to research the matter and draft a Long Form Complaint for filing in the Circuit Court." R.32, Ex.A at ¶¶ 49–50. Trustee LaGesse testified that, at a Village board meeting, the Village Attorney received "the approval of the village board before he filed the lawsuit" against the Rasches. R.37, Ex.12 at 33. Village Administrator Barber testified that the reason for bringing the long form complaint was that "[w]ith the exception of Roger Rasche ... all of the business owners along Route 1 complied with Julie **\*595** Riechers' requests" and either removed their signs or brought them into compliance. R.32, Ex.A at ¶ 56.

On January 12, 2000, the Village Attorney filed a two-count complaint against Mr. Rasche, alleging that the sign was erected and the electrical connection was installed without the required building permits. On November 28, 2000, the state court granted Mr. Rasche's motion for a directed verdict. [7]

On February 17, 2000, Mr. Rasche appeared before the Village adjudication system court on his remaining tickets (Nos. 4488 and 4304 through 4310); these citations were dismissed. In sum, the Village adjudicatory officer dismissed all citations issued to Mr. Rasche for the sign and inoperable vehicles. The Rasches contend that the officer dismissed the

citations because they were not among the violations that could be prosecuted through the local adjudication system. Defendants maintain that the adjudicatory officer dismissed the tickets because the wrong statutory section was listed for the alleged violation and Mr. Rasche was trying to keep his inoperable vehicles away from the front yard. *See* Appellees' Br. at 7–8.

In early 2000, the Village repealed the ordinance creating the local adjudication system. Village Administrator Barber explained that he had "received a letter from our retained hearing officer, John Murphey, resigning as hearing officer; and he also advised the Village that in enacting our Adjudicatory Ordinance, we neglected to include zoning violations within the purview of the ordinance, and he maintained that he had no jurisdiction over tickets covering ordinance violations." R.32, Ex.A at ¶ 54. Consequently, "[w]ith the resignation of the hearing officer, and because we concluded that the use of the ordinance was not cost effective, the Trustees repealed our Adjudicatory Ordinance." *Id.* at ¶ 55.

## II

### PROCEEDINGS IN THE DISTRICT COURT

The Rasches brought this § 1983 action against Mr. Lohmann in both his individual and official capacity and against the Village. They allege that the citations and warnings were issued in retaliation for the exercise of their First Amendment rights in speaking out against the Village's golf and waterworks bond proposals.

The district court granted summary judgment to Mr. Lohmann and to the Village. [8] The district court noted initially **\*596** that summary judgment was appropriate because "(1) Lohmann was not personally involved in the alleged constitutional deprivation; (2) the alleged retaliatory actions cannot be attributed to the Village because they were not taken by a person with final policymaking authority." R.40 at 7. Consequently, stated the court, it was unnecessary to address the question of whether the plaintiffs "show[ed] that their constitutionally protected speech was a motivating factor in defendants' actions." *Id.*

With respect to Mr. Lohmann, the court determined that, "[a]lthough the record establishes that Lohmann was aware

WESTLAW © 2020 Thomson Reuters. No claim to original U.S. Government Works.

of the Village's efforts to enforce the sign ordinance along Route 1, plaintiffs provide no evidence that he was aware of any Village official's retaliatory motive and no evidence that Lohmann either directed the conduct or consented to it." *Id.* at 9.

As for the claims against the Village, the district court simply stated that: "Because the facts read in a light most favorable to the plaintiffs do not create a genuine issue of material fact that plaintiffs' constitutional right to free expression was denied, it is unnecessary to address the question of municipal liability." *Id.* at 9–10. [9] Nevertheless, the district court went on to note in a footnote that:

> Plaintiffs seem to argue that Riechers or DiSanto was a final policymaker that would make the Village liable, even though neither of these individuals is named as a defendant accused of depriving them of their rights. The only relevant question then is whether Lohmann was a final policymaker, and since he has prevailed on the motion, the Village likewise is not liable. Obviously, Riechers was not a final policymaker because all of the evidence indicates that she was an employee following her superiors' directions. DiSanto, as police chief, did not enact the sign ordinance, and it is undisputed that the concern about enforcement derived from the Board. There is absolutely no evidence that DiSanto was a final policymaker, to say nothing of the lack of evidence that he had a motive to retaliate against plaintiffs based on their exercise of protected speech. *Id.* at 10 n. 9.

### III

### DISCUSSION

### A.

We first address whether the district court erred in granting summary judgment in favor of Mr. Lohmann. In examining this issue, we apply a well-established three-step analytical framework. We first ask whether the plaintiff's speech was constitutionally protected. *See* *Vukadinovich v. Bd. of Sch. Trus. of N. Newton* **\*597** *Sch. Corp.,* 278 F.3d 693, 699 (7th Cir.2002). If the speech was protected, we ask whether the defendants' actions were motivated by that constitutionally protected speech. *See id.* If the plaintiff can show that his constitutionally protected speech was a substantial or

motivating factor, the defendants must show that they would have taken the same action in the absence of his exercise of his rights under the First Amendment. *See id.* If the defendants carry that burden, the plaintiff bears the burden of persuasion to show that the defendants' proffered reasons were pretextual and that retaliation was the real reason for the defendants' action. *See id.* We also note that, "[s]ection 1983 creates a cause of action based on personal liability and predicated upon fault; thus, liability does not attach unless the individual defendant caused or participated in a constitutional deprivation." *Vance v. Peters,* 97 F.3d 987, 991 (7th Cir.1996) (internal quotation marks and citations omitted).

The district court correctly determined that the evidence in this record does not support a determination either that Mr. Lohmann "caused or participated in a constitutional deprivation," *Vance,* 97 F.3d at 991, or, under the three-step approach, that Mr. Lohmann's "actions [were] motivated by [the Rasches'] constitutionally protected speech," [10] *Vukadinovich,* 278 F.3d at 699. The Rasches' allegation that Mr. Lohmann directed Riechers to examine *only* the Rasches' sign will not sustain their burden in this regard. As noted at some length earlier, *see supra* note 4, Riechers gave two versions of her meeting with Village officials. If Riechers' initial deposition statement is true, Mr. Lohmann directed her to inspect not only the Rasches' sign but also the signs for Risings and for the Shady Long Golf Course. In that case, Mr. Lohmann did not tell her to look exclusively at the Rasches' sign. On the other hand, if Riechers' immediate retraction is accurate, Mr. Lohmann did not direct her to any particular sign. *See* R.32, Ex.Riechers' Dep. at 25–26. Neither version supports the view that Mr. Lohmann gave Riechers direction to focus exclusively on the Rasches' sign. Accordingly, the district court did not err in granting summary judgment for Mr. Lohmann.

### B.

We now turn to the issue of whether the district court erred in determining that summary judgment on behalf of the Village was warranted.

"[M]unicipalities cannot be held liable for § 1983 claims under a theory of respondeat superior." *Palmer v. Marion County,* 327 F.3d 588, 594 (7th Cir.2003) (internal

WESTLAW    © 2020 Thomson Reuters. No claim to original U.S. Government Works.    4

quotation marks and citations omitted). The Rasches therefore must establish that "the deprivation of constitutional rights is caused by a municipal policy or custom." *Kujawski v. Bd. of Comm'rs of Bartholomew County,* 183 F.3d 734, 737 (7th Cir.1999).

Under our case law, unconstitutional policies or customs can take three forms: (1) an express policy that, when enforced, causes a constitutional deprivation; (2) a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a "custom or usage" with the force of law; or (3) an allegation that the constitutional injury was caused by a person with final policymaking authority. **\*598** *Palmer,* 327 F.3d at 594–95. In our view, the Rasches cannot prevail under any of these theories.

The Rasches first submit that the Village is liable because the Board of Trustees directed the Village Attorney, or at least ratified the Village Attorney's decision, to file the state court suit against the Rasches. The Supreme Court has explained: "[P]roof that a municipality's legislative body or authorized decisionmaker has intentionally deprived a plaintiff of a federally protected right necessarily establishes that the municipality acted culpably." *Bd. of the County Comm'rs of Bryan County v. Brown,* 520 U.S. 397, 405, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997). [11] Here, the Board of Trustees, the "municipality's legislative body," authorized a suit against Mr. Rasche for an alleged violation of the sign ordinance. *Id.*

We therefore shall examine whether the Rasches' speech concerning the golf course and waterworks bond proposals was, on this record, "a substantial or motivating factor" in the Village's decision to bring suit against Mr. Rasche. *Vukadinovich,* 278 F.3d at 699. Evaluating the record in the light most favorable to the Rasches, the only evidence that the Village's decision to file suit was motivated by his speech is the proximity of time between the suit and the speech, and the testimony concerning a comment made by LaGesse in 1997 in his capacity as a member of the Beecher Recreation Association that he "would take out anybody who stood in [the] way of purchasing [the] golf course." R.37, Ex.6 at 10, 40.

The suit by the Village was brought soon after the waterworks referendum was put on the ballot. Although we have noted

that a "telling temporal sequence" can be used to establish causation, *see Sweeney v. West,* 149 F.3d 550, 558 (7th Cir.1998) (internal quotation marks omitted), we have also recognized in the analogous Title VII context that timing, "standing alone, does not create a genuine issue as to causal connection." *Foster v. Arthur Andersen, LLP,* 168 F.3d 1029, 1034 (7th Cir.1999). A plaintiff must "show more than just temporal proximity." *Id.*

We do not believe that the statement by LaGesse, a single legislator, made in a different capacity and three years before the legislative action now in question can be considered sufficiently probative to provide the additional support needed to sustain a jury verdict. [12] The fact that LaGesse, three years prior to the Trustee's bringing suit against the Rasches, in his capacity in a recreational association, was upset about losing the golf course does not demonstrate that the entire board of Trustees was motivated to retaliate unconstitutionally by bringing suit against Mr. Rasche for his sign. The importance of LaGesse's statement is rendered even more feeble when we recollect the context in which the Village Board took action. It referred the sign matter to litigation only after numerous attempts to obtain compliance **\*599** and only after its attempts at local administrative resolution had proved fruitless. The Village Administrator's unrebutted testimony is that he recommended the lawsuit to ensure that the Rasches' sign was removed only after judicial scrutiny of the proposed action. There was, therefore, abundant evidence that this Board decision was taken in the normal course of its business of pursuing a long-term effort to improve the Village's appearance by a broad-scale enforcement of its zoning ordinances.

The Rasches also submit that the Village is liable under the first form of unconstitutional policies identified in *Palmer* because "the express policy of the Village as enforced caused a constitutional deprivation." Appellants' Br. at 21. The Rasches identify the "express policies" or "official policy" as "the Adjudicatory Ordinance and the sign ordinance." Appellants' Br. at 13, 18. The Rasches make no argument that either the zoning ordinance or the adjudicatory ordinance is unconstitutional or represents unconstitutional policies; thus these ordinances do not fall within the first definition of unconstitutional "express" policies. The Rasches nevertheless argue that the ordinances, although not unconstitutional in themselves, have caused a constitutional violation. [13] We cannot accept this argument.

In order for a § 1983 plaintiff "to establish municipal liability on the theory that a facially lawful municipal action has led an employee to violate a plaintiff's rights," the plaintiff "must demonstrate that the municipal action was taken with 'deliberate indifference' as to its known or obvious consequences." *Bryan County,* 520 U.S. at 407, 117 S.Ct. 1382. The Rasches do not articulate how the obvious consequence of enacting the zoning ordinances was that the ordinances would be used to retaliate against Rasches' or other citizens' exercise of their First Amendment rights. As to the allegation that Mr. Lohmann specifically directed Riechers to examine only the Rasches' sign, we already have noted that the record will not support such an allegation.

As to the third form of unconstitutional policies or customs, the Rasches argue that various individuals possessed final policymaking authority. At the outset, we simply cannot conclude that the evidence would support a determination that a final policymaker's decision resulted in retaliation against the Rasches. "[M]unicipal liability under § 1983 attaches where—and only where—a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy *with respect to the subject matter in question.*" *Pembaur v. City of Cincinnati,* 475 U.S. 469, 483–84, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986) (emphasis added). In order to have final policymaking authority, an official must possess "[r]esponsibility for making law or setting policy," that is, "authority to adopt rules for the conduct of government." *Auriemma v. Rice,* 957 F.2d 397, 401 (7th Cir.1992) (internal quotation marks and citations **\*600** omitted). "Authority to make municipal policy may be granted directly by a legislative enactment or may be delegated by an official who possesses such authority, and of course, whether an official had final policymaking authority is a question of state law." *Pembaur,* 475 U.S. at 483, 106 S.Ct. 1292. In examining state law to determine such authority, we are to "[r]eview[ ] the relevant legal materials, including state and local positive law, as well as custom or usage having the force of law." *Kujawski,* 183 F.3d at 737 (internal quotation marks and emphasis omitted).

We have further elaborated on the term "final":

> *Every* public employee, including the policeman on the beat and the teacher in the public school, exercises authority ultimately delegated to him or her by their public

employer's supreme governing organs. A police officer has authority to arrest, and that authority is "final" in the practical sense that he doesn't have to consult anyone before making an arrest; likewise a teacher does not have to consult anyone before flunking a student. That is a perfectly good use of the word "final" in ordinary conversation but it does not fit the cases; for if a police department or a school district were liable for employees' actions that it authorized but did not direct, we would be back in the world of respondeat superior. To avoid this the cases limit municipal liability under section 1983 to situations in which the official who commits the alleged violation of the plaintiff's rights has authority that is final in the special sense that there is no higher authority.

*Gernetzke v. Kenosha Unified Sch. Dist. No. 1,* 274 F.3d 464, 469 (7th Cir.2001).

Under this formulation, Riechers certainly was not the person with final policymaking authority; she occupied a position quite analogous to a police officer making an arrest. Although Trustee Lane stated that Riechers was responsible for determining what signs were proper, it is clear that Riechers did not set the zoning policy, enact the zoning ordinance or even determine what area of town required her concentrated scrutiny. She simply had the authority to issue tickets and citations. She testified that she focused on Route 1 at the behest of the Board of Trustees. *See* R.32, Ex.Riechers' Dep. at 19–20. She also reported her activities to the Board of Trustees. *See* R.32, Ex.M. The Board set the policy—including her area of focus, Route 1—for her enforcement of the zoning laws. Indeed, at page 15 of their brief, the Rasches admit as much in arguing that "the Village of Beecher retained the authority to measure [Riechers'] conduct for conformance with their policies and approved [Riechers'] decisions in only going after the Rasches." Appellants' Br. at 15. If the Village retained such authority, then Riechers' authority cannot constitute final policymaking authority.

With respect to Mr. Lohmann, the Rasches have brought forth no authority to establish that, as a matter of state law, he has the authority to make final municipal policy with regard to zoning. Under Illinois law, it is the "corporate authorities" that have authority concerning zoning policy and enforcement. 65 ILCS 5/11–13–1. "Corporate authorities" include "the president and trustees or similar body when the reference is to villages or incorporated towns." 65 ILCS 5/1–1–2. Nevertheless, it appears that the president has only tie

breaking authority, veto power (which can be overridden), and the power to "recommend ... measures the ... president believes expedient." 65 ILCS 5/3.1–35–5, 5/3.1–45–5, 5/3.1–40–30. In general, the president's responsibilities are to "perform all the duties which are prescribed by **\*601** law, including ordinances, and shall take care that the laws and ordinances are faithfully executed." 65 ILCS 5/3.1–35–5. By contrast, the board of trustees has the authority to "pass ordinances, resolutions, and motions in the same manner as a city council." 65 ILCS 5/3.1–45–5. Generally, a person holding only executive power does not have policymaking authority for purposes of § 1983; rather, the policymaking authority in the city structure will be the city council, or here, the Board of Trustees. *See* *Auriemma,* 957 F.2d at 399–400. In any event, there is no evidence that Mr. Lohmann

took any actions against the Rasches. Therefore, even if Mr. Lohmann were a final policymaker, he could not be held liable to the Rasches because there is no evidence that he took or directed any action against them.

## Conclusion

For the foregoing reasons, we affirm the judgment of the district court.

AFFIRMED

## All Citations

336 F.3d 588

## Footnotes

1    We see no reason to disturb the district court's determination that Mrs. Rasche's interest in this litigation is sufficient to give her standing to appear as a litigant in this action. *See infra* note 8.

2    The ordinance does not expressly prohibit temporary and portable signs, but it defines a sign as one that is affixed on land or a structure—thus arguably excluding, at least by implication, temporary and portable signs. Under the ordinance, all signs must be approved by the building inspector on application for a permit. *See* R.32, Ex.A at 3.

3    According to Mr. Barber, his duties as the Village Administrator "include making recommendations to the Village Board of Trustees regarding local legislation, zoning and building issues, and local ordinance enforcement." R.32, Ex.A at ¶ 3. He attends all meetings of the Board of Trustees and answers to and takes direction from the Board of Trustees and the Village President. *See id.* at ¶¶ 2–4.

4    The Rasches maintain that, at this meeting, the "only specific sign that Barber and Lohmann directed Riechers to look at was the Rasches' sign." Appellants' Br. at 6. However, as noted by the district court, this characterization misrepresents the record. The Rasches base their assertion solely on a statement made on page 25 of Riechers' deposition. In response to the question, "[D]id [Mr. Lohmann and the Village Administrator] mention the Rasche sign to you as one of the signs they wanted you to look at?," Ms. Riechers responded "yes." R.32, Ex.Riechers' Dep. at 25. It initially should be noted that this response itself does not state, as the Rasches contend, that the Rasche sign was the *only* sign mentioned; rather the response indicates that the Rasche sign was "one of the signs they wanted [Ms. Riechers] to look at." *Id.* Further, the dialogue immediately following this question completely negates plaintiff's contention:

Q: ... [D]id they mention the Rasche sign to you as one of the signs they wanted you to look at?

A: Yes. [end of page 25]

Q: Did they mention any other signs by name?

A: Risings, Shady Long Golf Course.

Q: Excuse me a second. Risings, Shady Long Golf Course?

> A: Actually I think I'm going to take that back. I assumed this all on my own. I'm thinking about it. No one told me to deal with any particular thing. They just said go to Route 1, pick out things that you think are in violation.
>
> Q: Of the Village—
>
> A: Anything, right.
>
> Q: Of anything?
>
> A: Right. They did not tell me anything like even the sign, the Rasche sign. We just discussed different —I just actually did it on my own.

*Id.* at 25–26.

The Rasches do not include page 26 of the deposition in their appendix, although they do include and cite to page 25. They forwarded the same mischaracterization of facts in the district court. The district court explained:

> While plaintiffs allege that at this meeting the only sign Lohmann told Riechers to specifically look at was Roger's sign, they present at best a scintilla of evidence of this fact. Plaintiffs rely on Riechers' deposition where she states that Barber and Lohmann did mention the Rasche sign as one they wanted Riechers to look at. A few lines later, however, Riechers retracted the statement and testified, "Actually I think I'm going to take that back. I assumed this all on my own. I'm thinking about it. No one told me to deal with any particular thing. They just said go to Route 1, and pick out things that you think are in violation." (Riechers Dep. at 25–26.) (Disappointingly, plaintiffs fail to acknowledge page 26 of Riechers' deposition testimony.) With no argument addressing the testimony, which fairly read is that Lohmann did not single out the Rasche property, there is no basis to infer retaliation based on this meeting.

R.40 at 8. In a footnote, the court recognized that Riechers' immediate recantation "is consistent with another portion of Riechers' deposition testimony. Riechers previously was asked if specific property owners along Route 1 were singled out for her to talk to. Riechers responded that there were not, and that she was to talk to all property or business owners along Route 1. (*Id.* at 20)." R.40 at 8 n. 8.

5    The Rasches state repeatedly in their brief that "[w]hen Code Enforcement Officer Riechers went out to determine if any business signs along State Route 1 violated the Village of Beecher's sign ordinance, she did not determine whether any other business signs were in violation of the Village of Beecher sign ordinance except Rasche's. (Appendix No. 11, pp. 112–133.)" Appellants' Br. at 8–9. The record does not support this assertion. For example, on pages 26–27 of her deposition, Riechers details that she told four other businesses to remove their signs because the signs were not permanent, had wheels or were otherwise not affixed to the ground—which was the same violation the Rasches allegedly committed. *See* R.32, Ex.Riechers' Dep. at 26–27. Also, Riechers produced letters sent to other business owners who were told that their signs were in violation and that they were required to remove or to change their sign. *See* R.32, Ex.J. She specifically stated in these letters (dated July 14 and 15, 1999) that she and the Chief of Police, Mark DiSanto, "went to all local businesses on Dixie Highway to talk to the owners regarding various code violations" and to explain that the property owner's sign was in violation of the code and needed to be removed in the next 30 days. *Id.* The letters warn that, if the signs are not removed, "the Village may file a formal complaint with the Village Attorney." *Id.* The Rasches also emphasize that the sign on Knuth's Country Corner Restaurant, owned by relatives of the Village Attorney, was in violation of the ordinance because the restaurant went out of business in November of 2000 and it is a violation to have a sign on a vacant building. Riechers testified that a citation had not been issued to Knuth for his sign because in February 2001 (three months after the store closed), Knuth had "removed some of the signs. He has not removed the giant sign that's on the corner yet. But he has been working with me on it." R.37, Ex.1 at 32. According to Riechers' deposition, on February 21, 2001, Knuth asked for a few more weeks to get the large corner sign down because "he said he had more problems getting that one down. But he did remove the other ones ...." *Id.* at 33. Thus Riechers had not issued a citation yet, as of her March 2001 deposition, "because he has spoken with me and worked with me on it." *Id.* at 32.

6    In the Rasches' statement of facts, this fact appears twice, but refers to the same occasion and the same ticket —not two different occasions or tickets. *See* Appellants' Br. at 7 (discussing at top of page that "the Beecher

Adjudicatory Hearing Officer dismissed Ticket No. 4101" and stating at bottom of page after discussing issuance of further tickets that the "ticket for the illegal sign, No. 4101, was dismissed by the hearing officer on October 21, 1999 because it was not an offense covered by the Adjudicatory Ordinance").

7   The state court's order directing the verdict states in its entirety: "This cause comes before the Court for decision on Defendant's Motion for Directed Finding, the Court cites *People, ex rel Adams Elec. Co-op v. Village of Cant Point* [*sic., Camp Point* ], 286 Ill.App.3d 247, 221 Ill.Dec. 641, 675 N.E.2d 1371 [1997] and *Village of Riverwoods v. Untermyer,* 54 Ill.App.3d 816, 12 Ill.Dec. 371, 369 N.E.2d 1385 [1977], hereby grants the Motion for Directed Finding and all cases outlined in defendants brief." Appellants' App. at 53. The defendants had argued in their brief supporting their motion for directed verdict that the Village had failed to "offer into evidence the Village ordinance itself with publication noted thereon it, certified and signed by the Village Clerk and therefore, as a matter of law, the Village did not prove the existence of any ordinance under which Roger Rasche is charged." *Id.* at 39 (citing *Village of Riverwoods,* 54 Ill.App.3d 816, 12 Ill.Dec. 371, 369 N.E.2d 1385). Moreover, the Village had failed to offer into evidence "the Book of Ordinances" and thus failed to establish "the existence of the ordinance." *Id.* at 39 (citing *Village of Camp Point,* 286 Ill.App.3d 247, 221 Ill.Dec. 641, 675 N.E.2d 1371).

8   Before reaching the merits, the court first noted that, because "claims against individuals in their official capacities are suits against the municipality," it need only consider the claim against Mr. Lohmann in his individual capacity and the claim against the Village. R.40 at 6 n. 5.

The court also determined that Mrs. Rasche had standing despite the Village's argument that "she did not have any ownership interests in the business and none of the citations were issued against her." *Id.* at 7 n. 7. The district court concluded that "[t]he facts indicate that Velma has an ownership interest because Rasche Towing may be a family business. Also, because Velma asserts that defendants retaliated against *her* First Amendment rights, she has standing to assert an injury sustained as a result" and she is not bringing claims "on behalf of third parties," but "asserts her own claim, not that of her husband." *Id.*

9   This statement seems contrary to the court's earlier statement that because it agreed that the actions were not attributable to the Village (no municipal liability), it would not consider the question of whether the exercise of their First Amendment rights was a motivating or substantial factor in the Village's issuance of the citations. *See* R.40 at 7.

10   It is undisputed that the Rasches' speech on the bond issues was constitutionally protected.

11   A municipality can ratify the action of its employees by "adopting an employee's action as its own" and thus becoming "the author of the action for purposes of liability under ☐ section 1983." ☐ *Gernetzke v. Kenosha Unified Sch. Dist. No. 1,* 274 F.3d 464, 469 (7th Cir.2001). In order to adopt such an action, the municipality must know of the "subordinate's conduct" and "approve[ ] of the conduct and the basis for it." ☐ *Baskin v. City of Des Plaines,* 138 F.3d 701, 705 (7th Cir.1998) (internal quotation marks and citations omitted). Here, the Rasches argue that the Village, by authorizing the suit in state court, ratified the Village Attorney's actions. The suit is therefore an act by the Trustees. There is no evidence that the Trustees "ratified" any other actions (such as Riechers' or DiSanto's issuance of tickets).

12   We therefore need not decide whether this statement is admissible.

13   The Rasches later make an almost identical argument concerning Mr. Lohmann. They argue that, assuming he is a final policymaker, "Lohmann set in motion a series of acts by others, which he did, and reasonably knew or should have known that they would cause Riechers and the Police Chief to inflict the constitutional injuries retaliating against the Rasches only." Appellants' Br. at 16. Outside of the unsupported allegation that Mr. Lohmann directed Riechers to look at only the Rasches' sign, the Rasches give no indication of any activities that Mr. Lohmann "set in motion" which he "reasonably knew or should have known ... would cause Riechers and the Police Chief to inflict the constitutional injuries retaliating against the Rasches only." Appellants' Br. at 16.

---

**End of Document**      © 2020 Thomson Reuters. No claim to original U.S. Government Works.

FILED
12-07-2020
Clerk of Circuit Court
Waukesha County
2020CV001583

914 F.2d 1008
United States Court of Appeals,
Seventh Circuit.

NATIONAL PEOPLE'S ACTION, Plaintiff–Appellee,

v.

VILLAGE OF WILMETTE and Fred
W. Stoecker, Defendants–Appellants.

No. 89–3446.
|
Argued May 18, 1990.
|
Decided Oct. 3, 1990.

**Synopsis**
Suit was brought attacking village registration ordinance for door-to-door solicitors. The United States District Court for the Northern District of Illinois, Paul E. Plunkett, J., preliminarily enjoined village from enforcing that part of ordinance requiring fingerprinting of prospective solicitors. Appeal was taken. The Court of Appeals, Ripple, Circuit Judge, held that preliminary injunction was properly issued against enforcement of portion of ordinance requiring fingerprinting of prospective door-to-door solicitors, given demonstrated likelihood of success on claim that requirement unnecessarily impeded First Amendment freedom of speech and served little or no legitimate government purpose.

Affirmed.

**Procedural Posture(s):** Motion for Preliminary Injunction.

**Attorneys and Law Firms**

**\*1009** Edward A. Voci, Chicago, Ill., for plaintiff-appellee.

Anne Lorenz, Garr & Associates, Gregory E. Rogus, Segal, McCambridge, Singer & Mahoney, Chicago, Ill., Robert J. Mangler, Wilmette, Ill., for defendants-appellants.

Before COFFEY, RIPPLE and MANION, Circuit Judges.

**Opinion**

RIPPLE, Circuit Judge.

National People's Action (NPA) filed suit pursuant to 42 U.S.C. § 1983 against the Village of Wilmette (Village), challenging the constitutionality of the Village's registration ordinance regulating door-to-door solicitation. NPA sought money damages and an injunction against further enforcement of the ordinance. The district court denied NPA's motion for a preliminary injunction against the Village's prohibition of solicitors who have been convicted of a felony within the previous five years, but the court granted NPA's motion for a preliminary injunction against the Village's requirement that prospective solicitors submit fingerprints on their application for registration. The appellants filed a timely notice of appeal. For the following reasons, we affirm.

I

BACKGROUND

A. *Procedural Posture*
NPA's complaint alleged that section 5–5.3 of the Village of Wilmette Code (registration of solicitors) violated its first amendment free speech rights because the fingerprinting requirement discouraged its employee-solicitors from applying for a solicitation permit. In addition, the complaint alleged that the ordinance was overly broad in prohibiting the registration as a solicitor of any person who had been convicted of a felony within the previous five years.

The district court denied a preliminary injunction regarding the prohibition against the registration of felons. It granted a preliminary injunction regarding the fingerprinting requirement. The Village and Police Chief Stoecker appealed the grant of the preliminary injunction. [1] On November 17, 1989, the appellants moved in this court for an order staying the preliminary injunction. A motions panel of this court denied the stay on December 14, 1989.

B. *District Court Proceedings*
The first witness at the hearing on the preliminary injunction was Fred Stoecker, the chief of police for the Village. He testified that a prospective solicitor was required to submit a registration application and to be fingerprinted in the lobby of the police station. [2] Chief Stoecker acknowledged that the fingerprints on the registration form (as opposed to special fingerprint cards) could not be used for **\*1010** classification purposes. Upon questioning by the court, Chief Stoecker testified that the fingerprinting requirement served two purposes: to use for comparison purposes in the event a solicitor is suspected in a crime, and to receive more accurate

information on the registration form. When the court asked Chief Stoecker to clarify the latter purpose, the following colloquy ensued:

Q. [by the court] What is the basis for your belief that if fingerprints are required on that form the information that you get from the person seeking to be a solicitor in your town will be more accurate?

A. We have had many occasions when we are asked for applications and they are sent in, information is sent in, and once solicitors come into the building and see the process they leave.

Q. So that is the basis for that belief?

A. Yes.

Tr. of Feb. 23, 1989 at 18.

The court also received testimony from Frederick Clauser, the deputy chief of police, who stated that he was unaware of any occasion in which the fingerprints on the registration forms were used to confirm that a solicitor had committed a crime, although he believed that it would be feasible to use the fingerprints in that manner. [3] Finally, several NPA solicitors testified that they refused to give fingerprints at the police station because the process was associated with having committed a crime. Rather than be fingerprinted, the solicitors chose not to solicit in Wilmette.

On November 2, 1989, the district court issued oral findings of fact in support of its decision to grant a preliminary injunction. The court summarized its conclusion as follows: "The Court is not convinced that the requirement serves any useful purpose and, further, it finds it significantly deters qualified solicitors from coming into the village." Tr. of Nov. 2, 1989 at 6. In addition, the court found that the evidence at the hearing indicated that the fingerprints were not used to check identification, and that the Village had other means available to check if the applicants had a criminal record. With respect to the use of the fingerprints in later criminal investigations, the court concluded:

The only possible use of these prints for a legitimate government purpose might be in solving a crime where latent prints were found at the scene, however, because of the way the prints are taken such use here is problematic. Further, the evidence does not reflect that this has ever happened in Wilmette.

We conclude that the village fingerprint requirement at best only slightly serves some kind of a government interest, that it has the effect of chilling proper solicitation, and in fact is used by Wilmette for that very purpose.

*Id.* at 7.

II

ANALYSIS

A. *The Applicable Standards*

1.

The standards that apply to a grant of a preliminary injunction are well established. Initially, the district court must consider a number of factors in deciding whether to grant a preliminary injunction:

> Before a preliminary injunction will issue, the movant must show, as a threshold matter, that: (1) they have no adequate remedy at law; (2) they will suffer irreparable harm if the injunction is not granted; and (3) they have *some* likelihood of success on the merits in the sense that their "chances are better than negligible."
>
> *Roland Machinery Co. v. Dresser Industries, Inc.,* 749 F.2d 380, 386–87 (7th Cir.1984); *see also* *Lawson Products, Inc. v. Avnet, Inc.,* 782 F.2d 1429, 1433 (7th Cir.1986). If the movant can meet this threshold burden, the inquiry **\*1011** then becomes a "sliding scale" analysis of the harm to the parties and the public from the grant or denial of the injunction and the actual likelihood of success on the merits.

WESTLAW    © 2020 Thomson Reuters. No claim to original U.S. Government Works.    2

*Ping v. National Educ. Ass'n,* 870 F.2d 1369, 1371 (7th Cir.1989) (emphasis in original).

The standard that we apply to review the district court's determination is "tailored to the various functions that the district court must perform in fulfillment of its responsibilities." *Thornton v. Barnes,* 890 F.2d 1380, 1384 (7th Cir.1989). This court summarized this review as follows:

> [T]he preliminary injunction decision involves the resolution of a number of different issues, some of which are non-discretionary; others, like the final weighing and balancing of the equities, are classically left to the discretion of the district judge. Appellate review therefore must vary with the nature of the lower court decision. When a court of appeals considers a preliminary injunction order, which should set forth the judge's reasoning under Fed.R.Civ.P. 65(d), the factual determinations are reviewed under a clearly erroneous standard and the necessary legal conclusions are given *de novo* review. *SEC v. Suter,* 732 F.2d 1294, 1300 (7th Cir.1984); *E. Remy Martin & Co. v. Shaw–Ross International Imports,* 756 F.2d 1525, 1529 (11th Cir.1985). However, the ultimate evaluation and balancing of the equitable factors is a highly discretionary decision and one to which this court must give substantial deference. The variance in the standard of review expressed in *Roland* may, in part, be attributed to the existence of errors of law or fact. Clearly, a factual or legal error may alone be sufficient to establish that the court "abused its discretion" in making its final determination.

*Lawson Prods., Inc. v. Avnet, Inc.,* 782 F.2d 1429, 1437 (7th Cir.1986); *see also Somerset House, Inc. v. Turnock,* 900 F.2d 1012, 1014 (7th Cir.1990) (factual determinations reviewed on abuse of discretion standard). Based on these standards, " ' "our review is limited to determining 'whether the judge exceeded the bounds of permissible choice in the circumstances, not what we would have done if we had been in his shoes.' " ' " *Thornton,* 890 F.2d at 1385 (quoting *International Kennel Club, Inc. v. Mighty Star, Inc.,* 846 F.2d 1079, 1084 (7th Cir.1988) (quoting *A.J. Canfield Co. v. Vess Beverages, Inc.,* 796 F.2d 903, 906 (7th Cir.1986) (quoting *Roland Mach. Co. v. Dresser Indus.,* 749 F.2d 380, 390 (7th Cir.1984)))); *see also Cox v. City of Chicago,* 868 F.2d 217, 219 (7th Cir.1989) (review of grant or denial of preliminary injunction is under abuse of discretion standard); *David K. v. Lane,* 839 F.2d 1265, 1271 (7th Cir.1988) (deferential standard of review).

### 2.

An ordinance that regulates first amendment activity must be "narrowly drawn." *Village of Schaumburg v. Citizens for a Better Env't,* 444 U.S. 620, 637, 100 S.Ct. 826, 836, 63 L.Ed.2d 73 (1980); *Hynes v. Mayor of Oradell,* 425 U.S. 610, 617, 96 S.Ct. 1755, 1759, 48 L.Ed.2d 243 (1976). Also, the ordinance must be designed not to "unnecessarily interfer[e] with First Amendment freedoms." *Schaumburg,* 444 U.S. at 637, 100 S.Ct. at 836. " 'Precision of regulation must be the touchstone....' " *Id.* (quoting *NAACP v. Button,* 371 U.S. 415, 438, 83 S.Ct. 328, 340, 9 L.Ed.2d 405 (1963)).

The Supreme Court, in *dicta,* has approved the use of identification devices as a requirement for receiving a solicitation permit. *See Martin v. City of Struthers,* 319 U.S. 141, 148, 63 S.Ct. 862, 866, 87 L.Ed. 1313 (1943); *Cantwell v. Connecticut,* 310 U.S. 296, 306, 60 S.Ct. 900, 904, 84 L.Ed. 1213 (1940); *see also Hynes,* 425 U.S. at 618, 96 S.Ct. at 1759. This regulation is allowed because of the legitimate interests of the state to protect its citizens from criminal elements and unwanted disruptions

at home. *Hynes,* 425 U.S. at 618, 96 S.Ct. at 1759; *Martin,* 319 U.S. at 148, 63 S.Ct. at 866. Finding the proper means to control solicitation is a problem that "must be worked out by each community for itself with due respect for the constitutional **\*1012** rights of those desiring to distribute literature and those desiring to receive it, as well as those who choose to exclude such distributers from the home." *Martin,* 319 U.S. at 148–49, 63 S.Ct. at 866. Nevertheless, such restrictions on expression must be content-neutral and "narrowly tailored to serve a significant governmental interest," and they must "leave open ample alternative channels for communication of the information."

*Clark v. Community for Creative Non–Violence,* 468 U.S. 288, 293, 104 S.Ct. 3065, 3069, 82 L.Ed.2d 221 (1984); *see also Members of the City Council of Los Angeles v. Taxpayers for Vincent,* 466 U.S. 789, 808, 812, 104 S.Ct. 2118, 2130, 2132, 80 L.Ed.2d 772 (1984). In applying this standard, it must be remembered that the Supreme Court has reaffirmed—emphatically—"that a regulation of the time, place, or manner of protected speech must be narrowly tailored to serve the government's legitimate content-neutral interests but that it need not be the least-restrictive or least-intrusive means of doing so. Rather, the requirement of narrow tailoring is satisfied 'so long as the ... regulation promotes a substantial government interest that would be achieved less effectively absent the regulation.' " *Ward v. Rock Against Racism,* 491 U.S. 781, 109 S.Ct. 2746, 2757–58, 105 L.Ed.2d 661 (1989) (quoting *United States v. Albertini,* 472 U.S. 675, 689, 105 S.Ct. 2897, 2906, 86 L.Ed.2d 536 (1985)) (footnote omitted).

B. *Application to This Case*

The parties in this case mainly dispute one of the elements necessary to support a preliminary injunction: NPA's likelihood of success on the merits. NPA charges that the fingerprinting requirement unnecessarily impedes its first amendment freedom of speech, as applied to the states by the fourteenth amendment,[4] because it is intended to discourage applicants for solicitation permits. NPA contends that the ordinance does not serve a legitimate governmental objective because there is no evidence that the required fingerprinting deters criminal conduct or would significantly aid investigations of future criminal conduct. With respect to the latter point, NPA points out that, even if identifying criminals is a legitimate goal, the fingerprinting in this case is ineffective in achieving that goal because of the nonprofessional manner in which the fingerprints are taken. NPA concludes that the ordinance is not narrowly tailored because "sufficient, narrower, and less stigmatizing means of corroborating the identity of solicitors and deterring criminal behavior," Appellee's Br. at 23, are available and indeed have been used by the Village. Moreover, the Village allows citizens to place "no solicitor" signs on their door to deter criminals posing as solicitors.

The record before the district court amply supports its determination that the plaintiff established a probability of success on the merits. First, the court, which was permitted to make credibility determinations, concluded that the fingerprints, as taken by the Village, "really cannot be used to check for criminal records and the village does not try to do that." Tr. of Nov. 2, 1989 at 6. In short, *on the record before it,* the district court was entitled to conclude that the fingerprinting requirement served little or no legitimate governmental purpose. The only possible use of the fingerprints was to assist the authorities in later criminal investigations. However, the district court found specifically that the use of the fingerprints for this purpose was "problematic," *id.* at 7, because of the manner in which the prints were taken. Furthermore, the court concluded that "the evidence does not reflect" that the prints were ever used for such a purpose in Wilmette. *Id.* Accordingly, we cannot say, as *Ward* requires, that the " 'regulation promotes a substantial government interest that would be achieved less effectively absent the regulation.' " *Ward,* 109 S.Ct. at 2758 (quoting *United States v. Albertini,* 472 U.S. 675, 689, 105 S.Ct. 2897, 2906, 86 L.Ed.2d 536 (1985)).

**\*1013** Moreover, the district court emphasized that the fingerprinting procedure also affirmatively discourages protected activity:[5]

Indeed, in an effort to justify the fingerprinting the chief of police stated in response to a question by this Court that the only tangible benefit he saw from the fingerprinting was that it discouraged solicitors and that many left the village rather than comply with the requirement.

Tr. of Nov. 2, 1989 at 6–7. The district court's conclusion as to the true purpose and effect of the fingerprinting requirement is substantiated by the fact that, although the fingerprinting procedure was of no help in checking

criminal records, such a check was easily possible through other means.

The appellants also contest—in a rather conclusory and superficial manner—the other elements necessary to support a preliminary injunction. The appellants claim that NPA will not suffer irreparable harm because the group can solicit in all the other cities and villages in Illinois. We reject this argument. The harm created by restricting the prospective solicitors' right of expression in Wilmette cannot be cured by pointing to other municipalities that do allow free exercise of speech. Even a temporary deprivation of first amendment freedom of expression rights is generally sufficient to prove irreparable harm. *See Citizens for a Better Env't v. City of Park Ridge,* 567 F.2d 689, 691 (7th Cir.1975); *Schnell v. City of Chicago,* 407 F.2d 1084, 1086 (7th Cir.1969); *see also* 11 C. Wright & A. Miller, Federal Practice and Procedure § 2948 at 440 (1973); *cf. Dombrowski v. Pfister,* 380 U.S. 479, 486, 85 S.Ct. 1116, 1120–21, 14 L.Ed.2d 22 (1965) (allegation of impairment to freedom of expression demonstrated an irreparable injury); *Somerset House, Inc. v. Turnock,* 900 F.2d 1012, 1018 (7th Cir.1990) (allegation of first amendment violation supports finding of irreparable injury). The district court found that the fingerprinting requirement inhibited protected speech in Wilmette by discouraging prospective solicitors from filling out the required registration form. This finding is not clearly erroneous and does support a conclusion of irreparable harm.

The appellants also assert that NPA has an adequate remedy at law because there would be a full hearing in the future. But injunctions are especially appropriate in the context of first amendment violations because of the inadequacy of money damages. *See generally Flower Cab Co. v. Petitte,* 685 F.2d 192, 195 (7th Cir.1982) ("In [first amendment] cases the quantification of injury is difficult and damages are therefore not an adequate remedy.").

Finally, the appellants assert that the harm that the Village would suffer outweighs the harm to NPA, because of the harm that a criminal can inflict should one obtain a solicitor's permit. This argument ignores the district court's finding that the fingerprints are not used to check criminal records and that the Village has other means that it currently uses to check the records. As we have noted, the district court's finding that the fingerprinting requirement does not serve to deter crime is not clearly erroneous.

Based on the record before us, we conclude that the district court did not err in granting a preliminary injunction.

### Conclusion

The judgment of the district court is affirmed.

AFFIRMED.

**All Citations**

914 F.2d 1008

---

### Footnotes

1    NPA does not appeal the denial of a preliminary injunction on the five year felon restriction, and thus we shall not consider that issue.

2    There was a room outside the view of the general public for use in taking the fingerprints of suspects.

3    Although Chief Stoecker originally stated during his testimony that the fingerprints had been used in burglary investigations, Tr. of Feb. 23, 1989 at 18–19, he admitted on further examination that that statement might be inaccurate: "I might have been inaccurate in saying that we use the prints for comparisons. More accurately, I would say that we found that solicitors were involved in burglaries in the community on two occasions." *Id.* at 19.

4    *See Gitlow v. New York,* 268 U.S. 652, 666, 45 S.Ct. 625, 630, 69 L.Ed. 1138 (1925).

5    The Third Circuit dealt with a similar fingerprinting requirement in *New Jersey Citizen Action v. Edison Township,* 797 F.2d 1250 (3d Cir.1986), *cert. denied,* 479 U.S. 1103, 107 S.Ct. 1336, 94 L.Ed.2d 186 (1987).

After reviewing the Supreme Court precedent; 📑 *id.* at 1263–65, the court concluded that there was not a substantial relationship between the fingerprinting and an important state interest. 📑 *Id.* at 1265. The court noted that the fingerprints would assist in the apprehension of a canvasser who commits a crime, but determined that the city had not shown a relationship between canvassers and criminal behavior. *Id.*

                              © 2020 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW    © 2020 Thomson Reuters. No claim to original U.S. Government Works.    6

FILED
12-07-2020
Clerk of Circuit Court
Waukesha County
2020CV001583

Marshall v. Jerrico, Inc., 446 U.S. 238 (1980)

100 S.Ct. 1610, 24 Wage & Hour Cas. (BNA) 681, 64 L.Ed.2d 182, 88 Lab.Cas. P 33,898

100 S.Ct. 1610
Supreme Court of the United States

Ray MARSHALL, Secretary
of Labor, et al., Appellants,
v.
JERRICO, INC.

No. 79–253.
|
Argued March 19, 1980.
|
Decided April 28, 1980.

**Synopsis**
Employer brought action challenging civil penalty provisions of the Fair Labor Standards Act. The United States District Court for the District of Columbia granted plaintiff's motion for summary judgment, and the Supreme Court noted probable jurisdiction. The Supreme Court, Mr. Justice Marshall, held that section of Fair Labor Standards Act providing that money collected as civil penalties for employment of child labor in violation of the Act must be returned to the Department of Labor as reimbursement for amounts expended in determining the violation did not violate the due process clause by creating an impermissible risk of bias in the enforcement and administration of the Act, since no government officials stood to profit from vigorous enforcement of child labor provisions, there was no realistic possibility that assistant regional administrator's judgment would be distorted by the prospect of institutional gain, and civil penalties actually collected under the section represented less than 1% of employment standards administration's budget.

Reversed and remanded.

**Procedural Posture(s):** Motion for Summary Judgment.

**\*\*1610  \*238** *Syllabus* [*]

Under § 16(e) of the Fair Labor Standards Act (Act), sums collected as civil penalties for the unlawful employment of child labor are returned to the Employment Standards Administration (ESA) of the Department of Labor in reimbursement for the costs of determining violations and assessing **\*\*1611** penalties. An Assistant Regional Administrator determined that violations of child labor

provisions of the Act had occurred at restaurants managed by appellee and assessed a fine against appellee including an amount for willful violation. After appellee filed exceptions to the Assistant Regional Administrator's determination and assessment, a hearing was held before an Administrative Law Judge, who accepted the Assistant Regional Administrator's contention that violations had occurred, but found that the violations were not willful and reduced the total assessment accordingly. Appellee then filed suit in Federal District Court, contending that § 16(e) violated the Due Process Clause of the Fifth Amendment. The District Court granted summary judgment for appellee, holding that the reimbursement provision of § 16(e) created an impermissible risk of bias on the part of the Assistant Regional Administrator because a regional office's greater effort in uncovering violations could lead to an increased amount of penalties and a greater share of reimbursements for that office, and thus § 16(e) could distort the Assistant Regional Administrator's objectivity in assessing penalties.

*Held*: The reimbursement provision of § 16(e) does not violate the Due Process Clause of the Fifth Amendment by creating an impermissible risk of bias in the Act's enforcement and administration. Pp. 1613–1618.

(a) Strict due process requirements as to the neutrality of officials performing judicial or quasi-judicial functions, cf. *Tumey v. Ohio*, 273 U.S. 510, 47 S.Ct. 437, 71 L.Ed. 749, *Ward v. Monroeville*, 409 U.S. 57, 93 S.Ct. 80, 34 L.Ed.2d 267, are not applicable to the determinations of the assistant regional administrator, whose functions resemble those of a prosecutor more closely than those of a judge. In an adversary system, prosecutors are permitted to be zealous in their **\*239** enforcement of the law. Although traditions of prosecutorial discretion do not immunize from judicial scrutiny enforcement decisions that are contrary to law, rigid standards of neutrality cannot be the same for administrative prosecutors as for judges. Pp. 1613–1617.

(b) It is unnecessary in this case to determine with precision what limits there may be on a financial or personal interest of one who performs a prosecutorial function, for here the influence alleged to impose bias is exceptionally remote. No governmental official stands to profit economically from vigorous enforcement of child labor provisions; there is no realistic possibility that the assistant regional administrator's judgment will be distorted by the prospect of institutional gain as a result of zealous enforcement efforts; and ESA's

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.  1

100 S.Ct. 1610, 24 Wage & Hour Cas. (BNA) 681, 64 L.Ed.2d 182, 88 Lab.Cas. P 33,898

administration of the Act has minimized any potential for bias. On this record, the possibility that an assistant regional administrator might be tempted to devote an unusually large quantity of resources to enforcement efforts in the hope that he would ultimately obtain a higher total allocation of federal funds to his office is too remote to violate the constraints applicable to the financial or personal interest of officials charged with prosecutorial or plaintiff-like functions. Pp. 1617–1618.

Reversed and remanded.

**Attorneys and Law Firms**

Kenneth S. Geller, Washington, D. C., for appellants.

Thomas W. Power, Washington, D. C., for appellee.

**Opinion**

Mr. Justice MARSHALL delivered the opinion of the Court.

Under § 16(e) of the Fair Labor Standards Act, 29 U.S.C. § 216(e), sums collected as civil penalties for the unlawful employment of child labor are returned to the Employment Standards Administration (ESA) of the Department of Labor in reimbursement for the costs of determining violations and assessing penalties. The question for decision is whether this provision violates the Due Process Clause of the Fifth Amendment by creating an impermissible risk of bias in the Act's enforcement and administration.

***240  **1612  I

The child labor provisions of federal law are primarily contained in § 12 of the Fair Labor Standards Act, 52 Stat. 1067, as amended, 29 U.S.C. § 212. The Secretary of Labor has designated the ESA as the agency responsible for enforcing these provisions, 36 Fed.Reg. 8755 (1971). The ESA in turn carries out its responsibilities through regional offices, and the assistant regional administrator of each office has been charged with the duty of determining violations and assessing penalties.

Appellee Jerrico, Inc., is a Delaware corporation that manages approximately 40 restaurants in Kentucky, Indiana, Tennessee, Georgia, and Florida. In a series of investigations from 1969 to 1975, the ESA uncovered over 150 violations of the child labor provisions at appellee's various establishments. After considering the factors designated by statute and regulations,[1] the ESA Assistant Regional Administrator in the Atlanta office assessed a total fine of $103,000 in civil penalties for the various violations. That figure included a supplemental assessment of $84,500 because of his conclusion that the violations were willful.

Appellee filed exceptions to the determination and assessment of the Assistant Regional Administrator, and pursuant to 29 U.S.C. § 216(e), a hearing was held before an Administrative Law Judge. Witnesses included employees of appellee and representatives of the Department of Labor. The Administrative Law Judge accepted the Assistant Regional Administrator's **241 contention that violations had occurred, concluding that the record showed "a course of violations" for which "[r]espondent's responsibility cannot be disputed." At the same time, he was persuaded by appellee's witnesses and by a review of the evidence that the violations were not willful. Accordingly, he reduced the total assessment to $18,500.

Appellee did not seek judicial review of the decision of the Administrative Law Judge. Instead, it brought suit in Federal District Court, challenging the civil penalty provisions of the Act on constitutional grounds and seeking declaratory and injunctive relief against their continued enforcement. Appellee accepted the determination of the Administrative Law Judge and alleged no unfairness in the proceedings before him. Nonetheless, it contended that § 16(e) of the Act violated the Due Process Clause of the Fifth Amendment by providing that civil penalties must be returned to the ESA as reimbursement for enforcement expenses and by allowing the ESA to allocate such fines to its various regional offices. According to appellee, this provision created an impermissible risk and appearance of bias by encouraging the assistant regional administrator to make unduly numerous and large assessments of civil penalties.

After the parties engaged in discovery with respect to the administration of § 16(e), appellee moved for summary judgment. The District Court granted the motion. It acknowledged that the Office of Administrative Law Judges was unaffected by the total amount of the civil penalties. At the same time, the court concluded that the reimbursement provision created an impermissible risk of bias on the part of the assistant regional administrator. Citing *Tumey v. Ohio*, 273 U.S. 510, 47 S.Ct. 437, 71 L.Ed. 749 (1927), and

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.    2

*Ward v. Village of Monroeville,* 409 U.S. 57, 93 S.Ct. 80, 34 L.Ed.2d 267 (1972), the court found that because a regional office's greater effort in uncovering violations could lead to an increased amount of penalties and a greater share of reimbursements for that office, **1613 § 16(e) could distort the assistant regional administrator's objectivity in assessing penalties *242 for violations of the child labor provisions of the Act.

We noted probable jurisdiction, 444 U.S. 949, 100 S.Ct. 419, 62 L.Ed.2d 318 (1979), and now reverse.

## II

### A

The Due Process Clause entitles a person to an impartial and disinterested tribunal in both civil and criminal cases. This requirement of neutrality in adjudicative proceedings safeguards the two central concerns of procedural due process, the prevention of unjustified or mistaken deprivations and the promotion of participation and dialogue by affected individuals in the decisionmaking process. See *Carey v. Piphus,* 435 U.S. 247, 259–262, 266–267, 98 S.Ct. 1042, 1043, 1050–1052, 1053, 1054, 55 L.Ed.2d 252, (1978). The neutrality requirement helps to guarantee that life, liberty, or property will not be taken on the basis of an erroneous or distorted conception of the facts or the law. See *Mathews v. Eldridge,* 424 U.S. 319, 344, 96 S.Ct. 893, 907, 47 L.Ed.2d 18 (1976). At the same time, it preserves both the appearance and reality of fairness, "generating the feeling, so important to a popular government, that justice has been done," *Joint Anti-Fascist Committee v. McGrath,* 341 U.S. 123, 172, 71 S.Ct. 624, 649, 95 L.Ed. 817 (1951) (Frankfurter, J., concurring), by ensuring that no person will be deprived of his interests in the absence of a proceeding in which he may present his case with assurance that the arbiter is not predisposed to find against him.

The requirement of neutrality has been jealously guarded by this Court. In *Tumey v. Ohio, supra,* the Court reversed convictions rendered by the mayor of a town when the mayor's salary was paid in part by fees and costs levied by him acting in a judicial capacity. The Court stated that the Due Process Clause would not permit any "procedure which would offer a possible temptation to the average man as a judge to forget the burden of proof required to convict the defendant, or which might lead him not to hold the balance nice, clear and true between the state and the accused."

273 U.S., at 532, 47 S.Ct., at 444. *Tumey* was applied in *Ward v. Village of Monroeville, supra,* *243 to invalidate a procedure by which sums produced from a mayor's court accounted for a substantial portion of municipal revenues, even though the mayor's salary was not augmented by those sums. The forbidden "possible temptation," we concluded, is also present "when the mayor's executive responsibilities for village finances may make him partisan to maintain the high level of contribution from the mayor's court." 409 U.S., at 60, 93 S.Ct., at 83. We have employed the same principle in a variety of settings, demonstrating the powerful and independent constitutional interest in fair adjudicative procedure.[2] Indeed, "justice must satisfy the appearance of justice," *Offutt v. United States,* 348 U.S. 11, 14, 75 S.Ct. 11, 13, 99 L.Ed. 11 (1954), and this "stringent rule may sometimes bar trial by judges who have no actual bias and who would do their very best to weigh the scales of justice equally between contending parties," **1614 *In re Murchison,* 349 U.S. 133, 136, 75 S.Ct. 623, 625, 99 L.Ed. 942 (1955). See also *Taylor v. Hayes,* 418 U.S. 488, 94 S.Ct. 2697, 41 L.Ed.2d 897 (1974).

Appellee contends that these principles compel the conclusion that the reimbursement provision of the Act violates the Due Process Clause. We conclude, however, that the strict requirements of *Tumey* and *Ward* are not applicable to the determinations of the assistant regional administrator, whose functions resemble those of a prosecutor more closely than those of a judge. The biasing influence that appellee discerns in § 16(e) is, we believe, too remote and insubstantial to violate the constitutional constraints applicable to the decisions *244 of an administrator performing prosecutorial functions. To explain our conclusion, we turn to the relevant sections of the Act.

As noted above, the major portions of the federal child labor provisions appear in 29 U.S.C. § 212, which outlaws the employment in interstate commerce of "oppressive child labor," as that term is defined in 29 U.S.C. § 203(*l*) and implementing regulations. These provisions demonstrate a firm federal policy of "protect[ing] the safety, health, well-being, and opportunities for schooling of youthful workers."

29 CFR § 570.101 (1979). See also H.R.Rep. No. 1452, 75th Cong., 1st Sess., 6 (1937); S.Rep. No. 884, 75th Cong., 1st Sess., 2, 6 (1937).

Before 1974, the Secretary of Labor enforced the child labor provisions primarily through actions for injunctive relief, see 29 U.S.C. §§ 212(b), 217, and for criminal sanctions, see 29 U.S.C. §§ 216(a), 215(a)(4). Having found such relief to be an inadequate or insufficiently flexible remedy for violations of the law, cf. H.R.Rep. No. 93–913, p. 15 (1974), U.S.Code Cong. & Admin.News, 1974, p. 2811, Congress in 1974 authorized the Secretary to assess a civil penalty not to exceed $1,000 for each violation of § 212. 29 U.S.C. § 216(e). Under this provision for the assessment of civil penalties, the Secretary's determination of the existence of a violation and of the amount of the penalty is not final if the person charged with a violation enters an exception within 15 days of receiving notice. In the event that such an exception is entered, the final determination is made in an administrative hearing conducted in accordance with the Administrative Procedure Act, 5 U.S.C. § 554. The administrative law judge "may affirm, in whole or in part, the determination by the Administrator of the occurrence of violations or . . . may find that no violations occurred, and shall order payment of a penalty in the amount originally assessed or in a lesser amount . . . or order that respondent pay no penalty, as appropriate." 29 C.F.R. § 580.32(a) (1979). He is directed to consider the same factors considered by the assistant regional **\*245** administrator[3] in making his original assessment. *Ibid.* Under the natural construction of this regulation, the administrative law judge is required to conduct a *de novo* review of all factual and legal issues.[4]

The provision whose constitutionality is at issue in this case is a part of 29 U.S.C. § 216(e), the civil penalty section of the Act. That provision states that civil penalties collected for violations of the child labor law "shall be applied toward reimbursement of the costs of determining the violations and assessing and collecting such penalties, in accordance with the provisions of section 9a of this title." Section 9a, 29 U.S.C. § 9a, added in 1934, provides in turn that all sums

> "received by the Department of Labor in payment of the cost of such work shall be deposited to the credit of the appropriation of that bureau, service, office, division, or other agency of the Department of Labor which supervised such work, and may be used, in the discretion

of the Secretary of Labor, and notwithstanding any other provision of law, for the ordinary expenses of such agency and/or to secure the special services of persons who **\*\*1615** are neither officers nor employees of the United States."[5]

The record developed in the District Court permits a detailed description of the administration of the reimbursement provision in the years 1976, 1977, and 1978. It is plain that no official's salary is affected by the levels of the penalties. In all three years the sums collected as child labor penalties amounted to substantially less than 1% of the ESA's budget.[6] **\*246** And in each of those years, the ESA did not spend the full amount appropriated to it, and the sums that were not spent were returned to the Treasury. The amounts returned to the Treasury in that fashion substantially exceeded the sums collected under § 16(e) in all three years.[7] The challenged provisions have not, therefore, resulted in any increase in the funds available to the ESA over the amount appropriated by Congress.

Civil penalties for child labor violations are allocated by the national office of the ESA, subject to the approval of the Secretary of Labor. In 1976, the sums collected were allocated to and retained by the ESA national office; in 1977, they were allocated to the national office, to the Office of the Solicitor of Labor, and to the various regional offices in proportion to the amounts expended on enforcement of the child labor provisions;[8] and in 1978, the penalties were held in the Treasury. Civil penalties have never been allotted to the regional offices on the basis of the total amount of penalties collected by particular offices.

The District Court concluded that in these circumstances the challenged provision violated the Due Process Clause under the principles set forth in *Tumey,* and *Ward.* It noted that, as the 1977 practice demonstrated, the ESA has discretion to return sums collected as civil penalties to the regional offices in proportion to the amounts expended on enforcement efforts. Increased enforcement costs could thus lead to a **\*247** larger share of reimbursements. According to the court, an assistant regional administrator would therefore be inclined to maximize the total expenditures on enforcement of the child labor provisions of the Act, and those increased expenditures would result in an increase in the number and amount of penalties assessed. The court concluded that this possibility created an unconstitutional risk of bias in the

WESTLAW © 2020 Thomson Reuters. No claim to original U.S. Government Works.  4

assistant regional administrator's enforcement decisions. We disagree.

The assistant regional administrator simply cannot be equated with the kind of decisionmakers to which the principles of *Tumey* and *Ward* have been held applicable. He is not a judge. He performs no judicial or quasi-judicial functions. He hears no witnesses and rules on no disputed factual or legal questions. The function of assessing a violation is akin to that of a prosecutor or civil plaintiff. If the employer excepts to a penalty—as he has a statutory right to do—he is entitled to a *de novo* hearing before an administrative law judge.[9] In that hearing the assistant regional **\*\*1616** administrator acts as the complaining party and bears the burden of proof on contested issues. 29 CFR § 580.21(a) (1979). Indeed, **\*248** the Secretary's regulations state that the notice of penalty assessment and the employer's exception "shall, respectively be given the effect of a complaint and answer thereto for purposes of the administrative proceeding." 29 CFR § 580.3(b) (1979). It is the administrative law judge, not the assistant regional administrator, who performs the function of adjudicating child labor violations. As the District Court found, the reimbursement provision of § 16(e) is inapplicable to the Office of Administrative Law Judges.[10]

The rigid requirements of *Tumey* and *Ward,* designed for officials performing judicial or quasi-judicial functions, are not applicable to those acting in a prosecutorial or plaintiff-like capacity. Our legal system has traditionally accorded wide discretion to criminal prosecutors in the enforcement process, see *Linda R. S. v. Richard D.,* 410 U.S. 614, 93 S.Ct. 1146, 35 L.Ed.2d 793 (1973)35 L.Ed.2d 793 (1973), and similar considerations have been found applicable to administrative prosecutors as well, see *Moog Industries, Inc. v. FTC,* 355 U.S. 411, 414, 78 S.Ct. 377, 380, 2 L.Ed.2d 370 (1958); *Vaca v. Sipes,* 386 U.S. 171, 182, 87 S.Ct. 903, 912, 17 L.Ed.2d 842, (1967). Prosecutors need not be "neutral and detached," cf. *Ward v. Village of Monroeville,* 409 U.S., at 62, 93 S.Ct., at 84. In an adversary system, they are necessarily permitted to be zealous in their enforcement of the law. The constitutional interests in accurate finding of facts and application of law, and in preserving a fair and open process for decision, are not to the same degree implicated if it is the prosecutor, and not the judge, who is offered an incentive for **\*249** securing civil penalties. The distinction between judicial and nonjudicial officers was explicitly made in *Tumey,* 273 U.S., at 535, 47 S.Ct., at 445, where the

Court noted that a state legislature "may, and often ought to, stimulate prosecutions for crime by offering to those who shall initiate and carry on such prosecutions rewards for thus acting in the interest of the state and the people." See also *Hortonville School Dist. v. Hortonville Ed. Assn.,* 426 U.S. 482, 495, 96 S.Ct. 2308, 2315, 49 L.Ed.2d 1 (1976)

We do not suggest, and appellants do not contend, that the Due Process Clause imposes no limits on the partisanship of administrative prosecutors. Prosecutors are also public officials; they too must serve the public interest. *Berger v. United States,* 295 U.S. 78, 88, 55 S.Ct. 629, 633, 79 L.Ed. 1314 (1935). In appropriate circumstances the Court has made clear that traditions of prosecutorial discretion do not immunize from judicial scrutiny cases in which the enforcement decisions of an administrator were motivated by improper **\*\*1617** factors or were otherwise contrary to law. See *Dunlop v. Bachowski,* 421 U.S. 560, 567, n. 7, 568–574, 95 S.Ct. 1851, 1858, n. 7, 1858–1861, 44 L.Ed.2d 377 (1975); *Rochester Telephone Corp. v. United States,* 307 U.S. 125, 59 S.Ct. 754, 83 L.Ed. 1147 (1939).[11] Moreover, the decision to enforce—or not to enforce— may itself result in significant burdens on a defendant or a statutory beneficiary, even if he is ultimately vindicated in an adjudication. Cf. 2 K. Davis Administrative Law Treatise 215–256 (2d ed. 1979). A scheme injecting a personal interest, financial or otherwise, into the enforcement process may bring irrelevant or impermissible factors into the prosecutorial decision and in some **\*250** contexts raise serious constitutional questions. See *Bordenkircher v. Hayes,* 434 U.S. 357, 365, 98 S.Ct. 663, 669, 54 L.Ed.2d 604 (1978); cf. 28 U.S.C. § 528 (1976 ed., Supp. III) (disqualifying federal prosecutor from participating in litigation in which he has a personal interest). But the strict requirements of neutrality cannot be the same for administrative prosecutors as for judges, whose duty it is to make the final decision and whose impartiality serves as the ultimate guarantee of a fair and meaningful proceeding in our constitutional regime.

B

In this case, we need not say with precision what limits there may be on a financial or personal interest of one who performs a prosecutorial function,[12] for here the

100 S.Ct. 1610, 24 Wage & Hour Cas. (BNA) 681, 64 L.Ed.2d 182, 88 Lab.Cas. P 33,898

influence alleged to impose bias is exceptionally remote. No governmental official stands to profit economically from vigorous enforcement of the child labor provisions of the Act. The salary of the assistant regional administrator is fixed by law. 5 U.S.C. § 5332 (1976 ed. and Supp. III). The pressures relied on in such cases as *Tumey v. Ohio, supra; Gibson v. Berryhill,* 411 U.S. 564, 579, 93 S.Ct. 1689, 1698, 36 L.Ed.2d 488 (1973); and *Connally v. Georgia,* 429 U.S. 245, 250, 97 S.Ct. 546, 548, 50 L.Ed.2d 444 (1977) (*per curiam* ), are entirely absent here.

Nor is there a realistic possibility that the assistant regional administrator's judgment will be distorted by the prospect of institutional gain as a result of zealous enforcement efforts. As we have noted, the civil penalties collected under § 16(e) represent substantially less that 1% of the budget of the ESA. [13] In each of the relevant years, the amount of the ESA's **\*251** budget that was returned to the Treasury was substantially greater than the amount collected as civil penalties. Unlike in *Ward* and *Tumey,* it is plain that the enforcing agent is in no sense financially dependent on the maintenance of a high level of penalties. Furthermore, since it is the national office of the ESA, and not any assistant regional administrator, that decides how to allocate civil penalties, such administrators have no assurance that the penalties they assess will be returned to their offices at all. See *Dugan v. Ohio,* 277 U.S. 61, 48 S.Ct. 439, 72 L.Ed. 784 (1928).

Moreover, the ESA's administration of the Act has minimized any potential for bias. In the only year in which the ESA elected to allocate part of the civil penalties to the regional offices, it did so in proportion **\*\*1618** to the expenses incurred in investigating and prosecuting child labor violations, not on the basis of the amounts of penalties collected. Thus, even if an assistant regional administrator were to act on the assumption that civil penalties would be returned to his office in any given year, his decision to assess an unjustifiable large penalty in a particular case would be of no benefit to his office, since that decision would not produce an increase in the level of expenses.

The District Court's conclusion that the reimbursement provision violated the Due Process Clause was evidently premised on its perception that an assistant regional administrator might be tempted to devote an unusually large quantity of resources to enforcement efforts in the hope that he would ultimately obtain a higher total allocation of federal funds to his office. This increase in enforcement effort, the court suggested, might incline the assistant regional administrator to assess an unjustified number of penalties, and to make those penalties unduly high. But in light of the factors discussed above, it is clear that this possibility is too remote to violate the constraints applicable to the financial or personal interest of officials charged with prosecutorial or plaintiff-like **\*252** functions. [14] In order to produce the predicted result, the ESA would be required to decide to allocate civil penalties to regional offices; the sums allocated to the particular regional office would have to exceed any amount of that office's budget returned to the Treasury at the end of the fiscal year; the assistant regional administrator would have to receive authorization from his superiors to expend additional funds to increase his enforcement expenditures to the desired level; the increased expenditures would have to result in an increase in penalties; and the administrative law judge and reviewing courts would have to accept or ratify the assistant regional administrator's assessments. "[U]nder a realistic appraisal of psychological tendencies and human weakness,"

*Withrow v. Larkin,* 421 U.S. 35, 47, 95 S.Ct. 1456, 1464, 43 L.Ed.2d 712 (1975), it is exceedingly improbable that the assistant regional administrator's enforcement decisions would be distorted by some expectation that all of these contingencies would simultaneously come to fruition. We are thus unable to accept appellee's contention that, on this record and as presently administered, the reimbursement provision violates standards of procedural fairness embodied in the Due Process Clause.

The judgment of the District Court is reversed, and the case is remanded to that court for further proceedings consistent with this opinion.

*It is so ordered.*

**All Citations**

446 U.S. 238, 100 S.Ct. 1610, 64 L.Ed.2d 182, 24 Wage & Hour Cas. (BNA) 681, 88 Lab.Cas. P 33,898

WESTLAW     © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Marshall v. Jerrico, Inc., 446 U.S. 238 (1980)
100 S.Ct. 1610, 24 Wage & Hour Cas. (BNA) 681, 64 L.Ed.2d 182, 88 Lab.Cas. P 33,898

## Footnotes

\*     The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See 📙 *United States v. Detroit Lumber Co.,* 200 U.S. 321, 337, 26 S.Ct. 282, 287, 50 L.Ed. 499.

1     Those factors include "any history of prior violations; any evidence of willfulness or failure to take reasonable precautions to avoid violations; the number of minors illegally employed; the age of the minors so employed and records of the required proof of age; the occupations in which the minors were so employed; exposure of such minors to hazards and any resultant injury to such minors; the duration of such illegal employment; and, as appropriate, the hours of the day in which it occurred and whether such employment was during or outside school hours." 29 CFR § 579.5(c) (1979).

2     For example, we have invalidated a system in which justices of the peace were paid for issuance but not for nonissuance of search warrants, 📙 *Connally v. Georgia,* 429 U.S. 245, 97 S.Ct. 546, 50 L.Ed.2d 444 (1977) (*per curiam*); prohibited the trial of a defendant before a judge who has previously held the defendant in contempt, 📙 *Taylor v. Hayes,* 418 U.S. 488, 94 S.Ct. 2697, 41 L.Ed.2d 897 (1974); 📙 *Mayberry v. Pennsylvania,* 400 U.S. 455, 91 S.Ct. 499, 27 L.Ed.2d 523 (1971); forbidden a state administrative board consisting of optometrists in private practice from hearing charges filed against licensed optometrists competing with board members, 📙 *Gibson v. Berryhill,* 411 U.S. 564, 578–579, 93 S.Ct. 1689, 1697–1698, 36 L.Ed.2d 488 (1973); and prohibited a parole officer from making the determination whether reasonable grounds exist for the revocation of parole, 📙 *Morrissey v. Brewer,* 408 U.S. 471, 485–486, 92 S.Ct. 2593, 2602–2603, 33 L.Ed.2d 484 (1972).

3     See n. 1, *supra.*

4     See n. 9 *infra,* and accompanying text.

5     The section was originally designed "[t]o authorize the Department of Labor to make special statistical studies upon payment of the cost thereof, and for other purposes." See 48 Stat. 582; S.Rep. No. 322, 73d Cong., 2d Sess. (1934).

6     In 1976, the ESA collected about $151,000 in child labor penalties; in 1977, $650,000; and in 1978, $592,000. By comparison, $87,407,000 was appropriated to the ESA in 1976; $98,992,000 in 1977; and $119,632,000 in 1978. See Budget of the United States Government, Fiscal Year 1980—Appendix 652; Budget of the United States Government, Fiscal Year 1979—Appendix 623–624; Budget of the United States Government, Fiscal Year 1978—Appendix 510.

7     The record indicates that, in 1976, the ESA returned $981,000 to the Treasury; $870,000 was returned in 1977; and $4,600,000 in 1978.

8     In that year a total of $559,800 was allotted including $194,800 to the national office. The Chicago office received $44,300, the highest allotment of any regional office; the Denver office received the lowest, $4,900.

9     Appellee claims that the hearing before the administrative law judge is not truly *de novo* because the judge has the authority only to determine the existence of the violation, not to assess the reasonableness of the penalty. We are unable to discern any such limitation on the administrative law judge's authority. Under federal regulations, the administrative law judge is expressly empowered to review the amount of the penalty and is required to consider precisely those factors considered by the assistant regional administrator in making his assessment. See 29 CFR § 579.5 (1979). Indeed, in this very case the Administrative Law Judge carefully reviewed the Assistant Regional Administrator's assessment and reduced it by over 80%.

Appellee correctly points out that in 📙 *Ward v. Village of Monroeville,* 409 U.S. 57, 93 S.Ct. 80, 34 L.Ed.2d 267, (1972), we held that the availability of a trial *de novo* before an unbiased judge did not remove the constitutional infirmity in an original trial before one whose impartiality was impaired. A litigant, we said, "is

WESTLAW    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

100 S.Ct. 1610, 24 Wage & Hour Cas. (BNA) 681, 64 L.Ed.2d 182, 88 Lab.Cas. P 33,898

entitled to a neutral and detached judge in the first instance." *Id.,* at 61–62, 93 S.Ct., at 84. *Ward* does not aid appellee in this case, however, for the administrative law judge presides over the initial adjudication.

10  Appellee errs in suggesting that the Office of Administrative Law Judges is also entitled to reimbursement under § 16(e). When read in conjunction with 29 U.S.C. § 9(a), that section allows reimbursement to offices that "supervised [the] work" of "determining the violations and assessing and collecting [the] penalties." The Office of Administrative Law Judges does not "supervise" that work. Indeed, the Administrative Procedure Act expressly forbids such supervision. 5 U.S.C. § 554(d). The Office of Administrative Law Judges maintains an administrative section within the Department of Labor entirely separate from that of the supervising body, the ESA, and the Office has a separate budget.

11  Cf., *e. g., Adams v. Richardson,* 156 U.S.App.D.C. 267, 480 F.2d 1159 (1973); *Environmental Defense Fund, Inc. v. Ruckelshaus,* 142 U.S.App.D.C. 74, 439 F.2d 584 (1971); *Medical Comm. for Human Rights v. SEC,* 139 U.S.App.D.C. 226, 432 F.2d 659 (1970), vacated as moot, 404 U.S. 403 (1972); *Perez v. Boston Housing Authority,* 379 Mass. 703, 400 N.E.2d 1231, 1247, 1252–1253 (1980). See Stewart, The Reformation of American Administrative Law, 88 Harv.L.Rev. 1667, 1752–1756 (1975); Jaffe, The Individual Right to Initiate Administrative Process, 25 Iowa L.Rev. 485 (1940).

12  In particular, we need not say whether different considerations might be held to apply if the alleged biasing influence contributed to prosecutions against particular persons, rather than to a general zealousness in the enforcement process.

13  Even if ESA received a considerable amount in civil penalties in a particular year, of course, it is possible that Congress would decide to appropriate a corresponding lower amount from the treasury.

14  We need not, of course, say whether the alleged biasing influence is to remote to raise constitutional objections even under the standards of *Ward* and *Tumey.*

---

**End of Document**　　　　　　　　　　　　　　© 2020 Thomson Reuters. No claim to original U.S. Government Works.

FILED
12-07-2020
Clerk of Circuit Court
Waukesha County
2020CV001583

202 F.Supp.3d 896
United States District Court, S.D.
Indiana, Indianapolis Division.

GOODCAT, LLC, Plaintiff,

v.

David COOK, David Coleman, Dale Grubb, and
Marjorie Maginn, in their official capacities for
the Indiana Alcohol and Tobacco Commission;
and the State of Indiana, Defendants.

Cloudtown, LLC, DB Vapes, LLC, DNM Ventures,
LLC, Vapor Bank E-Liquid, LLC, Licensed E-Liquid
Manufacturing LLC, and VapeINg, LLC, Intervenors.

1:16-cv-01514-RLY-DML
|
Signed August 19, 2016

**Synopsis**
**Background:** Manufacturer of electronic vapor liquids
(e-liquids) for electronic cigarettes and other e-devices
brought action against Indiana Alcohol and Tobacco
Commission (ATC), challenging state law that imposed
certain requirements on manufacturers of e-liquids used in e-
devices sold in Indiana as violative of dormant Commerce
Clause. Other manufacturers of e-liquids intervened to oppose
manufacturer's challenges to law. Manufacturer sought
preliminary injunction.

**Holdings:** The District Court, Richard L. Young, Chief Judge,
held that:

statute's security requirements did not fall under Family
Smoking Prevention and Tobacco Control Act's (TCA)
preemption clause;

security requirements fell under TCA's savings clause;

manufacturer was likely to succeed on dormant Commerce
Clause claim;

manufacturer would suffer irreparable harm absent issuance
of injunction; and

balance of harms weighed in favor of injunctive relief.

Motion granted.

**Procedural Posture(s):** Motion for Preliminary Injunction.

**Attorneys and Law Firms**

**\*900** Eric N. Heyer, Neelam Gill, Thompson Hine LLP,
Washington, DC, Jenai M. Brackett, Nicholas C. Pappas,
Frost Brown Todd LLC, Indianapolis, IN, for Plaintiff.

David A. Arthur, Jonathan Paul Nagy, Joshua Robert
Lowry, Office of the Attorney General, Indianapolis, IN, for
Defendants.

Christopher J. Bayh, Mark Jason Crandley, Peter J.
Rusthoven, Barnes & Thornburg LLP, Indianapolis, IN, for
Intervenors.

## FINDINGS OF FACT, CONCLUSIONS
## OF LAW, AND ORDER

RICHARD L. YOUNG, CHIEF JUDGE, United States
District Court, Southern District of Indiana

GoodCat LLC, the Plaintiff, challenges the constitutionality
of certain requirements that Indiana Code § 7.1-7–1 *et seq.*
(the "Indiana Act" or the "Act") imposes on manufacturers
of electronic vapor liquids ("e-liquids") who wish to sell
their products in Indiana. Effective July 1, 2016, any
manufacturer of e-liquids destined for sale or distribution
in Indiana must have a manufacturing permit issued by the
Indiana Alcohol and Tobacco Commission ("ATC"). On June
20, the ATC rejected GoodCat's permit application. That
same day, GoodCat filed this lawsuit seeking a temporary
restraining order ("TRO") and a preliminary injunction
against Defendants, Commissioners of the ATC and the
State of Indiana, enjoining the ATC from enforcing certain
provisions against GoodCat. Other manufacturers of e-
liquids, Cloudtown LLC, *et al.* (collectively, "Intervenors"),
subsequently requested to intervene in this action to oppose
GoodCat's challenges to the Act. On June 30, the statutory
deadline for the ATC to issue permits, the court granted
GoodCat's request for a TRO and ordered the ATC to issue
GoodCat a provisional manufacturing permit.

Also on June 30, this court issued an opinion in a related
case, Legato Vapors LLC v. Cook, No. 1:15–cv–761,
193 F.Supp.3d 952, 2016 WL 3548658 (S.D.Ind. June
30, 2016). In that case, the plaintiffs challenged the Act

on several constitutional grounds, including the dormant Commerce Clause, the Equal Protection and Due Process Clauses of the Fourteenth Amendment, and the Indiana Constitution's Privileges and Immunities Clause. The court rejected each of the plaintiffs' **\*901** arguments and granted summary judgment in favor of the State. GoodCat, unlike the plaintiffs in *Legato Vapors*, challenges only a narrow group of provisions—commonly known as the "security requirements"—on legal theories not squarely before the court in *Legato Vapors*. The court, therefore, confines the scope of its consideration in this matter to issues not raised in *Legato Vapors*.

On July 11, the court held a preliminary injunction hearing. GoodCat, Defendants, and Intervenors appeared by counsel. Having considered GoodCat's Verified Complaint, the parties' briefs in support of and opposition to the motion for a preliminary injunction, and evidence and argument of counsel at the hearing, the court now issues the following findings of fact and conclusions of law.

## I. Findings of Fact [1]

### A. Introduction to e-liquids and GoodCat LLC
1. E-liquids typically contain nicotine, flavorings, propylene glycol, and/or vegetable glycerin. The nicotine concentrations and flavor combinations vary widely among e-liquids. (Stipulated Facts ¶¶ 2, 4).

2. Electronic nicotine delivery devices (or "ENDS"), including electronic cigarettes, heat and aerosolize e-liquids. Once the device aerosolizes the e-liquid, the user of the device inhales the vapor through a mouthpiece. (*Id.* ¶¶ 1, 3).

3. Since 2009, GoodCat has manufactured e-liquids from its manufacturing facility in Naples, Florida. (Filing No. 46 ("Hr'g Tr.") at 53:16–54:5).

4. GoodCat has forty employees, including nine degreed scientists, and the capacity to produce up to 3 million bottles a month and approximately 100 metric tons of e-liquid products per year. (*Id.* at 54:6–15, 55:8–11, 57:15–18).

5. GoodCat produces e-liquid products for approximately 104 brands with approximately 20,000 unique products, or "SKUs." (*Id.* at 56:15–23). In addition to shipping bottled e-liquids, approximately 20 to 25 percent of its sales consists

of stock, or "white label," e-liquids sold by the barrel to other distributors or smaller retailers who wish to bottle their own products. (*Id.* at 87:11–88:10). GoodCat's products are sold through convenience stores, big box stores, and so-called vape shops in Indiana.[2] (*Id.* at 56:8–14). It is estimated that approximately 200 retail outlets in Indiana sell GoodCat's products. (*Id.* at 56:21–23).

6. Raymond Keller founded GoodCat and currently serves as the company's president. Mr. Keller has a degree in biology and a background in nuclear engineering. Mr. Keller built GoodCat's production facility to implement stringent security measures similar to those he experienced in the nuclear industry. (*Id.* at 52:24–53:1, 92:19–93:3).

7. GoodCat uses keycard locks on all doors at its manufacturing facility to limit access to authorized personnel. A security computer records who enters or exits each door at GoodCat's facility, including the date and time. GoodCat also has a sophisticated, real-time surveillance system consisting of sixty-four camera views of the facility. (*Id.* at 62:12–64:6).

 **\*902** 8. GoodCat does not have a physical presence in Indiana. (*Id.* at 54:2–3).

9. Since 2009, GoodCat has been registered as a tobacco product establishment with the United States Food and Drug Administration ("FDA"). GoodCat has filed each of its product formulations with the FDA. (*Id.* at 64:17–65:1).

### B. The Federal Government's regulation of e-liquid
10. In 2009, Congress enacted the Family Smoking Prevention and Tobacco Control Act ("TCA"), codified at 21 U.S.C. § 387 *et seq.,* to grant the Food and Drug Administration ("FDA") authority to regulate tobacco products under the Food, Drug, and Cosmetics Act ("FDCA"), 21 U.S.C. § 301 *et seq. See* 21 U.S.C. § 387a(a).

11. The TCA extends the FDA's authority to regulate "all cigarettes, cigarette tobacco, roll-your-own tobacco, and smokeless tobacco and to any other tobacco products that the [FDA] by regulation deems to be subject to [the TCA]." *Id.* § 387a(b).

12. The TCA established certain regulations, such as "annual registration" and "premarket review" requirements, *see id.* §§

387e and 387j, and gives the FDA the authority to promulgate further regulations in certain areas, such as for manufacturing standards. *Id.* § 387f(e).

13. On May 10, 2016, the FDA exercised its authority under § 387a(b) to promulgate what is known as its "Deeming Rule," by which the FDA deems e-liquid a "tobacco product" and therefore subject to regulation as such under the FDCA. *See Deeming Tobacco Products to be Subject to the FDCA*, 81 Fed. Reg. 28,974 (May 10, 2016). The Deeming Rule takes effect on August 8, 2016. *Id.*

14. As a consequence of the Deeming Rule, which took effect on August 8, 2016, the FDCA's requirements concerning manufacturer and product registration, submission of ingredient listings, marketing, and premarket review applies to e-liquids. *Id.* at 28,976.

15. The Deeming Rule also established three new regulations governing the sale of e-liquids: (1) prohibitions on sales to persons under 18 years of age; (2) requirements that packages bear health warnings; and (3) prohibitions on vending machine sales. *Id.*

16. Although the FDA has had authority to promulgate regulations since 2009, it has not promulgated regulations concerning good manufacturing standards.

17. With respect to tobacco products, the FDCA specifically addresses preservation and preemption in Section 916 of the TCA, codified at 21 U.S.C. § 387p(a). That section, in pertinent part, provides as follows:

(1) Preservation

Except as provided in paragraph (2)(A), nothing in this subchapter, or rules promulgated under this subchapter, shall be construed to limit the authority of ... a State or political subdivision of a State ... to enact, adopt, promulgate, and enforce any law, rule, regulation, or other measure with respect to tobacco products that is in addition to, or more stringent than, requirements established under this subchapter, including a law, rule, regulation, or other measure relating to or prohibiting the sale, distribution, possession, exposure to, access to, advertising and promotion of, or use of tobacco products by individuals of any age, information reporting to the State, or measures relating to fire safety standards for tobacco products.

(2) Preemption of certain State and local requirements

(A) In General

No State ... may establish or continue in effect with respect to a tobacco product **\*903** any requirement which is different from, or in addition to, any requirement under the provisions of this subchapter relating to tobacco product standards, premarket review, adulteration, misbranding, labeling, registration, good manufacturing standards, or modified risk tobacco products.

(B) Exception

Subparagraph (A) does not apply to requirements relating to the sale, distribution, possession, information reporting to the State, exposure to, access to, the advertising and promotion of, or use of, tobacco products by individuals of any age, or relating to fire safety standards for tobacco products.

21 U.S.C. § 387p(a).

## C. Indiana's regulation of e-liquid

18. During its 2015 legislative session, the Indiana General Assembly enacted Indiana Public Law 176–2015, as amended by Indiana Public Law 214–2016 and codified at Indiana Code § 7.1-7–1 *et seq.* The Act imposes a comprehensive regulatory and permitting scheme on the manufacture of e-liquids for use in electronic cigarettes and other vaping devices. It applies to (1) "[t]he commercial manufacturing, bottling, selling, bartering, or importing of e-liquid in Indiana"; and (2) "[t]he sale, possession, and use of e-liquid products in Indiana." Ind. Code § 7.1–7–1–1; (*see* Stipulated Facts ¶ 5).

19. The purpose of the Act is:

> in the absence of federal regulations, to protect public health and safety by: (1) ensuring the safety and security of e-liquid manufactured for sale in Indiana; (2) ensuring that e-liquid manufactured or sold in Indiana conforms to appropriate standards of identity, strength, quality, and purity; and (3) ensuring that e-liquid is not contaminated or adulterated

by the inclusion of ingredients or other substances that might pose unreasonable threats to public health and safety.

Ind. Code § 7.1–7–1–2.

20. The Act requires a "manufacturer," defined as "a person or cooperative, located inside or outside Indiana, that is engaged in manufacturing e-liquid," *id.* § 7.1-7-2-15, to obtain a permit from the ATC "before mixing, bottling, packaging, or selling e-liquid to retailers or distributors in Indiana." *Id.* § 7.1-7-4-1(a).

21. Defendants interpret the Act as requiring an out-of-state manufacturer to obtain a manufacturing permit under the Act if the manufacturer sells e-liquid to: (i) a distributor or retailer located in Indiana; (ii) a distributor located outside of Indiana who then sells or distributes the product to a retailer located in Indiana; (iii) a consumer or end-user in Indiana over the Internet; or (iv) an out-of-state retailer who then sells the product to a consumer or end user in Indiana over the Internet. (Stipulated Facts ¶ 8).

22. In the event an e-liquid manufacturer sells its product in Indiana without first having obtained a manufacturing permit, the manufacturer commits a Class A infraction and may be subject to civil liability for damages and attorney's fees in a lawsuit by one or more permittee-manufacturers. Ind. Code §§ 7.1–7–6–3, 7.1–7–6–4.

**1. Security firm requirements**

23. To obtain a permit, a manufacturer must submit an application to the ATC containing, *inter alia*, evidence that it has a service agreement with a single security firm, valid for a period of five years. *Id.* § 7.1-7-4-1(d)(2).

24. The Act defines "security firm" as any entity that (1) "is independent from an applicant and manufacturer"; (2) "has experience in the security business"; and (3) as of July 1, 2015, (i) satisfies the requirements **\*904** under Section 7.1-7-4-1(d)(3), (ii) is a locksmith as defined under Section 7.1-7-2-14, and (iii) provides security services to the manufacturer. *Id.* § 7.1-7-2-22.

25. To qualify for a permit, the applicant-manufacturer must contract with a single security firm that, *inter alia*:

- has continuously employed, for not less than the previous one-year period, at least one employee who is accredited or certified by the Door and Hardware Institute as an Architectural Hardware Consultant;

- has continuously employed, for not less than the previous one-year period, at least one employee who is accredited or certified as a certified Rolling Steel Fire Door Technician by the International Door Association or the Institute of Door Dealer Education and Accreditation;

- employs an employee that, for at least a one-year period, has been certified as a professional locksmith by the Associated Locksmiths of America;

- has at least one year of commercial experience in the preceding year with owning and operating a security monitoring station with ownership, control, and use of a redundant offsite backup security monitoring station; and

- has at least one year of commercial experience in the preceding year with operating a facility that modifies commercial hollow metal doors, frames, and borrowed lights with authorization to apply the Underwriters Laboratories label.

*Id.* §§ 7.1-7-4-1(d), 7.1-7-2-14, and 7.1-7-2-22(3). A qualifying security firm may not subcontract with another entity or person to meet the credential requirements above. *Id.* § 7.1-7-2-11; (Stipulated Facts ¶ 9).

26. Although the Act requires that an eligible security firm have employed a certified Rolling Steel Fire Door Technician for at least a year, the Act does not require an e-liquid manufacturer to have rolling steel fire doors in its facility. (Hr'g Tr. at 64:10–16).

27. Defendants have no position on how a rolling steel fire door protects against tampering or adulteration of e-liquid during the manufacturing process. (Stipulated Facts ¶ 11).

28. A security firm qualifies under the Act only if it has complied continuously with Sections 7.1-7-4-1(d)(3), 7.1-7-2-14, and 7.1-7-2-22 since July 1, 2015. *Id.* § 7.1-7-2-22(3); (Stipulated Facts ¶ 10).

29. The Act requires that all applications for e-liquid manufacturing permits be submitted and approved by the ATC no later than June 30, 2016. The ATC has not accepted and will not accept manufacturing permit applications after June 30, 2016. Ind. Code § 7.1–7–4–1(b); (Stipulated Facts ¶¶ 5–6). Defendants do not know of any reason for the General Assembly's decision to set the June 30, 2016 deadline for e-liquid manufacturing permit applications. (Stipulated Facts ¶ 7).

**2. Mulhaupt's and the Act**

30. Mulhaupt's, Inc. is a security firm with facilities in Indianapolis, Terre Haute, and Lafayette, Indiana. (Hr'g Tr. at 16:2–6). At any given time, Mulhaupt's employs approximately 90 to 100 employees. (*Id.* at 17:20–21).

31. In August 2015, ATC Commissioner Marjorie Maginn and Jessica Allen, counsel for the ATC, toured a Mulhaupt's facility and discussed Mulhaupt's "capacities." (*Id.* at 25:15–20).

32. In 2015 and 2016, Mulhaupt's had no employee with both certifications and therefore, prior to the Amendment, did not qualify as an eligible security firm under the statute. (*Id.* at 25:24–26:17, 29:9–23).

33. Doug Mulhaupt, president of Mulhaupt's, testified that prior to the Amendment, **\*905** he had concerns that Mulhaupt's could not comply with the statute. (*Id.* at 25:24–26:17; Stipulated Facts, Ex. 9). Mr. Mulhaupt further testified that he believed that the company's attorneys, Jack Thar and Jennifer Drewry, discussed the ATC's approval of Mulhaupt's with members of the ATC prior to the Amendment's enactment in March 2016. (Hr'g Tr. at 26:21–27:10, 47:21–48:11).

34. In 2016, the General Assembly passed Indiana Public Law 214–2016, which amended Section 7.1–7–4–1(d)(3), effective March 24, 2016 (the "Amendment"). Prior to the Amendment, the law required a security firm to have an employee certified as both an architectural hardware consultant and a rolling steel fire door technician. *See* 2016 Ind. Acts 3154. The Amendment allows a qualifying security firm to satisfy the certification requirements with multiple employees holding different certifications. *Id.*; Ind. Code § 7.1–7–4–1(d)(3).

35. Mulhaupt's vice president, Michael Gibson, serves as the president-elect of the Door and Hardware Institute, which is the certifying organization identified in the statute for the Architectural Hardware Consultant certification. (Hr'g Tr. at 30:2–5).

36. Since the Act took effect, the ATC has approved only one security firm, Mulhaupt's, as compliant with the statutory requirements in Sections 7.1–7–4–1(d), 7.1–7–2–14, and 7.1–7–2–22. (*Id.* at 18:9–12).

37. Despite the exhaustive searches of GoodCat and other e-liquid manufacturers, no other known security firm anywhere in the United States satisfies the security firm requirements. (*Id.* at 18:9–16, 28:21–23, 84:1–4, 14–19; *see also* Stipulated Facts ¶ 30 n.1).

38. Mulhaupt's advised potential applicants for e-liquid manufacturing permits that, among other criteria, its decision to enter into service agreements with applicants would depend on "Mulhaupt's ability to meet the applicant's needs in the terms of service." (Stipulated Facts ¶ 34, Ex. 9; Hr'g Tr. 44:8–21). Mulhaupt's also advised potential applicants of a timeline for completing the application process. (Pl.'s Ex. 9).

39. Mulhaupt's received inquiries of some type from between twenty and forty e-liquid manufacturers and approximately eighteen applications, including multiple applications from manufacturers located outside Indiana. (Hr'g Tr. at 18:17–20, 19:5–15, 43:4–9). Preliminarily, Mulhaupt's determined that it might only do business with approximately eight of the eighteen applicants. (*Id.* at 19:1–4, 45:4–12). Mr. Mulhaupt testified that some of the manufacturers it rejected were located outside of Indiana and its contiguous states. (*Id.* at 45:4–9).

**D. Intervenors**

40. The ATC ultimately granted permits to six e-liquid manufacturers—Cloudtown, LLC; DB Vapes, LLC; DNM Ventures, LLC; Licensed E-Liquid Manufacturing LLC; VapeINg LLC; and Vapor Bank E-Liquid, LLC. (Pl.'s Ex. 11). Each of the six permittees entered into a security services agreement with Mulhaupt's. (*Id.*; Stipulated Facts ¶ 30). The six permittees have also intervened in this litigation to oppose GoodCat's challenge to the Act.

41. Four of the six permittees—DB Vapes, LLC; Licensed E-Liquid Manufacturing LLC; VapeINg LLC; and Vapor Bank E-Liquid, LLC—are located in Indiana.

42. Cloudtown, LLC is an Ohio-based company with a physical address in Cleves, Ohio. (Hr'g Tr. at 131:6–132:1). Despite having a permit, Cloudtown does not yet manufacture e-liquid for sale in Indiana. (*Id.* at 31:4–15).

**\*906** 43. DNM is a Florida company with headquarters in Bonita Springs, Florida, and manufacturing facilities in Largo, Florida. (Pl.'s Exs. 12 and 21). DNM manufactures, distributes, markets, and sells e-liquids. (Hr'g Tr. at 108:12–23). The majority interest holder in the company, with 75 percent ownership, has an Indianapolis, Indiana address; the holder of the remaining 25 percent interest has a Bonita Springs, Florida address. (Pl.'s Ex. 12). DNM's current chief executive officer is Brian King. (*Id.*; Hr'g Tr. 108:9–12).

44. The ATC received DNM's permit application on April 11, 2016, and approved it on April 19. (Pl.'s Ex. 12 and 13).

45. DNM began production of e-liquids in early June 2016. (Hr'g Tr. at 114:14–17).

46. DNM's permit application listed 8565 Somerset Drive, Unit A, Largo, Florida, as the address for its manufacturing facility. (Pl.'s Ex. 21). Another Florida company, Lizard Juice, LLC, shares the same physical address. (Pl.'s Ex. 20).

47. Regarding the relationship between DNM, a permittee, and Lizard Juice, Mr. King testified as follows:

Q: What's the relationship, if any, between Lizard Juice, LLC and DNM Ventures?

A: Lizard Juice is a brand—a regional brand that we brought to Indiana as part of our brand package. We have operational control of the plant and the manufacturing of our brand[s], the Lizard Juice, Akua, AMP, Space Jam and other brands that we're bringing to market as well.

(Hr'g Tr. at 116:14–20).

48. DNM has no ownership interest in Lizard Juice, LLC. (*Id.* at 117:7–12).

**E. Mulhaupt's rejects GoodCat's application for security services**

49. GoodCat began its search for a qualifying security firm in fall 2015. (Hr'g Tr. at 67:24–68:1).

50. GoodCat first heard that Mulhaupt's might satisfy the security firm criteria in February or March 2016. (*Id.* at 68:8–12). GoodCat immediately attempted to contact Mulhaupt's regarding its services. (*Id.* at 68:13–15).

51. On March 16, 2016, an employee of Mulhaupt's sent Mr. Keller of GoodCat an email enclosing a Mulhaupt's application and a standard non-disclosure agreement. (Stipulated Facts ¶ 36; Pl.'s Ex. 10). A few hours later, Mr. Keller sent GoodCat's completed application and non-disclosure agreement to Mike Gibson, Vice President of Mulhaupt's. (Hr'g Tr. at 69:16–70:3; Pl.'s Ex. 14).

52. On April 13, 2016, GoodCat received a letter via email from Mulhaupt's indicating that it rejected GoodCat's application. (Stipulated Facts ¶ 37). Mr. Keller made multiple follow-up inquiries with Mulhaupt's regarding its rejection of GoodCat's application but received no further information. (Hr'g Tr. at 72:17–22).

**F. GoodCat's attempts to comply with the Act's security requirements**

53. Following Mulhaupt's decision not to do business with GoodCat, GoodCat negotiated and entered into a services agreement with a Florida-based security firm, Security Specialist Incorporated ("SSI"). SSI meets the video surveillance requirements set forth in Indiana Code § 7.1–7–4–1(d)(3)(B)(I) with one exception: SSI neither owns nor operates a remote monitoring station. Instead, SSI contracts with another security company for this service. (Stipulated Facts ¶ 21; Pl.'s Exs. 1–2).

**\*907** 54. GoodCat and SSI each then contracted separately with local Florida-based persons that hold the Architectural Hardware Consultant and Rolling Steel Fire Door Technician certifications required by Indiana Code § 7.1–7–4–1(d)(3)(A)(i)–(ii), as well as a local Florida-based person that has been certified as a professional locksmith by the Associated Locksmiths of America for at least a one-year period as required by Indiana Code § 7.1–7–2–22(3)(B). (Stipulated Facts ¶¶ 22–24, 27–29; Pl.'s Exs. 3–8).

55. GoodCat and SSI each contracted with Fields Door and Hardware, Inc., which holds an Architectural Hardware

Consultant certification. Although Fields Door and Hardware has operated for more than one year a facility that modifies commercial hollow metal doors, frames, and borrowed lights, it does not have authorization to apply the Underwriters Laboratories label. Instead, it has authority to apply the "Intertek label," a competing fire rating label. (Stipulated Facts ¶¶ 25–26; Hr'g Tr. at 20:18–22). Like Underwriters Laboratories, Intertek is one of the Occupational Safety and Health Administration's ("OSHA") Nationally Recognized Testing Laboratories ("NRTL"). (Stipulated Facts ¶ 26).

56. GoodCat thus satisfies all of the statutory criteria for the award of an e-liquid manufacturing permit except that:

a. SSI has not continuously employed, for not less than a one-year period, at least one employee who is accredited or certified by the Door and Hardware Institute as an Architectural Hardware Consultant;

b. SSI has not continuously employed, for not less than the previous one-year period, at least one employee who is accredited or certified as a Rolling Steel Fire Door Technician by the International Door Association or the Institute of Door Dealer Education and Accreditation;

c. SSI does not employ an employee that, for at least a one-year period, has been certified as a Professional Locksmith by the Associated Locksmiths of America;

d. SSI does not own and operate the remote video security monitoring station, but rather contracts with another security company for this service;

e. SSI does not operate a facility that modifies commercial hollow metal doors, frames, and borrowed lights or have authorization to apply the Underwriters Laboratories label. (Stipulated Facts ¶ 15).

## G. The ATC rejects GoodCat's permit application

57. On April 28, 2016, GoodCat submitted a partial application for an e-liquid manufacturing permit to the ATC. GoodCat submitted additional materials in support of its application on June 16, 2016, including (1) an e-liquid security firm certification; (2) an addendum to the security firm certification; and (3) the service agreements between SSI and GoodCat and the subcontracting firms. (*Id.* ¶ 14; Pl.'s Exs. 1–8; Hr'g Tr. at 73:1–75:11).

58. The time required for GoodCat to negotiate and execute the various service agreements caused the delay between GoodCat's submission of the partial application and the supplemental materials. (Hr'g Tr. at 73:12–16, 75:12–16).

59. Part of the application to the ATC required GoodCat to certify that its e-liquid products contain only ingredients deemed permissible by Indiana Code § 7.1–7–5–1(a). (Hr'g Tr. at 65:12–15).

60. On June 20, 2016, the ATC returned the application materials to GoodCat's for failure to comply with Indiana Code § 7.1–7–4–1(d)(3)(A) insofar as GoodCat's security **\*908** services firm, SSI, subcontracted—and does not directly employ—persons with the requisite credentials. (Pl.'s Ex. 17; Hr'g Tr. at 75:25–76:21).

## H. Changes in Indiana's market for e-liquids

61. Prior to June 30, 2016, approximately 190 brands of e-liquids were sold in Indiana by Indiana retailers, excluding private label "house brands" manufactured by Indiana vape shops. Approximately 90 percent of the revenue from branded e-liquids came from e-liquids manufactured outside of Indiana. (Stipulated Facts ¶ 44; Hr'g Tr. at 98:1–5).

62. Prior to June 30, 2016, the brands of e-liquid sold by retailers in Indiana were associated with 177 distinct businesses. [3] Of those businesses, thirteen were located in Indiana; and approximately 164 were out-of-state businesses selling e-liquid in Indiana. (Stipulated Facts ¶ 45).

63. Amy Lane, the owner of a vape shop in Peru, Indiana, testified that since the Act took effect, she experienced a 44 percent price increase on an identical product that, prior to July 1, 2016, she could purchase from a West Coast manufacturer. (Hr'g Tr. at 99:5–23). Ms. Lane testified that, in her opinion, the Act has caused a relative scarcity of e-liquids in Indiana and associated higher prices. In her view, rising prices and the inability of permitted manufacturers to fulfill retail orders for products has caused at least 24 vape shops to close in Indiana. (*Id.* at 102:2–103:14).

## II. Conclusions of Law

1. To the extent any of the foregoing findings of fact constitute conclusions of law, the court hereby adopts them as conclusions of law. Similarly, if any conclusions of law set

WESTLAW     © 2020 Thomson Reuters. No claim to original U.S. Government Works.     7

forth below constitute findings of fact, the court adopts them as findings of fact.

2. The ATC is an executive agency of the State of Indiana. Ind. Code § 7.1–2–1–1. The Indiana General Assembly created the ATC and charged it with, *inter alia*, implementing and enforcing the regulatory scheme for e-liquids set forth in the Act. Ind. Code § 7.1–7–3–1.

3. The State of Indiana is a body politic. The State, acting through the General Assembly, enacted the statutory provisions challenged in this matter.

4. Because GoodCat challenges the Act's security requirements—and the ATC's enforcement of them—as violations of the United States Constitution, the court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331.

**A. Standard**

5. To succeed on a motion for a preliminary injunction, the moving party must show that it has (1) some likelihood of success on the merits, (2) no adequate remedy at law, and (3) that it will suffer irreparable harm without the injunction. *Planned Parenthood of Ind., Inc. v. Comm'r of Ind. State Dept. of Health*, 699 F.3d 962, 972 (7th Cir.2012). If it makes this threshold showing, the court weighs the balance of harm a grant or denial of the injunction would inflict on the parties and the effect of an injunction on the public interest. *Id.* The interdependence of these considerations requires the court to evaluate them on a sliding scale. *Judge v. Quinn*, 612 F.3d 537, 546 (7th Cir.2010); *Coronado v. Valleyview Pub. Sch. Dist. 365–U*, 537 F.3d 791, 795 (7th Cir.2008). Thus, "the more net harm an injunction can prevent, the weaker the plaintiff's claim on the merits can be while still supporting **\*909** some preliminary relief." *Hoosier Energy Rural Elec. Co-op, Inc. v. John Hancock Life Ins. Co.*, 582 F.3d 721, 725 (7th Cir.2009). As with any preliminary injunction motion, the court's inquiry begins with the merits of the claims.

**B. GoodCat's Claims**

7. In its Verified Complaint, GoodCat alleges that the security requirements set forth in Indiana Code §§ 7.1–7–2–14, 7.1–7–2–22, and 7.1–7–4–1(d) violate the dormant Commerce Clause in Article I, Section 8 of the United

States Constitution; the Due Process Clause of the Fourteenth Amendment; and the Supremacy Clause of Article VI by way of federal preemption. Because the court addresses statutory issues before constitutional ones, it turns first to the issue of preemption. *See Patriotic Veterans, Inc. v. Indiana*, 736 F.3d 1041, 1046 (7th Cir.2013).

**1. Preemption**

8. GoodCat argues that Section 916 of the TCA, codified at 21 U.S.C. § 387p, preempts the Act's security requirements for e-liquid manufacturers. Defendants and Intervenors counter that (1) security requirements do not "relate to" matters Congress expressly reserved for itself to regulate; and (2) even if the security requirements fall within the preemption clause, they cannot be "different from, or in addition to" existing federal regulations because the FDA has not exercised its authority to regulate tobacco products.

9. The Supremacy Clause provides that "the Laws of the United States ... shall be the supreme Law of the land ... any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2. The clause provides Congress the power to preempt state law. *Michigan S. R.R. Co. v. City of Kendallville*, 251 F.3d 1152, 1153 (7th Cir.2001). Thus, in determining whether a federal statute preempts state law, the court looks to the intent of Congress. *Patriotic Veterans, Inc.*, 736 F.3d at 1046.

10. Generally, the court ascertains Congress's intent "through a lens that presumes that the state law has not been preempted." *Id.* "[G]iven the historic police powers of the states, a court must assume that Congress did not intend to supersede those powers unless the language of the statute expresses a clear and manifest purpose otherwise." *Id.* When a challenged state law aims to protect public health and safety, the court must therefore construe any ambiguity in a preemption clause against preemption. *Id.* However, as GoodCat notes, that presumption does not apply where the state law in question bears upon an area with a history of significant federal presence. *United States v. Locke*, 529 U.S. 89, 108, 120 S.Ct. 1135, 146 L.Ed.2d 69 (2000) (finding presumption inapplicable because Congress, since "the earliest days of the Republic," has legislated matters of maritime commerce).

11. The plain language of the Act expresses the State's purpose of protecting the health and safety of Indiana consumers through its own regulatory scheme for e-liquids. Despite this traditional exercise of police powers, GoodCat argues—and neither Defendants nor Intervenors directly counter—that the non-preemption presumption does not trigger in this case because Congress has historically regulated the tobacco industry. Congress first asserted its authority over the manufacture of tobacco products in 2009 with the enactment of the TCA. *See* 21 U.S.C. § 387f(e). And, effective August 8, 2016, the FDA's Deeming Rule for the first time brought e-liquids within its sphere of regulatory authority over tobacco products.[4] *Deeming* **\*910** *Tobacco Products to be Subject to the FDCA*, 81 Fed. Reg. 28,974 (May 10, 2016). GoodCat further suggests that Congress's long and active presence in the Tobacco industry, particularly with respect to product labeling and advertising, *see FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 143–44, 120 S.Ct. 1291, 146 L.Ed.2d 121 (2000) ("Congress has enacted six separate pieces of legislation since 1965 addressing the problem of tobacco use and human health."), forecloses operation of the presumption in this case. Although the court doubts that the federal presence in the tobacco industry rises to the level GoodCat suggests, the court need not make this determination because, as explained below, Congress's expression of dominion over the manufacturing of tobacco products leaves little ambiguity for the court to construe. *See Altria Grp., Inc. v. Good*, 555 U.S. 70, 77, 129 S.Ct. 538, 172 L.Ed.2d 398 (2008) (affirming that courts must consider substance and scope of clause with a presumption disfavoring preemption "when the text ... is susceptible of more than one plausible reading"); *Bates v. Dow Agrosciences LLC*, 544 U.S. 431, 449, 125 S.Ct. 1788, 161 L.Ed.2d 687 (2005) ("In areas of traditional state regulation, we assume that federal statute has not supplanted state law unless Congress has made such an intention clear and manifest." (internal quotation marks omitted)).

12. As noted above, Section 387p(a) contains three clauses: a preservation clause, a preemption clause, and a savings clause. Section 387p(a)(1) preserves states' traditional power to adopt any "measure relating to or prohibiting the sale, distribution, possession, exposure to, access to, advertising and promotion of ... tobacco products, [or] information reporting to the State ...." Congress limited states' regulatory power only to those areas not preempted in Section 387p(a)(2) (A). That section prohibits states from enacting any measure "which is different from, or in addition to, any requirement ... relating to tobacco product standards, premarket review, adulteration, misbranding, labeling, registration, [and] good manufacturing standards ...." *Id.* Despite the express preemption, the savings clause specifically exempts from preemption an otherwise preempted state law if it relates to "the sale, distribution, possession, [or] information reporting to the State." *Id.* § 387p(a)(2)(B). In essence, states retain broad power to regulate, and even ban, the sale of tobacco products. *See U.S. Smokeless Tobacco Mfg. Co. v. City of New York*, 708 F.3d 428, 433 (2d Cir.2013) (noting that although Congress prohibited the FDA from banning entire categories of products, the TCA did not extend that prohibition to the states). As the Second Circuit observed, however, the preemption clause "reserves regulation at the manufacturing stage exclusively to the federal government." *Id.* (distinguishing between a sales ban on tobacco products with certain characteristics and a product standard subject to preemption); *see also Indep. Gas & Serv. Stations Ass'n, Inc. v. City of Chicago*, 112 F.Supp.3d 749, 754 (N.D.Ill.2015) (same).

**\*911** 13. The court now turns to GoodCat's contention that the Act's security requirements run afoul of Section 387p because they are "different from, or in addition to" the TCA's requirements relating to the registration, adulteration, premarket review, and good manufacturing standards of tobacco products.

### a. Product registration

14. The TCA requires that "every person who owns or operates any establishment in any State engaged in the manufacture, preparation, compounding, or processing of a tobacco product" must annually register business and contact information with the FDA and subject registered establishments to FDA inspections. 21 U.S.C. §§ 387e(b), (g). This annual registration also requires manufacturers to provide the FDA complete lists of all tobacco products and copies of product labels. *Id.* § 387e(i)(1)(b). GoodCat argues that the Indiana Act's mandate that manufacturers certify compliance with the security requirements amounts to additional and different registration requirements within the meaning of the preemption clause.

15. GoodCat's position fails for at least two reasons. First, the court must not interpret "relates to" literally, for "everything

in an open economy relates to everything else." *Lebamoff Enters., Inc. v. Huskey,* 666 F.3d 455, 457 (7th Cir.2012). The TCA requires a manufacturer to register as such and to provide the FDA with comprehensive product lists and corresponding labels. The Act, on the other hand, requires a manufacturer to verify that it has a service agreement with an eligible security firm before it may sell e-liquids in Indiana. To construe, as GoodCat does, the Act's security requirements as additional or different registration requirements within the meaning of the TCA would call into question any state or local regulation that requires a manufacturer to verify its compliance. In light of Congress's express reservation of regulatory power to the states, *see* 21 U.S.C. § 387p(a)(1), the court finds GoodCat's construction impermissibly broad. Second, the Act's security requirements relate to the sale and distribution of tobacco products—i.e., a manufacturer may not sell or distribute e-liquids in Indiana without a permit —and therefore fall within the savings provision. *See id. §* 387p(a)(2)(B); *U.S. Smokeless Tobacco Mfg. Co.,* 708 F.3d at 434 (finding no preemption of ordinance that bans sale of products with certain flavor characteristics); *see also Nat'l Ass'n of Tobacco Outlets, Inc. v. City of Providence,* 731 F.3d 71, 83 (1st Cir.2013) (same).

### b. Adulteration

16. GoodCat's argument with respect to adulteration and premarket review fail for similar reasons. Section 387b of the TCA directs the FDA to deem a tobacco product "adulterated" if, *inter alia,* it is "contaminated by any added poisonous or deleterious substance" or "it has been prepared, packed, or held under insanitary conditions." GoodCat points to no FDA regulations promulgated to address the adulteration of tobacco products. Rather, GoodCat directs the court to the Act's stated purpose of ensuring that e-liquids sold in Indiana are not contaminated or adulterated. Because the Act's stated purpose involves protecting Indiana consumers from adulterated products, GoodCat argues, the security requirements constitute different or additional requirements relating to adulteration and therefore subject to preemption. But the text of the preemption clause does not limit the purpose of state or local regulations of tobacco products; it applies only to specific measures imposing different or additional requirements. *See* 21 U.S.C. § 387p(a)(2)(A) ("No State **\*912** ... may establish ... *any requirement* which is different from, or in addition to, any requirement under the provisions of this subchapter ....") (emphasis added).

Thus, the clause does not operate unless the FDA regulates the adulteration of tobacco products, and GoodCat has not directed the court to any such regulations. Additionally, as explained above, because the Act's security requirements function to limit the sale or distribution of e-liquids in Indiana, the savings clause applies.

### c. Premarket review

17. Section 387j governs premarket review. For any tobacco products not commercially marketed as of February 15, 2007, a manufacturer must submit such products for premarket review and approval by the FDA before placing them in interstate commerce. *See* 21 U.S.C. §§ 387j(a)– (b). The application for premarket review must include a list of all components, ingredients, and additives in the product, and full descriptions of the manufacturing facilities and the processes used in its production. *Id.* § 387j(b); (*see also* Filing No. 10–1 at 12–18 (detailing information to include in application for premarket review)). GoodCat highlights the absence of security requirements from the information required for premarket review and concludes that, because a manufacturer could satisfy all the reporting requirements in Section 387j and yet fail to obtain authorization to sell e-liquids in Indiana, the Act's security requirements must be preempted. This view, however, conflates the FDA's review of specific tobacco products before they enter interstate commerce and the measures a manufacturer must implement at its facilities before selling *any* e-liquid in Indiana. The court finds the preemption clause inapplicable here.

### d. Good manufacturing standards

18. GoodCat's strongest argument for preemption lies in Congress's decision to vest the FDA with authority to regulate "good manufacturing standards" for tobacco products. The TCA charges the FDA with prescribing regulations "requiring that the methods used in, and the facilities and controls used for, the manufacture ... packing, and storage of a tobacco product conform to current good manufacturing practice." 21 U.S.C. § 387f(e)(1)(A). GoodCat argues that the Indiana Act's security requirements relate to the "facilities and controls used for the manufacture ... packing, and storage of a tobacco product," because any manufacturer wishing to participate in the Indiana market for e-liquids must have

an eligible security firm willing to continuously monitor its manufacturing facilities.

19. GoodCat relies on the Second Circuit's observation in *U.S. Smokeless Tobacco Manufacturing Co.* that Congress "reserve[d] regulation at the manufacturing stage exclusively to the federal government." 708 F.3d at 434. In that case, the court considered whether a New York City ordinance banning the sale of flavored tobacco products amounted to a "tobacco product standard" preempted by Section 387p(a)(2)(A). *Id.* at 433–45. The plaintiffs argued that such a sales ban functioned as a product standard in the same way that California law governing nonambulatory pigs in *National Meat Association v. Harris*, ––– U.S. ––––, 132 S.Ct. 965, 181 L.Ed.2d 950 (2012) functioned as a production standard in violation of the Federal Meat Inspection Act ("FMIA"), 21 U.S.C. § 601 *et seq.* The law at issue in *National Meat* prohibited slaughterhouses from holding or processing nonambulatory pigs for food—proscriptions absent from the FMIA—and required immediate and humane euthanasia. The Supreme Court held **\*913** that California's ban effectively imposed production requirements "in addition to, or different than" those under the FMIA and thus violated the FMIA's preemption provision.[5] *Nat'l Meat Ass'n*, ––– U.S. ––––, 132 S.Ct. at 973, 181 L.Ed.2d 950 ("[Criminal proscription] is something more than an 'incentive' or 'motivator'; the sales ban instead functions as a command to slaughterhouses to structure their operations in the exact way the [California law] mandates."). Finding no preemption, the *U.S. Smokeless Tobacco* court distinguished New York City's ordinance from a product standard, explaining that although states and localities cannot circumvent preemption by simply framing a local standard as a sales ban, operation of the ordinance "depends on ... [the] end product, and not on whether it was manufactured in a particular way or with particular ingredients." 708 F.3d at 434–35.[6]

20. Even if the Indiana Act's security requirements (1) relate to good manufacturing standards, *see* 21 U.S.C. § 387p(a)(2)(A), and (2) do not relate to the sale or distribution of e-liquids and thus fall under the savings clause, *see id.* § 387p(a)(2)(B), the FDA's failure to promulgate *any* regulations pursuant to its statutory authority condemns GoodCat's preemption challenge.

21. The parties appear to agree that the FDA has not issued product standards or good manufacturing practice regulations. *See, e.g.*, 81 Fed. Reg. 28,974, at 29,003 (rejecting calls to delay the deeming rule until the FDA issues regulations for product and manufacturing product standards; explaining that the agency needs more product-specific information by way of automatic registration requirements before promulgating such standards). Nor has GoodCat provided the court any indication that new regulations will be forthcoming. Furthermore, as Intervenors note, the FDA must satisfy certain review requirements before promulgating a new regulation, such as holding a hearing and affording an advisory committee reasonable time to submit recommendations. *See* 21 U.S.C. § 387f(e)(1)(B). Because the preemption clause in Section 387p triggers only when a state or local measure "is different from, or in addition to, any [federal] *requirement*," the clause cannot preempt the Indiana Act's security requirements.

22. This conclusion finds reinforcement in *Freightliner Corp. v. Myrick*, 514 U.S. 280, 115 S.Ct. 1483, 131 L.Ed.2d 385 (1995) **\*914** . There, the Supreme Court considered preemption challenges to Georgia common law causes of action for negligent design defects in tractor-trailers unequipped with antilock braking systems. *Freightliner Corp.*, 514 U.S. at 286, 115 S.Ct. 1483. The petitioner-manufacturers argued that the National Traffic and Motor Vehicle Safety Act of 1966 ("Safety Act"), 49 U.S.C. § 30101 *et seq.*, expressly preempted any state standard not identical to the federal standard. *Id.* Although the agency charged with implementing the Safety Act issued a regulation concerning braking systems, an appeals court suspended the regulation and remanded it to the agency for further consideration. At time of the litigation, the agency still had not taken final agency action to reinstate the standard. *Id.* at 285–86, 115 S.Ct. 1483.

23. Like GoodCat, the petitioners in *Freightliner* argued that "the absence of regulation itself constitutes regulation." *Id.* at 286, 115 S.Ct. 1483; (*see* Filing No. 10 ("Pl.'s Br. Supp.") at 22 ("No such security firm or 24-hour video monitoring requirements have even been suggested, much less imposed, by the FDA.")). The Court disagreed, concluding that:

[T]here is no evidence that [the agency] decided that trucks and trailers should be free from all state regulation of stopping distances .... Indeed, the lack of federal regulation did not result from an affirmative decision of agency officials to refrain from regulating air brakes. [The agency] did not decide that the minimum, objective safety standard required by [the Safety Act] should be the absence of all standards, both federal and state. Rather, the lack of a federal standard stemmed from the decision of a federal court that the agency had not compiled sufficient evidence to justify its regulation.

*Freightliner*, 514 U.S. at 286, 115 S.Ct. 1483 (footnote omitted). The FDA has clearly expressed its intent to regulate manufacturing standards at some point in the future; but the undisputed fact remains that no such standards yet exist. Furthermore, Section 387p's preservation and savings clauses underscore the lack of congressional intent "to centralize all authority over the [manufacturing of tobacco products] in ... the Federal Government." *See id.* For these reasons, the court finds that GoodCat is unlikely to succeed on its preemption challenge to the Indiana Act's security requirements.

### 2. Commerce Clause

24. The Commerce Clause empowers Congress to regulate interstate commerce. U.S. Const. art. I, § 8, cl. 3. Although not expressly stated, the so-called "dormant" Commerce Clause implicitly prohibits state and local governments, even in the absence of federal legislation, from enacting laws that discriminate against or excessively burden interstate commerce. *See Comptroller of Treasury of Md. v. Wynne,* —— U.S. ——, 135 S.Ct. 1787, 1794, 191 L.Ed.2d 813 (2015). GoodCat argues that the Act's security requirements impermissibly discriminate against out-of-state e-liquid manufacturers.[7]

**\*915** 25. To prevail under the dormant Commerce Clause, the plaintiff must first demonstrate that a law burdens

interstate commerce. *Alliant Energy Corp. v. Bie,* 330 F.3d 904, 911 (7th Cir.2003). The parties do not dispute that since the Act took effect, fewer e-liquids manufactured outside Indiana now find their way onto store shelves in Indiana. Thus, the court must categorize this burden to determine the level of scrutiny to apply. *See Nat'l Paint & Coatings Ass'n v. City of Chicago,* 45 F.3d 1124, 1130–31 (7th Cir.1995). Laws affecting interstate commerce fall into three categories: (1) laws that explicitly discriminate against interstate commerce; (2) facially neutral laws that bear more heavily on interstate commerce than on local commerce; and (3) and laws that burden commerce but do not discriminate, either explicitly or in effect, against interstate commerce. *Id.* at 1131.

26. Laws that explicitly discriminate are treated as "virtually per se" unconstitutional. *Id.*; *see also Dep't of Revenue of Ky. v. Davis,* 553 U.S. 328, 338, 128 S.Ct. 1801, 170 L.Ed.2d 685 (2008) ("A discriminatory law ... will survive only if it 'advances a legitimate local purpose that cannot be adequately served by reasonable nondiscriminatory alternatives' ...." (internal citations omitted)). The Act does not fall into this category.

27. Instead, the parties' dispute centers on whether the Act's security requirements have a disparate impact on interstate commerce and thus fall into the second category. Even within this category, a facially neutral law may nonetheless function as a facially discriminatory law if it acts "as an embargo on interstate commerce without hindering intrastate sales." *Nat'l Paint & Coatings Ass'n,* 45 F.3d at 1131. Courts will subject such laws to the same heightened scrutiny applied to laws that explicitly discriminate. *Id.* By contrast, a law that regulates evenhandedly and has only incidental or indirect effects on interstate commerce must survive the *Pike* balancing test, whereby "[the law] will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits." *Pike v. Bruce Church, Inc.,* 397 U.S. 137, 142, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970). Although no clear line separates the *Pike* approach and the heightened scrutiny for laws that more severely affect interstate commerce, "the critical consideration is the overall effect of the statute on both local and interstate activity." *Alliant Energy Corp.,* 330 F.3d at 911–12 (quoting *Brown–Forman Distillers Corp. v.*

*New York State Liquor Auth.*, 476 U.S. 573, 579, 106 S.Ct. 2080, 90 L.Ed.2d 552 (1986)); *see also Lebamoff Enters., Inc. v. Huskey*, 666 F.3d 455, 460 (7th Cir.2012) (noting the difficulty in categorizing and weighing effects on interstate commerce).

28. If, as Defendants and Intervenors argue, the security requirements do not disproportionately impact interstate commerce, they fall into the third category of effects and the rational basis standard applies. *Nat'l Paint & Coatings Ass'n*, 45 F.3d at 1131; *see also Exxon Corp. v. Governor of Maryland*, 437 U.S. 117, 126 n. 16, 98 S.Ct. 2207, 57 L.Ed.2d 91 (1978) (finding no discriminatory effect where the "statute has no impact on the relative proportions of local and out-of-state goods sold in Maryland and, indeed, no demonstrable effect whatsoever on the interstate flow of goods"). As proof of no discrimination, both Intervenors and Defendants rely on the fact that two of the six permit holders reside outside Indiana. Even more, one permittee, DNM Ventures, manufactures e-liquids in GoodCat's home state, Florida. (*See supra* Findings of Fact ¶¶ 3, 43). Thus, the argument goes, GoodCat cannot plausibly assert discrimination against non-Indiana manufacturers when **\*916** one-third of the permittees have manufacturing facilities outside Indiana.

29. The court finds differently. Prior to the Act taking effect, 164 of the 177 businesses (more than 90 percent) selling e-liquids in Indiana were out-of-state businesses, (*see supra* Finding of Fact ¶ 62), and approximately 90 percent of the revenue from branded e-liquids came from e-liquids manufactured outside Indiana. Fast-forward to present, and two-thirds of the permittees producing e-liquids for sale in Indiana have Indiana addresses. [8] This reallocation of commerce among local and out-of-state firms, by itself, calls for greater scrutiny than mere rational basis. *See Nat'l Paint & Coatings Ass'n*, 45 F.3d at 1131. That two permittees reside outside of Indiana means only that the effect of the security requirements did not amount to a complete ban on e-liquid sales from out-of-state manufacturers. GoodCat need not show complete discrimination to succeed on a dormant Commerce Clause challenge. *See id.*; *Hunt v. Washington State Apple Advert. Comm'n*, 432 U.S. 333, 351–53, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977) (finding discrimination against sales of Washington apples where North Carolina law did not ban Washington apples but it eliminated the competitive advantage Washington growers enjoyed vis-à-vis North Carolina growers).

30. This leaves the applicable standard somewhere between heightened scrutiny for facially neutral but severely discriminatory laws and the tougher *Pike* balancing test. The court concludes that even under the *Pike* approach, GoodCat has shown a reasonable likelihood of success under the Commerce Clause. But first, more on discrimination.

31. The Act provides that before any manufacturer can sell or distribute e-liquids in Indiana, it must first obtain a manufacturing permit issued by the ATC. To qualify for a permit, the applicant must prove it has a services agreement with a security firm that meets the security requirements. (*See supra* Findings of Fact, Section C(1)). The rigorous security requirements resulted in a single security firm in the United States qualifying to provide security services to manufacturers. This firm, Mulhaupt's, operates exclusively in Indiana, (*see supra* Finding of Fact ¶ 30); has limited capacity such that it cannot do business with every e-liquid manufacturer who seeks to participate in the Indiana market (*see supra* Findings of Fact ¶¶ 38–39); and maintained complete discretion in deciding whom to contract with, (*see id.*; Pl.'s Exs. 9 and 10). Moreover, the Act precludes all other firms who failed to satisfy the requirements from ever becoming eligible to provide security services. (*See supra* Findings of Fact ¶¶ 24–25). Therefore, even though the ATC issued permits evenhandedly (i.e., any manufacturer with, *inter alia*, proof of a services agreement with an eligible security firm could obtain a permit) the Act effectively delegated a policy of economic protectionism to a private entity.

32. Defendants and Intervenors argue that GoodCat has no basis to challenge the security requirements because to the extent the Act discriminates against interstate commerce, it discriminates against **\*917** other security firms—not e-liquids manufacturers. This argument misses the mark. The court sees no reason to limit its inquiry into "discriminatory effect" to whether a direct line of causation connects the State to the actual burden imposed on interstate commerce. The Act's security requirements are such that only one local firm can provide a state-mandated service for commercial access to Indiana's market for e-liquids. As one might predict, the lone firm's capacity in fact favors local commerce at the expense of interstate commerce.

WESTLAW © 2020 Thomson Reuters. No claim to original U.S. Government Works.

33. On the other side of the *Pike* balance, Intervenors and Defendants point to the court's observation in *Legato Vapors*:

> We start with the expressed "local benefits" of the Act, which are "to protect public health and safety" by ensuring e-liquids are "not contaminated or adulterated by [ingredients or substances] that might pose unreasonable threats to public health and safety." [ Ind. Code §] 7.1–7–1–2. It is well-established that states have the responsibility to protect the health, safety, and welfare of its citizens and are afforded great latitude to do so. The Supreme Court has explained that when applying Dormant Commerce Clause principles, a "common sense of our traditional recognition of the need to accommodate state health and safety regulation" exists. We find that the local benefits provided by the Act relating to the health and safety of Indiana citizens are significant.

*Legato Vapors LLC*, at *19. Although the *Legato Vapors* court acknowledged the legitimate ends of the Act's statutory scheme—the safety of Indiana consumers against intentional tampering and sabotage of e-liquid products—the court did not squarely address the security requirements or, more importantly, their *impact* on interstate commerce. GoodCat does not challenge the validity of the Act in its entirety, but rather the security requirements.

34. Defendants highlight, for example, the benefits of a single security firm with W2 employees compared to a piecemeal security team consisting of subcontractors. Beyond this, Defendants point to mere rational justifications for the remaining requirements, such as personnel certified in modifying commercial hollow metal doors. In light of the burden imposed on interstate commerce as set forth above, the court finds that the burden on interstate commerce clearly exceeds any purported benefits. As such, the court concludes that GoodCat has a reasonable likelihood of succeeding on its claim under the dormant Commerce Clause.

### 3. Due Process

35. GoodCat also challenges the security requirements as a violation of the Due Process Clause. For purposes of a preliminary injunction, however, the plaintiff need only present "a plausible claim on the merits" to show a reasonable likelihood of success. *Hoosier Energy Rural Elec. Co-op, Inc. v. John Hancock Life Ins. Co.*, 582 F.3d 721, 725 (7th

Cir.2009). Having determined that GoodCat has a reasonable likelihood of success on its claim under the Commerce Clause, the court's consideration of the merits ends here.

### C. Balance of harms

36. Absent injunctive relief, the court must determine whether GoodCat will suffer irreparable harm and, if so, the weight of that harm compared to any harm occasioned on the other parties.

37. "Irreparable harm is harm which cannot be repaired, retrieved, put down again, atoned for .... [T]he injury must be of a particular nature, so that compensation in money cannot atone for it." *Graham v. Med. Mut. of Ohio*, 130 F.3d 293, 296 (7th Cir.1997) **\*918** (internal quotation and citation omitted). Defendants and Intervenors argue that GoodCat has an available remedy for any harm through a final adjudication of this case. The court finds otherwise. Principles of sovereign immunity would preclude GoodCat any recovery against Defendants. *See, e.g.*, *Cmty. Pharmacies of Ind., Inc. v. Ind. Family*, 801 F.Supp.2d 802, 806 (S.D.Ind.2011) (finding that the Eleventh Amendment would prevent the plaintiff from recovering money damages). If the court denied preliminary relief, GoodCat would have to withdraw its commercial presence in Indiana. GoodCat would incur lost profits during the pendency of this litigation and have no way to recover. More fundamentally, however, a reasonable likelihood of a constitutional violation, such as GoodCat alleges, rises to the level of irreparable harm for the purposes of injunctive relief. *Baskin v. Bogan*, 983 F.Supp.2d 1021, 1028 (S.D.Ind.2014) (citing cases).

38. Because GoodCat seeks an injunction against enforcement of the security requirements as against GoodCat only, Intervenors' investment interests and concerns of any competitive advantage GoodCat might enjoy carry little weight here. First, as all parties agree, GoodCat has already invested substantial resources to comply with standards it expects the FDA to issue. Secondly, this Entry does not constitute a final ruling on the merits; it is merely the court's early, best analysis as to the merits of GoodCat's claims.

39. Similarly, although Indiana has a valid and important interest in seeing that its laws are enforced, the balance of harm to the State or to Indiana consumers does not outweigh the very real and nearly certain economic harm GoodCat will incur absent an injunction.

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

### III. Conclusion

For the reasons set forth herein, the court finds that GoodCat has a reasonable likelihood of succeeding on the merits of its claim under the dormant Commerce Clause, and that, absent a preliminary injunction, GoodCat will suffer irreparable harm that would outweigh any potential harm to Defendants, Intervenors, or the public interest. The court, therefore, **GRANTS** GoodCat's Motion for a Preliminary Injunction (Filing No. 9). The court hereby **ENJOINS** the ATC from enforcing Indiana Code §§ 7.1–7–2–14, 7.1–7–2–22(3)(B), and 7.1–7–4–1(d) against GoodCat. The court further **ORDERS** the ATC to issue GoodCat a manufacturing permit until GoodCat's claims reach final disposition.

**SO ORDERED** this 19th day of August 2016.

**All Citations**

202 F.Supp.3d 896

---

### Footnotes

1    GoodCat and the Defendants filed Joint Stipulations of Fact (Filing No. 36 ("Stipulated Facts")) prior to the preliminary injunction hearing and before the court granted the Intervenors' Motion to Intervene. Thus, the court cites to the stipulated facts only to the extent Intervenors neither objected to them during the July 11 hearing nor presented conflicting evidence.

2    "Vape shops" are typically small retail outlets where e-liquid users can purchase e-liquids and ENDS. (*See* Hr'g Tr. at 55:24–56:7).

3    It is not clear from the briefs or evidence presented to the court whether this figure includes only manufacturers of e-liquids.

4    Defendants devote substantial attention to the particulars of a consolidated action pending in the District Court for the District of Columbia, *Nicopure Labs, LLC v. FDA*, No. 1:16–cv–878–ABJ (D.D.C.), which challenges the FDA's Deeming Rule on constitutional and administrative grounds. Defendants do not elaborate on the significance of that litigation, other than to suggest that this court should "wait and see" how it unfolds before deciding the merits of GoodCat's preemption claim. The court disagrees. *See Kraft Foods Holdings, Inc. v. Helm*, 205 F.Supp.2d 942, 953 n. 12 (N.D.Ill.2002) (declining to stay proceedings pending the outcome of case before the Supreme Court which, one party argued, would resolve a circuit split on burden of proof required to show trademark dilution).

5    The FMIA's preemption clause reads, in relevant part:
    Requirements within the scope of [the FMIA] *with respect to premises, facilities, and operations* of any establishment at which inspection is provided under ... [the FMIA] which are *in addition to, or different than* those made under [the FMIA] may not be imposed by any State.
    21 U.S.C. § 678 (emphasis added).

6    In *National Association of Tobacco Outlets, Inc.*, the First Circuit considered the preemptive effect of Section 387p on a Providence, Rhode Island ordinance similar to the New York City ordinance at issue in *U.S. Smokeless Tobacco*, 731 F.3d at 74, 81–83. Although the court reached the same result as the *U.S. Smokeless Tobacco* court, it noted its disagreement with the Second Circuit's suggestion that a sales regulation may in effect, yet impermissibly under *National Meat*, regulate the manufacturing of tobacco products. *Id.* at 83 n. 11. The *National Association* court explained that unlike the FMIA's preemption clause at issue in *National Meat*, Section 387p contains a savings clause that exempts sales regulations from preemption. *Id.* Therefore, the court reasoned, whether a sales regulation impacts manufacturing has

no bearing on the preemption analysis. 🟡 *Id.* The court finds this reasoning persuasive in light of Congress's express reservation of states' authority to wholly ban entire categories of tobacco products. 21 U.S.C. § 387p(a)(1); *see* 🟡 *U.S. Smokeless Tobacco Mfg. Co.*, 708 F.3d at 433 (observing that the TCA prohibits the FDA—but not the states—from banning tobacco products).

7    The court notes that in 🚩 *Legato Vapors LLC v. Cook*, No. 1:15–cv–761, 193 F.Supp.3d 952, 2016 WL 3548658 (S.D.Ind. June 30, 2016), the plaintiffs challenged the Act as an attempt to regulate commerce wholly outside of Indiana in violation of the dormant Commerce Clause. GoodCat does not make this argument. To the extent the 🚩 *Legato Vapors* court evaluated the Act under the 🟡 *Pike* balancing test, *see infra*, it did not consider—as the plaintiffs did not specifically challenge—the constitutionality of the security requirements as discriminating against interstate commerce. *See* 🚩 *id* at 966–69, 2016 WL 3548658, at *9–11 (finding evenhanded regulation that only incidentally impacts interstate commerce; and thus no violation of the dormant Commerce Clause).

8    The court acknowledges its limited fact-finding at this early stage in the litigation. Despite having had an evidentiary hearing, the court and parties adhered to an expedited briefing and hearing schedule due to the then-looming effective date of the Act's permitting scheme. Thus, for example, the court does not know whether or to what extent in-state manufacturers were responsible for bringing e-liquid labels into Indiana from outside Indiana before or after the Act took effect. But because neither the Defendants nor Intervenors challenged GoodCat's assertions or their significance, (*see supra* Finding of Fact ¶ 62), the court accepts them as true.

---

**End of Document**        © 2020 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW    © 2020 Thomson Reuters. No claim to original U.S. Government Works.     16

**FILED**
**12-07-2020**
**Clerk of Circuit Court**
**Waukesha County**
**2020CV001583**

138 S.Ct. 1945
Supreme Court of the United States

Fane LOZMAN, Petitioner

v.

CITY OF RIVIERA BEACH, FLORIDA.

No. 17–21.
|
Argued Feb. 27, 2018.
|
Decided June 18, 2018.

**Synopsis**

**Background:** Owner of floating home located in city's marina brought § 1983 action alleging that city, through actions of its city council members, retaliated against him for criticizing municipal development project and opposing what he perceived as improper conduct of various council members, in violation of his First, Fourth, and Fourteenth Amendment rights. The United States District Court for the Southern District of Florida, No. 9:08–cv–80134–DTKH, Daniel T.K. Hurley, J., granted judgment for city after jury verdict in its favor. Owner appealed. The Court of Appeals for the Eleventh Circuit affirmed in a per curiam opinion, 681 Fed.Appx. 746. Certiorari was granted.

The Supreme Court, Justice Kennedy, held that under the circumstances of this case, the existence of probable cause did not bar owner's First Amendment retaliatory arrest claim, abrogating Dahl v. Holley, 312 F.3d 1228.

Vacated and remanded.

Justice Thomas filed a dissenting opinion.

**Procedural Posture(s):** Petition for Writ of Certiorari.

***1946** *Syllabus* *

After petitioner Lozman towed his floating home into a slip in a marina owned by the city of Riviera Beach, he became an outspoken critic of the City's plan to use its eminent domain power to seize waterfront homes for private development and often made critical comments about officials during the public-comment period of city council meetings. He also filed a lawsuit alleging that the City Council's approval of an agreement with developers violated Florida's open-meetings laws. In June 2006 the Council held a closed-door session, in part to discuss Lozman's lawsuit. He alleges that the meeting's transcript shows that councilmembers devised an official plan to intimidate him, and that many of his subsequent disputes with city officials and employees were part of the City's retaliation plan. Five months after the closed-door meeting, the Council held a public meeting. During the public-comment session, Lozman began to speak about the arrests of officials from other jurisdictions. When he refused a councilmember's request to stop making his remarks, the councilmember told the police officer in attendance to "carry him out." The officer handcuffed Lozman and ushered him out of the meeting. The City contends that he was arrested for violating the City Council's rules of procedure by discussing issues unrelated to the City and then refusing to leave the podium. Lozman claims that his arrest was to retaliate for his lawsuit and his prior public criticisms of city officials. The State's attorney determined that there was probable ***1947** cause for his arrest, but decided to dismiss the charges.

Lozman then filed suit under 42 U.S.C. § 1983, alleging a number of incidents that, under his theory, showed the City's purpose was to harass him, including by initiating an admiralty lawsuit against his floating home, see *Lozman v. Riviera Beach,* 568 U.S. 115, 133 S.Ct. 735, 184 L.Ed.2d 604. The jury returned a verdict for the City on all of the claims. The District Court instructed the jury that, for Lozman to prevail on his claim of a retaliatory arrest at the city council meeting, he had to prove that the arresting officer was motivated by impermissible animus against Lozman's protected speech and that the officer lacked probable cause to make the arrest. The Eleventh Circuit affirmed, concluding that any error the District Court made when it instructed the jury to consider the officer's retaliatory animus was harmless because the jury necessarily determined that the arrest was supported by probable cause when it found for the City on Lozman's other claims. The existence of probable cause, the court ruled, defeated a First Amendment claim for retaliatory arrest.

*Held* : The existence of probable cause does not bar Lozman's First Amendment retaliation claim under the circumstances of this case. Pp. 1950 – 1955.

Case 2020CV001583    Document 21    Filed 12-07-2020    Page 2 of 11

**Lozman v. City of Riviera Beach, Fla., 138 S.Ct. 1945 (2018)**

201 L.Ed.2d 342, 86 USLW 4428, 18 Cal. Daily Op. Serv. 5864...

(a) The issue here is narrow. Lozman concedes that there was probable cause for his arrest. Nonetheless, he claims, the arrest violated the First Amendment because it was ordered in retaliation for his earlier, protected speech: his open-meetings lawsuit and his prior public criticisms of city officials. Pp. 1950 – 1951.

(b) In a § 1983 case, a city or other local governmental entity cannot be subject to liability unless the harm was caused in the implementation of "official municipal policy."

*Monell v. New York City Dept. of Social Servs.,* 436 U.S. 658, 691, 98 S.Ct. 2018, 56 L.Ed.2d 611. The Court assumes that Lozman's arrest was taken pursuant to an official city policy.

Two major precedents bear on the issue whether the conceded existence of probable cause for the arrest bars recovery regardless of any intent or purpose to retaliate for past speech.

Lozman argues that the controlling rule is found in *Mt. Healthy City Bd. of Ed. v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471, a civil case in which a city board of education decided not to rehire an untenured teacher after a series of incidents, including a telephone call to a local radio station. The phone call was protected speech, but, the Court held, there was no liability unless the alleged constitutional violation was a but-for cause of the employment termination.

*Id.,* at 285–287, 97 S.Ct. 568. The City counters that the applicable precedent is *Hartman v. Moore,* 547 U.S. 250, 126 S.Ct. 1695, 164 L.Ed.2d 441, where the Court held that a plaintiff alleging a retaliatory prosecution must show the absence of probable cause for the underlying criminal charge, *id.,* at 265–266, 126 S.Ct. 1695. If there was probable cause, the case ends. If the plaintiff proves the absence of probable cause, then the *Mt. Healthy* test governs. Pp. 1951 – 1954.

(c) Whether *Hartman* or *Mt. Healthy* governs here is a determination that must await a different case. For Lozman's claim is far afield from the typical retaliatory arrest claim, and the difficulties that might arise if *Mt. Healthy* is applied to the mine run of arrests made by police officers are not present here. Lozman alleges that the City itself retaliated against him pursuant to an "official municipal policy" of intimidation. *Monell, supra,* at 691, 98 S.Ct. 2018. The fact that he must prove the existence and enforcement of an official **\*1948** policy motivated by retaliation separates his

claim from the typical retaliatory arrest claim. An official retaliatory policy can be long term and pervasive, unlike an ad hoc, on-the-spot decision by an individual officer. And it can be difficult to dislodge. A citizen can seek to have an individual officer disciplined or removed from service, but there may be little practical recourse when the government itself orchestrates the retaliation. Lozman's allegations, if proved, also alleviate the problems that the City says will result from applying *Mt. Healthy* in retaliatory arrest cases, for it is unlikely that the connection between the alleged animus and injury in a case like this will be "weakened ... by [an official's] legitimate consideration of speech," *Reichle v. Howards,* 566 U.S. 658, 668, 132 S.Ct. 2088, 182 L.Ed.2d 985, and there is little risk of a flood of retaliatory arrest suits against high-level policymakers. Because Lozman alleges that the City deprived him of the right to petition, " 'one of the most precious of the liberties safeguarded by the Bill of Rights,' " *BE & K Constr. Co. v. NLRB,* 536 U.S. 516, 524, 122 S.Ct. 2390, 153 L.Ed.2d 499, his speech is high in the hierarchy of First Amendment values. On these facts, *Mt. Healthy* provides the correct standard for assessing a retaliatory arrest claim. On remand, the Eleventh Circuit may consider any arguments in support of the District Court's judgment that have been preserved by the City, including whether a reasonable juror could find that the City formed a retaliatory policy to intimidate Lozman during its closed-door session, whether a reasonable juror could find that the arrest constituted an official act by the City, and whether, under *Mt. Healthy,* the City has proved that it would have arrested Lozman regardless of any retaliatory animus. Pp. 1953 – 1955.

681 Fed.Appx. 746, vacated and remanded.

KENNEDY, J., delivered the opinion of the Court, in which ROBERTS, C.J., and GINSBURG, BREYER, ALITO, SOTOMAYOR, KAGAN, and GORSUCH, JJ., joined. THOMAS, J., filed a dissenting opinion.

**Attorneys and Law Firms**

Pamela S. Karlan, Stanford, CA, for Petitioner.

Shay Dvoretzky, Washington, D.C., for Respondent.

Jeffrey B. Wall, Washington, D.C., for the United States as amicus curiae, by special leave of the Court, supporting the respondent.

Kerri L. Barsh, Greenberg Traurig, Miami, FL, Pamela S. Karlan, Jeffrey L. Fisher, David T. Goldberg, Stanford Law School, Supreme Court Litigation Clinic, Stanford, CA, for Petitioner.

Benjamin M. Flowers, Jones Day, Columbus, OH, Shay Dvoretzky, Jeffrey R. Johnson, Vivek Suri, Jones Day, Washington, D.C., Benjamin L. Bedard, Stephanie W. Kaufer, Roberts, Reynolds, Bedard & Tuzzio, PLLC, Andrew DeGraffenreidt III, City Attorney, Lina Busby, Assistant City Attorney, City of Riviera Beach, Riviera Beach, FL, for Respondent.

**Opinion**

Justice KENNEDY delivered the opinion of the Court.

This case requires the Court to address the intersection of principles that define when arrests are lawful and principles that prohibit the government from retaliating against a person for having exercised the right to free speech. An arrest deprives a person of essential liberties, but **\*1949** if there is probable cause to believe the person has committed a criminal offense there is often no recourse for the deprivation.

See, *e.g.,* 📗 *Devenpeck v. Alford,* 543 U.S. 146, 153, 125 S.Ct. 588, 160 L.Ed.2d 537 (2004). At the same time, the First Amendment prohibits government officials from retaliating against individuals for engaging in protected speech. 📗 *Crawford–El v. Britton,* 523 U.S. 574, 592, 118 S.Ct. 1584, 140 L.Ed.2d 759 (1998).

The petitioner in this case alleges that high-level city policymakers adopted a plan to retaliate against him for protected speech and then ordered his arrest when he attempted to make remarks during the public-comment portion of a city council meeting. The petitioner now concedes there was probable cause for the arrest. The question is whether the presence of probable cause bars petitioner's retaliatory arrest claim under these circumstances.

I

The city of Riviera Beach is on the Atlantic coast of Florida, about 75 miles north of Miami. The petitioner here is Fane Lozman. In 2006 Lozman towed his floating home into a slip in the City-owned marina, where he became a resident. Thus began his contentious relationship with the City's elected officials.

Soon after his arrival Lozman became an outspoken critic of the City's plan to use its eminent domain power to seize homes along the waterfront for private development. Lozman often spoke during the public-comment period at city council meetings and criticized councilmembers, the mayor, and other public employees. He also filed a lawsuit alleging that the Council's approval of an agreement with developers violated Florida's open-meetings laws.

In June 2006 the Council held a closed-door session, in part to discuss the open-meetings lawsuit that Lozman recently had filed. According to the transcript of the meeting, Councilmember Elizabeth Wade suggested that the City use its resources to "intimidate" Lozman and others who had filed lawsuits against the City. App. 176. Later in the meeting a different councilmember asked whether there was "a consensus of what Ms. Wade is saying," and others responded in the affirmative. *Id.,* at 181–182. Lozman alleges that these remarks formed an official plan to intimidate him. The City, on the other hand, maintains that the only consensus reached during the meeting was to invest the money and resources necessary to prevail in the litigation against it.

In all events, Lozman became embroiled in a number of disputes with city officials and employees over the ensuing years, many of which Lozman says were part of the City's plan of retaliation. The dispute that led to this litigation took place in 2006. In November of that year, five months after the closed-door meeting where the "intimidate" comment was made, the City Council held a public meeting. The agenda included a public-comment session in which citizens could address the Council for a few minutes. As he had done on earlier occasions and would do more than 200 times over the coming years, see Tr. in No. 9:08–cv–80134 (SD Fla.), Doc. 785, p. 61, Lozman stepped up to the podium to give remarks. He began to discuss the recent arrest of a former county official. Councilmember Wade interrupted him, directing him to stop making those remarks. Lozman continued speaking, this time about the arrest of a former official from the city of West Palm Beach. Wade then called for the assistance of the police officer in attendance. The officer approached Lozman and asked him to leave the podium. Lozman refused. So Wade told the officer to "carry him **\*1950** out." The officer handcuffed Lozman and ushered him out of the meeting. The incident was recorded on video. See Record, Def. Exh. 505, Doc. 687, available at https://www.supremecourt.gov/media/video/mp4files/Lozman_v_RivieraBeach.mp4. According to

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

Case 2020CV001583    Document 21    Filed 12-07-2020    Page 4 of 11

**Lozman v. City of Riviera Beach, Fla., 138 S.Ct. 1945 (2018)**

201 L.Ed.2d 342, 86 USLW 4428, 18 Cal. Daily Op. Serv. 5864...

the City, Lozman was arrested because he violated the City Council's rules of procedure by discussing issues unrelated to the City and then refused to leave the podium. According to Lozman, the arrest was to retaliate for his open-meetings lawsuit against the City and his prior public criticisms of city officials.

Under arrest, Lozman was escorted to police headquarters. He was charged with disorderly conduct and resisting arrest without violence and then released. Later, the State's attorney determined there was probable cause to arrest Lozman for those offenses but decided to dismiss the charges.

Lozman filed this lawsuit under Rev. Stat. § 1979, 42 U.S.C. § 1983. The complaint described a number of alleged incidents that, under Lozman's theory, showed the City's purpose to harass him in different ways. These ranged from a city employee telling Lozman that his dog needed a muzzle to the City's initiation of an admiralty lawsuit against Lozman's floating home—the latter resulting in an earlier decision by this Court. See *Lozman v. Riviera Beach,* 568 U.S. 115, 133 S.Ct. 735, 184 L.Ed.2d 604 (2013). The evidence and arguments presented by both parties with respect to all the matters alleged in Lozman's suit consumed 19 days of trial before a jury. The jury returned a verdict for the City on all of the claims.

Before this Court, Lozman seeks a reversal only as to the City's alleged retaliatory arrest at the November 2006 city council meeting. The District Court instructed the jury that, for Lozman to prevail on this claim, he had to prove that the arresting officer was himself motivated by impermissible animus against Lozman's protected speech and that the officer lacked probable cause to make the arrest. The District Court determined that the evidence was insufficient as a matter of law to support probable cause for the offenses charged at the time of the arrest (disorderly conduct and resisting arrest without violence). But the District Court concluded that there may have been probable cause to arrest Lozman for violating a Florida statute that prohibits interruptions or disturbances in schools, churches, or other public assemblies. Fla. Stat. § 871.01 (2017). (The City had brought this statute to the District Court's attention during the course of the litigation.) The District Court allowed the jury to decide whether there was probable cause to arrest for the public-disturbance offense.

Judgment having been entered for the City after the jury's verdict, Lozman appealed. The Court of Appeals for the Eleventh Circuit affirmed. 681 Fed.Appx. 746 (2017). As relevant here, the Court of Appeals assumed that the District Court erred when it instructed the jury that the officer, rather than the City, must have harbored the retaliatory animus. But the Court of Appeals held that any error was harmless because the jury necessarily determined that the arrest was supported by probable cause when it found for the City on some of Lozman's other claims—specifically, his claims that the arrest violated the Fourth Amendment and state law. *Id.,* at 751–752. And, under precedents which the Court of Appeals deemed controlling, the existence of probable cause defeated a First Amendment claim for retaliatory arrest. See *id.,* at 752 (citing *Dahl v. Holley,* 312 F.3d 1228, 1236 (C.A.11 2002)).

This Court granted certiorari, **\*1951** 538 U.S. ——, 138 S.Ct. 447, 199 L.Ed.2d 328 (2017), on the issue whether the existence of probable cause defeats a First Amendment claim for retaliatory arrest under § 1983. The Court considered this issue once before, see *Reichle v. Howards,* 566 U.S. 658, 663, 132 S.Ct. 2088, 182 L.Ed.2d 985 (2012), but resolved the case on different grounds.

II

The issue before the Court is a narrow one. In this Court Lozman does not challenge the constitutionality of Florida's statute criminalizing disturbances at public assemblies. He does not argue that the statute is overly broad, *e.g., Terminiello v. Chicago,* 337 U.S. 1, 69 S.Ct. 894, 93 L.Ed. 1131 (1949); *Watchtower Bible & Tract Soc. of N. Y., Inc. v. Village of Stratton,* 536 U.S. 150, 122 S.Ct. 2080, 153 L.Ed.2d 205 (2002); or that it impermissibly targets speech based on its content or viewpoint, *e.g., Texas v. Johnson,* 491 U.S. 397, 109 S.Ct. 2533, 105 L.Ed.2d 342 (1989); *Cohen v. California,* 403 U.S. 15, 91 S.Ct. 1780, 29 L.Ed.2d 284 (1971); or that it was enforced in a way that curtailed Lozman's right to peaceful assembly, *e.g., Brown v. Louisiana,* 383 U.S. 131, 86 S.Ct. 719, 15 L.Ed.2d 637 (1966). Lozman, furthermore, does not challenge the validity of the City Council's asserted limitations on the subjects

WESTLAW © 2020 Thomson Reuters. No claim to original U.S. Government Works.

201 L.Ed.2d 342, 86 USLW 4428, 18 Cal. Daily Op. Serv. 5864...

speakers may discuss during the public-comment portion of city council meetings (although he continues to dispute whether those limitations in fact existed).

Instead Lozman challenges only the lawfulness of his arrest, and even that challenge is a limited one. There is no contention that the City ordered Lozman's arrest to discriminate against him based on protected classifications, or that the City denied Lozman his equal protection rights by placing him in a "class of one." See *Village of Willowbrook v. Olech,* 528 U.S. 562, 120 S.Ct. 1073, 145 L.Ed.2d 1060 (2000) (*per curiam* ). Lozman, moreover, now concedes that there was probable cause for the arrest. Although Lozman does not indicate what facts he believes support this concession, it appears that the existence of probable cause must be based on the assumption that Lozman failed to depart the podium after receiving a lawful order to leave.

Lozman's claim is that, notwithstanding the presence of probable cause, his arrest at the city council meeting violated the First Amendment because the arrest was ordered in retaliation for his earlier, protected speech: his open-meetings lawsuit and his prior public criticisms of city officials. The question this Court is asked to consider is whether the existence of probable cause bars that First Amendment retaliation claim.

### III

It is well established that in a § 1983 case a city or other local governmental entity cannot be subject to liability at all unless the harm was caused in the implementation of "official municipal policy." *Monell v. New York City Dept. of Social Servs.,* 436 U.S. 658, 691, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978); see *Los Angeles County v. Humphries,* 562 U.S. 29, 36, 131 S.Ct. 447, 178 L.Ed.2d 460 (2010). Lozman's § 1983 damages claim is against only the City itself, based on the acts of its officers and employees—here, the members of the City Council. Lozman says that the City, through its city councilmembers, formed an official policy to retaliate against him and ordered his arrest. The Court assumes in the discussion to follow that the arrest was taken pursuant to an official city policy, but whether there was such a policy and what its content may have been are issues not decided here.

This brings the discussion to the issue the parties deem central to the **\*1952** case: whether the conceded existence of probable cause for the arrest bars recovery regardless of any intent or purpose to retaliate for past speech. Two major precedents could bear on this point, and the parties disagree on which should be applicable here. The first is this Court's decision in *Mt. Healthy City Bd. of Ed. v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977). See also *Board of Comm'rs, Wabaunsee Cty. v. Umbehr,* 518 U.S. 668, 116 S.Ct. 2342, 135 L.Ed.2d 843 (1996). Lozman urges that the rule of *Mt. Healthy* should control and that under it he is entitled to recover. The second is this Court's decision in *Hartman v. Moore,* 547 U.S. 250, 126 S.Ct. 1695, 164 L.Ed.2d 441 (2006), which the City cites for the proposition that once there is probable cause there can be no further claim that the arrest was retaliation for protected speech.

*Mt. Healthy* arose in a civil, not criminal, context. A city board of education decided not to rehire an untenured school teacher after a series of incidents indicating unprofessional demeanor. 429 U.S., at 281–283, 97 S.Ct. 568. One of the incidents was a telephone call the teacher made to a local radio station to report on a new school policy. *Id.,* at 282, 97 S.Ct. 568. Because the board of education did not suggest that the teacher violated any established policy in making the call, this Court accepted a finding by the District Court that the call was protected speech. *Id.,* at 284, 97 S.Ct. 568. The Court went on to hold, however, that since the other incidents, standing alone, would have justified the dismissal, relief could not be granted if the board could show that the discharge would have been ordered even without reference to the protected speech. *Id.,* at 285–287, 97 S.Ct. 568. In terms of precepts in the law of torts, the Court held that even if retaliation might have been a substantial motive for the board's action, still there was no liability unless the alleged constitutional violation was a but-for cause of the employment termination. *Ibid.*; see also *Umbehr, supra,* at 675, 116 S.Ct. 2342.

The City resists the applicability of the *Mt. Healthy* test as the sole determinant here. It contends that, where there was probable cause for the arrest, the applicable precedent is *Hartman*—a case that was in the criminal sphere and that turned on the existence of probable cause.

The background in *Hartman* was that a company and its chief executive, William Moore, had engaged in an extensive

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.    5

lobbying and governmental relations campaign opposing a particular postal service policy. 547 U.S., at 252–253, 126 S.Ct. 1695. Moore and the company were later prosecuted for violating federal statutes in the course of that lobbying. *Id.,* at 253–254, 126 S.Ct. 1695. After being acquitted, Moore filed suit against five postal inspectors, alleging that they had violated his First Amendment rights when they instigated his prosecution in retaliation for his criticisms of the Postal Service. *Id.,* at 254, 126 S.Ct. 1695. This Court held that a plaintiff alleging a retaliatory prosecution must show the absence of probable cause for the underlying criminal charge. *Id.,* at 265–266, 126 S.Ct. 1695. If there was probable cause, the case ends. If the plaintiff proves the absence of probable cause, then the *Mt. Healthy* test governs: The plaintiff must show that the retaliation was a substantial or motivating factor behind the prosecution, and, if that showing is made, the defendant can prevail only by showing that the prosecution would have been initiated without respect to retaliation. See 547 U.S., at 265–266, 126 S.Ct. 1695.

The Court in *Hartman* deemed it necessary to inquire as to the existence of probable **\*1953** cause because proving the link between the defendant's retaliatory animus and the plaintiff's injury in retaliatory prosecution cases "is usually more complex than it is in other retaliation cases." *Id.,* at 261, 126 S.Ct. 1695. An action for retaliatory prosecution "will not be brought against the prosecutor, who is absolutely immune from liability for the decision to prosecute." *Id.,* at 261–262, 126 S.Ct. 1695. Instead, the plaintiff must sue some other government official and prove that the official "induced the prosecutor to bring charges that would not have been initiated without his urging." *Id.,* at 262, 126 S.Ct. 1695. Noting that inquiries with respect to probable cause are commonplace in criminal cases, the Court determined that requiring plaintiffs in retaliatory prosecution cases to prove the lack of probable cause would help "bridge the gap between the nonprosecuting government agent's motive and the prosecutor's action." *Id.,* at 263, 126 S.Ct. 1695.

The City's argument here is that, just as probable cause is a bar in retaliatory prosecution cases, so too should it be a bar in this case, involving a retaliatory arrest. There is undoubted force in the City's position. *Reichle,* 566 U.S., at 667–668, 132 S.Ct. 2088. There are on average about 29,000 arrests per day in this country. Dept. of Justice–FBI, Uniform Crime Report,

Crime in the United States, 2016 (Fall 2017). In deciding whether to arrest, police officers often make split-second judgments. The content of the suspect's speech might be a consideration in circumstances where the officer must decide whether the suspect is ready to cooperate, or, on the other hand, whether he may present a continuing threat to interests that the law must protect. See, *e.g., District of Columbia v. Wesby,* 583 U.S. ––––, ––––, 138 S.Ct. 577, 587, 199 L.Ed.2d 453 (2018) ("suspect's untruthful and evasive answers to police questioning could support probable cause" (internal quotation marks omitted)).

For these reasons retaliatory arrest claims, much like retaliatory prosecution claims, can "present a tenuous causal connection between the defendant's alleged animus and the plaintiff's injury." *Reichle,* 566 U.S., at 668, 132 S.Ct. 2088. That means it can be difficult to discern whether an arrest was caused by the officer's legitimate or illegitimate consideration of speech. *Ibid.* And the complexity of proving (or disproving) causation in these cases creates a risk that the courts will be flooded with dubious retaliatory arrest suits. See Brief for District of Columbia et al. as *Amici Curiae* 5–11.

At the same time, there are substantial arguments that *Hartman*'s framework is inapt in retaliatory arrest cases, and that *Mt. Healthy* should apply without a threshold inquiry into probable cause. For one thing, the causation problem in retaliatory arrest cases is not the same as the problem identified in *Hartman. Hartman* relied in part on the fact that, in retaliatory prosecution cases, the causal connection between the defendant's animus and the prosecutor's decision to prosecute is weakened by the "presumption of regularity accorded to prosecutorial decisionmaking." 547 U.S., at 263, 126 S.Ct. 1695. That presumption does not apply in this context. See *Reichle, supra,* at 669, 132 S.Ct. 2088. In addition, there is a risk that some police officers may exploit the arrest power as a means of suppressing speech. See Brief for Institute for Free Speech as *Amicus Curiae.*

IV

The parties' arguments raise difficult questions about the scope of First Amendment protections when speech is made in connection with, or contemporaneously to, **\*1954** criminal activity. But whether in a retaliatory arrest case the *Hartman* approach should apply, thus barring a suit where

probable cause exists, or, on the other hand, the inquiry should be governed only by *Mt. Healthy* is a determination that must await a different case. For Lozman's claim is far afield from the typical retaliatory arrest claim, and the difficulties that might arise if *Mt. Healthy* is applied to the mine run of arrests made by police officers are not present here.

Here Lozman does not sue the officer who made the arrest. Indeed, Lozman likely could not have maintained a retaliation claim against the arresting officer in these circumstances, because the officer appears to have acted in good faith, and there is no showing that the officer had any knowledge of Lozman's prior speech or any motive to arrest him for his earlier expressive activities.

Instead Lozman alleges more governmental action than simply an arrest. His claim is that the City itself retaliated against him pursuant to an "official municipal policy" of intimidation. *Monell, 436 U.S., at 691, 98 S.Ct. 2018.* In particular, he alleges that the City, through its legislators, formed a premeditated plan to intimidate him in retaliation for his criticisms of city officials and his open-meetings lawsuit. And he asserts that the City itself, through the same high officers, executed that plan by ordering his arrest at the November 2006 city council meeting.

The fact that Lozman must prove the existence and enforcement of an official policy motivated by retaliation separates Lozman's claim from the typical retaliatory arrest claim. An official retaliatory policy is a particularly troubling and potent form of retaliation, for a policy can be long term and pervasive, unlike an ad hoc, on-the-spot decision by an individual officer. An official policy also can be difficult to dislodge. A citizen who suffers retaliation by an individual officer can seek to have the officer disciplined or removed from service, but there may be little practical recourse when the government itself orchestrates the retaliation. For these reasons, when retaliation against protected speech is elevated to the level of official policy, there is a compelling need for adequate avenues of redress.

In addition, Lozman's allegations, if proved, alleviate the problems that the City says will result from applying *Mt. Healthy* in retaliatory arrest cases. The causation problem in arrest cases is not of the same difficulty where, as is alleged here, the official policy is retaliation for prior, protected speech bearing little relation to the criminal offense for which the arrest is made. In determining whether there was probable cause to arrest Lozman for disrupting a public assembly, it

is difficult to see why a city official could have legitimately considered that Lozman had, months earlier, criticized city officials or filed a lawsuit against the City. So in a case like this one it is unlikely that the connection between the alleged animus and injury will be "weakened ... by [an official's] legitimate consideration of speech." *Reichle, 566 U.S., at 668, 132 S.Ct. 2088.* This unique class of retaliatory arrest claims, moreover, will require objective evidence of a policy motivated by retaliation to survive summary judgment. Lozman, for instance, cites a transcript of a closed-door city council meeting and a video recording of his arrest. There is thus little risk of a flood of retaliatory arrest suits against high-level policymakers.

As a final matter, it must be underscored that this Court has recognized the "right to petition as one of the most precious of the liberties safeguarded by the Bill of Rights." *BE & K Constr. Co. v.* **\*1955** *NLRB, 536 U.S. 516, 524, 122 S.Ct. 2390, 153 L.Ed.2d 499 (2002)* (internal quotation marks omitted). Lozman alleges the City deprived him of this liberty by retaliating against him for his lawsuit against the City and his criticisms of public officials. Thus, Lozman's speech is high in the hierarchy of First Amendment values. See *Connick v. Myers, 461 U.S. 138, 145, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983).*

For these reasons, Lozman need not prove the absence of probable cause to maintain a claim of retaliatory arrest against the City. On facts like these, *Mt. Healthy* provides the correct standard for assessing a retaliatory arrest claim. The Court need not, and does not, address the elements required to prove a retaliatory arrest claim in other contexts.

This is not to say, of course, that Lozman is ultimately entitled to relief or even a new trial. On remand, the Court of Appeals, applying *Mt. Healthy* and other relevant precedents, may consider any arguments in support of the District Court's judgment that have been preserved by the City. Among other matters, the Court of Appeals may wish to consider (1) whether any reasonable juror could find that the City actually formed a retaliatory policy to intimidate Lozman during its June 2006 closed-door session; (2) whether any reasonable juror could find that the November 2006 arrest constituted an official act by the City; and (3) whether, under *Mt. Healthy,* the City has proved that it would have arrested Lozman regardless of any retaliatory animus—for example, if Lozman's conduct during prior city council meetings had

WESTLAW    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

also violated valid rules as to proper subjects of discussion, thus explaining his arrest here.

For these reasons, the judgment of the Court of Appeals is vacated, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

Justice THOMAS, dissenting.

We granted certiorari to decide "whether the existence of probable cause defeats a First Amendment claim for retaliatory arrest under [ 42 U.S.C.] § 1983." *Ante,* at 1950 – 1951. Instead of resolving that question, the Court decides that probable cause should not defeat a "unique class of retaliatory arrest claims." *Ante,* at 1954. To fall within this unique class, a claim must involve objective evidence, of an official municipal policy of retaliation, formed well before the arrest, in response to highly protected speech, that has little relation to the offense of arrest. See *ante,* at 1954 – 1955. No one briefed, argued, or even hinted at the rule that the Court announces today. Instead of dreaming up our own rule, I would have answered the question presented and held that plaintiffs must plead and prove a lack of probable cause as an element of a First Amendment retaliatory-arrest claim. I respectfully dissent.

I

The petition for certiorari asked us to resolve whether "the existence of probable cause defeat[s] a First Amendment retaliatory-arrest claim as a matter of law." Pet. for Cert. i. That question has divided the federal courts for decades. See *id.,* at 10–13. We granted certiorari to consider it six years ago in *Reichle v. Howards,* 566 U.S. 658, 663, 132 S.Ct. 2088, 182 L.Ed.2d 985 (2012). But we did not resolve it then because the petitioner's second question presented—whether qualified immunity applied—fully resolved the case. *Ibid.* Since *Reichle,* the split in the federal courts has widened. See Pet. for Cert. 12–13. In this case, we again granted certiorari, **\*1956** 538 U.S. ——, 138 S.Ct. 447, 199 L.Ed.2d 328 (2017), this time only on the question of probable cause, see Pet. for Cert. i.

Yet the Court chooses not to resolve that question, leaving in place the decades-long disagreement among the federal

courts. The parties concentrated all their arguments on this question in their briefs and at oral argument. Neither party suggested that there was something special about Fane Lozman's claim that would justify a narrower rule. See, *e.g.,* Tr. of Oral Arg. 15–16 (refusing to take the "fallback position" that this "is some special kind of case"). Yet the Court does that work for them by defining a "unique class of retaliatory arrest claims" that do not require plaintiffs to plead and prove a lack of probable cause. *Ante,* at 1956.

By my count, the Court has identified five conditions that are necessary to trigger its new rule. First, there must be "an 'official municipal policy' of intimidation." *Ante,* at 1954 (quoting *Monell v. New York City Dept. of Social Servs.,* 436 U.S. 658, 691, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978)). Second, the policy must be "premeditated" and formed well before the arrest—here, for example, the policy was formed "months earlier." *Ante,* at 1954.[1] Third, there must be "objective evidence" of such a policy. *Ante,* at 1954. Fourth, there must be "little relation" between the "protected speech" that prompted the retaliatory policy and "the criminal offense for which the arrest is made." *Ante,* at 1954. Finally, the protected speech that provoked the retaliatory policy must be "high in the hierarchy of First Amendment values." *Ante,* at 1955. Where all these features are present, the Court explains, there is not the same "causation problem" that exists for other retaliatory-arrest claims. *Ante,* at 1954.

I find it hard to believe that there will be many cases where this rule will even arguably apply, and even harder to believe that the plaintiffs in those cases will actually prove all five requirements. Not even Lozman's case is a good fit, as the Court admits when it discusses the relevant considerations for remand. See *ante,* at 1954 – 1955. In my view, we should not have gone out of our way to fashion a complicated rule with no apparent applicability to this case or any other.

II

Turning to the question presented, I would hold that plaintiffs bringing a First Amendment retaliatory-arrest claim must plead and prove an absence of probable cause.[2] This Court has "repeatedly noted that 42 U.S.C. § 1983 creates ' "a species of tort liability." ' " *Memphis Community School Dist. v. Stachura,* 477 U.S. 299, 305, 106 S.Ct. 2537, 91 L.Ed.2d 249 (1986) (footnote omitted). Accordingly,

we "defin[e] the contours and prerequisites of a § 1983 claim" by "look[ing] first to the common **\*1957** law of torts." *Manuel v. Joliet,* 580 U.S. ——, ——, 137 S.Ct. 911, 920, 197 L.Ed.2d 312 (2017); see, *e.g., Heck v. Humphrey,* 512 U.S. 477, 484, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994) (analogizing to the "common-law cause of action for malicious prosecution"); *id.,* at 491, 114 S.Ct. 2364 (THOMAS, J., concurring) (emphasizing that the decision was "consistent ... with the state of the common law at the time" § 1983 was enacted").

When § 1983 was enacted, there was no common-law tort for retaliatory arrest in violation of the freedom of speech. See *Hartman v. Moore,* 547 U.S. 250, 259, 126 S.Ct. 1695, 164 L.Ed.2d 441 (2006). I would therefore look to the common-law torts that "provid[e] the closest analogy" to this claim. *Heck, supra,* at 484, 114 S.Ct. 2364. The closest analogs here are the three arrest-based torts under the common law: false imprisonment, malicious prosecution, and malicious arrest. In defining the elements of these three torts, 19th-century courts emphasized the importance of probable cause.

Consider first the tort of false imprisonment. Common-law courts stressed the need to shape this tort with an "indulgence" for peace officers, who are "specially charged with a duty in the enforcement of the laws." T. Cooley, Law of Torts 175 (1880) (Cooley); see, *e.g., Hogg v. Ward,* 3 H. & N. 417, 423, 157 Eng. Rep. 533, 536 (Ex. 1858) (opinion of Watson, B.) (stressing "the utmost importance that the police throughout the country should be supported in the execution of their duty"). Accordingly, private citizens were always liable for false imprisonment if the arrestee had not actually committed a felony, but constables were "excused" if they had "made [the arrest] on reasonable grounds of belief"—*i.e.,* probable cause. Cooley 175; accord, 2 C. Addison, Law of Torts § 803, p. 18 (1876); 1 F. Hilliard, The Law of Torts or Private Wrongs § 18, pp. 207–208, and n. (a) (1866). As Lord Mansfield explained, it was "of great consequence to the police" that probable cause shield officers from false-imprisonment claims, as "it would be a terrible thing" if the threat of liability dissuaded them from performing their official duties. *Ledwith v. Catchpole,* 2 Cald. 291, 295 (K.B.1783). This concern outweighed "the mischief and inconvenience to the public" from the reality that "[m]any an innocent man has and may be taken up upon suspicion." *Ibid.* Many State Supreme Courts agreed

with Lord Mansfield's reasoning. See, *e.g., Burns v. Erben,* 40 N.Y. 463, 469 (1869) (opinion of Woodruff, J.) (quoting *Ledwith* ); *Brockway v. Crawford,* 48 N.C. 433, 437 (1856) ("[The] exempt [ion] for responsibility" for arrests based on probable cause "encourages ... a sharp look-out for the apprehension of felons"). As one court put it, "How, in the great cities of this land, could police power be exercised, if every peace officer is liable to civil action for false imprisonment" whenever "persons arrested upon probable cause shall afterwards be found innocent?" *Hawley v. Butler,* 54 Barb. 490, 496 (N.Y.Sup.1868).

Courts also stressed the importance of probable cause when defining the torts of malicious prosecution and malicious arrest. See, *e.g., Ahern v. Collins,* 39 Mo. 145, 150 (1866) (holding that "malice and want of probable cause are necessary ingredients of both"). For the tort of malicious prosecution, courts emphasized the "necessity" of both the "allegation" and "proof" of probable cause, in light of the public interest "that criminals should be brought to justice." *Hogg v. Pinckney,* 16 S.C. 387, 393 (1882); see also *Chrisman v. Carney,* 33 Ark. 316, 326 (1878) ("The existence of probable cause is of itself alone a complete defense.... The interest which society has in the enforcement of the criminal laws requires this rule"). Similarly, if the element **\*1958** of probable cause were not "strictly guarded," "ill consequences would ensue to the public, for no one would willingly undertake to vindicate a breach of the public law and discharge his duty to society, with the prospect of an annoying suit staring him in the face." *Ventress v. Rosser,* 73 Ga. 534, 541 (1884); accord, *Cardival v. Smith,* 109 Mass. 158 (1872). The element of probable cause also played an evidentiary role for both torts. Lack of probable cause provided "evidence of malice, though inconclusive," *Herman v. Brookerhoff,* 8 Watts 240, 241 (Pa.1839), because "[m]alice may be inferred from a total want of probable cause," *Ventress, supra,* at 541; accord, *Ahern, supra,* at 150.

In sum, when § 1983 was enacted, the common law recognized probable cause as an important element for ensuring that arrest-based torts did not unduly interfere with the objectives of law enforcement. Common-law courts were wary of "throw[ing] down the bars which protect public officers from suits for acts done within the scope of their duty and authority, by recognizing the right of every one who chooses to imagine or assert that he is aggrieved by their doings, to make use of an allegation that they were malicious

Case 2020CV001583    Document 21    Filed 12-07-2020    Page 10 of 11

**Lozman v. City of Riviera Beach, Fla., 138 S.Ct. 1945 (2018)**

201 L.Ed.2d 342, 86 USLW 4428, 18 Cal. Daily Op. Serv. 5864...

in motive to harass them with suits on that ground." *Chesley v. King,* 74 Me. 164, 175–176 (1882).

Applying that principle here, it follows that plaintiffs bringing a First Amendment retaliatory-arrest claim under § 1983 should have to plead and prove a lack of probable cause. I see no justification for deviating from the historical practice simply because an arrest claim is framed in terms of the First Amendment. Even under a First Amendment theory, "the significance of probable cause or the lack of it looms large." *Hartman,* 547 U.S., at 265, 126 S.Ct. 1695. The presence of probable cause will tend to disprove that the arrest was done out of retaliation for the plaintiff's speech, and the absence of probable cause will tend to prove the opposite. See *id.,* at 261, 126 S.Ct. 1695. Because "[p]robable cause or its absence will be at least an evidentiary issue in practically all such cases" and "[b]ecause showing [its] absence ... will have high probative force, and can be made mandatory with little or no added cost," the absence of probable cause should be an "element" of the plaintiff's case. *Id.,* at 265–266, 126 S.Ct. 1695; see also *id.,* at 264, n. 10, 126 S.Ct. 1695 (refusing to carve out an exception for unusual cases).

Moreover, as with the traditional arrest-based torts, police officers need the safe harbor of probable cause in the First Amendment context to be able to do their jobs effectively. Police officers almost always exchange words with suspects before arresting them. And often a suspect's "speech provides

evidence of a crime or suggests a potential threat." *Reichle,* 566 U.S., at 668, 132 S.Ct. 2088. If probable cause were not required, the threat of liability might deter an officer from arresting a suspected criminal who, for example, has a political bumper sticker on his car, cf. *Kilpatrick v. United States,* 432 Fed.Appx. 937 (C.A.11 2011); is participating in a politically tinged protest, *Morse v. San Francisco Bay Area Rapid Transit Dist.,* 2014 WL 572352 (N.D.Cal., Feb. 11, 2014); or confronts and criticizes the officer during the arrest of a third party, *Holland v. San Francisco,* 2013 WL 968295 (N.D.Cal., Mar. 12, 2013). Allowing plaintiffs to bring a retaliatory-arrest claim in such circumstances, without pleading and proving a lack of probable cause, would permit plaintiffs to harass officers with the kind of suits that common-law courts deemed intolerable.

* * *

**\*1959** Because we should have answered the question presented and held that probable cause necessarily defeats First Amendment retaliatory-arrest claims, I respectfully dissent.

**All Citations**

138 S.Ct. 1945, 201 L.Ed.2d 342, 86 USLW 4428, 18 Cal. Daily Op. Serv. 5864, 2018 Daily Journal D.A.R. 5783, 27 Fla. L. Weekly Fed. S 363

---

## Footnotes

\*     The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States v. Detroit Timber & Lumber Co.,* 200 U.S. 321, 337, 26 S.Ct. 282, 50 L.Ed. 499.

1      This requirement suggests that the Court's rule does not apply when the "policy" that the plaintiff challenges is an on-the-spot decision by a single official with final policymaking authority, like the "policy" that this Court recognized in *Pembaur v. Cincinnati,* 475 U.S. 469, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986). See *id.,* at 484–485, 106 S.Ct. 1292 (holding that a county prosecutor's order to forcibly enter the plaintiff's clinic was a "municipal policy").

2      I am skeptical that 42 U.S.C. § 1983 recognizes a claim for retaliatory arrests under the First Amendment. I adhere to the view that "*no* 'intent-based' constitutional tort would have been actionable under the § 1983 that Congress enacted." *Crawford–El v. Britton,* 523 U.S. 574, 612, 118 S.Ct. 1584, 140 L.Ed.2d

**Lozman v. City of Riviera Beach, Fla., 138 S.Ct. 1945 (2018)**
201 L.Ed.2d 342, 86 USLW 4428, 18 Cal. Daily Op. Serv. 5864...

759 (1998) (Scalia, J., dissenting). But because no party presses this argument, I assume that such claims are actionable under § 1983.

---

**End of Document**                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

**FILED**
**12-07-2020**
**Clerk of Circuit Court**
**Waukesha County**
**2020CV001583**

651 F.3d 684
United States Court of Appeals,
Seventh Circuit.

Rhonda EZELL, et al., Plaintiffs–Appellants,
v.
CITY OF CHICAGO, Defendant–Appellee.

No. 10–3525.
|
Argued April 4, 2011.
|
Decided July 6, 2011.

**Synopsis**
**Background:** Residents, firing-range business, and nonprofit Second-Amendment-advocacy associations brought action challenging the constitutionality of city ordinance that mandated firing-range training as prerequisite to lawful gun ownership, yet prohibited all firing ranges in city. Residents moved for preliminary injunction to prevent enforcement of ordinance. The United States District Court for the Northern District of Illinois, Virginia Mary Kendall, J., 2010 WL 3998104, denied motion. Residents appealed.

**Holdings:** The Court of Appeals, Sykes, Circuit Judge, held that:

plaintiffs had standing to challenge ordinance;

plaintiffs established irreparable injury and lack of adequate remedy at law, as required for preliminary injunction;

in a matter of first impression, firing-range training was not categorically unprotected by Second Amendment;

in a matter of first impression, Second Amendment required city to establish strong public-interest justification for ordinance;

plaintiffs established strong likelihood of success on merits; and

balance of harms favored preliminary injunction.

Reversed and remanded.

Rovner, Circuit Judge, filed an opinion concurring in the judgment.

**Procedural Posture(s):** On Appeal; Motion for Preliminary Injunction.

**Attorneys and Law Firms**

**\*689** Alan Gura (argued), Attorney, Gura & Possessky, Alexandria, VA, David G. Sigale, Attorney, Glen Ellyn, IL, for Plaintiffs–Appellants.

James A. Feldman (argued), Attorney, Washington, DC, Mara S. Georges, Attorney, Office of the Corporation Counsel, Appeals Division, Suzanne M. Loose, Attorney, City of Chicago Law Department, Chicago, IL, for Defendant–Appellee.

Charles J. Cooper, Attorney, Cooper & Kirk, Washington, DC, for Amicus Curiae, Brett Benson.

Clifford M. Sloan, Attorney, Skadden, Arps, Slate, Meagher & Flom LLP, Washington, DC, for Amici Curiae, Paul Finkelman, Stanley Katz, David Thomas Konig, Patrick J. Charles, and Robert J. Spitzer.

Before KANNE, ROVNER, and SYKES, Circuit Judges.

**Opinion**

SYKES, Circuit Judge.

For nearly three decades, the City of Chicago had several ordinances in place "effectively banning handgun possession by almost all private citizens." McDonald v. City of Chicago, —— U.S. ——, 130 S.Ct. 3020, 3026, 177 L.Ed.2d 894 (2010). In 2008 the Supreme Court struck down a similar District of Columbia law on an original-meaning interpretation of the Second Amendment.[1] District of Columbia v. Heller, 554 U.S. 570, 635–36, 128 S.Ct. 2783, 171 L.Ed.2d 637 (2008). Heller held that the Amendment secures an individual right to keep and bear arms, the core component of which is the right to possess operable firearms —handguns included—for self-defense, most notably in the home. Id. at 592–95, 599, 628–29, 128 S.Ct. 2783.

Soon after the Court's decision in Heller, Chicago's handgun ban was challenged. McDonald, 130 S.Ct. at 3027. The foundational question in that litigation was whether the

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.                1

Second Amendment applies to the States and subsidiary local governments. 🔖 *Id.* at 3026. The Supreme Court gave an affirmative answer: The Second Amendment applies to the States through the Due Process Clause of the Fourteenth Amendment. 🔖 *Id.* at 3050. In the wake of *McDonald,* **\*690** the Chicago City Council lifted the City's laws banning handgun possession and adopted the Responsible Gun Owners Ordinance in their place.

The plaintiffs here challenge the City Council's treatment of firing ranges. The Ordinance mandates one hour of range **\*690** training as a prerequisite to lawful gun ownership, *see* CHI. MUN. CODE § 8–20–120, yet at the same time prohibits all firing ranges in the city, *see id.* § 8–20–080. The plaintiffs contend that the Second Amendment protects the right to maintain proficiency in firearm use—including the right to practice marksmanship at a range—and the City's total ban on firing ranges is unconstitutional. They add that the Ordinance severely burdens the core Second Amendment right to possess firearms for self-defense because it conditions possession on range training but simultaneously forbids range training everywhere in the city. Finally, they mount a First Amendment challenge to the Ordinance on the theory that range training is protected expression. The plaintiffs asked for a preliminary injunction, but the district court denied this request.

We reverse. The court's decision turned on several legal errors. To be fair, the standards for evaluating Second Amendment claims are just emerging, and this type of litigation is quite new. Still, the judge's decision reflects misunderstandings about the nature of the plaintiffs' harm, the structure of this kind of constitutional claim, and the proper decision method for evaluating alleged infringements of Second Amendment rights. On the present record, the plaintiffs are entitled to a preliminary injunction against the firing-range ban. The harm to their Second Amendment rights cannot be remedied by damages, their challenge has a strong likelihood of success on the merits, and the City's claimed harm to the public interest is based entirely on speculation.

## I. Background

### A. Chicago's Responsible Gun Owners Ordinance
The day after the Supreme Court decided *McDonald,* the Chicago City Council's Committee on Police and Fire held a hearing to explore possible legislative responses to the decision. A Chicago alderman asked the City's legal counsel what could be done about firearms possession and other gun-related activity in the city, including shooting ranges. The City's Corporation Counsel replied that the Council could "limit what we allow to operate in our city however is reasonable as decided by the City Council."

The Committee quickly convened hearings and took testimony about the problem of gun violence in Chicago. Witnesses included academic experts on the issue of gun violence in general; community organizers and gun-control advocates; and law-enforcement officers, including Jody Weis, then the Superintendent of the Chicago Police Department. Based on these hearings, the Committee made recommendations to the City Council about how it should regulate firearm possession and other firearm-related activity.

The Council immediately took up the Committee's recommendations and, just four days after *McDonald* was decided, repealed the City's laws banning handgun possession and unanimously adopted the Responsible Gun Owners Ordinance. *See* 🔖 *Nat'l Rifle Ass'n of Am., Inc. v. City of Chicago, Ill.,* Nos. 10–3957, 10–3965 & 11–1016, 2011 WL 2150785, at \*1 (7th Cir. June 2, 2011). The new Ordinance—a sweeping array of firearm restrictions—took effect on July 12, 2010. To give a sense of its scope: The Ordinance prohibits handgun possession outside the home, CHI. MUN.CODE § 8–20–020, and the possession of long guns outside the home or the owner's fixed place of business, *id.* § 8–20–030. It forbids the sale or other transfer of firearms except through inheritance or between peace officers. *Id.* § 8–20–100. A person may have "no more than one **\*691** firearm in his home assembled and operable." *Id.* § 8–20–040. The Ordinance bans certain kinds of firearms, including assault weapons and "unsafe handgun[s]," as well as certain firearm accessories and types of ammunition. *Id.* §§ 8–20–060, 8–20–085, 8–20–170.

The Ordinance also contains an elaborate permitting regime. It prohibits the possession of any firearm without a Chicago Firearm Permit. CHI. MUN.CODE § 8–20–110(a). (Certain public-safety and private-security professionals are exempt.) In addition, all firearms must have a registration certificate, and to register a firearm, the owner must have a valid Permit.[2] *Id.* at § 8–20–140(a), (b). To apply for a Permit, a person must have an Illinois Firearm Owner's Identification Card. *Id.* § 8–20–110(b)(2). Only those 21 years of age or older may apply for a Permit, except that a person between the ages of 18 and 20 may apply with the written consent

of a parent or legal guardian if the parent or guardian is not prohibited from having a Permit or a Firearm Owner's Identification Card. *Id.* § 8–20–110(b)(1). Persons convicted of certain crimes may not obtain a Permit. *Id.* § 8–20–110(b)(3) (disqualifying persons convicted of any violent crime, a second or subsequent drunk-driving offense, or an offense relating to the unlawful use of a firearm). Other lawsuits challenging these and other provisions of the Ordinance are currently pending in the District Court for the Northern District of Illinois. *See, e.g., Second Amendment Arms v. City of Chicago,* No. 110CV4257, 2010 WL 2843154 (N.D.Ill. filed July 9, 2010); *Benson v. City of Chicago,* No. 10 C 4184 (N.D.Ill. filed July 6, 2010).

As relevant here, permits are conditioned upon completion of a certified firearm-safety course. Applicants must submit an affidavit signed by a state-certified firearm instructor attesting that the applicant has completed a certified firearm-safety and training course that provides at least four hours of classroom instruction and one hour of range training.[3] CHI. MUN.CODE § 8–20–120(a)(7). At the same time, however, the Ordinance prohibits all "[s]hooting galleries, firearm ranges, or any other place where firearms are discharged." *Id.* § 8–20–280. The Ordinance also prohibits the "discharge [of] any firearm within the city," making no exception for controlled shooting at a firing range—because, of course, firing ranges are banned throughout the city.[4] *Id.* § 8–24–010.

Violations are punishable by a fine of $1,000 to $5,000 and incarceration for a term of "not less than 20 days nor more than 90 days," and "[e]ach day that such **\*692** violation exists shall constitute a separate and distinct offense." CHI. MUN.CODE § 8–20–300(a), (b). The penalties go up for subsequent convictions. *Id.* § 8–20–300(b) (For "[a]ny subsequent conviction," the penalty is a fine of $5,000 to $10,000 and incarceration for a term of "not less than 30 days, nor more than six months.").

The firing-range ban does not apply to governmental agencies. *Id.* § 8–20–280. The federal government operates four indoor firing ranges in Chicago, and the Chicago Police Department operates five. Apparently, the City also exempts private security companies; there are two indoor firing ranges operated by private security companies in Chicago.[5]

**B. The Litigation**

The plaintiffs are three Chicago residents, Rhonda Ezell, William Hespen, and Joseph Brown; and three organizations, Action Target, Inc.; the Second Amendment Foundation, Inc.; and the Illinois State Rifle Association. Action Target designs, builds, and furnishes firing ranges throughout the United States and would like to do so in Chicago. The Second Amendment Foundation and the Illinois Rifle Association are nonprofit associations whose members are firearms enthusiasts; among other activities, these organizations advocate for Second Amendment rights and have made arrangements to try to bring a mobile firing range to Chicago.

The plaintiffs sought a temporary restraining order ("TRO"), a preliminary injunction, and a permanent injunction against the City's ban on firing ranges, and corresponding declaratory relief invalidating the ban. The district court twice denied a TRO, finding that the plaintiffs were not irreparably harmed. The parties conducted expedited discovery, and the court held a two-day hearing on the preliminary-injunction motion. The plaintiffs presented the testimony of representatives of Action Target, the Second Amendment Foundation, and the Illinois Rifle Association. Declarations from the three individual plaintiffs were already in the record, so they did not testify.

The City called two witnesses: Sergeant Daniel Bartoli, a former rangemaster for the Chicago Police Department, and Patricia Scudiero, Chicago's Zoning Commissioner. Bartoli testified that firing ranges can carry a risk of injury from unintentional discharge and raised concerns about criminals seeking to steal firearms from range users. He also explained the possible problem of contamination from lead residue left on range users' hands after shooting. He identified various measures that a firing range should take to reduce these risks. To prevent theft, he said a range should have a secure parking lot and only one entrance into its facilities. To avoid injury from unintentional discharge, a range should provide a separate location for the loading and unloading of firearms and should erect a permanent, opaque fence to deter bystanders from congregating around the facility. He also said a range should have running water onsite so users can wash lead residue from their hands after shooting.

Scudiero testified that Chicago's zoning code prohibits all property uses not expressly permitted and contains no provision **\*693** for gun ranges.[6] If firing ranges were added as a permitted use, she said they should be classified as an "intensive use" under the Code. An "intensive use," she explained, is a use "that could pose a threat to the health, safety and welfare" of city residents and therefore

may be located only in a manufacturing district; even then, intensive uses are allowed only by special-use permit, not presumptively. On cross-examination Scudiero admitted she has never been to a firing range. She acknowledged as well that the governmental firing ranges within the city are not limited to manufacturing districts; they are located near churches, schools, university buildings, residential housing, a county courthouse, retail stores, and parks. She has not received any complaints from the public about these ranges.

The City introduced evidence that there are 14 firing ranges open to the public and located within 50 miles of its borders. Of these, seven are located within 25 miles of the city, and five are located within 5 miles of the city.

Because the legal issues in the case had been fully briefed, the plaintiffs asked the court to consider the preliminary-injunction hearing as a trial on the merits. See FED.R.CIV.P. 65(a)(2) (permitting the court to "advance the trial on the merits and consolidate it with the [preliminary-injunction] hearing"). The court declined to do so and took the matter under advisement.

## C. The Decision Below

Soon after the hearing, the district court issued a decision denying preliminary injunctive relief because the plaintiffs were neither irreparably harmed nor likely to succeed on the merits. The court's decision is a bit hard to follow; standing and merits inquiries are mixed in with the court's evaluation of irreparable harm. As we will explain, the court made several critical legal errors. To see how the decision got off-track requires that we identify its key holdings.

The judge began by "declin[ing] to adopt the intermediate scrutiny standard" of review, but held in the alternative that "even if" intermediate scrutiny applied, the "[p]laintiffs still fail to meet their burden of demonstrating irreparable harm." The judge said the organizational plaintiffs "do not have the necessary standing to demonstrate their irreparable harm" because "*Heller* and *McDonald* addressed an individual's right to possess a firearm" but "did not address an organization's right." Again, the court purported to enter an alternative holding: "Even if" the organizations had standing to assert a claim under *Heller* and *McDonald,* they "failed to present sufficient evidence ... that their constituency has been unable to comply with the statute." The court held that none of the plaintiffs were suffering irreparable harm because the injury in question was limited to the minor cost and inconvenience of having to travel outside the city to obtain the

range training necessary to qualify for a Permit and money damages would be sufficient to compensate the plaintiffs for this travel-related injury if they ultimately prevailed.

On the plaintiffs' likelihood of success on the merits, the judge was skeptical that **\*694** the firing-range ban violated anyone's Second Amendment rights: "Suggesting that firing a weapon at a firing range is tantamount to possessing a weapon within one's residence for self-defense would be establishing law that has not yet been expanded to that breadth." If the Second Amendment was implicated at all, the judge characterized the claim as a minor dispute about an inconvenient permit requirement: "[T]he [c]ity's boundaries are merely artificial borders allegedly preventing an individual from obtaining a [firearm] permit...." The court concluded that the City's evidence about "stray bullets," potential theft, and lead contamination was sufficient to show that "the safety of its citizens is at risk when compared to the minimal inconvenience of traveling outside of the [c]ity for a one-hour course."

Finally, the judge concluded that the balance of harms favored the City because the "potential harmful effects of firing ranges" outweighed any inconvenience the plaintiffs might experience from having to travel to ranges outside of Chicago. The court summarily rejected the plaintiffs' First Amendment claim, finding it underdeveloped. Alternatively, the court held that the range ban did not appear to implicate any expressive message.

The plaintiffs appealed. See 28 U.S.C. § 1292(a)(1) (authorizing immediate appeal of a decision granting or denying injunctive relief).

## II. Analysis

To win a preliminary injunction, a party must show that it has (1) no adequate remedy at law and will suffer irreparable harm if a preliminary injunction is denied and (2) some likelihood of success on the merits. See 🔖 *Christian Legal Soc'y v. Walker,* 453 F.3d 853, 859 (7th Cir.2006); *Joelner v. Vill. of Wash. Park,* 378 F.3d 613, 619 (7th Cir.2004); 🔖 *Abbott Labs. v. Mead Johnson & Co.,* 971 F.2d 6, 11–12 (7th Cir.1992). If the moving party meets these threshold requirements, the district court weighs the factors against one another, assessing whether the balance of harms favors the moving party or whether the harm to the nonmoving party or

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

the public is sufficiently weighty that the injunction should be denied. *Christian Legal Soc'y,* 453 F.3d at 859. We review the court's legal conclusions de novo, its findings of fact for clear error, and its balancing of the injunction factors for an abuse of discretion. *Id.*

The district court got off on the wrong foot by accepting the City's argument that its ban on firing ranges causes only minimal harm to the plaintiffs—nothing more than the minor expense and inconvenience of traveling to one of 14 firing ranges located within 50 miles of the city limits—and this harm can be adequately compensated by money damages. This characterization of the plaintiffs' injury fundamentally misunderstands the form of this claim and rests on the mistaken premise that range training does not implicate the Second Amendment *at all,* or at most only minimally. The City's confused approach to this case led the district court to make legal errors on several fronts: (1) the organizational plaintiffs' standing; (2) the nature of the plaintiffs' harm; (3) the scope of the Second Amendment right as recognized in *Heller* and applied to the States in *McDonald;* and (4) the structure and standards for judicial review of laws alleged to infringe Second Amendment rights.

**A. Standing**

We start with the organizational plaintiffs' standing. Article III restricts the judicial power to actual "Cases" and "Controversies," a limitation understood to confine the federal judiciary to "the **\*695** traditional role of Anglo-American courts, which is to redress or prevent actual or imminently threatened injury to persons caused by private or official violation of the law." *Summers v. Earth Island Inst.,* 555 U.S. 488, 129 S.Ct. 1142, 1148, 173 L.Ed.2d 1 (2009); *see also Lujan v. Defenders of Wildlife,* 504 U.S. 555, 559–60, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992); U.S. CONST. art. III, § 1. The doctrine of standing enforces this limitation. *Summers,* 129 S.Ct. at 1149; *Lujan,* 504 U.S. at 559–60, 112 S.Ct. 2130. "Standing exists when the plaintiff suffers an actual or impending injury, no matter how small; the injury is caused by the defendant's acts; and a judicial decision in the plaintiff's favor would redress the injury." *Bauer v. Shepard,* 620 F.3d 704, 708 (7th Cir.2010) (citing *Summers,* 129 S.Ct. 1142, and *Steel Co. v. Citizens for a Better Env't,* 523 U.S. 83, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998)).

We note first that the district court did not address the individual plaintiffs' standing, probably because it is not in serious doubt. Ezell, Hespen, and Brown are Chicago residents who own firearms and want to maintain proficiency in their use via target practice at a firing range. Ezell is the victim of three attempted burglaries and applied for a Chicago Firearm Permit to keep a handgun in her home for protection. Hespen is a retired Chicago police detective who maintains a collection of handguns, shotguns, and rifles. Brown is a U.S. Army veteran who was honorably discharged after service in World War II; he is currently chairman of the Marksmanship Committee of the Illinois unit of the American Legion and teaches a junior firearms course at an American Legion post outside the city. Ezell and Hespen left the city to complete the range training necessary to apply for a Permit to legalize their firearm possession in the city. Brown owns a firearm that he keeps outside the city's limits because he does not have a Permit.

The plaintiffs—all of them—frame their Second Amendment claim in two ways. First, they contend that the Amendment protects the right of law-abiding people to maintain proficiency in firearm use via marksmanship practice and the City's absolute ban on firing ranges violates this right. Second, they contend that the range ban impermissibly burdens the core Second Amendment right to possess firearms in the home for self-defense because it prohibits, everywhere in the city, the means of satisfying a condition the City imposes for lawful firearm possession. They seek a declaration that the range ban is invalid and an injunction blocking its enforcement.

Ezell and Hespen took affirmative steps to comply with the Ordinance's permitting process by completing the range-training requirement outside the city. Brown did not, so he must keep his firearm outside the city to avoid violating the Ordinance. For all three the City's ban on firing ranges inflicts continuous harm to their claimed right to engage in range training and interferes with their right to possess firearms for self-defense. These injuries easily support Article III standing.

Moreover, this is a pre-enforcement challenge to the Ordinance. The plaintiffs contend that the City's ban on firing ranges is wholly incompatible with the Second Amendment. It is well-established that "pre-enforcement challenges ... are within Article III." *Brandt v. Vill. of Winnetka, Ill.,* 612 F.3d 647, 649 (7th Cir.2010). The plaintiffs need not violate the Ordinance and risk prosecution in order to challenge it.

WESTLAW © 2020 Thomson Reuters. No claim to original U.S. Government Works.    5

*Schirmer v. Nagode,* 621 F.3d 581, 586 (7th Cir.2010) ("A person need not risk arrest before bringing a pre-enforcement challenge...."). The very "existence of a statute implies a threat to **\*696** prosecute, so pre-enforcement challenges are proper, because a probability of future injury counts as 'injury' for the purpose of standing." *Bauer,* 620 F.3d at 708. The City did not question the individual plaintiffs' standing; their injury is clear.

Regarding the organizational plaintiffs, however, the City's argument led the district court astray. The City emphasized that the Second Amendment protects an individual right, not an organizational one, and this point led the court to conclude that "the organizations do not have the necessary standing to demonstrate their irreparable harm."[7] This was error. Action Target, as a supplier of firing-range facilities, is harmed by the firing-range ban and is also permitted to "act[ ] as [an] advocate[ ] of the rights of third parties who seek access to" its services. *See Craig v. Boren,* 429 U.S. 190, 195, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976) (allowing beer vendor to challenge alcohol regulation based on its patrons' equal-protection rights); *see also Pierce v. Soc'y of Sisters,* 268 U.S. 510, 536, 45 S.Ct. 571, 69 L.Ed. 1070 (1925) (allowing private schools to assert parents' rights to direct the education of their children and citing "other cases where injunctions have issued to protect business enterprises against interference with the freedom of patrons or customers"); *MainStreet Org. of Realtors v. Calumet City,* 505 F.3d 742, 746–47 (7th Cir.2007). The Second Amendment Foundation and the Illinois Rifle Association have many members who reside in Chicago and easily meet the requirements for associational standing: (1) their members would otherwise have standing to sue in their own right; (2) the interests the associations seek to protect are germane to their organizational purposes; and (3) neither the claim asserted nor the relief requested requires the participation of individual association members in the lawsuit. *See United Food & Commercial Workers Union Local 751 v. Brown Group,* 517 U.S. 544, 553, 116 S.Ct. 1529, 134 L.Ed.2d 758 (1996); *Hunt v. Wash. State Apple Adver. Comm'n,* 432 U.S. 333, 343, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977); *Disability Rights Wis. v. Walworth Cnty. Bd. of Supervisors,* 522 F.3d 796, 801–02 (7th Cir.2008).

The district court held in the alternative that the organizational plaintiffs "failed to present sufficient evidence to support

their position that their constituency has been unable to comply with the statute." More specifically, the court held that the plaintiffs failed to produce "evidence of any one resident [of Chicago] who has been unable to travel to ... a range [or] has been unable to obtain [the] range training" required for a Permit. It's not clear whether these observations were directed at standing or the merits of the motion for a preliminary injunction; this discussion appears in the court's evaluation of irreparable harm. Either way, the point is irrelevant. Nothing depends on this kind of evidence. The availability of range training outside the city neither defeats the organizational plaintiffs' standing nor has anything to do with merits of the claim. The question is not whether or how easily Chicago residents can comply with the range-training requirement by traveling **\*697** outside the city; the plaintiffs are not seeking an injunction against the range-training requirement. The pertinent question is whether the Second Amendment prevents the City Council from banning firing ranges everywhere in the city; that ranges are present in neighboring jurisdictions has no bearing on this question.

**B. Irreparable Harm and Adequacy of Remedy at Law**

The City's misplaced focus on the availability of firing ranges outside the city also infected the district court's evaluation of irreparable harm. The judge's primary reason for rejecting the plaintiffs' request for a preliminary injunction was that they had "failed to establish the irreparable harm they have suffered by requiring them to travel outside of the [c]ity's borders to obtain their firing[-]range permits." The judge thus framed the relevant harm as strictly limited to incidental travel burdens associated with satisfying the Ordinance's range-training requirement. The judge noted that for at least some —perhaps many—Chicago residents, complying with the range-training requirement did not appear to pose much of a hardship at all. She observed that it might actually be easier for some Chicagoans to travel to a firing range in the suburbs than to one located, say, at the opposite end of the city if ranges were permitted to locate within city limits. The judge thought it significant that none of the individual plaintiffs had "testif[ied] that s/he was unable to travel outside of the [c]ity's borders to obtain the one-hour range training and all three have shown that they are capable of doing so and have done so in the past." The court held that although the Ordinance may force the plaintiffs to travel longer distances to use a firing range, this was a "quantifiable expense that can be easily calculated as damages."

This reasoning assumes that the harm to a constitutional right is measured by the extent to which it can be exercised

in another jurisdiction. That's a profoundly mistaken assumption. In the First Amendment context, the Supreme Court long ago made it clear that " ' one is not to have the exercise of his liberty of expression in appropriate places abridged on the plea that it may be exercised in some other place.' " *Schad v. Borough of Mt. Ephraim,* 452 U.S. 61, 76–77, 101 S.Ct. 2176, 68 L.Ed.2d 671 (1981) (quoting *Schneider v. State of New Jersey,* 308 U.S. 147, 163, 60 S.Ct. 146, 84 L.Ed. 155 (1939)). The same principle applies here. It's hard to imagine anyone suggesting that Chicago may prohibit the exercise of a free-speech or religious-liberty right within its borders on the rationale that those rights may be freely enjoyed in the suburbs. That sort of argument should be no less unimaginable in the Second Amendment context.

Focusing on individual travel harms was mistaken for another equally fundamental reason. The plaintiffs have challenged the firing-range ban on its face, not merely as applied in their particular circumstances. In a facial constitutional challenge, individual application facts do not matter. Once standing is established, the plaintiff's personal situation becomes irrelevant. It is enough that "[w]e have only the [statute] itself" and the "statement of basis and purpose that accompanied its promulgation." *Reno v. Flores,* 507 U.S. 292, 300–01, 113 S.Ct. 1439, 123 L.Ed.2d 1 (1993); *see also* Nicholas Quinn Rosenkranz, *The Subjects of the Constitution,* 62 STAN. L.REV. 1209, 1238 (2010) ("[F]acial challenges are to constitutional law what res ipsa loquitur is to facts— in a facial challenge, *lex ipsa loquitur:* the law speaks for itself."); David L. Franklin, *Facial Challenges, Legislative Purpose,* **\*698** *and the Commerce Clause,* 92 IOWA L.REV. 41, 58 (2006) ("A valid-rule facial challenge asserts that a statute is invalid on its face as written and authoritatively construed, when measured against the applicable substantive constitutional doctrine, without reference to the facts or circumstances of particular applications."); Mark E. Isserles, *Overcoming Overbreadth: Facial Challenges and the Valid Rule Requirement,* 48 AM. U.L.REV. 359, 387 (1998) ("[A] valid rule facial challenge directs judicial scrutiny to the terms of the statute itself, and demonstrates that those terms, measured against the relevant constitutional doctrine, and independent of the constitutionality of particular applications, contains a constitutional infirmity that invalidates the statute in its entirety.").

Though she did not specifically mention it, the judge might have had the *Salerno* principle in mind when she limited her focus to individual travel harms. Under *Salerno* a law is not

facially unconstitutional unless it "is unconstitutional in all of its applications." *Wash. State Grange v. Wash. State Republican Party,* 552 U.S. 442, 449, 128 S.Ct. 1184, 170 L.Ed.2d 151 (2008) (citing *United States v. Salerno,* 481 U.S. 739, 745, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987)). Stated differently, "[a] person to whom a statute properly applies can't obtain relief based on arguments that a differently situated person might present."[8] *United States v. Skoien,* 614 F.3d 638, 645 (7th Cir.2010) (en banc) (citing *Salerno,* 481 U.S. at 745, 107 S.Ct. 2095).

Here, the judge zeroed in on the occasional expense and inconvenience of having to travel to a firing range in the suburbs, but that's not the relevant constitutional harm. The plaintiffs contend that the Second Amendment protects the right to maintain proficiency in firearm use—including the right to train at a range—and the City's complete ban on range training violates this right. They also claim that the range ban impermissibly burdens the core Second Amendment right to possess firearms at home for protection because the Ordinance conditions lawful possession on range training but makes it impossible to satisfy this condition anywhere in the city. If they're right, then the range ban was unconstitutional when enacted and violates their Second Amendment rights every day it remains on the books. These are not application-specific harms calling for individual remedies.

In a facial challenge like this one, the claimed constitutional violation inheres in the terms of the statute, not its application. *See* Rosenkranz, *The Subjects of the Constitution,* 62 STAN. L.REV. at 1229–38. The remedy is necessarily directed at the statute itself and *must* be injunctive and declaratory; a successful facial attack means the statute is wholly invalid and cannot be applied *to anyone.* Chicago's law, if unconstitutional, is unconstitutional *without regard* to its application—or *in all* **\*699** its applications, as *Salerno* requires. That is, the City Council violated the Second Amendment when it made this law; its very existence stands as a fixed harm to every Chicagoan's Second Amendment right to maintain proficiency in firearm use by training at a range. This kind of constitutional harm is not measured by whether a particular person's gasoline or mass-transit bill is higher because he must travel to a firing range in the suburbs rather than one in the city, as the district court seemed to think. Whatever else the *Salerno* principle might mean for this case, it neither requires nor supports the district court's approach to irreparable harm.[9]

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.   7

Beyond this crucial point about the form of the claim, for some kinds of constitutional violations, irreparable harm is presumed. *See* 11A CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE & PROCEDURE § 2948.1 (2d ed. 1995) ("When an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary."). This is particularly true in First Amendment claims. *See, e.g.,* Christian Legal Soc'y, 453 F.3d at 867 ("[V]iolations of First Amendment rights are presumed to constitute irreparable injuries...." (citing Elrod v. Burns, 427 U.S. 347, 373, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976))). The loss of a First Amendment right is frequently presumed to cause irreparable harm based on "the intangible nature of the benefits flowing from the exercise of those rights; and the fear that, if those rights are not jealously safeguarded, persons will be deterred, even if imperceptibly, from exercising those rights in the future." Miles Christi Religious Order v. Twp. of Northville, 629 F.3d 533, 548 (6th Cir.2010) (internal alteration and quotation marks omitted); *see also* KH Outdoor, LLC v. City of Trussville, 458 F.3d 1261, 1272 (11th Cir.2006). The Second Amendment protects similarly intangible and unquantifiable interests. *Heller* held that the Amendment's central component is the right to possess firearms for protection. 554 U.S. at 592–95, 128 S.Ct. 2783. Infringements of this right cannot be compensated by damages.[10]

**\*700** In short, for reasons related to the form of the claim and the substance of the Second Amendment right, the plaintiffs' harm is properly regarded as irreparable and having no adequate remedy at law.

## C. Likelihood of Success on the Merits

Having rejected the plaintiffs' claim of irreparable harm, the district court only summarily addressed whether they were likely to succeed on the merits. Early on in her decision, the judge said she would not apply intermediate scrutiny to evaluate the constitutionality of the range ban—and by implication, rejected *any* form of heightened review. When she later returned to the merits, the judge suggested that banning range training might not implicate anyone's Second Amendment rights *at all*. She observed that although Chicago requires range training as a prerequisite to firearm possession, "the City does not have the ability to create a Constitutional

right to that training." Instead, the judge thought the key question was "whether the individual's right to possess firearms within his residence expands to the right to train with that same firearm in a firing range located within the [c]ity's borders." This statement of the question ends the court's discussion of the merits.

There are several problems with this analysis. First, it is incomplete. The judge identified but did not evaluate the Second Amendment merits question. More importantly, the court framed the inquiry the wrong way. Finally, it was a mistake to reject heightened scrutiny. The judge was evidently concerned about the novelty of Second Amendment litigation and proceeded from a default position in favor of the City. The concern is understandable, but the default position cannot be reconciled with *Heller*.

### 1. *Heller, McDonald,* and a framework for Second Amendment litigation

It's true that Second Amendment litigation is new, and Chicago's ordinance is unlike any firearms law that has received appellate review since *Heller*. But that doesn't mean we are without a framework for how to proceed. The Supreme Court's approach to deciding *Heller* points in a general direction. Although the critical question in *Heller*—whether the Amendment secures an individual or collective right—was interpretive rather than doctrinal, the Court's decision method is instructive.

With little precedent to synthesize, *Heller* focused almost exclusively on the original public meaning of the Second Amendment, consulting the text and relevant historical materials to determine how the Amendment was understood at the time of ratification. This inquiry led the Court to conclude that the Second Amendment secures a pre-existing natural right to keep and bear arms; that the right is personal and not limited to militia service; and that the "central component of the right" is the right of armed self-defense,

**\*701** most notably in the home. Heller, 554 U.S. at 595, 599–600, 128 S.Ct. 2783; *see also* McDonald, 130 S.Ct. at 3036–37, 3044. On this understanding the Court invalidated the District of Columbia's ban on handgun possession, as well as its requirement that all firearms in the home be kept inoperable. Heller, 554 U.S. at 629–35, 128 S.Ct. 2783. The Court said these laws were unconstitutional "[u]nder any ... standard[ ] of scrutiny" because "the inherent right of self-defense has been central to the Second Amendment

right" and the District's restrictions "extend[ ] ... to the home, where the need for defense of self, family, and property is most acute." *Id.* at 628–29, 128 S.Ct. 2783. That was enough to decide the case. The Court resolved the Second Amendment challenge in *Heller* without specifying any doctrinal "test" for resolving future claims.

For our purposes, however, we know that *Heller's* reference to "any standard of scrutiny" means any *heightened* standard of scrutiny; the Court specifically excluded rational-basis review. *Id.* at 628–29 & n. 27, 128 S.Ct. 2783 ("If all that was required to overcome the right to keep and bear arms was a rational basis, the Second Amendment would be redundant with the separate constitutional prohibitions on irrational laws, and would have no effect."); *see also* *Skoien,* 614 F.3d at 641 ("If a rational basis were enough [to justify a firearms law], the Second Amendment would not do anything ... because a rational basis is essential for legislation in general."). Beyond that, the Court was not explicit about how Second Amendment challenges should be adjudicated now that the historic debate about the Amendment's status as an individual-rights guarantee has been settled. *Heller,* 554 U.S. at 635, 128 S.Ct. 2783 ("[S]ince this case represents this Court's first in-depth examination of the Second Amendment, one should not expect it to clarify the entire field...."). Instead, the Court concluded that "whatever else [the Second Amendment] leaves to future evaluation, it surely elevates above all other interests the right of law-abiding, responsible citizens to use arms in defense of hearth and home." *Id.*

And in a much-noted passage, the Court carved out some exceptions:

> [N]othing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms.

*Id.* at 626–27, 128 S.Ct. 2783. The Court added that this list of "presumptively lawful regulatory measures" was illustrative, not exhaustive. *Id.* at 627 n. 26, 128 S.Ct. 2783; *see also* *McDonald,* 130 S.Ct. at 3047 (repeating *Heller's* "assurances" about exceptions).

These now-familiar passages from *Heller* hold several key insights about judicial review of laws alleged to infringe Second Amendment rights. First, the threshold inquiry in some Second Amendment cases will be a "scope" question: Is the restricted activity protected by the Second Amendment in the first place? *See* Eugene Volokh, *Implementing the Right to Keep and Bear Arms for Self–Defense: An Analytical Framework and a Research Agenda,* 56 UCLA L.REV. 1443, 1449. The answer requires a textual and historical inquiry into original meaning. *Heller,* 554 U.S. at 634–35, 128 S.Ct. 2783 ("Constitutional rights are enshrined with the scope they were understood to have when the people adopted them, whether or not future legislatures or (yes) even future judges think that scope too broad."); *McDonald,* **\*702** 130 S.Ct. at 3047 ("[T]he scope of the Second Amendment right" is determined by textual and historical inquiry, not interest-balancing.).

*McDonald* confirms that when state- or local-government action is challenged, the focus of the original-meaning inquiry is carried forward in time; the Second Amendment's scope as a limitation on the States depends on how the right was understood when the Fourteenth Amendment was ratified. *See* *McDonald,* 130 S.Ct. at 3038–42. Setting aside the ongoing debate about which part of the Fourteenth Amendment does the work of incorporation, and how, *see* *id.* at 3030–31 (plurality opinion of Alito, J.); *id.* at 3058–80 (Thomas, J., concurring); *id.* at 3089–99 (Stevens, J., dissenting); *id.* at 3120–21 (Breyer, J., dissenting), this wider historical lens is required if we are to follow the Court's lead in resolving questions about the scope of the Second Amendment by consulting its original public meaning as both a starting point and an important constraint on the analysis. *See* *Heller,* 554 U.S. at 610–19, 128 S.Ct. 2783; *McDonald,* 130 S.Ct. at 3038–42. [11]

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.   9

The Supreme Court's free-speech jurisprudence contains a parallel for this kind of threshold "scope" inquiry. The Court has long recognized that certain "well-defined and narrowly limited classes of speech"—e.g., obscenity, defamation, fraud, incitement—are categorically "outside the reach" of the First Amendment. *United States v. Stevens,* 559 U.S. 460, 130 S.Ct. 1577, 1584–85, 176 L.Ed.2d 435 (2010); *see also Brown v. Entm't Merchants Ass'n,* —— U.S. ——, 131 S.Ct. 2729, 2733–35, 180 L.Ed.2d 708 (2011). When the Court has "identified categories of speech as fully outside the protection of the First Amendment, it has not been on the basis of a simple cost-benefit analysis." *Stevens,* 130 S.Ct. at 1586. Instead, some categories of speech are unprotected as a matter of history and legal tradition. *Id.* So too with the Second Amendment. *Heller* suggests that some federal gun laws will survive Second Amendment challenge because they regulate activity falling outside the terms of the right as publicly understood when the Bill of Rights was ratified; *McDonald* confirms that if the claim concerns a state or local law, the "scope" question asks how the right was publicly understood when the Fourteenth Amendment was proposed and ratified. *Heller,* 554 U.S. at 625–28, 128 S.Ct. 2783; *McDonald,* 130 S.Ct. at 3038–47. Accordingly, if the government can establish that a challenged firearms law regulates activity **\*703** falling outside the scope of the Second Amendment right as it was understood at the relevant historical moment—1791 or 1868—then the analysis can stop there; the regulated activity is categorically unprotected, and the law is not subject to further Second Amendment review.

If the government cannot establish this—if the historical evidence is inconclusive or suggests that the regulated activity is *not* categorically unprotected—then there must be a second inquiry into the strength of the government's justification for restricting or regulating the exercise of Second Amendment rights. *Heller*'s reference to "any ... standard[ ] of scrutiny" suggests as much. 554 U.S. at 628–29, 128 S.Ct. 2783. *McDonald* emphasized that the Second Amendment "limits[,] but by no means eliminates," governmental discretion to regulate activity falling within the scope of the right. 130 S.Ct. at 3046 (emphasis and parentheses omitted). Deciding whether the government has transgressed the limits imposed by the Second Amendment —that is, whether it has "infringed" the right to keep and bear arms—requires the court to evaluate the regulatory means the government has chosen and the public-benefits

end it seeks to achieve. Borrowing from the Court's First Amendment doctrine, the rigor of this judicial review will depend on how close the law comes to the core of the Second Amendment right and the severity of the law's burden on the right. *See generally,* Volokh, *Implementing the Right to Keep and Bear Arms for Self–Defense,* 56 UCLA L.REV. at 1454–72 (explaining the scope, burden, and danger-reduction justifications for firearm regulations post-*Heller* ); Nelson Lund, *The Second Amendment,* Heller, *and Originalist Jurisprudence,* 56 UCLA L.REV. 1343, 1372–75 (2009); Adam Winkler, Heller's *Catch–22,* 56 UCLA L.REV. 1551, 1571–73 (2009); Lawrence B. Solum, District of Columbia v. Heller *and Originalism,* 103 NW. U.L.REV. 923, 979–80 (2009); Glenn H. Reynolds & Brannon P. Denning, Heller's *Future in the Lower Courts,* 102 NW. U.L.REV. 2035, 2042–44 (2008).

Both *Heller* and *McDonald* suggest that broadly prohibitory laws restricting the core Second Amendment right—like the handgun bans at issue in those cases, which prohibited handgun possession even in the home—are categorically unconstitutional. *Heller,* 554 U.S. at 628–35, 128 S.Ct. 2783 ("We know of no other enumerated constitutional right whose core protection has been subjected to a freestanding 'interest-balancing' approach."); *McDonald,* 130 S.Ct. at 3047–48. For all other cases, however, we are left to choose an appropriate standard of review from among the heightened standards of scrutiny the Court applies to governmental actions alleged to infringe enumerated constitutional rights; the answer to the Second Amendment "infringement" question depends on the government's ability to satisfy whatever standard of means-end scrutiny is held to apply.

The approach outlined here does not undermine *Skoien,* 614 F.3d at 639–43, or *United States v. Williams,* 616 F.3d 685, 691–93 (7th Cir.2010), both of which touched on the historical "scope" question before applying a form of intermediate scrutiny. And this general framework has been followed by the Third, Fourth, and Tenth Circuits in other Second Amendment cases.[12] *See United States v. Marzzarella,* **\*704** 614 F.3d 85, 89 (3d Cir.2010) ("As we read *Heller,* it suggests a two-pronged approach to Second Amendment challenges. First, we ask whether the challenged law imposes a burden on conduct falling within the scope of the Second Amendment's guarantee.... If it does not, our inquiry is complete. If it does, we evaluate the law

under some form of means-end scrutiny."); *United States v. Chester,* 628 F.3d 673, 680 (4th Cir.2010) (A "two-part approach to Second Amendment claims seems appropriate under *Heller,* as explained by ... the now-vacated *Skoien* panel opinion...."); *United States v. Reese,* 627 F.3d 792, 800–01 (10th Cir.2010) (same). Each of these cases involved a Second Amendment challenge asserted as a defense to a federal prosecution under 18 U.S.C. § 922, but we think the same principles apply here. *McDonald* reiterated that the Court has long since "abandoned 'the notion that the Fourteenth Amendment applies to the States only a watered-down, subjective version of the individual guarantees of the Bill of Rights.' " 130 S.Ct. at 3035 (quoting *Malloy v. Hogan,* 378 U.S. 1, 10–11, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964)).

### 2. Applying the framework to Chicago's firing-range ban

The plaintiffs challenge only the City's ban on firing ranges, so our first question is whether range training is categorically unprotected by the Second Amendment. *Heller* and *McDonald* suggest to the contrary. The Court emphasized in both cases that the "central component" of the Second Amendment is the right to keep and bear arms for defense of self, family, and home. *Heller,* 554 U.S. at 599, 128 S.Ct. 2783; *McDonald,* 130 S.Ct. at 3048. The right to possess firearms for protection implies a corresponding right to acquire and maintain proficiency in their use; the core right wouldn't mean much without the training and practice that make it effective. Several passages in *Heller* support this understanding. Examining post-Civil War legal commentaries to confirm the founding-era "individual right" understanding of the Second Amendment, the Court quoted at length from the "massively popular 1868 Treatise on Constitutional Limitations" by judge and professor Thomas Cooley: "[T]o bear arms implies something more than the mere keeping; it implies the learning to handle and use them ...; it implies the right to meet for voluntary discipline in arms, observing in doing so the laws of public order." 554 U.S. at 616, 617–18, 128 S.Ct. 2783 (internal quotation marks omitted); *see also id.* at 619, 128 S.Ct. 2783 (" 'No doubt, a citizen who keeps a gun or pistol under judicious precautions, practices in safe places the use of it, and in due time teaches his sons to do the same, exercises his individual right.' " (quoting BENJAMIN

VAUGHAN ABBOTT, JUDGE AND JURY: A POPULAR EXPLANATION OF THE LEADING TOPICS IN THE LAW OF THE LAND 333 (1880))).

Indeed, the City considers live firing-range training so critical to responsible **\*705** firearm ownership that it mandates this training as a condition of lawful firearm possession. At the same time, however, the City insists in this litigation that range training is categorically outside the scope of the Second Amendment and may be completely prohibited. There is an obvious contradiction here, but we will set it aside for the moment and consider the City's support for its categorical position. The City points to a number of founding-era, antebellum, and Reconstruction state and local laws that limited the discharge of firearms in urban environments. As we have noted, the most relevant historical period for questions about the scope of the Second Amendment as applied to the States is the period leading up to and surrounding the ratification of the Fourteenth Amendment. That point aside, most of the statutes cited by the City are not specific to controlled target practice and, in any event, contained significant carveouts and exemptions.

For example, the City cites a 1790 Ohio statute that prohibited the discharge of a firearm before sunrise, after sunset, or within one-quarter of a mile from the nearest building. Act of Aug. 4, 1790, Ch. XIII, § 4, in 1 The Statutes of Ohio and of the Northwestern Territory 104 (Chase ed. 1833). This statute is not directly related to controlled target practice. A similar 1746 statute limiting the discharge of firearms in Boston provided an exception for target practice: City residents could "fir[e] at a Mark or Target for the Exercise of their Skill and Judgment ... at the lower End of the Common" if they obtained permission from the "Field Officers of the Regiment in Boston"; they could also "fir[e] at a Mark from the Several Batteries in" Boston with permission from the "Captain General." Act of May 28, 1746, Ch. X, in Acts and Laws of the Massachusetts Bay 208 (Kneeland ed. 1746).

The City cites other eighteenth- and nineteenth-century statutes regulating the discharge of firearms in cities, but most of these allowed citizens to obtain a permit or license to engage in firearms practice from the governor or city council. [13] That was the case under the Philadelphia Act of August 26, 1721, § 4, one of the very statutes the Supreme Court considered in *Heller* and deemed "a licensing regime." 554 U.S. at 633, 128 S.Ct. 2783. In short, these laws were merely *regulatory* measures, distinguishable from the City's

absolute *prohibition* on firing ranges. *See* 📌 *id.* at 574, 632, 128 S.Ct. 2783, (founding-era statute that "restricted the firing of guns within the city limits to at least some degree" did not support the District of Columbia's "general[ ] prohibit[ion] on the **\*706** possession of handguns"). These "time, place, and manner" regulations do not support the City's position that target practice is categorically unprotected.

To be sure, a few of the eighteenth- and nineteenth-century statutes cited by the City might accurately be described as general prohibitions on discharging firearms within cities. Three of these, however, had clear fire-suppression purposes and do not support the proposition that target practice at a safely sited and properly equipped firing range enjoys no Second Amendment protection whatsoever. [14] Only two— a Baltimore statute from 1826 and an Ohio statute from 1831—flatly prohibited the discharge of firearms based on concerns unrelated to fire suppression, in contrast to the other regulatory laws we have mentioned. [15] *Cf.* 📌 *Heller,* 554 U.S. at 632, 128 S.Ct. 2783 ("[W]e would not stake our interpretation of the Second Amendment upon a single law ... that contradicts the overwhelming weight of other evidence...."). This falls far short of establishing that target practice is wholly outside the Second Amendment as it was understood when incorporated as a limitation on the States.

We proceed, then, to the second inquiry, which asks whether the City's restriction on range training survives Second Amendment scrutiny. As we have explained, this requires us to select an appropriate standard of review. Although the Supreme Court did not do so in either *Heller* or *McDonald,* the Court *did* make it clear that the deferential rational-basis standard is out, and with it the presumption of constitutionality. 📌 *Heller,* 554 U.S. at 628 n. 27, 128 S.Ct. 2783 (citing 📌 *United States v. Carolene Prods.,* 304 U.S. 144, 152 n. 4, 58 S.Ct. 778, 82 L.Ed. 1234 (1938)). This necessarily means that the City bears the burden of justifying its action under *some* heightened standard of judicial review.

The district court specifically decided against an intermediate standard of scrutiny but did not settle on any other, then sided with the City "even if" intermediate scrutiny applied. A choice must be made. The City urges us to import the "undue burden" test from the Court's abortion cases, *see, e.g.,* 📌 *Planned Parenthood of Se. Pa. v. Casey,* 505 U.S. 833, 876–79, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992), but we decline the invitation. Both *Heller* and *McDonald* suggest

that First Amendment analogues are more appropriate, *see* 📌 *Heller,* 554 U.S. at 582, 595, 635, 128 S.Ct. 2783; 📌 *McDonald,* 130 S.Ct. at 3045, and on the strength of that suggestion, we and other circuits have already begun to adapt First Amendment doctrine to the Second **\*707** Amendment context, *see* 📌 *Skoien,* 614 F.3d at 641; 📌 *id.* at 649 (Sykes, J., dissenting); 📌 *Chester,* 628 F.3d at 682; 📌 *Marzzarella,* 614 F.3d at 89 n. 4; *see also* Volokh, *Implementing the Right to Keep and Bear Arms for Self–Defense,* 56 UCLA L.REV. at 1449, 1452, 1454–55; Lund, *The Second Amendment, Heller, and Originalist Jurisprudence,* 56 UCLA L.REV. at 1376; Winkler, Heller's *Catch–22,* 56 UCLA L.REV. at 1572.

In free-speech cases, the applicable standard of judicial review depends on the nature and degree of the governmental burden on the First Amendment right and sometimes also on the specific iteration of the right. For example, "[c]ontent-based regulations are presumptively invalid," 📌 *R.A.V. v. City of St. Paul,* 505 U.S. 377, 382, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992), and thus get strict scrutiny, which means that the law must be narrowly tailored to serve a compelling governmental interest, 📌 *id.* at 395, 112 S.Ct. 2538; *see also* 📌 *Ariz. Free Enter. Club's Freedom Club PAC v. Bennett,* —— U.S. ——, 131 S.Ct. 2806, 2816–17, 180 L.Ed.2d 664 (2011). Likewise, "[l]aws that burden political speech are subject to strict scrutiny." 📌 *Citizens United v. Fed. Election Comm'n,* 558 U.S. 310, 130 S.Ct. 876, 898, 175 L.Ed.2d 753 (2010) (internal quotation marks omitted). On the other hand, "time, place, and manner" regulations on speech need only be "reasonable" and "justified without reference to the content of the regulated speech." 📌 *Ward v. Rock Against Racism,* 491 U.S. 781, 791, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989). The Supreme Court also uses a tiered standard of review in its speech-forum doctrine; regulations in a traditional public or designated public forum get strict scrutiny, while regulations in a nonpublic forum "must not discriminate on the basis of viewpoint and 'must be reasonable in light of the forum's purpose.'" 📌 *Choose Life Ill., Inc. v. White,* 547 F.3d 853, 864 (7th Cir.2008) (quoting 📌 *Good News Club v. Milford Cent. Sch.,* 533 U.S. 98, 106–07, 121 S.Ct. 2093, 150 L.Ed.2d 151 (2001)).

In election-law cases, regulations affecting the expressive association rights of voters, candidates, and parties are subject to a fluctuating standard of review that varies with the severity

of the burden on the right; laws imposing severe burdens get strict scrutiny, while more modest regulatory measures need only be reasonable, politically neutral, and justified by an important governmental interest. *See Crawford v. Marion Cnty. Election Bd.,* 553 U.S. 181, 190–91, 128 S.Ct. 1610, 170 L.Ed.2d 574 (2008); *Wash. State Grange,* 552 U.S. at 451–52, 128 S.Ct. 1184; *Burdick v. Takushi,* 504 U.S. 428, 434, 112 S.Ct. 2059, 119 L.Ed.2d 245 (1992); *Lee v. Keith,* 463 F.3d 763, 768 (7th Cir.2006). "First Amendment challenges to disclosure requirements in the electoral context"—for example, laws compelling the disclosure of the names of petition signers—are reviewed "under what has been termed 'exacting scrutiny.' " *Doe v. Reed,* 561 U.S. 186, 130 S.Ct. 2811, 2818, 177 L.Ed.2d 493 (2010). This standard of review requires "a substantial relation between the disclosure requirement and a sufficiently important governmental interest," and "the strength of the governmental interest must reflect the seriousness of the actual burden on First Amendment rights." *Id.* (internal quotation marks omitted).

Similarly, restrictions imposed on adult bookstores are reviewed under an intermediate standard of scrutiny that requires the municipality to present "evidence that the restrictions actually have public benefits great enough to justify any curtailment of speech." *Annex Books, Inc. v. City of Indianapolis,* 581 F.3d 460, 462 (7th Cir.2009) (citing *Los Angeles v.* **\*708** *Alameda Books, Inc.,* 535 U.S. 425, 122 S.Ct. 1728, 152 L.Ed.2d 670 (2002), and *Renton v. Playtime Theatres, Inc.,* 475 U.S. 41, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986)). And in commercial-speech cases, the Court applies an intermediate standard of review that accounts for the "subordinate position" that commercial speech occupies "in the scale of First Amendment values." *Bd. of Trs. of State Univ. of N.Y. v. Fox,* 492 U.S. 469, 477, 109 S.Ct. 3028, 106 L.Ed.2d 388 (1989). In this context intermediate scrutiny requires "a fit between the legislature's ends and the means chosen to accomplish those ends, ... a fit that is not necessarily perfect, but reasonable; that represents not necessarily the single best disposition but one whose scope is in proportion to the interest served." *Id.* at 480, 109 S.Ct. 3028 (internal quotation marks and citation omitted); *see also Sorrell v. IMS Health Inc.,* ––– U.S. ––––, 131 S.Ct. 2653, 2667–68, 180 L.Ed.2d 544 (2011) (To justify commercial-speech restrictions, "the State must

show at least that the statute directly advances a substantial governmental interest and that the measure is drawn to achieve that interest.").

Labels aside, we can distill this First Amendment doctrine and extrapolate a few general principles to the Second Amendment context. First, a severe burden on the core Second Amendment right of armed self-defense will require an extremely strong public-interest justification and a close fit between the government's means and its end. Second, laws restricting activity lying closer to the margins of the Second Amendment right, laws that merely regulate rather than restrict, and modest burdens on the right may be more easily justified. How much more easily depends on the relative severity of the burden and its proximity to the core of the right.

In *Skoien* we required a "form of strong showing"—a/k/a "intermediate scrutiny"—in a Second Amendment challenge to a prosecution under 18 U.S.C. § 922(g)(9), which prohibits the possession of firearms by persons convicted of a domestic-violence misdemeanor. 614 F.3d at 641. We held that "logic and data" established a "substantial relation" between dispossessing domestic-violence misdemeanants and the important governmental goal of "preventing armed mayhem." *Id.* at 642. Intermediate scrutiny was appropriate in *Skoien* because the claim was not made by a "law-abiding, responsible citizen" as in *Heller,* 554 U.S. at 635, 128 S.Ct. 2783; nor did the case involve the central self-defense component of the right, *Skoien,* 614 F.3d at 645.

Here, in contrast, the plaintiffs *are* the "law-abiding, responsible citizens" whose Second Amendment rights are entitled to full solicitude under *Heller,* and their claim comes much closer to implicating the core of the Second Amendment right. The City's firing-range ban is not merely regulatory; it *prohibits* the "law-abiding, responsible citizens" of Chicago from engaging in target practice in the controlled environment of a firing range. This is a serious encroachment on the right to maintain proficiency in firearm use, an important corollary to the meaningful exercise of the core right to possess firearms for self-defense. That the City conditions gun possession on range training is an additional reason to closely scrutinize the range ban. All this suggests that a more rigorous showing than that applied in *Skoien* should be required, if not quite "strict scrutiny." To be appropriately respectful of the individual rights at issue in this case, the City bears the burden of establishing a strong

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.   13

public-interest justification for its ban on range training: The City must establish a close fit between the **\*709** range ban and the actual public interests it serves, and also that the public's interests are strong enough to justify so substantial an encumbrance on individual Second Amendment rights. Stated differently, the City must demonstrate that civilian target practice at a firing range creates such genuine and serious risks to public safety that prohibiting range training throughout the city is justified.

At this stage of the proceedings, the City has not come close to satisfying this standard. In the district court, the City presented no data or expert opinion to support the range ban, so we have no way to evaluate the seriousness of its claimed public-safety concerns. Indeed, on this record those concerns are entirely speculative and, in any event, can be addressed through sensible zoning and other appropriately tailored regulations. That much is apparent from the testimony of the City's own witnesses, particularly Sergeant Bartoli, who testified to several common-sense range safety measures that could be adopted short of a complete ban.

The City maintains that firing ranges create the risk of accidental death or injury and attract thieves wanting to steal firearms. But it produced no evidence to establish that these are realistic concerns, much less that they warrant a total prohibition on firing ranges. In the First Amendment context, the government must supply actual, reliable evidence to justify restricting protected expression based on secondary public-safety effects. *See* Alameda Books, Inc., 535 U.S. at 438, 122 S.Ct. 1728 (A municipality defending zoning restrictions on adult bookstores cannot "get away with shoddy data or reasoning. The municipality's evidence must fairly support the municipality's rationale for its ordinance."); *see also* Annex Books, Inc. v. City of Indianapolis, 624 F.3d 368, 369 (7th Cir.2010) (affirming preliminary injunction where a city's "empirical support for [an] ordinance [limiting the hours of operation of an adult bookstore] was too weak"); New Albany DVD, LLC v. City of New Albany, 581 F.3d 556, 560–61 (7th Cir.2009) (affirming preliminary injunction where municipality offered only "anecdotal justifications" for adult zoning regulation and emphasizing the necessity of assessing the seriousness of the municipality's concerns about litter and theft).

By analogy here, the City produced no empirical evidence whatsoever and rested its entire defense of the range ban on speculation about accidents and theft. Much of the focus in

the district court was on the possible hazards of mobile firing ranges. The City hypothesized that one cause of range-related injury could be stray bullets, but this seems highly implausible insofar as a properly equipped indoor firing range is concerned. The district court credited the plaintiffs' evidence that "mobile ranges are next to Sam's Clubs and residences and shopping malls and in parking lots, and there's not been any difficulties with them in those places." Commissioner Scudiero acknowledged that the law-enforcement and private-security firing ranges in Chicago are located near schools, churches, parks, and stores, and they operate safely in those locations. And Sergeant Bartoli testified about the availability of straightforward range-design measures that can effectively guard against accidental injury. He mentioned, for example, that ranges should be fenced and should designate appropriate locations for the loading and unloading of firearms. Other precautionary measures might include limiting the concentration of people and firearms in a range's facilities, the times when firearms can be loaded, and the types of ammunition allowed. *See also, e.g.,* NRA RANGE SOURCE BOOK (providing "basic and advanced guidance to **\*710** assist in the planning, design, construction and maintenance of shooting range facilities"), http://www.nrahq.org/shootingrange/sourcebook.asp (last visited June 2, 2011); FLA. STAT. § 823.16(6) (2011) (referencing the safety standards of the NRA *Range Source Book* ); KAN. ADMIN. REGS. § 115–22–1(b) (2011) (same); MINN.STAT. § 87A.02 (2010) (same); NEB.REV.STAT. § 37–1302(4) (2010) (same); OHIO ADMIN. CODE 1501: 31–29–03(D) (2011) (same).

At the preliminary-injunction hearing, the City highlighted an additional public-safety concern also limited to mobile ranges: the risk of contamination from lead residue left on range users' hands after firing a gun. Sergeant Bartoli was asked a series of questions about the importance of hand-washing after shooting; he said that "lucrative amounts of [cold running] water and soap" were required to ensure that lead contaminants were removed. The City argued below that mobile firing ranges might not be sufficiently equipped for this purpose, suggesting that mobile ranges would have inadequate restroom facilities and might have to rely on "port-a-potties." This sparked a discussion about the adequacy of the water supply available at a standard "port-a-potty." The City continued on this topic until the judge cut it short by acknowledging her own familiarity with "port-a-potties." On appeal the City raised but did not dwell on its concern about lead contamination. For good reason: It cannot be taken

WESTLAW     © 2020 Thomson Reuters. No claim to original U.S. Government Works.     14

seriously as a justification for banishing all firing ranges from the city. To raise it at all suggests pretext.

Perhaps the City can muster sufficient evidence to justify banning firing ranges everywhere in the city, though that seems quite unlikely. As the record comes to us at this stage of the proceedings, the firing-range ban is wholly out of proportion to the public interests the City claims it serves. Accordingly, the plaintiffs' Second Amendment claim has a strong likelihood of success on the merits.

### D. Balance of Harms

The remaining consideration for preliminary injunctive relief is the balance of harms. It should be clear from the foregoing discussion that the harms invoked by the City are entirely speculative and in any event may be addressed by more closely tailored regulatory measures. Properly regulated firing ranges open to the public should not pose significant threats to public health and safety. On the other side of the scale, the plaintiffs have established a strong likelihood that they are suffering violations of their Second Amendment rights every day the range ban is in effect. The balance of harms favors the plaintiffs.

The plaintiffs asked the district court to enjoin the enforcement of *Chicago Municipal Code* § 8–20–280—the prohibition on "[s]hooting galleries, firearm ranges, or any other place where firearms are discharged." They are entitled to a preliminary injunction to that effect. To be effective, however, the injunction must also prevent the City from enforcing other provisions of the Ordinance that operate indirectly to prohibit range training. The plaintiffs have identified several provisions of the Ordinance that implicate activities integral to range training: CHI. MUN.CODE §§ 8–20–020 (prohibiting the possession of handguns outside the home), 8–20–030 (prohibiting the possession of long guns outside the home or business), 8–20–080 (prohibiting the possession of ammunition without a corresponding Permit and registration certificate), 8–20–100 (prohibiting the transfer of firearms and ammunition except through inheritance), 8–24–010 (prohibiting the discharge of firearms except for self-defense, defense of another, **\*711** or hunting). To the extent that these provisions prohibit law-abiding, responsible citizens from using a firing range in the city, the preliminary injunction should include them as well. Similarly, the injunction should prohibit the City from using its zoning code to exclude firing ranges from locating anywhere in the city.

Finally, because range training is required for the issuance of a Chicago Firearm Permit, a registration certificate, and ultimately, for lawful possession of any firearm, *see* CHI. MUN.CODE §§ 8–20–110(a), 8–20–140(a)–(b), the firing-range ban implicates not only the right to train at a range but also the core Second Amendment right to possess firearms for self-defense. Accordingly, the preliminary injunction should include sections 8–20–110(a) and 8–20–140(a) to the extent that those provisions operate to prohibit otherwise eligible persons from "carry[ing] or possess[ing] a firearm" at a range without a Permit or registration certificate while they are trying to complete the range-training prerequisite for lawful firearm possession.

Those are the bounds of the proposed preliminary injunction, which should be entered upon remand. The City worries that entering an order enjoining the range ban would allow "anyone [to] park a mobile range anywhere, anytime"; shoddy ranges operated by unlicensed instructors and lacking adequate hand-washing facilities could crop up in Chicago's most dangerous neighborhoods. To the contrary, a preliminary injunction against the range ban does not open the door to a parade of firing-range horribles. *Cf.* 🔲 *McDonald,* 130 S.Ct. at 3047 ("Despite municipal respondents' doomsday proclamations, incorporation does not imperil every law regulating firearms."). The City may promulgate zoning and safety regulations governing the operation of ranges not inconsistent with the Second Amendment rights of its citizens; the plaintiffs may challenge those regulations, but not based on the terms of this injunction. As for the City's concern about a "regulatory vacuum" between the issuance of the preliminary injunction and the promulgation of firing-range zoning and safety regulations, we note that it faced a similar dilemma after the Supreme Court decided *McDonald.* The sky did not fall. The City Council moved with dispatch and enacted the Ordinance just four days later.

The plaintiffs have established their entitlement to a preliminary injunction based on their Second Amendment claim, so we need not address the alternative argument that range training is protected expression under the First Amendment. Given the strong likelihood of success on the former claim, the latter claim seems like surplusage.

For the foregoing reasons, we REVERSE the district court's order denying the plaintiffs' motion for a preliminary injunction and REMAND with instructions to enter a preliminary injunction consistent with this opinion.

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.     15

ROVNER, Circuit Judge, concurring in the judgment.

Stung by the result of *McDonald v. City of Chicago,* ——
U.S. ——, 130 S.Ct. 3020, 177 L.Ed.2d 894 (2010), the
City quickly enacted an ordinance that was too clever by
half. Recognizing that a complete gun ban would no longer
survive Supreme Court review, the City required all gun
owners to obtain training that included one hour of live-
range instruction, and then banned all live ranges within City
limits. [1]  **\*712**  This was not so much a nod to the importance
of live-range training as it was a thumbing of the municipal
nose at the Supreme Court. The effect of the ordinance is
another complete ban on gun ownership within City limits.
That residents may travel outside the jurisdiction to fulfill
the training requirement is irrelevant to the validity of the
ordinance inside the City. In this I agree with the majority:
given the framework of *District of Columbia v. Heller,*
554 U.S. 570, 128 S.Ct. 2783, 171 L.Ed.2d 637 (2008), and
*McDonald,* the City may not condition gun ownership for
self-defense in the home on a prerequisite that the City renders
impossible to fulfill within the City limits. The plaintiffs have
a strong likelihood of success on the merits of that claim and
the district court should have granted an injunction against
the operation of the ordinance to the extent that it imposed an
impossible pre-condition on gun ownership for self-defense
in the home. There are two obvious ways for the City to
remedy this problem: it may either drop the requirement for
one hour of live-range training or it may permit live-range
training within the City limits.

Even if the City were to drop the live-range requirement,
though, the plaintiffs claim an independent Second
Amendment right to maintain proficiency in firearm use
by practicing live-range shooting. The majority goes much
farther than is required or justified, however, in finding
that the plaintiffs' claim for live-range training is so
closely allied to "core" Second Amendment rights that
a standard akin to strict scrutiny should be applied.
Granted, the right to use a firearm in the home for
self-defense would be seriously impaired if gun owners
were prevented from obtaining the training necessary to
use their weapons safely for that purpose. We do not
yet know how a complete ban on any firearms training
would be received by the Supreme Court, but *Heller* and
*McDonald* strongly suggest that a comprehensive training
ban would not pass constitutional muster. But the City has
not banned all firearms training; it has banned only one
type of training. There is no ban on classroom training.

There is no ban on training with a simulator and several
realistic simulators are commercially available, complete
with guns that mimic the recoil of firearms discharging
live ammunition. *See e.g.* http://www.virtrasystems. com/
law-enforcement-training/virtra-range-le (last visited July
6, 2011); http://www.meggitttrainingsystems.com/main.php?
id=25&name=LE_Virtual_B luefire_Weapons (last visited
July 6, 2011); http://www.ontargetfire armstraining.com/
simulator.php (last visited July 6, 2011). It is possible that,
with simulated training, technology will obviate the need
for live-range training. In any case, the limited record to
date suggests that even the City considers live-range training
necessary to the safe operation of guns in the home for self-
defense. A complete ban on live ranges in the City, therefore,
is unlikely to withstand scrutiny under any standard of review.
The plaintiffs have a strong likelihood of succeeding on the
merits of this claim. Public safety interests apply on both sides
of the balance: there are obvious safety risks associated with
operating live shooting ranges (more on that later), but there
are perhaps equally compelling safety interests in ensuring
that gun owners possess the skills necessary to handle their
weapons safely. On the record as it currently stands, the
district court should have enjoined that part of the ordinance
banning all live ranges within City limits. For that reason, I
concur in the judgment.

 **\*713**  I write separately because the majority adopts a
standard of review on the range ban that is more stringent
than is justified by the text or the history of the Second
Amendment. Although the majority characterizes this aspect
of the ordinance as a complete ban on an activity "implicating
the core of the Second Amendment right," a more accurate
characterization would be a regulation in training, an area
ancillary to a core right. *Ante,* at 708. A right to maintain
proficiency in firearms handling is not the same as the right
to practice at a live gun range. As such, I cannot agree that "a
more rigorous showing than that applied in *Skoien,* should be
required, if not quite 'strict scrutiny.' " *Ante,* at 709. *Skoien*
required the government to demonstrate that the statute at
issue served an "important government objective," and that
there was a "substantial relationship" between the challenged
legislation and that objective. *United States v. Skoien,* 614
F.3d 638, 642 (7th Cir.2010), *cert. denied,* —— U.S. ——, 131
S.Ct. 1674, 179 L.Ed.2d 645 (2011).

The majority's analysis of laws in effect during the time
period surrounding the adoption of the Second and Fourteenth
Amendments helps to prove the point that no scrutiny beyond

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.     16

that described in *Skoien* is necessary. The majority concedes that the City has presented us with "a number of founding-era, antebellum, and Reconstruction state and local laws that limited the discharge of firearms in urban environments." *Ante*, at 705. Some jurisdictions enacted outright bans on discharging firearms in city limits. Some laws limited the time, place and manner of firearms discharges. Some laws required permission from a government authority before discharging firearms in urban areas. The majority finds these laws irrelevant to the Second Amendment analysis here because they are "not specific to controlled target practice and, in any event, contained significant carveouts and exemptions." *Ante*, at 705. The majority also distinguishes them as regulatory measures rather than outright bans on firing ranges. Finally, the majority dismisses some of the laws because they were clearly aimed at fire suppression, which the majority believes would not be a concern at a safely sited and properly equipped firing range.

But these observations contravene rather than support the majority's ensuing analysis. First of all, none of the 18th and 19th century jurisdictions cited by the City and dismissed by the majority were apparently concerned that banning or limiting the discharge of firearms within city limits would seriously impinge the rights of gun owners or limit their ability to learn how to safely use their weapons. Citizens living in densely populated areas had few legitimate reasons to discharge their firearms near their homes, and likely used them mostly when out in the country. Opportunities to hunt and practice outside of city limits were likely adequate for training purposes. Given the majority's nod to the relevance of historical regulation, curt dismissal of actual regulations of firearms discharges in urban areas is inappropriate.

Second, as I noted above, many of these jurisdictions regulated the time, place and manner of gun discharges. For example, as the majority itself points out, one statute prohibited the discharge of firearms before sunrise, after sunset, or within one quarter mile of the nearest building. Others prohibited firearms discharge without specific permissions and only then at specific locations. The "time, place and manner" framework of the First Amendment seems well-suited to the regulation of live-range training within a densely populated urban area. A complete ban on live-range training in Chicago, of course, likely would not survive under the intermediate scrutiny **\*714** applied to restrictions on time, place and manner, especially because the City itself concedes the importance of this training to the safe operation of firearms for self-defense in the home. Indeed,

the City allows ranges to operate in some of the most densely populated parts of the City, albeit strictly for the use of law enforcement and trained security personnel. The majority purports to distinguish time, place and manner restrictions and other regulations on the grounds that the City's ordinance is a complete ban, but the ban on live ranges affects only one aspect of firearms training. The intermediate scrutiny applied to time, place and manner restrictions is both adequate and appropriate in these circumstances.

Finally, that some of those early laws were concerned with fire suppression does not mean that they are irrelevant to our analysis today. On the contrary, these laws inform us that public safety was a paramount value to our ancestors, a value that, in some circumstances, trumped the Second Amendment right to discharge a firearm in a particular place. Analogizing to the First Amendment context, a categorical limit is sometimes appropriate, as in the case of bans on obscenity, defamation, and incitement to crime. *See* 🔖 *Skoien,* 614 F.3d at 641. In the same way that a person may not with impunity cry out "Fire!" in a crowded theater, a person in 18th century New York, and 19th century Chicago and New Orleans could not fire a gun in the tinder boxes that these cities had become. *See* Footnote 14 above. If we are to acknowledge the historical context and the values of the period when the Second and Fourteenth Amendments were adopted, then we must accept and apply the full understanding of the citizenry at that time. In the instance of firearms ordinances which concerned themselves with fire safety, we must acknowledge that public safety was seen to supercede gun rights at times. Although fire is no longer the primary public safety concern when firearms are discharged within City limits, historical context tells us that cities may take public safety into account in setting reasonable time, place and manner restrictions on the discharge of firearms within City limits.

The majority's summary dismissal of the City's concern for public safety related to live gun ranges is to my mind naive. One need only perform a simple internet search on "gun range accidents" to see the myriad ways that gun owners manage to shoot themselves and others while practicing in these supposedly safe environments. From dropping a loaded gun in a parking lot to losing control of a strong weapon on recoil, gun owners have caused considerable damage to themselves and others at live gun ranges. To say that the City's concerns for safety are "entirely speculative" is unfounded. *Ante*, at 709. The plaintiffs themselves "do not doubt that gun ranges may be regulated in the interest of public safety." Reply Brief at 22. *See also* Reply Brief at 26–27 (conceding

that the City may except certain parts of the City, set range distances from other uses, require a license or permission for target practice, and regulate the operation and location of gun ranges). The plaintiffs' concessions regarding gun range regulations are by no means a complete list of restrictions the City may impose on gun ranges. At this stage of the litigation, the City has not yet had an opportunity to develop a full record on the safety issues raised by placing live gun ranges in an urban environment. Common sense tells us that guns are inherently dangerous; responsible gun owners treat them with great care. Unfortunately, not all gun owners are responsible. The City has a right to impose reasonable time, place and manner restrictions on the operation of  **715** live ranges in the interest of public safety and other legitimate governmental concerns.

As for the remaining parts of the ordinance challenged by the plaintiffs, I agree that, to the extent that these provisions entirely prohibit gun owners from practicing at live ranges, they must be enjoined for the time being. As far as I can tell, though, the plaintiffs have not presented any evidence demonstrating, for example, that prohibiting gun owners

from possessing guns outside the home will impinge on their ability to practice at a range. As the plaintiffs' own witnesses testified, some ranges lend patrons guns with which to practice. But if the ordinance both prohibits gun owners from transporting their own weapons and prevents ranges from lending weapons for practice, then those aspects of the ordinance must be enjoined.

The ordinance admittedly was designed to make gun ownership as difficult as possible. The City has legitimate, indeed overwhelming, concerns about the prevalence of gun violence within City limits. But the Supreme Court has now spoken in *Heller* and *McDonald* on the Second Amendment right to possess a gun in the home for self-defense and the City must come to terms with that reality. Any regulation on firearms ownership must respect that right. For that reason, I respectfully concur in the judgment.

**All Citations**

651 F.3d 684

## Footnotes

1    The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. CONST. amend. II.

2    Once issued, a Chicago Firearm Permit is valid for three years. CHI. MUN.CODE § 8–20–130(a). Any registration certificate expires with the Permit. The Permit fee is $100; the registration certificate fee is $15. *Id.* §§ 8–20–130(b), 8–20–150(a). An application for a registration certificate must be submitted "no later than 5 business days after a person takes possession within the city of a firearm from any source," *id.* § 8–20–140(d), and registration certificates are subject to an annual reporting requirement, *id.* § 8–20–145(c). Failure to file an annual report regarding each registered firearm "may result" in revocation of the owner's registration certificate, his Permit, or both. *Id.* § 8–20–145.

3    The Ordinance provided a 90–day "grandfathering" period after its effective date during which previously acquired firearms could be registered. CHI. MUN.CODE § 8–20–140(d)(2). To take advantage of this provision, a firearm owner had to complete all of the prerequisites for a Permit, including a firearm-safety course with one hour of range training.

4    There are exceptions for discharging a firearm in self-defense or in defense of another, and also for game-bird hunting in certain limited areas of the city. *Id.* § 8–24–010.

5    We say "apparently" because it is not clear whether the exception allowing private security companies to operate firing ranges is codified. The Ordinance contains an exemption for private security contractors at section 8–20–020(b), but this exemption appears to apply only to the provision of the Ordinance making it "unlawful for any person to carry or possess a handgun, except when in the person's home," *id.* § 8–20–020(a), not to section 8–20–280, the provision banning firing ranges.

6    *See* CHI. MUN.CODE §§ 17–2–0204 (Residential Districts section stating: "Uses that are not listed in the [corresponding use] table are ... prohibited."), 17–3–0204 (Business & Commercial Districts section stating

the same), 17–4–0204 (Downtown Districts section stating the same), 17–5–0204 (Manufacturing Districts section stating the same), 17–6–0403–C (Special Purpose Districts section stating the same). Apparently, the City does not interpret the "Sports and Recreation" special-use category allowed in manufacturing districts, *see id.* § 17–5–0207, to include firing ranges.

7     The district court's emphasis on the organizational plaintiffs' standing is puzzling. As we have noted, it's clear the individual plaintiffs have standing. Where at least one plaintiff has standing, jurisdiction is secure and the court will adjudicate the case whether the additional plaintiffs have standing or not. *See* *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.,* 429 U.S. 252, 264, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977); *Bond v. Utreras,* 585 F.3d 1061, 1070 (7th Cir.2009); *Bethune Plaza, Inc. v. Lumpkin,* 863 F.2d 525, 530–31 (7th Cir.1988).

8     We noted in *Skoien* that "the *Salerno* principle has been controversial" and does not apply to all facial challenges: "[T]he Justices have allowed 'overbreadth' arguments when dealing with laws that restrict speech and reach substantially more conduct than the justifications advanced for the statute support...." *United States v. Skoien,* 614 F.3d 638, 645 (7th Cir.2010) (en banc) (citing *United States v. Stevens,* 559 U.S. 460, 130 S.Ct. 1577, 1587, 176 L.Ed.2d 435 (2010)). Overbreadth claims are a distinct type of facial challenge. *Stevens,* 130 S.Ct. at 1587 ("In the First Amendment context, ... this Court recognizes 'a second type of facial challenge,' whereby a law may be invalidated as overbroad if 'a *substantial number* of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep.' " (emphasis added) (quoting *Wash. State Grange v. Wash. State Republican Party,* 552 U.S. 442, 449 n. 6, 128 S.Ct. 1184, 170 L.Ed.2d 151 (2008))).

9     For different views of the *Salerno* doctrine and the structure of the facial and as-applied forms of judicial review, see generally Nicholas Quinn Rosenkranz, *The Subjects of the Constitution,* 62 STAN. L.REV. 1209, 1242–50 (2010); David L. Franklin, *Facial Challenges, Legislative Purpose, and the Commerce Clause,* 92 IOWA L.REV. 41, 58 (2006); Matthew D. Adler, *Rights, Rules, and the Structure of Constitutional Adjudication: A Response to Professor Fallon,* 113 HARV. L.REV. 1371 (2000); Richard H. Fallon, Jr., *As-Applied and Facial Challenges and Third–Party Standing,* 113 HARV. L.REV. 1321 (2000); Mark E. Isserles, *Overcoming Overbreadth: Facial Challenges and the Valid Rule Requirement,* 48 AM. U.L.REV. 359 (1998); Michael C. Dorf, *Facial Challenges to State and Federal Statutes,* 46 STAN. L.REV. 235 (1994); Henry P. Monaghan, *Harmless Error and the Valid Rule Requirement,* 1989 SUP.CT. REV. 195.

10     The City cites our opinion in *Campbell v. Miller,* 373 F.3d 834, 835 (7th Cir.2004), which cautioned against the assumption "that money never is an adequate remedy for a constitutional wrong." But *Campbell* concerned a Fourth Amendment unreasonable-search claim—a claim properly characterized as "a constitutional tort" and "often ... analogized to (other) personal-injury litigation." *Id.* In *Campbell* the plaintiff contended that jail officers violated the Fourth Amendment by subjecting him to an unreasonable search; the proper, fully adequate remedy for that kind of constitutional violation is damages. The constitutional claim here is quite different. The plaintiffs do not contend that a city official violated the Second Amendment by enforcing the range ban against them; they contend that the City Council violated the Second Amendment by enacting the firing-range ban in the first place. If they prevail, the *only* appropriate remedy is a declaration that the firing-range ban is invalid and an injunction forbidding its enforcement.

The City also cites the First Circuit's decision in *Public Service Co. of New Hampshire v. Town of West Newbury,* 835 F.2d 380, 382 (1st Cir.1987). In *Public Service Co.,* local regulators ordered a nuclear power plant to remove utility poles from its property because they were too high. The plant owner sued, alleging a denial of due process. The First Circuit noted that the "alleged denial of procedural due process, without more, does not automatically trigger" a finding of irreparable harm. *Id.* The court then affirmed the denial of preliminary injunctive relief because "the prospects of any irreparable damage were speculative" and the

owner had little likelihood of success on the merits. *Id.* at 383. *Public Service Co.,* like *Campbell,* does not help the City. An improper order requiring the removal of utility poles can easily be remedied by damages— not so with the constitutional violations alleged here.

11    On this aspect of originalist interpretive method as applied to the Second Amendment, see generally AKHIL REED AMAR, THE BILL OF RIGHTS: CREATION AND RECONSTRUCTION 215–30,257–67 (1998); Brannon P. Denning & Glenn H. Reynolds, *Five Takes on* McDonald v. Chicago, 26 J.L. & POL. 273, 285–87 (2011); Josh Blackman & Ilya Shapiro, *Keeping Pandora's Box Sealed: Privileges or Immunities,* The Constitution in 2020, *and Properly Extending the Right to Keep and Bear Arms to the States,* 8 GEO. J.L.& PUB. POL'Y 1, 51–57 (2010); Clayton E. Cramer, Nicholas J. Johnson & George A. Mocsary, *"This Right Is Not Allowed by Governments That Are Afraid of the People": The Public Meaning of the Second Amendment When the Fourteenth Amendment Was Ratified,* 17 GEO. MASON L. REV. 823, 824–75 (2010); Steven G. Calabresi & Sarah E. Agudo, *Individual Rights Under State Constitutions When the Fourteenth Amendment Was Ratified in 1868: What Rights Are Deeply Rooted in American History and Tradition?,* 87 TEX. L.REV. 7, 11–17, 50–54 (2008); Randy E. Barnett, *Was the Right to Keep and Bear Arms Conditioned on Service in an Organized Militia?,* 83 TEX. L.REV. 237, 266–70 (2004); David B. Kopel, *The Second Amendment in the Nineteenth Century,* 1998 BYU L.REV. 1359; Stephen P. Halbrook, *Personal Security, Personal Liberty, and "The Constitutional Right to Bear Arms": Visions of the Framers of the Fourteenth Amendment,* 5 SETON HALL CONST. L.J. 341 (1995).

12    The Ninth Circuit recently adopted a somewhat different framework for Second Amendment claims. In *Nordyke v. King,* a divided panel announced a gatekeeping "substantial burden" test before the court will apply heightened scrutiny. 644 F.3d 776, 783–86 (9th Cir.2011) (O'Scannlain, J.). Under this approach only laws that substantially burden Second Amendment rights will get some form of heightened judicial review. *Id.* The *Nordyke* majority specifically deferred judgment on "what type of heightened scrutiny applies to laws that substantially burden Second Amendment rights." *Id.* at 786 n. 9. Judge Gould, concurring in *Nordyke,* would apply heightened scrutiny "only [to] arms regulations falling within the core purposes of the Second Amendment, that is, regulations aimed at restricting defense of the home, resistance of tyrannous government, and protection of country." *Id.* at 795. All other firearms laws, he said, should be reviewed for reasonableness, *id.,* although by this he meant the sort of reasonableness review that applies in the First Amendment context, not the deferential rational-basis review that applies to all laws, *id.* at 796–98.

13    *See* Act of Aug. 26, 1721, § IV, in A Digest of the Acts of Assembly Relating to the City of Philadelphia 183 (Duane ed. 1856) (hereinafter Philadelphia Digest) (providing for "governor's special license"); Act of Feb. 9, 1750–51, ch. 388, in 1 Laws of the Commonwealth of Pennsylvania 312 (Carey ed. 1803) (providing for "Governor's special license"); Ordinance of June 7, 1813, § V, in Philadelphia Digest 188 (providing for permission from the board of commissioners); Ordinance of Sept. 8, 1851, § IX, in Philadelphia Digest 419 (providing for permission from the president of the board of commissioners); Ordinance of 1854, ch. 5, § 20, in Revised Ordinances of the City of Manchester, N.H. 59 (Gage ed. 1859) (providing for "permission of the Mayor and Aldermen in writing"); Act of Feb. 14, 1855, § 78, in Private Laws of the State of Illinois 144 (Bailhache ed. 1861) (providing for "permission from the mayor or common council"); Bylaw, Title XI, ch. IV, in Charter and By–Laws of the City of New Haven, Conn. 90 (Benham ed. 1865) (providing for "permission ... of the Mayor, or some one or more of the Aldermen"); Ordinance of June 12, 1869, § 17, in Laws and Ordinances Governing the City of St. Joseph, Mo. 110 (Grubb ed. 1869) (providing for "permission from the city council or written permission from the mayor").

14    *See* Act of Apr. 22, 1786, in The New York Daily Advertiser, Dec. 30, 1788 (prohibiting discharge of firearms "for the more effectual prevention of FIRES in the city of New York"); Ordinance of July 1, 1817, art. 12, in Ordinances of the City of New Orleans 62, 68 (prohibiting the discharge of firearms for the "Prevention of fires"); Ordinance of Apr. 18, 1881, ch. XV, art. XX, § 1298, in Municipal Code of Chicago 307 (Jamieson ed. 1881) (prohibiting firearms discharge under article governing "Firearms, Fireworks and Cannons").

WESTLAW    © 2020 Thomson Reuters. No claim to original U.S. Government Works.    20

15    *See* Ordinance of Mar. 9, 1826, § 6, in Baltimore Gazette and Daily Advertiser, Dec. 17, 1827 ("[I]f any person shall fire or discharge any Gun or Pistol or fire arms within the City, unless it be on some occasion of Military parade and then by order of some officer having the command, every such person, for every such offense, shall forfeit and pay a sum not exceeding five dollars."); Acts of Feb. 17, 1831, § 6, in 29 Acts of a General Nature of the State of Ohio 162 (Olmsted ed. 1831) (subjecting "any person or persons [who] shall shoot or fire a gun at a target within the limits of any recorded town plat" to a fine "not exceeding five dollars, nor less than fifty cents").

1    As the majority clarifies, the City grants exceptions for ranges in a few select circumstances such as ranges used by law enforcement personnel. None of these ranges are open to the public in general or to the plaintiffs in particular.

---

**End of Document**            © 2020 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW    © 2020 Thomson Reuters. No claim to original U.S. Government Works.    

FILED
12-07-2020
Clerk of Circuit Court
Waukesha County
2020CV001583

549 F.3d 1079
United States Court of Appeals,
Seventh Circuit.

GIRL SCOUTS OF MANITOU
COUNCIL, INC., Plaintiff–Appellant,

v.

GIRL SCOUTS OF The UNITED STATES OF
AMERICA, INC., et al., Defendants–Appellees.

No. 08–2488.
|
Argued Sept. 8, 2008.
|
Decided Sept. 11, 2008. [1]
|
Opinion Dec. 15, 2008.

**Synopsis**

**Background:** Local Girl Scouts council sued Girl Scouts national organization (GSUSA), challenging GSUSA's decision to merge local council into larger regional council, thereby reducing size of its jurisdiction. Local council sought preliminary injunction against planned organizational changes pending resolution of its challenge. The United States District Court for the Eastern District of Wisconsin, 2008 WL 2324617, J.P. Stadtmueller, J., denied motion, and local council appealed.

**Holdings:** The Court of Appeals, Kanne, Circuit Judge, held that:

local council satisfied "irreparable harm" threshold criterion for preliminary injunction;

local council qualified as "dealer" under Wisconsin Fair Dealership Law (WFDL);

local council satisfied inadequacy-of-legal-remedies threshold criterion for preliminary injunction;

local council made threshold showing of some likelihood of success; and

balance of harms strongly weighed in favor of local council.

Reversed.

**Procedural Posture(s):** On Appeal; Motion for Preliminary Injunction.

**Attorneys and Law Firms**

**\*1082** Gary W. Leydig, Attorney, Riordan, Fulkerson, Hupet & Coleman, Chicago, IL, for Plaintiff–Appellant.

Kenneth Kirschner, Attorney, Heller Ehrman, New York, NY, David E. Jones, Attorney, Heller Ehrman LLP, Madison, WI, for Defendants–Appellees.

Before POSNER, KANNE, and TINDER, Circuit Judges.

**Opinion**

KANNE, Circuit Judge.

Girls Scouts of the United States of America (GSUSA) first chartered Girl Scouts of Manitou Council, Inc. as a local Girl Scout council in 1950. Now, almost sixty years later, GSUSA, acting pursuant to a new organizational strategy, is in the process of merging many of its local councils to form larger regional councils. Manitou has declined to participate in the proposed restructuring, which has prompted GSUSA to undertake proceedings to unilaterally reduce Manitou's chartered territory. Manitou filed suit against GSUSA and sought a preliminary injunction to prevent any changes to its jurisdiction pending final resolution of its claims. The district court denied Manitou's motion for a preliminary injunction, concluding that Manitou would not suffer the requisite irreparable harm, and Manitou appealed. We have found the district court's determination that Manitou would not suffer irreparable harm between now and resolution of its claims to be clearly erroneous. Because Manitou has also satisfied the other requirements for a preliminary injunction, on September 11, 2008, this court issued an order, with an opinion to follow, reversing the district court. The order enjoined GSUSA from making any changes to, or interfering with, Manitou's current jurisdiction. This opinion sets forth the rationale for our order of September 11.

**I. BACKGROUND**

In 1912, Juliette Gordon Low founded the Girl Scouts in Savannah, Georgia. Nearly four decades later, in 1950,

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.     1

Congress incorporated the organization as the Girl Scouts of the United States of America. *See* Pub.L. No. 460, 64 Stat. 22 (1950) (codified as amended at 36 U.S.C. § 80301 *et seq.*). Today, as GSUSA approaches its 100th birthday, its membership stands at approximately 3.7 million and includes satellite organizations in ninety countries.

The stated purposes of GSUSA are "to promote the qualities of truth, loyalty, helpfulness, friendliness, courtesy, purity, kindness, obedience, cheerfulness, thriftiness, and kindred virtues among girls," 36 U.S.C. § 80302(1), and to instill "the highest ideals of character, patriotism, conduct, and attainment," *id.* § 80302(3). Notwithstanding these virtuous aspirations, however, "Girl Scouting" is big business. In Fiscal Year 2006, GSUSA reported operating revenues of nearly $123 million. Of that number, $35 million derived from membership dues, [2] while another $13.5 million came from the sales of Girl Scout merchandise. [3] Notably, these figures do not include direct revenues from sales of **\*1083** the organization's famous cookies, which accrue entirely to the local councils that conduct the sales. [4]

GSUSA is led by the National Council of Girl Scouts, which consists of delegates from its various member organizations. The National Council meets every three years to elect its board of directors (the "National Board") and various corporate officers. The National Board appoints other corporate officers, including the chief executive officer. GSUSA is governed by the *Blue Book of Basic Documents,* a compilation of organizational documents that includes GSUSA's congressional charter, constitution, bylaws, policies, and so forth. GSUSA periodically updates the *Blue Book;* it issued the current version in 2006.

To provide Girl Scouting to the masses, GSUSA has developed an extensive network of local councils. In 2005, GSUSA's organizational structure featured approximately 315 of these councils. Each local council is governed by its own independent board of directors, employs its own officers and professional staff, and is responsible for its own financial health. A local council's primary revenue sources include private donations, sales of Girl Scout cookies, sales of other Girl Scout products and services, [5] and fees and charges from the use of council-owned camps and facilities.

The relationship between GSUSA and a local council is defined by that council's Girl Scout charter. For a nominal fee, GSUSA issues a charter to the local council, which grants to that council "the right to develop, manage, and maintain Girl Scouting throughout the areas of its jurisdiction," including the right to use GSUSA's names and protected marks. In the charter application, which the charter incorporates by its terms, the local council agrees "to operate as a council in accordance with and to be limited by policies so identified, published, and distributed to councils by Girl Scouts of the United States of America, accepting them as binding on the Council, on all its members, officers, employees, and those affiliating with it." Each charter designates the council's jurisdiction and remains valid for a stated length of time.

*A. Girl Scouts of Manitou Council, Inc.*

The plaintiff in this case, Girl Scouts of Manitou Council, Inc., a Wisconsin nonprofit corporation, is one of GSUSA's local councils. Manitou's headquarters are in Sheboygan, Wisconsin. Its current jurisdiction consists of all or part of seven counties located in eastern Wisconsin, [6] and its membership exceeds 7,000 individuals. GSUSA originally chartered Manitou in 1950 and has routinely renewed its charter, with the most recent renewal taking effect on January 1, 2006. The present charter is to run for "up to four years."

Manitou, like GSUSA, is no small organization. It is managed by an independent board of directors and employs a full-time staff of seventeen people. It owns significant real property, including two large Girl Scout camps and a corporate office building. The first camp, Camp Evelyn, is a **\*1084** 240–acre development in Plymouth, Wisconsin, that includes more than forty buildings and features an Olympic-sized swimming pool. The second camp, Camp Manitou, covers 140 acres near Two Rivers, Wisconsin. Manitou states that the two properties have a combined fair market value of more than $12 million. The corporate headquarters, which include administrative offices and meeting and activity rooms, are located in Sheboygan and have a fair market value in excess of $3 million.

Manitou asserts that nearly 100% of its annual revenues derive from the sale of Girl Scout merchandise and services, private donations, and investment income from Manitou's reserve funds. Girl Scout cookie sales alone generate more than $1 million in revenue each year. Manitou states that less than 0.2% of its revenues come from renting its facilities to third parties unaffiliated with the Girl Scouts.

*B. GSUSA's National Realignment Strategy*

In 2004, in response to what it cites as declining membership, fading brand image, and "waning program effectiveness," GSUSA commenced a thorough evaluation of its organization to determine how, moving forward, it could remain both viable and relevant. GSUSA, aided by a consultant from Columbia University, concluded that a "fundamental transformation" was necessary. In a strategy introduced in the summer of 2005, GSUSA announced a plan to reduce, by the end of 2009, the number of local councils from approximately 315 to 109, merging the local organizations to form larger, "high capacity" councils. These larger councils, according to GSUSA, would no longer compete for top local sponsors and media attention, would have the resources to hire professionally trained staff members, and would be positioned to take advantage of economies of scale in programming, training, fund-raising, and branding. GSUSA's realignment plan was nationwide in scope and involved virtually every council, regardless of size or past performance.

The National Board approved the realignment plan in September 2005. That winter, CEOs and chairs of the boards from the various local councils met in Orlando to discuss the realignment process. From that meeting, in which Manitou's representatives actively participated, came the initial realignment strategy for Wisconsin. The final proposal (the "Wisconsin Realignment Plan"), formally submitted by Denise Schemenauer, Manitou's CEO, on behalf of the affected councils in May 2006, would have reduced the fifteen local councils located in Wisconsin and the Upper Peninsula of Michigan to three. Manitou would have merged 60% of its territory with the territories of six other councils in northern Wisconsin and the Upper Peninsula [7] to form a new council, the Girl Scouts of Northwestern Great Lakes. The remainder of Manitou's territory would have been divided between the other two new Wisconsin councils, which were to be situated to Manitou's south and southwest. The National Board approved the Wisconsin Realignment Plan in August 2006.

Not long thereafter, Manitou's leadership began having second thoughts about the proposed realignment. Between May **\*1085** and October 2007, while continuing to avow its intentions to follow through with the merger, Manitou proposed three separate amendments to the Wisconsin Realignment Plan. GSUSA's leadership rejected each in turn, choosing instead to reaffirm its support for the Wisconsin Realignment Plan. In a letter to the chair of Manitou's Board, Liesl Rice, dated October 3, 2007, GSUSA denied Manitou's

third such proposal and stated that "[w]e will not again reconsider the jurisdictional boundaries, as approved by the National Board on August 24, 2006." The letter concluded by directing Manitou's leadership to sign the written agreements necessary for the merger to proceed. If Manitou failed to do so, warned GSUSA, "the National Board will take all necessary and further action in accordance with the Blue Book of Basic Documents 2006."

In three separate communications dated January 9, 2008, Manitou and its legal counsel informed GSUSA leadership that Manitou's board of directors had concluded "that a merger with the other Councils currently suggested by [GSUSA] is not in the best interest of Manitou Council and its members." Faced with Manitou's resistance to the realignment merger, GSUSA initiated procedures later that same month to unilaterally remove more than half of Manitou's jurisdiction. These procedures had been outlined for the first time in the *Blue Book of Basic Documents 2006,* which contained a new section establishing steps to change a council's jurisdiction under a variety of circumstances, including when involved councils were unable to reach a merger agreement. *See* Girl Scouts of the U.S. of Am., *Blue Book of Basic Documents 2006,* at 28–29 (2006) [hereinafter *Blue Book* ]. After several delays, GSUSA established June 15, 2008, as the date on which the National Board would make a final decision regarding Manitou's jurisdiction.

### C. Procedural History

On February 29, 2008, Manitou filed a diversity action against GSUSA in the United States District Court for the Eastern District of Wisconsin, seeking equitable relief on a variety of grounds, including violation of the Wisconsin Fair Dealership Law, breach of contract, tortious interference, economic coercion, and conspiracy. Manitou sought to have the court permanently enjoin GSUSA from altering Manitou's existing jurisdiction. The same day, Manitou also filed a motion requesting a preliminary injunction against GSUSA. The district court, without conducting an evidentiary hearing, denied this motion in an order dated June 5, 2008. The district court rested its decision on a single finding: that Manitou had failed to meet its threshold burden of demonstrating that it would suffer irreparable harm in the absence of a preliminary injunction. It is this order that Manitou appealed. After hearing oral arguments from the parties, this court issued an order on September 11, 2008, in which we reversed the district court and enjoined GSUSA "from making any changes to, or interfering with, the current council jurisdiction

WESTLAW © 2020 Thomson Reuters. No claim to original U.S. Government Works.   3

of appellant Girl Scouts of Manitou Council, Inc., pending final resolution on the merits in the district court."

## II. ANALYSIS

An equitable, interlocutory form of relief, " 'a preliminary injunction is an exercise of a very far-reaching power, never to be indulged in except in a case clearly demanding it.' " *Roland Mach. Co. v. Dresser Indus., Inc.,* 749 F.2d 380, 389 (7th Cir.1984) (quoting *Warner Bros. Pictures, Inc. v. Gittone,* 110 F.2d 292, 293 (3d Cir.1940) (per curiam)). To determine whether a situation warrants such a remedy, a district court engages in an analysis **\*1086** that proceeds in two distinct phases: a threshold phase and a balancing phase.

To survive the threshold phase, a party seeking a preliminary injunction must satisfy three requirements. *See Ty, Inc. v. Jones Group, Inc.,* 237 F.3d 891, 895 (7th Cir.2001); *Lawson Prods., Inc. v. Avnet, Inc.,* 782 F.2d 1429, 1433 (7th Cir.1986). First, that absent a preliminary injunction, it will suffer irreparable harm in the interim period prior to final resolution of its claims. *Ty,* 237 F.3d at 895. Second, that traditional legal remedies would be inadequate. *Id.* And third, that its claim has some likelihood of succeeding on the merits. *Id.* If the court determines that the moving party has failed to demonstrate any one of these three threshold requirements, it must deny the injunction. *Abbott Labs. v. Mead Johnson & Co.,* 971 F.2d 6, 11 (7th Cir.1992). If, however, the court finds that the moving party has passed this initial threshold, it then proceeds to the balancing phase of the analysis. *Id.*

In this second phase, the court, in an attempt to minimize the cost of potential error, *see Am. Hosp. Supply Corp. v. Hosp. Prods. Ltd.,* 780 F.2d 589, 593–94 (7th Cir.1986), "must somehow balance the nature and degree of the plaintiff's injury, the likelihood of prevailing at trial, the possible injury to the defendant if the injunction is granted, and the wild card that is the 'public interest,' " *Lawson Prods.,* 782 F.2d at 1433. Specifically, the court weighs the irreparable harm that the moving party would endure without the protection of the preliminary injunction against any irreparable harm the nonmoving party would suffer if the court were to grant the requested relief. *Abbott Labs.,* 971 F.2d at 11–12. In so doing, the court employs a sliding scale approach: "[t]he

more likely the plaintiff is to win, the less heavily need the balance of harms weigh in his favor; the less likely he is to win, the more need it weigh in his favor." *Roland Mach.,* 749 F.2d at 387; *see also Ty,* 237 F.3d at 895; *Abbott Labs.,* 971 F.2d at 12. Where appropriate, this balancing process should also encompass any effects that granting or denying the preliminary injunction would have on nonparties (something courts have termed the "public interest"). *Ty,* 237 F.3d at 895; *Roland Mach.,* 749 F.2d at 388. Taking into account all these considerations, the district court must exercise its discretion "to arrive at a decision based on a subjective evaluation of the import of the various factors and a personal, intuitive sense about the nature of the case." *Lawson Prods.,* 782 F.2d at 1436.

We review a district court's decision to grant or deny a preliminary injunction for an abuse of discretion. *Id. at 1437.* A district court abuses its discretion when, in conducting its preliminary injunction analysis, it commits a clear error of fact or an error of law. *Ty,* 237 F.3d at 896; *Abbott Labs.,* 971 F.2d at 13; *see also Lawson Prods.,* 782 F.2d at 1437 ("Clearly, a factual or legal error may alone be sufficient to establish that the court 'abused its discretion' in making its final determination."). A district court's finding of fact is clearly erroneous when " 'the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.' " *Anderson v. City of Bessemer City, N.C.,* 470 U.S. 564, 573, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985) (quoting *United States v. U.S. Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 92 L.Ed. 746 (1948)). The question is "whether the judge exceeded the bounds of permissible choice in the circumstances." *Roland Mach.,* 749 F.2d at 390. Absent such errors, we accord a district court's decisions during the balancing phase of the analysis great deference. *Abbott Labs.,* 971 F.2d at 13.

**\*1087** Where, as here, a district court decides that a party moving for a preliminary injunction has not satisfied one of the threshold requirements, we have encouraged the court to conduct at least a cursory examination of all the aforementioned preliminary injunction considerations. *Platinum Home Mortgage Corp. v. Platinum Fin. Group, Inc.,* 149 F.3d 722, 730 (7th Cir.1998); *Meridian Mut. Ins.*

WESTLAW    © 2020 Thomson Reuters. No claim to original U.S. Government Works.    4

*Co. v. Meridian Ins. Group, Inc.,* 128 F.3d 1111, 1121 (7th Cir.1997). Doing so expedites our review and helps to protect the interests of the parties. *Platinum Home Mortgage,* 149 F.3d at 730; *Meridian Mut. Ins.,* 128 F.3d at 1121. If the district court declines to do so and chooses instead to rest its entire decision on one factual finding—here, the absence of irreparable harm—we review that finding of fact, as we do any finding of fact, for clear error. *See Stewart v. Taylor,* 104 F.3d 965, 970 (7th Cir.1997); *Meridian Mut. Ins.,* 128 F.3d at 1114. Should we determine the district court's factual finding to be erroneous, we then may complete the preliminary injunction analysis if the record contains information sufficient for us to assess the remaining factors. *See, e.g., Meridian Mut. Ins.,* 128 F.3d at 1120.

In the present case, the district court never reached the balancing phase of the preliminary injunction analysis; instead, it ceased its analysis and denied Manitou's motion once it determined that Manitou had failed to demonstrate that it would suffer irreparable harm without the preliminary injunction. We begin our analysis with that finding.

### A. Irreparable Harm

In its order denying Manitou's motion for a preliminary injunction, the district court concluded that Manitou had not demonstrated that it would suffer irreparable harm without injunctive relief. The court based this finding on four grounds. First, because GSUSA had not reached a final decision regarding Manitou's future jurisdiction at the time of the court's order, the court found that any alleged harm to be suffered by Manitou as a result of GSUSA's realignment strategy was mere speculation. The court noted that as a result of GSUSA's review process, "the realignment may not even occur." Second, the district court found that Manitou "has not demonstrated that it would lose any assets, employees, or the ability to provide Girl Scouting." Third, the court determined that should a final judgment on the merits be in Manitou's favor, it simply could have its jurisdiction restored. These three grounds we shall refer to as "merits-based," because they involve the question of whether Manitou will *actually suffer* irreparable harm.

As a fourth ground for its decision, the district court found unavailing Manitou's attempts to seek protection as a "dealer" under the Wisconsin Fair Dealership Law ("WFDL"), Wis. Stat. § 135 *et seq.* The WFDL protects dealers from

grantors who wish to "terminate, cancel, fail to renew or substantially change the competitive circumstances of a dealership agreement without good cause." *Id.* § 135.03. Importantly for present purposes, the WFDL also provides for a presumption of irreparable harm when its terms are violated. *Id.* § 135.065. Here, the court refused to "improperly expand" the definition of a "dealer" under the WFDL to include Manitou, a nonprofit corporation. Because the court concluded Manitou was not a dealer, it was not entitled to the statutory presumption of irreparable harm.

We first address the court's merits-based conclusions that any harm was speculative, that Manitou would suffer no harm, and that any harm Manitou might **\*1088** suffer would be rectifiable following trial, i.e., was not irreparable. We then proceed to the court's statutory conclusions regarding Manitou's arguments for protection under the WFDL.

### 1. The District Court's Merits–Based Findings

The district court concluded that any injuries suffered by Manitou were speculative because the National Board had not yet formally required Manitou to cede portions of its jurisdiction. On June 15, 2008, ten days after the district court entered its order, the National Board mandated that Manitou deliver, no later than September 15, 2008, 60% of its jurisdiction to the six councils with which it was to merge originally, which have since successfully merged into one large council. Thus, it is clear that any harm Manitou might suffer, the existence of which we discuss below, is no longer mere speculation.

Next, the district court found that Manitou did not demonstrate that the changed jurisdiction would result in a loss of its assets, the termination of any of its employees, or an impairment on its ability to provide Girl Scouting. The facts in the record, however, tell a different story. By removing the majority of Manitou's jurisdiction, GSUSA is reducing Manitou's ability to generate revenues—revenues that Manitou needs to cover its annual budget, which is largely fixed and was established based on Manitou's existing membership levels.

Manitou, like many nonprofit organizations, relies on the people comprising it to remain viable. With fewer people come fewer resources. As Schemenauer, Manitou's CEO, stated in her affidavit, removing 60% of Manitou's jurisdiction would result in a commensurate reduction in the number of current child and adult members, prospective members, volunteers, and current and potential donors.

Because members' annual participation fees accrue to GSUSA and not to Manitou, fewer participants will not *directly* impact Manitou's bottom line. However, every source of Manitou's revenue is derivative of the number of members active in its council. Cookie sales, from which Manitou nets more than $1 million in profits each year, would be reduced by 60%. With a smaller jurisdiction, there are fewer girls to do the selling and fewer community members to do the buying. Similarly, while the girls themselves are perhaps not soliciting donations, it is the relationships of these girls to interested community members that prompts donors to direct their charitable dollars toward Manitou. Fewer members means fewer relationships, which results in a reduced donor base.

Manitou operates on an annual budget of approximately $2 million. GSUSA argues that smaller membership will allow Manitou to cut this budget and reduce its expenses in accordance with its reduced revenues, resulting in Manitou's continued financial viability. While it is true that a smaller membership will reduce certain variable costs, many of Manitou's largest expenses are fixed, meaning that they will remain unchanged regardless of Manitou's membership level. Manitou's two camps, for example, Camp Evelyn and Camp Manitou, feature over 360 acres of land, swimming pools, dining halls, and dozens of other buildings. The overhead to operate these two camps will vary little based on the size of Manitou's jurisdiction. Manitou also owns and operates a corporate headquarters building; like the overhead at the campgrounds, expenses incurred in running the building are not contingent on the size of Manitou's membership. Working inside the headquarters are seventeen full-time staff members. Again, Manitou **\*1089** must pay the salaries and benefits of its employees regardless of how many individuals are currently participating in Girl Scouting within Manitou's jurisdiction.

Faced with drastically reduced revenue streams and fixed expenses, it is clear that taking a large portion of Manitou's jurisdiction would impose severe financial stress on Manitou that could ultimately force Manitou into insolvency. In addition, without ample resources to continue supporting its organizational infrastructure, Manitou may be forced to terminate portions of its professional staff or relinquish pieces of real property.

Beyond these tangible concerns, Manitou makes clear that removing its jurisdiction also poses a serious risk to the organization's significant goodwill, which we have recognized can constitute irreparable harm. *See, e.g.,*

*Meridian Mut. Ins.,* 128 F.3d at 1120; *Gateway E. Ry. Co. v. Terminal R.R. Ass'n of St. Louis,* 35 F.3d 1134, 1140 (7th Cir.1994); *Reinders Bros., Inc. v. Rain Bird E. Sales Corp.,* 627 F.2d 44, 53 (7th Cir.1980). Manitou, like all Girl Scout councils, relies heavily on goodwill to advance its mission. For fifty-eight years, Manitou has developed relationships within its community that are vital to its continued existence. These relationships manifest themselves in the form of memberships, which we have already discussed; volunteers; and cash and in-kind donations.

In her affidavit, Schemenauer stated that Manitou has recruited and trained tens of thousands of adult volunteers. Under the proposed realignment, many of these volunteers will, without question, begin donating their time to the new council governing their location. Manitou's investment in these people, in both time and money, will be lost, as will their accrued knowledge and work capacity.

Perhaps the most significant area in which Manitou will feel a loss of goodwill is in its pursuit of charitable donations. Manitou has received tens of millions of dollars in donations, in both cash and in-kind gifts, to help Manitou provide experiences for its members. These gifts come from individuals, businesses, foundations, and other charitable organizations. By removing 60% of its jurisdiction, Manitou would undoubtedly lose or damage many of these relationships. Donors now located in the new jurisdiction will be inclined to donate to the local council administering to that jurisdiction, not Manitou. And donors within Manitou's remaining jurisdiction may become disillusioned with Manitou's shrinking territory or, worse still, believe that Manitou has done something wrong that warrants GSUSA's reduction in its jurisdiction. In contrast with *American Hospital Supply,* in which we found similar harm to goodwill speculative, 780 F.2d at 595, here such damages have already become evident. Schemenauer provided figures in her affidavit demonstrating that donors have already withheld nearly $30,000 in contributions based on mere speculation within the community regarding Manitou's forced merger or loss of territory. The situation promises only to worsen once that speculation becomes reality.

The district court's final merits-based conclusion was that any harm Manitou might suffer before final resolution of its claims would not be irreparable. A harm is "irreparable" if it "cannot be prevented or fully rectified by the final judgment after trial." *Roland Mach.,* 749 F.2d at 386. The district

WESTLAW     © 2020 Thomson Reuters. No claim to original U.S. Government Works.     6

court found not only that Manitou had failed to demonstrate it would be injured absent a preliminary injunction, but also that any alleged injuries were not irreparable, i.e., that any injuries would be rectifiable following a final judgment on **\*1090** the merits by simply restoring the taken jurisdiction to Manitou.

As we have shown, however, simply returning the territory to Manitou following trial will not account for the incalculable losses Manitou risks in the interim—namely, the potential loss of property, employees, or its entire business, as well as damage to its goodwill. These harms are both real and irreparable. *See Pelfresne v. Vill. of Williams Bay,* 865 F.2d 877, 883 (7th Cir.1989) ("As a general rule, interference with the enjoyment or possession of land is considered 'irreparable' since land is viewed as a unique commodity...."); *Gateway E. Ry.,* 35 F.3d at 1140 (recognizing that although economic losses generally will not sustain a preliminary injunction, there are exceptions where, as here, a remedy may come " 'too late to save plaintiff's business' " (quoting *Roland Mach.,* 749 F.2d at 386)); *Meridian Mut. Ins.,* 128 F.3d at 1120 ("[T]he plaintiff has suffered injury to its goodwill.... Such damage can constitute irreparable harm ...."); *cf. Kinney ex rel. NLRB v. Int'l Union of Operating Eng'rs, Local 150,* 994 F.2d 1271, 1279 (7th Cir.1993) (noting that, from an employee's perspective, termination was an irreparable injury for which money damages were an inadequate remedy).

Given these findings, we are " 'left with the definite and firm conviction that a mistake has been committed.' " *Anderson,* 470 U.S. at 573, 105 S.Ct. 1504 (quoting *U.S. Gypsum Co.,* 333 U.S. at 395, 68 S.Ct. 525); *see also Roland Mach.,* 749 F.2d at 390 (questioning "whether the judge exceeded the bounds of permissible choice in the circumstances"). Manitou clearly risks irreparable harm if it is not granted the protection of a preliminary injunction. The district court's finding to the contrary is clearly erroneous, and the court therefore abused its discretion by relying on that erroneous finding as the basis for its decision to deny the preliminary injunction.

### *2. The District Court's Statutory Conclusions*

As further support for its conclusion that Manitou would not suffer irreparable harm, the district court disagreed with Manitou's argument that it was a "dealer" protected by the Wisconsin Fair Dealership Law, Wis. Stat. § 135.02(2), and, as such, enjoyed a statutory presumption of irreparable harm, *id.* § 135.065. Whether an organization qualifies for protection as a dealer under the WFDL is question of law that we review *de novo. Simos v. Embassy Suites, Inc.,* 983 F.2d 1404, 1411 (7th Cir.1993).

The Wisconsin legislature enacted the WFDL to promote "fair business relations between dealers and grantors, ... the continuation of dealerships on a fair basis," Wis. Stat. § 135.025(2)(a), and "[t]o protect dealers against unfair treatment by grantors, who inherently have superior economic power and superior bargaining power in the negotiation of dealerships," *id.* § 135.025(2)(b). Specifically, the WFDL makes it illegal for any grantor to "terminate, cancel, fail to renew or substantially change the competitive circumstances of a dealership agreement without good cause." *Id.* § 135.03. A party properly seeking protection under the WFDL enjoys a statutory presumption of irreparable harm. *Id.* § 135.065.

The WFDL protects only a "dealer," defined as an organization that is the grantee of a dealership. *Id.* § 135.02(2). The statute specifies three requirements for a dealership to exist. *See id.* § 135.02(3)(a). First, that there be a contract or agreement between the two parties. *Id.* Second, that the agreement provide the grantee the right to do one of three things: (1) sell goods or services; **\*1091** (2) distribute goods or services; or (3) use the grantor's trademarks, names, logos, or other commercial symbols. *Id.* Third, that there exist a "community of interest" between the parties "in the business of offering, selling or distributing goods or services at wholesale, retail, by lease, agreement or otherwise." *Id.* Applying the facts to these requirements, we conclude that Manitou is a dealer and therefore falls within the purview of the WFDL.

#### *a. Agreement Between the Parties*

For a dealership to exist, the first requirement is that there be an agreement between the parties. The form of this agreement is of little concern. *See id.* § 135.02(3)(a) (noting that the agreement can be "either expressed or implied, ... oral or written"). GSUSA does not contest the presence of an agreement between GSUSA and Manitou. Although the contours of that agreement remain somewhat in dispute, that an agreement exists in one form or another is without question.

b. *Sale or Distribution of Goods or Services; Use of Protected Marks*

The second requirement for a dealership is that the agreement must grant to Manitou "the right to sell or distribute goods or services, or use a trade name, trademark, service mark, logotype, advertising or other commercial symbol." *Id.* Although any one of these three functions would suffice to satisfy the requirement, Manitou succeeds on all three grounds.

First, Manitou sells and distributes goods. Manitou's primary revenue stream derives from its annual sale of Girl Scout cookies, which nets Manitou a yearly profit in excess of $1 million. During this process, Manitou's members both solicit sales and distribute the products. *Cf. Moodie v. Sch. Book Fairs, Inc.,* 889 F.2d 739 (7th Cir.1989) (holding that although a book distributor did not sell goods or use protected marks, its distribution activities qualified it as a dealer under the WFDL); *Bush v. Nat'l Sch. Studios, Inc.,* 139 Wis.2d 635, 407 N.W.2d 883, 888 (1987) (noting that a "prepackaged business format dictated by the franchisor and identified with the franchisor's trademark" was "clearly covered by the WFDL"); *Siegel v. Leer, Inc.,* 156 Wis.2d 621, 457 N.W.2d 533, 536 (App.1990) (finding that the sale of "pick-up truck caps" satisfied the "sale of goods" requirement of a dealership).

Second, Manitou distributes services—namely, educational and community services afforded by participation in Girl Scouting. *Cf. Bush,* 407 N.W.2d at 891 (finding this second prong of the dealership test satisfied by a distributor of student photography services); *Bakke Chiropractic Clinic, S.C. v. Physicians Plus Ins. Corp.,* 215 Wis.2d 605, 573 N.W.2d 542, 545–47 (Ct.App.1997) (listing factors the court found persuasive in reaching its decision in *Bush* ). As GSUSA reiterates throughout its arguments, the mission of Girl Scouting is one of education. Absent Manitou's relationship with GSUSA, it loses the ability to provide Girl Scouting services, a fact that Wisconsin courts have found important in addressing whether "services" are being offered under the WFDL. *See Bakke,* 573 N.W.2d at 546; *Pollack v. Calimag,* 157 Wis.2d 222, 458 N.W.2d 591, 596 (Ct.App.1990) (finding it important that a doctor retained the ability to provide health services regardless of whether he was associated with a particular clinic).

Third, Manitou makes exhaustive use of GSUSA's names and marks. These names and marks, which are the essence of Manitou's identity, provide Manitou with its entire reason for being. The Wisconsin Supreme Court has contemplated sufficient use of the mark where "the trademark **\*1092** of the grantor or of the dealership is ... prominently displayed for several purposes, including as an implicit guarantee of a certain quality of product and service." *Foerster, Inc. v. Atlas Metal Parts Co.,* 105 Wis.2d 17, 313 N.W.2d 60, 66 (1981). Manitou uses GSUSA's marks, logos, and names on virtually everything it produces or sells, including advertisements, newsletters and other publications, uniforms, and merchandise. It is clear that Manitou "has made a substantial investment in the trademark." *Moodie,* 889 F.2d at 743 (finding only *de minimis* investment in the protected marks relevant to that case).

Despite these facts, GSUSA continues to argue that the WFDL is inapplicable. Its grounds for this argument, however, remain murky. It ignores that local Girl Scout councils sell millions of dollars of cookies each year and states that the mission of Girl Scouts is "an educational one," that local councils are not " 'dealers' in anything," and reiterates that the local councils are nonprofit entities.

But we remain guided by the statute. The WFDL expresses no concern for the "mission" or other motivation underlying the sales in question; it asks only whether sales occur. Nor does the statute draw any distinction between "for-profit" and "not-for-profit" entities. Its stated concern is with "fair *business* relations," Wis. Stat. § 135.025(2)(a) (emphasis added), and it is beyond dispute that nonprofit corporations can be substantial businesses. Indeed, both GSUSA and Manitou, notwithstanding their status as nonprofits, are multimillion-dollar businesses possessing substantial assets and liabilities. GSUSA even conceded at oral argument that the WFDL does not contain a blanket exemption for nonprofit organizations. But, aside from its argument regarding the educational mission, which we find largely irrelevant and wholly unpersuasive, GSUSA is unable to state a reason that *this* nonprofit should be exempt while it admits that others are not.

Finally, GSUSA's argument that the Girl Scouts are not " 'dealers' of anything," emphasizing the word "dealer" as if its members are accused of selling drugs on the street corner, is unavailing. It matters not whether we would call the Girl

Scouts "dealers" in everyday conversation; what matters is only how the statute defines the term, and the activities of Manitou clearly fall within its definition.

In concluding that Manitou was not a dealer, the district court, quoting the Wisconsin Supreme Court's decision in *Kania v. Airborne Freight Corp.,* 99 Wis.2d 746, 300 N.W.2d 63, 76 (1981), said it would not adopt an "expansive interpretation of the definition of 'dealership.' " As we have shown, however, finding that Manitou qualifies as a dealer requires no expansion of the WFDL. Manitou is a business. It sells and distributes goods. It distributes services. It makes extensive use of GSUSA's marks and names. These requirements satisfy the statute's plain language, which the Wisconsin Supreme Court has recognized was designed "to encompass an extraordinarily diverse set of business relationships not limited to the traditional franchise." *Ziegler Co. v. Rexnord, Inc. (Ziegler I),* 139 Wis.2d 593, 407 N.W.2d 873, 878 (1987) (discussing broader statutory objectives in the context of the "community of interest" dealership requirement).

### c. Community of Interest

Having determined that Manitou has satisfied the first two requirements for "dealership" status under the WFDL, we turn to the final inquiry, which is whether there exists the necessary "community of interest" between Manitou and GSUSA. *See* Wis. Stat. § 135.02(3)(a) (requiring "a community of interest in the business of **\*1093** offering, selling or distributing goods or services at wholesale, retail, by lease, agreement or otherwise"); *see also* id. § 135.02(1) (defining "community of interest" as "a continuing financial interest between the grantor and grantee in either the operation of the dealership business or the marketing of such goods or services").

The Wisconsin Supreme Court has established two "guideposts" to inform our analysis of whether a community of interest exists within a business relationship. *See Ziegler I,* 407 N.W.2d at 878–79; *see also* Home Protective Servs., Inc. v. ADT Sec. Servs., Inc., 438 F.3d 716, 719 (7th Cir.2006). The first is a "continuing financial interest" between the parties. *Cent. Corp. v. Research Prods. Corp.,* 272 Wis.2d 561, 681 N.W.2d 178, 187 (Wis.2004); *Ziegler I,* 407 N.W.2d at 878. The second is the level of "interdependence," or "the degree to which the dealer and grantor cooperate,

coordinate their activities and share common goals in their business relationship." *Ziegler I,* 407 N.W.2d at 879. Considered together, these two guideposts indicate whether the alleged dealer's stake in the business relationship is great enough to threaten its financial health if the grantor exercises its power to terminate. *Cent. Corp.,* 681 N.W.2d at 188.

The Wisconsin Supreme Court has also noted that the community of interest analysis involves "a wide variety of facets" of the business relationship. *Ziegler I,* 407 N.W.2d at 879. It has identified a non-exhaustive list of factors that courts should consider, including (1) the duration of the business relationship; (2) the nature and extent of the parties' contractual arrangement; (3) the proportion of time and revenue the alleged dealer devotes to the alleged grantor's products or services; (4) the percentage of gross profits that the alleged dealer derives from the alleged grantor's products or services; (5) the nature and extent of the alleged grantor's territorial grant to the alleged dealer; (6) the nature and extent of the alleged dealer's uses of the alleged grantor's proprietary marks; (7) the nature and extent of the alleged dealer's investment in facilities, inventory, and goodwill in furtherance of the alleged dealership; (8) the personnel devoted by the alleged dealer to the alleged dealership; (9) the amount spent by the alleged dealer on advertising or promotions for the alleged grantor's products and services; and (10) the nature and extent of any supplementary services provided by the alleged dealer to consumers of the alleged grantor's products and services. *Id.* at 879–80; *see also* Home Protective Servs., 438 F.3d at 719–20.

Given these many considerations, GSUSA and Manitou share a continuing financial interest and the interdependence necessary to find the requisite "community of interest" for a dealership relationship to exist. Manitou has been a local Girl Scout council since GSUSA first chartered it in 1950. The contractual relationship between the two organizations is extensive. Manitou devotes 100% of its time and resources to providing Girl Scouting to its jurisdiction. Manitou derives virtually 100% of its profits from offering Girl Scouting products and services. GSUSA has granted Manitou a broad territory that includes seven counties and over 7,000 active members. Manitou makes extensive use of GSUSA's proprietary marks. Manitou has substantial investments in real property and goodwill within its community, all of which were made in the name of Girl Scouting. Manitou devotes 100% of its personnel to providing Girl Scouting to its

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

jurisdiction. All of Manitou's advertisements or promotions are intended to build interest and support for Girl Scouting.

Only one of GSUSA's arguments against finding a community of interest bears **\*1094** mentioning—once again, the question of "profits" earned by Manitou. GSUSA continues to speak out of both sides of its mouth regarding the WFDL's applicability to nonprofit organizations. At oral argument, GSUSA conceded that all nonprofits are not exempt from protection from the WFDL; in its brief, however, GSUSA remains focused on the for-profit/not-for-profit distinction, arguing that because Manitou, as a nonprofit, earns no "profits," it cannot be a dealer under the statute. In this regard, however, GSUSA is simply wrong. "For-profit" and "not-for-profit" are shorthand classifications, not literal labels. A "profit" is an excess of revenues over expenditures. What distinguishes a for-profit from a not-for-profit is what the company does with these excess revenues. GSUSA understands this distinction. Quoting from *Essential Elements of a Girl Scout Corporation,* a GSUSA publication:

> The term "nonprofit organization" does not mean (as is most often incorrectly assumed) an organization that cannot enjoy a profit. Rather, the term means that the organization's profit may not be distributed to its members, officers, or directors in their private capacities. *Profit is defined as excess revenue over expenses,* and commonly known in Girl Scouting as a surplus.... *Nonprofit organizations are permitted to generate profits* but cannot pass profits on to persons as equity owners.

Girl Scouts of the U.S. of Am., *Essential Elements of a Girl Scout Corporation* 10 (1999) (emphasis added). Indeed, the record indicates that both GSUSA and Manitou, although "nonprofits," operate at a substantial surplus.

\* \* \* \* \*

To summarize this portion of the analysis, Manitou is a "dealer" within the meaning of the term as defined by the WFDL. First, a contractual relationship exists between Manitou and GSUSA. Second, Manitou sells or distributes GSUSA's products or services and makes extensive use of GSUSA's proprietary marks. And third, a community of interest exists between Manitou, the dealer, and GSUSA, the grantor. We next turn to the practical implications that Manitou's dealership status has on its prayer for interlocutory relief.

The WFDL presumes that a dealer has been irreparably harmed when the dealer seeks to preliminarily enjoin a grantor's alleged violations of the statute. Wis. Stat. § 135.065. The statute does not make clear, nor have the Wisconsin courts addressed, whether this statutory presumption of irreparable harm is rebuttable or irrebuttable. *But see S & S Sales Corp. v. Marvin Lumber & Cedar Co.,* 435 F.Supp.2d 879, 884–86 (E.D.Wis.2006) (examining the issue before ultimately concluding that the WFDL provides for a rebuttable presumption of irreparable harm). We need not attempt to decide how the Wisconsin Supreme Court would decide that issue today, because even if we are to assume that the presumption is rebuttable, GSUSA has not rebutted it. As we discussed at length above, Manitou will be irreparably harmed by GSUSA's attempts to unilaterally remove a large portion of its jurisdiction, even without the protection of the WFDL. It would be nonsensical for us to make such findings but agree with GSUSA that it has rebutted the WFDL's presumption of irreparable harm.

For the foregoing reasons, we conclude that Manitou would be irreparably harmed between now and resolution of Manitou's claims on the merits if we permitted GSUSA to alter Manitou's jurisdiction during the interim period. Because the record contains ample information to evaluate the remaining factors in the preliminary injunction analysis—indeed, everything that **\*1095** the district court used to make its decision, given that the court declined to hold an evidentiary hearing—we now turn to the question of the adequacy of legal remedies. *See Meridian Mut. Ins.,* 128 F.3d at 1120.

### B. Inadequacy of Legal Remedies

In addition to irreparable harm, a second threshold requirement that an injured party must meet to obtain interlocutory relief is to demonstrate that traditional legal remedies, i.e., money damages, would be inadequate. *Ty,* 237 F.3d at 895; *Lawson Prods.,* 782 F.2d at 1433; *Roland Mach.,* 749 F.2d at 386. A damages remedy

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.    10

need be "seriously deficient," but not "wholly ineffectual." *Roland Mach., 749 F.2d at 386.* In *Roland Machinery,* we discussed four general circumstances that could result in an inadequate legal remedy, at least two of which are applicable here. [8] *Id.*

The first is when a damages award may come too late to save the plaintiff's business. *Id.* As we discussed above, there is a substantial risk in this case that Manitou, given a drastically reduced jurisdiction, will lack the cash flow necessary to sustain the fixed costs of operating its business. Additionally, we have recognized that a longstanding business often has a vested interest in continuing in that business, not simply in receiving the monetary equivalent of its operation. *See id.;* *see also Semmes Motors, Inc. v. Ford Motor Co., 429 F.2d 1197, 1205 (2d Cir.1970)* (noting that a terminated family automobile dealer had a "right to continue a business in which [he] had engaged for twenty years and into which his son had recently entered" that was "not measurable entirely in monetary terms"). Manitou wants to provide Girl Scouting to the young women living within its jurisdiction in eastern Wisconsin, not trade its operation for a sum of GSUSA's money. *Cf. Semmes Motors, Inc., 429 F.2d at 1205* ("[T]he Semmes want to sell automobiles, not to live on the income from a damages award.").

A second circumstance leading to an inadequate legal remedy is when the nature of the loss incurred by the plaintiff makes it difficult to calculate damages. *Roland Mach., 749 F.2d at 386.* In this situation, Manitou's damages would be virtually impossible to compute. This conclusion is based on the potential loss of institutional knowledge accompanying the unwanted termination of employees, *cf. Local Lodge No. 1266, Int'l Ass'n of Machinists & Aerospace Workers v. Panoramic Corp., 668 F.2d 276, 286–87 (7th Cir.1981)* (noting that "[w]here, as here, employer action threatens a permanent loss of jobs, a damage remedy is inadequate" and concluding that reinstatement of terminated employees would be, "at best, impracticable"); loss of real property, *see Pelfresne, 865 F.2d at 883* ("[L]and is viewed as a unique commodity for which monetary compensation is an inadequate substitute."); and damage to goodwill, *Ty, 237 F.3d at 902* (" '[I]t is virtually impossible to ascertain the precise economic consequences of intangible harms, such as

damage to reputation and loss of goodwill ....' " (quoting *Abbott Labs., 971 F.2d at 16*)).

For these reasons, it is apparent that only an equitable remedy would provide Manitou with effective relief. Having concluded that Manitou has satisfied two of the three threshold requirements for us to **\*1096** issue a preliminary injunction, we now turn to the third: Manitou's likelihood of success on the merits of its claims.

*C. Likelihood of Success on the Merits*

To succeed in its attempt to preliminarily enjoin GSUSA from interfering with its jurisdiction, Manitou must show that it has a "better than negligible" chance of success on the merits of at least one of its claims. *Ty, 237 F.3d at 897; Omega Satellite Prods. Co. v. City of Indianapolis, 694 F.2d 119, 123 (7th Cir.1982).* This is an admittedly low requirement and is simply a threshold question. *Roland Mach., 749 F.2d at 387.* Only after we clear the threshold inquiries and proceed to the balancing phase of the analysis must we determine how likely Manitou's success must be for us to issue the requested injunction. *Id.; see also Ty, 237 F.3d at 895; Abbott Labs., 971 F.2d at 12.*

Manitou's complaint contains ten causes of action against GSUSA. Count I alleges violations of the WFDL. The WFDL provides that "[n]o grantor, directly or through any officer, agent or employee, may terminate, cancel, fail to renew or substantially change the competitive circumstances of a dealership agreement without good cause." Wis. Stat. § 135.03. In defense of its actions, GSUSA argues, first, that it is not changing the competitive circumstances of Manitou's agreement with GSUSA, and, alternatively, that if GSUSA is doing so, it is with good cause. For the following reasons, we conclude that Manitou has a better-than-negligible chance of succeeding on the merits of its WFDL claim. Because Manitou surpasses the threshold on at least one of its causes of action, we need not discuss Manitou's likelihood of success on its remaining nine claims.

*1. Substantial Change of the Competitive Circumstances of the Dealership Agreement*

GSUSA first contends that stripping Manitou of 60% of its jurisdiction does not alter the competitive circumstances of Manitou's agreement with GSUSA. Section 135.03 prohibits a grantor from substantially changing "the competitive

circumstances of a dealership *agreement* without good cause." *Id.* (emphasis added). Citing the Wisconsin Court of Appeals's decision in *Super Valu Stores, Inc. v. D–Mart Food Stores, Inc.,* 146 Wis.2d 568, 431 N.W.2d 721 (Ct.App.1988), in which a food wholesaler sought to terminate its agreement with a grocer, GSUSA claims that the terms of its agreement with Manitou preclude finding any change in competitive circumstances. First, GSUSA argues that, like the agreement in *Super Valu Stores,* its agreement with Manitou is nonexclusive. Second, GSUSA contends that because Manitou's charter application provides that its jurisdiction is "subject to change at the discretion of the GSUSA," it acted within the conduct contemplated by the agreement, not as a substantial change to it. We find both arguments unpersuasive because of ambiguities attending the relevant provisions of the agreement.[9]

 **\*1097** It is doubtful that the agreement here is nonexclusive. In *Super Valu Stores,* the court relied heavily on the agreement's express nonexclusivity provision in reaching its conclusions. *Id.* at 725 ("Compliance with the *express terms* of the dealership agreement cannot, *under the circumstances of this case,* give rise to a violation of sec. 135.03." (emphasis added)). In this case, neither the charter nor the application—nor any of the other documents, for that matter—contain such a provision. In fact, language in the charter and application arguably indicates that the parties intended that the agreement *would be* exclusive. In the charter application, for example, Manitou agreed "to develop, manage, and maintain Girl Scouting *throughout the area of its jurisdiction.*" Further, the *Blue Book of Basic Documents 2006,* which GSUSA cites at length, contains the following policy statement: "When a Girl Scout council is chartered and the territory in which it is to operate has been decided upon, *all* Girl Scout troops in *all* the communities within that territory shall be under its jurisdiction...." *Blue Book, supra,* at 20. Assuming, as only makes sense, that a Girl Scout troop reports to only one local council at a time, and assuming that GSUSA adheres to its own policies, this statement makes it logically impossible that multiple local councils might be assigned the same jurisdiction. GSUSA's longstanding practice of assigning non-overlapping territories to the local councils supports this conclusion. That the agreement did not contain an express nonexclusivity agreement, and was even arguably exclusive, is a significant difference from the facts in *Super Valu Stores.*

Next, GSUSA encourages us to adopt an expansive interpretation of *Super Valu Stores,* which, according to GSUSA, establishes that *any action* taken by a grantor that is specifically contemplated by the terms of the relevant agreement cannot be a "substantial change in competitive circumstances." *Id.* As we discuss below, ambiguities surrounding the relevant provision in the charter application make it unnecessary for us to decide the scope of the *Super Valu Stores* decision today. However, we note that such an expansive interpretation would conflict with the WFDL's directions to construe its protections liberally, Wis. Stat. § 135.025(1), and to counteract attempts to skirt the WFDL's protections by contractual agreement, *id.* § 135.025(3).

Manitou's charter application contains the following provision:

> [Manitou], now having jurisdiction over the area described in the official record of the council's jurisdiction on file with [GSUSA] ..., hereby applies for a charter for the same jurisdiction, subject to change at the discretion of GSUSA, for the term January 1, 2006, through December 31, 2009.

The most straightforward interpretation of this provision, which does not appear in Manitou's charter but in the application to renew its charter, is that GSUSA reserved the right to change Manitou's jurisdiction only during the application process. It says nothing about GSUSA's ability to alter Manitou's jurisdiction once the charter has issued. The charter itself further supports this interpretation. Manitou's actual charter states that GSUSA grants Manitou the right to administer Girl Scouting "within the area of jurisdiction agreed upon with [GSUSA]." The only way to read these two statements together is if one, the application, relates to the time during the application process, while the **\*1098** other, the charter, deals with the time after GSUSA issues the charter.

A second discrepancy between the charter application and the charter itself provides additional support for this conclusion. As noted above, the charter application states that the charter is to run from January 1, 2006, to December 31, 2009. The charter that GSUSA issued, however, remains valid not until

December 31, 2009, but for "up to four years." This provides additional evidence that the above-cited provision pertained only to the pending application, which was subject to change and not finalized until GSUSA issued the charter itself. Thus, the charter, once issued, does not, by its terms, grant GSUSA the right to change Manitou's territory.

Because it is possible to evaluate the present situation and conclude, first, that GSUSA's agreement was exclusive, and, second, that the agreement did not provide GSUSA the right to amend Manitou's jurisdiction, this presents quite a different case from *Super Valu Stores*. There is at least a better-than-negligible chance that GSUSA has substantially altered the competitive circumstances of its agreement with Manitou.

### 2. Good Cause

GSUSA's final argument during this phase of the analysis is that if in fact it is attempting to substantially change the competitive circumstances of its dealership agreement with Manitou, it does so with good cause. *See* Wis. Stat. § 135.03 ("No grantor ... may terminate, cancel, fail to renew or substantially change the competitive circumstances of a dealership *without good cause*." (emphasis added)). We evaluate the presence of good cause on a case-by-case basis, *Wis. Music Network, Inc. v. Muzak Ltd. P'ship,* 5 F.3d 218, 224 (7th Cir.1993), with the burden of showing good cause on the grantor, *Morley–Murphy Co. v. Zenith Elecs. Corp.,* 142 F.3d 373, 376 (7th Cir.1998). The statute defines "good cause" in the following way:

> Failure by a dealer to comply substantially with essential and reasonable requirements imposed upon the dealer by the grantor, or sought to be imposed by the grantor, which requirements are not discriminatory as compared with requirements imposed on other similarly situated dealers either by their terms or in the manner of their enforcement.

Wis. Stat. § 135.02(4)(a). A dealer also provides good cause if it acts in bad faith "in carrying out the terms of the dealership." *Id.* § 135.02(4)(b).

The Wisconsin Supreme Court liberally addressed the issue of good cause in *Ziegler Co. v. Rexnord, Inc. (Ziegler II),* 147 Wis.2d 308, 433 N.W.2d 8 (1988). In that case, Rexnord, a manufacturer of industrial equipment, declined to renew its agreement with Ziegler, one of its distributors, prompting Ziegler to sue for alleged violations of the WFDL. *Id.* at 10. In defense, Rexnord argued that although Ziegler had done nothing wrong according to the letter of the statute, Rexnord's substantial economic losses justified its decision. *Id.* at 11. The court concluded that a "grantor's economic circumstances may constitute good cause to alter its method of doing business with its dealers, but such changes must be essential, reasonable and non-discriminatory." *Id.* Under the court's rationale, for good cause to exist, there must be (1) an "objectively ascertainable" need for the proposed change, (2) the change must be a proportionate response to that need, and (3) the change must be nondiscriminatory. *Id.* at 13; *see also* *Morley–Murphy,* 142 F.3d at 378.

This court interpreted the *Ziegler II* decision in *Morley–Murphy,* 142 F.3d 373, **\*1099** in which we found that Zenith Electronics might have had good cause for instituting a nationwide change to its distribution system. Zenith's proposed change was similar in some respects to GSUSA's nationwide restructuring to form large, "high capacity" councils. Zenith, faced with operating losses in nine out of ten years and over $320 million in losses during the previous five years, sought to implement a new nationwide distribution strategy that would result in the termination of Morley–Murphy, a successful Zenith dealer for more than fifty years. *Id.* at 374–75. This court, following the instructions of the Wisconsin Supreme Court in *Ziegler II,* found it possible that Zenith's economic losses justified Morley–Murphy's termination and remanded the case for further proceedings on that issue. *Id.* at 378.

In this case, unlike in *Ziegler II* and *Morley–Murphy,* we question both the objective need and the proportionate response of GSUSA's attempt to unilaterally reduce Manitou's jurisdiction. This is because the circumstances confronting GSUSA differ markedly from those facing Rexnord and Zenith, both of which were reacting to extended periods of substantial economic losses.

WESTLAW    © 2020 Thomson Reuters. No claim to original U.S. Government Works.    13

GSUSA arguably presents no objective economic need for its proposed action; at the very least, its financial circumstances are a far cry from the dire economic straits confronted by Rexnord, *see Ziegler II,* 433 N.W.2d at 10–11, and Zenith, *see Morley–Murphy,* 142 F.3d at 374–75. GSUSA's financial statements indicate that GSUSA's operating revenues exceeded its operating expenses in Fiscal Years 2005 and 2006, earning operating profits of $886,000 and $2.5 million, respectively. Further, we find little support for GSUSA's argument that intangible concerns such as "fading brand image" and "waning program effectiveness," without a tangible effect on the bottom line, present the types of concerns Wisconsin courts have contemplated by the "good cause" provision of the WFDL. *See Ziegler II,* 433 N.W.2d at 12 ("If the grantor is demonstrably losing substantial amounts of money under the relationship, it may constitute good cause for changes to the contract.").

Even if the need for change were objectively ascertainable, we also question the proportionality of GSUSA's response. GSUSA is attempting to form fewer councils, each with a larger size. In the present situation, however, if GSUSA succeeds in removing 60% of Manitou's territory, we fail to see how this will help GSUSA advance its strategy. Because Manitou will continue to exist, albeit on a smaller scale, following GSUSA's removal of most of its jurisdiction, the number of councils in Wisconsin will remain the same. In addition, Manitou, as a still-existing council, will be 60% *smaller* than it was before the change. So instead of fewer councils with higher capacity, GSUSA will be left with the same number of local councils, at least one of which will have a reduced capacity. We do not believe that this method of implementing GSUSA's realignment strategy is a proportionate response to its need to address "unfavorable trends" in "membership, brand image and program effectiveness." [10] We therefore find that chances are better than negligible that a jury could conclude that GSUSA lacked an objectively **\*1100** ascertainable need for its proposed change, or that it failed to respond proportionately to that need.

Based on these findings, we conclude that Manitou has a better-than-negligible chance of success on the merits of its claims. This completes the threshold portion of our analysis. In addition to showing that it has some likelihood of succeeding on the merits of its claims, Manitou has also demonstrated that traditional legal remedies would be inadequate and that it would suffer irreparable harm in the

absence of a preliminary injunction. *See Lawson Prods.,* 782 F.2d at 1433. We now proceed to the balancing phase of the preliminary injunction analysis. *Id.*

*D. Balancing Irreparable Harms Using the Sliding Scale*

During the balancing phase of the preliminary injunction analysis, the goal of the court is to choose the course of action that minimizes the costs of being mistaken. *Am. Hosp. Supply,* 780 F.2d at 593. To do so, the court must compare the potential irreparable harms faced by both parties to the suit— the irreparable harm risked by the moving party in the absence of a preliminary injunction against the irreparable harm risked by the nonmoving party if the preliminary injunction is granted. *Ty,* 237 F.3d at 895. We evaluate these harms using a sliding scale approach. *Id.* The more likely it is that Manitou will win its case on the merits, the less the balance of harms need weigh in its favor. *Abbott Labs.,* 971 F.2d at 12; *Roland Mach.,* 749 F.2d at 387. Conversely, if it is very unlikely—albeit better than negligible, as we have already determined—that Manitou will win on the merits, the balance of harms need weigh much more in Manitou's favor. *Abbott Labs.,* 971 F.2d at 12; *Roland Mach.,* 749 F.2d at 387. When conducting this balancing, it is also appropriate to take into account any public interest, which includes the ramifications of granting or denying the preliminary injunction on nonparties to the litigation. *Lawson Prods.,* 782 F.2d at 1433; *Ty,* 237 F.3d at 895. This analysis is " 'subjective and intuitive, one which permits district courts to weigh the competing considerations and mold appropriate relief.' " *Ty,* 237 F.3d at 896 (quoting *Abbott Labs.,* 971 F.2d at 12 (citations and internal quotation marks omitted)).

The balance of harms in this case strongly weighs in Manitou's favor. We have discussed at length the irreparable harms that Manitou faces if it is denied injunctive relief. Conversely, GSUSA risks virtually zero irreparable harm. GSUSA is in the midst of a national reorganization that is not scheduled for completion until the end of 2009. With realignment efforts ongoing across the country, a delay in eastern Wisconsin poses little short- or long-term risk for GSUSA. And, in stark contrast to Manitou, any harms GSUSA does face are certainly not irreparable, but are instead fully rectifiable following resolution on the merits.

The public interest here also favors Manitou. On GSUSA's side are the six councils to which Manitou is supposed to cede its jurisdiction. These councils have already combined, however, and have begun operating as a unified council, so we fail to see how they would suffer significant harm by waiting on this litigation's outcome. Thousands of other people have an interest in this case. It has become an emotional debate for those intimately involved, as well as those watching from the sidelines. In our view, the best way to protect these individuals and families is to offer them finality. The worst thing that could happen to the Manitou community is to have it broken apart, only to try to piece **\*1101** it back together again at a later time. Manitou's members, parents, and community leaders deserve an outcome in this case, regardless of whether it ultimately favors GSUSA or Manitou, that will not later be changed. By maintaining the status quo, we ensure that the final resolution of this case on the merits will be just that— final.

Because the balance of irreparable harms, including the public interest, weighs entirely in Manitou's favor, we need not conduct a lengthy examination to quantify the likelihood of Manitou's success on the merits of its claims. We express no

opinion, in fact, on how likely we believe it is that Manitou will succeed on the merits. Given the drastic imbalance of the irreparable harms, we conclude only that Manitou's chances of success, even if they are scarcely greater than "better than negligible," are sufficient to sustain our grant of injunctive relief in this case. *See* *Menominee Rubber Co. v. Gould, Inc.,* 657 F.2d 164, 167 (7th Cir.1981).

### III. CONCLUSION

For the foregoing reasons, our order of September 11, 2008, REVERSED the decision of the district court and ENJOINED GSUSA "from making any changes to, or interfering with, the current council jurisdiction of appellant Girl Scouts of Manitou Council, Inc., pending final resolution on the merits in the district court."

**All Citations**

549 F.3d 1079

### Footnotes

1　With notation that an opinion would follow.

2　Every Girl Scout is required to pay annual membership dues of $10. These dues accrue to GSUSA, not to the local councils. A more complete explanation of the financial relationship between GSUSA and its local councils follows.

3　GSUSA sells Girl Scout-branded merchandise to the local councils at wholesale, who then resell the products to their members.

4　Although GSUSA does not receive direct revenues from the sale of Girl Scout cookies, it does receive royalties paid from the bakeries approved and licensed by GSUSA to produce Girl Scout cookies.

5　In addition to cookies, Girl Scouts sell candy, nuts, calendars, and magazine subscriptions, as well as Girl Scout-licensed apparel and equipment.

6　Manitou's jurisdiction extends into all or part of the Wisconsin counties of Calumet, Dodge, Fond du Lac, Manitowoc, Ozaukee, Sheboygan, and Washington.

7　The other six councils involved in the proposed realignment were the Girl Scouts of the Fox River Area, Inc.; Girl Scouts of the Peninsula Waters, Inc.; Girl Scouts of Lac–Bale Council, Inc.; Girl Scouts of Woodland Council, Inc.; Girl Scouts of Birch Trails Council WI, Inc.; and Girl Scouts of Indian Waters Council, Inc. Notwithstanding Manitou's refusal to participate, these councils have continued with merger plans and now operate as a single council located in northern Wisconsin and the Upper Peninsula of Michigan.

8　In addition to the two situations discussed above, the other two instances we cited in *Roland Machinery* that could lead to inadequate legal remedies are, first, if the plaintiff's lost revenues would make it impossible to

finance its lawsuit, and second, if the plaintiff would be unable to collect damages from the defendant at a later time because of the defendant's subsequent insolvency. ⬜ 749 F.2d at 386.

9    Unlike in *Super Valu Stores,* where there was an express agreement that unequivocally defined the bounds of the questioned relationship, *see* ⬜ 431 N.W.2d at 723, it is unclear what exactly constitutes the agreement in this case. GSUSA, for example, continues to argue on one hand that there is no formal contract between the parties, while on the other hand claiming that Manitou is bound by the terms of the agreement to adhere to GSUSA's constitution, bylaws, and policies. Having already decided that there is an agreement between the parties, we assume, without deciding, that the contract includes, at a minimum, Manitou's charter and its charter application, which the charter incorporates by its own terms.

10    We should note that we view with skepticism GSUSA's unilateral removal proposition. If GSUSA succeeds in removing 60% of Manitou's jurisdiction, there is no reason to believe that GSUSA will continue to allow Manitou, by then only 40% of its original size, to continue long-term operations. Doing so would fly in the face of GSUSA's ongoing initiative: to combine and grow its local councils. Instead, this appears to be only the first step in a multi-step process to remove all of Manitou's territory.

---

**End of Document**                                        © 2020 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW    © 2020 Thomson Reuters. No claim to original U.S. Government Works.    16

FILED
12-07-2020
Clerk of Circuit Court
Waukesha County
2020CV001583

**STATE OF WISCONSIN**      **CIRCUIT COURT**      **WAUKESHA COUNTY**

ERICA BREWER, et al.,

    *Plaintiffs*,

  v.          Case No. 2020CV001583
             Case Codes: 30701, 30704, 30301

TOWN OF EAGLE, et al.,

    *Defendants*.

## RULE 3.3 CITATION OF NON-WISCONSIN AUTHORITIES

*Elrod v. Burns*, 427 U.S. 347 (1976)

*Ezell v. City of Chicago*, 651 F.3d 684 (7th Cir. 2011)

*Girl Scouts of Manitou Council, Inc. v. Girl Scouts of U.S. of America, Inc.*, 549 F.3d 1079 (7th Cir. 2008)

*Goldberg v. Kelly*, 397 U.S. 254 (1970)

*GoodCat, LLC v. Cook*, 202 F. Supp. 3d 896 (S.D. Ind. 2016)

*Lozman v. City of Riviera Beach*, 138 S. Ct. 1945 (2018)

*Marshall v. Jerrico*, 446 U.S. 238 (1980)

*National People's Action v. Village of Wilmette*, 914 F.2d 1008 (7th Cir. 1990)

*Rasche v. Village of Beecher*, 336 F.3d 588 (7th Cir. 2003)

*South Lyme Property Owners Assoc., Inc. v. Town of Old Lyme*, 121 F. Supp. 2d 195 (D. Conn. 2008)

*Surita v. Hyde*, 665 F.3d 860 (7th Cir. 2011)

*Village of Willowbrook v. Olech*, 528 U.S. 562 (2000)

96 S.Ct. 2673, 49 L.Ed.2d 547, 1 IER Cases 60

FILED
12-07-2020
Clerk of Circuit Court
Waukesha County
2020CV001583

96 S.Ct. 2673

Supreme Court of the United States

Richard J. ELROD, etc., et al., Petitioners,

v.

John BURNS et al.

No. 74-1520.

|

Argued April 19, 1976.

|

Decided June 28, 1976.

**Synopsis**

Noncivil service employees of the Cook County, Illinois, sheriff's office brought class action alleging that they were fired or threatened with dismissal for the sole reason that they were not affiliated with or sponsored by the political party of the current sheriff. The United States District Court for the Northern District of Illinois dismissed the complaint for failure to state a claim upon which relief could be granted, and plaintiffs appealed. The Court of Appeals, 509 F.2d 1133, reversed and remanded, and certiorari was granted. The Supreme Court, Mr. Justice Brennan, with two Justices joining and two Justices concurring in the result, held, inter alia, that plaintiffs stated a valid claim for deprivation of constitutional rights secured by the First and Fourteenth Amendments.

Affirmed.

Mr. Justice Stewart filed an opinion concurring in the judgment, in which Mr. Justice Blackmun joined.

Mr. Chief Justice Burger filed a dissenting opinion.

Mr. Justice Powell filed a dissenting opinion in which Mr. Chief Justice Burger and Mr. Justice Rehnquist joined.

Mr. Justice Stevens took no part.

**\*\*2676** Syllabus [*]

**\*347** Respondents, Republicans who are non-civil-service employees of the Cook County, **\*\*2677** Ill., Sheriff's Office, brought this suit as a class action for declaratory, injunctive, and other relief against petitioners, including the newly elected Sheriff, a Democrat, and county Democratic organizations, alleging that in violation of the First and Fourteenth Amendments and various statutes, including the Civil Rights Act of 1871, respondents were discharged or (in the case of one respondent) threatened with discharge for the sole reason that they were not affiliated with or sponsored by the Democratic Party. Finding that respondents had failed to show irreparable injury, the District Court denied their motion for a preliminary injunction and ultimately dismissed their complaint for failure to state a claim upon which relief could be granted. The Court of Appeals reversed and remanded with instructions to enter appropriate preliminary injunctive relief. Held: The judgment is affirmed. Pp. 2679-2690; 2690.

509 F.2d 1133, affirmed.

Mr. Justice BRENNAN, joined by Mr. Justice WHITE and Mr. Justice MARSHALL, concluded that:

1. Neither the political-question doctrine nor the separation-of-powers doctrine makes this case inappropriate for judicial resolution, since, Inter alia, neither doctrine applies to the federal judiciary's relationship to the States. Pp. 2679-2680.

2. The practice of patronage dismissals violates the First and Fourteenth Amendments and respondents thus stated a valid claim for relief. Pp. 2681-2689.

(a) Patronage dismissals severely restrict political belief and association, which constitute the core of those activities protected by the First Amendment, and government may not, without seriously inhibiting First Amendment rights, force a public employee to relinquish his right to political association as the price of holding a public job. Perry v. Sindermann, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570; Keyishian v. Board of Regents, 385 U.S. 589, 87 S.Ct. 675, 17 L.Ed.2d 629. Pp. 2681-2683.

**\*348** (b) Though First Amendment rights are not absolute, they may be curtailed only by interests of vital importance, the burden of proving the existence of which rests upon the government, Buckley v. Valeo, 424 U.S. 1, 94, 96 S.Ct. 612, 46 L.Ed.2d 659. If conditioning the retention of public employment on the employee's support of the in-party is to survive constitutional challenge, it must further some vital government end by a means that is least restrictive of freedom of belief and association in achieving that end, and the

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.  1

benefit gained must outweigh the loss of the constitutionally protected rights. Pp. 2683-2685.

(c) The inefficiency resulting from wholesale replacement of public employees on a change of administration belies the argument that employees not of the same political persuasion as the controlling party will not be motivated to work effectively; nor is it clear that patronage appointees are more qualified than those they replace. Since unproductive employees may always be discharged and merit systems are available, it is clear that less drastic means than patronage dismissals are available to insure the vital need for government efficiency and effectiveness. Pp. 2685-2687.

(d) The need to insure that policies that the electorate has sanctioned are effectively implemented can be fully satisfied by limiting patronage dismissals to policymaking positions. P. 2687.

(e) Patronage dismissals cannot be justified by their contribution to the proper functioning of our democratic process through their assistance to partisan politics, since political parties are nurtured by other methods that are less intrusive. More fundamentally, any contribution of patronage dismissals to the democratic process does not suffice to override their severe encroachment on First Amendment freedoms. Pp. 2687-2689.

3. Since at the time the preliminary injunction was sought one of the named respondents was threatened with job loss, as were many of the class that respondents **2678 were seeking to have certified (if they had not already been coerced into supporting the Democratic Party to avoid discharge), First Amendment interests were either threatened or being impaired. Thus, irreparable injury was shown, and since respondents demonstrated a probability of success on the merits, the issuance of the injunction was properly directed by the Court of Appeals. Pp. 2689-2690.

*349 Mr. Justice STEWART, joined by Mr. Justice BLACKMUN, concluded that a nonpolicymaking, nonconfidential government employee may not be discharged from a job that he is satisfactorily performing, upon the sole ground of his political beliefs, and that no other issue is involved in this case. P. 2690.

**Attorneys and Law Firms**

Thomas A. Foran, Chicago, Ill., for petitioners.

John C. Tucker, Chicago, Ill., for respondents.

**Opinion**

Mr. Justice BRENNAN announced the judgment of the Court and delivered an opinion in which Mr. Justice WHITE and Mr. Justice MARSHALL joined.

This case presents the question whether public employees who allege that they were discharged or threatened with discharge solely because of their partisan political affiliation or nonaffiliation state a claim for deprivation of constitutional rights secured by the First and Fourteenth Amendments.

I

Respondents brought this suit in the United States District Court for the Northern District of Illinois *350 against petitioners, Richard J. Elrod, Richard J. Daley, the Democratic Organization of Cook County, and the Democratic County Central Committee of Cook County. Their complaint alleged that they were discharged or threatened with discharge solely for the reason that they were not affiliated with or sponsored by the Democratic Party. They sought declaratory, injunctive, and other relief for violations of the First and Fourteenth Amendments and 42 U.S.C. ss 1983, 1985, 1986, 1988. Finding that the respondents failed to make an adequate showing of irreparable injury, the District Court denied their motion for a preliminary injunction and ultimately dismissed their complaint for failure to state a claim upon which relief could be granted. The United States Court of Appeals for the Seventh Circuit, relying on Illinois State Employees Union v. Lewis, 473 F.2d 561 (CA7 1972), reversed and remanded, holding that respondents' complaint stated a legally cognizable claim. The Court of Appeals instructed the District Court to enter appropriate preliminary injunctive relief. 509 F.2d 1133 (CA7 1975). We granted certiorari. 423 U.S. 821, 96 S.Ct. 33, 46 L.Ed.2d 37. We affirm. [1]

II

In December 1970, the Sheriff of Cook County, a Republican, was replaced by Richard Elrod, a Democrat. At that time, respondents, all Republicans, were employees of the Cook County Sheriff's Office. They were non-civil-service

employees and, therefore, not covered by any statute, ordinance, or regulation protecting them from arbitrary discharge. One respondent, John Burns, was Chief Deputy of the Process Division and supervised all departments of the Sheriff's Office working on the **\*351** seventh floor of the building housing that office. Frank Vargas was a bailiff and security guard at the Juvenile Court of Cook County. Fred L. Buckley was employed as a process server in the office. Joseph Dennard was an employee in the office.

It has been the practice of the Sheriff of Cook County, when he assumes office from a Sheriff of a different political party, to **\*\*2679** replace non-civil-service employees of the Sheriffs' Office with members of his own party when the existing employees lack or fail to obtain requisite support from, or fail to affiliate with, that party. Consequently, subsequent to Sheriff Elrod's assumption of office, respondents, with the exception of Buckley, were discharged from their employment solely because they did not support and were not members of the Democratic Party and had failed to obtain the sponsorship of one of its leaders. Buckley is in imminent danger of being discharged solely for the same reasons. Respondents allege that the discharges were ordered by Sheriff Elrod under the direction of the codefendants in this suit.

### III

At the outset, we are met with objections to our consideration of this case based on the political-question doctrine and the principle of separation of powers. These objections need not long detain us.

A question presented to this Court for decision is properly deemed political when its resolution is committed by the Constitution to a branch of the Federal Government other than this Court. Baker v. Carr, 369 U.S. 186, 217, 82 S.Ct. 691, 710, 7 L.Ed.2d 663 (1962). Thus, "it is the relationship between the judiciary and the coordinate branches of the Federal Government, and not the federal judiciary's relationship to the States, which gives rise to the 'political question.' " Id., 369 U.S. at 210, 82 S.Ct. at 706. That matters related to a State's, or even the Federal Government's, elective process are implicated by **\*352** this Court's resolution of a question is not sufficient to justify our withholding decision of the question. In particular, in this case, ware asked only to determine whether the politically motivated discharge of employees of the Cook County Sheriff's Office comports with the limitations of the First and Fourteenth Amendments. This involves solely a question of constitutional interpretation, a function ultimately the responsibility of this Court. Id., 369 U.S. at 211, 82 S.Ct. at 706. See Powell v. McCormack, 395 U.S. 486, 518-549, 89 S.Ct. 1944, 1962-1978, 23 L.Ed.2d 491 (1969). Petitioners do not, and could not, argue that a decision as to the constitutionality of the Sheriff's practices should be left to Congress or the President. The political-question doctrine, therefore, is no obstacle to judicial review in this case. See Williams v. Rhodes, 393 U.S. 23, 28, 89 S.Ct. 5, 9, 21 L.Ed.2d 24 (1968).

Petitioners also object that our review of this case will offend the principle of separation of powers, for the executive's responsibility to insure that the laws be faithfully executed requires the power of appointment or removal at will, unimpaired by any judicial oversight. They cite Myers v. United States, 272 U.S. 52, 47 S.Ct. 21, 71 L.Ed. 160 (1926), in support of their argument. The short answer to this argument is that the separation-of-powers principle, like the political-question doctrine, has no applicability to the federal judiciary's relationship to the States. The matter in Myers itself was limited to the permissibility of restraints imposed by Congress on the President concerning the removal of the executive officers. More fundamentally, however, the answer to petitioners' objection is that there can be no impairment of executive power, whether on the state or federal level, where actions pursuant to that power are impermissible under the Constitution. Where there is no power, there can be no impairment of power. And our determination of the limits on state executive power contained in the Constitution **\*353** is in proper keeping with our primary responsibility of interpreting that document. It is to such a determination that we now turn.

### IV

The Cook County Sheriff's practice of dismissing employees on a partisan basis is but one form of the general practice of political patronage.[2] The practice also includes **\*\*2680** placing loyal supporters in government jobs that may or may not have been made available by political discharges. Nonofficeholders may be the beneficiaries of lucrative government contracts for highway construction, buildings, and supplies. Favored wards may receive improved public services. Members of the judiciary may even engage

in the practice through the appointment of receiverships, trusteeships, and refereeships. Although political patronage comprises a broad range of activities, we are here concerned only with the constitutionality of dismissing public employees for partisan reasons.

Patronage practice is not new to American politics. It has existed at the federal level at least since the Presidency of Thomas Jefferson,[3] although its popularization and legitimation primarily occurred later, in the Presidency of Andrew Jackson.[4] The practice is not unique to American politics. It has been used in many European countries,[5] and in darker times, it played a significant role in the Nazi rise to power in Germany and other totalitarian states.[6] More recent times have witnessed *354 a strong decline in its use, particularly with respect to public employment. Indeed, only a few decades after Andrew Jackson's administration, strong discontent with the corruption and inefficiency of the patronage system of public employment eventuated in the Pendleton Act,[7] the foundation of modern civil service. And on the state and local levels, merit systems have increasingly displaced the practice.[8] This trend led the Court to observe in CSC v. National Association of Letter Carriers, 413 U.S. 548, 564, 93 S.Ct. 2880, 2889, 37 L.Ed.2d 796 (1973), that "the judgment of Congress, the Executive, and the country appears to have been that partisan political activities by federal employees must be limited if the Government is to operate effectively and fairly, elections are to play their proper part in representative government, and employees themselves are to be sufficiently free from improper influences."

The decline of patronage employment is not, of course, relevant to the question of its constitutionality. It is the practice itself, not the magnitude of its occurrence, the constitutionality of which must be determined. Nor for that matter does any unacceptability of the practice signified by its decline indicate its unconstitutionality. Our inquiry does not begin with the judgment of history, though the actual operation of a practice viewed in retrospect may help to assess its workings with respect to constitutional limitations. Compare Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), with *355 Plessy v. Ferguson, 163 U.S. 537, 16 S.Ct. 1138, 41 L.Ed. 256 (1896). Rather, inquiry must commence with identification of the constitutional limitations implicated by a challenged governmental practice.[9]

V

The cost of the practice of patronage is the restraint it places on freedoms of belief **2681 and association. In order to maintain their jobs, respondents were required to pledge their political allegiance to the Democratic Party, work for the election of other candidates of the Democratic Party, contribute a portion of their wages to the Party, or obtain the sponsorship of a member of the Party, usually at the price of one of the first three alternatives. Regardless of the incumbent party's identity, Democratic or otherwise, the consequences for association and belief are the same. An individual who is a member of the out-party maintains affiliation with his own party at the risk of losing his job. He works for the election of his party's candidates and espouses its policies at the same risk. The financial and campaign assistance that he is induced to provide to another party furthers the advancement of that party's policies to the detriment of his party's views and ultimately his own beliefs, and any assessment of his salary is tantamount to coerced belief. See Buckley v. Valeo, 424 U.S. 1, 19, 96 S.Ct. 612, 634-635, 46 L.Ed.2d 659 (1976). Even a pledge of allegiance to another party, however ostensible, only serves to compromise the individual's true beliefs. Since the average public employee is hardly in the financial position to support his party and another, or to lend his time to two parties, the *356 individual's ability to act according to his beliefs and to associate with others of his political persuasion is constrained, and support for his party is diminished.

It is not only belief and association which are restricted where political patronage is the practice. The free functioning of the electoral process also suffers. Conditioning public employment on partisan support prevents support of competing political interests. Existing employees are deterred from such support, as well as the multitude seeking jobs. As government employment, state or federal, becomes more pervasive, the greater the dependence on it becomes, and therefore the greater becomes the power to starve political opposition by commanding partisan support, financial and otherwise. Patronage thus tips the electoral process in favor of the incumbent party, and where the practice's scope is substantial relative to the size of the electorate, the impact on the process can be significant.

Our concern with the impact of patronage on political believe and association does not occur in the abstract, for political belief and association constitute the core of those activities protected by the First Amendment.[10] Regardless

of the nature of the inducement, whether it be by the denial of public employment or, as in Board of Education v. Barnette, 319 U.S. 624, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943), by the influence of a teacher over students, "(i)f there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein." Id., 319 U.S., at 642, 63 S.Ct., at 1187. And, though *357 freedom of belief is central, "(t)he First Amendme protects political association as well as political expression." Buckley v. Valeo, supra, 424 U.S. at 11, 96 S.Ct. at 632. "There can no longer be any doubt that freedom to associate with others for the common advancement of political beliefs and ideas is a form of 'orderly group activity' protected by the First and Fourteenth Amendments. NAACP v. Button, 371 U.S. 415, 430, 83 S.Ct. 328, 336, 9 L.Ed.2d 405; Bates v. Little Rock, 361 U.S. 516, 522-523, 80 S.Ct. 412, 416-417, 4 L.Ed.2d 480; NAACP v. Alabama, 357 U.S. 449, 460-461, 78 S.Ct. 1163, 1171, 2 L.Ed.2d 1488. The right to associate with the political party of one's choice is an integral part of this basic constitutional freedom." Kusper v. Pontikes, 414 U.S. 51, 56-57, 94 S.Ct. 303, 307, 38 L.Ed.2d 260 (1973).

**2682 These protections reflect our "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open," New York Times Co. v. Sullivan, 376 U.S. 254, 270, 84 S.Ct. 710, 721, 11 L.Ed.2d 686 (1964), a principle itself reflective of the fundamental understanding that "(c)ompetition in ideas and governmental policies is at the core of our electoral process . . . ." Williams v. Rhodes, 393 U.S., at 32, 89 S.Ct., at 11. Patronage, therefore to the extent it compels or restrains belief and association is inimical to the process which undergirds our system of government and is "at war with the deeper traditions of democracy embodied in the First Amendment." Illinois State Employees Union v. Lewis, 473 F.2d, at 576. As such, the practice unavoidably confronts decisions by this Court either invalidating or recognizing as invalid government action that inhibits belief and association through the conditioning of public employment on political faith.

The Court recognized in United Public Workers v. Mitchell, 330 U.S. 75, 100, 67 S.Ct. 556, 569, 91 L.Ed. 754

(1947), that "Congress may not 'enact a regulation providing that no Republican, Jew or Negro shall be appointed to federal office . . . .' " This *358 principle was reaffirmed in Wieman v. Updegraff, 344 U.S. 183, 73 S.Ct. 215, 97 L.Ed. 216 (1952), which held that a State could not require its employees to establish their loyalty by extracting an oath denying past affiliation with Communists. And in Cafeteria Workers v. McElroy, 367 U.S. 886, 898, 81 S.Ct. 1743, 1750, 6 L.Ed.2d 1230 (1961), the Court recognized again that the government could not deny employment because of previous membership in a particular party. [11]

Particularly pertinent to the constitutionality of the practice of patronage dismissals are Keyishian v. Board of Regents, 385 U.S. 589, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967), and Perry v. Sindermann, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972). In Keyishian, the Court invalidated New York statutes barring employment merely on the basis of membership in "subversive" organizations. Keyishian squarely held that political association alone could not, consistently with the First Amendment, constitute *359 an adequate ground for denying public employment. [12] In Perry, the Court broadly rejected the validity of limitations on First Amendment rights as a condition to the receipt of a governmental benefit, stating that the government "may not deny a benefit to a person on a basis that infringes his constitutionally protected interests especially, his interest in freedom of speech. For if the government could deny a benefit to a person because of his constitutionally protected speech or associations, his exercise of those freedoms would in effect be penalized and inhibited. This would allow **2683 the government to 'produce a result which (it) could not command directly.' Speiser v. Randall, 357 U.S. 513, 526, 78 S.Ct. 1332, 1342, 2 L.Ed.2d 1460. Such interference with constitutional rights is impermissible." 408 U.S., at 597, 92 S.Ct. at 2697.

Patronage practice falls squarely within the prohibitions of Keyishian and Perry. Under that practice, public employees hold their jobs on the condition that they provide, in some acceptable manner, support for the favored political party. The threat of dismissal for failure to provide that support unquestionably inhibits protected belief and association, and dismissal for failure to provide support only penalizes its exercise. The belief and association which government may not ordain directly are achieved by indirection. [13] And *360

regardless of how evenhandedly these restraints may operate in the long run, after political office has changed hands several times, protected interests are still infringed and thus the violation remains.

VI

Although the practice of patronage dismissals clearly infringes First Amendment interests, our inquiry is not at an end, for the prohibition on encroachment of First Amendment protections is not an absolute. Restraints are permitted for appropriate reasons. Keyishian and Perry, however, not only serve to establish a presumptive prohibition on infringement, but also serve to dispose of one suggested by petitioners' reference to this Court's affirmance by an equally divided court in Bailey v. Richardson, 341 U.S. 918, 71 S.Ct. 669, 95 L.Ed. 1352 (1951), aff'g 86 U.S.App.D.C. 248, 182 F.2d 46 (1950). [14] That is the notion that because there is no right to a government benefit, such as public employment, the benefit may be denied for any reason. Perry, however, emphasized that "[f]or at least a quarter-century, this Court has made clear that even though a person has no 'right' to a valuable governmental benefit and even though the government may *361 deny him the benefit for any number of reasons, there are some reasons upon which the government may not rely." 408 U.S., at 597, 92 S.Ct., at 2697. *Perry* and *Keyishian* properly recognizene such impermissible reason: The denial of a public benefit may not be used by the government for the purpose of creating an incentive enabling it to achieve what it may not command directly. " '[T]he theory that public employment which may be denied altogether may be subjected to any conditions, regardless of how unreasonable, has been uniformly rejected.' " Keyishian v. Board of Regents, 385 U.S., at 605-606, 87 S.Ct., at 685. "It is too late in the day to doubt that the liberties of religion and expression may be infringed by the denial of or placing of conditions upon a benefit or privilege." Sherbert v. Verner, 374 U.S. 398, 404, 83 S.Ct. 1790, 1794, 10 L.Ed.2d 965 (1963). " '[T]his Court now has rejected the concept that constitutional rights turn upon whether a governmental benefit is characterized as a "right" or as a "privilege" ' " **2684 Sugarman v. Dougall, 413 U.S. 634, 644, 93 S.Ct. 2842, 2848, 37 L.Ed.2d 853 (1973) (quoting Graham v. Richardson, 403 U.S. 365, 374, 91 S.Ct. 1848, 1853, 29 L.Ed.2d 534 (1971)). [15]

*362 While the right-privilege distinction furnishes no ground on which to justify patronage, petitioners raise several other justifications requiring consideration. Before examining those justifications, however, it is necessary to have in mind the standards according to which their sufficiency is to be measured. It is firmly established that a significant impairment of First Amendment rights must survive exacting scrutiny. Buckley v. Valeo, 424 U.S., at 64-65, 96 S.Ct., at 656; NAACP v. Alabama, 357 U.S. 449, 460-461, 78 S.Ct. 1163, 1170-1171, 2 L.Ed.2d 1488 (1958). "This type of scrutiny is necessary even if any deterrent effect on the exercise of First Amendment rights arises, not through direct government action, but indirectly as an unintended but inevitable result of the government's conduct . . . ." Buckley v. Valeo, supra, 424 U.S., at 65, 96 S.Ct., at 656. Thus encroachment "cannot be justified upon a mere showing of a legitimate state interest." Kusper v. Pontikes, 414 U.S., at 58, 94 S.Ct., at 308. The interest advanced must be paramount, one of vital importance, and the burden is on the government to show the existence of such an interest. Buckley v. Valeo, supra, 424 U.S., at 94, 96 S.Ct., at 670; Williams v. Rhodes, 393 U.S., at 31-33, 89 S.Ct., at 10-11; NAACP v. Button, 371 U.S. 415, 438, 444, 83 S.Ct. 328, 340, 343, 9 L.Ed.2d 405 (1963); Bates v. Little Rock, 361 U.S. 516, 524, 80 S.Ct. 412, 417, 4 L.Ed.2d 480 (1960); NAACP v. Alabama, supra, 357 U.S., at 464-466, 78 S.Ct., at 1172-1173; Thomas v. Collins, 323 U.S. 516, 530, 65 S.Ct. 315, 322, 89 L.Ed. 430 (1945). In the instant case, care must be taken not to confuse the interest of partisan organizations with governmental interests. Only the latter will suffice. Moreover, it is not enough that the means chosen in furtherance of the interest is rationally related to that end. Sherbert v. Verner, supra, 374 U.S., at 406, 83 S.Ct. at 1795. The gain to the subordinating interest provided by the means must outweigh the incurred loss of protected rights, see United Public Workers v. Mitchell, 330 U.S., at 96, 67 S.Ct., at 567, [16] and the government must "emplo(y) means *363 closely drawn to avoid unnecessary abridgment. . . ." Buckley v. Valeo, supra, 424 U.S., at 25, 96 S.Ct., at 638. "(A) State may not choose means that unnecessarily restrict constitutionally protected liberty. 'Precision of regulation must be the touchstone in an area so closely touching our most precious freedoms.' If the State has open to it a less

drastic way of satisfying its legitimate interests, it may not choose a legislative scheme that broadly stifles the exercise of fundamental personal liberties." **\*\*2685** Kusper v. Pontikes, supra, 414 U.S., at 59, 94 S.Ct., at 308 (citations omitted). See United States v. Robel, 389 U.S. 258, 88 S.Ct. 419, 19 L.Ed.2d 508 (1967); Shelton v. Tucker, 364 U.S. 479, 81 S.Ct. 247, 5 L.Ed.2d 231 (1960). In short, if conditioning the retention of public employment on the employee's support of the in-party is to survive constitutional challenge, it must further some vital government end by a means that is least restrictive of freedom of belief and association in achieving that end, and the benefit gained must outweigh the loss of constitutionally protected rights. [17]

**\*364** One interest which has been offered in justification of patronage is the need to insure effective government and the efficiency of public employees. It is argued that employees of political persuasions not the same as that of the party in control of public office will not have the incentive to work effectively and may even be motivated to subvert the incumbent administration's efforts to govern effectively. We are not persuaded. The inefficiency resulting from the wholesale replacement of large numbers of public employees every time political office changes hands belies this justification. And the prospect of dismissal after an election in which the incumbent party has lost is only a disincentive to good work. [18] Further, it is not clear that dismissal in order to make room for a patronage appointment will result in replacement **\*365** by a person more qualified to do the job since appointment often occurs in exchange for the delivery of votes, or other party service, not job capability. More fundamentally, however, the argument does not succeed because it is doubtful that the mere difference of political persuasion motivates poor performance; nor do we think it legitimately may be used as a basis for imputing such behavior. The Court has consistently recognized that mere political association is an inadequate basis for imputing disposition to ill-willed conduct. See Keyishian v. Board of Regents, 385 U.S., at 606-608, 87 S.Ct., at 685-686; Elfbrandt v. Russell, 384 U.S. 11, 19, 86 S.Ct. 1238, 1242, 16 L.Ed.2d 321 (1966); Wieman v. Updegraff, 344 U.S., at 190-191, 73 S.Ct., at 218. [19] Though those cases involved affiliation **\*\*2686** with the Communist Party, we do not "consider **\*366** these (respondents') interest in freely associating with members of the (Republican) Party less worthy of protection than (other) employees' interest

in associating with Communists or former Communists." Illinois State Employees Union v. Lewis, 473 F.2d, at 570. At all events, less drastic means for insuring government effectiveness and employee efficiency are available to the State. Specifically, employees may always be discharged for good cause, such as insubordination or poor job performance, when those bases in fact exist.

Even if the first argument that patronage serves effectiveness and efficiency be rejected, it still may be argued that patronage serves those interests by giving the employees of an incumbent party the incentive to perform well in order to insure their party's incumbency and thereby their jobs. Patronage, according to the argument, thus makes employees highly accountable to the public. But the ability of officials more directly accountable to the electorate to discharge employees for cause and the availability of merit systems, growth in the use of which has been quite significant, convince us that means less intrusive than patronage still exist for achieving accountability in the public work force and, thereby, effective and efficient government. The greater effectiveness of patronage over these less drastic means, if any, is at best marginal, a gain outweighed by the absence of intrusion on protected interests under the alternatives.

The lack of any justification for patronage dismissals as a means of furthering government effectiveness and efficiency distinguishes this case from CSC v. Letter Carriers, 413 U.S. 548, 93 S.Ct. 2880, 37 L.Ed.2d 796 (1973), and United Public Workers v. Mitchell, 330 U.S. 75, 67 S.Ct. 556, 91 L.Ed. 754 (1949). In both of those cases, legislative restraints on political management and campaigning by public employees were upheld despite their encroachment on First Amendment rights **\*367** because, *inter alia,* they did serve in a necessary manner to foster and protect efficient and effective government. [20] Interestingly, the activities that were restrained by the legislation involved in those cases e characteristic of patronage practices. As the Court observed in Mitchell, "The conviction that an actively partisan governmental personnel threatens good administration has deepened since (1882). Congress recognizes danger to the service in that political rather than official effort may earn advancement and to the public in that governmental favor may be channeled through political connections." 330 U.S. at 97-98, 67 S.Ct. at 568.

**\*\*2687** A second interest advanced in support of patronage is the need for political loyalty of employees,

not to the end that effectiveness and efficiency be insured, but to the end that representative government not be undercut by tactics obstructing the implementation of policies of the new administration, policies presumably sanctioned by the electorate. The justification is not without force, but is nevertheless inadequate to validate patronage wholesale. Limiting patronage dismissals to policymaking positions is sufficient to achieve this governmental end. Nonpolicymaking individuals usually have only limited responsibility and are therefore not in a position to thwart the goals of the in-party.

No clear line can be drawn between policymaking and nonpolicymaking positions. While nonpolicymaking individuals usually have limited responsibility, that is not to say that one with a number of responsibilities is necessarily in a policymaking position. The nature of the responsibilities is critical. Employee supervisors, for **\*368** example, may have many responsibilities, but those responsibilities may have only limited and well-defined objectives. An employee with responsibilities that are not well defined or are of broad scope more likely functions in a policymaking position. In determining whether an employee occupies a policymaking position, consideration would also be given to whether the employee acts as an adviser or formulates plans for the implementation of broad goals. Thus, the political loyalty "justification is a matter of proof, or at least argument, directed at particular kinds of jobs." Illinois State Employees Union v. Lewis, 473 F.2d, at 574. Since, as we have noted, it is the government's burden to demonstrate an overriding interest in order to validate an encroachment on protected interests, the burden of establishing this justification as to any particular respondent will rest on the petitioners on remand, cases of doubt being resolved in favor of the particular respondent.

It is argued that a third interest supporting patronage dismissals is the preservation of the democratic process. According to petitioners, " 'we have contrived no system for the support of party that does not place considerable reliance on patronage. The party organization makes a democratic government work and charges a price for its services.' "[21] The argument is thus premised on the centrality of partisan politics to the democratic process.

Preservation of the democratic process is certainly an interest protection of which may in some instances justify limitations on First Amendment freedoms. See Buckley v. Valeo, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976); CSC v. Letter

Carriers, supra; Williams v. Rhodes, 393 U.S. 23, 89 S.Ct. 5, 21 L.Ed.2d 24 (1968); United Public Workers v. Mitchell, supra. But however important **\*369** preservation of the two-party system or any system involving a fixed number of parties may or may not be,[22] Williams v. Rhodes, supra, 393 U.S. at 32, 89 S.Ct. at 11, we are not persuaded that the elimination of patronage practice or, as is specifically involved here, the interdiction of patronage dismissals, will bring about the demise of party politics. Political parties existed in the absence of active patronage practice prior to the administration of Andrew Jackson, and they have survived substantial reduction in their patronage **\*\*2688** power through the establishment of merit systems.[23]

Patronage dismissals thus are not the least restrictive alternative to achieving the contribution they may make to the democratic process.[24] The process functions as well without the practice, perhaps even better, for patronage dismissals clearly also retard that process. Patronage can result in the entrenchment of one or a few parties to the exclusion of others. And most indisputably, as we recognized at the outset, patronage is a very effective impediment to the associational and speech freedoms which **\*370** are essential to a meaningful system of democratic government. Thus, if patronage contributes at all to the elective process, that contribution is diminished by the practice's impairment of the same. Indeed, unlike the gain to representative government provided by the Hatch Act in *CSC V. Letter Carriers, supra,* and *United Public Workers v. Mitchell, supra,* the gain to representative government provided by the practice of patronage, if any, would be insufficient to justify its sacrifice of First Amendment rights.[25]

To be sure, Letter Carriers and Mitchell upheld Hatch Act restraints sacrificing political campaigning and management, **\*371** activities themselves protected by the First Amendment. But in those cases it was the Court's judgment that congressional subordination of those activities was permissible to safeguard the core interests of individual belief and association.[26] Subordination of some First Amendment activity was permissible to protect other such activity. Today, we hold that subordination of other First Amendment activity, that is, patronage dismissals, not only is permissible, but also is mandated by the First Amendment. And since patronage dismissals fall within the category of political campaigning and management, this conclusion irresistibly flows from Mitchell and Letter Carriers. For if the First Amendment did

not place individual belief and association above political campaigning and management, at least in the setting of public employment, the restraints on those latter activities **2689 could not have been judged permissible in Mitchell and Letter Carriers. [27]

It is apparent that at bottom we are required to engage in the resolution of conflicting interests under the First Amendment. The constitutional adjudication called for *372 by this task is well within our province. [28] The illuminating source to which we turn in performing the task is the system of government the First Amendment was intended protect, a democratic system whose proper functioning is indispensably dependent on the unfettered judgment of each citizen on matters of political concern. Our decision in obedience to the guidance of that source does not outlaw political parties or political campaigning and management. Parties are free to exist and their concomitant activities are free to continue. We require only that the rights of every citizen to believe as he will and to act and associate according to his beliefs be free to continue as well.

In summary, patronage dismissals severely restrict political belief and association. Though there is a vital need for government efficiency and effectiveness, such dismissals are on balance not the least restrictive means for fostering that end. There is also a need to insure that policies which the electorate has sanctioned are effectively implemented. That interest can be fully satisfied by limiting patronage dismissals to policymaking positions. Finally, patronage dismissals cannot be justified by their contribution to the proper functioning of our democratic process through their assistance to partisan politics since political parties are nurtured by other, less intrusive and *373 equally effective methods. More fundamentally, however, any contribution of patronage dismissals to the democratic process does not suffice to override their severe encroachment on First Amendment freedoms. We hold, therefore, that the practice of patronage dismissals is unconstitutional under the First and Fourteenth Amendments, and that respondents thus stated a valid claim for relief.

VII

There remains the question whether the issuance of a preliminary injunction was properly directed by the Court of Appeals. The District Court predicated its denial of respondents' motion for a preliminary injunction on its finding that the allegations in their complaints and affidavits did not

constitute a sufficient showing of irreparable injury and that respondents had an adequate remedy at law. The Court of Appeals held, however: "Inasmuch as this case involves First Amendment rights of association which must be carefully guarded against infringement by public office holders, we judge that injunctive relief is clearly appropriate in these cases." 509 F.2d, at 1136. We agree.

At the time a preliminary injunction was sought in the District Court, one of the respondents was only threatened with discharge. In addition, many of the members of the class respondents were seeking to have certified prior to the dismissal of their complaint were threatened **2690 with discharge or had agreed to provide support for the Democratic Party in order to avoid discharge. It is clear therefore that First Amendment interests were either threatened or in fact being impaired at the time relief was sought. The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury. See *374 New York Times Co. v. United States, 403 U.S. 713, 91 S.Ct. 2140, 29 L.Ed.2d 822 (1971). [29] Since such injury was both threatened and occurring at the time of respondents' motion and since respondents sufficiently demonstrated a probability of success on the merits, the Court of Appeals might properly have held that the District Court abused its discretion in denying preliminary injunctive relief. See Bantam Books, Inc. v. Sullivan, 372 U.S. 58, 67, 83 S.Ct. 631, 637, 9 L.Ed.2d 584 (1963).

The judgment of the Court of Appeals is

Affirmed.

Mr. Justice STEVENS did not participate in the consideration or decision of this case.

Mr. Justice STEWART, with whom Mr. Justice BLACKMUN joins, concurring in the judgment.

Although I cannot join the plurality's wide-ranging opinion, I can and do concur in its judgment.

This case does not require us to consider the broad contours of the so-called patronage system, with all its variations and permutations. In particular, it does not require us to consider the constitutional validity of a system that confines the hiring of some governmental employees to those of a particular political party, and I would intimate no views whatever on that question.

96 S.Ct. 2673, 49 L.Ed.2d 547, 1 IER Cases 60

**\*375** The single substantive question involved in this case is whether a nonpolicymaking, nonconfidential government employee can be discharged or threatened with discharge from a job that he is satisfactorily performing upon the sole ground of his political beliefs. I agree with the plurality that he cannot. See Perry v. Sindermann, 408 U.S. 593, 597-598, 92 S.Ct. 2694, 2697-2698, 33 L.Ed.2d 570.

Mr. Chief Justice BURGER, dissenting.

The Court's decision today represents a significant intrusion into the area of legislative and policy concerns that the sort of intrusion Mr. Justice BRENNAN has recently protested in other contexts. I therefore join Mr. Justice POWELL's dissenting opinion, and add a few words simply to emphasize an aspect that seems particularly important to me.

The Illinois Legislature has pointedly decided that roughly half of the Sheriff's staff shall be made up of tenured career personnel and the balance left exclusively to the choice of the elected head of the department. The Court strains the rational bounds of First Amendment doctrine and runs counter to longstanding practices that are part of the fabric of our democratic system to hold that the Constitution Commands something it has not been thought to require for 185 years. For all that time our system has wisely left these matters to the States and, on the federal level, to the Congress. The Court's action is a classic example of trivializing constitutional adjudication a function of the highest importance in our system.

Only last week, in **\*\*2691** National League of Cities v. Usery, 426 U.S. 833, 96 S.Ct. 2465, 49 L.Ed.2d 245 (1976), we took steps to arrest the downgrading of States to a role comparable to the departments of France, governed entirely out of the national capital. Constant inroads on the powers of the States **\*376** to manage their own affairs cannot fail to complicate our system and centralize more power in Washington. For the reasons Mr. Justice POWELL persuasively adduces, the First Amendment neither requires nor justifies such inroads in this case. In view, the issue is not so much whether the patronage system is "good" or "bad," as the plurality characterizes the problem, but whether the choice of its use in the management of the very government of each State was not, in the words of the Tenth Amendment, "reserved to the States . . . or to the people."

Congress long ago, as a matter of policy, opted for a federal career service with a small number of purely political appointments in the executive branch, and many governmental departments have a limited number of positions in which the persons appointed have no tenure but serve at the pleasure of the cabinet officer or agency chief, who in turn serves at the pleasure of the President. See, E. g., Leonard v. Douglas, 116 U.S.App.D.C. 136, 321 F.2d 749 (1963). The considerations leading to these legislative conclusions are for me not open to judicial scrutiny under the guise of a First Amendment claim, any more than is the right of a newly elected Representative or Senator, for example, to have a staff made up of persons who share his political philosophy and affiliation and are loyal to him. It seems to me that the Illinois Legislature's choice is entitled to no less deference.

Mr. Justice POWELL, with whom THE CHIEF JUSTICE and Mr. Justice REHNQUIST join, dissenting.

The Court holds unconstitutional a practice as old as the Republic, a practice which has contributed significantly to the democratization of American politics. This decision is urged on us in the name of First Amendment rights, but in my view the judgment neither is constitutionally **\*377** required nor serves the interest of a representative democracy. It also may well disserve rather than promote core values of the First Amendment. I therefore dissent.

I

The Cook County Sheriff's Office employs approximately 3,000 people. Roughly half of these employees are "merit" employees given various protections from discharge. The other half of the employees have no such protection. Customary Illinois political practice has allowed such "non-merit" positions to be awarded on "patronage" grounds. This tradition has entitled newly elected officeholders to replace incumbent nonmerit employees with patronage appointments.

Petitioner Richard Elrod, a Democrat, was elected Sheriff of Cook County in 1970, succeeding a Republican. Consistently with Illinois practice, he dismissed a number of incumbent employees because they lacked Democratic affiliation and were unable to secure Democratic sponsorship. The named respondents, several discharged employees and another employee threatened with discharge, are all Republicans who concededly were hired by Elrod's predecessor because of their political affiliations.

II

Elrod v. Burns, 427 U.S. 347 (1976)
96 S.Ct. 2673, 49 L.Ed.2d 547, 1 IER Cases 60

As the plurality opinion recognizes, patronage practices of the sort under consideration here have a long history in America.[1] Although an extensive recounting of that history is not necessary, I think it important to **\*378** survey it more fully than does **\*\*2692** the plurality opinion.[2] The observation that patronage employment received its primary popularization and legitimation during Jackson's Presidency, Ante, at 2680, understates the historical antecedents of the practice, which stretch back to Washington's presidency.

Partisan politics, as we now know them, did not assume a prominent role in national politics immediately after the adoption of the Constitution. Nonetheless, Washington tended to confine appointments even of customs officials and postmasters to Federalists, as opposed to anti-Federalists. As the role of parties expanded, partisan considerations quickly influenced employment decisions. John Adams removed some Republicans from minor posts, and Jefferson, the first President to succeed a President of an opposing party, made significant patronage use of the appointment and removal powers. The administrations of Madison, Monroe, and John Quincy Adams provided no occasion for conspicuous patronage practice in employment, as each succeeded a copartisan. Jackson, of course, used patronage extensively when he became the first President since Jefferson to succeed an antagonistic administration.

It thus appears that patronage employment practices emerged on the national level at an early date, and that they were conspicuous during Jackson's Presidency largely because of their necessary dormancy during the long succession of Republican Presidents. During that period, however, patronage in hiring was practiced widely in the States, especially in New York and Pennsylvania. This afforded a theoretical and popular legitimacy to patronage, helping to lay the groundwork for acceptance of Jackson's actions on the national level.

**\*379** It is recognized that patronage in employment played a significant role in democratizing American politics. See, E. g., C. Fish, The Civil Service and the Patronage 156-157 (1905); Sorauf, Patronage and Party, 3 Midwest J. Pol.Sci. 115-116 (1959). Before patronage practices developed fully, an "aristocratic" class dominated political affairs, a tendency that persisted in areas where patronage did not become prevalent. C. Fish, Supra, at 157. Patronage practices broadened the base of political participation by providing incentives to take part in the process, thereby increasing the volume of political discourse in society. Patronage also

strengthened parties, and hence encouraged the development of institutional responsibility to the electorate on a permanent basis. Parties became "instrument(s) through which discipline and responsibility may be achieved within the Leviathan." Sorauf, Supra, at 115.

In many situations patronage employment practices also entailed costs to government efficiency. These costs led eventually to reforms placing most federal and state civil service employment on a nonpatronage basis. But the course of such reform is of limited relevance to the task of constitutional adjudication in this case. It is pertinent to note, however, that a perceived impingement on employees' political beliefs by the patronage system was not a significant impetus to such reform. Most advocates of reform were concerned primarily with the corruption and inefficiency that patronage was thought to induce in civil service and the power that patronage practices were thought to give the "professional" politicians who relied on them. D. Rosenbloom, Federal Service and the Constitution 70-74 (1971). Moreover, it generally was thought that elimination of these evils required the imposition both of a merit system and of restrictions on First Amendment activities **\*380** by government employees. *Id.*, at 76-77, 82-86; see, *e. g.*, *CSC v. Letter Carriers*, 413 U.S. 548, 93 S.Ct. 2880, 37 L.Ed.2d 796 (1973).

III

It might well be possible to dispose of this case on the ground that it implicates no **\*\*2693** First Amendment right of the respondents, and therefore that they have failed to state a cause of action. They are employees seeking to avoid discharge not citizens desiring an opportunity to be hired by the county without regard to their political affiliation or loyalty. Respondents' complaint acknowledges the longstanding existence of the patronage system they now challenge:

"For many years past and continuing to this time it has been the practice of the elected Sheriff of Cook County, when he assumes office from a Sheriff of a different political party, to replace all or substantially all of the non-civil service employees of the Sheriff's office who did not (a) Pledge their political allegiance to the political party of the incoming Sheriff; (and/or meet other specified political requirements) . . . ." App. p. 3.

WESTLAW    © 2020 Thomson Reuters. No claim to original U.S. Government Works.    11

We thus have complaining employees who apparently accepted patronage jobs knowingly and willingly, while fully familiar with the "tenure" practices long prevailing in the Sheriff's Office. Such employees have Benefited from their political beliefs and activities; they have not been penalized for them. In these circumstances, I am inclined to agree with the holding of the Supreme Court of Pennsylvania in American Federation of State Employees v. Shapp, 443 Pa. 527, 280 A.2d 375 (1971), that beneficiaries of a patronage system may not be heard to challenge it when it comes their turn to be replaced. See also Nunnery v. Barber, 503 F.2d 1349 (CA4 1974).

The plurality opinion virtually ignores this issue in **\*381** an apparent rush to constitutional adjudication. It also may be that the pleadings present an inadequate record on which to decide this matter. [3] In any event, I am forced to turn to the question addressed by the plurality, even though a full development of the evidence or more carefully drawn pleadings may have justified a disposition on the ground that these respondents cannot challenge the patronage hiring practices. [4]

IV

The question is whether it is consistent with the First and Fourteenth Amendments for a State to offer some employment conditioned, explicitly or implicitly, on partisan political affiliation and on the political fortunes of the incumbent officeholder. This is to be determined, as the plurality opinion agrees, by whether patronage hiring practices sufficiently advance important state interests to justify the consequent burdening of First Amendment interests. Buckley v. Valeo, 424 U.S. 1, 25, 96 S.Ct. 612, 637-638, 46 L.Ed.2d 659 (1976); Ante, at 2683-2685. It is difficult to disagree with the view, as an abstract proposition, that government employment ordinarily should not be conditioned upon one's political beliefs or activities. But we deal **\*382** here with a highly practical and rather fundamental element of our political system, not the theoretical abstractions of a political science seminar. In concluding that patronage hiring practices are unconstitutional, the plurality seriously underestimates the strength of the government interest especially at the local level in allowing some patronage hiring practices, and it exaggerates the perceived burden on First Amendment rights. [5]

**\*\*2694** A

As indicated above, patronage hiring practices have contributed to American democracy by stimulating political activity and by strengthening parties, thereby helping to make government accountable. [6] It cannot be questioned seriously that these contributions promote important state interests. Earlier this Term we said of the government interest in encouraging political debate:

"(Public financing of Presidential campaigns) is . . . (an effort) to use public money to facilitate and enlarge public discussion and participation in the electoral process, goals vital to a self-governing people." Buckley v. Valeo, supra, at 92-93, 96 S.Ct. at 670 (footnote omitted).

**\*383** "Legislation to enhance these First Amendment values is the rule, not the exception. Our statute books are replete with laws providing financial assistance to the exercise of free speech . . . ." Id., at 93 n. 127, 96 S.Ct., at 670.

We ao have recognized the strong government interests in encouraging stable political parties and avoiding excessive political fragmentation. Through the medium of established parties the "people . . . are presented with understandable choices and the winner in the general election with sufficient support to govern effectively," Storer v. Brown, 415 U.S. 724, 735, 94 S.Ct. 1274, 1281, 39 L.Ed.2d 714 (1974), while "splintered parties and unrestrained factionalism (might) do significant damage to the fabric of government." Id., 415 U.S. at 736, 94 S.Ct. at 1282. See Buckley v. Valeo, supra, 424 U.S. at 98, 101, 96 S.Ct. at ——.

Without analysis, however, the plurality opinion disparages the contribution of patronage hiring practices in advancing these state interests. It merely asserts that such practices cause the "free functioning of the electoral process (to suffer)," Ante, at 2681, and that "we are not persuaded that the elimination of . . . patronage dismissals, will bring about the demise of party politics." Ante, at 2687. One cannot avoid the impression, however, that even a threatened demise of parties would not trouble the plurality. In my view, this thinking reflects a disturbing insensitivity to the political realities relevant to the disposition of this case. [7]

The complaining parties are or were employees of the Sheriff. In many communities, the sheriff's duties are as routine as process serving, and his election attracts little or no general public interest. In the States, and **\*384** especially in the thousands of local communities, there are large numbers of elective offices, and many are as relatively obscure as that of the local sheriff or constable. Despite the importance of elective offices to the ongoing work of local governments, election campaigns for lesser offices in particular usually attract little attention from the media, with consequent disinterest and absence of intelligent participation on the part of the public. Unless the candidates for these offices are able to dispense the traditional patronage that has accrued to the offices, they also are unlikely to attract donations of time or money from voluntary groups. In short, the resource pools that fuel the intensity of political interest and debate in "important" elections **\*\*2695** frequently "could care less" about who fills the offices deemed to be relatively unimportant. Long experience teaches that at this local level traditional patronage practices contribute significantly to the democratic process. The candidates for these offices derive their support at the precinct level, and their modest funding for publicity, from cadres of friends and political associates who hope to benefit if their "man" is elected.[8] The activities of the latter are **\*385** often the principal source of political information for the voting public. The "robust" political discourse that the plurality opinion properly emphasizes is furthered not restricted by the time-honored system.

Patronage hiring practices also enable party organizations to persist and function at the local level. Such organizations become visible to the electorate at large only at election time, but the dull periods between elections require ongoing activities: precinct organizations must be maintained; new voters registered; and minor political "chores" performed for citizens who otherwise may have no practical means of access to officeholders. In some communities, party organizations and clubs also render helpful social services.

It is naive to think that these types of political activities are motivated at these levels by some academic interest in "democracy" or other public service impulse. For the most part, as every politician knows, the hope of some reward generates a major portion of the local political activity supporting parties. It is difficult to overestimate the contributions to our system by the major political parties, fortunately limited in number compared to the fractionalization that has made the continued existence of democratic government doubtful in some other countries.

Parties generally are stable, high-profile, and permanent institutions. When the names on a long ballot are meaningless to the average voter, party affiliation affords a guidepost by which voters may rationalize a myriad of political choices. Cf. Buckley v. Valeo, 424 U.S., at 66-68, 96 S.Ct., at 657-658. Voters can and do hold parties to long-term accountability, and it is not too much to say that, in their absence, responsive and responsible performance in low-profile offices, particularly, is difficult to maintain.

It is against decades of experience to the contrary, then, that the plurality opinion concludes that patronage **\*386** hiring practices interfere with the "free functioning of the electoral process." *Ante*, at 2681. This *ad hoc* judicial judgment runs counter to the judgments of the representatives of the people in state and local governments, representatives who have chosen, in most instances, to retain some patronage practices in combination with a merit-oriented civil service. One would think that elected representatives of the people are better equipped than we to weigh the need for some continuation of patronage practices in light of the interests above identified,[9] and **\*\*2696** particularly in view of local conditions.[10] See **\*387** CSC v. Letter Carriers, 413 U.S., at 564, 93 S.Ct., at 2889-2890; United Public Workers v. Mitchell, 330 U.S. 75, 99, 67 S.Ct. 556, 569, 91 L.Ed. 754 (1947). Against this background, the assertion in the plurality opinion that "(p)atronage dismissals . . . are not the least restrictive alternative to achieving (any) contribution they may make to the democratic process" is unconvincing, especially since no alternative to some continuation of patronage practices is suggested. Ante, at 2688 (footnote omitted).

B

I thus conclude that patronage hiring practices sufficiently serve important state interests, including some interests sought to be advanced by the First Amendment, to justify a tolerable intrusion on the First Amendment interests of employees or potential employees.

The plurality opinion asserts that patronage hiring practices contravene the fundamental principle that " 'no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion . . . .' " West Virginia State Board of Education v. Barnette, 319 U.S. 624, 642, 63 S.Ct. 1178, 1187, 87 L.Ed. 1628 (1943). But such practices simply cannot be so construed.

This case differs materially from previous cases involving the imposition of political conditions on employment, see, E. g., Garner v. Los Angeles Board, 341 U.S. 716, 71 S.Ct. 909, 95 L.Ed. 1317 (1951), cases where there was an attempt to exclude "a minority group . . . odious to the majority." Id., at 725, 71 S.Ct., at 915 (Frankfurter, J., concurring in part and dissenting in part). In that context there was a danger that governmental action was directed toward the elimination of political beliefs **388** by penalizing adherents to them. But patronage hiring practices have been consistent historically with vigorous ideological competition in the political "marketplace." And even after one becomes a beneficiary, the system leaves significant room for individual political expression. Employees, regardless of affiliation, may vote freely [11] and express themselves on some political issues. See Perry v. Sindermann, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972); Pickering v. Board of Education, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968). The principal intrusion of patronage hiring practices on First Amendment interests thus arises from the coercion on associational choices that may be created by one's desire initially to obtain employment. This intrusion, while not insignificant, must be measured in light of **2697** the limited role of patronage hiring in most government employment. The pressure to abandon one's beliefs and associations to obtain government employment especially employment of such uncertain duration does not seem to me to assume impermissible proportions in light of the interests to be served.

V

On the assumption that we must reach the constitutional issue at the behest of respondents, I would hold that a state or local government may elect to condition employment on the political affiliation of a prospective employee and on the political fortunes of the hiring incumbent. History and long-prevailing practice across the country support the view that patronage hiring practices make a sufficiently substantial contribution to the practical functioning of our democratic system to support **389** their relatively modest intrusion on First Amendment interests. The judgment today unnecessarily constitutionalizes another element of American life an element certainly not without its faults but one which generations have accepted on balance as having merit. [12] We should have heeded, instead, the admonition of Mr. Justice Holmes that "(i)f a thing has been practised for two hundred years by common consent, it will need a strong case for the Fourteenth Amendment to affect it%. ." Jackman v. Rosenbaum Co., 260 U.S. 22, 31, 43 S.Ct. 9, 9, 67 L.Ed. 107 (1922); see Walz v. Tax Comm'n, 397 U.S. 664, 678, 90 S.Ct. 1409, 1416, 25 L.Ed.2d 697 (1970).

**All Citations**

427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547, 1 IER Cases 60

## Footnotes

| | |
|---|---|
| * | The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See United States v. Detroit Timber & Lumber Co., 200 U.S. 321, 337, 26 S.Ct. 282, 287, 50 L.Ed. 499. |
| 1 | For purposes of our review, all of the well-pleaded allegations of respondents' complaint and uncontroverted affidavits filed in support of the motion for a preliminary injunction are taken as true. |
| 2 | M. Tolchin & S. Tolchin, To the Victor 5-6 (1971). |
| 3 | Id., at 323. |
| 4 | Id., at 323-326. |
| 5 | See C. Fish, The Civil Service and the Patronage 87, 209-210 (1904); D. Rosenbloom, Federal Service and the Constitution 238-240 (1971). |
| 6 | C. Friedrich & Z. Brzezinski, Totalitarian Dictatorship and Autocracy 183-188 (rev. ed. 1965). |
| 7 | Act of Jan. 16, 1883, c. 27, s 2(2) Fifth, Sixth, 22 Stat. 404. |
| 8 | See Broadrick v. Oklahoma, 413 U.S. 601, 604-605, n. 2, 93 S.Ct. 2908, 2912, 37 L.Ed.2d 830 (1973). Factors contributing to the declining use of patronage have not been limited to the proliferation of merit |

systems. New methods of political financing, the greater necessity of job expertise in public employment, growing issue orientation in the elective process, and new incentives for political campaigners have also contributed. Sorauf, The Silent Revolution In Patronage, 20 Pub.Admin.Rev. 28, 34 (1960).

9    For comprehensive commentary on the constitutionality of the practice of patronage dismissals, see Schoen, Politics, Patronage, and the Constitution, 3 Ind.Legal Forum 35 (1969); Comment, Patronage Dismissals: Constitutional Limits and Political Justification, 41 U.Chi.L.Rev. 297 (1974).

10   "It is important to note that while it is the Fourteenth Amendment which bears directly upon the State it is the more specific limiting principles of the First Amendment that finally govern this case." Board of Education v. Barnette, 319 U.S. 624, 639, 63 S.Ct. 1178, 1186, 87 L.Ed. 1628 (1943).

11   Protection of First Amendment interests has not been limited to invalidation of conditions on government employment requiring allegiance to a particular political party. This Court's decisions have prohibited conditions on public benefits, in the form of jobs or otherwise, which dampen the exercise generally of First Amendment rights, however slight the inducement to the individual to forsake those rights.

In Torcaso v. Watkins, 367 U.S. 488, 81 S.Ct. 1680, 6 L.Ed.2d 982 (1961), decided the same day as Cafeteria Workers, the Court squarely held that a citizen could not be refused a public office for failure to declare his belief in God. More broadly, the Court has held impermissible under the First Amendment the dismissal of a high school teacher for openly criticizing the Board of Education on its allocation of school funds. Pickering v. Board of Education, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968). And in Sherbert v. Verner, 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963), unemployment compensation, rather than public employment, was the government benefit which could not be withheld on the condition that a person accept Saturday employment where such employment was contrary to religious faith. Similarly, the First Amendment prohibits limiting the grant of a tax exemption to only those who affirm their loyalty to the State granting the exemption. Speiser v. Randall, 357 U.S. 513, 78 S.Ct. 1332, 2 L.Ed.2d 1460 (1958).

12   Thereafter, United States v. Robel, 389 U.S. 258, 88 S.Ct. 419, 19 L.Ed.2d 508 (1967), similarly held that mere membership in the Communist Party could not bar a person from employment in private defense establishments important to national security.

13   The increasingly pervasive nature of public employment provides officials with substantial power through conditioning jobs on partisan support, particularly in this time of high unemployment. Since the government however, may not seek to achieve an unlawful end either directly or indirectly, the inducement afforded by placing conditions on a benefit need not be particularly great in order to find that rights have been violated. Rights are infringed both where the government fines a person a penny for being a Republican and where it withholds the grant of a penny for the same reason.

Petitioners contend that even though the government may not provide that public employees may retain their jobs only if they become affiliated with or provide support for the in-party, respondents here have waived any objection to such requirements. The difficulty with this argument is that it completely swallows the rule. Since the qualification may not be constitutionally imposed absent an appropriate justification, to accept the waiver argument is to say that the government may do what it may not do. A finding of waiver in this case, therefore, would be contrary to our view that a partisan job qualification abridges the First Amendment.

14   Brief for Petitioners 12-13.

15   See also Board of Regents v. Roth, 408 U.S. 564, 571 n. 9, 92 S.Ct. 2701, 2706, 33 L.Ed.2d 548 (1972): "In a leading case decided many years ago, the Court of Appeals for the District of Columbia Circuit held that public employment in general was a 'privilege,' not a 'right,' and that procedural due process guarantees therefore were inapplicable. Bailey v. Richardson, 86 U.S.App.D.C. 248, 182 F.2d 46, aff'd by an equally divided Court, 341 U.S. 918, 71 S.Ct. 669, 95 L.Ed. 1352. The basis of this holding has been thoroughly undermined in the ensuing years. For, as Mr. Justice Blackmun wrote for the Court only last year, 'this Court now has rejected the concept that constitutional rights turn upon whether a governmental benefit is

WESTLAW    © 2020 Thomson Reuters. No claim to original U.S. Government Works.    15

Elrod v. Burns, 427 U.S. 347 (1976)

96 S.Ct. 2673, 49 L.Ed.2d 547, 1 IER Cases 60

characterized as a "right" or as a "privilege." ' Graham v. Richardson, 403 U.S. 365, 374, 91 S.Ct. 1848, 1853, 29 L.Ed.2d 534. See, e. g., Morrissey v. Brewer, 408 U.S. (471) at 482, 92 S.Ct. (2593) at 2600 (33 L.Ed.2d 484); Bell v. Burson, (402 U.S. 535,) at 539, 91 S.Ct. (1586) at 1589 (29 L.Ed.2d 90); Goldberg v. Kelly, (397 U.S. 254,) at 262, 90 S.Ct. (1011) at 1017 (25 L.Ed.2d 287); Shapiro v. Thompson, 394 U.S. 618, 627 n. 6, 89 S.Ct. 1322, 1329, 22 L.Ed.2d 600; Pickering v. Board of Education, 391 U.S. 563, 568, 88 S.Ct. 1731, 1734, 20 L.Ed.2d 811; Sherbert v. Verner, 374 U.S. 398, 404, 83 S.Ct. 1790, 1794, 10 L.Ed.2d 965."

16    "(T)his Court must balance the extent of the guarantees of freedom against a congressional enactment to protect a democratic society against the supposed evil of political partisanship by classified employees of government." United Public Workers v. Mitchell, 330 U.S., at 96, 67 S.Ct., at 567.

17    The Court's decision in United States v. O'Brien, 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968), does not support petitioners. O'Brien dealt with the constitutionality of laws regulating the "nonspeech" elements of expressive conduct. No such regulation is involved here, for it is association and belief per se, not any particular form of conduct, which patronage seeks to control. Moreover, while partisanship may involve activities such as registering with a political organization, wearing a campaign button, or contributing to a campaign fund, we cannot say these activities can be equated with such conduct as destruction of a draft card which was involved in O'Brien. See Buckley v. Valeo, 424 U.S. 1, 17, 96 S.Ct. 612, 634, 46 L.Ed.2d 659 (1976). Finally, to paraphrase the Court's observations in Buckley : "Even if the categorization of (partisan activity) as conduct were accepted, the limitations challenged here would not meet the O'Brien test because the governmental interests advanced in support of the (practice of patronage) involve 'suppressing communication.' " Id., at 17, 96 S.Ct., at 634. For the end to be furthered by the practice involves the compulsion of support for the incumbent political party. Indeed, unlike the legislation tested in Buckley, the practice of patronage does "focus on the ideas expressed by persons or groups subjected to (it) . . . ." Ibid. And, contrary to O'Brien's proscription, under patronage "the alleged governmental interest in regulating conduct arises in some measure because the communication allegedly integral to the conduct is itself thought to be harmful." 391 U.S., at 382, 88 S.Ct., at 1682.

18    It does not appear that efficiency and effective government were the concerns of elected officials in this case. Employees originally dismissed were reinstated after obtaining sponsorship letters, a practice hardly promotive of efficiency if the employee's work had been less than par or if the employee had previously behaved in an insubordinate manner. App. 14. Complaints by one supervisor that too many people were being discharged too fast, without adequately trained replacements, were met with the response that the number of dismissals was to be maintained because the job openings were needed for partisan appointments. Id., at 15. One Republican employee of the Sheriff's Office was told that his dismissal had nothing to do with the quality of his work, but that his position was needed for a Democratic replacement. Id., at 22.

19    In this regard, petitioners' reliance on American Communications Assn. v. Douds, 339 U.S. 382, 70 S.Ct. 674, 94 L.Ed. 925 (1950), is misplaced. To be sure, that decision upheld a section of the National Labor Relations Act denying certain benefits of the Act to labor organizations which had not filed with the National Labor Relations Board affidavits that their leaders were not members of the Communist Party. The Court there deferred to a legislative determination, that, with respect to labor relations, the Communist Party was unlike other parties in its use of union leadership to bring about strikes and other obstructions to commerce. The Court was careful to note in Douds, however, that the precise holding in that case would not serve as a departure point for inferences of ill conduct grounded merely on political association. Id., 339 U.S. at 410, 70 S.Ct. at 689. Indeed, the Court in Douds also carefully observed that political affiliations and beliefs "are

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.    16

circumstances ordinarily irrelevant to permissible subjects of government action." *Id.,* 339 U.S. at 391, 70 S.Ct. at 680.

Those caveats were well stated. With but three exceptions shortly after Douds, *Adler v. Board of Education,* 342 U.S. 485, 72 S.Ct. 380, 96 L.Ed. 517 (1952); *Garner v. Los Angeles Board,* 341 U.S. 716, 71 S.Ct. 909, 95 L.Ed. 1317 (1951); and *Gerende v. Board of Supervisors,* 341 U.S. 56, 71 S.Ct. 565, 95 L.Ed. 745 (1951), the Court's decisions have consistently rejected all inferences based merely on belief and association, and we do so today. See e. g., *Keyishian v. Board of Regents,* 385 U.S., at 606-608, 87 S.Ct., at 685-686; *Wieman v. Updegraff,* 344 U.S., at 188-190, 73 S.Ct., at 217-218.

20   Legislative restraints on political management and campaigning were also upheld in Letter Carriers and Mitchell because they served to protect individual belief and association and, thereby, the political process. The distinction between this case and those cases in that respect is treated infra, this page and at 2687-2688.

21   Brief for Petitioners, 43, quoting V. Key, Politics, Parties and Pressure Groups 369 (5th ed. 1964).

22   Partisan politics bears the imprimatur only of tradition, not the Constitution.

"It may be correct that the patronage system has been followed for 'almost two hundred years' and therefore was in existence when the Constitution was adopted. However, the notoriety of the practice in the administration of Andrew Jackson in 1828 implies that it was not prevalent theretofore; we are not aware of any discussion of the practice during the drafting of the Constitution or the First Amendment. In any event, if the age of a pernicious practice were a sufficient reason for its continued acceptance, the constitutional attack on racial discrimination would, of course, have been doomed to failure." *Illinois State Employees Union v. Lewis,* 473 F.2d 561, 568 n. 14 (CA7 1972).

23   Sorauf, The Silent Revolution in Patronage, 20 Pub.Admin.Rev. 28, 32-33 (1960); Sorauf, Patronage and Party, 3 Midwest J.Pol.Sci. 115, 118-120 (1959).

24   See n. 8, Supra.

25   The Court's decision earlier this term in *Buckley v. Valeo,* 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976), is not contrary. It is true that in Buckley, as here, the interest to be served was the democratic system, and accordingly in Buckley, the infringement of some First Amendment rights was held to be tolerable. In Buckley, however, unlike here, the disclosure and contribution limitations on campaign financing, which were upheld, were essential to eliminating the grave evil of improper influence in the political process. The Court found that those provisions "constitute the Act's primary weapons against the reality or appearance of improper influence stemming from the dependence of candidates on large campaign contributions." *Id.,* at 58, 96 S.Ct., at 653. The Court further found that "(t)he contribution ceilings . . . serve the basic governmental interest in safeguarding the integrity of the electoral process without directly impinging upon the rights of individual citizens and candidates to engage in political debate and discussion." Ibid. With respect to expenditure limitations, however, which were not upheld, the Court found: "These provisions place substantial and direct restrictions on the ability of candidates, citizens, and associations to engage in protected political expression, restrictions that the First Amendment cannot tolerate." *Id.,* at 58-59, 96 S.Ct., at 653. The restrictions imposed by patronage dismissals, limiting wholesale an individual's political beliefs, expression, and association, while perhaps less direct, are equally, if not more, substantial, and therefore also intolerable to the First Amendment. Moreover, patronage dismissals involve the evil of influence, whose very need for elimination justified the contribution and disclosure provisions in Buckley.

26   "To declare that the present supposed evils of political activity are beyond the power of Congress to redress would leave the nation impotent to deal with what many sincere men believe is a material threat to the democratic system." *United Public Workers v. Mitchell, supra,* 330 U.S., at 99, 67 S.Ct., at 569. "Congress

may reasonably desire to limit party activity of federal employees so as to avoid a tendency toward a one-party system." Id., at 100, 67 S.Ct., at 569.

27    The judgment that the First Amendment interests in political campaigning and management must, in the setting of public employment, give way to the First Amendment interests in individual belief and association does not necessarily extend to other contexts. Restraining political campaigning and management in the area of public employment leaves it free to continue in other settings. The consequence of no such restraint, however, is the complete restriction of individual belief and association for each public employee affected.

28    Letter Carriers did observe: "Although Congress is free to strike a different balance than it has, if it so chooses, we think the balance it has so far struck is sustainable by the obviously important interests sought to be served by the limitations on partisan political activities now contained in the Hatch Act." 413 U.S., at 564, 93 S.Ct., at 2890. Though Congress may be free not to impose restraints on political campaigning and management in the public employment sector, we are not similarly free to do so where those practices, protected as they may be in other contexts, are found impermissibly to preempt equally, if not more, fundamental constitutional rights.

29    The timeliness of political speech is particularly important. See Carroll v. Princess Anne, 393 U.S. 175, 182, 89 S.Ct. 347, 352, 21 L.Ed.2d 325 (1968); Wood v. Georgia, 370 U.S. 375, 391-392, 82 S.Ct. 1364, 1373-1374, 8 L.Ed.2d 569 (1962).

"(T)he purpose of the First Amendment includes the need . . . 'to protect parties in the free publication of matters of public concern, to secure their right to a free discussion of public events and public measures, and to enable every citizen at any time to bring the government and any person in authority to the bar of public opinion by any just criticism upon their conduct in the exercise of the authority which the people have conferred upon them,' " Id., at 392, 82 S.Ct., at 1374 (quoting 2 T. Cooley, Constitutional Limitations 885 (8th ed. 1927)).

1    Substantially for the reasons stated in the plurality opinion, I agree that the question presented here is a justiciable one. I note, however, that the ability to formulate judicial standards is another factor to be considered in evaluating justiciability. Baker v. Carr, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962). The difficulty of formulating standards might pose a bar to judicial review of some patronage practices not before us.

2    The sources primarily relied upon for the statements in text are C. Fish, The Civil Service and the Patronage (1905), and D. Rosenbloom, Federal Service and the Constitution (1971).

3    On petitioners' motion to dismiss, the District Court had before it only the complaint and the petitioners' conclusory motions to dismiss. Although one reasonably may be confident that these employees willingly accepted this employment as political patronage, with full knowledge that their continued employment depended on the outcome of the next election, this may not be entirely clear from the pleadings as viewed upon a motion to dismiss. The District Court made no finding of fact in this respect, and its brief opinion does not rely on this ground.

4    One may agree readily that different plaintiffs legitimately could assert First Amendment interests. These would be individuals who desired to be hired for state or local employment and who possessed all requisite qualifications except the "right" political posture or sponsorship.

5    This case involves only employees. We thus face no allegations that patronage practices exclude any voters or candidates from effective participation in the political process by impermissibly disadvantaging them. Cf. Shakman v. Democratic Organization of Cook County, 435 F.2d 267 (CA7 1970). Elrod informs us that since 1955 two Democrats, two Republicans, and an Independent have served as Sheriff. Reply Brief for Petitioners 11 n. 20a.

6    Some commentators have believed that patronage hiring practices promote other social interests as well:

"Patronage is peculiarly important for minority groups, involving much more than the mere spoils of office. Each first appointment given a member of any underdog element is a boost in that element's struggle for social acceptance. It means that another barrier to their advance has been lifted, another shut door has swung open."

S. Lubell, The Future of American Politics 76-77 (1952).

7    As this case presents only the question whether a State constitutionally may pursue patronage hiring practices, we do not consider whether such practices would be justified if pursued by the Federal Government.

8    Former Senator Paul H. Douglas (D. Ill.) said of patronage hiring practices:

"In short, I am for civil service but not for having civil service dominate public employment 100 percent. That would give us the bureaucracy of Germany and France which I do not regard as ideal.

"But I would like to have you consider just how long most liberals would be able to last in Congress if you stripped us of all patronage, as you desire. We who try to defend the interests of the people, the consumers and the taxpayers commonly face the powerful opposition of the special-interest groups which will spend enormous sums of money to defeat us. . . . If we are to survive we need some support rooted in gratitude for material favors which at the same time do not injure the general public." Letter to New Republic, July 14, 1952, p. 2.

9    The plurality might be taken to concede some promotion of the democratic process by patronage hiring practices but to conclude that in net effect such practices will reduce political debate impermissibly by affecting some employees or potential employees and thereby depriving society of the "unfettered judgment of each citizen on matters of political concern." Ante, at 2689. In the past the Court has upheld congressional actions designed to increase the overall level of political discourse but affecting adversely the First Amendment interests of some individuals. 🚩 Buckley v. Valeo, supra, 424 U.S. 1, 64-68, 96 S.Ct. 612, 656-658, 46 L.Ed.2d 659 (1976) (disclosure requirements); 🚩 CSC v. Letter Carriers, 413 U.S. 548, 564-566, 93 S.Ct. 2880, 2889-2891, 37 L.Ed.2d 796 (1973); 🚩 Red Lion Broadcasting Co. v. FCC, 395 U.S. 367, 392-395, 89 S.Ct. 1794, 1807-1809, 23 L.Ed.2d 371 (1969). In Letter Carriers we indicated specifically that the First Amendment freedoms of federal employees could be limited in an effort to further the functioning of the democratic process. I do not believe that local legislative judgments as to what will further the democratic process in light of local conditions should receive less weight than these congressional judgments. Surely that should be the case until we have a record, if one could be created, showing the fears of the plurality to be justified.

10    The judgment today is limited to nonpolicymaking positions. Ante, at 2687. A "policy-making" exception, however, will not allow substantial advancement of the state interests undercut by the Court's holding, as it is doubtful that any significant number of employees can be identified as policymakers in a sheriff's office. States have chosen to provide for the election of many local officials who have little or no genuine policymaking functions, see Supra, at 2694-2695, and the subordinates of such officials are even less likely to have such functions. It thus is predictable that the holding today will terminate almost completely the contributions of patronage hiring practices to the democratic process. The probability of this result is increased to the extent that the needs of efficiency in local government require that policymaking positions be included in a merit-oriented, nonpolitical civil service.

11    It appears that before the adoption of the Australian ballot, one's access to or retention of a government job sometimes could depend on voting "correctly." D. Rosenbloom, Supra, n. 2, at 61. Today this ultimate core of political expression is beyond the reach of any coercive effects of the patronage system.

12    In concluding that the Constitution does not require the invalidation of state and local patronage systems, I wish to make clear that approval of any particular type of system or of the practice in any particular State, city, or community is not implied. I believe that the prevailing practice is to establish a broad base of merit-oriented civil service, but to leave some room for the operation of traditional patronage. I must say that the "mix" in Cook County (where only about half of the employees in the Sheriff's Office are within the merit system) seems disproportionate. On the other hand, there are smaller communities E. g., where nonpartisan,

WESTLAW    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

**Elrod v. Burns, 427 U.S. 347 (1976)**
96 S.Ct. 2673, 49 L.Ed.2d 547, 1 IER Cases 60

council-manager forms of government exist in which the merit system embraces the vast majority of public employees. Political scientists and students of government differ, and their views also have varied from time to time, as to the best means of structuring state and local government employment in the public interest. Nor is the answer necessarily the same for every community without regard to its size, form of government, or other local conditions. My conviction, as indicated in the opinion above, is that we should not foreclose local options in the name of a constitutional right perceived to be applicable for the first time after nearly two centuries.

---

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

**FILED**
**12-07-2020**
**Clerk of Circuit Court**
**Waukesha County**
**2020CV001583**

90 S.Ct. 1011
Supreme Court of the United States

Jack R. GOLDBERG, Commissioner of Social
Services of the City of New York, Appellant,

v.

John KELLY et al.

No. 62.
|
Argued Oct. 13, 1969.
|
Decided March 23, 1970.

**Synopsis**

New York City residents receiving financial aid under
federally-assisted program of Aid to Families with Dependent
Children or under New York State's general Home Relief
program brought suit challenging adequacy of procedures for
notice and hearing in connection with termination of such
aid. The three-judge United States District Court for the
Southern District of New York, 294 F.Supp. 893, entered
judgment in favor of plaintiffs, and defendant appealed. The
Supreme Court, Mr. Justice Brennan, held that procedural due
process requires that pretermination evidentiary hearing be
held when public assistance payments to welfare recipient are
discontinued, and further held that procedures followed by
city of New York in terminating public assistance payments to
welfare recipients were constitutionally inadequate in failing
to permit recipients to appear personally with or without
counsel before official who finally determined continued
eligibility and failing to permit recipient to present evidence
to that official orally or to confront or cross-examine adverse
witnesses.

Affirmed.

Mr. Chief Justice Burger and Mr. Justice Black dissented.

For dissenting opinions of Mr. Chief Justice Burger and Mr.
Justice Stewart see 397 U.S. 282, 285, 90 S.Ct. 1028, 1029.

**Procedural Posture(s):** On Appeal.

**\* ttorneys and 1 a6  0 ir2  s**

 33898A  3Lʌᴡᴡ John J. Loflin, Jr., New York City, for
appellant.

33898F  Lee A. Albert, New York City, for appellees.

**mpinion**

Mr. Justice BRENNAN delivered the opinion of the Court.

The question for decision is whether a State that terminates
public assistance payments to a particular recipient without
affording him the opportunity for an evidentiary hearing prior
to termination denies the recipient procedural due process
in violation of the Due Process Clause of the Fourteenth
Amendment.

This action was brought in the District Court for the Southern
District of New York by residents of New  3ʌꜱO  York City
receiving financial aid under the federally assisted program of
Aid to Families with Dependent Children (AFDC) or under
New York State's general Home Relief program.[1] Their
complaint alleged that the New York State and New York City
officials administering these programs terminated, or were
about to terminate, such aid without prior notice and hearing,
thereby denying them due process of law.[2] At the time  3Lʌ4
the suits were filed there was no requirement of prior notice
or hearing of any kind before termination of financial aid.
However, the State and city adopted procedures for notice
and hearing after the suits were brought, and the plaintiffs,
appellees here, then challenged the constitutional adequacy of
those procedures.

The State Commissioner of Social Services amended the
State Department of Social Services' Official Regulations
to require that local social services officials proposing to
discontinue or suspend a recipient's financial aid do so
according to a procedure that conforms to either subdivision
(a) or subdivision (b) of s 351.26 of the regulations as
amended.[3] The City of New York  3Lʌ5 elected to  33898w
promulgate a local procedure according to subdivision (b).
That subdivision, so far as here pertinent, provides that the
local procedure must include the giving of notice to the
recipient of the reasons for a proposed discontinuance or
suspension at least seven days prior to its effective date,
with notice also that upon request the recipient may have
the proposal reviewed by a local welfare official holding
a position superior to that of the supervisor who approved
the proposed discontinuance or suspension, and, further, that
the recipient may submit, for purposes of the review, a
written statement to demonstrate why his grant should not
be discontinued or suspended. The decision by the reviewing
official whether to discontinue or suspend aid must be

made expeditiously, with written notice of the decision to the recipient. The section further expressly provides that '(a)ssistance shall not be discontinued or suspended prior to the date such notice of decision is sent to the recipient and his representative, if any, or prior to the proposed effective date of discontinuance or suspension, whichever occurs later.'

Pursuant to subdivision (b), the New York City Department of Social Services promulgated Procedure No. 68—18. A caseworker who has doubts about the recipient's continued eligibility must first discuss them with the recipient. If the caseworker concludes that the recipient is no longer eligible, he recommends termination **3Lw7** of aid to a unit supervisor. If the latter concurs, he sends the recipient a letter stating the reasons for proposing to terminate aid and notifying him that within seven days he may request that a higher official review the record, and may support the request with a written statement prepared personally or with the aid of an attorney or other person. If the reviewing official affirms the determination of ineligibility, aid is stopped immediately and the recipient is informed by letter of the reasons for the action. Appellees' challenge to this procedure emphasizes the absence of any provisions for the personal appearance of the recipient before the reviewing official, **33898O** for oral presentation of evidence, and for confrontation and cross-examination of adverse witnesses.[4] However, the letter does inform the recipient that he may request a later administrative 'fair hearing.'[5] This is a proceeding before an independent **3LO9** state hearing officer at which the recipient may appear personally, offer oral evidence, confront and cross-examine the witnesses against him, and have a record made of the hearing. If the recipient prevails at the 'fair hearing' he is paid all funds erroneously withheld.[6] HEW Handbook, pt. IV, ss 6200—6500; 18 NYCRR ss 84.2—84.23. A recipient whose aid is not restored by a 'fair hearing' decision may have judicial review. N.Y.Civil Practice Law and Rules, Art. 78 (1963). The recipient is so notified, 18 NYCRR s 84.16.

I

The constitutional issue to be decided, therefore, is the narrow one whether the Due Process Clause requires that the recipient be afforded an evidentiary hearing before the termination of benefits.[7] The District Court held **3LO8** that only a pretermination evidentiary hearing would satisfy the constitutional command, and rejected the argument of the state and city officials that the combination of the post-termination 'fair hearing' with the informal pre-termination

review disposed of all due process claims. The court said: 'While post-termination review is **338984** relevant, there is one overpowering fact which controls here. By hypothesis, a welfare recipient is destitute, without funds or assets. * * * Suffice it to say that to cut off a welfare recipient in the face of * * * 'brutal need' without a prior hearing of some sort is unconscionable, unless overwhelming considerations justify it.' Kelly v. Wyman, 294 F.Supp. 893, 899, 900 (1968). The court rejected the argument that the need to protect the public's tax revenues supplied the requisite 'overwhelming consideration.' 'Against the justified desire to protect public funds must be weighed the individual's overpowering need in this unique situation not to be wrongfully deprived of assistance. * * * While the problem of additional expense must be kept in mind, it does not justify denying a hearing meeting the ordinary standards of due process. Under all the circumstances, we hold that due process requires an adequate hearing before termination of welfare benefits, and the fact that there is a later constitutionally fair proceeding does not alter the result.' Id., at 901. Although state officials were party defendants in the action, only the Commissioner of Social Services of the City of New York appealed. We noted probable jurisdiction, 394 U.S. 971, 89 S.Ct. 1469, 22 L.Ed.2d 751 (1969), to decide important issues that have been the subject of disagreement in principle between the three-judge court in the present case and that convened in Wheeler v. Montgomery, 397 U.S. 280, 90 S.Ct. 1026, 25 L.Ed.2d 307. We affirm.

Appellant does not contend that procedural due process **3LOL** is not applicable to the termination of welfare benefits. Such benefits are a matter of statutory entitlement for persons qualified to receive them.[8] Their termination involves state action that adjudicates important rights. The constitutional challenge cannot be answered by an argument that public assistance benefits are "a 'privilege' and not a 'right.' " Shapiro v. Thompson, 394 U.S. 618, 627 n. 6, 89 S.Ct. 1322, 1327 (1969). Relevant constitutional restraints apply as much to the withdrawal of public assistance benefits as to disqualification for unemployment compensation, Sherbert v. Verner, 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963); or to denial of a tax exemption, Speiser v. Randall, 357 U.S. 513, 78 S.Ct. 1332, 2 L.Ed.2d 1460 (1958); or to discharge from public employment, Slochower v. Board of Higher Education, 350 U.S. 551, 76 S.Ct. 637, 100 L.Ed. 692 (1956).[9] The extent to **338985** which procedural due process **3LOA** must

be afforded the recipient is influenced by the extent to which he may be 'condemned to suffer grievous loss,' Joint Anti-Fascist Refugee Committee v. McGrath, 341 U.S. 123, 168, 71 S.Ct. 624, 647, 95 L.Ed. 817 (1951) (Frankfurter, J., concurring), and depends upon whether the recipient's interest in avoiding that loss outweighs the governmental interest in summary adjudication. Accordingly, as we said in Cafeteria & Restaurant Workers Union, etc. v. McElroy, 367 U.S. 886, 895, 81 S.Ct. 1743, 1748—1749, 6 L.Ed.2d 1230 (1961), 'consideration of what procedures due process may require under any given set of circumstances must begin with a determination of the precise nature of the government function involved as well as of the private interest that has been affected by governmental action.' See also Hannah v. Larche, 363 U.S. 420, 440, 442, 80 S.Ct. 1502, 1513, 1514, 4 L.Ed.2d 1307 (1960).

It is true, of course, that some governmental benefits may be administratively terminated without affording the recipient a pre-termination evidentiary hearing. [10] **1012** But we agree with the District Court that when welfare is discontinued, only a pre-termination evidentiary hearing provides the recipient with procedural due process. Cf. Sniadach v. Family Finance Corp., 395 U.S. 337, 89 S.Ct. 1820, 23 L.Ed.2d 349 (1969). For qualified recipients, welfare provides the means to obtain essential food, clothing, housing, and medical care. [11] Cf. Nash v. Florida Industrial Commission, 389 U.S. 235, 239, 88 S.Ct. 362, 366, 19 L.Ed.2d 438 (1967). Thus the crucial factor in this context—a factor not present in the case of the blacklisted government contractor, the discharged government employee, the taxpayer denied a tax exemption, or virtually anyone else whose governmental entitlements are ended—is that termination of aid pending resolution of a controversy over his eligibility may deprive an eligible recipient of the very means by which to live while he waits. Since he lacks independent resources, his situation becomes immediately desperate. His need to concentrate upon finding the means for daily subsistence, in turn, adversely **1013** affects his ability to seek redress from the welfare bureaucracy. [12]

Moreover, important governmental interests are promoted by affording recipients a pre-termination evidentiary hearing. From its founding the Nation's basic **1014** commitment has been to foster the dignity and well-being of all persons within its borders. We have come to recognize that forces not within the control of the poor contribute to their poverty. [13] This perception, against the background of our traditions, has significantly influenced the development of the contemporary public assistance system. Welfare, by meeting the basic demands of subsistence, can help bring within the reach of the poor the same opportunities that are available to others to participate meaningfully in the life of the community. At the same time, welfare guards against the societal malaise that may flow from a widespread sense of unjustified frustration and insecurity. Public assistance, then, is not mere charity, but a means to 'promote the general Welfare, and secure the Blessings of Liberty to ourselves and our Posterity.' The same governmental interests that counsel the provision of welfare, counsel as well its uninterrupted provision to those eligible to receive it; pre-termination evidentiary hearings are indispensable to that end.

Appellant does not challenge the force of these considerations but argues that they are outweighed by countervailing governmental interests in conserving fiscal and administrative resources. These interests, the argument goes, justify the delay of any evidentiary hearing until after discontinuance of the grants. Summary adjudication protects the public fisc by stopping payments promptly upon discovery of reason to believe that a recipient is no longer eligible. Since most terminations are accepted without challenge, summary adjudication also conserves both the fisc and administrative time and energy by reducing the number of evidentiary hearings actually held.

**1015** We agree with the District Court, however, that these governmental interests are not overriding in the welfare context. The requirement of a prior hearing doubtless involves some greater expense, and the benefits paid to ineligible recipients pending decision at the hearing probably cannot be recouped, since these recipients are likely to be judgment-proof. But the State is not without weapons to minimize these increased costs. Much of the drain on fiscal and administrative resources can be reduced by developing procedures for prompt pre-termination hearings and by skillful use of personnel and facilities. Indeed, the very provision for a post-termination evidentiary hearing in New York's Home Relief program is itself cogent evidence that the State recognizes the primacy of the public interest in correct eligibility determinations and therefore in the provision of procedural safeguards. Thus, the interest of the eligible recipient in uninterrupted receipt of public assistance, coupled with the State's interest that his payments not be erroneously terminated, clearly outweighs the State's competing concern to prevent any increase in its fiscal and administrative

WESTLAW © 2020 Thomson Reuters. No claim to original U.S. Government Works.

burdens. As the District Court correctly concluded, '(t)he stakes are simply too high for the welfare recipient, and the possibility for honest error or irritable misjudgment too great, to allow termination of aid without giving the recipient a chance, if he so desires, to be fully informed **\*3389\*** of the case against him so that he may contest its basis and produce evidence in rebuttal.' 294 F.Supp., at 904—905.

## II

We also agree with the District Court, however, that the pre-termination hearing need not take the form of a judicial or quasi-judicial trial. We bear in mind that the statutory 'fair hearing' will provide the recipient **\*1014\*** with a full administrative review.[14] Accordingly, the pre-termination hearing has one function only: to produce an initial determination of the validity of the welfare department's grounds for discontinuance of payments in order to protect a recipient against an erroneous termination of his benefits. Cf. Sniadach v. Family Finance Corp., 395 U.S. 337, 343, 89 S.Ct. 1820, 1823, 23 L.Ed.2d 349 (1969) (Harlan, J., concurring). Thus, a complete record and a comprehensive opinion, which would serve primarily to facilitate judicial review and to guide future decisions, need not be provided at the pre-termination stage. We recognize, too, that both welfare authorities and recipients have an interest in relatively speedy resolution of questions of eligibility, that they are used to dealing with one another informally, and that some welfare departments have very burdensome caseloads. These considerations justify the limitation of the pre-termination hearing to minimum procedural safeguards, adapted to the particular characteristics of welfare recipients, and to the limited nature of the controversies to be resolved. We wish to add that we, no less than the dissenters, recognize the importance of not imposing upon the States or the Federal Government in this developing field of law any procedural requirements beyond those demanded by rudimentary due process.

'The fundamental requisite of due process of law is the opportunity to be heard.' Grannis v. Ordean, 234 U.S. 385, 394, 34 S.Ct. 779, 783, 58 L.Ed. 1363 (1914). The hearing must be 'at a meaningful time and in a meaningful manner.' Armstrong v. Manzo, 380 U.S. 545, 552, 85 S.Ct. 1187, 1191, 14 L.Ed.2d 62 (1965). In the present context these principles require that a recipient have timely and adequate

notice detailing the reasons for a **\*3389\*** proposed termination, and an effective opportunity to defend by confronting any adverse witnesses and by presenting his own arguments and evidence orally. These rights are important in cases such as those before us, where recipients have challenged proposed terminations as resting on incorrect or misleading factual premises or on misapplication of rules or policies to the facts of particular cases.[15]

We are not prepared to say that the seven-day notice currently provided by New York City is constitutionally insufficient per se, although there may be cases where fairness would require that a longer time be given. Nor do we see any constitutional deficiency in the content or form of the notice. New York employs both a letter and a personal conference with a caseworker to inform a recipient of the precise questions raised about his continued eligibility. Evidently the recipient is told the legal and factual bases for the Department's doubts. This combination is probably **\*3389\*** the most effective method of communicating with recipients.

The city's procedures presently do not permit recipients to appear personally with or without counsel before the official who finally determines continued eligibility. Thus a recipient is not permitted to present evidence to that official orally, or to confront or cross-examine adverse witnesses. These omissions are fatal to the constitutional adequacy of the procedures.

The opportunity to be heard must be tailored to the **\*1017\*** capacities and circumstances of those who are to be heard.[16] It is not enough that a welfare recipient may present his position to the decision maker in writing or second-hand through his caseworker. Written submissions are an unrealistic option for most recipients, who lack the educational attainment necessary to write effectively and who cannot obtain professional assistance. Moreover, written submissions do not afford the flexibility of oral presentations; they do not permit the recipient to mold his argument to the issues the decision maker appears to regard as important. Particularly where credibility and veracity are at issue, as they must be in many termination proceedings, written submissions are a wholly unsatisfactory basis for decision. The second-hand presentation to the decisionmaker by the caseworker has its own deficiencies; since the caseworker usually gathers the facts upon which the charge of ineligibility rests, the presentation of the recipient's side of the controversy cannot safely be left to him. Therefore a recipient must be allowed to state his position orally. Informal procedures

**Goldberg v. Kelly, 397 U.S. 254 (1970)**

90 S.Ct. 1011, 25 L.Ed.2d 287

will suffice; in this context due process does not require a particular order of proof or mode of offering evidence. Cf. HEW Handbook, pt. IV, s 6400(a).

In almost every setting where important decisions turn on questions of fact, due process requires an opportunity to confront and cross-examine adverse witnesses. E.g., ICC v. Louisville & N.R. Co., 227 U.S. 88, 93—94, 33 S.Ct. 185, 187—188, 57 L.Ed. 431 (1913); Willner v. Committee on Character & Fitness, 373 U.S. 96, 103—104, 83 S.Ct. 1175, 1180—1181, 10 L.Ed.2d 224 (1963). What we said in **3L49** Greene v. McElroy, 360 U.S. 474, 496—497, 79 S.Ct. 1400, 1413, 3 L.Ed.2d 1377 (1959), is particularly pertinent here:

> 'Certain principles have remained relatively immutable in our jurisprudence. One of these is that where governmental action seriously injures an individual, and the reasonableness of the action depends on fact findings, the evidence used to prove the Government's case must be disclosed to the individual so that he has an opportunity to show that it is untrue. While this is important in the case of documentary evidence, it is even more important where the evidence consists of the testimony of individuals whose memory might be faulty or who, in fact, might be perjurers or persons motivated by malice, vindictiveness, intolerance, prejudice, or jealousy. We have formalized these protections in the requirements of confrontation and cross-examination. They have ancient roots. They find expression in the Sixth Amendment * * *. This Court has been zealous to protect these rights from erosion. It has spoken out not only in criminal cases, * * * but also in all types of cases where administrative * * * actions were under scrutiny.'

Welfare recipients must therefore be given an opportunity to confront and cross-examine the witnesses relied on by the department.

**3389LL** 'The right to be heard would be, in many cases, of little avail if it did not comprehend the right to be heard by counsel.' Powell v. Alabama, 287 U.S. 45, 68—69, 53 S.Ct. 55, 64, 77 L.Ed. 158 (1932). We do not say that counsel must be provided at the pre-termination hearing, but only that the recipient must be allowed to retain an attorney if he so desires. Counsel can help delineate the issues, present the factual contentions in an orderly manner, conduct cross-examination, and generally safeguard the **3L48** interests of the recipient. We do not anticipate that this assistance will unduly prolong or otherwise encumber the hearing. Evidently HEW has reached the same conclusion. See 45 CFR s 205.10, 34 Fed.Reg. 1144 (1969); 45 CFR s 220.25, 34 Fed.Reg. 13595 (1969).

Finally, the decisionmaker's conclusion as to a recipient's eligibility must rest solely on the legal rules and evidence adduced at the hearing. Ohio Bell Tel. Co. v. PUC, 301 U.S. 292, 57 S.Ct. 724, 81 L.Ed. 1093 (1937); United States v. Abilene & S.R. Co., 265 U.S. 274, 288—289, 44 S.Ct. 565, 569—570, 68 L.Ed. 1016 (1924). To demonstrate compliance with this elementary requirement, the decision maker should state the reasons for his determination and indicate the evidence he relied on, cf. Wichita R. & Light Co. v. PUC, 260 U.S. 48, 57—59, 43 S.Ct. 51, 54—55, 67 L.Ed. 124 (1922), though his statement need not amount to a full opinion or even formal findings of fact and conclusions of law. And, of course, an impartial decision maker is essential. Cf. In re Murchison, 349 U.S. 133, 75 S.Ct. 623, 99 L.Ed. 942 (1955); Wong Yang Sung v. McGrath, 339 U.S. 33, 45—46, 70 S.Ct. 445, 451—452, 94 L.Ed. 616 (1950). We agree with the District Court that prior involvement in some aspects of a case will not necessarily bar a welfare official from acting as a decision maker. He should not, however, have participated in making the determination under review.

Affirmed.

Mr. Justice BLACK, dissenting.

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.   5

In the last half century the United States, along with many, perhaps most, other nations of the world, has moved far toward becoming a welfare state, that is, a nation that for one reason or another taxes its most **3L4L** affluent people to help support, feed, clothe, and shelter its less fortunate citizens. The result is that today more than nine million men, women, and children in the United States receive some kind of state or federally financed public assistance in the form of allowances or gratuities, generally paid them periodically, usually by the week, month, or quarter. [1] Since these gratuities are paid on the basis of need, the list of recipients is not static, and some people go off the lists and others are added from time to time. These ever-changing lists put a constant administrative burden on government and it certainly could not have reasonably anticipated that this burden would include the additional procedural expense imposed by the Court today.

The dilemma of the ever-increasing poor in the midst of constantly growing affluence presses upon us and must inevitably be met within the framework of our democratic constitutional government, if our system is to survive as such. It was largely to escape just such pressing economic problems and attendant government repression that people from **3389LA** Europe, Asia, and other areas settled this country and formed our Nation. Many of those settlers had personally suffered from persecutions of various kinds and wanted to get away from governments that had unrestrained powers to make life miserable for their citizens. It was for this reason, or so I believe, that on reaching these new lands the early settlers undertook to curb their governments by confining their powers **3L4A** within written boundaries, which eventually became written constitutions. [2] They wrote their basic charters as nearly as men's collective wisdom could do so as to proclaim to their people and their officials an emphatic command that: 'Thus far and no farther shall you go; and where we neither delegate powers to you, nor prohibit your exercise of them, we the people are left free.' [3]

Representatives of the people of the Thirteen Original Colonies spent long, hot months in the summer of 1787 in Philadelphia, Pennsylvania, creating a government of limited powers. They divided it into three departments—Legislative, Judicial, and Executive. The Judicial Department was to have no part whatever in making any laws. In fact proposals looking to vesting some power in the Judiciary to take part in the legislative process and veto laws were offered, considered, and rejected by the Constitutional Convention. [4] In my **3L4F**

judgment there is not one word, phrase, or sentence from the beginning to the end of the Constitution from which it can be inferred that judges were granted any such legislative power. True, Marbury v. Madison, 1 Cranch 137, 2 L.Ed. 60 (1803), held, and properly, I think, that courts must be the final interpreters of the Constitution, and I recognize that the holding can provide an opportunity to slide imperceptibly into constitutional amendment and law making. But when federal judges use this judicial power for legislative purposes, I think they wander out of their field of vested powers and transgress into the area constitutionally assigned to the Congress and the people. That is precisely what I believe the Court is doing in this case. Hence my dissent.

The more than a million names on the relief rolls in New York, [5] and the more than nine million names on the rolls of all the 50 States were not put there at random. The names are there because state welfare officials believed that those people were eligible for assistance. Probably in the officials' haste to make out the lists many names were put there erroneously in order to alleviate immediate suffering, and undoubtedly some people are drawing relief who are not entitled **3389LF** under the law to do so. Doubtless some draw relief checks from time to time who know they are not eligible, either because they are not actually in need or for some other reason. Many of those who thus draw undeserved gratuities are without sufficient property to enable the government to collect back from them any money they wrongfully receive. But the Court today holds that it would violate the Due Process Clause of the Fourteenth Amendment to stop paying those people weekly or monthly allowances unless the government first affords them a full 'evidentiary hearing' even **3L4w** though welfare officials are persuaded that the recipients are not rightfully entitled to receive a penny under the law. In other words, although some recipients might be on the lists for payment wholly because of deliberate fraud on their part, the Court holds that the government is helpless and must continue, until after an evidentiary hearing, to pay money that it does not owe, never has owed, and never could owe. I do not believe there is any provision in our Constitution that should thus paralyze the government's efforts to protect itself against making payments to people who are not entitled to them.

Particularly do I not think that the Fourteenth Amendment should be given such an unnecessarily broad construction. That Amendment came into being primarily to protect Negroes from discrimination, and while some of its language can and does protect others, all know that the chief purpose behind it was to protect ex-slaves. Cf. Adamson v.

California, 332 U.S. 46, 71—72, and n. 5, 67 S.Ct. 1672, 1686, 91 L.Ed. 1903 (1947) (dissenting opinion). The Court, however, relies upon the Fourteenth Amendment and in effect says that failure of the government to pay a promised charitable instalment to an individual deprives that individual of his own property, in violation of the Due Process Clause of the Fourteenth Amendment. It somewhat strains credulity to say that the government's promise of charity to an individual is property belonging to that individual when the government denies that the individual is honestly entitled to receive such a payment.

I would have little, if any, objection to the majority's decision in this case if it were written as the report of the House Committee on Education and Labor, but as an opinion ostensibly resting on the language of the Constitution I find it woefully deficient. Once the verbiage is pared away it is obvious that this Court today adopts the views of the District Court 'that to cut off a welfare recipient in the face of * * * 'brutal need' without a prior **3L4O** hearing of some sort is unconscionable,' and therefore, says the Court, unconstitutional. The majority reaches this result by a process of weighing 'the recipient's interest in avoiding' the termination of welfare benefits against 'the governmental interest in summary adjudication.' Ante, at 1018. Today's balancing act requires a 'pre-termination evidentiary hearing,' yet there is nothing that indicates what tomorrow's balance will be. Although the majority attempts to bolster its decision with limited quotations from prior cases, it is obvious that today's result doesn't depend on the language of the Constitution itself or the principles of other decisions, but solely on the collective judgment of the majority as to what would be a fair and humane procedure in this case.

This decision is thus only another variant of the view often expressed by some members of this Court that the Due Process Clause forbids any conduct that a majority of the Court believes 'unfair,' 'indecent,' or 'shocking to their consciences.' See, e.g., Rochin v. California, 342 U.S. 165, 172, 72 S.Ct. 205, 209, 96 L.Ed. 183 (1952). Neither these words nor any like them appear anywhere in the Due Process Clause. If they did, they would leave the majority of Justices free to hold any conduct unconstitutional that they should conclude **3389Lw** on their own to be unfair or shocking to them. [6] Had the drafters of the Due Process Clause meant to leave judges such ambulatory power to declare **3L44** laws unconstitutional, the chief value of a written constitution, as the Founders saw it, would have been lost. In fact, if that view of due process is correct, the Due Process Clause could

easily swallow up all other parts of the Constitution. And truly the Constitution would always be 'what the judges say it is' at a given moment, not what the Founders wrote into the document. [7] A written constitution, designed to guarantee protection against governmental abuses, including those of judges, must have written standards that mean something definite and have an explicit content. I regret very much to be compelled to say that the Court today makes a drastic and dangerous departure from a Constitution written to control and limit the government and the judges and moves toward a constitution designed to be no more and no less than what the judges of a particular social and economic philosophy declare on the one hand to be fair or on the other hand to be shocking and unconscionable.

The procedure required today as a matter of constitutional law finds no precedent in our legal system. Reduced to its simplest terms, the problem in this case is similar to that frequently encountered when two parties have an ongoing legal relationship that requires one party to make periodic payments to the other. Often the situation arises where the party 'owing' the money stops paying it and justifies his conduct by arguing that the recipient is not legally entitled to payment. The recipient can, of course, disagree and go to court to compel payment. But I know of no situation in our legal system in which the person alleged to owe money to **3L45** another is required by law to continue making payments to a judgment-proof claimant without the benefit of any security or bond to insure that these payments can be recovered if he wins his legal argument. Yet today's decision in no way obligates the welfare recipient to pay back any benefits wrongfully received during the pretermination evidentiary hearings or post any bond, and in all 'fairness' it could not do so. These recipients are by definition too poor to post a bond or to repay the benefits that, as the majority assumes, must be spent as received to insure survival.

The Court apparently feels that this decision will benefit the poor and needy. In my judgment the eventual result will be just the opposite. While today's decision requires only an administrative, evidentiary hearing, the inevitable logic of the approach taken will lead to constitutionally imposed, time-consuming delays of a full adversary process of administrative and judicial review. In the next case the welfare recipients are bound to argue that cutting off benefits before judicial review of the agency's decision is also a denial of due process. Since, by hypothesis, **3389LO** termination of aid at that point may still 'deprive an eligible recipient of the very means by which to live while he waits,' ante, at 1018, I would be surprised if the weighing process did not

compel the conclusion that termination without full judicial review would be unconscionable. After all, at each step, as the majority seems to feel, the issue is only one of weighing the government's pocketbook against the actual survival of the recipient, and surely that balance must always tip in favor of the individual. Similarly today's decision requires only the opportunity to have the benefit of counsel at the administrative hearing, but it is difficult to believe that the same reasoning process would not require the appointment of counsel, for otherwise the right to counsel is a meaningless one since these **3147** people are too poor to hire their own advocates. Cf. 🔖 Gideon v. Wainwright, 372 U.S. 335, 344, 83 S.Ct. 792, 796, 9 L.Ed.2d 799 (1963). Thus the end result of today's decision may well be that the government, once it decides to give welfare benefits, cannot reverse that decision until the recipient has had the benefits of full administrative and judicial review, including, of course, the opportunity to present his case to this Court. Since this process will usually entail a delay of several years, the inevitable result of such a

constitutionally imposed burden will be that the government will not put a claimant on the rolls initially until it has made an exhaustive investigation to determine his eligibility. While this Court will perhaps have insured that no needy person will be taken off the rolls without a full 'due process' proceeding, it will also have insured that many will never get on the rolls, or at least that they will remain destitute during the lengthy proceedings followed to determine initial eligibility.

For the foregoing reasons I dissent from the Court's holding. The operation of a welfare state is a new experiment for our Nation. For this reason, among others, I feel that new experiments in carrying out a welfare program should not be frozen into our constitutional structure. They should be left, as are other legislative determinations, to the Congress and the legislatures that the people elect to make our laws.

**\* ll Citations**

397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287

# Footnotes

[1] AFDC was established by the Social Security Act of 1935, 49 Stat. 627, as amended, 🔖 42 U.S.C. ss 601—610 (1964 ed. and Supp. IV). It is a categorical assistance program supported by federal grants-in-aid but administered by the States according to regulations of the Secretary of Health, Education, and Welfare.

See N.Y. Social Welfare Law ss 343—362 (1966). We considered other aspects of AFDC in 🔖 King v. Smith, 392 U.S. 309, 88 S.Ct. 2128, 20 L.Ed.2d 1118 (1968), and in 🚩 Shapiro v. Thompson, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969).

Home Relief is a general assistance program financed and administered solely by New York state and local governments. N.Y. Social Welfare Law ss 157—165 (1966), since July 1, 1967, Social Services Law ss 157—🚩 166. It assists any person unable to support himself or to secure support from other sources. Id., 🔖 s 158.

[2] Two suits were brought and consolidated in the District Court. The named plaintiffs were 20 in number, including intervenors. Fourteen had been or were about to be cut off from AFDC, and six from Home Relief. During the course of this litigation most, though not all, of the plaintiffs either received a 'fair hearing' (see infra, at 1015—1016) or were restored to the rolls without a hearing. However, even in many of the cases where payments have been resumed, the underlying questions of eligibility that resulted in the bringing of this suit have not been resolved. For example, Mrs. Altagracia Guzman alleged that she was in danger of losing AFDC payments for failure to cooperate with the City Department of Social Services in suing her estranged husband. She contended that the departmental policy requiring such cooperation was inapplicable to the facts of her case. The record shows that payments to Mrs. Guzman have not been terminated, but there is no indication that the basic dispute over her duty to cooperate has been resolved, or that the alleged danger of termination has been removed. Home Relief payments to Juan DeJesus were terminated because he refused to accept counseling and rehabilitation for drug addiction. Mr. DeJesus maintains that he does not

use drugs. His payments were restored the day after his complaint was filed. But there is nothing in the record to indicate that the underlying factual dispute in his case has been settled.

3    The adoption in February 1968 and the amendment in April of Regulation s 351.26 coincided with or followed several revisions by the Department of Health, Education, and Welfare of its regulations implementing 42 U.S.C. s 602(a)(4), which is the provision of the Social Security Act that requires a State to afford a 'fair hearing' to any recipient of aid under a federally assisted program before termination of his aid becomes final. This requirement is satisfied by a post-termination 'fair hearing' under regulations presently in effect. See HEW Handbook of Public Assistance Administration (hereafter HEW Handbook), pt. IV, ss 6200—6400. A new HEW regulation, 34 Fed.Reg. 1144 (1969), now scheduled to take effect in July 1970, 34 Fed.Reg. 13595 (1969), would require continuation of AFDC payments until the final decision after a 'fair hearing' and would give recipients a right to appointed counsel at 'fair hearings.' 45 CFR s 205.10, 34 Fed.Reg. 1144 (1969); 45 CFR s 220.25, 34 Fed.Reg. 1356 (1969). For the safeguards specified at such 'fair hearings' see HEW Handbook, pt. IV, ss 6200—6400. Another recent regulation now in effect requires a local agency administering AFDC to give 'advance notice of questions it has about an individual's eligibility so that a recipient has an opportunity to discuss his situation before receiving formal written notice of reduction in payment or termination of assistance.' Id., pt. IV, s 2300(d)(5). This case presents no issue of the validity or construction of the federal regulations. It is only subdivision (b) of s 351.26 of the New York State regulations and implementing procedure 68—18 of New York City that pose the constitutional question before us. Cf.

Shapiro v. Thompson, 394 U.S. 618, 641, 89 S.Ct. 1322, 1335, 22 L.Ed.2d 600 (1969). Even assuming that the constitutional question might be avoided in the context of AFDC by construction of the Social Security Act or of the present federal regulations thereunder, or by waiting for the new regulations to become effective, the question must be faced and decided in the context of New York's Home Relief program, to which the procedures also apply.

4    These omissions contrast with the provisions of subdivision (a) of s 351.26, the validity of which is not at issue in this Court. That subdivision also requires written notification to the recipient at least seven days prior to the proposed effective date of the reasons for the proposed discontinuance or suspension. However, the notification must further advise the recipient that if he makes a request therefor he will be afforded an opportunity to appear at a time and place indicated before the official identified in the notice, who will review his case with him and allow him to present such written and oral evidence as the recipient may have to demonstrate why aid should not be discontinued or suspended. The District Court assumed that subdivision (a) would be construed to afford rights of confrontation and cross-examination and a decision based solely on the record. Kelly v. Wyman, 294 F.Supp. 893, 906—907 (1968).

5    N.Y. Social Welfare Law s 353(2) (1966) provides for a post-termination 'fair hearing' pursuant to 42 U.S.C. s 602(a)(4). See n. 3, supra. Although the District Court noted that HEW had raised some objections to the New York 'fair hearing' procedures, 294 F.Supp., at 898 n. 9, these objections are not at issue in this Court. Shortly before this suit was filed, New York State adopted a similar provision for a 'fair hearing' in terminations of Home Relief. 18 NYCRR ss 84.2—84.23. In both AFDC and Home Relief the 'fair hearing' must be held within 10 working days of the request, s 84.6, with decision within 12 working days thereafter, s 84.15. It was conceded in oral argument that these time limits are not in fact observed.

6    Current HEW regulations require the States to make full retroactive payments (with federal matching funds) whenever a 'fair heairng' results in a reversal of a termination of assistance. HEW Handbook, pt. IV, ss 6200(k), 6300(g), 6500(a); see 18 NYCRR s 358.8. Under New York State regulations retroactive payments can also be made, with certain limitations, to correct an erroneous termination discovered before a 'fair hearing' has been held. 18 NYCRR s 351.27. HEW regulations also authorize, but do not require, the State to continue AFDC payments without loss of federal matching funds pending completion of a 'fair

7    hearing.' HEW Handbook, pt. IV, s 6500(b). The new HEW regulations presently scheduled to become effective July 1, 1970, will supersede all of these provisions. See n. 3, supra.

7    Appellant does not question the recipient's due process right to evidentiary review after termination. For a general discussion of the provision of an evidentiary hearing prior to termination, see Comment, The Constitutional Minimum for the Termination of Welfare Benefits: The Need for and Requirements of a Prior Hearing, 68 Mich.L.Rev. 112 (1969).

8    It may be realistic today to regard welfare entitlements as more like 'property' than a 'gratuity.' Much of the existing wealth in this country takes the form of rights that do not fall within traditional common-law concepts of property. It has been aptly noted that

'(s)ociety today is built around entitlement. The automobile dealer has his franchise, the doctor and lawyer their professional licenses, the worker his union membership, contract, and pension rights, the executive his contract and stock options; all are devices to aid security and independence. Many of the most important of these entitlements now flow from government: subsidies to farmers and businessmen, routes for airlines and channels for television stations; long term contracts for defense, space, and education; social security pensions for individuals. Such sources of security, whether private or public, are no longer regarded as luxuries or gratuities; to the recipients they are essentials, fully deserved, and in no sense a form of charity. It is only the poor whose entitlements, although recognized by public policy, have not been effectively enforced.' Reich, Individual Rights and Social Welfare: The Emerging Legal Issues, 74 Yale L.J. 1245, 1255 (1965). See also Reich, The New Property, 73 Yale L.J. 733 (1964).

9    See also Goldsmith v. United States Board of Tax Appeals, 270 U.S. 117, 46 S.Ct. 215, 70 L.Ed. 494 (1926) (right of a certified public accountant to practice before the Board of Tax Appeals); Hornsby v. Allen, 326 F.2d 605 (C.A.5th Cir. 1964) (right to obtain a retail liquor store license); Dixon v. Alabama State Board of Education, 294 F.2d 150 (C.A.5th Cir.), cert. denied, 368 U.S. 930, 82 S.Ct. 368, 7 L.Ed.2d 193 (1961) (right to attend a public college).

10    One Court of Appeals has stated: 'In a wide variety of situations, it has long been recognized that where harm to the public is threatened, and the private interest infringed is reasonably deemed to be of less importance, an official body can take summary action pending a later hearing.' R. A. Holman & Co. v. SEC, 112 U.S.App.D.C. 43, 47, 299 F.2d 127, 131, cert. denied, 370 U.S. 911, 82 S.Ct. 1257, 8 L.Ed.2d 404 (1962) (suspension of exemption from stock registration requirement). See also, for example, Ewing v. Mytinger & Casselberry, Inc., 339 U.S. 594, 70 S.Ct. 870, 94 L.Ed. 1088 (1950) (seizure of mislabeled vitamin product); North American Cold Storage Co. v. Chicago, 211 U.S. 306, 29 S.Ct. 101, 53 L.Ed. 195 (1908) (seizure of food not fit for human use); Yakus v. United States, 321 U.S. 414, 64 S.Ct. 660, 88 L.Ed. 834 (1944) (adoption of wartime price regulations); Gonzalez v. Freeman, 118 U.S.App.D.C. 180, 334 F.2d 570 (1964) (disqualification of a contractor to do business with the Government). In Cafeteria & Restaurant Workers Union, etc. v. McElroy, supra, 367 U.S. at 896, 81 S.Ct. at 1749, summary dismissal of a public employee was upheld because '(i)n (its) proprietary military capacity, the Federal Government, * * * has traditionally exercised unfettered control,' and because the case involved the Government's 'dispatch of its own internal affairs.' Cf. Perkins v. Lukens Steel Co., 310 U.S. 113, 60 S.Ct. 869, 84 L.Ed. 1108 (1940).

11    Administrative determination that a person is ineligible for welfare may also render him ineligible for participation in state-financed medical programs. See N.Y. Social Welfare Law s 366 (1966).

12    His impaired adversary position is particularly telling in light of the welfare bureaucracy's difficulties in reaching correct decisions on eligibility. See Comment, Due Process and the Right to a Prior Hearing in Welfare Cases, 37 Ford.L.Rev. 604, 610—611 (1969).

13    See, e.g., Reich, supra, n. 8, 74 Yale L.J., at 1255.

14    Due process does not, of course, require two hearings. If, for example, a State simply wishes to continue benefits until after a 'fair' hearing there will be no need for a preliminary hearing.

15    This case presents no question requiring our determination whether due process requires only an opportunity for written submission, or an opportunity both for written submission and oral argument, where there are no factual issues in dispute or where the application of the rule of law is not intertwined with factual issues. See

🔖 FCC v. WJR, 337 U.S. 265, 275—277, 69 S.Ct. 1097, 1103—1104, 93 L.ed. 1353 (1949).

16    '(T)he prosecution of an appeal demands a degree of security, awareness, tenacity, and ability which few dependent people have.' Wedemeyer & Moore, The American Welfare System, 54 Calif.L.Rev. 326, 342 (1966).

1    This figure includes all recipients of Oldage Assistance, Aid to Families with Dependent Children, Aid to the Blind, Aid to the Permanently and Totally Disabled, and general assistance. In this case appellants are AFDC and general assistance recipients. In New York State alone there are 951,000 AFDC recipients and 108,000 on general assistance. In the Nation as a whole the comparable figures are 6,080,000 and 391,000. U.S. Bureau of the Census, Statistical Abstract of the United States: 1969 (90th ed.), Table 435, p. 297.

2    The goal of a written constitution with fixed limits on governmental power had long been desired. Prior to our colonial constitutions, the closest man had come to realizing this goal was the political movement of the Levellers in England in the 1640's. J. Frank, The Levellers (1955). In 1647 the Levellers proposed the adoption of An Agreement of the People which set forth written limitations on the English Government. This proposal contained many of the ideas which later were incorporated in the constitutions of this Nation. Id. at 135—147.

3    This command is expressed in the Tenth Amendment:

'The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people.'

4    It was proposed that members of the judicial branch would sit on a Council of Revision which would consider legislation and have the power to veto it. This proposal was rejected. J. Elliot, 1 Elliot's Debates 160, 164, 214 (Journal of the Federal Convention); 395, 398 (Yates' Minutes); vol. 5, pp. 151, 161—166, 344—349 (Madison's Notes) (Lippincott ed. 1876). It was also suggested that The Chief Justice would serve as a member of the President's executive council, but this proposal was similarly rejected. Id., vol. 5, pp. 442, 445, 446, 462.

5    See n. 1, supra.

6    I am aware that some feel that the process employed in reaching today's decision is not dependent on the individual views of the Justices involved, but is a mere objective search for the 'collective conscience of mankind,' but in my view that description is only a euphemism for an individual's judgment. Judges are as human as anyone and as likely as others to see the world through their own eyes and find the 'collective conscience' remarkably similar to their own. Cf. 🔖 Griswold v. Connecticut, 381 U.S. 479, 518—519, 85 S.Ct. 1678, 1700—1701, 14 L.Ed.2d 510 (1965) (Black, J., dissenting); 🔖 Sniadach v. Family Finance Corp., 395 U.S. 337, 350—351, 89 S.Ct. 1820, 1827, 23 L.Ed.2d 349 (1969) (Black, J., dissenting).

7    To realize how uncertain a standard of 'fundamental fairness' would be, one has only to reflect for a moment on the possible disagreement if the 'fairness' of the procedure in this case were propounded to the head of the National Welfare Rights Organization, the president of the national Chamber of Commerce, and the chairman of the John Birch Society.

---

**End of Document**                                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

© 2020 Thomson Reuters. No claim to original U.S. Government Works.    11

Case 2020CV001583  Document 27  Filed 12-07-2020  Page 1 of 2
**Village of Willowbrook v. Olech, 528 U.S. 562 (2000)**

120 S.Ct. 1073, 145 L.Ed.2d 1060, 68 USLW 4157, 30 Envtl. L. Rep. 20,360...

FILED
12-07-2020
Clerk of Circuit Court
Waukesha County
2020CV001583

120 S.Ct. 1073
Supreme Court of the United States

VILLAGE OF WILLOWBROOK, et al., Petitioners,
v.
Grace OLECH.

No. 98–1288.
|
Feb. 23, 2000.

**Synopsis**

Homeowner sued village, alleging that village's demand for 33-foot easement in order to connect her property to municipal water supply violated equal protection clause of Fourteenth Amendment. The United States District Court for the Northern District of Illinois, George M. Marovich, J., 1998 WL 196455, dismissed action for failure to state a claim, and homeowner appealed. The Seventh Circuit Court of Appeals, 160 F.3d 386, reversed. After granting certiorari, the Supreme Court held that homeowner could assert equal protection claim as class of one.

Affirmed.

Justice Breyer filed separate opinion, concurring in result.

**Procedural Posture(s):** On Appeal.

**Opinion**

 **\*\*1074  \*563** PER CURIAM.

Respondent Grace Olech and her late husband Thaddeus asked petitioner Village of Willowbrook (Village) to connect their property to the municipal water supply. The Village at first conditioned the connection on the Olechs granting the Village a 33–foot easement. The Olechs objected, claiming that the Village only required a 15–foot easement from other property owners seeking access to the water supply. After a 3–month delay, the Village relented and agreed to provide water service with only a 15–foot easement.

Olech sued the Village, claiming that the Village's demand of an additional 18–foot easement violated the Equal Protection Clause of the Fourteenth Amendment. Olech asserted that the 33–foot easement demand was "irrational and wholly arbitrary"; that the Village's demand was actually motivated by ill will resulting from the Olechs' previous filing of an unrelated, successful lawsuit against the Village; and that the Village acted either with the intent to deprive Olech of her rights or in reckless disregard of her rights. App. 10, 12.

The District Court dismissed the lawsuit pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a cognizable claim under the Equal Protection Clause. Relying on Circuit precedent, the Court of Appeals for the Seventh **\*564** Circuit reversed, holding that a plaintiff can allege an equal protection violation by asserting that state action was motivated solely by a " 'spiteful effort to "get" ' him for reasons wholly unrelated to any legitimate state objective.' " 160 F.3d 386, 387 (1998) (quoting Esmail v. Macrane, 53 F.3d 176, 180 (C.A.7 1995)). It determined that Olech's complaint sufficiently alleged such a claim. 160 F.3d, at 388. We granted certiorari to determine whether the Equal Protection Clause gives rise to a cause of action on behalf of a "class of one" where the plaintiff did not allege membership in a class or group.* 527 U.S. 1067, 120 S.Ct. 10, 144 L.Ed.2d 841 (1999).

 Our cases have recognized successful equal protection claims brought by a "class of one," where the plaintiff alleges that she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment. See Sioux City Bridge Co. v. Dakota County, 260 U.S. 441, 43 S.Ct. 190, 67 L.Ed. 340 (1923); Allegheny Pittsburgh Coal Co. v. Commission of Webster Cty., 488 U.S. 336, 109 S.Ct. 633, 102 L.Ed.2d 688 (1989). In so doing, we have explained that " '[t]he purpose **\*\*1075** of the equal protection clause of the Fourteenth Amendment is to secure every person within the State's jurisdiction against intentional and arbitrary discrimination, whether occasioned by express terms of a statute or by its improper execution through duly constituted agents.' " Sioux City Bridge Co., supra, at 445, 43 S.Ct. 190 (quoting Sunday Lake Iron Co. v. Township of Wakefield, 247 U.S. 350, 352, 38 S.Ct. 495, 62 L.Ed. 1154 (1918)).

 **\*565** That reasoning is applicable to this case. Olech's complaint can fairly be construed as alleging that the Village intentionally demanded a 33–foot easement as a condition of connecting her property to the municipal water supply where the Village required only a 15–foot easement from other similarly situated property owners. See Conley v.

120 S.Ct. 1073, 145 L.Ed.2d 1060, 68 USLW 4157, 30 Envtl. L. Rep. 20,360...

Gibson, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). The complaint also alleged that the Village's demand was "irrational and wholly arbitrary" and that the Village ultimately connected her property after receiving a clearly adequate 15–foot easement. These allegations, quite apart from the Village's subjective motivation, are sufficient to state a claim for relief under traditional equal protection analysis. We therefore affirm the judgment of the Court of Appeals, but do not reach the alternative theory of "subjective ill will" relied on by that court.

*It is so ordered.*

Justice BREYER, concurring in the result.

The Solicitor General and the village of Willowbrook have expressed concern lest we interpret the Equal Protection Clause in this case in a way that would transform many ordinary violations of city or state law into violations of the Constitution. It might be thought that a rule that looks only to an intentional difference in treatment and a lack of a rational basis for that different treatment would work such a transformation. Zoning decisions, for example, will often, perhaps almost always, treat one landowner differently from another, and one might claim that, when a city's zoning authority takes an action that fails to conform to a city zoning regulation, it lacks a "rational basis" for its action (at least if the regulation in question is reasonably clear).

This case, however, does not directly raise the question whether the simple and common instance of a faulty zoning decision would violate the Equal Protection Clause. That is because the Court of Appeals found that in this case respondent **\*566** had alleged an extra factor as well—a factor that the Court of Appeals called "vindictive action," "illegitimate animus," or "ill will." 160 F.3d 386, 388 (C.A.7 1998). And, in that respect, the court said this case resembled *Esmail v. Macrane,* 53 F.3d 176 (C.A.7 1995), because the *Esmail* plaintiff had alleged that the municipality's differential treatment "was the result not of prosecutorial discretion honestly (even if ineptly—even if arbitrarily) exercised but of an illegitimate desire to 'get' him." 160 F.3d, at 388.

In my view, the presence of that added factor in this case is sufficient to minimize any concern about transforming run-of-the-mill zoning cases into cases of constitutional right. For this reason, along with the others mentioned by the Court, I concur in the result.

**All Citations**

528 U.S. 562, 120 S.Ct. 1073, 145 L.Ed.2d 1060, 68 USLW 4157, 30 Envtl. L. Rep. 20,360, 00 Cal. Daily Op. Serv. 1359, 2000 Daily Journal D.A.R. 1909, 2000 CJ C.A.R. 897

---

# Footnotes

\*    We note that the complaint in this case could be read to allege a class of five. In addition to Grace and Thaddeus Olech, their neighbors Rodney and Phyllis Zimmer and Howard Brinkman requested to be connected to the municipal water supply, and the Village initially demanded the 33–foot easement from all of them. The Zimmers and Mr. Brinkman were also involved in the previous, successful lawsuit against the Village, which allegedly created the ill will motivating the excessive easement demand. Whether the complaint alleges a class of one or of five is of no consequence because we conclude that the number of individuals in a class is immaterial for equal protection analysis.

---

**End of Document**    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

FILED
12-07-2020
Clerk of Circuit Court
Waukesha County
2020CV001583

**STATE OF WISCONSIN        CIRCUIT COURT        WAUKESHA COUNTY**

ERICA BREWER, et al.,

      *Plaintiffs*,

    v.                                                          Case No. 2020CV001583
                                      Case Codes: 30701, 30704, 30301

TOWN OF EAGLE, et al.,

      *Defendants*.

---

## NOTICE OF MOTION AND
## PLAINTIFFS' MOTION FOR A TEMPORARY INJUNCTION

---

Plaintiffs ERICA BREWER and ZACHARY MALLORY, by and through their attorney MICHAEL VAN KLEUNEN of CRAMER, MULTHAUF & HAMMES, LLP, move the Court for an order enjoining Defendants from pursuing or taking any enforcement actions against the Mallorys—including inspecting the Mallorys' property, requiring the Mallorys to make any changes to their property, imposing additional fines and fees, or filing enforcement claims—for (1) conditions or alleged violations that existed on their property at the time or before this lawsuit was filed; or (2) violations that may be alleged to occur during the pendency of this lawsuit but that are based on ordinances Defendants cited the Mallorys for violating before this lawsuit was filed.

This Motion shall be heard before the Honorable Ralph M. Ramirez at the Waukesha County Courthouse, 515 West Moreland Boulevard, Waukesha, Wisconsin, at a date and time as set by the Court.

This Motion is supported by the accompanying brief and the exhibits attached thereto.

Dated: December 7, 2020

Alexa Gervasi*
Kirby West*
Marie Miller*
INSTITUTE FOR JUSTICE
901 N. Glebe Rd., Suite 900
Arlington, VA 22203
(703) 682-9320
agervasi@ij.org; kwest@ij.org;
mmiller@ij.org
*Lead Counsel for Plaintiffs*

*Motion for admission pro hac vice pending

Electronically signed by Michael Van Kleunen
Michael P. Van Kleunen (SBN: 1113958)
CRAMER, MULTHAUF & HAMMES, LLP
1601 East Racine Avenue • Suite 200
P.O. Box 558
Waukesha, WI 53187
(262) 542-4278
mvk@cmhlaw.com
*Local Counsel for Plaintiffs*

FILED
12-07-2020
Clerk of Circuit Court
Waukesha County
2020CV001583

**STATE OF WISCONSIN**    **CIRCUIT COURT**    **WAUKESHA COUNTY**

ERICA BREWER, et al.,

                    Plaintiffs,

v.

TOWN OF EAGLE, et al.,

                    Defendants.

Case No. 2020CV001583

Case Codes: 30701, 30704, 30301

---

### ORDER GRANTING PLAINTIFFS' MOTION FOR A TEMPORARY INJUNCTION

The matter before the Court is Plaintiffs' Motion for a Temporary Injunction.

NOW THEREFORE, IT IS ORDERED that:

1.    Defendants are enjoined from pursuing or taking any enforcement actions against Plaintiffs—including inspecting Plaintiffs' property, requiring Plaintiffs to make any changes to their property, imposing additional fines and fees, or filing enforcement claims—for conditions or alleged violations that existed on their property at the time or before the above-captioned lawsuit was filed; and

2.    Defendants are enjoined from pursuing or taking any enforcement actions against Plaintiffs—including inspecting Plaintiffs' property, requiring Plaintiffs to make any changes to their property, imposing additional fines and fees, or filing enforcement claims—for violations that may be alleged to occur during the pendency of the above-captioned lawsuit but that are based on ordinances Defendants cited Plaintiffs for violating before the lawsuit was filed.

FILED
12-08-2020
Clerk of Circuit Court
Waukesha County
2020CV001583

DATE SIGNED: December 8, 2020

<u>Electronically signed by Hon. Ralph M. Ramirez</u>
Circuit Court Judge

| STATE OF WISCONSIN | CIRCUIT COURT | WAUKESHA COUNTY |
|---|---|---|

ERICA BREWER, et al.,

                           Plaintiffs,

v.

TOWN OF EAGLE, et al.,

                           Defendants.

Case No. 2020CV001583

Case Codes: 30701, 30704, 30301

---

## ORDER GRANTING MOTION TO APPEAR *PRO HAC VICE*

The matter before the court, the Motion of Michael Van Kleunen, who is an active member of the State Bar of Wisconsin, to allow Kirby West, Marie Miller, and Alexa Gervasi to appear *pro hac vice* in the above-entitled action in association with Michael Van Kleunen of Cramer, Multhauf & Hammes, LLP, pursuant to Wisconsin Supreme Court Rule 10.03(4).

NOW THEREFORE, IT IS ORDERED that:

1.     Pursuant to SCR 10.03(4), Kirby West, Marie Miller, and Alexa Gervasi are granted permission to appear and participate in this court in the above-entitled action in association with Michael Van Kleunen of Cramer, Multhauf & Hammes, LLP; and

2.      Kirby West, Marie Miller, and Alexa Gervasi shall abide by the Rules of Professional Conduct for attorneys and the Rules of Decorum of the court, SCR 62.02. Violation of the provisions will result in revocation of the authorization to appear in this case.

###################################

2

FILED
12-09-2020
Clerk of Circuit Court
Waukesha County
2020CV001583

STATE OF WISCONSIN       CIRCUIT COURT       WAUKESHA COUNTY

ERICA BREWER and
ZACHARY MALLORY,

      Plaintiffs,

    v.                                Case No:  20-CV-1583
                                            Case Code:  30701

TOWN OF EAGLE,
TOWN OF EAGLE TOWN BOARD,
DON MALEK, CHRIS MOMMAERTS,
STEVE MUTH, JANIS SUHM, DANIEL WEST,
MUNICIPAL LAW & LITIGATION GROUP, S.C.,
MARTIN MONTOYA, and TIM SCHWECKE,

      Defendants.

---

### NOTICE OF APPEARANCE

---

TO:    All Counsel of Record

    **PLEASE TAKE NOTICE** that Attorney Thomas A. Cabush of Kasdorf, Lewis & Swietlik, S.C. has been retained by and appears for the Defendants, Town of Eagle, Town of Eagle Town Board, Don Malek, Chris Mommaerts, Steve Muth, Janis Suhm, Daniel West, Municipal Law & Litigation Group, S.C., Martin Montoya, and Tim Schwecke, in the above-referenced matter. Copies of all pleadings and other papers should be served upon us via the Wisconsin Circuit Court eFiling System or via U.S. Mail at the address below.

Dated this 9th day of December, 2020,

KASDORF, LEWIS & SWIETLIK, S.C.
Attorneys for Defendants, Town of Eagle, Town of
Eagle Town Board, Don Malek, Chris Mommaerts,
Steve Muth, Janis Suhm, Daniel West, Municipal
Law and Litigation Group, S.C., Martin Montoya,
and Tim Schwecke.

By: *Electronically signed by Thomas A. Cabush*
Thomas A. Cabush
State Bar No. 1019433

MAILING ADDRESS:
One Park Plaza, Suite 500
11270 W. Park Place
Milwaukee, WI 53224
Phone:   (414) 577-4000
Fax:      (414) 577-4400
E-Mail:  tcabush@kasdorf.com

2

FILED
12-09-2020
Clerk of Circuit Court
Waukesha County
2020CV001583

STATE OF WISCONSIN     CIRCUIT COURT     WAUKESHA COUNTY

ERICA BREWER and
ZACHARY MALLORY,

      Plaintiffs,

    v.                            Case No:   20-CV-1583
                                         Case Code:  30701

TOWN OF EAGLE,
TOWN OF EAGLE TOWN BOARD,
DON MALEK, CHRIS MOMMAERTS,
STEVE MUTH, JANIS SUHM, DANIEL WEST,
MUNICIPAL LAW & LITIGATION GROUP, S.C.,
MARTIN MONTOYA, and TIM SCHWECKE,

      Defendants.

## NOTICE OF APPEARANCE

TO:    All Counsel of Record

    **PLEASE TAKE NOTICE** that Attorney Matthew J. Hastings of Kasdorf, Lewis & Swietlik, S.C. has been retained by and appears for the Defendants, Town of Eagle, Town of Eagle Town Board, Don Malek, Chris Mommaerts, Steve Muth, Janis Suhm, Daniel West, Municipal Law & Litigation Group, S.C., Martin Montoya, and Tim Schwecke, in the above-referenced matter. Copies of all pleadings and other papers should be served upon us via the Wisconsin Circuit Court eFiling System or via U.S. Mail at the address below.

Dated this 9th day of December, 2020,

KASDORF, LEWIS & SWIETLIK, S.C.
Attorneys for Defendants, Town of Eagle, Town of
Eagle Town Board, Don Malek, Chris Mommaerts,
Steve Muth, Janis Suhm, Daniel West, Municipal
Law and Litigation Group, S.C., Martin Montoya,
and Tim Schwecke.

By: *Electronically signed by Matthew J. Hastings*
　　　Matthew J. Hastings
　　　State Bar No. 1059063

MAILING ADDRESS:
One Park Plaza, Suite 500
11270 W. Park Place
Milwaukee, WI 53224
Phone:　(414) 577-4000
Fax:　　(414) 577-4400
E-Mail:　mhastings@kasdorf.com