# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| ERICA BREWER and ZACHARY MALLORY, | |
| Plaintiffs, | Case No. 20-CV-1820-JPS |
| v. | |
| TOWN OF EAGLE, TOWN OF EAGLE TOWN BOARD, DON MALEK, CHRIS MOMMAERTS, STEVE MUTH, JANIS SUHM, DANIEL WEST, MUNICIPAL LAW & LITIGATION GROUP SC, MARTIN MONTOYA, and TIM SCHWECKE, | **ORDER** |
| Defendants, | |
| v. | |
| MIDVALE INDEMNITY COMPANY, | |
| Intervenor Defendant. | |

## I.    INTRODUCTION

This civil-rights case comes before the Court on Erica Brewer ("Brewer") and Zachary Mallory's ("Mallory") (collectively, "Plaintiffs") allegations that their constitutional rights were violated by their local government. (Docket #1-2 at 3); 42 U.S.C. § 1983. On November 9, 2020, Plaintiffs filed this case in Waukesha County Circuit Court in the State of

Wisconsin.[1] (Docket #1 at 1). Defendants then removed the case to this Court pursuant to 28 U.S.C. §§ 1446 and 1441(c). (*Id.*) On January 27, 2021, Defendants filed a motion for judgment on the pleadings, (Docket #14), which is now fully briefed.[2] While the parties were briefing out that motion, Plaintiffs filed a motion for a preliminary injunction. (Docket #19). For the reasons stated below, the Court will partially grant Defendants' motion for judgment on the pleadings and will grant Plaintiffs' motion for a preliminary injunction.

## 2. RELEVANT ALLEGATIONS

### 2.1 Factual Background

Plaintiffs are a married couple and the owners of a property located in Eagle, Wisconsin (the "Farm"). (Docket #1-2 at 19). In 2016, Plaintiffs purchased the Farm with the intention of creating a family business that would generate enough income so as to enable them to retire early from their professions (Brewer is an operating-room nurse; Mallory is a cybersecurity specialist and veteran of the United States Coast Guard). (*Id.* at 22). The Farm is a 3.8-acre property upon which Plaintiffs maintain a residential house, barn, chicken coop, and beehives. (*Id.*)

The house, barn, and water and electrical lines were built and installed on the Farm in approximately 1997, before Plaintiffs purchased the

---

[1] *Brewer v. Town of Eagle*, 2020CV001583 (Waukesha Cnty. Cir. Ct.) *available at* https://wcca.wicourts.gov/caseDetail.html?caseNo=2020CV001583&countyNo=67&index=0 (last visited August 4, 2021).

[2] Defendants' brief in support of their motion for judgment on the pleadings, (Docket #15 at 1–34), exceeds the page limit set by local rule. Civ. L.R. 7(f) ("[T]he principal memorandum in support of, or in opposition to, any motion must not exceed 30 pages."). Plaintiffs pointed out this violation to the Court but graciously did not press the issue. (Docket #23 at 1 n.1). The Court reminds Defendants' counsel that trustworthy advocacy requires diligent rule following.

property. (*Id.*) Plaintiffs allege that, when they purchased the Farm, they were assured that the house, barn, and original utility lines were properly permitted, and they continue to be unaware of any evidence that either the house or the barn were built, or the original utilities were installed, without the required permits. (*Id.* at 22–23). When Plaintiffs purchased the Farm, it was zoned as "Agricultural 3," however, in 2017, the Town rezoned the Farm to "Rural Residential," thus limiting Plaintiffs' ability to engage in agricultural activities under the Town's Zoning Code. (*Id.* at 23).

Despite the rezoning, Plaintiffs have been allowed to utilize their property for limited agricultural uses. (*Id.*) And, because of Mallory's service in the armed forces, the Farm is recognized as a "Veteran Farm" by the Farmer Veteran Coalition. (*Id.*) Plaintiffs are certified members of the Coalition's Homegrown by Heroes program. (*Id.*) From the Farm, Plaintiffs have sold and/or continue to sell fresh vegetables, eggs, poultry, and other products, as well as to extract honey and beeswax for jarring and to create hot sauce, lip balm, reusable food wraps, and other products. (*Id.* at 23–24). Plaintiffs sell their products at local farmers' markets. (*Id.* at 24).

The Town of Eagle (the "Town") is a municipality in Waukesha County, Wisconsin. (*Id.* at 20). The Town's Board (the "Board") was created by the Town in accordance with Wisconsin Statutes section 60.10 and, among other responsibilities, is authorized to determine whether to investigate, pursue, and enforce ordinance violations against residents of the Town. (*Id.* at 19). Don Malek ("Malek") is the Chairman of the Board; Chris Mommaerts ("Mommaerts"), Steve Muth ("Muth"), Janis Suhm ("Suhm"), and Daniel West ("West") are supervisors on the Board (collectively, the "Board Members"). (*Id.* at 20–21).

According to the Town's written policy, the Town may investigate and enforce ordinance violations only in response to written complaints submitted by residents alleging that their neighbors are noncompliant with Town ordinances. (*Id.* at 24). The terms "ordinance" or "ordinances" include the Town's Zoning Code, Municipal Code, Building Code, and other civil ordinances enforced through proceedings before the Board. (*Id.* at 24–25). Complainants may submit complaints anonymously after speaking with a Board Member and requesting that the Board Member write and sign the complaint on the complainants' behalf. (*Id.* at 25). All complaints must be signed by the Town Chairman and forwarded to the Town Clerk before a site inspection may occur. (*Id.*) The Town Clerk must forward complaints to the Zoning Administrator and/or Building Inspector, who then perform an on-site inspection, noting instances of non-compliance with photographs and references to the violated ordinance(s). (*Id.* at 25–26). If the Zoning Administrator and/or Building Inspector identifies violations, he or she must give notice of the violations to the noncompliant resident, providing the resident thirty days to comply. (*Id.* at 26).

Once a resident makes "substantial progress" toward compliance, he or she may appear before the Board to request a thirty-day extension; the Board, with sole discretion, may grant additional extensions. (*Id.*) The Zoning Administrator and/or Building Inspector then conduct a follow-up inspection after expiration of the time the Board allotted for coming into compliance. (*Id.*) If a resident has failed to comply after the time limit expires, the Zoning Administrator and/or Building Inspector forward the matter to the Town Attorney, who will issue a citation. (*Id.*at 27). If a resident's property returns to non-compliance within six months of coming

into compliance, the Town Attorney may issue a citation or commence a civil action without first providing the resident with notice of the new violation. (*Id.*)

Tim Schwecke ("Schwecke") is the Town Planner and Zoning Administrator. (*Id.*) The Town pays Schwecke $75.00 an hour to investigate, pursue, and enforce violations. (*Id.* at 28). Plaintiffs believe that Schwecke is paid using the money collected from residents for fines and fees for violations; they further aver that Schwecke receives additional compensation for identifying and enforcing violations. (*Id.*) Martin Montoya ("Montoya") is the Town Building Inspector. (*Id.* at 21). Plaintiffs believe he is also paid hourly for investigating, pursuing, and enforcing violations using the fees paid by residents who are in violation of Town ordinances. (*Id.* at 29). Municipal Law & Litigation Group, S.C. ("Municipal Law Group") is a law firm hired by the Town to enforce ordinance violations; Plaintiffs believe that Municipal Law Group is paid hourly by the residents against whom violations are found, either through the fines imposed for the violations or through separate fees. (*Id.* at 21, 30).

At some point prior to May 2020, Plaintiffs learned that the Town used its enforcement policy to impede a neighbor's ability to run a small horse-farm business on the neighbor's property. (*Id.* at 31). Thereafter, Plaintiffs began questioning the propriety of the Board's actions at town meetings and on social media. (*Id.*) They made open-records requests for documents and regularly attempted to communicate with the Board, Board Members, and the Town Clerk regarding whether the Board was following the law and proper procedures. (*Id.* at 32). Plaintiffs allege that they were "respectful, but persistent" in questioning and calling attention to the Board's practices and exercise of authority. (*Id.*)

On or about May 15, 2020, Malek received (or, as Plaintiffs suggest, created) an anonymous complaint alleging that the Farm was in violation of numerous Town ordinances. (*Id.* at 32, 102). By letter dated May 19, 2020, Schwecke informed Plaintiffs that a complaint had been lodged against them for unspecified allegations of ordinance violations and asked that Plaintiffs contact him. (*Id.* at 32, 100). The letter expressly noted that the Town had "not determined if there [was] merit to the complaint or not," but it asked that Plaintiffs contact Schwecke "so that [they] [could] set up a time for a site inspection." (*Id.* at 100). After requests by Plaintiffs, Schwecke provided them with a copy of the anonymous complaint; it alleged that Plaintiffs (1) were running a retail business from the Farm and promoting the Farm on social media as a pick-up location for community supported agriculture; (2) had excess grazing animals per acre and were announcing, via social media, their intention to sell meat to the public; (3) had unconfined poultry and possibly excess poultry; (4) kept livestock in an accessory building fewer than fifty feet from a lot line; (5) had an excess number of accessory buildings; (6) had constructed or expanded accessory buildings without a permit; and (7) had an outdoor woodburning stove too close to their residence. (*Id.* at 32–33).

Plaintiffs declined to voluntarily allow a site inspection, and the Town sought and received a special inspection warrant ("SIW") from the Joint Municipal Court for Waukesha County. (Docket #15 at 4). On or about June 18, 2020, Schwecke and Montoya conducted an onsite inspection of the Farm pursuant to the SIW. (Docket #1-2 at 33). By letter dated June 30, 2020, Schwecke and Montoya informed Plaintiffs that they had identified numerous violations, including (1) having too many detached accessory buildings, including a prohibited soft-sided structure; (2) having an

unpermitted hot tub; (3) operating a home business without a permit; (4) having too many livestock; (5) housing livestock in a structure within fifty feet of a lot line; (6) failing to properly maintain property by keeping farming equipment and construction materials outside and having tufts of grass or weeds taller than twelve inches; (7) building "something" on their second-floor deck without a permit; (8) having unpermitted water and electrical lines running to their barn; and (9) failing to complete accessory buildings, as evidenced by the sight of plywood on the roof. (*Id.* at 33–34, 104–06). Schwecke and Montoya provided Plaintiffs with instructions for how to remedy some of the alleged violations and informed Plaintiffs that failure to remedy all violations would result in the Town pursuing legal action and the imposition of an undisclosed monetary penalty. (*Id.* at 34). Thereafter, Plaintiffs retained legal counsel. (*Id.* at 35).

Between June 30, 2020, and October 5, 2020, Plaintiffs—both personally and through their attorney—communicated regularly with Defendants about the Plaintiffs' efforts to come into compliance, to seek clarification regarding why certain ordinances were being enforced against them, and to accommodate Defendants' requests for follow-up inspections. (*Id.*) Plaintiffs allege that, during this time, they received conflicting information from Schwecke, Montoya, and Municipal Law Group regarding what steps they needed to take to come into compliance and which violations would be enforced by the Town. (*Id.*) Still though, Plaintiffs allege that they took steps to resolve their violations, including closing and tearing down their farm stand, arranging to slaughter their excess livestock, razing their greenhouse, removing equipment and building materials from their property, and cutting their grass where necessary. (*Id.* at 36).

Plaintiffs requested additional time to comply, however, on October 9, 2020, Municipal Law Group responded by letter and accused Plaintiffs of an "apparent lack of effort to address the multiple violations" (the "October 9 letter"). (*Id.* at 37). This letter catalogued a significant number of continued violations and action items, including a requirement that Plaintiffs obtain a permit for the flower shelf on their second-floor balcony, completely remove their hot tub (not just the woodburning heater), and sign an agreement with the Town to reimburse the Town for its costs and expenses in addressing the violations. (*Id.* at 37–39). Despite the negative economic impact to them, Plaintiffs state that they continued to make many of the unwanted changes to the Farm. (*Id.* at 40). The Town and Board have not provided Plaintiffs with information or documents that would aid them in understanding what costs and expenses they might face; accordingly, Plaintiffs have not signed the reimbursement agreement. (*Id.*)

Plaintiffs again asked for additional time to consider the conditions in the October 9 letter and continued trying to come into compliance. (*Id.* at 40–41). Municipal Law Group initially responded to the request by suggesting that the Board might consider granting the extension at their next Town meeting. (*Id.* at 41). Hours later, Municipal Law Group sent a follow-up response (the "October 26 Letter"). It stated that, even though Municipal Law Group did not have discretion to extend or modify the offer set forth in his October 9 letter, the impression, "[q]uite frankly . . . is that it is unlikely that [Plaintiffs'] request would be granted." (*Id.*) Municipal Law Group realleged that Plaintiffs had not made "a concerted effort to bring the property into compliance." (*Id.*) The letter closed by informing Plaintiffs that the Town wanted to reinspect the Farm. (*Id.* at 41–42). Municipal Law Group conducted this reinspection on November 6, 2020. (*Id.* at 42).

Subsequently, Schwecke, Montoya, and/or Municipal Law Group made five separate visits to the Farm, during which, Plaintiffs allege, they regularly changed their instructions regarding what steps Plaintiffs needed to take to come into compliance. (*Id.*)

By email dated October 27, 2020, Suhm informed Plaintiffs that the Board Members voted against them in deciding to pursue enforcement of the violations. (*Id.* at 43, 115). Suhm wrote that Plaintiffs "[had] literally ticked off all the board members with [their] meeting comments and on [F]acebook." (*Id.* at 115). Suhm told Plaintiffs that "that wasn't good because the board members voted with emotion," leaving Plaintiffs with no option but to pay for the permits and abide by Municipal Law Group's compliance instructions—which would include agreeing to pay Municipal Law Group, Montoya, and Schwecke's fees—as "to get this over with." (*Id.*) From this email exchange, it appears that Suhm was acquainted with Plaintiffs. (*Id.*) (Suhm writing that, "[o]riginally I was told I couldn't vote due to our friendship, but I fought to be able to discuss and vote").

## 2.2 Procedural Background

In November 2020, Plaintiffs filed this case in Waukesha County Circuit Court,[3] and Defendants removed it to this Court. (Docket #1 at 1). Plaintiffs bring five counts pursuant to Section 1983: (1) "Retaliatory Enforcement (Freedom of Speech—U.S. Constitution amend. I)"; (2) "Discriminatory Enforcement (Equal Protection Clause—U.S. Constitution amend. XIV)"; (3) "Procedural Due Process Improper Profit Motives (Due Process Clause—U.S. Constitution amend. XIV)"; (4) "Procedural Due

---

[3]Defendants aver that Plaintiffs commenced this action "[o]n the eve of the Town commencing an action to prosecute [Plaintiffs' code] violations" in state court (known as a "zoning enforcement action"). (Docket #15 at 1–2).

Process Improper Burden of Proof for Permitting (Due Process Clause—U.S. Constitution amend. XIV)"; and (5) "Procedural Due Process Presumption of Wrongdoing (Due Process Clause—U.S. Constitution amend. XIV)." (Docket #1-2).

At the heart of these claims, Plaintiffs believe that "Defendants have spent six months investigating, pursuing, and enforcing trivial ordinances against [Plaintiffs], that it does not enforce against similarly situated residents, because [Plaintiffs] spoke out against the Town Board." (*Id.* at 43). This includes filing false, anonymous complaints against Plaintiffs so that the Board could pursue investigation and enforcement actions. (*Id.* at 25). Plaintiffs want their Farm restored to the way it was before the Town began its enforcement proceedings, and they do not want to take the additional steps as demanded by the Town (e.g., to tear down their barn, slaughter their livestock, or pay an undisclosed amount of fees to Municipal Law Group).

## 3. DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS

Federal Rule of Civil Procedure 12(c) permits a party to move for judgment after the complaint and answer have been filed by the parties. *Buchanan-Moore v. County of Milwaukee*, 570 F.3d 824, 827 (7th Cir. 2009). A motion for judgment on the pleadings is governed by the same standard as a motion to dismiss for failure to state a claim under Rule 12(b)(6). *Adams v. City of Indianapolis*, 742 F.3d 720, 727–28 (7th Cir. 2014).[4] To survive a

---

[4] Plaintiffs' counsel cites *Delgado v. Jones*, 282 F.3d 511, 515 (7th Cir. 2002), for the proposition that "[a] motion for a judgment on the pleadings under Fed. R. Civ. P. 12(c), like a motion for failure to state a claim under Fed. R. Civ. P. 12(b)(6), should not be granted 'unless it appears beyond doubt that the plaintiff cannot prove any facts that would support his claim for relief.'" *Id.* (quoting *Gustafson v. Jones*, 117 F.3d 1015, 1017 (7th Cir. 1997)); (Docket #23 at 4). In both *Delgado* and

challenge under Rule 12(c) or 12(b)(6), a complaint must provide "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). In other words, the complaint must give "fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). The allegations must "plausibly suggest that the plaintiff has a right to relief, raising that possibility above a speculative level." *Kubiak v. City of Chicago*, 810 F.3d 476, 480 (7th Cir. 2016) (citation omitted). In reviewing the complaint, the Court is required to "accept as true all of the well-pleaded facts in the complaint and draw all reasonable inferences in favor of the plaintiff." *Id.* at 480–81.

### 3.1 Individually Named Defendants

In addition to naming the Town and the Board as defendants, Plaintiffs sue each individually-named defendant in their "official capacity." (Docket #1-2 at 16–17). This includes the Board Members (Malek, Mommaerts, Muth, Suhm, and West), the Town Attorney (Municipal Law Group), the Town Building Inspector (Montoya), and the Town Planner (Schwecke). (*Id.*) Unlike individual capacity suits, "official-capacity suits . . . 'generally represent only another way of pleading an action against an entity of which an officer is an agent.'" *Kentucky v. Graham*, 473 U.S. 159, 165 (1985). Thus, "[a]s long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all

_____

*Gustafson*, the Seventh Circuit Court of Appeals pulled this standard from *Conley v. Gibson*, 355 U.S. 41, 45–46 (1957)—a case which has since been famously abrogated by *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) and *Ashcroft v. Iqbal*, 556 U.S. 662, 668 (2009). The "no set of facts" standard is no longer the law. *Twombly*, 550 U.S. at 546 ("The 'no set of facts' language has been questioned, criticized, and explained away long enough by courts and commentators, and is best forgotten as an incomplete, negative gloss on an accepted pleading standard.").

Case 2:20-cv-01820-JPS   Filed 08/06/21   Page 11 of 37   Document 48

respects other than name, to be treated as a suit against the entity." *Id.* at 166. Here, that means that an official-capacity suit against the named parties is, in reality, a suit against the Town and the Board. *Id.* When faced with actions alleging both municipal- and official-capacity claims, the latter are properly dismissed as redundant. *Smith v. Metro. Sch. District*, 128 F.3d 1014, 1020 n.3 (7th Cir. 1997). Plaintiffs concede this point, (Docket #23 at 12), and the Court will dismiss the individually named Defendants.

### 3.2 *Monell* Claims

To maintain a § 1983 claim against a municipal entity, a plaintiff must first identify a "policy or custom" attributable to governmental policymakers. *Gable v. City of Chicago*, 296 F.3d 531, 537 (7th Cir. 2002) (citing *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 691–94) (1978)). This requirement serves to "distinguish acts of the municipality from acts of [its] employees . . . and thereby make clear that municipal liability is limited to action for which the municipality is actually responsible." *Grieveson v. Anderson,* 538 F.3d 763, 771 (7th Cir. 2008) (internal quotations and citations omitted). A "policy or custom" may take one of three forms:

> (1) an express policy that, when enforced, causes a constitutional deprivation; (2) a widespread practice that, although not authorized by written law or express [governmental] policy, is so permanent and well settled as to constitute a custom or usage with the force of law; or (3) an allegation that the constitutional injury was caused by a person with final policymaking authority.

*Gable*, 296 F.3d at 537 (citation omitted).

A plaintiff must also demonstrate "requisite causation," which means that "the policy or custom was the 'moving force' behind [the] constitutional deprivation." *Id.* (quoting *Monell*, 436 U.S. at 691–94). A plaintiff may demonstrate this "by showing a series of bad acts and inviting

Case 2:20-cv-01820-JPS   Filed 08/06/21   Page 12 of 37   Document 48

the court to infer from them that the policymaking level of government was bound to have noticed what was going on" and, therefore, "by failing to do anything must have encouraged or at least condoned [the activity]." *Jackson v. Marion County*, 66 F.3d 151, 152 (7th Cir. 1995). The plaintiff must plead facts alleging that the "gap" in the defendant's policies reflected a decision to act unconstitutionally. *Calhoun v. Ramsey*, 408 F.3d 375, 380 (7th Cir. 2005). In assessing whether the absence of a policy or protocol gives rise to a decision to violate a person's constitutional rights, a court will look for "evidence that there is a true municipal policy at issue, not a random event." *Id.*

Plaintiffs contend option three: that Defendants, as entities with final policymaking authority, caused Plaintiffs' injuries. (Docket #23 at 16). At the very least, all parties agree that the Board is a final policymaker. And the complaint catalogues a series of actions allegedly taken by the Board that negatively affected Plaintiffs. For example, Plaintiffs allege that the Board initiated enforcement proceedings against Plaintiffs, (Docket #1-2 at 44), considered (and ultimately denied) Plaintiffs' requests for extensions and variances, (*id.* at 22, 40), directed Municipal Law Group to communicate instructions and alleged violations to Plaintiffs, (*id.*), added offenses to the list of Plaintiffs' violations, (*id.* at 39), failed to communicate effectively with Plaintiffs about potential costs of enforcement, (*id.* at 40), cancelled meetings, (*id.* at 42), sought reinspection of the Farm, (*id.*), and took votes against Plaintiffs, (*id.* at 43). As alleged in the complaint, the Board, as a final-policymaking authority, played a significant role in the allegations charged by Plaintiffs. As to the causation requirement, the Court will more fully address below whether Plaintiffs have sufficiently pleaded

claims that the Board, as a final policymaker, caused the various alleged constitutional injuries to the Plaintiffs.

### 3.3    First Amendment (Count I)

In Count I ("Retaliatory Enforcement, Freedom of Speech"), Plaintiffs argue that "the Town and Town Board—acting through the Board Members under color of state law—adopted and enforced a deliberate and pervasive policy or custom to retaliate against residents who speak out against the Town, Town Board, and Town officials." (Docket #1-2 at 46–47). Specifically, Plaintiffs believe that they were retaliated against for exercising their First Amendments rights and that Defendants sought code enforcement against Plaintiffs because of their comments at town meetings and on social media. (*Id.* at 47–50). Defendants move for judgment on the pleadings as to Count I. (Docket #15 at 20–26). The Court will deny Defendants' motion for judgment on the pleadings as to Count I.

Before challenging whether Plaintiffs have sufficiently pleaded the elements of First Amendment retaliation, Defendants argue that, because they had probable cause to investigate the Farm and undertake enforcement actions, they cannot be liable for First Amendment retaliation. In support, Defendants discuss the probable-cause defense to claims of retaliation in the criminal arrest and prosecution context.

In the criminal context, "in most cases, probable cause to arrest defeats a claim of retaliatory arrest." *Lund v. City of Rockford*, 956 F.3d 938, 941 (7th Cir. 2020). Typically, where police have probable cause to arrest a person, that person cannot bring a successful claim of First Amendment retaliation under § 1983. *Id.* "The plaintiff pressing a retaliatory arrest claim must plead and prove the absence of probable cause for the arrest." *Id.* at 944 (quoting *Nieves v. Bartlett*, 139 S. Ct. 1715, 1724 (2019)).

The Court agrees with Defendants' application of this line of cases to civil code enforcement cases. *See Bondar v. D'Amato*, No. 06-C-109, 2007 WL 1700114, at *15–16 (E.D. Wis. June 11, 2007). The Court also agrees with Defendants' assertion that Plaintiffs have failed to plead a lack of probable cause for such code enforcement. The Town successfully sought a SIW which was predicated on probable cause, and Plaintiffs do not allege that the SIW was inappropriately issued without probable cause.

However, Defendants fail to discuss an important exception to the probable-cause defense. In *Nieves*, the Supreme Court wrote that "the no-probable-cause requirement should not apply when a plaintiff presents objective evidence that he was arrested when otherwise similarly situated individuals not engaged in the same sort of protected speech had not been." 139 S. Ct. at 1728. The Seventh Circuit adopted Justice Gorsuch's view that this exception should be applied "commonsensically." *Lund*, 956 F.3d at 945 (quoting *Nieves*, 139 S. Ct. at 1734 (Gorsuch, J., concurring in part and dissenting in part)). Thus, "other kinds of evidence, such as admissions [that an action was taken in retaliation], might be enough to allow a claim to proceed." *Id.* (quoting *Nieves*, 139 S. Ct. at 1734 (Gorsuch, J., concurring in part and dissenting in part)). A court "must consider each set of facts as it comes . . . and in assessing whether the facts supply objective proof of retaliatory treatment . . . common sense must prevail." *Id.*

In their pleadings, Plaintiffs provided a copy of an email, sent from Suhm (a Board Member) to Plaintiffs, stating that the Town Board "voted with emotion" to take enforcement actions against Plaintiffs because Plaintiffs had "literally ticked off all the board members with [their] meeting comments and on [F]acebook." (Docket #1-2 at 43, 115). At the pleadings stage, the Court accepts this as commonsense evidence that

Plaintiffs were treated differently because of their exercise of free speech, even if Defendants had probable cause to pursue enforcement of municipal codes.

Next, Defendants challenge whether Plaintiffs have pleaded the elements of First Amendment retaliation. To succeed on a First Amendment retaliation claim, a plaintiff "must ultimately show that (1) he engaged in activity protected by the First Amendment; (2) he suffered a deprivation that would likely deter First Amendment activity in the future; and (3) the First Amendment activity was 'at least a motivating factor' in the Defendants' decision to take the retaliatory action." *Bridges v. Gilbert*, 557 F.3d 541, 546 (7th Cir. 2009) (quoting *Woodruff v. Mason*, 542 F.3d 545, 551 (7th Cir. 2008)). The parties dispute only elements two and three.

Defendants first dispute the third element—causation—arguing that their actions had nothing to do with Plaintiffs' speech. Instead, Defendants argue, they initiated enforcement actions "based on a citizen complaint," not on "any speech." (Docket #15 at 23). Defendants make much ado about their assertion that a "citizen complaint" sparked Defendants' ordinance enforcement. (*Id.*) But this is Defendants' own factual conclusion; it is not contained in the pleadings and is contrary to Plaintiffs' allegations therein. Further, Defendants' assertion fails to acknowledge the crux of Plaintiffs' First Amendment retaliation claim: that Defendants retaliated against them not only through their initial investigation but also by taking a series of subsequent enforcement actions.

The Court finds Plaintiffs' inclusion of the email from Suhm to be most compelling. (Docket #1-2 at 43, 115). To downplay the importance of this email, Defendants misstate the legal standard. They write that, in this case, "any alleged speech [by Plaintiffs] was not *the* motivating factor" for

Case 2:20-cv-01820-JPS   Filed 08/06/21   Page 16 of 37   Document 48

the Town's actions, and, therefore, Plaintiffs have failed to state a First Amendment claim. (Docket #15 at 23) (emphasis added). But, under the pleading standard[5] in this Circuit, protected speech need only be "*at least a motivating factor.*" *Woodruff*, 542 F.3d at 551 (emphasis added). In a light most favorable to Plaintiffs, the pleadings plausibly allege that some of Defendants' actions were provoked, at least in part, by retaliatory intent. The email raises this possibility above mere speculation.

As to element two—deterrence—"the alleged adverse action . . . must be sufficient to deter an ordinary person from engaging in that First Amendment activity in the future." *Santana v. Cook Cnty. Bd. of Rev.*, 679 F.3d 614, 622 (7th Cir. 2012); *see also Surita v. Hyde*, 665 F.3d 860, 878 (7th Cir. 2011) ("We apply an objective test: whether the alleged conduct by the

---

[5]Compare the pleading standard to the burden-shifting that occurs upon a motion for summary judgment:

> [I]n presenting a prima facie case of First Amendment retaliation at summary judgment, the plaintiff need only show evidence that his speech was a "motivating factor," rather than the "but for" cause, of an adverse employment action. *Greene v. Doruff*, 660 F.3d 975, 977 (7th Cir. 2011); *see also Kidwell v. Eisenhauer*, 679 F.3d 957, at 964–65 (7th Cir. 2012) (discussing *Greene*). A prima facie case requires evidence that: (1) [the plaintiff] engaged in activity protected by the First Amendment, (2) he suffered an adverse action that would likely deter free speech, and (3) the First Amendment activity was a motivating factor in the decision to retaliate. *Redd v. Nolan*, 663 F.3d 287, 294–95 (7th Cir. 2011); *Spiegla v. Hull*, 371 F.3d 928, 941–43 (7th Cir. 2004). *Greene* explains that a "motivating factor" is one that is a "sufficient condition" for an adverse action (the presence of the factor guaranteed the adverse action). *Greene*, 660 F.3d at 978–79. If—but only if—[a plaintiff] furnishes a prima facie case, the burden shifts to the defendant to show that the retaliatory motive was not a "but for" cause, or a "necessary condition," of the adverse action (that is, even without the retaliatory motive, the adverse action would have occurred anyway). *Id.* at 980.

*Foster v. Adams*, 489 F. App'x 959, 961 (7th Cir. 2012).

defendants would likely deter a person of ordinary firmness from continuing to engage in protected activity.").

Defendants misstate this standard within the first sentence of their argument. They write that Defendants' actions (i.e., enforcement of the zoning laws) "[have not] deterred the Plaintiffs from First Amendment activity." (Docket #15 at 24). They cite to numerous instances in the pleadings in which Plaintiffs allege that they continued to question, call attention to, and communicate with Defendants about enforcement actions. (*Id.* at 25). To be sure, Plaintiffs themselves may not have been deterred from engaging in First Amendment activity. However, Plaintiffs' actions have no bearing as to whether an ordinary person would have held equally fast. Perhaps Plaintiffs—one a veteran of the United States Coast Guard and the other an operating-room nurse—are persons of greater-than-ordinary firmness. Defendants cite no comparative case law on this element, and the Court will not engage in an archaeological dig or truffle hunt for a case with similar facts to determine whether an ordinary person would be deterred by Defendants' alleged actions. The Court will deny Defendants' motion for judgment on the pleadings as to Count I.

### 3.4 Equal Protection (Count II)

Defendants move to dismiss Count II: "Discriminatory Enforcement (Equal Protection Clause—U.S. Constitution amend. XIV)." Defendants first move to dismiss this claim on the grounds that it is a repackaged claim of their First Amendment retaliation count and, therefore, duplicative.

In *Vukadinovich v. Bartels*, the plaintiff was terminated from his teaching position at a public high school after a local newspaper published some of his comments regarding why he resigned from basketball coaching. 853 F.2d 1387, 1387–89 (7th Cir. 1988). The plaintiff brought claims under

two constitutional theories: (1) First Amendment retaliation, and (2) violation of the Equal Protection clause. *Id.* First, the district court dismissed the First Amendment retaliation claim because the plaintiff's comments were not protected by the First Amendment; the circuit court affirmed this decision. *Id.* at 1391. Second, the district court characterized the plaintiff's Equal Protection claim as one of "selective prosecution" and then held that the plaintiff's claims did not satisfy the elements of selective prosecution. *Id.* at 1391–92. Thus, the court dismissed the claim.

The circuit court upheld the district court's decision as to the plaintiff's second claim for two reasons. First, the circuit court agreed that the plaintiff had failed to satisfy the elements of selective prosecution. *Id.* at 1392. Specifically, the plaintiff had failed to show that the school decided to terminate him in order to curtail his exercise of the First Amendment because his speech was not protected. *Id.* Second, the circuit court had reservations as to whether the district court correctly characterized the second claim as one of "selective prosecution":

> [The plaintiff] claims only that he was treated differently than other uncertified teachers in retaliation for the exercise of his First Amendment rights. In other words, he does not dispute that he could have been fired simply because he was uncertified; instead, he claims that he was selected for termination, while other uncertified teachers were not, because he exercised his right to free speech. *Such a claim fits uneasily into an equal protection framework.* Normally, we think of the Equal Protection Clause as forbidding the making of invidious classifications—classifications on the basis of such characteristics as race, religion, or gender. Here, plaintiff is not claiming that he was classified on the basis of some forbidden characteristic, only that he was treated differently because he exercised his right to free speech. We believe this is best characterized as a mere rewording of plaintiff's First

Case 2:20-cv-01820-JPS   Filed 08/06/21   Page 19 of 37   Document 48

Amendment-retaliation claim, which was properly disposed of.

*Id.* at 1391–92 (emphasis added).

Here, Plaintiffs' Equal Protection count is a repackaged argument of their First Amendment retaliation count. Both counts rest on the ultimate allegation that Defendants are treating Plaintiffs differently than other similarly situated property owners because Plaintiffs exercised their First Amendment right in criticism of Defendants. Surely, the line between retaliation and discrimination is fine—almost invisible in this case. Whereas in *Vukadinovich* the circuit court upheld the district court's dismissal of the Equal Protection claim because, in part, the plaintiff's activity was not protected by the First Amendment, in the present case, the Court is allowing Plaintiffs' First Amendment count to proceed. *See supra* Section 2.1. Thus, the Court will dispense with Plaintiffs' Equal Protection count because it is duplicative of the First Amendment count. *See, e.g., Frisenda v. Inc. Village of Malverne*, 775 F. Supp. 2d 486, 518 (E.D.N.Y. 2011) (citing *Vukadinovich*, 853 F.2d at 1391–92) ("to the extent that plaintiff also may be attempting to assert an equal protection claim based upon retaliation for First Amendment activity . . . such a claim is completely duplicative of the First Amendment retaliation claim and, therefore, should not go forward."). Thus, the Court will grant Defendants' motion as to Count II.

### 3.5 Procedural Due Process (Counts III, IV, and V)

Defendants—the parties that removed this action to federal court and, in doing so, argued that the federal court has subject-matter jurisdiction over it—now move to dismiss Plaintiffs' three procedural due process counts for lack of subject-matter jurisdiction for not being ripe. Despite this oddness, the Court cannot ignore a challenge to its subject-

Case 2:20-cv-01820-JPS   Filed 08/06/21   Page 20 of 37   Document 48

matter jurisdiction. *Dave v. Ashcroft*, 363 F.3d 649, 652 (7th Cir. 2004) ("[W]e may not decide a case without subject matter jurisdiction and thus neither the parties nor their lawyers may . . . waive arguments that the court lacks jurisdiction.") (internal quotations and citations omitted). Typically, the burden to establish jurisdiction upon removal falls on a defendant (i.e., the removing party), but, here, Plaintiffs are the ones arguing that the case they filed in state court should now remain in federal court. *See Collier v. SP Plus Corp.*, 889 F.3d 894, 896 (7th Cir. 2018) ("As the party invoking federal jurisdiction, [the defendant] had to establish that all elements of jurisdiction—including Article III standing—existed at the time of removal."). Nevertheless, because subject-matter jurisdiction cannot be waived, the Court must parse through the parties' arguments regarding the Court's jurisdiction (or lack thereof) as to Plaintiffs' procedural due process counts.[6]

---

[6] Plaintiffs state that "Defendants cannot argue this case must be litigated in state court after removing the case to federal court." (Docket #23 at 11–12 n. 8) (citing *Int'l Coll. of Surgeons v. City of Chicago*, 153 F.3d 356, 360 n.4 (7th Cir. 1998) (observing that a state waives its argument for *Younger* Abstention by "expressly urging the district court to address the merits of the case"); *Ryan v. State Bd. of Elections of State of Ill.*, 661 F.2d 1130, 1136 (7th Cir. 1981) (noting that the defendant's "submission to a federal forum, therefore, renders *Younger* abstention inapplicable.")).

Plaintiffs' proffered case law concerns the *Younger* Abstention Doctrine. Unlike subject-matter jurisdiction, "*Younger* is not a jurisdictional bar based on Article III requirements, but instead a prudential limitation on the court's exercise of jurisdiction grounded in equitable considerations of comity." *Spargo v. New York State Comm'n on Jud. Conduct*, 351 F.3d 65, 74 (2d Cir. 2003) (citing *Benavidez v. Eu*, 34 F.3d 825, 829 (9th Cir. 1994) ("*Younger* abstention is not jurisdictional, but reflects a court's prudential decision not to exercise jurisdiction which it in fact possesses.")). Thus, considerations based on the *Younger* Abstention Doctrine may be waived, but barriers posed by subject-matter jurisdiction may not be waived. *Id.* The Court must ensure that it has subject-matter jurisdiction.

Case 2:20-cv-01820-JPS   Filed 08/06/21   Page 21 of 37   Document 48

Plaintiffs bring three procedural due process claims. First, Plaintiffs argue that their procedural due process rights were violated because the Town gave Municipal Law Group, Schwecke, and Montoya "significant financial incentives in initiating, pursuing, and drawing out enforcement processes" (Count III; Plaintiffs label this count "Improper Profit Motives"). (Docket #1-2 at 54). Plaintiffs maintain that they are "are entitled to protection from this profit-driven enforcement" of ordinances. (*Id.* at 57). Second, Plaintiffs argue that their procedural due process rights were violated because they were "restricted to proving their innocence" and, therefore, denied "a meaningful opportunity to defend themselves" against the Defendants' accusations of wrongdoing (Count IV; Plaintiffs label this count "Improper Burden of Proof for Permitting"). (*Id.*) More specifically, because the Town's policy requires that Plaintiffs offer the previously issued permits to establish that structures and utilities are properly permitted, and because the Town is responsible for maintaining records of such permits, when the Town cannot locate the permits, "the burden of producing . . . [the permits] (or a cop[ies] thereof) is placed on [Plaintiffs], creating an unconstitutionally stringent standard of proof and denying [Plaintiffs] their rights to be meaningfully heard and to defend themselves and their Farm." (*Id.* at 58). Further, if Plaintiffs cannot produce these permits, they are at risk of being penalized even where their barn and utilities were properly permitted. (*Id.*) Third, Plaintiffs argue that their procedural due process rights were violated because the Town began threatening them with fines "more than a month before the Town Board inspected the property to determine whether the allegations were true or informed [Plaintiffs] that they were not in compliance with Town ordinances" (Count V; Plaintiffs label this count "Presumption of

Case 2:20-cv-01820-JPS   Filed 08/06/21   Page 22 of 37   Document 48

Wrongdoing"). (*Id.* at 60). In other words, "[t]he Town has denied Plaintiff their right to due process by threatening them with tens of thousands of dollars of fines for violations that the Town has not proven exist or existed." (*Id.* at 63).

Property owners are guaranteed the constitutional right that no "[s]tate [may] deprive any person of . . . property, without due process of law." U.S. Const. amend. XIV. "In order to prevail on a procedural due process claim . . . property owner[s] must show that [they were] deprived of a full and fair hearing to adjudicate [their] rights . . . or that they were deprived of property because of the intentional but random and unauthorized conduct by an employee." *Tschanz v. WPPI Energy*, No. 19-CV-896-BBC, 2020 WL 2112272, at *5 (W.D. Wis. May 4, 2020) (internal quotations and citations omitted). Here, neither party argues that Defendants allegedly injured Plaintiffs with "intentional but random and unauthorized conduct;" thus, Plaintiffs must allege "sufficient facts to suggest that there was no notice and hearing or that the process provided to them was constitutionally inadequate." *Id.*

In the context of land-use decisions, the bar for procedural due process is so low that landowners' claims that their local government did not provide due process often boil down to matters of state-law rather than constitutional law. "Federal courts are not boards of zoning appeals." *River Park, Inc. v. City of Highland Park*, 23 F.3d 164, 165 (7th Cir. 1994). Land-use matters are generally of local concern and local law, and "[a] person contending that state or local regulation of the use of land has gone overboard must repair to state court." *Id.*

In *River Park*, the plaintiff owned a country club in an Illinois suburb. *Id.* The plaintiff requested that the city rezone the property; for purposes of

the appeal, the court assumed that state law required the city to rezone upon proper application by a landowner. *Id.* Through political maneuvering and "[s]talling tactics," the city failed to rezone the property, and the plaintiff went bankrupt. *Id.* The plaintiff sued the city for violating its right to due process. *Id.* In reviewing the district court's decision, the Seventh Circuit first held that the plaintiff was entitled to due process in zoning decisions. *Id.* at 166. Second, the court discussed and summarized the requirements of due process in zoning and land-use decisions by local governments: "the procedures 'due' in zoning cases are minimal." *Id.* Thus, while the city may have violated state law, "[f]ailure to implement state law violates that state law, not the Constitution; the remedy lies in state court." *Id.* at 166–67. The court concluded that,

> a property owner may not avoid [the finality requirement of] *Williamson* by applying the label "substantive due process" to the claim . . . . So too with the label "procedural due process." Labels do not matter. A person contending that state or local regulation of the use of land has gone overboard must repair to state court . . . . [W]hen the claim depends on the due process clause, state litigation may supply that process . . . . This is not because the owner must "exhaust" state remedies . . . rather the idea in zoning cases is that the due process clause permits municipalities to use political methods to decide, so that the only procedural rules at stake are those local law provides, and these rules must be vindicated in local courts.

*Id.* at 167.

Defendants contend that Plaintiffs cannot yet state ripe procedural due process claims because they still have unused, adequate procedures at the state level through which to challenge the Town's zoning-compliance determinations (e.g., mandamus, common law writ of certiorari, a challenge made to the Board of Zoning Appeals pursuant to Wisconsin

Statutes section 62.23(7)(e)(4) (2021)). (Docket #15 at 5, 11). Defendants argue that Plaintiffs' due process claims are premature and that Wisconsin will provide Plaintiffs with due process—it is just a matter of Plaintiffs availing themselves of such process. (*Id.* at 12–13).

Plaintiffs argue that Defendants are attempting to impose an illegitimate exhaustion requirement on Plaintiffs' due process claims. (Docket #23 at 11). In *Knick v. Township of Scott, Pennsylvania*, the Supreme Court eliminated the state-level exhaustion requirement in Takings-Clause cases brought under the Fifth Amendment. 139 S. Ct. 2162 (2019) (overruling, in part, *Williamson Cnty. Reg'l Plan. Comm'n v. Hamilton Bank of Johnson City*, 473 U.S. 172 (1985)). Under the Takings Clause, "[a] property owner has an actionable Fifth Amendment takings claim when the government takes his property without paying for it." *Id.* at 2167. In other words, the injury prohibited by the Fifth Amendment occurs upon the government taking the land without paying the owner. *Id.* Thus, to require a party to exhaust state remedies would "impose[] an unjustifiable burden on takings plaintiffs." *Id.*

But this case does not arise under the Takings Clause, and Defendants are not claiming that Plaintiffs need to *exhaust* their state court remedies. Instead, Defendants are arguing that a federal court's decision in this case on procedural due process grounds is premature because the state processes have not been taken to their finality. Plaintiffs still have an opportunity to be heard and to receive their due process at the state level. This is not an exhaustion requirement but rather a recognition that, so long as there exist unused opportunities at the state level for Plaintiffs to receive due process, a federal court cannot yet say that Plaintiffs were denied due process—it is a matter of ripeness doctrine. *See Knick*, 139 S. Ct. at 2169

("*Williamson County* held that the developer's Fifth Amendment claim was not 'ripe' for two reasons. First, the developer still had an opportunity to seek a variance from the appeals board, so any taking was therefore not yet final . . . . Knick does not question the validity of this finality requirement."); *Trustees of Marion Kingdom Hall of Jehovah's Witnesses v. City of Marion*, 638 F. Supp. 2d 962, 968 (S.D. Ill. 2007) ("[T]here is no requirement that a plaintiff asserting a deprivation of constitutional rights by persons acting under color of state law must exhaust administrative remedies before bringing an action under 42 U.S.C. § 1983 . . . . However, in the context of constitutional challenges to local land use regulation, the ripeness doctrine imposes on litigants a duty to pursue state remedies before seeking recourse to federal court.").

Plaintiffs have not shown that the available procedures at the state level would be inadequate and futile.[7] Instead, they allege that the process which they have received thus far is inadequate. Plaintiffs' journey through the procedures administered at the state level is not complete. While Plaintiffs are not required to exhaust their state remedies, they are required to avail themselves of the process available to them before they can come to the federal court complaining that they were not given adequate process.

---

[7]Plaintiffs, in their response brief, write that they "cannot vindicate their rights against a constitutionally deficient enforcement process within that very process." (Docket #23 at 11). Defendants discuss Plaintiffs' available state mechanisms by which to obtain due process (e.g., mandamus or common law writ of certiorari), and Plaintiffs offer little besides a conclusory statement that such procedures would be deficient. "[W]e should not reject [a state-law remedy as inadequate] unless the remedy . . . can readily be characterized as inadequate to the point that it is meaningless or nonexistent and, thus, in no way can be said to provide the due process relief guaranteed by the fourteenth amendment." *Michalowicz v. Village of Bedford Park*, 528 F.3d 530, 535 (7th Cir. 2008).

Case 2:20-cv-01820-JPS   Filed 08/06/21   Page 26 of 37   Document 48

While "[t]he right discussed in *Knick* is 'the irrevocable right to just compensation immediately upon a taking . . . by which the landowner has already suffered a constitutional violation' irrespective of the availability of a subsequent compensation remedy," *Bruzga v. City of Boulder by & through Bd. of Cnty. Commissioners*, 795 F. App'x 599, 603 (10th Cir. 2020) (quoting *Knick*, 139 S. Ct. at 2172), "a procedural due process violation does not occur until or unless the plaintiff has been deprived of adequate process." *Id.*

Plaintiffs attempt to differentiate their case from those discussed above:

> Here, by contrast, [Plaintiffs] are not challenging a decision about the zoning of their property. Rather, they are challenging numerous, specific constitutional infirmities underlying a code-enforcement system that has been weaponized against them, depriving them of their First and Fourteenth Amendment rights. [Plaintiffs] cannot vindicate their rights against a constitutionally deficient enforcement process within that very process.

(Docket #23 at 11). Plaintiffs suggest that, as to their Due Process claims, they are not aggrieved by the actions they had to take on the Farm but rather only by the lack of process afforded to them. However, in their complaint, Plaintiffs state much more concrete injuries:

> a.      Being forced to destroy structures on their property that the Town allows similarly situated residents to have and that [Plaintiffs] want to have;
>
> b.      Being forced to destroy structures on their property that [Plaintiffs] paid to construct;
>
> c.      Being forced to make changes to their property that the Town does not require of similarly situated residents and that [Plaintiffs] did not want to make;
>
> d.      Being forced to retain an attorney to protect their property rights;

Case 2:20-cv-01820-JPS   Filed 08/06/21   Page 27 of 37   Document 48

> e.     Being forced to destroy their farm stand and cease selling products from the Farm, limiting their earning potential through their farming activities . . . .

(Docket #1-2 at 44–46). Plaintiffs allege in their complaint that they are "entitled to protection from this threatened, unconstitutional deprivation of property and to relief for the harms they have endured *as a result* of the Town and Town Board's denial of due process to date." (*Id.* at 45) (emphasis added). This case boils down to Plaintiffs being aggrieved by land-use decisions about the Farm by Defendants. Denial of due process is the mechanism by which Defendants allegedly injured them—it is not the injury itself.

Further, were the Court to allow Plaintiffs to recharacterize their Due Process claims, denial of Due Process, on its own without a concrete and particularized injury (e.g., a negative land-use decision), is not enough to maintain standing. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 573 (1992). Thus, even if the Court accepted Plaintiffs' attempt to differentiate their situation from the precedent, they still should not be in federal court because they have not shown an injury stemming from a constitutionally inadequate process.

Lastly, in their briefing, the parties do not consider that Defendants' successful motion for judgment on the pleadings as to these counts for lack of subject-matter jurisdiction results in their remand to the state court, not in their outright dismissal. *See, e.g., Collier*, 889 F.3d at 896–97. If there is no ripe question of federal law, the Court does not have subject-matter jurisdiction; if the Court does not have subject-matter jurisdiction, then Plaintiffs' claims for violations of procedural due process, as contained in Counts III, IV, and V, were not rightly removed to federal court in the first

instance, and the Court cannot issue a final dismissal on them. *Id.* The Court must remand these counts to state court. *Id.*

## 4. PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

The Court will next discuss Plaintiffs' motion for a preliminary injunction, keeping in mind that only one of Plaintiffs' claims survives in federal court. A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008) (citing *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997)). "To obtain a preliminary injunction, a plaintiff must show that: (1) without this relief, it will suffer irreparable harm; (2) traditional legal remedies would be inadequate; and (3) it has some likelihood of prevailing on the merits of its claims." *Speech First, Inc. v. Killeen*, 968 F.3d 628, 637 (7th Cir. 2020), *as amended on denial of reh'g and reh'g en banc* (Sept. 4, 2020) (internal quotations and citations omitted). "If a plaintiff makes such a showing, the court proceeds to a balancing analysis, where the court must weigh the harm the denial of the preliminary injunction would cause the plaintiff against the harm to the defendant if the court were to grant it." *Mays v. Dart*, 974 F.3d 810, 818 (7th Cir. 2020). The balancing analysis involves a "'sliding scale' approach: the more likely the plaintiff is to win on the merits, the less the balance of harms needs to weigh in his favor, and vice versa." *Id.* Finally, "the balance of equities must 'tip[] in [the applicant's] favor,' and the 'injunction [must be] in the public interest.'" *Ill. Republican Party v. Pritzker*, 973 F.3d 760, 763 (7th Cir. 2020), *cert. denied*, 141 S. Ct. 1754 (2021) (quoting *Winter*, 555 U.S. at 20).

### 4.1 Likelihood of Success on the Merits

"When a party seeks a preliminary injunction on the basis of a potential First Amendment violation, the likelihood of success on the merits

will often be the determinative factor." *Joelner v. Village of Washington Park, Illinois*, 378 F.3d 613, 620 (7th Cir. 2004). Thus, the Court will begin with this factor. "[A]n applicant for preliminary relief bears a significant burden." *Ill. Republican Party*, 973 F.3d at 763. And, "even though . . . at such a preliminary stage, the applicant need not show that it definitely will win the case," "a mere possibility of success is not enough." *Id.* ("the 'better than negligible' standard was retired by the Supreme Court"). The applicant must make a "strong showing" of success on the merits (but this does not require proof by a preponderance of the evidence, as such a standard "would spill too far into the ultimate merits for something designed to protect both the parties and the process while the case is pending"). *Id.*

To succeed on a First Amendment retaliation claim, a plaintiff "must ultimately show that (1) he engaged in activity protected by the First Amendment; (2) he suffered a deprivation that would likely deter First Amendment activity in the future; and (3) the First Amendment activity was 'at least a motivating factor' in the Defendants' decision to take the retaliatory action." *Bridges*, 557 F.3d at 546 (quoting *Woodruff*, 542 F.3d at 551). The Court need not restate its analysis in Section 3.3, *supra*, but will provide the following discussion.

First, it is almost certain (and the parties do not dispute) that Plaintiffs engaged in protected First Amendment speech. Second, Defendants argue that an ordinary, law-abiding person would not be deterred from exercising their First Amendment rights because "a property owner not in violation of the law would have absolutely no reason to hesitate in criticizing the Town." (Docket #26 at 13). Defendants' argument that the protections of the First Amendment are guaranteed to only those who uphold the law with absolute resolution is unavailing. As discussed in

Section 3.3, *supra*, a plaintiff may overcome a government's defense of probable cause if there is commonsense evidence that the plaintiff was treated differently than others similarly situated because of the plaintiff's free-speech activities. *Lund*, 956 F.3d at 945 (quoting *Nieves*, 139 S. Ct. at 1734 (Gorsuch, J., concurring in part and dissenting in part)). A citizen—law abiding or not—should not have to endure retaliation from their local government due to their free-speech activity. Here, Defendants' allegedly retaliatory behavior is their enforcement of local ordinances that they do not normally enforce; this includes entering the Farm, causing Plaintiffs to amass substantial fines, and requiring Plaintiffs to make undesired changes to the Farm. Faced with these types of consequences, an average person would be deterred from engaging in free speech.

As discussed above, Plaintiffs have sufficiently pleaded that their speech was at least a motivating factor in Defendants' decision to enforce certain ordinances against them. *See supra* Section 3.3. When it comes to determining whether Plaintiffs' First Amendment retaliation count will succeed on the merits, however, the burden then "shifts to the defendant to show that the retaliatory motive was not a 'but for' cause, or a 'necessary condition,' of the adverse action (that is, even without the retaliatory motive, the adverse action would have occurred anyway)." *Foster*, 489 F. App'x at 961. Plaintiffs have offered an email written by a Board member stating that "[Plaintiffs] have literally ticked off all the board members with [their] meeting comments and on [F]acebook." (Docket #19-7 at 2). The Board member went on to say that "[t]hat wasn't good because the board members voted with emotion." (*Id.*) The Board member then advised that "[p]ermits and action by [Plaintiffs] is needed to be applied for to get this over with." (*Id.*)

Defendants argue that the timing of the email is fatal because it was sent after enforcement actions were already being taken and because it was written in reference to only a single Board vote on particular topic (i.e., whether to give Plaintiffs an extension of time to comply). But the cases that Defendants cite are inapposite. For example, in *Graber v. Clarke*, a government-employment case, the court noted that "[a]lthough [the plaintiff's] speech preceded the suspension, without other evidence linking the two events, we cannot find the suspension was motivated by that speech." 763 F.3d 888, 899 (7th Cir. 2014) (citing *Mullin v. Gettinger*, 450 F.3d 280, 285 (7th Cir. 2006) ("[T]he fact that a plaintiff's protected speech may precede an adverse employment decision alone does not establish causation.")). In the present case, Plaintiffs are not relying on timing alone—the Board member's email is offered to confirm their suspicions of retaliation. Further, Defendants do not offer evidence that they take similar enforcement actions against similarly situated property owners. While the Board member's email seems to have been prompted by the Board's then-most-recent vote, it was written with a broader perspective than just that one vote: "[p]ermits and action by [Plaintiffs] is needed to be applied for to get this over with." (Docket #19-7 at 2).

Defendants' attempt to minimize the significance of the email sent to Plaintiffs fails, and they do not meet their burden to show that the retaliatory motive was not a "but for" cause of Defendants' actions. Plaintiffs have made a "demonstration of how [they] propose[] to prove the key elements of [their] case." *Ill. Republican Party*, 973 F.3d at 762. The Court is satisfied that Plaintiffs have made the necessary showing that they are sufficiently likely to succeed on the merits such that the Court may grant a preliminary injunction.

### 4.2 Irreparable Harm/Lack of an Adequate Remedy at Law

"The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). Recently, a court in this District noted that "[t]he loss of First Amendment freedoms is *presumed* to constitute irreparable injury for which money damages are inadequate." *Camelot Banquet Rooms, Inc. v. United States Small Bus. Admin.*, 458 F. Supp. 3d 1044, 1062 (E.D. Wis. 2020), *appeal dismissed*, No. 20-1729, 2020 WL 6481792 (7th Cir. Aug. 5, 2020) (emphasis added).

In the present case, Plaintiffs are challenging the retaliatory and unconstitutional enforcement of ordinances by Defendants against Plaintiffs. According to Plaintiffs, the retaliatory actions have resulted in financial harms to Plaintiffs, including the incurrence of fees and the destruction of structures on the Farm. Defendants argue that these types of damages are easily calculated and redressable.

But Plaintiffs are not just pointing to the financial and property-damage harms they have and will continue to experience as a result of Defendants' actions. They are citing the irreparable harm that Defendants' allegedly retaliatory actions have on Plaintiffs' First Amendment rights. Certainly, Plaintiffs are concerned about financial loss, but the harm for which they seek an injunction is more intrinsic. The harm is an active threat to the rights guarded by the Constitution. Their property is being destroyed and the fines against them are mounting because, they allege, Defendants are retaliating against them for criticizing the Town. A party can be compensated for altering their property, paying fines, or losing business, but they cannot be adequately compensated for losing (or facing threats against the exercise of) their First Amendment rights.

Case 2:20-cv-01820-JPS   Filed 08/06/21   Page 33 of 37   Document 48

### 4.3    Balancing of Equities and Public Interest

Defendants raise the objection that, by granting Plaintiffs' request for a preliminary injunction, the Court would essentially be prohibiting the Town from enforcing its code against Plaintiffs, thereby giving Plaintiffs a license to flagrantly violate local ordinances. Certainly, such an outcome would go against the public interest. A purpose of local governments is to guard the health, safety, and public welfare of its citizens through the enactment and enforcement of its local ordinances. Local governments are entitled to set the character of their neighborhoods and enforce regulations that promote that character.

But local governments are not entitled to violate the First Amendment. "[T]here can be no irreparable harm to a municipality when it is prevented from enforcing an unconstitutional statute because 'it is always in the public interest to protect First Amendment liberties.'" *Joelner*, 378 F.3d at 620 (quoting *Connection Distrib. Co. v. Reno*, 154 F.3d 281, 288 (6th Cir. 1998)). While Plaintiffs are not alleging that the ordinances being enforced against them are unconstitutional, they have made a sufficient showing that Defendants are enforcing the ordinances in violation of the First Amendment. It is in the best interest of all involved that Defendants not be allowed to retaliate against Plaintiffs for exercising their First Amendment rights.

### 4.4    The Preliminary Injunction Order

Keeping in mind the above concerns of both parties, the Court will now outline the parameters of the preliminary injunction. This Order is *not* a proclamation that the Town of Eagle is prohibited from enforcing its ordinances against Plaintiffs for the purpose of protecting health, safety, and public welfare. Plaintiffs are not immune from the law; indeed,

Plaintiffs have requested no such status. Rather, this Order is designed to preserve what was the status quo for Plaintiffs and the Farm prior to Defendants taking allegedly retaliatory actions against Plaintiffs through the enforcement of ordinances which are not ordinarily enforced against landowners who do not criticize the Town. In the final analysis, Defendants may not enforce their ordinances in violation of the protections afforded under the First Amendment.

Thus, this Order directs Defendants to discontinue their practices of entering the Farm to engage in the inspections and enforcement actions, as alleged in the complaint. Defendants are further directed to discontinue the accrual of daily fines presently being credited against Plaintiffs, as alleged in the complaint. Defendants are further directed to refrain from continuing to enforce any code violations such that Plaintiffs are required to take undesired actions on the Property, including the destruction of livestock and structures, as alleged in the complaint. This Order is forward looking insofar as it relates to those continuing enforcement actions *as alleged in the complaint to have been commenced by Defendants in retaliation for Plaintiffs' First Amendment activity*. It is not so forward looking as to prohibit all future enforcement actions that the Town may take in good faith for legitimate violations of the law which threaten health, safety, and public welfare.

**5.    CONCLUSION**

For the reasons explained above, the Court will grant Defendants' motion for judgment on the pleadings, (Docket #14), in part. Thus, Counts III, IV, and V are, hereby, remanded to the state court. Count II is dismissed without prejudice. The Court will dismiss Defendants Don Malek, Chris Mommaerts, Steve Muth, Janis Suhm, Daniel West, Municipal Law & Litigation Group SC, Martin Montoya, and Tim Schwecke from the action.

The Court will also grant Plaintiffs' motion for a preliminary injunction, (Docket #19), as outlined in Section 4.4, *supra*.

As to the discovery related motions, the crux of the parties' arguments concerns (1) Defendants' desire to halt discovery during the pendency of their motion for judgment on the pleadings, and (2) Plaintiffs' desire to compel discovery while the Court decided that motion. The Court will deny as moot all of these discovery motions, (Docket #16, #31, #33), in light of this Order on the motion for judgment on the pleadings.

Finally, this Order changes the landscape of this litigation. It sends some counts back to the state court, dismisses another, and removes certain Defendants from the case. While the Court was authoring its Order, Midvale Indemnity Company filed a motion to intervene, bifurcate, and stay the proceedings of this case. The Court will deny this motion without prejudice and allow Midvale Indemnity Company to reassess its position in light of this Order. Midvale Indemnity Company may file a new motion, if desired, within 30 days of this Order.

Accordingly,

**IT IS ORDERED** that Defendants' motion for judgment on the pleadings (Docket #14) be and the same is hereby **GRANTED in part and DENIED in part**;

**IT IS FURTHER ORDERED** that Count II of Plaintiffs' Complaint (Docket #1-2) be and the same is hereby **DISMISSED without prejudice**;

**IT IS FURTHER ORDERED** that Counts III, IV, and V of Plaintiffs' Complaint (Docket #1-2) be and the same are hereby **REMANDED** to the Waukesha County Circuit Court;

**IT IS FURTHER ORDERED** that Defendants Don Malek, Chris Mommaerts, Steve Muth, Janis Suhm, Daniel West, Municipal Law &

Litigation Group SC, Martin Montoya, and Tim Schwecke be and the same are hereby **DISMISSED** from this action;

**IT IS FURTHER ORDERED** that the parties' motions related to discovery (Docket #16, #31, #33) be and the same are hereby **DENIED as moot**;

**IT IS FURTHER ORDERED** that Plaintiffs' motion for preliminary injunction (Docket #19) be and the same is hereby **GRANTED** as outlined in the body of this Order; and

**IT IS FURTHER ORDERED** that Midvale Indemnity Company's motion to intervene, bifurcate, and stay the proceedings (Docket #40) be and the same is hereby **DENIED without prejudice**; Midvale Indemnity Company may file a new motion within 30 days of this Order.

The Clerk of the Court is directed to take all appropriate steps to effectuate the remand of Counts III, IV, and V back to the Waukesha County Circuit Court.

Dated at Milwaukee, Wisconsin, this 6th day of August, 2021.

BY THE COURT:

J.P. Stadtmueller
U.S. District Judge