# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

|  |  |
|---|---|
| ERICA BREWER and ZACHARY MALLORY, | |
| Plaintiffs, | Case No. 20-CV-1820-JPS |
| v. | |
| TOWN OF EAGLE and TOWN OF EAGLE TOWN BOARD, | **ORDER** |
| Defendants. | |

## 1. INTRODUCTION

This civil rights case came before the Court by way of removal in December of 2020. ECF No. 1. Plaintiffs Erica Brewer ("Erica") and Zachary Mallory ("Zachary") (jointly, "Plaintiffs") allege violations of their First Amendment rights stemming from criticism lodged against Defendants Town of Eagle and Town of Eagle Town Board ("Defendants"). *Id*. Now before the Court is Defendants' motion for summary judgment. ECF No. 65. For the reasons discussed herein, the Court will deny the motion.

## 2. FACTUAL BACKGROUND[1]

### 2.1 Introduction to Plaintiffs and the Property

Plaintiffs, a married couple, own a property located in the Town of Eagle ("Eagle"). Eagle is a municipality in Waukesha County, Wisconsin.

Plaintiffs purchased the 3.8-acre property in 2016 with the intention of starting a family business thereon. The property is recognized by the

---

[1]The following recitation of facts is drawn from the parties' agreed upon statement of facts, ECF No. 68, with minor, non-substantive edits.

Farmer Veteran Coalition as a "Veteran Farm." On the property, Plaintiffs maintain a residence, barn, chicken coop, and beehives, and they engage in various agricultural activities. They cultivate and sell produce, raise poultry and gather eggs, and extract honey and beeswax from their hives. They sell many of these products at local farmers markets, as well as from their property.

### 2.2    The Rezoning

When Plaintiffs purchased the property, it was zoned as "Agricultural 3." In 2017, the year after Plaintiffs purchased it, Eagle rezoned the property to "Rural Residential." This rezoning limited Plaintiffs' ability to engage in agricultural activities on the property. Notwithstanding the rezoning, Eagle has allowed Plaintiffs to continue limited agricultural uses of the property.

### 2.3    Structures, Improvements, and Permits

The house, barn, 12x12 shed, and water and electrical lines present on the property have existed thereon since roughly 1997. When Plaintiffs purchased the property, their real estate agent assured them that the house, barn, and original utility lines were properly permitted. There exists a copy of the permit for the house, but apparently the parties located no permits for the other aforementioned structures. Eagle represents that it does not have permits for the barn or the utilities and that both were erected without the required permits.

Sometime following their purchase of the property, but before May of 2020, Plaintiffs obtained a permit to construct an outdoor pool. They erected that outdoor pool and subsequently added an outdoor hot tub with

a submersible heating element. For this latter improvement, they did not obtain a permit, as they believed that no permit was necessary.

In July of 2017, Zachary asked Eagle's Building Inspector, Martin Montoya ("Montoya") whether he would require a permit to rebuild a shed. Montoya told him no permit would be needed if the shed were 150 square feet or less, but that nevertheless such construction would require compliance with applicable zoning codes and restrictions regarding building height and location. Montoya informed Zachary that Eagle's ordinances did not allow more than three accessory structures and that Plaintiffs would need to obtain a variance if they wanted to erect additional structures on their property. Montoya told Zachary that a chicken coop counted as an accessary structure.

Plaintiffs constructed a greenhouse on their property without obtaining a permit. They additionally built a temporary soft-sided storage shed on their property without obtaining a permit. They then constructed a chicken coop attached to the barn. Plaintiffs did not obtain a permit for that construction, either. At some point, Plaintiffs also began building something on the outside of the second floor of their house without obtaining a permit. The purpose of this addition was to provide shade and stability for plants. Plaintiffs also erected a farm stand on their property from which they sell produce. They did not obtain a permit for construction of this stand, nor one for selling products from the property.

### 2.4 Plaintiffs' Speech on Matters of Public Concern[2]

Plaintiffs engaged in vocal questioning at town meetings and on social media[3] of the Town of Eagle Town Board's ("Board") actions. Plaintiffs made open-records requests for documents and regularly attempted to communicate with the Board, its members, and the Town Clerk regarding whether the Board was complying with the law and with proper procedures. Plaintiffs were persistent but respectful in such questioning. Erica spoke regularly at town meetings. She questioned the Town Chairman, Don Malek ("Malek"), regarding his handling of proceedings. She was openly critical of his ability to run meetings. She additionally accused another Board member and a Board Supervisor, Stephen Muth ("Muth") of driving by her house and taking pictures from his car.

At a Board meeting on August 3, 2020, Erica suggested that a Board Supervisor and County Supervisor, Christine Mommaerts ("Mommaerts") had received produce as a bribe to influence her vote on the beekeeping ordinance. This upset Mommaerts, who left the meeting in tears.[4]

---

[2]The parties do not dispute that Plaintiffs' speech criticizing Eagle and its Board members' actions addressed matters of public concern.

[3]At least one such form of social media on which Erica expressed criticism of the Board was in a Facebook group or groups, throughout the record occasionally called "Keeping Wisconsin Rural" and "Keep Eagle Rural," where town residents discussed "what was going on at [board] meetings" and "stated their opinions of how the meetings were run." ECF No. 74 at 23; ECF No. 75 at 110; ECF No. 76 at 24.

[4]At that same meeting, however, Mommaerts and the rest of the Board granted to vote Plaintiffs' request for an extension from July 30, 2020 through September 16, 2020 within which to fix the code violations on their property.

On social media, Erica posted a comment encouraging residents of Eagle to file complaints directly with the county, rather than through Mommaerts. County representatives, following receipt of such complaints, instructed Mommaerts to notify her constituents that receiving such complaints is what she was there for.

Additionally, Erica took issue with the Board disallowing public comment on a potential beekeeping ordinance. The Board stated that it disallowed public comment because the topic was being adjourned to be discussed at a later meeting. The topic was being adjourned, the Board asserted, because Tim Wilbanks ("Wilbanks"), a speaker who had been arranged to present to the Board, could not be present at the original meeting.[5]

On July 22, 2020, Erica emailed Board members because, as she interpreted it, the Board had refused to take public comment at the meeting related to the potential beekeeping ordinance. In that email, Erica criticized Malek for shutting down comments and argued against the ordinance, which would set a hive limit. Erica also criticized the Board's selection of Wilbanks as an advisor on beekeeping.

On July 27, 2020, Mommaerts emailed the Town Clerk, Lynn Pepper ("Pepper"), relaying that Wilbanks had asked if the Board could just "go with" someone else in light of the contentious state of the bee issue.

---

[5]The minutes of the Board meeting at which this exchange occurred reflect that the topic of the beekeeping ordinance was only partially adjourned—the Board discussed the beekeeping ordinance at length, immediately following approval of the meeting agenda, then voted to table the remainder of the discussion to a following meeting. ECF No. 81-18 at 3. The minutes reflect that Erica then stated that the Board and Malek could "not restrict public comment." *Id.* Malek informed Erica that public comment would be allowed on "anything but the Beekeeping Ordinance." *Id.*

Mommaerts asked the Town Clerk to put something "'politically' correct" on the website regarding why Wilbanks would not be coming. She also wrote about how she wanted to touch base with Wilbanks to see if they could "draft" something updated to "throw a bone" at the dissatisfied dissenters. Mommaerts additionally relayed how she had told another Board Supervisor, Janis Suhm ("Suhm"), about how "Mallory [was] making a mess of things." "Mallory" to referred to Erica.

Erica additionally spoke negatively and publicly on social media about Pepper, specifically regarding her salary and minute-taking.

### 2.5 Eagle's Code Enforcement Practices and Policies

Eagle created its Board in accordance with Wisconsin Statutes Section 60.10. The Board is authorized to determine whether to investigate, pursue, and enforce ordinance violations against residents of Eagle. "Ordinance" broadly includes Eagle's zoning code, municipal code, building code, and other civil ordinances enforced through Board proceedings.

Eagle has two written policies for ordinance enforcement. One is for zoning code enforcement, and one is for building code enforcement. These two policies are very similar, except that the zoning code enforcement policy contains the following statement, which the building code enforcement policy does not: "The complainant must be either personally affected by the violation or the violation must directly affect his or her property value." Despite this difference, Eagle treats the written Zoning Code Enforcement Procedure as applicable to both building code enforcement and to maintenance code enforcement.

Eagle's policy allows it to investigate alleged ordinance violations through on-site inspections only in response to written complaints submitted by residents who have been "personally affected" by the alleged ordinance violations or whose property value is "directly affect[ed]" thereby. Complaints can be submitted anonymously only if the complainant speaks with a Board member and has that member sign the complaint on the complainant's behalf.

According to the understanding of Pepper, the Town Clerk, code enforcement begins only by way of a complaint submitted to a Board member. It was Pepper's understanding that complaints went to Malek for his signature, and that Malek then turned the complaint over to either the Building Inspector or the Zoning Administrator.

The Town Chairman (at all times relevant to this lawsuit, Malek) is the only person who determines whether a complainant is, indeed, personally affected, or whether their property value is affected, by the alleged ordinance violation. There is no check in place to ensure that the Town Chairman evaluates a complaint based on those criteria. The Town Chairman could, hypothetically, choose not to evaluate whether a complainant meets those criteria. Historically, if a complainant's property was located next-door to the property complained about, the Town Chairman would presume the criteria to be met without otherwise verifying that the alleged violation existed.

Malek testified that his practice is to evaluate whether a complainant meets the criteria prior to signing off on the complaint and passing it on. In contrast, Pepper testified that she did not believe Malek did anything to determine whether the allegations in a complaint were true or fabricated before passing the complaint off to the Building Inspector or Zoning

Administrator. At the time of the events at issue, Montoya was Eagle's Building Inspector, and Tim Schwecke ("Schwecke") was Eagle's Town Planner and Zoning Administrator.

Once the Town Chairman has signed the complaint, it is passed to either the Building Inspector or Zoning Administrator, who then performs a field inspection, notes any non-compliance, and takes photos. For both the Building Inspector and the Zoning Administrator, it is policy to give notice of identified violations to the noncompliant property owner, providing them 30 days to comply. Once a property owner makes "substantial progress" towards compliance, they may appear before the Board to request a "one time" 30-day extension. The Zoning Administrator and/or Building Inspector then conducts a follow-up inspection after expiration of the time allotted for compliance. Pursuant to Eagle's written policy, if a property owner has failed to comply, the Zoning Administrator and/or Building Inspector forwards the matter to the Town Attorney, who will issue a citation.

Notwithstanding Eagle's policies and general practices, investigation into and evaluation of complaints is not always handled uniformly. In one instance, Malek received a complaint from one of his neighbors directed towards another neighbor. While usually Malek would forward such a complaint to Schwecke or Montoya, in that instance, Malek held onto the complaint and met with the neighbors personally to mediate the issue. The neighbors against whom that complaint had been lodged were not as vocal as Plaintiffs in criticizing Eagle and its Board.

Deviations from Eagle's written policy can occur, ostensibly only after being cleared by the Board. One such regular deviation is that, despite the fact that Eagle's written procedure requires a copy of the Town Code

section sought to be enforced to be included with the letter notifying property owners of violations, that copy of the Town Code section is oftentimes not included. Another common deviation is giving property owners more than one 30-day extension to come into compliance, rather than affording only a single extension and referring the matter to the Town Attorney for a citation against the property owner thereafter.

In evaluating requests for extensions, the Board evaluates the progress the property owner has made in correcting the violations and whether the property owner has paid required fees. In this evaluation process, the Board relies on reports provided to it by the Zoning Administrator and/or Building Inspector. In reality, since 2016, Eagle has rarely denied a request for an extension of time, although occasionally the Board will grant a lesser extension of time than that requested. It is typical for property owners to take up to a year and a half to bring their properties into compliance, and Eagle typically affords extensions of time to comply throughout that period. The only circumstances in which the Board would deny an extension are those in which the property owner makes no effort to come into compliance or those in which the property owner is delinquent on fees owed to Eagle.

By Eagle's estimate, roughly 80% of all cases of such complaints are resolved without issuance of a citation or prosecution of a civil action.

### 2.6 Neighbor Disputes, Plaintiffs' Alleged Violations, and Enforcement Thereof

Beginning in early 2016, Plaintiffs were involved in various disputes with their next-door neighbors, the Komornickis. Plaintiffs complained that the Komornickis used a bright light outside their barn, which bothered Plaintiffs. Plaintiffs emailed Malek to that effect, and Malek asked the

Komornickis to decrease use of the barn light at night. The Komornickis complied, at least temporarily. On one occasion, police were called to Plaintiffs' and the Komornickis' properties over this issue. On another occasion, the Komornickis put signs on their fence between the properties which asked Plaintiffs not to leave food on the fence because the Komornickis' horses could access it.

In October of 2019, Plaintiffs called the police after the Komornickis removed some produce from the property line area. According to Plaintiffs, the Komornickis called Malek and reported Plaintiffs for having too many poultry and livestock on their property and for operating three businesses out of their home.

On October 2, 2019, a different neighbor of Plaintiffs emailed Malek and Pepper, stating that the purple shed on Plaintiffs' lawn was an eye sore. She complained about the size and location of Plaintiffs' farm stand and how it attracted motorists into both her own and Plaintiffs' driveways throughout the day and night.

That same day, Kelly Komornicki ("Kelly") (one of Plaintiffs' next-door neighbors) emailed Malek regarding issues with Plaintiffs. Kelly wanted Plaintiffs' beehives moved at least 50 feet off the property line so that the bees would not bother her and her horses. In her email, Kelly also mentioned animal limit violations and the general disorderly appearance of the property. She shared the other neighbor's concern about the farm stand being an eye sore, and she reported multiple other structures on the property being in varying states of disrepair. She also reported the various businesses being operated out of Plaintiffs' home which resulted in unwelcome neighborhood traffic. Kelly reported that Plaintiffs regularly

Case 2:20-cv-01820-JPS   Filed 03/21/23   Page 10 of 49   Document 87

used a dog whistle which upset Kelly's horses. Kelly concluded the email by thanking Malek for stopping by the property and for hearing her out.

A few days later, Malek forwarded Kelly's email to Eagle's Building Inspector, Schwecke. Malek included the comment: "Hi, Tim . . . . Here is some more . . . ." This was not unusual as a general matter, as Schwecke was typically kept updated about neighbor disputes and complaints such as this. Malek additionally forwarded the email to Pepper, asking her to pass it along to the Board members. Malek included a comment to Pepper to the effect that the Board must remain solid and united.

On October 3, 2019, Kelly emailed Malek, providing some suggested provisions for a beekeeping ordinance. The email referenced current ordinances in place in other Wisconsin cities and provided links thereto. Kelly noted that those ordinances required neighbor consent to keep bees, which helps alleviate conflict. She reported that Plaintiffs' hives had "at least six swarms" of bees and that she did not feel safe.

Malek forwarded this email from Kelly to Schwecke on October 5, 2019, stating "[h]ere is some added ammunition for you when you go visit [Plaintiffs' property]." Schwecke drove by and around Plaintiffs' property after having been apprised of the complaints, but he did not enter Plaintiffs' property. He was unable to see anything concerning from his drive-bys. On at least two additional occasions, Malek instructed Schwecke to conduct a drive-by inspection of the property to check out potential ordinance violations before a formal written complaint was filed with Pepper.

On October 22, 2019, Schwecke emailed Malek indicating that he had prepared a draft beekeeping ordinance after having reviewed Kelly's emails, the ordinances referenced from other Wisconsin cities, and work he had performed for other communities.

On January 3, 2020, Kelly emailed Malek to update him. She noted that things had been relatively quiet up until Plaintiffs began building solid barriers on the property line to cover the signs the Komornickis had put up. She also mentioned that Plaintiffs were putting up additional cameras. She expressed having severe anxiety over what she interpreted as escalation by Plaintiffs. She additionally expressed her concern about Plaintiffs' growing business ventures and the volume of people it invited into the area. Finally, she inquired about the status of the beekeeping ordinance, and she thanked Malek for his consideration.

Malek responded the same day, stating that "one of the only reasons why [he] deal[s] with things like this is because of . . . GOOD people" like Kelly. Malek forwarded Kelly's email to Pepper and again asked her to pass it on to the other Board members, and Pepper did so.

Schwecke understood Malek's reference to "GOOD people" to demonstrate potential favoritism for the Komornickis over Plaintiffs. Meanwhile, Pepper testified that Malek regularly referred to the citizens of Eagle generally as "good people," although she also stated she had never heard Malek use that term in reference to Plaintiffs.

In the spring of 2020, Plaintiffs began to complain to both Eagle and the county that the Komornickis were improperly spreading and composting manure on the Komornickis' property. When Malek responded to any of Plaintiffs' complaints, he did not thank them for expressing their concern, tell them it was good to hear from them, refer to them as "GOOD people" of Eagle, or encourage them to keep him posted, as he did with Kelly.

On April 17, 2020, Pepper sent an email to Malek and Schwecke alerting them to a flyer distributed by Plaintiffs. That same day, Pepper

forwarded to Malek an email from the Eagle Business Association, of which Erica was vice president and Suhm, a member of Eagle's Board, was president. The email served to notify the community "with deep sadness" of the cancellation of a community event. In response to Pepper's email, Malek replied: "WHAT IS SAD IS THE PRESIDENT AND VICE PRESIDENT OF THE ORGANIZATION!!!!!!!!"

### 2.7 Official Complaint Against Plaintiffs and Eagle's Response[6]

Around May 15, 2020, Mr. Komornicki submitted a written, anonymous complaint alleging code violations against Plaintiffs.[7] Pepper received the complaint from Mr. Komornicki, who told her "Don knows who it is. He's expecting the letter." Pepper submitted the complaint to Malek, who, after confirming it was from the Komornickis, forwarded it to Schwecke. The letter from Mr. Komornicki identified numerous potential violations, including Plaintiffs' running a retail business off of the property, having grazing animals in excess of the number allowed per acre, having accessory buildings in excess of the number allowed, and having unconfined poultry.

Pursuant to Eagle's policy, Schwecke informed Plaintiffs that a complaint had been lodged against them but noted that Eagle had not yet

---

[6] Plaintiffs' Itemized Disputed Facts, ECF No. 69, asserts that "[t]he Defendants took actions, including threats of actions, against the Mallorys that would likely deter a person of ordinary firmness from continuing to publicly criticize the Town or Town Board members." This is a legal argument, not an assertion of fact. *See Daugherty v. Harrington*, 906 F.3d 606, 611 (7th Cir. 2018) ("Summary judgment is not a time to be coy: '[c]onclusory statements not grounded in specific facts' are not enough.'"). Accordingly, the Court will disregard it for purposes of ascertaining the facts of the case.

[7] *See* ECF No. 81-12 at 2.

determined whether there was merit to the complaint. Schwecke requested that Plaintiffs set up a time with him for a site inspection.

Suhm, who was friendly with Erica (at least compared to Erica's relationship with other Board members), advised Plaintiffs not to voluntarily allow a site inspection of their property because once the inspectors were on the property, they might discover additional violations.

Plaintiffs timely responded to Schwecke, but they did not offer a date for a site inspection as requested. Plaintiffs asked Schwecke if he could send them a copy of the anonymous complaint, and Schwecke did so. Still, wanting to collect additional information and waiting on fulfillment of an open records request, Plaintiffs did not provide Schwecke with an amenable time and date for a site inspection.

On June 1, 2020, Zachary emailed Erica with a link of projects that did not require permits in Eagle, stating "[s]o they will nail us on greenhouse and for barn additions (connecting shed and new coop) [and] Possibly hot tub . . ."

On June 3, 2020, Erica contacted the individual who owned the property before Plaintiffs to inquire about permits for the barn and shed. The previous owner informed her that he built the barn and shed under the new construction permit issued to him and that the clerk at the time told him a 10x12 structure wouldn't require a permit. The previous owner also informed her that the barn had been inspected upon its completion, and that the barn had been included in the permit he received. Nevertheless, neither the home's zoning and occupancy permit nor its building permit in Eagle's files references a barn.

On June 4, 2020, Plaintiffs wrote to Schwecke, Montoya, and Malek, insisting that no site inspection was needed because the allegations of

violations were unfounded and, in any event, Plaintiffs could clear it up right away. They stated that, upon clarification as to which specific buildings and structures the complaint addressed, they would pay all necessary fees and apply for all necessary permits. They suggested a "digital viewing" of the property in light of COVID-19 and expressed a willingness to work with Montoya as necessary. Plaintiffs conceded to selling produce and other products from the farm stand and to having "three grazing livestock as allowed." They stated that those grazing livestock had offspring which would be removed as soon as they were weaned.

Additionally, Plaintiffs mentioned how Malek's family had purchased items from their farm and that if he thought there were violations associated therewith, certainly he wouldn't have supported their farm. They also lodged complaints back at the Komornickis, citing a "building being too close to the property line and too close to wetland" in addition to possibly violative drainage and plumbing work. Plaintiffs further expressed suspicion that it was Malek himself who had written and signed the anonymous complaint. They accused Malek of having made no efforts to verify whether the complaint's allegations were true prior to signing it. Plaintiffs argued that Malek should have come directly to them to discuss the grievances.

Neither Malek nor Schwecke responded to Plaintiffs' email, and neither Schwecke nor Montoya continued to try to work with Plaintiffs to set up a time for an inspection. They interpreted Plaintiffs' response as essentially "ignoring the complaint" and "refusing to voluntarily schedule a site inspection." Neither Schwecke nor Montoya informed Plaintiffs that

they would seek a special inspection warrant if Plaintiffs continued to refuse to provide a date and time for an inspection.

On June 10, 2020, Montoya, after consulting with Schwecke, obtained a special inspection warrant for Plaintiffs' property. This process involved the Town Attorney. Typically, Montoya would not apply for a special inspection warrant until after being directed to do so following a Board meeting. In this instance, Montoya applied for the special inspection warrant before a Board meeting could occur.

In a June 12, 2020 report prepared for a June 17, 2020 Board meeting, Schwecke referenced Plaintiffs' property, noting that a complaint had been submitted against Plaintiffs and that an inspection was needed to determine if there were any violations. Upon noticing that their property was referenced in the Board's agenda for the June 17, 2020 meeting, Plaintiffs forwarded their June 4th email (which remained unresponded to) to the remaining members of the Board.

On or about June 24, 2020, Schwecke and Montoya, accompanied by law enforcement, conducted an onsite inspection of Plaintiffs' property pursuant to the special inspection warrant. Neither Montoya nor Schwecke were explicitly instructed by the Board to inspect Plaintiffs more aggressively than they would other property owners. By notice of violation dated June 30, 2020, Schwecke and Montoya identified numerous violations of the building code, zoning code, and property maintenance code. The notice of violation stated that there were five detached accessory buildings (the barn, a lean-to, a greenhouse, a soft-sided shed, and the farm stand) and that Eagle records revealed no permits for any of them. It stated also that only two such buildings were allowed in any event. It also referenced the soft-sided building as being violative of the zoning code. Schwecke and

Montoya asked Plaintiffs to advise them if Plaintiffs had any evidence that they had obtained permits or approvals for any of these buildings.

The notice of violation identified many additional violations. It identified Plaintiffs' outdoor hot tub as violative because it used an integrated wood burner, which required a permit. It noted that Plaintiffs' operation of the farm stand as a business without a permit was violative. It also referenced as violative Plaintiff's excessive number of livestock, the housing of livestock in a structure within fifty feet of a lot line, the keeping of farming equipment and construction materials outside, and having grass or weeds taller than twelve inches. The notice stated further that a permit was lacking for a water line running to one of the buildings and for electric power running to one or more of the buildings, and that some of the accessory buildings were not completed (had exposed plywood).

The letter stated that Plaintiffs needed to apply for all necessary permits and remove any disallowed buildings. It instructed Plaintiffs not to do any further work on any of the detached buildings in an attempt at correcting them without proper permitting. It also instructed Plaintiffs to clean up the yard.

The letter did not include a copy of the "Town Code section being enforced," as required under Eagle's policy. It did reference penalties, however, indicating that the failure to remedy the violations would result in Eagle pursuing legal action and imposing monetary penalties in an undisclosed amount. The letter finally noted that once Plaintiffs believed they were in compliance, they needed to contact Schwecke and Montoya.

Plaintiffs thereafter retained counsel. On July 21, 2020, Plaintiffs, through counsel, responded to Montoya and Schwecke's notice of violations letter. Counsel asserted that the alleged violations were

supported by insufficient facts and that many of the buildings, structures, and other allegedly violative items and uses on the property were valid nonconforming uses. Counsel also requested that the applicable ordinances themselves be provided. Finally, counsel requested an extension of the deadline to fix any valid violations.

Counsel followed up on July 28, 2020 after receiving no response from Schwecke and Montoya. Schwecke thereafter responded that counsel's letter had been forwarded to Pepper and that the Town Attorney would be assisting in the response.

The Town Attorney, Paul Alexy ("Alexy"), responded to Plaintiffs' counsel on July 29, 2020. He attached the zoning ordinance in effect as of November 10, 2009 and suggested that Plaintiffs' counsel file an open records request to acquire additional codes. Alexy stated that Plaintiffs and counsel could appear at a Board meeting on August 3, 2020 to present their request for an extension. Alexy additionally requested that Plaintiffs and counsel provide information regarding which violations Plaintiffs had remedied to date, the justification for an extension, whether any plans had been developed to further address the violations, and the anticipated time frame for resolution of the violations. Alexy noted that the Board would not engage in discussion regarding the bases for the notice of violation.

On August 3, 2020, Plaintiffs requested, and were granted, an extension. The Board granted Plaintiffs a 45-day extension, giving them until September 16, 2020 to bring their property into compliance. Also on August 3, 2020, Plaintiffs submitted a complaint against the Komornickis.

On September 9, 2020, Schwecke emailed Plaintiffs' counsel to schedule an inspection prior to the deadline in order to verify compliance.

Also in September of 2020, Plaintiffs contacted Montoya to discuss the alleged violations regarding lack of permits for the woodburning heater for their outdoor hot tub. Montoya told them they would need a building permit to operate the heating element and would potentially also need a zoning permit. Plaintiffs chose to cease using the hot tub.

On September 14, 2020, Schwecke inspected the property to evaluate the extent of compliance. Schwecke followed the inspection with a letter to Plaintiffs' counsel, acknowledging that Plaintiffs had alleviated some violations but had not yet addressed others. Schwecke wrote that he would review his findings with the Board at the September 16, 2020 meeting.

On September 15, 2020, Plaintiffs' counsel wrote a letter to Pepper to be forwarded to the Board in advance of the September 16, 2020 meeting. It asserted that "much, if not all, of the items identified in the June 30, 2020 Notice of Violation letter are incorrect and invalid." It further stated that Plaintiffs had taken several steps to address various of Eagle's other concerns with the property. Specifically, it provided that several of the structures on the property had been, or were soon to be, removed. It stated that Plaintiffs would remove the excess livestock in roughly two months. It did not, however, address the lack of zoning and building permits for the remaining accessory structures, the lack of permits for electrical lines and the water line, and the violation of a building being used to house animals less than 50 feet from the property line. It also did not explain why Plaintiffs needed up to two months to remove livestock and structures.

At the September 16, 2020 Board meeting, Plaintiffs' counsel explained that Plaintiffs needed additional time to come into compliance. Plaintiffs' counsel also reiterated that Plaintiffs had purchased the property in 2016 and that it had been rezoned since that time, making some of its

currently violative aspects potentially valid nonconforming uses. Nevertheless, Plaintiffs' counsel explained that Plaintiffs were willing to cooperate with Eagle and had been making communications to that effect.

Muth objected that the non-compliance had been ongoing since June and that Eagle had already incurred significant costs with the inspections and legal fees. Malek stated that he wanted an inspection to be completed by Montoya on the property because, after viewing some photos taken of the property, he opined that there was still a property maintenance issue. Another Board member concurred. A Board member moved to proceed as recommended by Alexy, including the possible recovery from Plaintiffs of some of the fees associated with the violations.

On September 30, 2020, Montoya inspected the property as desired by the Board. The following day, Alexy wrote to Plaintiffs' counsel regarding remaining violations.

On October 1, 2020, Montoya emailed Pepper stating that he had attached the "Mallory letter" in anticipation of the Board's upcoming meeting. Montoya requested that Pepper have Malek look the letter over. That same day, Pepper emailed Montoya stating that she was on the phone with Malek and that Malek wanted the "beehives listed as a new violation in your letter." It was not common for Malek to instruct Montoya about potential violations Montoya may have otherwise missed.

On October 2, 2020, Montoya issued a report from his inspection on September 30, 2020. The report noted that current non-compliances included work having been done without permits, excess accessory buildings, grass and weeds exceeding 12 inches, and excess beehives. The report additionally noted that the property had a "vast amount of outside

storage material." Montoya wrote that any such storage could not be visible from neighboring properties or from the street.

That same day, Plaintiffs' counsel submitted a letter to the Board, reiterating many of the comments already made as well as noting that the outside storage materials were there only temporarily or otherwise could be removed quickly. Again, Plaintiffs' counsel's letter neglected to address some of the outstanding violations and missing permits. The letter sought additional time within which to further address some of the issues.

On October 5, 2020, the Board again met and considered Plaintiffs' extension request. The Board expressed frustration at Plaintiffs' inability to bring their property fully into compliance. Nevertheless, the Board authorized Alexy to send a letter to Plaintiffs' counsel on October 9, 2020, granting a further extension. Plaintiffs would have until October 31, 2020 to bring their property into compliance.

The letter additionally expressed the Board's general dissatisfaction with the rate at which Plaintiffs were addressing the violations and noted that many of the violations originally identified remained. It noted further that there had been no "follow-through" on Plaintiffs' previous representation to the Board that Plaintiffs would apply for all necessary permits right away. As to property maintenance, the letter asserted that while Plaintiffs refer to the property as a farm, the property is zoned under the Rural Residential zoning district and had to be maintained accordingly.

The letter additionally indicated that Plaintiffs would be required to sign an agreement to reimburse Eagle for the costs associated with addressing the violations. Eagle had used such a reimbursement agreement on at least one previous occasion. The letter noted that if Plaintiffs rejected

Case 2:20-cv-01820-JPS   Filed 03/21/23   Page 21 of 49   Document 87

the agreement, Eagle would pursue remedies for each day of violation since the formal complaint against Plaintiffs had been submitted.

On October 26, 2020, Plaintiffs' counsel sought an additional extension, citing delays attributable to rain and snow. Alexy responded that only the Board had the authority to grant the extension but that it was unlikely the Board would have the opportunity to meet to consider the request before the October 31, 2020 deadline. But even if the Board were able to convene before then, Alexy explained, it was unlikely the Board would be willing to grant another extension. Alexy stated that Plaintiffs should consider the October 31, 2020 deadline to remain in effect and additionally notified Plaintiffs that Eagle intended to reinspect the property on November 2, 2020.

The next day, Erica and Suhm corresponded by email. Erica accused Suhm of voting against Plaintiffs, and Suhm asserted that Erica had "ticked off all the board members with [her] meeting comments and on facebook." Suhm told Erica that all she needed to do to fix the situation was to get the necessary permits and take the actions instructed by Eagle. Despite being friendly with Erica, Suhm stated that she voted as a Board member based on the "lack of progress by the Plaintiffs, especially with regard to not having applied for permits." And although Suhm had no personal knowledge as to the basis for the other Board members' votes, she assumed that their emotions had "something to do with it." Nevertheless, Suhm testified that even if the other Board members had been driven by emotion, it "wouldn't matter" because the "paperwork" was clear that Plaintiffs had committed violations and failed to remedy them in a timely manner.

Reinspection of Plaintiffs' property was scheduled for November 6, 2020. Montoya became unavailable, so Plaintiffs allowed Alexy to walk the

property and document the progress. Montoya later issued a report dated November 6, 2020, based off of photos Alexy had taken on the property. The report detailed many remaining violations.

Schwecke testified that Plaintiffs were "working towards compliance," but nevertheless his and Montoya's reports consistently identified remaining violations and missing permits.

On November 9, 2020, on the eve of the Board voting whether to authorize an action to prosecute Plaintiffs' code violations in state court, Plaintiffs filed the instant lawsuit.

### 2.8 Non-Enforcement Against Other Violative Properties

Mommaerts, one of the Board's members at the time, owned a property in Eagle with accessory structures in excess of the number allowed. A written complaint was anonymously emailed to report this violation, but no action was taken. The email, sent from "Anon Resident," additionally reported various other property owners for code violations. The anonymous email sender did not provide their address, nor did they indicate whether they lived next-door to any of the alleged perpetrators.

The email alleged that one resident operated a farm stand without a permit, had too many grazing animals, had too many outbuildings, had an unpermitted pool, and was transporting and keeping out-of-state beehives without a state inspection. The email reported that another had too many livestock and ran a retail business from his home in violation of Eagle's code. It alleged that another ran a business out of his garage and reported that another sold alcohol without a liquor license and had an oversized farm stand. It alleged that another property owner impermissibly kept a junk vehicle, and that another kept a snow fence up year-round.

No action was taken by Eagle or its Board in response to this report, despite the email having been sent to all Board Supervisors, the Town Clerk, the Zoning Administrators, and other officials. No one directed the complainant to a Supervisor who could sign the complaint on the anonymous sender's behalf. Eagle and its Board took no investigative action in response to the email. Mommaerts and the rest of the named property owners were never instructed to remedy their alleged violations.

3.      SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56 provides that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Boss v. Castro*, 816 F.3d 910, 916 (7th Cir. 2016). A fact is "material" if it "might affect the outcome of the suit" under the applicable substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute of fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

The court construes all facts and reasonable inferences in the light most favorable to the non-movant. *Bridge v. New Holland Logansport, Inc.*, 815 F.3d 356, 360 (7th Cir. 2016). "At summary judgment a court may not assess the credibility of witnesses, choose between competing inferences or balance the relative weight of conflicting evidence; it must view all the evidence in the record in the light most favorable to the non-moving party and resolve all factual disputes in favor of the non-moving party." *Abdullahi v. City of Madison*, 423 F.3d 763, 769 (7th Cir. 2005). Ultimately, "the non-movant need not match the movant witness for witness, nor persuade the court that her case is convincing, she need only come forward with

appropriate evidence demonstrating that there is a pending dispute of material fact." *Waldridge v. Am. Hoeschst Corp.*, 24 F.3d 918, 921 (7th Cir. 1994). But simply "denying a fact that has evidentiary support 'does not transform it into a disputed issue of fact sufficient to survive a motion for summary judgment.'" *Uncommon v. Spigen, Inc.*, 305 F. Supp. 3d 825, 838 (N.D. Ill. 2018) (internal quotation omitted).

## 4.    ANALYSIS

"Official reprisal for protected speech 'offends the Constitution [because] it threatens to inhibit exercise of the protected right . . . .'" *Hartman v. Moore*, 547 U.S. 250, 256 (2006) (quoting *Crawford-El v. Britton*, 523 U.S. 574, 588 (1998)). "[T]he law is settled that as a general matter the First Amendment prohibits government officials from subjecting an individual to retaliatory actions . . . for speaking out." *Id*.

"In order to withstand a motion for summary judgment on a First Amendment retaliation claim, a plaintiff must show '(1) he engaged in activity protected by the First Amendment, (2) he suffered a deprivation that would likely deter First Amendment activity in the future, and (3) the First Amendment activity was at least a motivating factor in the Defendants' decision to take the retaliatory action.'" *Hill v. Best*, No. 10-cv-26-JPG-PMF, 2014 U.S. Dist. LEXIS 127519, at *10 (S.D. Ill. Sept. 11, 2014) (quoting *Bridges v. Gilbert*, 557 F.3d 541, 546 (7th Cir. 2009)).

After the plaintiff has made out its prima facie case, "the burden shifts to the defendant to rebut the causal inference created by the plaintiff's showing and to prove that it would have taken the same action regardless of the plaintiff's protected activity." *Id*. (internal citation omitted). *See also Rasche v. Beecher*, 336 F.3d 588, 597 (7th Cir. 2003) ("If the speech was

protected, we ask whether the defendants' actions were motivated by that constitutionally protected speech . . . . If the plaintiff can show that his constitutionally protected speech was a substantial or motivating factor, the defendants must show that they would have taken the same action in the absence of his exercise of his rights under the First Amendment."). "If the defendants carry that burden [to show that they would have taken the same action in any event], the plaintiff bears the burden of persuasion to show that the defendants' proffered reasons were pretextual and that retaliation was the real reason for the defendants' action." *Rasche*, 336 F.3d at 597.

"It is clear, moreover, that the causation is understood to be but-for causation, without which the adverse action would not have been taken . . . ." *Hartman*, 547 U.S. at 260. "[W]e say that upon a prima facie showing of retaliatory harm, the burden shifts to the defendant official to demonstrate that even without the impetus to retaliate he would have taken the action complained of . . . ." *Id.* "It may be dishonorable to act with an unconstitutional motive and perhaps in some instances be unlawful, but action colored by some degree of bad motive does not amount to a constitutional tort if that action would have been taken anyway." *Id.*

Importantly, "[m]unicipalities cannot be held liable for § 1983 claims under a theory of respondeat superior." *Palmer v. Marion County*, 327 F.3d 588, 594 (7th Cir. 1991). Plaintiffs asserting a claim of First Amendment retaliation against a municipality must therefore establish that "the deprivation of constitutional rights is caused by a municipal policy or custom." *Kujawski v. Bd. of Comm'rs of Batholomew Cnty.*, 183 F.3d 734, 737 (7th Cir. 1999). "[U]nconstitutional policies or customs can take three forms: (1) an express policy that, when enforced, causes a constitutional deprivation; (2) a widespread practice that, although not authorized by

written law or express municipal policy, is so permanent and well settled as to constitute a 'custom or usage' within the force of law; or (3) an allegation that the constitutional injury was caused by a person with final policymaking authority." *Rasche*, 336 F.3d at 597–598 (internal citation omitted).

Moreover, a plaintiff asserting constitutional liability against a municipality must demonstrate "requisite causation," which means that "the policy or custom was the 'moving force' behind [the] constitutional deprivation." *Gable v. City of Chicago*, 296 F.3d 531, 537 (7th Cir. 2002) (internal citation omitted). A plaintiff may demonstrate this "by showing a series of bad acts and inviting the court to infer from them that the policymaking level of government was bound to have noticed what was going on" and, therefore, "by failing to do anything must have encouraged or at least condoned [the activity]." *Jackson v. Marion County*, 66 F.3d 151, 152 (7th Cir. 1995).

### 4.1 Plaintiff's Prima Facie Case

#### 4.1.1 Engagement in Activity Protected by the First Amendment

The plaintiff in a First Amendment retaliation case must first demonstrate that she engaged in activity protected by the First Amendment. *Hill*, 2014 U.S. Dist. LEXIS 127519, at *10. Protected speech is that which deals with matters of "public concern"; the inquiry is a question of law. *Connick v. Myers*, 461 U.S. 138, 145 (1983). It is well established that the right to criticize public officials is at the heart of the First Amendment. *New York Times Co. v. Sullivan*, 376 U.S. 254, 269–70 (1964). "[I]t is a prized American privilege to speak one's mind, although not always with perfect good taste, on all public institutions." *Bridges v. California*, 314 U.S. 252, 270

(1941). "[D]ebate on public issues should be uninhibited, robust, and wide-open, and . . . it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." *New York Times Co.*, 376 U.S. at 270.

The parties do not dispute that Plaintiffs engaged in activity protected by the First Amendment. *See* ECF No. 68 at 9 (noting that the parties do not dispute that Plaintiffs' speech criticizing Eagle and its Board members' actions addressed matters of public concern); ECF No. 81 at 7 ("The parties agree, at least for purposes of summary judgment, that the Mallorys engaged in protected speech . . . .").

Even if they did, there is no question that Plaintiffs' speech relating to the Board, its members and their respective official performances, and the beekeeping ordinance is protected by the First Amendment. The parties' statement of undisputed facts, ECF No. 68, is rife with references to Plaintiffs', and primarily Erica's, criticism towards the Board and its members. *See, e.g.*, ECF No. 76 at 30 (Pepper testimony) (Q: And for the Town Board meetings where Erica or Zach attended, were they active participants?" A: "During public comments, at times, yes."), at 31 (Q: "Do you recall Erica ever saying anything critical about the Town Board or a Board member during a Town meeting?" A: "Yes."), at 34 ("[S]he said directly to [Malek] . . . that he didn't know how to run meetings."), and at 34–35 ("[Erica] on social media attacked me about my salary and my minute-taking relentlessly."). In addition to criticizing the Board and its members, Erica also publicly expressed her opinion as to the beekeeping ordinance then under consideration. These are constitutionally protected activities, and so the first element of Plaintiffs' prima facie case is met.

### 4.1.2 Suffering of a Deprivation Likely to Deter Future First Amendment Activity

The next element requires that Plaintiffs "suffered a deprivation that would likely deter First Amendment activity in the future." *Hill*, 2014 U.S. Dist. LEXIS 127519, at *10. This test is an objective one. *FKFJ, Inc. v. Village of Worth*, 11 F.4th 574, 585 (7th Cir. 2021). In other words, whether Plaintiffs were themselves deterred from engaging in further First Amendment activity is not the question. The court asks instead "whether the alleged conduct by the defendants would likely deter a person of ordinary firmness from continuing to engage in protected activity." *Id*. "[T]he law merely requires some negative consequence (deprivation) with a chilling effect on First Amendment activity." *Id*. The Seventh Circuit has stated that the alleged injury "need not be great in order to be actionable" and that even the mere threat of sanctions may be sufficient to allege First Amendment injury. *Mosely v. Bd. of Educ.*, 434 F.3d 527, 534 (7th Cir. 2006) (internal citations omitted).

Discussion of this element requires clarification as to which Defendants, versus as to which non-parties, certain adverse conduct may be deemed attributable. As noted previously, "[m]unicipalities cannot be held liable for § 1983 claims under a theory of respondeat superior." *Palmer*, 327 F.3d at 594. This requires a court to "distinguish acts of the municipality from acts of [its] employees . . . and thereby make clear that municipal liability is limited to action for which the municipality is actually responsible." *Grieveson v. Anderson*, 538 F.3d 763, 771 (7th Cir. 2008) (internal quotations and citations omitted). It bears clarifying that the

Komornickis, Montoya, and Schwecke are not Defendants in this case.[8] Nor are the individual Board members Defendants in this case.[9] The Court must discern what conduct may be attributed specifically to Eagle and its Board, not necessarily solely to the employees thereof.

To establish an official policy or custom, a plaintiff may show that his constitutional injury was caused by a person with final policymaking authority. *Wragg v. Village of Thornton*, 604 F.3d 464, 467 (7th Cir. 2010). "It is well-established that when a particular course of action is directed by those who set municipal policy, the municipality is responsible under section 1983, even if the act in question is undertaken only once." *Valentino v. Village of S. Chicago Heights*, 575 F.3d 664, 675 (7th Cir. 2009). "Absent proof that the injury in question was caused by an employee with final policymaking authority," or absent proof of other exceptions not argued here, "there can be no liability on the part of the municipality itself." *Palka v. City of Chicago*, 622 F.3d 428, 434 (7th Cir. 2011).

"Whether an entity has final policymaking authority is a question of state or local law." *Milestone v. City of Monroe*, 665 F.3d 774, 780 (7th Cir. 2011). "The identification of those officials whose decisions represent the official policy of the local governmental unit is itself a legal question to be resolved by the trial judge before the case is submitted to the jury." *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 703, 737 (1989) (brackets and emphasis omitted).

---

[8] The Court dismissed Montoya and Schwecke as Defendants in this case on August 6, 2021. ECF No. 48 at 36–37.

[9] The Court dismissed Malek, Mommaerts, Muth, Suhm, and West as Defendants in this case on August 6, 2021. ECF No. 48 at 36–37.

"Not every municipal official with discretion is a final policymaker; authority to make final policy in a given area requires more than mere discretion to act." *Milestone,* 665 F.3d at 780. "Whether a public official has final policymaking authority often turns on whether his decisions are subject to review by a higher official or other authority." *Id.*; *see also Palka,* 622 F.3d at 434 (where an individual's "decisions were subject to review and implementation by a higher authority, he cannot be a final policymaker for purposes of municipal § 1983 liability"). "In determining whether an official has final policymaking authority, the court considers:"

> (1) whether the official is constrained by policies of other officials or legislative bodies; (2) whether the official's decision on the issue in question is subject to meaningful review; and (3) whether the policy decision purportedly made by the official is within the realm of the official's grant of authority.

*Valentino,* 575 F.3d at 676 (internal citation omitted).

Additionally, "[a] municipal employee may also possess final policymaking authority where the final policymaker has delegated that authority, either expressly or impliedly." *Webb v. Town of St. Joseph,* 925 F.3d 209, 215 (5th Cir. 2019); *see also Kujawski,* 183 F.3d at 737 ("Final policymaking authority may be granted directly by statute or delegated or ratified by an official having policymaking authority."). Once a final policymaker has been identified, the court's task is to "determine whether the official in question is a final policymaker for the local government "in a particular area, or on a particular issue." *Kujawski,* 183 F.3d at 738 (internal citation omitted).

The parties agree that the Board is a final policymaker. ECF No. 48 at 13.[10] But according to Plaintiffs, "[t]he Town is incorrect that there was only one policymaker (the Town Board) whose only policymaking authority was to decide whether to authorize the Town Attorney to issue a lawsuit." ECF No. 81 at 7. In contrast, Plaintiffs argue, members of the Board itself, or at least the Town Chairman (Malek), are similarly final policymakers. *Id.* at 14–17. Plaintiffs argue that the Town Chairman is an official with final policymaking authority for purposes of municipal liability because, for example, his decision on whether, and when, to pass forward a complaint to the Building Inspector or Zoning Administrator after receiving it was his alone and subject to essentially no review. *Id.* at 15. The Court agrees that the record supports these conclusions.

Wis. Stat. § 60.24, entitled "Powers and duties of town board chairperson," provides that the chairperson shall "assure the administration of statutes" and "[s]ee that town orders and ordinances are obeyed." Wis. Stat. § 60.24(1)(d) and (e). The chairperson is statutorily authorized to "[s]ee that . . . order [is] maintained in the town" and "[c]ause actions to be commenced for recovery of forfeitures for violations of town ordinances that can be recovered in municipal court . . . ." *Id.* at (1)(e) and (3)(ym).

Malek exercised final policymaking authority regarding whether, when, and how to move forward with ordinance complaints against property owners because he exercised essentially unchecked discretion regarding those aspects of the ordinance enforcement process—for

_____

[10]Indeed, Wis. Stat. § 60.22(1) provides that the Board has authority over "all affairs of the town not committed by law to another body or officer or to a town employee." *See* ECF No. 81 at 13.

example, whether and when to move complaints on to the next steps of investigation and prosecution. This is not a case where all complaints move forward automatically upon their submission.

The parties' statement of undisputed facts provides that "[t]he Town Chairman is the only person who determines whether a complainant is personally affected, or their property value is directly affected by the alleged code violations" for purposes of complaint screening. ECF No. 68 at 11; *see also* ECF No. 73 at 141 (Schwecke testimony that he did not begin to investigate an anonymous email complaint because "the complaints go to Don . . . . He signs off on them if he wants them to be investigated, and I didn't receive any indication from Don that I was supposed to be doing it."); ECF No. 75 at 30 (Mommaerts deposition) (Q: "Do you know who did have a say in whether their property was investigated?" A: "The way we learned in investigations, I would say since Don received it, it would be Don."); ECF No. 76 at 52 (Pepper testimony that it was "Don's" job to investigate whether the person who was complaining was personally affected).

The Town Chairman, in practice, has the discretion to decide whether to evaluate those criteria at all and how such evaluation is made. ECF No. 68 at 11 (noting that it is undisputed that the Town Chairman can choose not to evaluate whether a complainant meets those criteria); ECF No. 71 at 19 (noting that, in response to the question as to how Malek "determine[s] whether or not the complaint is made by a neighbor who's being affected," Malek stated, "We just know it."); ECF No. 73 at 136 (Schwecke testimony that the definition of what it means to be "directly affected" is ultimately "up to Don."); ECF No. 68 at 12 (noting that the Town Clerk believed that a neighbor wanting to cause trouble could file a baseless

Case 2:20-cv-01820-JPS   Filed 03/21/23   Page 33 of 49   Document 87

complaint, and no one on behalf of Eagle would investigate its veracity before an inspection occurred). Pepper testified that from her understanding, Malek did not do anything "to determine whether the allegations were true or completely fabricated" before moving the complaint forward. ECF No. 76 at 85.

Malek testified that his practice was to automatically deem such criteria met in cases where the complainant's property is next-door to the property complained of, and therefore sign and move the complaint forward without further evaluation. ECF No. 68 at 12. But the record demonstrates that Malek has discretion to deviate from both Eagle's policy and his own typical practice. For example, the parties do not dispute the existence of an instance in which Malek, instead of promptly forwarding a complaint between two of his neighbors to the Building Inspector or Zoning Administrator, instead chose to attempt to mediate the issue himself. ECF No. 81-14 at 4. No one reviews the exercise of that discretion—Malek is understood to have the last word, so to speak, on those issues. *See Valentino*, 575 F.3d at 676–77 (noting as relevant to the final policymaker analysis that the municipal official there at issue had the "final say-so" regarding the plaintiff's termination and had the "unfettered discretion" to hire and fire whomever he pleased). As was the case in *Valentino*, where the defendants could not "point to any instances in which the board provided any meaningful oversight of [the municipal official's] decisionmaking process or meaningfully reviewed his termination decisions," the record here demonstrates no instance in which the Board operated as a meaningful check on Malek's decisions regarding ordinance complaints. *See id.* at 678. To the contrary, the Board and its members wholly defer to Malek on that front. The Court accordingly holds that Malek is a "de facto policymaker"

Case 2:20-cv-01820-JPS   Filed 03/21/23   Page 34 of 49   Document 87

for Eagle and its Board, at least as to the aforementioned aspects of ordinance enforcement. *See id*.

Now that the Court has clarified that both the Board and Malek constitute final policymakers for purposes of municipal liability, and therefore which conduct can give rise to such liability, the Court can properly discuss the second element of Plaintiffs' prima facie case, which essentially asks "whether the alleged conduct by the defendants would likely deter a person of ordinary firmness from continuing to engage in protected activity." *FKFJ, Inc.*, 11 F.4th at 585. "Whether retaliatory conduct is sufficiently severe to deter is generally a question of fact, but when the asserted injury is truly minimal, we can resolve the issue as a matter of law." *Douglas v. Reeves*, 964 F.3d 643, 647 (7th Cir. 2020).

The Court finds that a jury could reasonably find this element as being met. The alleged conduct by Defendants and Malek here includes signing off on the complaint against Plaintiffs, voting on whether to enforce ordinances against them,[11] and ultimately pursuing code violations against them where Defendants perhaps might not have otherwise done so.[12] By

---

[11]*See* ECF No. 74 at 13 (Suhm testimony confirming that "part of [her] work as town supervisor" included "vot[ing] on whether or not to enforce ordinances against property owners whose property was subject to complaints about compliance with the town vote").

[12]Defendants characterize the "first adverse effect of which the Plaintiffs complain" as the "June 24, 2020 inspection." ECF No. 65 at 8. The Court takes a broader view. The first adverse effect of which Plaintiffs complain and characterize as retaliation for their speech goes back at least to the previous month, May of 2020, following Mr. Komornicki's anonymous submission of the official complaint against Plaintiffs. *See* ECF No. 68 at 24 ("In responding to the anonymous complaint, the Mallorys sought to bring to light what they perceived to be Malek's favoritism toward the Komornickis and disfavor toward the Mallorys, in part because he was 'surveying' their property in October of 2019 and then in May of 2020 signed off on the anonymous complaint.").

signing the complaint and moving it forward, the inspection and enforcement process was triggered. By allowing Montoya to seek a special inspection warrant just six days after Plaintiffs stated that they would reach out to confer with Montoya and/or Schwecke, the Board enabled the enforcement process to continue on an expedited basis.[13] ECF No. 72 at 44–45. The record shows that Malek instructed Montoya to add an additional

_____

Defendants further emphasize that "[a]though it had sufficient legal and factual grounds to do so, the Town never actually issued a citation or filed an enforcement action in any court." ECF No. 65 at 10. That is true, but immaterial. Merely because Eagle did not ultimately invoke the sanction does not mean adverse effects were not experienced before that point.

[13]Defendants argue that Eagle and its Board cannot be held liable for retaliation, *inter alia*, because it was other, independent individuals and those individuals' actions that caused any harm to Plaintiffs. For example, Defendants write that "the issuance of the special inspection warrant by the court . . . took place without intervention by the Town Board." ECF No. 65 at 20. The record is not entirely clear on this point.

The individual who applied for the inspection warrant in this case, Montoya, testified that it is the decision of "the Town," and specifically "the Board," whether to seek an inspection warrant. ECF No. 72 at 41. The question was posed to him whether the decision to seek such a warrant is "entirely [his] decision" or whether there "are any other people involved." *Id*. Montoya responded that the Town would make that decision—that he would "tell the Town, 'Hey, [the property owners] are refusing access,' and then they will go to—order me to get an inspection warrant." *Id*.; *see also id.* at 44 ("[T]hey're the ones who decide if we need to do an inspection warrant."). It is, in other words, not a decision left to Montoya's discretion, but rather is one for which he seeks authorization from the Board.

Regarding the specific inspection warrant at issue in this case, Montoya testified that he didn't recall how the Board instructed him to "get" it. *Id*. at 42. He did not testify that he applied for the special inspection warrant without authorization from Eagle or its Board, but he could not recall the circumstances in which the Board authorized seeking a special inspection warrant in this case. His testimony allows for the inference, however, that he did receive Board authorization to seek the warrant, in part because he never corrected counsel when she referred to the warrant as the "Special Inspection Warrant that you were instructed to seek by the Town." *Id*.

violation to those already asserted against Plaintiffs, and that it was uncommon for Malek to do so. ECF No. 68 at 45–46 (detailing email from Pepper to Montoya wherein she relays to Montoya that Malek wanted the beehives listed as an additional violation against Plaintiffs and noting that in her tenure Malek had suggested the inclusion of additional violations against a property owner "very few" times); ECF No. 72 at 61 (Montoya testifying that he did not remember "any other instance in which [Malek] asked [him]" to add a violation").

And at a certain point when Plaintiffs had failed to bring their property into complete compliance, the Board authorized issuance of a letter warning Plaintiffs that it could assess forfeitures in the range of $20,000. ECF No. 71 at 132; ECF No. 81-34 at 4. Suhm additionally testified that the Board ultimately voted to deny Plaintiffs' last extension request. ECF No. 74 at 16, 26 ("[T]he Board decided that they would be sending a letter to them to not extend their time to meet compliance."); ECF No. 75 at 61 (Mommaerts testimony confirming that at an October Board meeting, the Board members agreed that no further extensions should be granted and that the Board should pursue litigation against Plaintiffs).

The Board expected Plaintiffs to reach full compliance within a shorter time period than that typically afforded to other non-complying property owners. *See* ECF No. 72 at 29 (Montoya testifying that non-compliant property owners typically make small, incremental process and that they typically do not achieve full compliance until two years after submission of the triggering complaint); ECF No. 68 at 61 ("It typically takes about a year and a half for residents to bring their properties into compliance . . . ."). It can therefore be reasonably inferred that the Board acted more strictly against Plaintiffs than against other non-complying

property owners. Defendants' assertion that the "only thing the Town Board did other than grant Plaintiffs' multiple extension requests was authorize a settlement letter . . . to resolve the parties' dispute without litigation" is simply not supported by the record. *See* ECF No. 82 at 2.

Viewing the record in the light most favorable to Plaintiffs, it appears that this is not a situation wherein the asserted injury is "truly minimal" such that the Court could determine as a matter of law that no reasonable jury could find the injury sufficient to deter a person of ordinary firmness from engaging in further First Amendment activity. *See Douglas*, 964 F.3d at 647. A reasonable jury could find that the above-noted actions, taken together, are enough of a deprivation to chill a person of ordinary firmness from continuing to engage in protected First Amendment activities.[14]

### 4.1.3 Causation

Next, Plaintiffs must show that the "First Amendment activity was at least a motivating factor in the Defendants' decision to take the retaliatory action." *Hill*, 2014 U.S. Dist. LEXIS 127519, at *10. Critically, at

---

[14]Defendants go through the list of adverse actions to which Plaintiffs claim to have been subject and conclude that each, individually, is insufficient to deter the First Amendment expression of an ordinary individual. ECF No. 82 at 7–8. But in determining whether Defendants' conduct was objectively so sufficient, the Court may consider these adverse actions in the aggregate rather than as discrete, isolated items. Context matters, and Defendants ignore the totality of the circumstances. *See, e.g., Bennett v. Hendrix*, 423 F.3d 1247 (11th Cir. 2005) ("[M]inor instances of retaliation would not chill a person of ordinary firmness because they did not even *amount to* an adverse employment action.") (emphasis added); *Hudgins v. City of Albany,* No. 02-6040-TC, 2004 U.S. Dist. LEXIS 13986, at *16 (D. Or. Jan. 16, 2004) ("Plaintiff may establish that these actions were adverse actions individually or were part of several actions that, when taken together, amounted to a severe and sustained campaign of employer retaliation that was reasonably likely to deter plaintiff from engaging in speech protected under the First Amendment.").

this stage in their prima facie case, Plaintiffs need not show "but-for causation, but only that the protected activity is *a* motivating factor in the defendants' conduct." *FKFJ, Inc.*, 11 F.4th at 586. "Causation may be proven through direct or circumstantial evidence." *Id*. "To establish causation through circumstantial evidence, a plaintiff may present evidence of 'suspicious timing, ambiguous oral or written statements, or behavior towards or comments directed'" towards Plaintiffs indicating animus against them. *Id*. (internal citation omitted). But suspicious timing, in and of itself, is typically "not enough to get past a motion for summary judgment." *Shanklin v. Freeman*, 799 Fed. App'x 392, 395 (7th Cir. 2020).

The Court concludes that, viewing it in the light most favorable to Plaintiffs, the record contains sufficient evidence to allow a reasonable jury to conclude that Plaintiffs' First Amendment activity—specifically, their vocal criticism of the Board, its members, and the Board's actions, both at Board meetings and on social media—was a motivating factor in Defendants' conduct.

First, "[t]o show that [adverse action] was motivated by [her] protected speech, [a plaintiff] must . . . demonstrate that the defendants knew of the protected speech." *McGreal v. Village of Orland Park*, 850 F.3d 308, 313 (7th Cir. 2017). Plaintiffs have done so. Multiple Board members acknowledged that Erica was "more vocal than the average town resident" and that she spoke at meetings during public comment "most of the time." ECF No. 74 at 22 (Suhm testimony); ECF No. 75 at 26 (Mommaerts testimony confirming that she would describe Erica as one of the "small handful of people who spoke more often than others" prior to the fall of 2020). Suhm testified that Malek was aware of critical comments Plaintiff made on Facebook because Malek stated at a Board meeting that "he did

not like keeping a Wisconsin Rural page" and he thought the page was "untruthful and all gossip." ECF No. 74 at 25, 33. Mommaerts testified that she was aware that Erica had brought multiple ethics complaints against her to the county. ECF No. 75 at 153–56.[15] And one Eagle resident, during public comment at a Board meeting, strongly suggested that Erica was one of "several bullies in this town who are disrespectful to everyone" and that the community "need[s] to put a stop to this." ECF No. 81-23 at 2. In sum, the record demonstrates that the Board was aware of Erica's tendency to express criticism.

The record can similarly be viewed as demonstrating animus towards Erica on the part of the Board, its members, and Malek. Furthermore, various pieces of evidence in the record allow for the reasonable inference that such animus was attributable to Plaintiffs' protected First Amendment expression.

The record reasonably indicates that Malek, in his capacity as Town Chairman, favored the Komornickis and other property owners who were not known to be vocally critical of the Board and its members over Plaintiffs. Malek testified that when he used the term "good people" of Eagle in an email to Kelly, he agreed that that term referred to the "people who acknowledge what [he's] done" as Town Chairman, that he would include the Komornickis in that category, and that he would "possibly" not include Plaintiffs in that category. ECF No. 71 at 33. Schwecke testified that

---

[15] *See also* ECF No. 75 at 163 (Q: "And then Erica accused you of bribery in a public meeting twice, right?" A: "Correct." Q: "Erica then reported you to the ethics board, correct?" A: "At some point, yeah." Q: "And a couple of months later, you had the opportunity to vote on whether to pursue code enforcement against the Mallorys, right?" A: "Correct." Q: "And you voted to pursue code enforcement?" A: "Correct.").

he could potentially understand the use of the term "good people" in that email as showing "favoritism for the Komornickis over the Mallorys." ECF No. 73 at 177–78. In another instance, Malek emailed Pepper regarding a "very touching voice message" from Kelly, and he instructed her to forward it to all Board members. ECF No. 76 at 56; ECF No. 81-3 at 2. Pepper testified that this was atypical—that Malek did not generally instruct her to forward emails to the entire Board. ECF No. 76 at 56.

In an email responding to the cancellation announcement of an event, Malek responded "WHAT IS SAD IS THE PRESIDENT AND VICE PRESIDENT OF THE ORGANIZATION!!!!!!!!" referring to Suhm and Erica and his disapproval of their decision to cancel the event. ECF No. 81-10 at 2; ECF No. 71 at 77–78; ECF No. 68 at 21. Malek further testified that when Erica emailed him an informal complaint regarding the bothersome bright light on the Komornickis' property, Malek forwarded the email directly to Kelly, and he testified that he "[r]arely" forwarded complaints about a resident directly to the resident complained about. ECF No. 71 at 88. He conceded that he did not similarly forward Kelly's emails complaining about Plaintiffs and their property directly to Plaintiffs. *Id.* at 90.

And although Malek stated that it was "[p]ositively not" his position to determine what violations occur on a property, *id*. at 104, that did not stop him from instructing Montoya to include in his report a beekeeping violation against Plaintiffs, something Malek was not otherwise known to do. *Id*. at 123–26; *see also* ECF No. 72 at 27 (Montoya testimony that it was "not common" for Malek to instruct him as to other possible violations that Montoya might have missed); ECF No. 76 at 61 (Pepper testimony that there were "[v]ery few" instances she could recall wherein Malek had asked Montoya to add something to a violations letter). Malek conceded that he

could not remember any other instance in which he had instructed either Montoya or Schwecke to add a violation. ECF No. 71 at 128.

Additionally, when Erica emailed a purportedly anonymous complaint[16] about various property violations attributable to Mommaerts and other Eagle property owners, neither Malek nor any other employee of Eagle or its Board responded to it or took any action to verify it. This was so despite (1) Malek testifying that his involvement with the enforcement process included verifying complaints to make sure that they comply with enforcement proceedings, whether those complaints took the form of "letter or email." ECF No. 80 at 11[17]; and (2) Eagle's Zoning Code Enforcement Procedure stating that "[i]f the complainant wants to be kept anonymous, then they shall be directed to speak with a Town Board member and request the Town Board member to write the complaint and sign it on their behalf." ECF No. 81-47 at 2. No one responded to Erica's complaint email, neither to verify that it met the criteria of Eagle's Zoning Code Enforcement

---

[16]The Court describes the email as "purportedly anonymous" because while it reflects the intention of at least some degree of anonymity, it also included a clue as to the complainant's identity. The email was sent from "Anon Resident" and by "Anon_resident@outlook.com" but was also sent to "mallorymeadowseagle@gmail.com," the email address associated with Plaintiffs' farm business. ECF No. 81-50 at 2. Erica later confirmed that she did, indeed, send this complaint email. The email was sent to Pepper, the Board, and Malek, among others. It can reasonably be inferred that Pepper, the Board, and Malek could have been tipped off to the complainant's true identity by the inclusion of Plaintiffs' business email address. It can similarly be inferred, based on the totality of the circumstances, that Plaintiffs' identity—and their notoriety for being critical of the Board—may have motivated the total lack of response to the email.

[17]Malek also acknowledged that it was acceptable under both Eagle's policy and its practice to have ordinance complaints either dropped off in person in writing or "emailed to the Clerk." ECF No. 80 at 13.

Procedure nor to direct her to "speak with a Town Board member" so that such Board member could sign the complaint. *See* ECF No. 81-47 at 2.

Additionally, Montoya testified that in most instances of non-compliance, it takes "a while" for the property owners to remedy all identified violations. Specifically, he stated, property owners make "small progress" and typically do not fully comply for "two years." ECF No. 72 at 29. In contrast, it took only approximately six months in Plaintiffs' case before the Board determined that Plaintiffs were not remedying the violations fast enough and that it would not likely provide any further extensions. ECF No. 68 at 55, 58 (noting that the official complaint against Plaintiffs was submitted May 15, 2020); ECF No. 81-37 at 2 (October 26, 2020 letter from Alexy to Plaintiffs' previous attorney stating that his impression was that it "is unlikely that your [extension] request would be granted" and that Plaintiffs should "consider the Town Board's October 31, deadline to remain in effect."). This was so even though Malek testified that in "almost every case" of extension requests, "residents are given extensions for various reasons," including for "weather" or simply because the number of violations was "monumental." ECF No. 80 at 22. It is reasonable to infer, based on the totality of the record, that this inflexibility was due to animus against Plaintiffs as compared to other property owners in Eagle.

Erica also testified that she was personally aware of at least one situation in which a property owner was denied permits after having run against Malek for the position of Town Chairman. ECF No. 70 at 110. She testified that the property owner's "neighbor shared with [the property owner] how board members were encouraging them to have complaints against him and his property." *Id*. This was after that property owner had, as part of his campaign against Malek for the role of Town Chairman,

shared with the public "some of the tactics Don Malek had used while they were both running for town chair" and had frustrated the Board members by attempting to record board meetings. *Id*. at 110–11. This can reasonably be interpreted as additional evidence of Malek's and the Board's tendency to take adverse administrative and municipal action against property owners who criticize or are oppositional to the Board and Town Chairman.

Also highly relevant is an October 27, 2020 email from Suhm to Erica, wherein Suhm wrote that Erica had "ticked off all the board members with [her] meeting comments and on facebook," which "wasn't good because the board members voted with emotion." ECF No. 68 at 55–56; ECF No. 81-38 at 2. This was in response to an email wherein Erica wrote, *inter alia*, "[i]s that why you voted against us in closed session and previous motions?" ECF No. 81-38 at 2. The parties do not dispute that "Suhm . . . assumed that other members of the Board had negative feelings towards the Plaintiffs based on the comments the Plaintiffs made . . . ." ECF No. 68 at 56. When asked whether she was "aware of any negative feelings that members of the board had towards either Erica or Zach," Suhm responded, "I'm assuming they did. I'm assuming they did . . . . Because [Erica] was very vocal at the meetings and berated people in public." ECF No. 74 at 31.

And while Mommaerts testified that she voted not with emotion, but rather based on facts, she conceded that Erica had made comments at meetings that Mommaerts disagreed with, found uncalled for, was "devastated" and "very appalled" by, and interpreted as an assault on Mommaerts's character. ECF No. 75 at 82–83, 144 ("[W]hen she said that I was taking bribes, yes, I take that as a character assault . . . . I felt that was uncalled for."). She further testified that she "did not like that it was stated

in an open forum." *Id*. at 83; *see also* ECF No. 76 at 33 (Pepper testimony that Mommaerts was "very upset" following this public accusation).

Mommaerts similarly conceded to having frustration with Erica over a Facebook exchange where Erica advocated for Eagle property owners to submit grievances directly to the county, rather than to Mommaerts. ECF No. 75 at 128–29 (Q: "[Y]ou felt like Erica was having people leapfrog over you, go around you, cut you—cut you out of this thing that you had been working on and kind of leading, right?" A: "It made it bad for the whole town, not just me."); ECF No. 81-20 at 3 (July 2020 email from Mommaerts to Pepper wherein Mommaerts states: "Talked about the county meeting and how they leapfrogged over me. Not a good idea."). In the same email, Mommaerts characterized Erica as "making a mess of things" regarding the beekeeping ordinance. ECF No. 81-20 at 32–3.

These circumstances reasonably allow the inference that Malek and the Board had animus against Plaintiffs which could reasonably be attributed to Plaintiffs' criticisms of the Board, its members and their respective performances in their positions, and the Board's handling of the proposed beekeeping ordinance and other matters.

### 4.2    Burden Shift to Defendants[18]

As noted, once the plaintiff has made out her prima facie case, the burden shifts to the defendants to show that the government officials

---

[18]As they did for their motion for judgment on the pleadings, ECF Nos. 14, 15, Defendants rely on, inter alia, *Nieves v. Bartlett*, 139 S. Ct. 1715, 1726 (2019) and *Lund v. City of Rockford*, 956 F.3d 938 (7th Cir. 2020). They cite these cases for the proposition that the "presence of probable cause is an absolute bar to a First Amendment retaliation claim." ECF No. 65 at 8. Those cases stand for the proposition that a plaintiff pressing a retaliatory arrest claim must plead and prove the absence of probable cause for the arrest. *Lund*, 956 F.3d at 944 ("[P]robable cause defeats a claim of retaliatory arrest."). And as the Court clarified in its order

"would have taken the same action regardless of the plaintiff's protected activity." *Hill*, 2014 U.S. Dist. LEXIS 127519, at *10; *see also Isabell v. Trs. of Ind. Univ.*, 432 F. Supp. 3d 786, 799 (N.D. Ind. 2020) ("Triable issues existing thus far, the burden shifts to the defendant to establish that the same recommendation and decision would have been made anyway."). Put otherwise, Defendants can rebut Plaintiffs' prima facie case "only by establishing that [Defendants'] conduct was not a but-for or 'necessary condition' of the harm." *Surita v. Hyde*, 665 F.3d 860, 874 (7th Cir. 2011) (internal citation omitted). "[I]f evidence exists upon which a reasonable jury could find but-for causation, no more is necessary to overcome a defendant's summary judgment motion." *Id.* This inquiry is a question of fact. *Id.* at 878.

The Court must draw all reasonable inferences in favor of the non-moving party—here, Plaintiffs. In so doing, the Court concludes that a reasonable jury could find that Defendants' conduct was a but-for cause of the harm Plaintiffs suffered. The issue is genuinely disputed and must therefore be resolved by a jury.

Much of what the Court has already discussed in reference to Plaintiffs' prima facie case is similarly relevant to the discussion of Defendants' burden to demonstrate that the harm to Plaintiffs would have occurred even if Plaintiffs had never made any protected First Amendment expression.

---

on the motion for judgment on the pleadings, ECF No. 48 at 15, the courts in those decisions clarified that "a narrow qualification is warranted for circumstances where officers have probable cause to make arrests, but typically exercise their discretion not to do so." *Id.* at 944 (quoting *Nieves*, 139 S. Ct. at 1727)).

The record demonstrates that Eagle's ordinance complaint process is, at least primarily, complainant driven—i.e., the process is set in motion by the filing of a complaint by a resident of Eagle—and in that respect the initiation of ordinance enforcement is arguably independent of Eagle and its Board. Defendants therefore argue that the Komornickis would have brought the complaint at issue against Plaintiffs regardless of whether Plaintiffs criticized the Board and its members.

But even if that argument is taken as true, in the Court's opinion, it represents too narrow a view of the circumstances. It fails to account for the other adverse actions and decisions made against and as to Plaintiffs during the enforcement process in its entirety. And while the Komornickis were the ones to bring the official complaint against Plaintiffs, items in the record reasonably allow one to infer that Malek's unusually friendly relationship with the Komornickis may have encouraged them to take that course of action in light of Plaintiffs' notoriety in Eagle. For example, while Malek denies it, Erica asserts that, as far back as October of 2019 (roughly seven months before the Komornickis submitted an official complaint against Plaintiffs), Malek would "survey[] the Mallory property from Komornick[i's] property." ECF No. 81-31 at 3. Malek also encouraged Kelly to keep him and the Board "posted as to what is going on" regarding the property disputes between Plaintiffs and the Komornickis and foreshadowed that he believed that "as time goes on [] eventually things will be caught up with." ECF No. 81-4 at 2.

And as discussed previously, the initiation of the proceeding against Plaintiffs is not the sole adverse action to which they were subject. The Board had heightened expectations of Plaintiffs' compliance compared to other property owners who were not known to be as critical against the

Board as Plaintiffs. The Board allowed Montoya to apply for a special inspection warrant as to Plaintiffs' property less than a week after the notice of violations was sent to Plaintiffs, and this was not common practice. Malek instructed Montoya to add an additional violation against Plaintiffs to the report, and this was not common practice. The Board expected quicker compliance and refused to extend further extensions only six months after the submission of the triggering complaint, even though Plaintiffs were acknowledged to be making steps towards compliance throughout that period, and even though property owners with similar levels of non-compliance were commonly afforded up to two years to come into full compliance.

In light of all of this, there is a genuine dispute of material fact as to whether each of those adverse actions would have occurred against Plaintiffs even if they had never uttered a single critical word against the Board and Malek.

**5. CONCLUSION**

The Court's role at this stage is to decide only whether a reasonable jury could find for Plaintiffs based on the existing record. The Court does not here weigh the relative quality or persuasiveness of conflicting evidence, inquire into the credibility of the various individuals who provided testimony in this case, or decide in which direction to draw an inference on any given issue. Those are matters solely for the jury. *See Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003). The Court concludes only that, based on the record now before it, and construing that record in the light most favorable to the nonmovant, a reasonable jury could find for Plaintiffs.

Accordingly,

**IT IS ORDERED** that Defendants' motion for summary judgment, ECF No. 64, be and the same is hereby **DENIED**.

Dated at Milwaukee, Wisconsin, this 21st day of March, 2023.

BY THE COURT:

_____
J. P. Stadtmueller
U.S. District Judge